**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (*Joint Administration Pending*) |

**DECLARATION OF LEO LAFRANCO IN
SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, I, Leo LaFranco, declare as follows under the penalty of perjury:

1.      I have been employed with Optio Rx, LLC (**"Optio Rx"** and together with certain of its affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the **"Debtors,"** or the **"Company"**) since 2022, when I joined the Company to become its Chief Financial Officer.  I hold a BBA in Accounting from the University of Notre Dame and an MBA from the University of Chicago, Booth School of Business.  I am also a certified public accountant.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical, LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary, LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061.

2.      I have more than 25 years of accounting experience, primarily in the healthcare and pharmaceutical industries.  Prior to joining the Debtors' organization, I was the chief financial officer (**"CFO"**) of Allure Healthcare Services, a privately owned nursing home owner/operator with facilities in skilled nursing and long-term care.  Prior to that, I served as: (i) the CFO of Highland Ventures LTD, a privately owned retail conglomerate with extensive commercial real estate holdings; (ii) the Corporate Controller and acting CFO of Medical Management LLC, a privately owned health care provider operating vein clinics and vascular and uterine surgery labs with in excess of 80 locations in 15 states and the District of Columbia; (iii) the Director of Financial Planning and Analysis for Physicians Immediate Care, an urgent care provider with clinics in Illinois, Indiana, and Nebraska; and (iv) the Director of Process Improvement and Analysis, the Director of Acquisitions, the Manager of Financial Planning and Analysis and Senior Staff Accountant for Walgreens – Infusion Services, (formerly Option Care Inc.), its HealthCare Division, specializing in infusion therapy and specialty pharmaceutical distribution.

3.      As the Debtors' CFO, I have familiarity with the operations and financial activities of the Debtors, and I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of such matters from the Debtors' other officers or retained advisers.  I am authorized by each of the Debtors to submit this declaration on their behalf.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this declaration.

4865-9894-5465, v. 10

4.       I submit this declaration on behalf of the Debtors (a) in support of the Debtors'

voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code, (b) in

support of the Debtors' request for relief in the form of motions and applications (collectively, the

**"First Day Pleadings"**) filed contemporaneously with this declaration, and (c) to assist this Court

and other interested parties in understanding the circumstances giving rise to the commencement

of the Debtors' chapter 11 cases (the **"Chapter 11 Cases"**).  I have reviewed the Debtors' petitions

and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my

belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors'

businesses and the maximization of the value of the Debtors' estates.

5.       To familiarize the Court with the Debtors and the relief that the Debtors seek early

in these Chapter 11 Cases, this Declaration is organized in four parts.  **Part I** provides an

introduction to the Debtors and detailed information on their corporate history and business

operations.  **Part II** describes the Debtors' prepetition organization and capital structure.  **Part III**

describes the events that led to the commencement of these Chapter 11 Cases and the Debtors'

prepetition restructuring efforts, including the negotiation and formulation of the plan of

reorganization (the **"Plan"**) and disclosure statement (the **"Disclosure Statement"**), filed

contemporaneously herewith.  **Part IV** briefly addresses the First Day Pleadings and incorporates

the facts set forth in each of the First Day Pleadings as if fully set forth in this Declaration.

## PART I:
## INTRODUCTION

**A.**       **THE CHAPTER 11 CASES.**

6.       On June 7, 2024 (the **"Petition Date"**), each Debtor commenced a case by filing a

petition for relief under chapter 11 of the Bankruptcy Code (collectively, the **"Chapter 11 Cases"**).

The Debtors have requested that the Chapter 11 Cases be jointly administered for administrative purposes only.

7.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

8.      To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

**B.      THE DEBTORS' BUSINESS OPERATIONS.**

**i.      General**

9.      The Debtors operate in four primary specialty pharmacy business segments, including: (i) clinically focused retail dermatology pharmacies; (ii) compounding pharmacies; (iii) hospice pharmacies; and (iv) fertility treatments.  Overall, the Company employs approximately 260 employees in 18 locations located in seven states and services more than 100,000 patients. The Debtors also provide prescription fulfilling services to long term care facilities, among other things.

**ii.      Retail Pharmacies**

10.      The Company owns and operates seven clinically focused retail dermatology pharmacies, five are located in California and two are located in New York (the **"Retail Pharmacies"**).  The Retail Pharmacies accounted for approximately 59% of the Debtors 2023 revenue (approximately $98 million of a total of $166 million in revenue) and are one of the largest clinically focused dermatology pharmacy chains in the United States.  The Retail Pharmacies have storefronts, allowing patients to pick up their prescriptions, other retail items and a limited selection of over-the-counter medications.  If a patient is not located near one of the Retail

- 4 -

Pharmacies, the Company can ship prescriptions directly.  As of the Petition Date, the Retail Pharmacies have 55 employees, including two salespeople that market the specialized services provided by the Retail Pharmacies directly to dermatologists.

### iii.    Compounding Pharmacies and Other Pharmacy Lines

11.    The Company also operates compounding pharmacies (the **"Compounding Pharmacies"**).  Pharmacy compounding is the preparation of customized medications for human patients and animals.  The Company currently operates seven Compounding Pharmacies that ship prescriptions to patients nationwide, including one that is primarily a fertility pharmacy (as discussed below).  The Debtors' Compounding Pharmacies accounted for approximately $44 million of the Debtors' combined revenue in 2023, including $23 million in fertility treatments and $21 million in compounding, infusion, OTC, and DME revenues.  Despite accounting for a smaller percentage of the Company's overall revenue, the Compounding Pharmacies are the Company's most profitable business segment relative to the revenue they generate.  As of the Petition Date, the Compounding Pharmacies have 104 employees, including one salesperson to market the services offered.

12.    Among other products, the Compounding Pharmacies provide Bio-Identical Hormone Replacement Therapy (**"BHRT"**) for both men and women.  BHRT is a personalized natural approach to hormone balancing, using hormones that are chemically identical to those produced by a patient's body.  This personalized treatment aims to restore hormonal balance, replenishing a patients' essential hormones that may have declined due to aging or other factors.

13.    These conditions affect millions of men and women.  As the number of patients seeking hormone-related treatment has grown, so has the mass production of pills, patches and creams by the drug industry.  Each person's body is different and has its own unique needs, but

commercially manufactured products tend to be "one size fits all," and they do not always account for the differences between individuals.  A growing population and longer life expectancies has expanded the number of patients experiencing the symptoms of hormonal imbalances.

14.     For example, by the year 2025, the number of post-menopausal women (older than age 51) is expected to be more than 1.1 billion and nearly 30 percent of the total U.S. population is aged 55 and older.  A hormonal imbalance for women may cause several related health concerns, including, without limitation, a decreased libido, fibrocystic breasts, hot flashes, infertility, irregular menstrual cycle, night sweats, painful intercourse, PMS, post-partum depression, and weight gain.

15.     The Company also provides personalized hormone replacement solutions for men. Every man's body is different, and factors such as age, genetics, lifestyle, and existing health conditions significantly determine hormone levels.  There may be times when standard medications don't address the diverse needs of men.  Some of the conditions the Company's hormone replacement solutions for men address are adrenal fatigue, andropause, low testosterone and thyroid imbalance.

### iv.     Veterinary Compounding

16.     Compounding is an increasingly popular solution to veterinary patient problems. When it comes to things like skin rashes, eye and ear infections, heart conditions, cancer, and diabetes, animals and humans have a lot in common.  However, giving pets medication presents a unique set of challenges. Compounding techniques enable the Company's pharmacists to formulate medications as liquids, chewables, capsules, pills, or transdermal creams and gels for pets.

- 6 -

17.     The Company specializes in customizing medications in unique dosages and forms to meet a pet's individual needs.  In many cases, the Company can create medications that are not available in standard forms, allowing for a treatment program specifically tailored to individual pets.

### v.     Hospice Pharmacies

18.     The Company also operates four hospice pharmacies (the **"Hospice Pharmacies"**).  The Debtors' Hospice Pharmacies provide medications for the compassionate care of people in the last phases of incurable diseases.  The Debtors' Hospice Pharmacies accounted for approximately $23.5 million of the Debtors' combined revenue in 2023 and currently have 80 employees.

### vi.     Fertility Treatments

19.     The Company also provides specialized fertility treatments (the **"Fertility Treatments"**) for its patients.  The Company operates one pharmacy that specializes in Fertility Treatments (the **"Fertility Pharmacy"**) and compounding treatments as set forth above.  The Company provides complete packages for a patient's Fertility Treatments, including syringes, needles, swabs and sharps containers and offers a full line of sterile and non-sterile fertility compounds.  The Debtors' Fertility Treatments accounted for approximately $23 million of the Debtors' combined revenue in 2023.  As of the Petition Date, the Fertility Pharmacy has 18 employees.

### PART II:
### THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

20.     Non-Debtor CBC Pharma HoldCo, LLC (**"CBC Pharma"**) is the direct or indirect parent company of Optio Rx and each of the other Debtors.  A corporate organization chart of the Debtors is attached hereto as <u>**Exhibit A**</u>.  As of the Petition Date, certain of the Debtors are obligated as borrowers, issuers, or guarantors on: (i) a secured credit facility, referred to as the

Prepetition Credit Agreement; (ii) an unsecured Note Purchase Agreement; and (iii) various Seller Notes (*each as defined below*). The Prepetition Credit Agreement is secured by a first-priority lien on and security interest in substantially all the Debtors' assets.

### A.    PREPETITION CREDIT AGREEMENT

21.    Pursuant to that certain Credit Agreement, dated as of June 28, 2019 (as amended, the **"Prepetition Credit Agreement"**), by and among CBC Pharma, Optio Rx, Loan Admin Co LLC, as administrative agent, and Loan Admin Co LLC, as lead arranger (the **"Prepetition Admin Agent"**) and the lenders party thereto from time to time (the **"Prepetition Secured Lenders"**), as of the Petition Date, the Debtors are indebted to the Prepetition Secured Lenders in an aggregate principal amount of approximately $127.6 million, including accrued and unpaid interest, fees and other claims (the **"Prepetition Secured Obligations"**). The Prepetition Secured Obligations are secured by first-priority liens and security interests in substantially all the Debtors' assets (the **"Prepetition Liens"**). At the time the Prepetition Credit Agreement was entered into, certain Prepetition Secured Lenders also acquired equity interests in CBC Pharma, representing approximately 11.6% of the fully diluted equity interests in CBC Pharma at that time. Certain Prepetition Secured Lenders subsequently made additional investments in equity interests of CBC Pharma in connection with further acquisitions by CBC Pharma; as of the Petition Date, these Prepetition Secured Lenders own approximately 19.9% of the common equity interests in CBC Pharma.

22.    On September 16, 2022, the Prepetition Admin Agent served a notice of default and exercise of certain remedies (the "**Notice of Default**") under the Prepetition Loan Documents on CBC Pharma and Optio Rx. The Notice of Default asserted CBC Pharma and Optio Rx's failure to comply with and/or cure certain material obligations under the Prepetition Loan Documents. In

accordance with the terms thereunder, among other things, the Prepetition Admin Agent, as directed by the Prepetition Secured Lenders, appointed Pharmacy Management LLC as the Prepetition Admin Agent's sub-agent for purposes of exercising remedies under the Prepetition Loan Documents.  Pursuant to the Prepetition Loan Documents, as directed by the Prepetition Secured Lenders, Pharmacy Management, as sub-agent, exercised the voting rights of the membership interests in Optio Rx pledged by CBC Pharma as collateral for the Prepetition Secured Obligations to amend the operating agreement of Optio Rx to (i) remove CBC Pharma as Manager of Optio Rx and (ii) appoint Pharmacy Management as Manager of Optio Rx.  As a result of this action, since September 16, 2022, Pharmacy Management, under the direction of its Board of Managers, has exercised operational control of Optio Rx and the other Debtors.  Initially, the Board of Managers of Pharmacy Management consisted of one independent manager, three designees of the Prepetition Secured Lenders, and the CEO of Optio Rx at the time.  Prior to the Petition Date, all members of the Board of Managers of Pharmacy Management other than the independent manager have resigned.

23.    In connection with the Prepetition Credit Agreement, on or about November 3, 2022, certain of the Prepetition Secured Lenders entered into an Agreement Among Lenders, (as amended, the **"AAL"**).  The AAL is between and among: (i) holders (each, a **"First Out Holder"** and collectively, the **"First Out Holders"**) of first out term loans (the **"First Out Term Loans"**) and revolving loans under the Prepetition Credit Agreement and the AAL; (ii) the holder (the **"Last Out Holder"**) of last out term loans (the **"Last Out Term Loans"**) under the Prepetition Credit Agreement and the AAL; (iii) the Prepetition Admin Agent, and (iv) any other lender party to the AAL.  One part of the transactions at the time the AAL was entered into provided additional liquidity to Optio Rx, in the form of new money last out term loans from the Last Out Holder.

- 9 -

Prior to acquiring the Last Out Term Loans, the Last Out Holder had provided financing to certain equity holders of CBC Pharma to fund their equity investments in CBC Pharma. The Last Out Holder also indirectly owns a minority portion of CBC Pharma.

24.     The AAL is a subordination agreement under section 510(a) of the Bankruptcy Code that sets forth specific remedies, priorities, voting rights and other rights between the Last Out Holder and the First Out Holders under the Prepetition Credit Agreement and AAL until the First Out Term Loans are repaid in full. In general terms, the rights of the Last Out Holder have been subordinated to the rights of the First Out Holders.

25.     As of the Petition Date, interest on the Prepetition Secured Obligations is accruing at approximately 15% to 19% per annum, depending upon the tranche. With respect only to the Last Out Term Loans, in addition to cash interest, the Debtors accrued additional interest at a rate equal to 2.00% per annum on the then outstanding principal amount of the Last Out Term Loans in kind (**"Last Out PIK Interest"**), which Last Out PIK Interest was capitalized by adding such amount to the then outstanding principal amount of the Last Out Term Loans. The Debtors have been in default of the Prepetition Credit Agreement since September of 2022. The Prepetition Secured Obligations mature on June 28, 2024.

26.     As of the Petition Date, and at all times since September 16, 2022, Pharmacy Management LLC, as the manager of Optio Rx, has had one independent director.

27.     As of the Petition Date, the Prepetition Credit Agreement consists of (a) Term Loans[2] in the approximate principal amount of $32,986,997.19, (b) Healthy Choice Incremental Term Loans in the approximate principal amount of $9,859,596,28, (c) Revolving Loans in the

---

[2]     Capitalized terms used in this paragraph but not defined herein have the meanings ascribed to them in the Prepetition Credit Agreement. In the event any terms defined herein conflict with the definitions of such terms in the Prepetition Credit Agreement, the terms of the Prepetition Credit Agreement shall control.

approximate principal amount of $5,000,000.00, (d) Last Out Term Loans in the approximate

principal amount of $57,143,815.64, (e) First Out Term Loans in the approximate principal amount

of $5,000,000.00, and (f) accrued fees and interest of $17,592,726.

### B.   NOTE PURCHASE AGREEMENT

28.     Pursuant to that certain Note Purchase Agreement, dated as of September 25, 2020

(the **"Note Purchase Agreement"**), Optio Rx issued $50,000,000 in subordinated unsecured notes

(the **"Notes"**) to note purchasers from time to time (the **"Noteholders"**).  Aves Management LLC

serves as the Administrative Agent for the Noteholders.  All the Debtor subsidiaries of Optio Rx

have guaranteed the Notes.

29.     Interest on the Notes was set to accrue at 16.5% per annum, paid by adding and

capitalizing the full amount of such interest to the principal amount of the Notes in kind (the

**"PIK Interest"**).   Under the terms of the Note Purchase Agreement, the Notes mature on

March 25, 2025.

30.     The Notes are subject to a Subordination Agreement, dated as of September 25,

2020, subordinating the Noteholders' claims under the Note Purchase Agreement to the Prepetition

Secured Obligations.

31.     As of the Petition Date, the Debtors are indebted to the Noteholders in an aggregate

principal amount of approximately $73.8 million, including accrued and unpaid PIK Interest, fees

and other claims (the **"Prepetition Noteholder Obligations"**).

### C.   SELLER NOTES

32.     Several of the Debtors are obligated under unsecured notes issued to prior owners

of certain businesses that were purchased by the Debtors (the **"Seller Notes"**).  As of the Petition

Date, the Debtors are indebted on the Seller Notes in an aggregate principal amount of

approximately $29.9 million, including accrued and unpaid interest, fees and other claims (the **"Seller Note Obligations"**).

### D.    OTHER CREDITORS

33.    As of the Petition Date, the Debtors had approximately $2.4 million in unsecured trade debt and $1.5 million in secured trade debt owing to certain vendors under supply and security agreements (the **"Vendor Secured Claims"**).  To the extent any supplier has a valid, fully perfected and unavoidable lien that is senior to the Prepetition Liens held by the Prepetition Secured Lenders, they are considered permitted liens (**"Permitted Liens"**) under the proposed DIP financing (**"DIP Financing"**) and Plan.

## PART III:
## EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A.    DECLINING FINANCIAL PERFORMANCE

34.    The Company was formed in 2018.  Through 2020, the Company had acquired nineteen pharmacies, some of which were purchased as part of multi-pharmacy groups.  The Company funded these acquisitions with a mix of equity, third-party senior secured debt and subordinated debt, and seller financing through the takeback of certain notes by the pharmacy owners selling their businesses.  Operationally, the Company largely left the pharmacies to run autonomously.

35.    Apart from the growth stemming from acquisitions, the Company began experiencing difficulty generating organic growth and boosting profitability at the individual pharmacies.  The Company likewise experienced difficulty achieving expectations around the full year cash flow potential of the pharmacies.  By the end of 2021, the Company's investors elected to install new leadership—a new chief executive officer was elected in early 2022.

36.     In early 2022, the Company and an important payor, with which the Company was dispensing and billing pharmaceuticals, got into a significant dispute regarding the scope of their contract. This ultimately led the Company to discontinue certain products, which contributed to a material decline in the Company's revenue and profitability.

37.     In 2021, the Company earned $16.1 million in reported EBITDA from all its business operations. EBITDA has been eroding ever since.

38.     Starting in early 2022, the Company's new management team sought to refocus the Company on compounding rather than retail products—2022 concluded with $14.5 million in EBITDA. At the same time earnings were declining, interest rates began to increase, causing the Company's debt service to increase dramatically.

39.     In 2023, several factors caused a dramatic reduction in earnings, resulting in only $6.2 million in EBITDA for 2023. Specifically, the Company no longer had the benefit of the profitable products that were discontinued in 2022. The new strategy to focus on compounding failed, and an expensive sales force and corporate infrastructure hired to support the transition further increased costs. In addition, in 2023, former employees opened two competing pharmacies, significantly reducing revenues at two of the Debtors' profitable pharmacies—several productive sales representatives also left the Company. Legal expenses also increased significantly in 2023, further reducing earnings. The Company's failure to turn around profitability in 2022 and 2023 led the Company to bring in a new chief executive officer, who began in early 2024.

40.     At the end of the first quarter of 2024, the Company's year to date EBITDA was $500,000, translating into an annualized EBITDA of only $2 million. Currently, the Company's cash interest payment obligations under the Prepetition Loan Documents are $4 million per quarter (or, $16 million annually). As of the Petition Date, the Company has only approximately $1.8

million in cash on hand and no remaining availability on its Revolving Loans.  Given the
Company's current cash position, the Company does not have the ability to pay its upcoming
interest payments due to Prepetition Secured Lenders and risks failing to pay operating costs in
the ordinary course of business.  The inability to pay interest on the Prepetition Secured
Obligations, coupled with the impending maturity on June 28, 2024, has created the need for the
Company to restructure all its obligations through the RSA and Plan.

   B.   **PREPETITION MARKETING PROCESSES**

   41.   On July 10, 2023, the Debtors retained Triangle Heath Advisors. LLC (**"Triangle"**)
to market the Debtors' Retail Pharmacies (the **"Retail Pharmacy Marketing Process"**), its largest
operating segment in terms of both revenue and EBITDA.  The Retail Pharmacy Marketing
Process was related to pharmacy operations of the Debtors five Retail Pharmacies in California
and two in New York.

   42.   The Retail Pharmacy Marketing Process ran through April 30, 2024.  During the
Retail Pharmacy Marketing Process, Triangle reached out to 279 potential strategic and financial
buyers, of which 41 executed a non-disclosure agreement (**"NDA"**). Triangle sent a confidential
information memorandum (**"CIM"**) to all interested buyers that executed an NDA.  Despite having
numerous calls and meetings with several of the potential buyers, an offer for the Retail Pharmacies
that cleared the Company's senior secured debt obligations was not received.

   43.   On July 20, 2023, the Debtors also retained Triangle to market the Hospice
Pharmacies (the **"Hospice Marketing Process"**).

   44.   The Hospice Marketing Process also ran through April 30, 2024 without success.
During the Hospice Marketing Process, Triangle reached out to 192 potential strategic and
financial buyers, of which eight executed an NDA.  Triangle sent a CIM to all interested buyers

- 14 -

that executed an NDA.  Despite having numerous calls and meetings with several of the potential buyers, an offer for the Hospice Pharmacies that cleared the Company's senior secured debt obligations was not received.

45.    Accordingly, no offers for the Retail Pharmacies and the Hospice Pharmacies cleared the Company's senior secured debt obligations.  Given the unsuccessful marketing processes, the Debtors approached the Prepetition Secured Lenders to discuss restructuring alternatives.

### C.    THE RESTRUCTURING SUPPORT AGREEMENT

46.    On May 9, 2024, the Debtors, the First Out Holders, the Last Out Holder (and together with the First Out Holders, the **"Consenting Lenders"**), and the Prepetition Admin Agent, entered into that certain Restructuring Support Agreement (the **"RSA"**), pursuant to which the Debtors and the Consenting Lenders approved certain restructuring transactions with respect to the Debtors' capital structure on the terms and conditions set forth in therein and as specified in the term sheet attached thereto as Exhibit B (including all exhibits, annexes, and schedules thereto, the **"Plan Term Sheet"** and, such transactions as described in the RSA and the Plan Term Sheet, the **"Restructuring Transactions"**).  The Restructuring Transactions have been incorporated into the Plan filed contemporaneously herewith.

47.    The Plan contemplates a partial debt for equity swap, as follows (the "**Debt for Equity Swap**"):

a.    on the effective date of the Plan (the **"Effective Date"**), the First Out Holders and the Last Out Holder will convert (i) a portion of their Prepetition Secured Obligations into exit facility claims (the "**Prepetition Lien Conversion**") on such terms as to effect the Exit Capital Structure attached as an exhibit to the RSA (the "**Exit Facility Claims**") and (ii) the remaining

portion of their Prepetition Secured Obligations into preferred and common equity shares or units of Online Pharmacy Holdings LLC (the "**Prepetition Lien Conversion Equity**"),[3] the new holding company formed on May 22, 2024 to issue preferred and common equity shares or units in connection with the Prepetition Lien Conversion, which Prepetition Lien Conversion Equity shall constitute consideration for the First Out Holders and Last Out Holder committing to such Prepetition Lien Conversion, all to effect the Exit Capital Structured attached as an exhibit to the RSA; and

 b. on the Effective Date, the DIP Lenders will convert 100% of their DIP Superpriority Claims into Exit Facility Claims, all to effect the Exit Capital Structure attached as an exhibit to the RSA.

 48. On the Effective Date, after consummation of the transactions contemplated in the Debt for Equity Swap described above, the Prepetition Secured Obligations and related claims shall constitute first-priority, perfected, enforceable and unavoidable Exit Facility Claims in full force and effect, which Exit Facility Claims and liens shall be first-priority, enforceable, unavoidable and automatically perfected by virtue of the Confirmation Order (defined below) entered by the Bankruptcy Court; provided, however, each of the holders of the Prepetition Secured Claims will gift (the "**GUC Trade Gift**") to the holders of allowed general unsecured trade claims (the "**GUC Trade Claims**") and transfer into an escrow account their proportionate share to satisfy (x) 80-95% of all allowed GUC Trade Claims on the Effective Date and (y) the remaining 5%-20% of such allowed GUC Trade Claims on the one year anniversary of the Effective Date. Additionally, any impaired creditors eligible to vote who vote to accept the Plan of Reorganization

---

[3]   Such Prepetition Lien Conversion Equity is subject to dilution for a post-Effective Date management incentive plan established for the reorganized Debtors (the "**Reorganized Debtors**").

and elect to opt-in to the Plan releases shall receive their respective pro rata share of the GUC Opt-In Gift under the Plan.  Finally, there is a provision for convenience class claims under the Plan.

49.     Creditors that hold allowed Vendor Secured Claims will, at the election of the Reorganized Debtors: (a) be paid in cash in full on the Effective Date of the Plan in satisfaction of their respective allowed secured claims; (b) receive the return of their collateral; or (c) receive such other treatment as the Reorganized Debtors and such vendor agree.  The Plan also provides for the payment in full of administrative, priority and other secured claims.

50.     The Notes, Seller Notes and all equity in Optio Rx, held by CBC Pharma, shall be cancelled, released, and extinguished under the Plan.

51.     Pursuant to the RSA, the Debtors are required to comply with certain milestones (each, a **"Milestone"** and collectively, the **"Milestones"**), including: (i) the filing of these Chapter 11 Cases no later than 60 days after the Agreement Effective Date (as defined in the RSA); (ii) the filing of the Plan and the Disclosure Statement no later than five (5) business days after the Petition Date; (iii) entry of an interim DIP order (the **"Interim DIP Order"**) no later than five (5) business days after the Petition Date; (iv) the entry of a final DIP Order (the **"Final DIP Order"**) no later than forty-five (45) days after the Petition Date; (v) the entry of a disclosure statement order (the **"Disclosure Statement Order"**) no later than 45 days after the Petition Date; (vi) the entry of a confirmation order (the **"Confirmation Order"**) no later than 75 days after the Petition Date; and (vii) the satisfaction or waiver of the conditions to the Effective Date under the Plan no later than five (5) business days after the Debtors obtain the last pharmaceutical license or other regulatory approval necessary for the Reorganized Debtors to conduct their business post-Effective Date.

52.     The Plan and the transactions contemplated thereby are vital to preserve the Debtors' operations, employment, and ability to continue to provide uninterrupted services to their

customers.  The Plan provides the most efficient and cost-effective path forward for the Debtors, will maximize recovery for creditors, and will preserve jobs for the Debtors' employees.

### D.    POST-PETITION FINANCING

53.    The Debtors anticipated the need for post-petition financing.  In late April, as part of the RSA process, the First Out Holders and the Last Out Holder under the Prepetition Credit Agreement (or its affiliates or related funds) (each, a **"DIP Lender"** and together, the **"DIP Lenders"**) provided the Debtors with a proposed term sheet for debtor-in-possession financing to fund the costs of these Chapter 11 Cases.  The proposal is reflected in a DIP Credit Agreement (the **"DIP Credit Agreement"**) that provides for a proposed $10 million "new money" DIP facility, at a competitive interest rate (the "**DIP Facility**").

54.    As described further in the DIP Declaration filed in support of the DIP Facility, Paladin, the Debtors' financial advisor, conducted a market check by seeking competing DIP financing offers.  No other proposals were received.  Based upon Paladin's efforts to arrange refinancing with prospective lenders, the Debtors and their advisors believe that no other, better options for DIP financing are available to them other than the proposed DIP Facility.

55.    Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases.  Importantly, the DIP Facility was negotiated at arms' length among the proposed DIP Lenders and the Debtors' proposed counsel and advisors.

56.    The Debtors do not have the ability to borrow under their existing Prepetition Credit Agreement.  The Debtors require funds to sustain their operations and pay for the costs of the Chapter 11 process.  In light of the proposed Plan, the timeline for the Debtors' stay in Chapter 11

will be materially shortened.  Nonetheless, the Debtors require the funds to be provided under the DIP Facility to support their operations and the costs of the Chapter 11 Cases, and to achieve Plan confirmation and consummation.  The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their businesses while providing sufficient liquidity to administer these Chapter 11 Cases and facilitate the Plan process.

## PART IV
## FIRST DAY PLEADINGS

57.     To facilitate their restructuring efforts, the Debtors have filed various First Day Pleadings concurrently with this Declaration.

58.     I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief and are incorporated herein by reference.

59.     I believe that the relief sought in each First Day Pleading is vital to enable the Debtors' transition into Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, is necessary to avoid immediate and irreparable harm, and constitutes a critical element in maximizing value during these Chapter 11 Cases.

60.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

## DECLARATION

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

4865-9894-5465, v. 10

Dated:  June 9, 2024

By:    /s/ Leo LaFranco

Name: Leo LaFranco
Title:  Chief Financial Officer

# <u>EXHIBIT A</u>

**Corporate Organizational Chart**

# Optio Rx, LLC Organization Structure





*HCP Pharmacy, LLC is a
non-operating entity

NEAL GERBER EISENBERG

2