## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (*Joint Administration Pending*) |

## DISCLOSURE STATEMENT RELATING TO THE
## JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OPTIO RX, LLC, *et al.*

CHIPMAN, BROWN, CICERO & COLE, LLP

William E. Chipman, Jr.
David W. Carickhoff
Mark. D. Olivere
Alan M. Root
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Email:  Chipman@chipmanbrown.com
　　　　Carickhoff@chipmanbrown.com
　　　　Olivere@chipmanbrown.com
　　　　Root@chipmanbrown.com

*Counsel to the Debtors and
Debtors-in-Possession*

Dated: June 10, 2024

---

[1]　The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical, LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary, LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy, LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216).  The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60062.

THIS SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT OR REJECT THE PLAN AND IN CONNECTION WITH THE FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "**BANKRUPTCY CODE**").   THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.   AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT APPROVING THE DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

---

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON [_____, 2024] UNLESS EXTENDED BY THE DEBTORS IN WRITING.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS [_____, 2024] (THE "**VOTING RECORD DATE**")

---

### RECOMMENDATION BY THE DEBTORS

The Debtors have approved the transactions contemplated by the Plan (as defined below) and recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.

---

### **IMPORTANT NOTICE**

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS, THE DEBTORS' BUSINESS, AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT A**.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO AMEND THE PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE NEW PREFERRED AND COMMON EQUITY SHARES OR UNITS OF ONLINE PHARMACY HOLDINGS LLC DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER, THE "**SECURITIES ACT**"), OR ANY STATE SECURITIES LAWS ("**BLUE SKY LAWS**").

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

NO SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL OR REGULATORY AUTHORITY.  THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY THE SEC OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR BLUE SKY LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS INTEND TO RELY ON SECTIONS 3(A)(9) AND 18(B)(4)(E) OF THE SECURITIES ACT TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS THE OFFER OF CLASS B UNITS TO HOLDERS OF 2020 NOTES CLAIMS PRIOR TO THE FILING OF THE CHAPTER 11 CASES, INCLUDING IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  THE DEBTORS INTEND TO RELY ON SECTION 1145 OF THE BANKRUPTCY CODE, TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, THE ISSUANCE OF PREFERRED AND COMMON EQUITY SHARES OR UNITS OF ONLINE PHARMACY HOLDINGS LLC TO HOLDERS OF PREPETITION LIEN CLAIMS.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY PREFERRED AND COMMON EQUITY SHARES OR UNITS OF ONLINE PHARMACY HOLDINGS LLC

PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH EQUITY INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY, SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," "CONTINUE," "INTEND", "WILL" OR THE NEGATIVES THEREOF, AS WELL AS ANY SIMILAR OR COMPARABLE LANGUAGE.  THESE STATEMENTS OFTEN DISCUSS PLANS, STRATEGIES, EVENTS OR DEVELOPMENTS THAT THE DEBTORS EXPECT OR ANTICIPATE WILL OR MAY OCCUR IN THE FUTURE AND ARE BASED UPON THE BELIEFS AND ASSUMPTIONS OF THE DEBTORS' MANAGEMENT AND ON THE INFORMATION CURRENTLY AVAILABLE TO THEM.  YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  EXCEPT AS REQUIRED BY LAW, THE DEBTORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  THE LIQUIDATION ANALYSIS, FEASIBILITY ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT EACH CREDITOR WHO IS ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH WILL BE FILED NO LATER THAN SEVEN CALENDAR DAYS PRIOR TO THE PLAN OBJECTION DEADLINE (AS DEFINED BELOW), AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN. YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN

SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. (*PREVAILING EASTERN TIME*) ON [_____ 2024],** UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND IF THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH

MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

# TABLE OF CONTENTS

**ARTICLE I** INTRODUCTION..................................................................................................1
    **1.1**    General. ...............................................................................................................1

**ARTICLE II** PRELIMINARY STATEMENT ...............................................................................1

**ARTICLE III** QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE
STATEMENT AND THE PLAN .........................................................................................2
    **3.1**    What is chapter 11?..............................................................................................2
    **3.2**    Why are the Debtors sending me this Disclosure Statement? .............................2
    **3.3**    Why are votes being solicited prior to Bankruptcy Court approval of the
Disclosure Statement?.........................................................................................3
    **3.4**    Am I entitled to vote on the Plan? ......................................................................3
    **3.5**    What will I receive from the Debtors if the Plan is consummated? .....................4
    **3.6**    What will I receive from the Debtors if I hold an Allowed Administrative
Claim, a Professional Fee Claim, or a Priority Tax Claim?................................8
    **3.7**    Are any regulatory approvals required to consummate the Plan? .......................11
    **3.8**    What happens to my recovery if the Plan is not confirmed or does not go
effective?............................................................................................................11
    **3.9**    If the Plan provides that I get a distribution, do I get it upon Confirmation
or when the Plan goes effective, and what is meant by "Confirmation,"
"Effective Date," and "Consummation?" ...........................................................11
    **3.10**    What are the sources of Cash and other consideration required to fund the
Plan?...................................................................................................................12
    **3.11**    Is there potential litigation related to the Plan? .................................................12
    **3.12**    How will the preservation of the Causes of Action impact my recovery
under the Plan?...................................................................................................12
    **3.13**    Will there be releases and exculpation granted to parties in interest as part
of the Plan? ........................................................................................................13
    **3.14**    When is the deadline to vote on the Plan? ..........................................................17
    **3.15**    How do I vote on the Plan?..................................................................................17
    **3.16**    Why is the Bankruptcy Court holding a Confirmation Hearing? ........................17
    **3.17**    When is the Confirmation Hearing set to occur?................................................18
    **3.18**    What is the purpose of the Confirmation Hearing? .............................................18
    **3.19**    What is the effect of the Plan on the Debtors' ongoing businesses? ....................18
    **3.20**    Will any party have significant influence over the corporate governance
and operations of the Reorganized Debtors? ......................................................18
    **3.21**    Who do I contact if I have additional questions with respect to this
Disclosure Statement or the Plan? ......................................................................19
    **3.22**    Do the Debtors recommend voting in favor of the Plan? ....................................19
    **3.23**    Who Supports the Plan?.......................................................................................19

**ARTICLE IV** DEBTORS' CORPORATE HISTORY, STUCTURE, AND BUSINESS
OVERVIEW.......................................................................................................................20
    **4.1**    The Debtors' Prepetition Businesses ..................................................................20
    **4.2**    Organizational Structure and Equity Ownership. ................................................22
    **4.3**    The Capital Structure ..........................................................................................22

4869-9662-5086, v. 7

**ARTICLE V** EVENTS LEADING TO CHAPTER 11 FILING ....................................25
    **5.1**    Declining Financial Performance .........................................................25
    **5.2**    The Prepetition Marketing Process.......................................................26
    **5.3**    The Restructuring Support Agreement ..................................................27
    **5.4**    Milestones ............................................................................................28

**ARTICLE VI** MATERIAL DEVELOPMENTS AND ANTICIPATED  EVENTS OF
THE CHAPTER 11 CASES .........................................................................................28
    **6.1**    First Day Relief.....................................................................................28
    **6.2**    Proposed Confirmation Schedule .........................................................29

**ARTICLE VII** SUMMARY OF THE PLAN .............................................................30
    **7.1**    General Compromise and Settlement of Claims, Interests, and
            Controversies .......................................................................................30
    **7.2**    Restructuring Transactions....................................................................30
    **7.3**    Sources of Consideration for Plan Distributions .................................31
    **7.4**    Continued Corporate Existence ............................................................31
    **7.5**    Existing Governance Documents...........................................................31
    **7.6**    Members of the Governing Bodies .......................................................32
    **7.7**    Vesting of Assets in the Reorganized Debtors .....................................32
    **7.8**    Section 1145 Exemption .......................................................................32
    **7.9**    Cancellation and Surrender of Instruments and Agreements................32
    **7.10**   Corporate Action ..................................................................................33
    **7.11**   Section 1146 Exemption from Certain Taxes and Fees ........................33
    **7.12**   Preservation of Causes of Action .........................................................34
    **7.13**   Single Satisfaction of Claims ...............................................................34
    **7.14**   Releases.................................................................................................34
    **7.15**   Deemed Substantive Consolidation ......................................................35

**ARTICLE VIII** OTHER KEY ASPECTS OF THE PLAN .......................................35
    **8.1**    Treatment of Executory Contracts and Unexpired Leases....................35
    **8.2**    Provisions Governing Distributions......................................................40
    **8.3**    Releases and Exculpations ....................................................................44
    **8.4**    Conditions Precedent to Confirmation and Consummation of the Plan ................50
    **8.5**    Modification, Revocation, or Withdrawal of the Plan ..........................52

**ARTICLE IX** RISK FACTORS ...............................................................................53
    **9.1**    Bankruptcy Law Considerations...........................................................53
    **9.2**    Risks Related to Recoveries Under the Plan.........................................58

**ARTICLE X** SOLICITATION AND VOTING PROCEDURES................................62
    **10.1**   Holders of Claims Entitled to Vote on the Plan ...................................62
    **10.2**   Votes Required for Acceptance by a Class............................................62
    **10.3**   Certain Factors to Be Considered Prior to Voting................................63
    **10.4**   Solicitation Procedures .........................................................................63

**ARTICLE XI** CONFIRMATION OF THE PLAN.....................................................64
    **11.1**   The Confirmation Hearing ....................................................................64
    **11.2**   Requirement for Confirmation of the Plan ...........................................65
    **11.3**   Feasibility..............................................................................................65

**11.4**    Acceptance by Impaired Classes ...................................................................65

**11.5**    Confirmation Without Acceptance by all Impaired Classes ..................................66

**11.6**    Liquidation Analysis .................................................................................67

**ARTICLE XII** CERTAIN SECURITIES LAW MATTERS ........................................................67

**12.1**    Exemption from Registration Requirements of the Securities Act and Blue Sky Laws.............................................................................................67

**ARTICLE XIII** CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ...........................................................................................68

**13.1**    Introduction..............................................................................................68

**13.2**    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor and the Reorganized Debtors ..................................................................69

**13.3**    U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims and Interests. .........................................................................................70

**ARTICLE XIV** RECOMMENDATION ...................................................................................72

4869-9662-5086, v. 7

Annexed as exhibits (the "**Exhibits**") to this Disclosure Statement are copies of the following documents:

EXHIBIT A              Plan of Reorganization

EXHIBIT B              Restructuring Support Agreement

EXHIBIT C              Liquidation Analysis

EXHIBIT D              Feasibility Analysis

4869-9662-5086, v. 7

# ARTICLE I
# INTRODUCTION

1.1    *General.*

Optio Rx, LLC (**"Optio Rx"**), and certain of its above captioned direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the **"Debtors"** or the **"Company"**), hereby transmit this disclosure statement (as may be amended, supplemented or otherwise modified from time to time, the **"Disclosure Statement"**), pursuant to section 1125 of title 11 of the United States Code (the **"Bankruptcy Code"**), in connection with the solicitation of votes on the *Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.,* (the **"Plan"**), dated as of June 9, 2024.  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THAT THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

# ARTICLE II
# PRELIMINARY STATEMENT

Optio Rx is a Delaware limited liability company that has 26 direct and/or indirect subsidiaries.  Non-Debtor CBC Pharma HoldCo, LLC (**"CBC Pharma"**) is the direct or indirect parent company of Optio Rx and each of the other Debtors.

The Debtors operate in four primary specialty pharmacy business segments, including: (i) clinically focused retail dermatology pharmacies; (ii) compounding pharmacies; (iii) hospice pharmacies; and (iv) fertility treatments.  Overall, the Company employs approximately 260 employees in 18 locations located in 7 states and services more than 100,000 patients.  The Debtors also provide prescription fulfilling services to long term care facilities, among other things.

While the Debtors' businesses as a whole remain operationally sound, the Company has experienced a number of unexpected challenges in recent years, including the inability to service the Debtors' debt obligations and liquidity issues that have left the Debtors unable to repay or recapitalize the outstanding principal and interest under their Prepetition Credit Agreement which matures on June 28, 2024.

In early 2024, the Debtors entered comprehensive restructuring discussions with certain Consenting Lenders (as defined below) to consummate a potential transaction to increase financial flexibility and create a stronger, sustainable capital structure moving forward.  In this regard, on May 9, 2024, the Debtors entered into a Restructuring Support Agreement, pursuant to which the Debtors and the Consenting Lenders approved certain restructuring transactions with respect to the Debtors' capital structure as more fully set forth below.

With Plan and key creditor support in place pursuant to the Restructuring Support Agreement, the Debtors expect to emerge positioned to capitalize on their asset base as the Company looks to continue its go-forward growth and operating plans.  Accordingly, the Restructuring Support Agreement contains certain milestones, including securing an order confirming the Plan no later than seventy-five (75) days after the Petition Date.  The Debtors believe they can confirm the Plan and emerge from chapter 11 within these time periods without prejudicing the ability of any parties to assert their rights in the Chapter 11 Cases.

The Restructuring Support Agreement is a significant achievement for the Debtors and a welcomed culmination of the lengthy negotiations with the Debtors' key creditors.  A right-sized capital structure will allow the Company to capitalize on its business going forward and maximize value for the benefit of all stakeholders.  The Debtors strongly believe that the Plan is in the best interests of the Debtors' stakeholders and represents the best available transaction for the Debtors to maximize value.  **For these reasons, the Debtors strongly recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan vote to accept the Plan**.

**ARTICLE III**
**QUESTIONS AND ANSWERS REGARDING**
**THIS DISCLOSURE STATEMENT AND THE PLAN**

**3.1**     *What is chapter 11?*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**3.2**     *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**3.3** ***Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?***

By sending this Disclosure Statement and soliciting votes for the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases.  The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement, which may be scheduled as shortly as 45 days after commencing the Chapter 11 Cases, with Confirmation of the Plan as shortly as 75 days after commencing the Chapter 11 Cases, all subject to the Bankruptcy Court's approval and availability.

**3.4** ***Am I entitled to vote on the Plan?***

Your ability to vote on the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of _____, 2024).  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| CLASS | CLAIM | IMPAIRMENT | ENTITLED TO VOTE |
|:---:|---|:---:|:---:|
| 1 | Prepetition Lien Claims | Impaired | Yes |
| 2 | Vendor Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | No (deemed to reject) |
| 7 | Noteholder Claims | Impaired | No (deemed to reject) |
| 8 | Seller Note Claims | Impaired | No (deemed to reject) |

4869-9662-5086, v. 7

| CLASS | CLAIM | IMPAIRMENT | ENTITLED TO VOTE |
|---|---|---|---|
| 9 | Convenience Class Claims | Impaired | Yes |
| 10 | Intercompany Claims | Impaired | No (deemed to reject) |
| 11 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 12 | Equity Interests in Optio Rx | Impaired | No (deemed to reject) |

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**3.5**    *What will I receive from the Debtors if the Plan is consummated?*

The following table provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|---|---|---|---|---|
| Class 1 | Prepetition Lien Claims | Except to the extent that a Holder of an Allowed Prepetition Lien Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and | $127,600,000 | N/A |

---

[2]    The amounts set forth in this chart reflect the Debtors' most current estimates of projected claim amounts.

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|---|---|---|---|---|
| | | in exchange for each Allowed Prepetition Lien Claim, each such Holder shall receive the following treatment in accordance with the Restructuring Support Agreement and the Plan Term Sheet:<br><br>i.    in connection with the Prepetition Lien Conversion, (a) a portion of the Holder's respective Prepetition Lien Claims shall constitute first-priority, perfected, enforceable and unavoidable Exit Facility Claims in full force and effect, which Exit Facility Claims and Exit Facility Liens shall be first-priority, enforceable, unavoidable and automatically perfected by virtue of entry of the Confirmation Order; provided, however, on the Effective Date, each of the Holders of the Prepetition Lien Claims shall (i) provide their proportionate share of the GUC Trade Gift to the holders of allowed General Unsecured Claims and (ii) provide their proportionate share of the GUC Opt-In Gift, as applicable; and (b) on the Effective Date, the Holder shall receive its respective portion of the Prepetition Lien Conversion Equity, and which shall fully vest and be entitled to such rights as may be detailed in the New Governance Documents and | | |

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|---|---|---|---|---|
| | | which on the Effective Date shall constitute all of the issued and outstanding equity shares or units, subject to the management incentive plan. | | |
| Class 2 | Vendor Secured Claims | On the Effective Date, each Holder of an Allowed Vendor Secured Claims shall receive, in full satisfaction of such claim, at the election of the Reorganized Debtors: (a) Cash payment in full on the Effective Date, or as soon as reasonably practicable thereafter, in satisfaction of their respective allowed Secured Claims; (b) the return of their collateral; or (c) such other treatment as the Reorganized Debtors and such vendor agree. | $1,534,134 | Claims will be reinstated and, thus, no impact on recovery. |
| Class 3 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Secured Claim. | $0.00 | 100% |
| Class 4 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Priority Claim. | $0.00 | 100% |
| Class 5 | General Unsecured Trade Claims | The holders of Allowed General Unsecured Trade Claims are impaired by the Plan and shall, by virtue of the GUC Trade Gift, (x) on the | $2,033,751 | 100% |

4869-9662-5086, v. 7

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|---|---|---|---|---|
| | | Effective Date, receive [80%-95%] of their respective Allowed General Unsecured Trade Claim and (y) on the one-year anniversary of the Effective Date, receive the remaining [5%-20%] of their respective Allowed General Unsecured Trade Claim.. | | |
| Class 6 | Other General Unsecured Claims | On the Effective Date, all Other General Unsecured Claims shall be cancelled, released, and extinguished without any distribution.. | $379,970 | 0% |
| Class 7 | Noteholder Claims | On the Effective Date, all Noteholder Claims shall be cancelled, released, and extinguished without any distribution. | $73,809,454 | 0% |
| Class 8 | Seller Note Claims | On the Effective Date, all Seller Note Claims shall be cancelled, released, and extinguished without any distribution. | $30,046,706 | 0% |
| Class 9 | Convenience Class Claims | The Holders of Allowed General Unsecured Claims in an amount of $500 or less, or who elect to reduce their respective claims below $500, shall, on the later of (i) the Effective Date and (ii) the date that is ten (10) business days after such Convenience Claim becomes an Allowed Claim, in full and final satisfaction of such Claim, receive payment in Cash equal to the lesser of (x) 100% of the Allowed amount of such Convenience Claim and (y) such Holder's | TBD | 100% |

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|---|---|---|---|---|
| | | pro rata share of the pool of Convenience Claims. | | |
| Class 10 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without any distribution. | TBD | 0% |
| Class 11 | Intercompany Interests | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor(s), and with the consent of the Consenting Lenders, which consent shall not be unreasonably withheld, either (a) Reinstated or (b) canceled and released. | N/A | N/A |
| Class 12 | Equity Interests in Optio Rx | On the Effective Date, all Equity Interests in Optio Rx shall be cancelled, released, and extinguished of such Interests on account of such Interests. | N/A | 0% |

**3.6    *What will I receive from the Debtors if I hold an Allowed Administrative Claim, a Professional Fee Claim, or a Priority Tax Claim?***

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Expense Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, or as otherwise provided in the Plan, each Holder of an Allowed Administrative Claim against any of the Debtors shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, within five (5) Business Days after the Effective Date, or as soon as reasonably practicable thereafter, (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than five (5) Business Days after such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; or (iii) at such time and upon such terms as set forth in an order of the Bankruptcy Code; provided that Administrative Claims incurred by any Debtor in the ordinary course of such Debtor's business may be paid in the ordinary course of business by the Debtors, consistent with past practice and in

accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

    2.    <u>Professional Fee Claims</u>

        a.    Final Fee Applications and Payment of Professional Fee Claims

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court in the Chapter 11 Cases.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from (but not limited by the estimates provided for in Section 2.02(c) of the Plan) the Professional Fee Escrow Account.  Any objections to Professional Fee Claims must be filed and served on the Debtors and the Reorganized Debtors and the requesting party no later than thirty days after service of the final request for payment of Professional Fee Claims.

        b.    Professional Fee Escrow Account

Prior to the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors other than the Reorganized Debtors' reversionary interest therein.  The amount of Professional Fee Claims owing to the Professionals on and after the Confirmation Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  When all Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

        c.    Professional Fee Account Estimates

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimate to the Debtors no later than one (1) Business Day before the Effective Date; *provided*, *however*, that such estimates shall not be considered an admission, cap or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the Estimates. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

        d.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or

action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation of the Plan and Consummation, incurred by the Debtors or any Professional following the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

3.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such Holder agree to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim within five (5) Business Days after the Effective Date; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installments over a period not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (iii) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

The Reorganized Debtors shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

4.    DIP Facility

On the Effective Date, all Allowed DIP Lien Claims and DIP Superpriority Claims due and owing under the DIP Facility shall be the subject of the DIP Lien Conversion into Exit Facility Claims.

5.    Statutory Fees

The Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee, including quarterly fees payable under 28 U.S.C. §1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business at the time of Confirmation.  On and after the Effective Date, to the extent the Chapter 11 Cases remain open, and for so long as any Reorganized Debtor remains obligated to pay quarterly fees, such Reorganized Debtor shall pay the applicable U.S.

4869-9662-5086, v. 7

Trustee fees for that Reorganized Debtor when due in the ordinary course until such time as the Bankruptcy Court enters a final decree in the Reorganized Debtors' Chapter 11 Cases.

      6.      <u>Transaction Expenses</u>

The Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the Restructuring Support Agreement, as applicable, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail and without any requirement for Bankruptcy Court's review or approval. All Transaction Expenses to be paid on the Effective Date (to the extent not previously invoiced) shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Day before the anticipated Effective Date; provided, however, that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay when due the reasonable pre- and post-Effective Date Transaction Expenses related to the implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date, upon receipt of invoices therefor.

**3.7**    ***Are any regulatory approvals required to consummate the Plan?***

At this time, other than approvals to transfer certain pharmacy licenses, there are no known regulatory approvals that are required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**3.8**    ***What happens to my recovery if the Plan is not confirmed or does not go effective?***

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of extended Chapter 11 Cases, or of a liquidation scenario, see Article 11.6 of this Disclosure Statement, and the Liquidation Analysis attached hereto as **<u>Exhibit C</u>**.

**3.9**    ***If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"***

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"— or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. <u>See</u> 8.4 of this Disclosure Statement, titled

"Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**3.10    *What are the sources of Cash and other consideration required to fund the Plan?***

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with Cash on hand, the GUC Trade Gift, and the GUC Opt-In Gift.

**3.11    *Is there potential litigation related to the Plan?***

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation. See Article 9.2(d)4 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. See 9.1(h) of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**3.12    *How will the preservation of the Causes of Action impact my recovery under the Plan?***

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Section 7.02 of the Plan), each of the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and each of the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date. Each of the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of such Reorganized Debtor. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that any of the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which any of the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Debtor Releases), each of the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan

or a Bankruptcy Court order, each of the Reorganized Debtors expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action as a consequence of the Confirmation or Consummation. Each of the Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

**3.13**   *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Lenders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement. The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Indeed, the Released Parties are integral to the facilitation of the transactions contemplated in the Plan and the releases, as proposed, are necessary to provide finality and permit the Debtors to move forward with the operations of their business without the threat of litigation against them. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED ANY AND ALL CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES:  (I) EACH OF THE RELEASED PARTIES; (II) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR REJECT THE PLAN AND OPT-INTO THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE FORM INDICATING THAT THEY OPT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (III) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO AFFIRMATIVELY OPT-INTO THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE FORM INDICATING THAT THEY OPT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (IV) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (I) THROUGH THE FOLLOWING CLAUSE (V); AND (V) EACH RELATED PARTY WITH RESPECT TO EACH OF THE FOREGOING IN CLAUSES (I) THROUGH (V).

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation

4869-9662-5086, v. 7

provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

(a)     Releases by the Debtor

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each of the Debtors, the Reorganized Debtors and their Estates, including any successors to the Debtors or any estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, that any of the Debtors, the Reorganized Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of a Holder of any Claim against, or Interest in, the Debtors or other Entity, based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership or operation thereof), purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Exit Facility, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.  For the avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson,**

(viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date or (ii) the rights of any of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of any of the Debtors under any employment agreement with a current or former employee of any the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases, which include by reference each of the related provisions and definitions contained in the Plan, and further shall constitute the Bankruptcy Court's finding that the Debtor Releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Releases; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Debtors' Estates asserting any Cause of Action released pursuant to the Debtor Releases.

(b)    Releases by Holders of Claims and Interests

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, including any derivative claims asserted on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership or operation thereof), the subject matter of or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors any other Released Party, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among any of the Debtors or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New

- 15 -

**Governance Documents, the Disclosure Statement, the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release the (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) rights of Holders of Allowed Claims or Allowed Interests to receive distributions under the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

(c)     Discharge of Claims

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of claim or Interest based upon such debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted

the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

(d)    Exculpation

**As of the Effective Date, except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim other than those arising out of or relating to any act by or omission of an Exculpated Party that have been determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on the Plan, distribution of consideration pursuant to the Plan and, to the extent applicable, the offer, issuance and sale or purchase of securities pursuant to the Plan and, therefore, are not, and on account of such solicitation, distribution and issuance shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan, such distributions made pursuant to the Plan and issuance of securities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) the rights of Holders of Allowed Claims or Allowed Interests to receive treatment in accordance with the Plan.**

**3.14    *When is the deadline to vote on the Plan?***

The Voting Deadline is [_____, 2024], at 5:00 p.m. (*prevailing* Eastern Time).

**3.15    *How do I vote on the Plan?***

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to holders of Claims that are entitled to vote on the Plan (the "**Ballot**"). For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is actually received by the Debtors' claims, noticing, and solicitation agent, Stretto, Inc. (the "**Solicitation Agent**") on or before the Voting Deadline, *i.e.* [_____, 2024], at 5:00 p.m. (*prevailing* Eastern Time). If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise. See Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**3.16    *Why is the Bankruptcy Court holding a Confirmation Hearing?***

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. Shortly after the commencement of the Chapter 11 Cases, the Debtors will request

that the Bankruptcy Court schedule the Confirmation Hearing on or before a date that is Seventy-Five (75) days after the Petition Date.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

**3.17     *When is the Confirmation Hearing set to occur?***

The Debtors intend to request that the Bankruptcy Court schedule the Confirmation Hearing on or before a date that is Seventy-Five (75) days after the Petition Date, or as such time determined by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Debtors intend to request that objections to Confirmation must be filed and served on the Debtors, and certain other parties, at a time determined by the Bankruptcy Court.

**3.18     *What is the purpose of the Confirmation Hearing?***

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**3.19     *What is the effect of the Plan on the Debtors' ongoing businesses?***

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (see Articles 8.02 and 8.03 of the Plan).  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**3.20     *Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?***

As of the Effective Date, and subject to the Restructuring Support Agreement, the existing members of the Reorganized Debtors' Governing Bodies shall remain in their current capacities as members of such Governing Body of the applicable Reorganized Debtor, unless or until replaced or removed in accordance with the New Governance Documents of the Reorganized Debtors.  The New Governance Documents of the Reorganized Debtors shall be as set forth in the Plan Supplement and shall be acceptable in form and substance to the Consenting Lenders.  To the

4869-9662-5086, v. 7

extent any such officer of the Reorganized Debtors is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such trustee and officer shall also be disclosed in the Plan Supplement.

**3.21** ***Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?***

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, Inc., via one of the following methods:

*By regular mail, hand delivery or overnight mail at:*

Optio Rx
c/o Stretto, Inc
410 Exchange
Ste 100
Irvine, CA 9260

*By electronic mail at:*

OptioRXInquiries@stretto.com

*By telephone (toll free) at:*

Toll-free:  949.590.3286

Local:  866.515.5505

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://cases.stretto.com/OptioRX (free of charge) or, upon the filing of the Chapter 11 Cases, via PACER at https://www.pacer.gov (for a fee).

**3.22** ***Do the Debtors recommend voting in favor of the Plan?***

Yes.  The Debtors believe that the Plan provides for a larger recovery to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan contemplates a significant deleveraging of the Company's balance sheet and enables the Debtors to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent in the Plan.

**3.23** ***Who Supports the Plan?***

The Plan is supported by the Debtors and the Consenting Lenders that have executed the Restructuring Support Agreement.

# ARTICLE IV
## DEBTORS' CORPORATE HISTORY, STUCTURE, AND BUSINESS OVERVIEW

**4.1** ***The Debtors' Prepetition Businesses***

    (a)    **Overview**[3]

The Debtors operate in four primary specialty pharmacy business segments, including: (i) clinically focused retail dermatology pharmacies; (ii) compounding pharmacies; (iii) hospice pharmacies; and (iv) fertility treatments. Overall, the Company employs approximately 260 employees in 18 locations located in seven states and services more than 100,000 patients. The Debtors also provide prescription fulfilling services to long term care facilities, among other things.

    (b)    **Retail Pharmacies**

The Company owns and operates seven clinically focused retail dermatology pharmacies, five are located in California and two are located in New York (the "Retail Pharmacies"). The Retail Pharmacies accounted for approximately 59% of the Debtors 2023 revenue (approximately $98 million of a total of $166 million in revenue) and are one of the largest clinically focused dermatology pharmacy chains in the United States. The Retail Pharmacies have storefronts, allowing patients to pick up their prescriptions, other retail items and a limited selection of over-the-counter medications. If a patient is not located near one of the Retail Pharmacies, the Company can ship prescriptions directly. As of the Petition Date, the Retail Pharmacies have 55 employees, including two salespeople that market the specialized services provided by the Retail Pharmacies directly to dermatologists.

    (c)    **Compounding Pharmacies and Other Pharmacy Lines**

11.    11.    The Company also operates compounding pharmacies (the **"Compounding Pharmacies"**). Pharmacy compounding is the preparation of customized medications for human patients and animals. The Company currently operates seven Compounding Pharmacies that ship prescriptions to patients nationwide, including one that is primarily a fertility pharmacy (as discussed below). The Debtors' Compounding Pharmacies accounted for approximately $44 million of the Debtors' combined revenue in 2023, including $23 million in fertility treatments and $21 million in compounding, infusion, OTC, and DME revenues. Despite accounting for a smaller percentage of the Company's overall revenue, the Compounding Pharmacies are the Company's most profitable business segment relative to the revenue they generate. As of the Petition Date, the Compounding Pharmacies have 104 employees, including one salesperson to market the services offered.

Among other products, the Compounding Pharmacies provide Bio-Identical Hormone Replacement Therapy (**"BHRT"**) for both men and women. BHRT is a personalized natural approach to hormone balancing, using hormones that are chemically identical to those produced

---

[3]    While stated in the present tense, the information contained in this Overview section is accurate as of the date of this Disclosure Statement.

by a patient's body.  This personalized treatment aims to restore hormonal balance, replenishing a patients' essential hormones that may have declined due to aging or other factors.

These conditions affect millions of men and women.  As the number of patients seeking hormone-related treatment has grown, so has the mass production of pills, patches and creams by the drug industry.  Each person's body is different and has its own unique needs, but commercially manufactured products tend to be "one size fits all," and they do not always account for the differences between individuals.  A growing population and longer life expectancies has expanded the number of patients experiencing the symptoms of hormonal imbalances.

For example, by the year 2025, the number of post-menopausal women (older than age 51) is expected to be more than 1.1 billion and nearly 30 percent of the total U.S. population is aged 55 and older.  A hormonal imbalance for women may cause several related health concerns, including, without limitation, a decreased libido, fibrocystic breasts, hot flashes, infertility, irregular menstrual cycle, night sweats, painful intercourse, PMS, post-partum depression, and weight gain.

The Company also provides personalized hormone replacement solutions for men.  Every man's body is different, and factors such as age, genetics, lifestyle, and existing health conditions significantly determine hormone levels.  There may be times when standard medications don't address the diverse needs of men.  Some of the conditions the Company's hormone replacement solutions for men address are adrenal fatigue, andropause, low testosterone and thyroid imbalance.

(d)     **Veterinary Compounding**

Compounding is an increasingly popular solution to veterinary patient problems.  When it comes to things like skin rashes, eye and ear infections, heart conditions, cancer, and diabetes, animals and humans have a lot in common.  However, giving animals medication presents a unique set of challenges. Compounding techniques enable the Company's pharmacists to formulate medications as liquids, chewables, capsules, pills, or transdermal creams and gels for animals.

The Company specializes in customizing medications in unique dosages and forms to meet a animal's individual needs.  In many cases, the Company can create medications that are not available in standard forms, allowing for a treatment program specifically tailored to individual animals.

(e)     **Hospice Pharmacies**

The Company also operates four hospice pharmacies (the **"Hospice Pharmacies"**).  The Debtors' Hospice Pharmacies provide medications for the compassionate care of people in the last phases of incurable diseases.  The Debtors' Hospice Pharmacies accounted for approximately $23.5 million of the Debtors' combined revenue in 2023 and currently have 80 employees.

(f)     **Fertility Treatments**

The Company also provides specialized fertility treatments (the **"Fertility Treatments"**) for its patients.  The Company operates one pharmacy that specializes in Fertility Treatments (the

"**Fertility Pharmacy**") and compounding treatments as set forth above. The Company provides complete packages for a patient's Fertility Treatments, including syringes, needles, swabs and sharps containers and offers a full line of sterile and non-sterile fertility compounds. The Debtors' Fertility Treatments accounted for approximately $23 million of the Debtors' combined revenue in 2023. As of the Petition Date, the Fertility Pharmacy currently has 18 employees.

**4.2    *Organizational Structure and Equity Ownership.***

Non-Debtor CBC Pharma is the direct or indirect parent company of Optio Rx and each of the other Debtors.   The organizational chart below shows the Company's current organizational structure:



(a)      **Employees**

Overall, the Company employs approximately 260 employees in 18 locations located in 7 states. To date, the Company has not experienced any significant work stoppages or other labor problems.

(b)      **Regulation of Company's Business**

The Company's operations are subject to various federal, state and local environmental, health, and safety laws, licenses and regulations governing the ongoing operation of its primary specialty pharmacy businesses.

**4.3    *The Capital Structure***

As of the Petition Date, certain of the Debtors are obligated as borrowers, issuers, or guarantors on: (i) a secured credit facility, referred to as the Prepetition Credit Agreement; (ii) an

4869-9662-5086, v. 7

unsecured Note Purchase Agreement; and (iii) various Seller Notes (each as defined below). The Prepetition Credit Agreement is secured by a first-priority lien on and security interest in substantially all the Debtors' assets.

(a)    **Prepetition Credit Agreement**

Pursuant to that certain Credit Agreement, dated as of June 28, 2019 (as amended, the **"Prepetition Credit Agreement"**), by and among CBC Pharma, Optio Rx, Loan Admin Co LLC, as administrative agent, and Loan Admin Co LLC, as lead arranger (the **"Prepetition Admin Agent"**) and the lenders party thereto from time to time (the **"Prepetition Secured Lenders"**), as of the Petition Date, the Debtors are indebted to the Prepetition Secured Lenders in an aggregate principal amount of approximately $127.6 million, including accrued and unpaid interest, fees and other claims (the **"Prepetition Secured Obligations"**). The Prepetition Secured Obligations are secured by first-priority liens and security interests in substantially all the Debtors' assets (the **"Prepetition Liens"**). At the time the Prepetition Credit Agreement was entered into, certain Prepetition Secured Lenders also acquired equity interests in CBC Pharma, representing approximately 11.6% of the fully diluted equity interests in CBC Pharma at that time. Certain Prepetition Secured Lenders subsequently made additional investments in equity interests of CBC Pharma in connection with further acquisitions by CBC Pharma; as of the Petition Date, these Prepetition Secured Lenders own approximately 19.9% of the common equity interests in CBC Pharma. The Last Out Lender additionally indirectly owns a minority interest in CBC Pharma.

On September 16, 2022, the Prepetition Admin Agent served a notice of default and exercise of certain remedies (the **"Notice of Default"**) under the Prepetition Loan Documents on CBC Pharma and Optio Rx. The Notice of Default asserted CBC Pharma and Optio Rx's failure to comply with and/or cure certain material obligations under the Prepetition Loan Documents. In accordance with the terms thereunder, among other things, the Prepetition Admin Agent appointed Pharmacy Management LLC as the Prepetition Admin Agent's sub-agent for purposes of exercising remedies under the Prepetition Loan Documents. Pursuant to the Prepetition Loan Documents, as directed by the Prepetition Secured Lenders, Pharmacy Management, as sub-agent, exercised the voting rights of the membership interests in Optio Rx pledged by CBC Pharma as collateral for the Prepetition Secured Obligations to amend the operating agreement of Optio Rx to (i) remove CBC Pharma as Manager of Optio Rx and (ii) appoint Pharmacy Management as Manager of Optio Rx. As a result of this action, since September 16, 2022, Pharmacy Management, under the direction of its Board of Managers, has exercised operational control of Optio Rx and the other Debtors. Initially, the Board of Managers of Pharmacy Management consisted of one independent manager, three designees of the Prepetition Secured Lenders, and the CEO of Optio Rx at the time. Prior to the Petition Date, all members of the Board of Managers of Pharmacy Management other than the independent manager have resigned.

In connection with the Prepetition Credit Agreement, on or about November 3, 2022, certain of the Prepetition Secured Lenders entered into an Agreement Among Lenders, (as amended, the **"AAL"**). The AAL is between and among: (i) holders (each, a **"First Out Holder"** and collectively, the **"First Out Holders"**) of first out term loans (the **"First Out Term Loans"**) and revolving loans under the Prepetition Credit Agreement and the AAL; (ii) the holder (the **"Last Out Holder"**) of last out term loans (the **"Last Out Term Loans"**) under the Prepetition Credit Agreement and the AAL; (iii) the Prepetition Admin Agent, and (iv) any other lender party to the

- 23 -

AAL.  One part of the transactions at the time the AAL was entered into provided additional liquidity to Optio Rx, in the form of new money last out term loans from the Last Out Holder. Prior to acquiring the Last Out Term Loans, the Last Out Holder had provided financing to certain equity holders of CBC Pharma to fund their equity investments in CBC Pharma.

The AAL is a subordination agreement under section 510(a) of the Bankruptcy Code that sets forth specific remedies, priorities, voting rights and other rights between the Last Out Holder and the First Out Holders under the Prepetition Credit Agreement and AAL until the First Out Term Loans are repaid in full.  In general terms, the rights of the Last Out Holder have been subordinated to the rights of the First Out Holders.

As of the Petition Date, interest on the Prepetition Secured Obligations is accruing at approximately 15% to 19 % per annum, depending upon the tranche.  With respect only to the Last Out Term Loans, in addition to cash interest, the Debtors accrued additional interest at a rate equal to 2.00% per annum on the then outstanding principal amount of the Last Out Term Loans in kind (**"Last Out PIK Interest"**), which Last Out PIK Interest was capitalized by adding such amount to the then outstanding principal amount of the Last Out Term Loans.  The Debtors have been in default of the Prepetition Credit Agreement since September of 2022.  The Prepetition Secured Obligations mature on June 28, 2024.  As of the Petition Date, and at all times since September 16, 2022, Pharmacy Management LLC, as the manager of Optio Rx, has one independent director.

As of the Petition Date, the Prepetition Credit Agreement consists of (a) Term Loans  in the approximate principal amount of $32,986,997.19, (b) Healthy Choice Incremental Term Loans in the approximate principal amount of $9,859,596,28, (c) Revolving Loans in the approximate principal amount of $5,000,000.00, (d) Last Out Term Loans in the approximate principal amount of $57,143,815.64, (e) First Out Term Loans in the approximate principal amount of $5,000,000.00, and (f) accrued fees and interest of $17,592,726.

(b)    **Note Purchase Agreement**

Pursuant to that certain Note Purchase Agreement, dated as of September 25, 2020 (the **"Note Purchase Agreement"**), Optio Rx issued $50,000,000 in unsecured notes (the **"Notes"**) to note purchasers from time to time (the **"Noteholders"**).  Aves Management LLC serves as the Administrative Agent for the Noteholders.  All of the Debtor subsidiaries of Optio Rx have guaranteed the Notes.  Interest on the Notes was set to accrue at 16.5% per annum, paid by adding and capitalizing the full amount of such interest to the principal amount of the Notes in kind (the **"PIK Interest"**).  Under the terms of the Note Purchase Agreement, the Notes mature on March 25, 2025.

The Notes are subject to a Subordination Agreement, dated as of September 25, 2020, subordinating the Noteholders' claims under the Note Purchase Agreement to the Prepetition Secured Obligations.  As of the Petition Date, the Debtors are indebted to the Noteholders in an aggregate principal amount of approximately $73.8 million, including accrued and unpaid PIK Interest, fees and other claims (the **"Prepetition Noteholder Obligations"**).

(c)      **Seller Notes**

Several of the Debtors are obligated under unsecured notes issued to prior owners of certain businesses that were purchased by the Debtors (the **"Seller Notes"**).  As of the Petition Date, the Debtors are indebted on the Seller Notes in an aggregate principal amount of approximately $29.9 million, including accrued and unpaid interest, fees and other claims (the **"Seller Note Obligations"**).

(d)      **Other Creditors**

As of the Petition Date, the Debtors had approximately $2.4 million in unsecured trade debt and $1.5 million in secured trade debt owing to certain to vendors under supply and security agreements (the **"Vendor Secured Claims"**).  To the extent any supplier has a valid, fully perfected, and unavoidable lien, that is senior to the Prepetition Liens held by the Prepetition Secured Lenders, they are considered permitted liens (**"Permitted Liens"**) under the proposed DIP financing and Plan.

**ARTICLE V**
**EVENTS LEADING TO CHAPTER 11 FILING**

While the Company's business remains operationally sound, it has experienced several unexpected challenges in recent years as described below, including the inability of the Debtors to service the Company's debt obligations.  In addition, the Debtors face liquidity issues that leave them unable to repay or recapitalize the outstanding principal and interest due to the Prepetition Secured Lenders under the Prepetition Credit Agreement coming due in June.  Consequently, the Debtors negotiated with the Consenting Lenders the terms of the Plan Term Sheet, the Restructuring Support Agreement, the Plan and the Restructuring Transactions (as defined below).  These transactions, when effectuated, are expected to leave the Company's business intact, de-lever the balance sheet of the Debtors, enhance long-term growth prospects, and improve operational performance.

**5.1**   *Declining Financial Performance*

The Company was formed in 2018.  Through 2020, the Company had acquired nineteen pharmacies, some of which were purchased as part of multi-pharmacy groups.  The Company funded these acquisitions with a mix of equity, third-party senior secured debt and subordinated debt, and seller financing through the takeback of certain notes by the pharmacy owners selling their businesses.  Operationally, the Company largely left the pharmacies to run autonomously.

Apart from the growth stemming from acquisitions, the Company began experiencing difficulty generating organic growth and boosting profitability at the individual pharmacies.  The Company likewise experienced difficulty achieving expectations around the full year cash flow potential of the pharmacies.  In 2021, the Company earned $16.1 million in reported EBITDA from all business operations but has been eroding ever since.

By the end of 2021, the Company's investors elected to install new leadership—a new chief executive officer was elected in early 2022.  In early 2022, the Company and an important payor, with which the Company was dispensing and billing pharmaceuticals, got into a significant dispute

regarding the scope of their contract. This ultimately led the Company to discontinue certain products, which contributed to a material decline in the Company's revenue and profitability.

Starting in early 2022, the Company's new management team sought to refocus the Company on compounding rather than retail products—2022 concluded with $14.5 million in EBITDA. At the same time earnings were declining, interest rates began to increase, causing the Company's debt service to increase dramatically.

In 2023, several factors caused a dramatic reduction in earnings, resulting in only $6.2 million in EBITDA for 2023. The Company no longer had the benefit of the profitable products that were discontinued in 2022. The new strategy to focus on compounding failed, and an expensive sales force and corporate infrastructure hired to support the transition further increased costs. In addition, in 2023, former employees opened two competing pharmacies, significantly reducing revenues at two of the Debtors' profitable pharmacies—several productive sales representatives also left the Company. Legal expenses also increased significantly in 2023, further reducing earnings. The Company's failure to turn around profitability in 2022 and 2023 led the Company to bring in a new chief executive officer, who began in early 2024.

At the end of the first quarter of 2024, the Company's year to date EBITDA was $500,000, translating into an annualized EBITDA of only $2 million. Currently, the Company's cash interest payment obligations under the Prepetition Loan Documents are $4 million per quarter (or, $16 million annually). As of the Petition Date, the Company has only approximately $1.8 million in cash on hand and no remaining availability on its Revolving Loans. Given the Company's current cash position, the Company does not have the ability to pay its upcoming interest payments due to Prepetition Secured Lenders and risks failing to pay operating costs in the ordinary course of business. The inability to pay interest on the Prepetition Secured Obligations, coupled with the pending June 28, 2024 maturity date, has created the need for the Company to restructure all its obligations through the RSA and Plan.

## 5.2    *The Prepetition Marketing Process*

On July 10, 2023, the Debtors retained Triangle Heath Advisors. LLC (**"Triangle"**) to market the Debtors' Retail Pharmacies (the **"Retail Pharmacy Marketing Process"**), its largest operating segment in terms of both revenue and EBITDA. The Retail Pharmacy Marketing Process was related to pharmacy operations of the Debtors five Retail Pharmacies in California and two in New York.

The Retail Pharmacy Marketing Process ran through April 30, 2024. During the Retail Pharmacy Marketing Process, Triangle reached out to 279 potential strategic and financial buyers, of which 41 executed a non-disclosure agreement (**"NDA"**). Triangle sent a confidential information memorandum (**"CIM"**) to all interested buyers that executed an NDA. Despite having numerous calls and meetings with several of the potential buyers, an acceptable offer for the Retail Pharmacies that cleared the Company's senior secured debt obligations was not received.

On July 20, 2023, the Debtors also retained Triangle to market the Hospice Pharmacies (the **"Hospice Marketing Process"**). The Hospice Marketing Process also ran through April 30, 2024 without success. During the Hospice Marketing Process, Triangle reached out to 192

potential strategic and financial buyers, of which eight executed an NDA.  Triangle sent a CIM to all interested buyers that executed an NDA.  Despite having numerous calls with several of the potential buyers, an offer for the Hospice Pharmacies that cleared the Company's senior secured debt obligations was not received.  Accordingly, no offers for the Retail Pharmacies and the Hospice Pharmacies cleared the Company's senior secured debt obligations.

Given the unsuccessful marketing processes, the Debtors approached the Prepetition Secured Lenders to discuss restructuring alternatives.

**5.3**     ***The Restructuring Support Agreement***

On May 9, 2024, the Debtors, the First Out Holders, the Last Out Holder (and together with the First Out Holders, the **"Consenting Lenders"**), and the Prepetition Admin Agent, entered into that certain Restructuring Support Agreement, pursuant to which the Debtors and the Consenting Lenders approved certain restructuring transactions with respect to the Debtors' capital structure on the terms and conditions set forth in therein and as specified in the term sheet attached thereto as Exhibit B (including all exhibits, annexes, and schedules thereto, the **"Plan Term Sheet"** and, such transactions as described in the Restructuring Support Agreement and the Plan Term Sheet, the **"Restructuring Transactions"**).  The Restructuring Transactions have been incorporated into the Plan filed contemporaneously herewith.

The Plan contemplates a partial debt for equity swap, as follows (the **"Debt for Equity Swap"**):

a.     on the Effective Date of the Plan, the First Out Holders and the Last Out Holder will convert (i) a portion of their Prepetition Secured Obligations into exit facility claims (the **"Prepetition Lien Conversion"**) on such terms as to effect the Exit Capital Structure attached as an exhibit to the RSA (the **"Exit Facility Claims"**) and (ii) the remaining portion of their Prepetition Secured Obligations into preferred and common equity shares or units of Online Pharmacy Holdings LLC (the **"Prepetition Lien Conversion Equity"**), the new holding company formed on May 22, 2024 to issue preferred and common equity shares or units in connection with the Prepetition Lien Conversion, which Prepetition Lien Conversion Equity shall constitute consideration for the First Out Holders and Last Out Holder committing to such Prepetition Lien Conversion, all to effect the Exit Capital Structured attached as an exhibit to the RSA; and

b.     on the Effective Date, the DIP Lenders will convert 100% of their DIP Superpriority Claims into Exit Facility Claims, all to effect the Exit Capital Structure attached as an exhibit to the RSA.

On the Effective Date, after consummation of the transactions contemplated in the Debt for Equity Swap described above, the Prepetition Secured Obligations and related claims shall constitute first-priority, perfected, enforceable and unavoidable Exit Facility Claims in full force and effect, which Exit Facility Claims and liens shall be first-priority, enforceable, unavoidable and automatically perfected by virtue of the Confirmation Order (defined below) entered by the Bankruptcy Court; provided, however, each of the holders of the Prepetition Secured Claims will gift (the **"GUC Trade Gift"**) to the holders of allowed general unsecured trade claims (the **"GUC Trade Claims"**) and transfer into an escrow account their proportionate share to satisfy (x) 80-

95% of all allowed GUC Trade Claims on the Effective Date and (y) the remaining 5%-20% of such allowed GUC Trade Claims on the one year anniversary of the Effective Date. Additionally, any impaired creditors eligible to vote who vote to accept the Plan of Reorganization and elect to opt-in to the Plan releases shall receive their respective pro rata share of the GUC Opt-In Gift under the Plan. Finally, there is a provision for convenience class claims under the Plan.

Creditors that hold allowed Vendor Secured Claims will, at the election of the Reorganized Debtors: (a) be paid in cash in full on the Effective Date of the Plan in satisfaction of their respective allowed secured claims; (b) receive the return of their collateral; or (c) receive such other treatment as the Reorganized Debtors and such vendor agree. The Plan also provides for the payment in full of administrative, priority and other secured claims.

The Notes, Seller Notes and all equity in Optio Rx, held by CBC Pharma, shall be cancelled, released, and extinguished under the Plan.

**5.4**    *Milestones*

Pursuant to the RSA, the Debtors are required to comply with certain milestones (each, a **"Milestone"** and collectively, the **"Milestones"**), including: (i) the filing of the Chapter 11 Cases no later than 60 days after the Agreement Effective Date (as defined in the Restructuring Support Agreement); (ii) the filing of the Plan and the Disclosure Statement no later than five (5) business days after the Petition Date; (iii) entry of an interim DIP order (the **"Interim DIP Order"**) no later than five (5) business days after the Petition Date; (iv) the entry of a final DIP Order (the **"Final DIP Order"**) no later than forty-five (45) days after the Petition Date; (v) the entry of a disclosure statement order (the **"Disclosure Statement Order"**) no later than 45 days after the Petition Date; (vi) the entry of a confirmation order (the **"Confirmation Order"**) no later than 75 days after the Petition Date; and (vii) the satisfaction or waiver of the conditions to the Effective Date under the Plan no later than five (5) business days after the Debtors obtain the last pharmaceutical license or other regulatory approval necessary for the Reorganized Debtors to conduct their business post-Effective Date.

The Plan and the transactions contemplated thereby are vital to preserve the Debtors' operations, employment, and ability to continue to provide uninterrupted services to their patients. The Plan provides the most efficient and cost-effective path forward for the Debtors, will maximize recovery for creditors, and will preserve jobs for the Debtors' employees.

### ARTICLE VI
### MATERIAL DEVELOPMENTS AND ANTICIPATED
### EVENTS OF THE CHAPTER 11 CASES

**6.1**    *First Day Relief*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the **"Petitions"**), the Debtors intend to file several motions (the "**First Day Motions"**) designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, are available and can be viewed free of charge, at https://cases.stretto.com/OptioRX.

**6.2**    *Proposed Confirmation Schedule*

The Restructuring Support Agreement requires that the Debtors comply with the Restructuring Support Agreement Milestones, including securing confirmation of the Plan no later than seventy-five (75) days after the Petition Date.  In light of the Debtors' extensive prepetition restructuring efforts, the timeline from the anticipated Petition Date to the confirmation hearing provides more than sufficient time to administer these Chapter 11 Cases in a manner that gives all parties in interest a full and fair opportunity to participate in the process consistent with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Following commencement of the Chapter 11 Cases, the Debtors will file a scheduling motion seeking approval of the confirmation schedule based on the anticipated Petition Date, which proposed timeline is as follows:

| EVENT | PROPOSED DATE/DEADLINE |
|---|---|
| Voting Record Date | , 2024 |
| Solicitation Commencement Date | Within three (3) business days following the entry of the Disclosure Statement Order |
| Rule 3018(a) Motion Deadline | , 2024 |
| Voting Deadline | , 2024 |
| Plan Objection Deadline | , 2024 |
| Deadline to File Confirmation Brief | , 2024 |
| Deadline to File Voting Report | , 2024 |
| Confirmation Hearing | , 2024 |

The Debtors will request that the Court require any responses or objections to the adequacy of the information contained in the Disclosure Statement or confirmation of the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) state the name and address of the objecting party and the amount and nature of the claim or interest beneficially owned by such entity; (d) state with particularity the legal and factual basis for such objections, and, if practicable, a proposed modification to the Plan that would resolve such objections; and (e) be filed with the Court with proof of service thereof and served on the following parties (the "**Notice Parties**") so as to be actually received by the Objection Deadline: (a) proposed counsel for the Debtors, Chipman, Brown, Cicero & Cole LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (Attn: William Chipman, Esquire (Chipman@chipmanbrown.com) and Mark D. Olivere, Esquire (Olivere@chipmanbrown.com)); (b) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jonathan W. Lipshie, Esquire); (c) counsel to the

Consenting Lenders, DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (Attn: Stuart Brown, Esquire (stuart.brown@dlapiper.com) and Matthew Sarna, Esquire (matthew.sarna@dlapiper.com)); and (d) any other party entitled to notice under Bankruptcy Rule 2002.

**ARTICLE VII**
**SUMMARY OF THE PLAN**

The Plan contemplates the following key terms, among others described herein and therein:

**7.1    *General Compromise and Settlement of Claims, Interests, and Controversies***

Pursuant to section 1123 of the Bankruptcy Code and, to the extent applicable, Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made or treatment provided on account of such Allowed Claim or Interest.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests and controversies pursuant to Bankruptcy Rule 9019.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  Subject to Article VI of the Plan, all treatment of Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against and Interests in or against any of the Debtors and their Estates and Causes of Action against other Entities.

**7.2    *Restructuring Transactions***

On the Effective Date, and pursuant to the Plan, the Debtors or the Reorganized Debtors, as applicable, shall (as agreed to by the Consenting Lenders consistent with the terms of the Restructuring Support Agreement) consummate the Restructuring Transactions set forth in the Plan Term Sheet in order to effectuate the Debtors' financial reorganization consistent with the terms of the Plan.  Without limiting the foregoing, before, on or as soon as reasonably practicable after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and their respective officers and members of the Governing Body, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (i) the execution, delivery, filing, registration or recordation of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition,

- 30 -

transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement and the Restructuring Support Agreement; (ii) the execution, delivery, filing, registration or recordation of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (iii) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Governance Documents; (iv) such other transactions that are required to effectuate the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law; provided that all such actions are consented to by the Consenting Lenders, which consent shall not be unreasonably withheld.  Pursuant to sections 363 and 1123 of the Bankruptcy Code, the Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan. The authorizations and approvals contemplated by 4.01 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**7.3**     *Sources of Consideration for Plan Distributions*

Any Cash payments or distributions required to be made hereunder shall be obtained from existing Cash of the Debtors and the Exit Facility.

**7.4**     *Continued Corporate Existence*

Except as otherwise provided in the Plan, the Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date as separate corporate entities, limited liability companies, partnerships or other form, with all the powers of a corporation, limited liability company, partnership or other form, pursuant to the applicable law in the jurisdiction in which the Debtors are incorporated or formed pursuant to the New Governance Documents.

**7.5**     *Existing Governance Documents*

The Existing Governance Documents of the Debtors in effect prior to the Effective Date shall be amended or restated and replaced by the New Governance Documents on or prior to the Effective Date, subject in each case to the consent rights of the Consenting Lenders as set forth in the Restructuring Support Agreement.  Solely to the extent required under the Plan, the Bankruptcy Code, or applicable non-bankruptcy law or necessary to effectuate the transactions contemplated by the Plan, on or immediately prior to the Effective Date, the Reorganized Debtors shall file the New Governance Documents (in a manner acceptable to the Debtors and the Consenting Lenders and consistent with the Restructuring Support Agreement) with the applicable Secretary of State and/or other applicable authorities in the state of incorporation or formation or otherwise (as the case may be) in accordance with the applicable federal laws or state laws of the respective state. The New Governance Documents shall be deemed to be amended pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable non-bankruptcy law).  The New Governance Documents shall be in the form filed with the Plan

Supplement and shall be acceptable in form and substance to the Consenting Lenders. After the Effective Date, the Reorganized Debtors may amend and restate their New Governance Documents, as applicable, and may file such documents as permitted by the laws of the respective states without further authorization from the Bankruptcy Court.

**7.6**    *Members of the Governing Bodies*

As of the Effective Date, and subject to the Restructuring Support Agreement, the existing members of the Reorganized Debtors' Governing Bodies shall remain in their current capacities as members of such Governing Body of the applicable Reorganized Debtor, unless or until replaced or removed in accordance with the New Governance Documents of the Reorganized Debtors in the sole discretion of such Reorganized Debtor.  To the extent any such officer of the Reorganized Debtors is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such trustee and officer shall also be disclosed in the Plan Supplement.

**7.7**    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Restructuring Support Agreement or any agreement, instrument or other document incorporated therein, on the Effective Date, all property of the Estates and all Causes of Action of the Debtors (except those released pursuant to the Debtor Releases) shall vest in the applicable Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure the Reorganized Debtors' obligations under the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interest or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation order.

**7.8**    *Section 1145 Exemption*

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the offer, issuance, sale or distribution under the Plan of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC shall be exempt from registration under Section 5 of the Securities Act (or any State or local law requiring registration for offer or sale of a security) under section 1145 of the Bankruptcy Code.  The offer, issuance, sale or distribution under the Plan of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC will be subject to the restrictions on resale of securities held by Affiliates of an issuer.

**7.9**    *Cancellation and Surrender of Instruments and Agreements*

On the Effective Date, except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, (i) all rights of any Holder of Interests in the Debtors, including options or warrants to purchase Interests, or obligating the Debtors to issue, transfer or sell Interests in the Debtors, shall be cancelled; and (ii) all Seller Notes, Notes and indentures of

the Debtors shall cease to be effective, and Aves Management LLC, as Administrative Agent under the Note Purchase Agreement shall not have any continuing duties or obligations thereunder and shall be discharged.

**7.10    *Corporate Action***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) to the extent undertaken, selection and appointment of the members of the Governing Body and officers of the Reorganized Debtors; (ii) adoption of or modification to the Existing Governance Documents, if required; (iii) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (iv) implementation of the Restructuring Transactions; and (v) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan (including the grant of security interests set forth in the Plan) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, the members of the Governing Body or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by Section 4.09 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

**7.11    *Section 1146 Exemption from Certain Taxes and Fees***

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtors to the Reorganized Debtors or to any other Person) of property under the Plan or pursuant to: (i) the issuance, reinstatement, distribution, transfer or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust, or other security interest or the securing of additional indebtedness by such or other means; (iv) the making, assignment or recording of any lease or sublease; or (v) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan, shall not be subject to any stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, recordation fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental

assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**7.12**   *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Article III(a) hereof), each of the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and each of the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.  Each of the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of such Reorganized Debtor.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that any of the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which any of the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Debtor Releases), each of the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, each of the Reorganized Debtors expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action as a consequence of the Confirmation or Consummation.  Each of the Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

**7.13**   *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against the Debtors and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim plus applicable interest.

**7.14**   *Releases*

The Plan contains certain releases (as described more fully in Section 3.13 of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest

as part of the Plan?"), including mutual releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders.  Additionally, (i) each Released Party; (ii) all Holders of Claims or Interests that vote to accept or reject the Plan and opt-in to the releases provided by the Plan by checking the box on the applicable form indicating that they opt to grant the releases provided in the Plan; (iii) all Holders of Claims or Interests that abstain from voting on the Plan and who affirmatively opt-in to the releases provided by the Plan by checking the box on the applicable form indicating that they opt to grant the releases provided in the Plan; (iv) each current and former Affiliate of each Entity in clause (i) through the following clause (v); and (v) each Related Party with respect to each of the foregoing in clauses (i) through (v), conclusively, absolutely, unconditionally, irrevocably and forever consents to the release and discharge of any and all Causes of Action against the Debtors and the Released Parties to the extent set forth in the Plan.

## 7.15   *Deemed Substantive Consolidation*

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, Confirmation and distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

## ARTICLE VIII
## OTHER KEY ASPECTS OF THE PLAN

## 8.1   *Treatment of Executory Contracts and Unexpired Leases*

(a)   **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed (or assumed and assigned to the respective Reorganized Debtor, as applicable) pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by a Debtor, pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List.  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan and the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party on or before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by such order or the provisions of the Plan.  All assumed

Executory Contracts or Unexpired Leases shall be enforceable by the Reorganized Debtors or such party such Executory Contract or Unexpired Lease was assigned to in accordance with their terms notwithstanding any provision in such contract or lease that prohibits, restricts or conditions assumption, assignment or transfer. Any provision in any such contract or lease that permits a Person to terminate or modify such agreement or to otherwise modify the rights of any of the Debtors or the Reorganized Debtors or assignee, as applicable, based on the filing of the Chapter 11 Cases or the financial condition of any of the Debtors or the Reorganized Debtors, as applicable, shall be unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, any of the Debtors' assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party or parties thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. After the Effective Date, each of the Reorganized Debtors shall have the right to terminate, amend or modify any contracts, including intercompany contracts, leases or other agreements without approval of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, as set forth in Section 5.01 of the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

(b)     **Claims Based on the Rejection of Executory Contracts or Unexpired Leases.**

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all proofs of claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Section 7.06 of the Plan, notwithstanding anything in a proof of claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Section 3.04 of the Plan and may be objected to in accordance with the provisions of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

(c)    **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned to the respective Reorganized Debtor, as applicable) pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash upon the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  The Debtors shall provide notices of proposed cure amounts (if any) to counterparties to Executory Contracts and Unexpired Leases to be assumed reflecting the Debtors' intention to assume or assume and assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any) or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  If a counterparty to any Executory Contract or Unexpired Lease that the Debtors or Reorganized Debtors intend to assume does not receive such a notice, the proposed cure amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).  In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  The cure notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by counsel to the Debtors on the confirmation objection deadline or other deadline that may be set by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.  Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

The payment of the cure amount shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (i) the amount of any payments to cure such a default; (ii) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption.

The Debtor or the Reorganized Debtor, as applicable, shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Debtor or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the Cure

- 37 -

obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List.

(d)     **Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in the Plan or specifically provided in the Plan Supplement, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by any of the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

(e)     **Reservation of Rights**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan or Plan Supplement shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the relevant Debtor or Reorganized Debtor, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date. The deemed assumption provided for herein shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

(f)     **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any of the Debtors, including any Executory Contracts and Unexpired Leases assumed by any Debtor (or assumed and assigned, as applicable), will be performed by such Debtor or Reorganized Debtor, or the Entity to which such Executory Contract or Unexpired Lease was assigned, as applicable, in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order except as otherwise provided in the Plan.

(g)      **Assumption of Insurance Policies**

Notwithstanding anything in the Plan or the Confirmation Order, including any provision that purports to be preemptory or supervening, the Insurance Policies (including all of the D&O Liability Insurance Policies) are hereby treated as Executory Contracts under the Plan and, on the Effective Date, shall be deemed assumed (and assigned to the Reorganized Debtors) under section 365 of the Bankruptcy Code and will re-vest in the Reorganized Debtors.  Regardless of whether any Insurance Policy is an Executory Contract, on and after the Effective Date, the Insurance Policies will remain valid and enforceable in accordance with their terms and shall not be impaired by the Plan or Confirmation Order, and the Debtors, the Reorganized Debtors or any such assignee, as applicable, and the Insurers will perform their respective obligations to one another, if any, under the Insurance Policies.  After the Effective Date, to the extent consistent with applicable law and New Governance Documents, the Reorganized Debtors (or any such assignee) may increase, reduce, restrict, or otherwise modify, in their sole discretion, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of each of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, proof of claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

(h)      **Assumption of the Employee Compensation and Benefits Program**

Unless otherwise provided in the Plan (or the Plan Supplement), the Confirmation Order or any other order of the Bankruptcy Court in the Chapter 11 Cases, all employment agreements, severance policies, indemnification agreements, compensation and benefit plans, policies, and programs of the Company including, without limitation, all workers' compensation programs, savings plans, retirement plans, deferred compensation plans, SERP plans, rabbi trusts, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans or other agreements with or applicable to any of its current or former employees, retirees, members of any Governing Body, officers or managers of the Debtors shall be treated as Executory Contracts under the Plan, shall be set forth in the Plan Supplement, and shall be deemed assumed (or assumed and assigned to the respective Reorganized Debtors, as applicable) pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the

Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(i)      **Indemnification Obligations**

Consistent with applicable law, all indemnification provisions in place as of the Effective Date for the Released Parties only (whether in the by-laws, trust agreements, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other governance documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers and other professionals of, or acting on behalf of, any of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, any of the Debtors than the indemnification provisions in place prior to the Effective Date.

(j)      **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases, if any, pursuant to section 365(d)(4) of the Bankruptcy Code.

**8.2**    *Provisions Governing Distributions*

(a)      **Record Date for Distributions**

With respect to Impaired Claims, on the Distribution Record Date, the Claims Register and the various transfer registers for each of the Classes of Claims, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims. The Debtors shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.

(b)      **Timing of Distributions**

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against or an Allowed Interest in the Debtors shall receive the full amount of the distributions that the Plan provides for such an Allowed Claim or such an Allowed Interest in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

(c)    **Disbursing Agent**

The Debtors or Reorganized Debtors may retain a Disbursing Agent to assist with the distributions to be made under the Plan as directed by the Debtors or Reorganized Debtors. The Disbursing Agent shall make all distributions required under the Plan.

(i)    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(ii)    Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out of pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out of pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.  The Disbursing Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Disbursing Agent seeks reimbursement, and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Disbursing Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Disbursing Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Disbursing Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(d)    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent: (i) to the signatory set forth on any proof of claim or proof of interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no proof of claim or proof of interest is filed or if the Debtors have not been notified in writing of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related proof of claim or proof of interest; or (iii) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Distributions under the Plan on account of Allowed Claims and Allowed Interests shall not be subject to levy, garnishment, attachment or

like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan. None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

(e)    **Fractional Distributions**

Whenever any payment of a fraction pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole share (up or down), with half or less being rounded down. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(f)    **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder of Claim or Interest is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred. Notwithstanding the foregoing under of the Plan, any Unimpaired Claims shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan, unless and until such Unimpaired Claim has been either (a) paid in full (i) on terms agreed to between the holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as applicable, (ii) in the Allowed amount of such Unimpaired Claim as determined by applicable law or (iii) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

(g)    **Manner of Payment**

At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements

(h)    **Compliance with Tax Requirements and Allocations**

In connection with the Plan and all instruments issued in connection therewith, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing

authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.   Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they determine in good faith are reasonable and appropriate.  The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.  For the avoidance of doubt, any amounts withheld pursuant to Section 6.08 of the Plan shall be treated as if distributed to the Holder of the Allowed Claim.

Any Holder of an Impaired Claim entitled to receive any property as an issuance or distribution under the Plan shall, upon request by the Disbursing Agent, provide an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8.  If such request is made and such Holder of an Impaired Claim fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtors or the Reorganized Debtors, as applicable, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtors, the Reorganized Debtors and their respective property.

(i)     **Allocation Between Principal and Interest**

Except as otherwise provided in the Plan, for U.S. federal income tax purposes, distributions shall be allocated first to the principal amount of such Allowed Claims (as determined for U.S. federal income tax purposes), with any excess allocated to unpaid interest that accrued on such Claims.

(j)     **Setoffs and Recoupment**

Except as otherwise provided in the Plan and Confirmation Order, the Debtors and the Reorganized Debtors may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, withhold (but not set off except as set forth in the Plan) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim or Interest.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim or Interest and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim or Interest) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that any of the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim or Interest, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or

the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such holder, except as specifically provided herein.

(k)     **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy or non-bankruptcy law, postpetition and/or default interest shall not accrue or be paid on any prepetition Claims against any of the Debtors, and no Holder of a prepetition Claim against any of the Debtors shall be entitled to interest accruing on or after the Petition Date or interest at the contract default rate on any such prepetition Claim.

**8.3     _Releases and Exculpations_**

(a)     **General Compromise and Settlement of Claims, Interests and Controversies**

As discussed in detail herein and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and, to the extent applicable, Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made or treatment provided on account of such Allowed Claim or Interest.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests and controversies pursuant to Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. Subject to Article VI of the Plan, all treatment of Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against and Interests in or against any of the Debtors and their Estates and Causes of Action against other Entities.

(b)     **Releases by the Debtors**

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each of the Debtors, the Reorganized Debtors and their Estates, including any successors to the Debtors or any estates representatives appointed or selected**

- 44 -

pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, that any of the Debtors, the Reorganized Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of a Holder of any Claim against, or Interest in, the Debtors or other Entity, based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership or operation thereof), purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Exit Facility, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date. For the avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date or (ii) the rights of any of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of any of the Debtors under any employment agreement with a current or former employee of any the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases, which include by reference each

of the related provisions and definitions contained in the Plan, and further shall constitute the Bankruptcy Court's finding that the Debtor Releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Releases; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Debtors' Estates asserting any Cause of Action released pursuant to the Debtor Releases.

(c)    **Releases by Holders of Claims and Interests**

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, including any derivative claims asserted on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership or operation thereof), the subject matter of or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors any other Released Party, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among any of the Debtors or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current

4869-9662-5086, v. 7

employee of any of the Debtors under any employment agreement or plan or (iii) rights of Holders of Allowed Claims or Allowed Interests to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

(d)    **Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of claim or Interest based upon such debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

(e)    **Exculpation**

**As of the Effective Date, except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim other than those arising out of or relating to any act by or omission of an Exculpated Party that have been determined in a Final Order of a court of competent jurisdiction to have constituted**

**actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on the Plan, distribution of consideration pursuant to the Plan and, to the extent applicable, the offer, issuance and sale or purchase of securities pursuant to the Plan and, therefore, are not, and on account of such solicitation, distribution and issuance shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan, such distributions made pursuant to the Plan and issuance of securities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) the rights of Holders of Allowed Claims or Allowed Interests to receive treatment in accordance with the Plan.**

(f)    **Injunction**

Effective as of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Enjoined Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any of the Debtors, any of the Reorganized Debtors, the Exculpated Parties or the Released Parties and their respective assets and properties: (i) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting or enforcing any encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

(g)    **Term of Injunctions and Stays**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until

the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

       (h)    **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entities, including Governmental Units, shall discriminate against any of the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any of the Reorganized Debtors or another Entity with whom such Reorganized Debtor has been associated, solely because the Debtors have been a debtor under chapter 11 of the Bankruptcy Code, have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or have not paid a debt that is dischargeable in the Chapter 11 Cases.

       (i)    **Release of Liens, Claims and Interests**

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all Claims, Interests or Liens, including but not limited to mortgages, deeds of trust, Liens, pledges or other security interests, against or in any property of the Estates shall be fully released, discharged, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Entity holding such Liens, Claims or Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtors held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  For the avoidance of doubt, the Exit Facility Claims effected through the Prepetition Lien Conversion and the DIP Lien Conversion pursuant to the Plan shall not be released, discharged, terminated or extinguished to effect the Exit Capital Structure attached to the Restructuring Support Agreement.

4869-9662-5086, v. 7

**8.4**    *Conditions Precedent to Confirmation and Consummation of the Plan*

    (a)    **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 8.03 of the Plan.

    1.    The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtors and the Consenting Lenders, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code (which, for the avoidance of doubt, may be the same order as the order confirming the Plan).

    2.    The Plan and the Plan Supplement, including any schedules, documents, agreements, supplements and exhibits thereto (in each case in form and substance acceptable to the Debtors and the Consenting Lenders as provided for under the Restructuring Support Agreement) shall have been filed.

    3.    The Restructuring Support Agreement shall not have been rejected by the Debtors, shall not have been terminated as of immediately prior to the Confirmation Date, nor shall there have been any breach thereof by any party.

    (b)    **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 8.03 of the Plan:

    1.    Each document or agreement constituting the Definitive Documents shall have been executed and/or effectuated and shall be in form and substance consistent with the Restructuring Support Agreement, including any consent rights included therein.

    2.    The Plan shall have been filed and the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement, including any consent rights included therein, and such Confirmation Order shall not have been stayed, modified, vacated, appealed or subjected to an injunction and shall have become a Final Order.

    3.    The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption, assumption and assignment, and rejection, as applicable, of Executory Contracts and Unexpired Leases by the Debtors as contemplated herein.

    4.    All (i) governmental and regulatory approvals, clearances and consents necessary and legally required, if any, under applicable non-bankruptcy law and (ii) material third-party consents and approvals, if any, in each case in connection with the transactions provided for in the Plan shall have been obtained, are not subject to unfulfilled conditions, and are in full force and

4869-9662-5086, v. 7

effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that restrains, prevents or enjoins the Restructuring Transactions.

5.      All statutory fees and obligations then due and payable to the Office of the U.S. Trustee shall have been paid and satisfied.

6.      To the extent invoiced at least one (1) Business Day before the Effective Date, all amounts on account of invoiced and unpaid Restructuring Fees have been paid in full.

7.      The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount in accordance with Section 2.02 of the Plan.

8.      The transactions contemplated in the Restructuring Transactions shall have been executed and completed by all of the Entities that are parties thereto.

9.      The Restructuring Support Agreement shall have been assumed pursuant to the Confirmation Order.

10.     The New Governance Documents shall have been filed with the appropriate governmental authority.

11.     The Existing Governance Documents shall have been amended, restated, or replaced by the New Governance Documents, respectively, in all cases consistent with the consent rights of the Consenting Lenders as set forth in the Restructuring Support Agreement.

12.     The Restructuring Support Agreement shall not have been terminated as of immediately prior to the Effective Date and there has been no breach thereof by any party.

(c)      **Waiver of Conditions**

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article VIII of the Plan may be waived, in whole or in part, at any time by the Debtors, with the prior written consent of the Consenting Lenders (email shall suffice), without notice, leave or order of the Bankruptcy Court or any formal action; *provided*, *however*, that the Debtors may not waive entry of the Confirmation Order.

(d)      **Effect of Failure of Conditions**

If the Consummation of the Plan does not occur by the Outside Date (as defined in the Restructuring Support Agreement) as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (i) constitute a waiver or release of any claims by or Claims against or Interests in any of the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holder

of Claims or Interests or any other Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by any of the Debtors, any Holder or any other Entity in any respect.

(e)    **Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**8.5    *Modification, Revocation, or Withdrawal of the Plan***

(a)    **Modification and Amendments**

Except as otherwise provided in the Plan, the Debtors (with the consent of the Consenting Lenders) reserve the right to modify the Plan as to material and/or immaterial terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019 and applicable restrictions on modifications set forth in the Plan, the Debtors (with the consent of the Consenting Lenders) expressly reserve their respective rights to revoke, withdraw, alter, amend or modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in each case in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article IX of the Plan. Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, any alterations, amendments or modifications of the Plan proposed in writing by the Debtors at any time prior to or after the Confirmation Date, but prior to the Effective Date, and in all cases subject to the consent of the Consenting Lenders, Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, without the re-solicitation if the proposed alteration, amendment or modification do not materially and adversely change the treatment of the Claim of such Holder; *provided*, *however*, that any Holders of Claims or Interests that were deemed to accept the Plan because such Claims or Interests were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be Unimpaired.

(b)    **Effect of Confirmation on Modifications**

Entry of a Confirmation Order, including under section 1127 of the Bankruptcy Code, shall mean that all modifications or amendments to the Plan occurring after the solicitation are approved pursuant to section 1127(a) of the Bankruptcy Code or section 1127(b) of the Bankruptcy Code, as applicable, and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c)    **Revocation or Withdrawal of the Plan**

The Debtors reserve the right, upon prior notice to and with the consent of the Consenting Lenders, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization, either entirely or as to any one or more of the Debtors.  If the Plan is revoked or

withdrawn as to fewer than all of the Debtors, such revocation or withdrawal shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked or withdrawn.  If (i) the Debtors revoke or withdraw the Plan in its entirety in accordance with this Section 9.03, (ii) the Restructuring Support Agreement is terminated by the Outside Date (as defined in the Restructuring Support Agreement), or (iii) Confirmation or Consummation does not occur by the Outside Date (as defined in the Restructuring Support Agreement), then, absent further order of the Bankruptcy Court: (i) the Plan shall be null and void in all respects unless extended by the Debtors, with the prior written consent of the Consenting Lenders; (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity, including the Holders of Claims or Interests or the Consenting Lenders; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity, including the Holders of Claims or Interests or the Consenting Lenders.

## ARTICLE IX
## RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES**

**9.1**    *Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

(a)    **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May**

**Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

Subject to the terms of the Restructuring Support Agreement, if the Restructuring Transactions are not consummated, the Debtors will thereafter consider all available restructuring alternatives, including filing an alternative chapter 11 plan, selling assets, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to fund the reorganization transactions;
- the Debtors' liquidity; and
- how the Debtors' businesses are viewed by investors and lenders.

(b)     **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(c)     **The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.**

The Debtors have not obtained or requested an opinion from any bank or other firm as to the fairness of the consideration under the Plan.

(d)     **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the Debtors' cash interest expense, improve the Debtors' liquidity and provide the Debtors greater flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry and changes in

commodity prices. As a result of these risks, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

      (e)      **The Restructuring Support Agreement May Be Terminated**

As more fully set forth in the Restructuring Support Agreement, it may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified Milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Consenting Lenders of their respective obligations under the Restructuring Support Agreement. In the event that the Restructuring Support Agreement is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets. Termination of the Restructuring Support Agreement could result in the loss of support for the Plan by important creditor constituencies and could result in the withdrawal of the Plan and protracted Chapter 11 Cases.

      (f)      **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article VIII of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and the Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

      (g)      **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the Restructuring Support Agreement. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

      (h)      **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the

Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their businesses and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

The Debtors, subject to the terms and conditions of the Plan and the consent rights of the Consenting Lenders on terms set forth in the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.  The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

(i)     **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses.  *See* Article 9.2(d) of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business."  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of

- 56 -

these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

(j)     **The Chapter 11 Cases May Be Converted to a Case under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (b) additional expenses and Claims, some of which would be entitled to priority, would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

(k)     **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the Restructuring Support Agreement.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(l)     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

(m)     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

(n)     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VII of the Plan.  Certain parties in interest may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions established by the United States Court of Appeals for the Third Circuit.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.

**9.2     *Risks Related to Recoveries Under the Plan***

(a)     **Estimated Valuations of the Debtors, and Estimated Recoveries to Holders of Allowed Claims and Interests, Are Not Intended to Represent Potential Market Values**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the financial results included in the Feasibility Analysis; and (d) the assumption that capital and equity markets remain consistent with current conditions.

Accordingly, the estimated recoveries do not necessarily reflect, and should not be construed as reflecting, values that may be attained for the Debtors' securities in the public or private markets.

(b)     **The Reorganized Debtors May Be Forced to Take Other Actions to Satisfy their Obligations**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on the financial condition and operating performance of their businesses, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face liquidity issues and there may be a need to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt.  These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

(c)     **Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtor**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Case may adversely affect the Reorganized Debtors and holders of certain Claims.

(d)     **Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

    1.     The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends primarily its financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  Some of the factors that may affect the Company's business or financial condition include: the demand for the Reorganized Debtors' products or services; the prices of raw materials; disruptions to the Reorganized Debtors' supply chain; competition from other industry participants; technology advances; significant delays in the collection of accounts or notes receivable; customer, counterparty, supplier or vendor defaults; costs of complying with, or liabilities imposed under, environmental, health and safety laws; the impact of pending and future legal proceedings; the interruption, disruption, failure or malfunction of our information technology systems including due to cyberattack; the impact of changes in tax law that could adversely affect the tax treatment for federal income tax purposes; economic and political instability; disruptions in the capital and credit markets; and access to available capital to meet operating requirements.

4869-9662-5086, v. 7

2.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include, among other things, the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability of the Debtors to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability of the Debtors to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans. These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.      The Debtors May Not Be Able to Achieve Their Financial Results or Meet Their Post-Restructuring Debt Obligations.

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, the Reorganized Debtors' future revenues, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs.

The Feasibility analysis, attached hereto as **Exhibit D**, relies on certain financial projections related to the Reorganized Debtors' operations, which represent the best estimate of

the Debtors' management and financial advisor of the future financial performance of Reorganized Debtors based on currently known facts and assumptions about future operations of Reorganized Debtors, as well as the U.S. and world economy in general and the relevant industries in which the Company operates. The financial projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, including those risks that affect the Company's businesses as discussed herein, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics and/or pandemics may affect the actual financial results achieved. There is no guarantee that the financial projections will be realized, and actual financial results may differ significantly from the financial projections.

4.      The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

5.      The Company's Operations May be Impacted By the Continuing COVID-19 Pandemic

The business and financial results of the Company have been and may continue to be negatively impacted by the outbreak of COVID-19 and could be similarly negatively impacted by other pandemics or epidemics in the future. In 2020, COVID-19 has significantly impacted economic activity and markets around the world, and it could negatively impact the Company's business in numerous ways. These impacts of the COVID-19 pandemic or other global or regional health pandemics or epidemics could have the effect of heightening many of the other risks described in this "Risk Factors" section, such as those relating to the Company's results of operations or financial condition. The Company might not be able to predict or respond to all impacts on a timely basis to prevent near- or long-term adverse impacts to their results. The ultimate impact of these disruptions also depends on events beyond the knowledge or control of the Company, including the duration and severity of any outbreak and actions taken by parties other than the Company to respond to them. Any of these disruptions could have a negative impact on the Company's business operations, financial performance and results of operations, which impact could be material.

6.      Natural Disasters Could Have a Material Adverse Effect on the Company

Natural disasters can potentially destroy numerous business structures and homes and could disrupt the Company's supply chain. Disruptions in supply could have a material adverse

effect on the Company. Damage and higher prices caused by natural disasters could also have an adverse effect on the Company due to the impact on the financial condition of its customers. To the extent the frequency or magnitude of significant weather events and natural disasters increases, the resulting increase in disruptions also could have adverse impacts on the Company on both the supply and demand side.

7.      The Pharmaceutical Business is Highly Competitive, and Competition May Negatively Affect the Company's Operations

The Company is affected by the competition for customers among all of the participants in the pharmaceutical business. The Company competes with a number of large national and regional firms and several thousand small independent firms. Because of the relatively low barriers to entry into the pharmaceutical market, there is the potential for small independent companies, as well as other companies not previously engaged in the Debtors business segments, to compete with the Company. As a result, the Company is subject to the risk of additional competition in the future. Some of the Company's competitors may have greater financial resources or lower costs than the Company does. Should a competitor attempt to increase market share by reducing prices, the Company's operating margins and customer base may be negatively impacted.

## ARTICLE X
## SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot (the "Ballot") to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.

### 10.1    *Holders of Claims Entitled to Vote on the Plan*

The Debtors are soliciting votes to accept or reject the Plan only from holders of Claims or Interests in Classes 1, 5 and 9 (the **"Voting Class"**). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan. The Debtors are not soliciting votes from Holders of Claims or Interests in Classes 2, 3, 4, 5, 6, 7, 8, 10, 11 and 12.

### 10.2    *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**10.3**     *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**10.4**     *Solicitation Procedures*

(a)     **Solicitation Agent**

The Debtors have retained Stretto, Inc. to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)     **Solicitation Package**

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Classes (collectively, the **"Solicitation Package"**):

(i)        cover letter in support of the Plan;

(ii)       the appropriate Ballot and applicable voting instructions, together with a preaddressed, postage pre-paid return envelope; and

(iii)      this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto (which may be distributed in paper or USB-flash drive format).

(c)      **Distribution of the Solicitation Package and Plan Supplement**

[_____] (the **"Voting Record Date"**) is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package or grant access to the Solicitation Package via the Solicitation Agent's website to Holders of Claims in the Voting Classes in , 5 and 9, which is twenty (20) Business Days before the Voting Deadline (*i.e.*, 5:00 p.m. (Eastern Daylight Time) on [_____]).  The Solicitation Package (except the Ballot) may also be obtained from the Solicitation Agent by: (a) calling the Debtor's restructuring hotline at 866.515.5505 (domestic toll-free) or 949.590.3286 (local/international toll), (b) emailing OptioRXInquiries@stretto.com, and/or (c) writing to the Solicitation Agent at OptioRx Ballot Processing, c/o Stretto, Inc, 410 Exchange, Suite 100, Irvine, CA 92602.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/OptioRX, or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days before the Objection Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

# ARTICLE XI
# CONFIRMATION OF THE PLAN

## 11.1   *The Confirmation Hearing*

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Debtors will request that the Bankruptcy Court set hearing dates to approve the Plan and Disclosure Statement.  The Disclosure Statement and/or Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan.  An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 11.2    *Requirement for Confirmation of the Plan*

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## 11.3    *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).  To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.  The Feasibility Analysis attached hereto as **Exhibit D** and is incorporated herein by reference.  Based upon the Feasibility Analysis, the Debtors believe that the Plan will meet the feasibility requirements of the Bankruptcy Code.  Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision.  Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.

## 11.4    *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

4869-9662-5086, v. 7

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Section 3.06 of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**11.5**  *Confirmation Without Acceptance by all Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

(a)    **No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)      **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class. The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.  There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan.

**11.6     *Liquidation Analysis***

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7. Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the **"Liquidation Analysis"**) prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code

**ARTICLE XII**
**CERTAIN SECURITIES LAW MATTERS**

**12.1     *Exemption from Registration Requirements of the Securities Act and Blue Sky Laws***

(a)      **Section 1145 of the Bankruptcy Code (After Filing Chapter 11 Cases)**

The Debtors are relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act to exempt the offering, issuance and distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC (the **"Section 1145 Securities"**) pursuant to the Plan after the filing of Chapter 11 Cases. Section 1145(a)(1) of the Bankruptcy Code provides that registration

requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of securities by a debtor under a plan of reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for cash and property.  Recipients of the Section 1145 Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act, any applicable state Blue Sky Law, other local law.

**ARTICLE XIII**
**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

**13.1**   *Introduction*

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the **"Tax Code"**), the U.S. Treasury Regulations promulgated thereunder (the **"Treasury Regulations"**), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the **"IRS"**), and other applicable authorities (collectively, **"Applicable Tax Law"**), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  Except as discussed in Section 13.3 hereof, no opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, broker-dealers, mutual funds, governmental authorities or agencies, persons who are not U.S. Holders (defined below), pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors or the Reorganized Debtors within the meaning of the Tax Code, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, Persons who prepare "applicable financial statements" (as defined in section 451 of the Tax Code), Persons using a mark-to- market method of accounting, Persons who are themselves in bankruptcy or regulated investment companies). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the Tax

- 68 -

Code).  This summary also assumes that the various third-party debt and other arrangements to which the Debtors and the Reorganized Debtors, as applicable, are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form.  This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (b) that are not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust, if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) the trust has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

Furthermore, this discussion assumes that all separate plans of reorganization under the Bankruptcy Code constituting the Plan will be consummated.  If less than all of such plans of reorganization will be consummated, their federal income tax consequences may be materially different than the consequences described below.  The following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim. All Holders of Claims should seek tax advice based on their particular circumstances from an independent tax advisor regarding the federal, state, local, and other tax consequences of the transactions contemplated by the Plan.

## 13.2    *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor and the Reorganized Debtors*

In general, absent an exception, a debtor will realize and recognize cancellation of debt (**"COD"**) income for U.S. federal income tax purposes if outstanding indebtedness is satisfied for total consideration less than the amount of such indebtedness.  In general, the amount of COD income is the excess of (a) the adjusted issue price of the satisfied indebtedness over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the debtor issued, and (iii) the fair market value of any other new consideration (including stock or a partnership

interest of the debtor or a party related to the debtor), in each case, given in satisfaction of such indebtedness at the time of the exchange.

The Debtors may incur COD income as a result of the implementation of the Plan. Specifically, Optio Rx may incur COD income as a result of satisfying Allowed Class 1 Claims by issuing new preferred and common equity shares or units of Online Pharmacy Holdings LLC to the Holders of those Claims.

Under section 108 of the Tax Code, a taxpayer is not required to include COD income in gross income if (a) the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the **"Bankruptcy Exception"**), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the **"Insolvency Exception"**).

**13.3** ***U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims and Interests.***

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Interests. This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local, or estate and gift taxation is addressed.

**EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE,**

**LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

(a)      **Tax Consequences to the Debtors**

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD Income to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below.  Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

The recognition of COD Income may be treated differently in the context of a confirmed chapter 11 plan.  For example, under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income.  The Tax Attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards.  If the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, the excess still is excluded from income.  Pursuant to section 108(b)(4)(A), the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized.  Section l08(e)(2) provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

(b)      **Tax Consequences for Holders of Claims**

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim.  The tax basis of a Holder in a Claim will generally be equal to the Holder's cost.  To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one (1) year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration

is characterized as accrued interest.  A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Combined Plan and Disclosure Statement, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Combined Plan and Disclosure Statement on account of its Claim.

**ARTICLE XIV**
**RECOMMENDATION**

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

*[Remainder of page intentionally left blank]*

4869-9662-5086, v. 7

Dated:  June 10, 2024

Respectfully submitted,


**Optio Rx, LLC**
**Braun Pharma, LLC**
**Dr. Ike's PharmaCare, LLC**
**Rose Pharmacy SA LLC**
**Rose Pharmacy SF LLC**
**Rose Pharmacy RM LLC**
**Pet Apothecary, LLC**
**Crestview Holdings, LLC**
**SBH Medical, LLC**
**H&H Pharmacy, LLC**
**Enovex Pharmacy, LLC**
**SMC Pharmacy, LLC**
**SMC Lyons Holdings, LLC**
**Baybridge Pharmacy, LLC**
**Central Pharmacy, LLC**
**Pro Pharmacy, LLC**
**Healthy Choice Compounding LLC**
**Oakdell Compounding Pharmacy, LLC**
**The Pet Apothecary LLC**
**Crestview Pharmacy, LLC**
**SBH Medical, Ltd.**
**Concierge Pharmacy, LLC**
**Firstcare Pharmacy, LLC**
**Easycare Pharmacy, LLC**
**Primecare Pharmacy, LLC.**


By:    */s/ Ben David*
Name: Ben David
Title:   Chief Executive Officer

4869-9662-5086, v. 7

**<u>EXHIBIT A</u>**

**Plan**

**(Attached)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (*Joint Administration Pending*) |

## JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF OPTIO RX, LLC, *et al.*

**CHIPMAN, BROWN, CICERO & COLE, LLP**

William E. Chipman, Jr.
David Carickhoff
Mark. D. Olivere
Alan M. Root
Hercules Plaza
1313 North Market Street
Suite 5400
Wilmington, Delaware 19801
Email: Chipman@chipmanbrown.com
        Carickhoff@chipmanbrown.com
        Olivere@chipmanbrown.com
        Root@chipmanbrown.com

*Counsel to the Debtors and Debtors-in-Possession*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061.

# **TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF
TIME AND GOVERNING LAW ........................................................................... 1

Section 1.01    Defined Terms ............................................................. 1

Section 1.02    Rules of Interpretation................................................. 15

Section 1.03    Computation of Time .................................................. 15

Section 1.04    Governing Law ........................................................... 16

Section 1.05    References to Monetary Figures.................................... 16

Section 1.06    Reference to the Debtors or the Reorganized Debtors ..... 16

Section 1.07    Consent Rights of Consenting Lenders .......................... 16

Section 1.08    Controlling Document .................................................. 16

ARTICLE II ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND STATUTORY
FEES ............................................................................................................ 17

Section 2.01    Administrative Claims.................................................. 17

Section 2.02    Professional Fee Claims .............................................. 17

Section 2.03    Priority Tax Claims ..................................................... 19

Section 2.04    DIP Facility ............................................................... 19

Section 2.05    Statutory Fees ............................................................ 19

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 19

Section 3.01    Deemed Substantive Consolidation............................... 19

Section 3.02    Classification of Claims and Interests ........................... 20

Section 3.03    Summary of Classification for the Reorganized Debtors... 20

Section 3.04    Classification and Treatment of Claims and Interests....... 21

Section 3.05    Special Provisions Regarding Reinstated Unimpaired Claims ....... 25

Section 3.06    Voting Classes, Presumed Acceptance by Non-Voting Classes ...... 26

Section 3.07    Elimination of Vacant Classes ..................................... 26

Section 3.08    Controversy Concerning Impairment ............................ 26

Section 3.09    Intercompany Interests ................................................ 26

Section 3.10    Subordinated Claims ................................................... 26

Section 3.11    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
Code            27

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN......................................... 27

Section 4.01    Restructuring Transactions........................................... 27

Section 4.02    Sources of Cash for Plan Distributions .......................... 28

Section 4.03    Continued Corporate Existence..................................... 28

- i -

Section 4.04    Existing Governance Documents ...................................................................... 28

Section 4.05    Members of the Governing Bodies ................................................................... 28

Section 4.06    Vesting of Assets in the Reorganized Debtors ................................................. 29

Section 4.07    Section 1145 Exemption .................................................................................. 29

Section 4.08    Cancellation and Surrender of Instruments and Agreements .......................... 29

Section 4.09    Corporate Action ............................................................................................. 29

Section 4.10    Section 1146 Exemption from Certain Taxes and Fees ................................... 30

Section 4.11    Preservation of Causes of Action .................................................................... 30

Section 4.12    Single Satisfaction of Claims ......................................................................... 31

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 31

Section 5.01    Assumption of Executory Contracts and Unexpired Leases ........................... 31

Section 5.02    Claims Based on Rejection of Executory Contracts or Unexpired Leases ...... 32

Section 5.03    Cure of Defaults and Objections to Cure Amounts and Assumption for Executory Contracts and Unexpired Leases Assumed .................................................................... 33

Section 5.04    Modifications, Amendments, Supplements, Restatements or Other Agreements 34

Section 5.05    Reservation of Rights ...................................................................................... 34

Section 5.06    Contracts and Leases Entered Into After the Petition Date .............................. 35

Section 5.07    Assumption of Insurance Policies ................................................................... 35

Section 5.08    Assumption of the Employee Compensation and Benefits Program ............... 35

Section 5.09    Indemnification Obligations ............................................................................ 36

Section 5.10    Nonoccurrence of Effective Date .................................................................... 36

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 36

Section 6.01    Record Date for Distributions ......................................................................... 36

Section 6.02    Timing of Distributions ................................................................................... 37

Section 6.03    Disbursing Agent ............................................................................................ 37

Section 6.04    Delivery of Distributions and Undeliverable or Unclaimed Distributions ....... 38

Section 6.05    Fractional Distributions ................................................................................... 38

Section 6.06    Undeliverable Distributions and Unclaimed Property ..................................... 38

Section 6.07    Manner of Payment ......................................................................................... 39

Section 6.08    Compliance with Tax Requirements and Allocations ...................................... 39

Section 6.09    Allocation Between Principal and Interest ....................................................... 39

Section 6.10    Setoffs and Recoupment ................................................................................. 39

Section 6.11    No Postpetition or Default Interest on Claims ................................................ 40

ARTICLE VII SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS .. 40

4865-3582-3548, v. 5

Section 7.01    General Compromise and Settlement of Claims, Interests and Controversies. 40

Section 7.02    Releases by the Debtor ................................................................. 41

Section 7.03    Releases by Holders of Claims and Interests ................................ 42

Section 7.04    Discharge of Claims ..................................................................... 43

Section 7.05    Exculpation .................................................................................. 44

Section 7.06    Injunction..................................................................................... 44

Section 7.07    Term of Injunctions or Stays ....................................................... 45

Section 7.08    Protection Against Discriminatory Treatment ............................. 45

Section 7.09    Release of Liens, Claims and Interests.......................................... 45

ARTICLE VIII CONDITIONS PRECEDENT TO CONFIRMATION  OF THE PLAN AND
THE EFFECTIVE DATE .............................................................................................. 46

Section 8.01    Conditions Precedent to Confirmation ........................................ 46

Section 8.02    Conditions Precedent to the Effective Date .................................. 47

Section 8.03    Waiver of Conditions ................................................................... 48

Section 8.04    Effect of Failure of Conditions..................................................... 48

Section 8.05    Substantial Consummation ........................................................... 48

ARTICLE IX MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ........ 48

Section 9.01    Modification and Amendments ..................................................... 48

Section 9.02    Effect of Confirmation on Modifications...................................... 49

Section 9.03    Revocation or Withdrawal of the Plan ......................................... 49

ARTICLE X RETENTION OF JURISDICTION ............................................................... 49

ARTICLE XI MISCELLANEOUS PROVISIONS ............................................................. 52

Section 11.01    Tax Structure .............................................................................. 52

Section 11.02    Immediate Binding Effect ........................................................... 52

Section 11.03    Additional Documents................................................................. 52

Section 11.04    Reservation of Rights .................................................................. 52

Section 11.05    Successors and Assigns ............................................................... 53

Section 11.06    Notices........................................................................................ 53

Section 11.07    Entire Agreement ........................................................................ 54

Section 11.08    Severability of Plan Provisions ................................................... 54

Section 11.09    Exhibits....................................................................................... 54

Section 11.10    Votes Solicited in Good Faith ..................................................... 55

Section 11.11    Closing of Chapter 11 Cases ....................................................... 55

Section 11.12    Document Retention..................................................................... 55

Section 11.13    Further Assurances...................................................................... 55

Section 11.14   Claims Against Other Debtors ........................................................................... 56

Section 11.15   Transaction Expenses ....................................................................................... 56

- iv -

**INTRODUCTION**

The Debtors propose the Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used in the Plan and not otherwise defined shall have the respective meanings set forth in Section 1.01 of the Plan or the Bankruptcy Code.  Although proposed jointly for administrative purposes, the Plan also seeks entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, Confirmation, and distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan and certain related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME AND GOVERNING LAW**

**Section 1.01   Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

(a)        "AAL" means the Agreement Among Lenders, dated as of November 3, 2022 (as amended), between and among the First Out Holders, the Last Out Holder and the Prepetition Admin Agent.

(b)        "Administrative Claim" means any Claim for the costs and expenses of administration of the Chapter 11 Cases pursuant to section 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors, other than the Professional Fee Claims.

(c)        "Administrative Expense Claim Bar Date" means the date that is forty-five (45) days after notice of entry of the Effective Date, which notice shall set forth such deadline and be served on all parties known by the Debtors to hold or potentially hold Administrative Claims.

- 1 -

(d)        "<u>Affiliate</u>" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if such Person was a Debtor.

(e)        "<u>Allowed</u>" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors in their Schedules as other than "disputed, contingent or unliquidated" (as such terms are defined in the Schedules); (b) a proof of Claim that has been Filed and as to which the Debtors, the Reorganized Debtors, or other parties-in-interest have not Filed an objection by the applicable Claims Objection Bar Date; (c) a Proof of Claim that is neither Disputed nor has been disallowed by a Final Order; (d) a Claim that is allowed pursuant to the terms of this Plan; or (e) a Claim that is estimated pursuant to section 502(c) of the Bankruptcy Code, unless otherwise and explicitly provided by order of the Bankruptcy Court.

(f)        "<u>Avoidance Actions</u>" means any and all actual or potential avoidance, recovery, subordination or other Claims, Causes of Action or remedies that may be brought by or on behalf of the Company Parties, their Estates, or other parties in interest under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) or other applicable sections of the Bankruptcy Code or under similar or related local, state, federal or foreign statutes and common law, including fraudulent transfer laws.

(g)        "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

(h)        "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware and, to the extent of any withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

(i)        "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

(j)        "<u>Business Day</u>" means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

(k)        "<u>Cash</u>" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks or other similar items.

(l)        "<u>Cause of Action</u>" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license or franchise of any kind or character whatsoever, known or unknown, foreseen or unforeseen, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance

- 2 -

of doubt, the term "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to or otherwise contest Claims or Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, Avoidance Actions, or chapter 5 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any claim under any state or foreign law, including any fraudulent transfer or similar claim.

(m)    "CBC Pharma" means Non-Debtor CBC Pharma Holdco, LLC, the direct or indirect parent company of Optio Rx and each of the other Debtors.

(n)    "Chapter 11 Cases" means the cases pending for the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

(o)    "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code.

(p)    "Claims Register" means the official register of Claims against or Interests in any of the Debtors maintained by the Solicitation Agent.

(q)    "Class" means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

(r)    "Company" means Optio Rx, LLC and certain of its direct and indirect subsidiaries that are Debtors in these Chapter 11 Cases.

(s)    "Company Parties" means, consistent with the Restructuring Support Agreement:  (1) Optio Rx, LLC; (2) Braun Pharma, LLC; (3) Dr. Ike's PharmaCare, LLC; (4) Rose Pharmacy SA LLC; (5) Rose Pharmacy SF LLC; (6) Rose Pharmacy RM LLC; (7) Pet Apothecary, LLC; (8) Crestview Holdings, LLC; (9) SBH Medical, LLC; (10) H&H Pharmacy, LLC; (11) Enovex Pharmacy, LLC; (12) SMC Pharmacy, LLC; (13) SMC Lyons Holdings, LLC; (14) Baybridge Pharmacy, LLC; (15) Central Pharmacy, LLC; (16) Pro Pharmacy, LLC; (17) Healthy Choice Compounding LLC; (18) Oakdell Compounding Pharmacy, LLC; (19) The Pet Apothecary LLC; (20) Crestview Pharmacy, LLC; (21) SBH Medical, Ltd.; (22) Concierge Pharmacy, LLC; (23) Firstcare Pharmacy, LLC; (24) Easycare Pharmacy, LLC; and (25) Primecare Pharmacy, LLC.

(t)    "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

(u)    "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

(v)    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be, or may have been, continued from time to time.

- 3 -

(w)      "<u>Confirmation Order</u>" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan in the Chapter 11 Cases pursuant to section 1129 of the Bankruptcy Code in a form consistent with the consent rights of the parties to the Restructuring Support Agreement.

(x)      "<u>Consenting Lender Advisors</u>" means DLA Piper LLP (US) and counsel to the Last Out Holder.

(y)      "<u>Consenting Lenders</u>" means the First Out Holders and the Last Out Holder that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

(z)      "<u>Consummation</u>" means the occurrence of the Effective Date.

(aa)     "<u>Convenience Claim</u>" means a General Unsecured Claim in an amount of $500 or less, or a General Unsecured Claim that has been reduced by its Holder below $500.

(bb)     "<u>Cure Claim</u>" means a Claim based upon a monetary default, if any, by a Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

(cc)     "<u>D&O Liability Insurance Policies</u>" means all insurance policies of the Debtors or the Reorganized Debtors or any non-Debtor Affiliate for directors', officers', managers' and any other Insured (as defined in such policy) entities' liability.

(dd)     "<u>Debtors</u>" means the above captioned debtors, in their capacity as debtors and debtors-in-possession in these Chapter 11 Cases.

(ee)     "<u>Definitive Documents</u>" has the meaning set forth in the Restructuring Support Agreement.

(ff)     "<u>DIP Agent</u>" means Loan Admin Co LLC, the administrative agent and the collateral agent for the DIP Lenders with respect to the DIP Facility.

(gg)     "<u>DIP Agent Advisor</u>" means DLA Piper LLP (US).

(hh)     "<u>DIP Credit Agreement</u>" means the debtor-in-possession financing agreement by and among certain Company Parties, the DIP Agent, and the DIP Lenders setting forth the terms of the DIP Facility, in accordance with the DIP Facility Term Sheet.

(ii)     "<u>DIP Documents</u>" means, collectively, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, and the Interim DIP Order and Final DIP Order.

(jj)     "<u>DIP Facility</u>" means the loans under the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Facility Term Sheet.

- 4 -

(kk)        "DIP Facility Term Sheet" means the debtor-in-possession to exit financing, to be provided by the DIP Lenders and the Consenting Lenders, as applicable, as specified in the term sheet attached as Exhibit A to the Restructuring Support Agreement.

(ll)        "DIP Lenders" means the First Out Holders and Last Out Holder under the Prepetition Credit Agreement (or its or their affiliates or related funds).

(mm)        "DIP Lien Secured Claims" means the allowed first-priority, perfected, enforceable and unavoidable secured claims granted to the DIP Lenders in the DIP Orders.

(nn)        "DIP Lien Conversion" means the conversion of 100% of the DIP Lenders' DIP Superpriority Claims into Exit Facility Claims to effect the Exit Capital Structure attached as an exhibit to the Restructuring Support Agreement on the Effective Date.

(oo)        "DIP Orders" means collectively the Interim DIP Order and the Final DIP Order.

(pp)        "DIP Superpriority Claims" means the allowed superpriority administrative expense claims, granted to the DIP Lenders in the DIP Orders, in excess of the value of the Debtors' interests in the Collateral, if any.

(qq)        "Disbursing Agent" means the Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors, to make or facilitate distributions pursuant to the Plan, which Entity may include the Solicitation Agent.

(rr)        "Disclosure Statement" means the disclosure statement with respect to the Plan, including all exhibits, appendices, schedules, ballots and related documents thereto, as amended, supplemented or modified from time to time, to be approved by the Confirmation Order.

(ss)        "Distribution Date" means the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence.

(tt)        "Distribution Record Date" means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the first Business Day after the day on which the Confirmation Order is entered by the Bankruptcy Court.

(uu)        "Effective Date" means the first Business Day after the Confirmation Date on which all provisions, terms and conditions specified in Section 8.02 have been either satisfied or waived pursuant to Section 8.03.

(vv)        "Enjoined Party" means all Entities who have held, hold or may hold Claims or Interests that have been released or discharged or are subject to exculpation pursuant to the Plan.

(ww)        "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(xx)        "Equity Security" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in any of the Debtors.

(yy)    "Estates" means the estates of each of the Debtors created under section 541 of the Bankruptcy Code.

(zz)    "Exculpated Claim" means any claim and Cause of Action related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination or negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition and postpetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the DIP Facility, the Exit Facility, the Plan Term Sheet, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the DIP Facility, the Exit Facility, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, and any other contract, instrument, release or other agreement or document created or entered into before or during these Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including, to the extent applicable, the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event or other occurrence taking place prior to, on or after the Petition Date.

(aaa)    "Exculpated Party" means, collectively, and in each case in its capacity as such: (i) each of the Debtors; (ii) each of the Reorganized Debtors; (iii) any statutory committees appointed in the Chapter 11 Cases; (iv) each current and former Affiliate of each Entity in clause (i) through the following clause (iii); and (v) each Related Party of each Entity in clause (i) through this clause (iii).

(bbb)    "Exculpation" means the exculpation provision set forth in Section 7.05 hereof.

(ccc)    "Executory Contract" means a contract to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

(ddd)    "Existing Governance Documents" means the Debtors' respective certificates of incorporation, certificates of formation, bylaws, charters, trust agreements, indentures, limited liability company agreements, partnership agreements, shareholder agreements and such other formation and constituent documents in effect prior to the Effective Date.

(eee)    "Exit Capital Structure" means the capital structure chart attached to the Restructuring Support Agreement as Exhibit C.

(fff)    "Exit Facility" means that certain exit facility comprising the sum of the DIP Lien Conversion and a portion of the Prepetition Lien Claims that are the subject of clause (a) of the Prepetition Lien Conversion and consistent with the terms, conditions, and provisions of an exit facility giving effect to the Exit Capital Structure.

(ggg)    "Exit Facility Claims" means the portion of the First Out Holders and Last Out Holder's respective Prepetition Lien Claims and 100% of the DIP Lenders' DIP Superpriority Claims to be rolled in into the Exit Facility under the Plan Term Sheet.

(hhh)    "Final DIP Order" means the order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the DIP Agent and the DIP Lenders.

(iii)    "Final Order" means an order, ruling or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has: (a) not been reversed, stayed, modified, amended, or vacated as to which the time to appeal, petition for certiorari or move for a new trial, stay, reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for a new trial, stay, reargument, reconsideration or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration or rehearing was sought; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

(jjj)    "Finance Documents" means (a) the Prepetition Credit Agreement, (b) the AAL, and (c) all other documents entered into, pursuant to, or in connection with, the foregoing documents in clauses (a) and (b) of this definition (including, but not limited to, any cash management arrangements and ancillary facilities).

(kkk)    "Financing Orders" means any orders entered in the Chapter 11 Cases authorizing debtor-in-possession financing or the use of cash collateral (whether interim or final).

(lll)    "First Out Holders" means the holders of First Out Term Loans and/or First Out Revolving Loans under the Prepetition Credit Agreement and the AAL.

(mmm)"First Out Term Lien Claims" means First Out Term Loan secured claims.

(nnn)    "First Out Term Loans" means the first out term loans provided by the First Out Holders under the Prepetition Credit Agreement and the AAL.

(ooo)    "First Out Revolving Lien Claims" means First Out Revolving Loan secured claims.

(ppp)    "First Out Revolving Loans" means the first out revolving loans provided by the First Out Holders under the Prepetition Credit Agreement and the AAL.

(qqq)    "General Unsecured Claim" means any unsecured Claim against any of the Debtors that is not a Noteholder Claim, a Seller Noteholder Claim, an Intercompany Claim or a Claim that is Secured, subordinated or entitled to priority under the Bankruptcy Code.

(rrr)    "GUC Opt-In Gift" the gift, in the amount of $[●], from the Prepetition Secured Lenders to the Holders of Allowed Claims or Interests (i) that are entitled to vote on the Plan and (ii) who vote to accept the Plan and opt-in to the releases in favor of the Released Parties.

(sss)    "General Unsecured Trade Claim" means any General Unsecured Claim held by a trade vendor that agrees to continue to provide goods or services to the Reorganized Debtors

following the Effective Date on the same or better terms as immediately prior to the Petition Date by entering into a Trade Agreement with the Debtors.

(ttt)    "GUC Trade Gift" means the gift from the Prepetition Secured Lenders to the Holders of allowed General Unsecured Trade Claims to satisfy (x) [80-95%] of all Allowed General Unsecured Trade Claims on the Effective Date and (y) the remaining [5%-20%] of such Allowed General Unsecured Trade Claims on the one-year anniversary of the Effective Date.

(uuu)    "Governing Body" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity.

(vvv)    "Governmental Unit" means any domestic, foreign, provincial, federal, state, local or municipal (a) government, (b) governmental agency, commission, department, bureau, ministry or other governmental entity or (c) any other governmental unit as defined in section 101(27) of the Bankruptcy Code.

(www)    "Holder" means any Entity holding a Claim or an Interest, as applicable.

(xxx)    "Impaired" means any Claim or Interest in an Impaired Class.

(yyy)    "Impaired Class" means a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.  For the avoidance of doubt, Impaired Classes under the Plan are Classes 1, 5, 6, 7, 8, 9, 10 and 12.

(zzz)    "Insurance Policies" means any insurance policies, insurance settlement agreements, coverage-in-place agreements or other agreements related to the provision of insurance entered into by or issued to or for the benefit of any of the Debtors or their predecessors.

(aaaa)    "Insurer" means a counterparty to any Insurance Policy that is not a Debtor, its predecessors, or Affiliates.

(bbbb)    "Intercompany Claim" means any Claim against a Debtor held by a Debtor or a Company Party.

(cccc)    "Intercompany Interest" means an any Interest in a Debtor held by a Debtor or a Company Party.

(dddd)    "Interest" means collectively, (i) any Equity Security, or any other equity, ownership interest (including any such interest in a partnership, limited liability company or other Entity), in any of the Debtors, (ii) any other rights, options, warrants rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any of the Debtors, and (iii) any and all Claims against any of the Debtors that are otherwise determined by the Bankruptcy Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest or subject to subordination as an equity interest pursuant to section 510(b) of the Bankruptcy Code.

- 8 -

(eeee)    "<u>Interim DIP Order</u>" means the order from the Bankruptcy Court approving the DIP Facility on an interim basis.

(ffff)    "<u>Last Out Holder</u>" means the holder of Last Out Term Loans under the Prepetition Credit Agreement and the AAL.

(gggg)    "<u>Last Out Term Lien Claims</u>" means the Last Out Term Loan secured claims.

(hhhh)    "<u>Last Out Term Loans</u>" means the last out term loans provided by the Last Out Holder under the Prepetition Credit Agreement and the AAL.

(iiii)    "<u>Lien</u>" has the meaning set forth in section 101(37) of the Bankruptcy Code.

(jjjj)    "<u>Local Rules</u>" means the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware.

(kkkk)    "<u>Milestones</u>" have the meaning set forth in Section 6.03 of the Restructuring Support Agreement.

(llll)    "<u>New Governance Documents</u>" means the partnership agreement, certificate of incorporation, certificate of formation, bylaws, charter, trust agreement, indenture, limited liability company agreement, shareholder agreement and such other formation and constituent documents of the Reorganized Debtors, each of which shall be included in the Plan Supplement.

(mmmm)    "<u>Notes</u>" means the notes issued by Optio Rx under the Note Purchase Agreement.

(nnnn)    "<u>Noteholders</u>" means the purchasers from time to time of the Notes under the Note Purchase Agreement.

(oooo)    "<u>Noteholder Claims</u>" means the subordinated claims of the Noteholders due under the Notes.

(pppp)    "<u>Note Purchase Agreement</u>" means that certain Note Purchase Agreement, dated as of September 25, 2020, as amended, between and among CBC Pharma, Optio Rx, the Noteholders, and Aves Management LLC, as Administrative Agent, subject to the Subordination Agreement.

(qqqq)    "<u>Online Pharmacy Holdings LLC</u>" means the new holding company formed on May 22, 2024 to issue preferred and common equity shares or units in connection with the Prepetition Lien Conversion.

(rrrr)    "<u>Optio Rx</u>" means Debtor Optio Rx, LLC.

(ssss)    "<u>Other General Unsecured Claim</u>" means any unsecured Claim against any of the Debtors that is not a Noteholder Claim, a Seller Noteholder Claim, a General Unsecured Trade Claim, an Intercompany Claim or a Claim that is Secured, subordinated or entitled to priority under the Bankruptcy Code.

(tttt)    "Other Priority Claim" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (i) an Administrative Claim, (ii) a Professional Fee Claim or (iii) a Priority Tax Claim.

(uuuu)    "Outside Date" shall be December 31, 2024, which date may be extended solely upon the express written consent from each of the Consenting Lenders.

(vvvv)    "Person" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

(wwww)    "Petition Date" means the first date on which each of the Debtors commenced a Chapter 11 Case.

(xxxx)    "Pharmacy Management LLC" means the entity serving as the manager of Optio Rx

(yyyy)    "Plan" means this Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, *et al.*, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Restructuring Support Agreement or the terms hereof, as the case may be, and the Plan Supplement, subject to the consent rights of the Consenting Lenders set forth in the Restructuring Support Agreement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

(zzzz)    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules and exhibits to the Plan including, among other things, as applicable: (i) the New Governance Documents; (ii) the Schedule of Retained Causes of Action; (iii) the Rejected Executory Contract and Unexpired Lease List; (iv) the Feasibility Analysis; and (v) any other necessary documentation related to the Restructuring Transactions (in each case, as may be altered, amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be filed by the Debtors, to the extent reasonably practicable, no later than seven (7) days before the earlier of (a) the Voting Deadline, (b) the confirmation objection deadline, or (c) such later date as may be approved by the Bankruptcy Court on notice to parties in interest; provided that, through the Effective Date, the Debtors, subject to the consent rights in the Restructuring Support Agreement, shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan and the Restructuring Support Agreement.

(aaaaa)    "Plan Term Sheet" means the term sheet summarizing the Restructuring Transactions attached to the Restructuring Support Agreement as Exhibit B.

(bbbbb)    "Prepetition Admin Agent" means Loan Admin Co LLC, as administrative agent, and Loan Admin Co LLC, as lead arranger, under the Prepetition Credit Agreement.

(ccccc)    "Prepetition Credit Agreement" means that certain Credit Agreement, dated as of June 28, 2019 (as amended), by and among CBC Pharma, the Debtors, the Prepetition Admin Agent and the Prepetition Secured Lenders.

- 10 -

(ddddd)    "<u>Prepetition Lien Claims</u>" means the First Out Term Lien Claims, the First Out Revolving Lien Claims and the Last Out Term Lien Claims secured by first-priority liens and security interests in substantially all the Debtors' assets.

(eeeee)    "<u>Prepetition Lien Conversion</u>" means the First Out Holders' and Last Out Holder's conversion of (i) a portion of their Prepetition Lien Claims into Exit Facility Claims and (ii) the remaining portion of their Prepetition Lien Claims into Prepetition Lien Conversion Equity, all to effect the Exit Capital Structure attached to the Restructuring Support Agreement.

(fffff)    "<u>Prepetition Lien Conversion Equity</u>" means the preferred and common equity shares or units of Online Pharmacy Holdings LLC received by the First Out Holders and Last Out Holder as consideration for committing to the conversion of the remaining portion of their Prepetition Lien Claims after converting a portion of their Prepetition Lien Claims into Exit Facility Claims, and in which Interests in Optio Rx shall vest on the Effective Date.

(ggggg)    "<u>Prepetition Secured Lenders</u>" means the First Out Lien Holders, the Last Out Lien Holder, and any other lender party to the Prepetition Credit Agreement and AAL from time to time.

(hhhhh)    "<u>Prepetition Secured Obligations</u>" means the First Out Term Loans, the First Out Revolving Loans, and the Last Out Term Loans.

(iiiii)    "<u>Priority Tax Claim</u>" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

(jjjjj)    "<u>Pro Rata</u>" means, with respect to an Allowed Claim, the percentage represented by a fraction (i) the numerator of which shall be an amount equal to such Claim and (ii) the denominator of which shall be an amount equal to the aggregate amount of Allowed and estimated Claims in the same Class as such Claim, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the portion that such Holder's Claim in a particular class bears to the aggregate amount of all Allowed and estimated Claims in such multiple Classes.

(kkkkk)    "<u>Professional</u>" means an Entity: (a) retained pursuant to a Final Order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

(lllll)    "<u>Professional Fee Amount</u>" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals that such Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II of the Plan.

(mmmmm)    "<u>Professional Fee Claim</u>" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

(nnnnn)    "<u>Professional Fee Escrow Account</u>" means an interest-bearing account to be funded by the Debtors with Cash on or prior to the Effective Date in an amount equal to the Professional Fee Amount.

(ooooo)    "<u>Reinstated</u>" means, with respect to any Claim or Interest, that the Claim or Interest shall not be discharged hereunder and the Holder's legal, equitable and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation, rendering such Claim or Interest unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstate" or "Reinstatement" shall have correlative meanings.

(ppppp)    "<u>Rejected Executory Contract and Unexpired Lease List</u>" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases (if any) that will be rejected by the Reorganized Debtors pursuant to the Plan, which list, as may be amended from time to time, shall be included in the Plan Supplement.

(qqqqq)    "<u>Related Parties</u>" means, collectively, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former affiliates, and such party's and such affiliates' current and former affiliates, directors, trustees, managers, officers, investment committee, members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, employees, agents, management companies, fund advisors or managers, managed funds (including any beneficial holders for the account of whom such funds are managed), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors (including, for the avoidance of doubt, any attorneys, investment bankers or other professionals and advisors retained by any current and former director and manager in his or her capacity as director or manager of such person) and any such Person's or Entity's respective heirs, executory, estates and nominees.

(rrrrr)    "<u>Released Parties</u>" means, collectively, (a) each of the Debtors, (b) the Reorganized Debtors, (c) the Consenting Lenders, (d) the DIP Lenders, (e) the Admin Agent; and (f) the Related Parties of each of the foregoing Entities in clauses (a) through (e) of this definition. For the avoidance of doubt, the manager of Pharmacy Management LLC and its Related Parties shall be deemed Released Parties. For the further avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

(sssss)    "<u>Releasing Party</u>" means, collectively, and in each case in their capacity as such: (i) each of the Released Parties; (ii) all Holders of Claims or Interests that vote to accept or reject the Plan and opt-into the releases provided by the Plan by checking the box on the applicable form indicating that they opt to grant the releases provided in the Plan; (iii) all Holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who affirmatively opt-into the releases provided by the Plan by checking the box on the applicable form indicating that they opt to grant the releases provided in the Plan; (iv) each current and former Affiliate of each Entity in clause (i)

- 12 -

through the following clause (v); and (v) each Related Party with respect to each of the foregoing in clauses (i) through (v).

(ttttt)    "Reorganized Debtors" means, collectively, the Debtors, and any successors thereto, by merger, consolidation or otherwise, as reorganized pursuant to and under the Plan, on or after the Effective Date.

(uuuuu)    "Restructuring Transactions" means the transactions set forth in the Restructuring Support Agreement, the Plan Term Sheet attached thereto and all other exhibits to the Restructuring Support Agreement or the Plan Term Sheet that shall be implemented on or prior to the Effective Date.

(vvvvv)    "Retained Causes of Action" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any of the Debtors or their Estates may hold against any Entity, including (a) Avoidance Actions; (b) claims and Causes of Action brought prior to the Effective Date, (c) claims and Causes of Action against any Entities for failure to pay for products or services provided or rendered by any of the Debtors, (d) claims and Causes of Action relating to strict enforcement of any of the Debtors' intellectual property rights, including patents, copyrights and trademarks, including claims against third parties for infringement of any such intellectual property rights or other misuse of such intellectual property, and (e) claims and Causes of Action seeking the recovery of any of the Debtors' accounts receivable or other receivables or rights to payment created or arising in connection with any of the Debtors' businesses, including claim overpayments and tax refunds; *provided* that the Retained Causes of Action shall not include all Causes of Action settled, released, or exculpated under the Plan, including the releases in Article VII.

(wwwww) "Schedules" means, collectively and if any are required, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs, if any, filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code and the applicable Bankruptcy Rules, as such Schedules may be amended, modified or supplemented from time to time, solely to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

(xxxxx)    "Secured" means, when referring to a Claim: (a) secured by a Lien on property in which an Estate of any of the Debtors against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estates' interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed pursuant to the Plan as a Secured Claim.

(yyyyy)    "Secured Claim" means any Claim that is Secured.

(zzzzz)    "Seller Notes" means those certain unsecured notes, that certain of the Debtors are obligated on, issued to prior owners of businesses that were purchased by the Debtors, including, without limitation, unsecured notes issued to BHM Capital, Inc., Universal Pharmaceutical Services, Inc., H&H Pharmacy, Inc. (d/b/a Dr. Ike's Pharmacy #1), Dr. Ike, Inc.

- 13 -

(d/b/a Dr. Ike's PharmaCare), Robert Hirsh, Elizabeth Buller, Salo, Inc., PIA Holdings, Inc., Baybridge Pharmacy Corp., 121 Central Pharmacy Corp., Delco Pharmacy Corp., OCPLP, Inc., and John J. Carson.

(aaaaaa)    "Seller Noteholders" means holders of Seller Notes.

(bbbbbb)    "Seller Noteholder Claims" means the unsecured Claims of the Seller Noteholders.

(cccccc)    "Solicitation Agent" means Stretto, Inc.

(dddddd)    "Subordinated Claim" means a Claim that is subordinated pursuant to section 510(b) of the Bankruptcy Code or any other applicable law.

(eeeeee)    "Subordinated Lender" means, collectively, Aves Special Opportunities Fund I, L.P., Allstate Insurance Company, Cross Country Mortgage, LLC, and Siguler Guff (Optio Rx) Holdings, LLC.

(ffffff)    "Subordination Agreement" means that certain Subordination Agreement, dated as of September 25, 2020, between and among, the Subordinated Lender, Optio Rx as the Borrower, Aves Management, LLC as the Subordination Agent, and Loan Admin Co LLC, as Administrative Agent, as amended, modified, extended, restated, replaced, or supplemented from time to time, subordinating the Noteholder Claims under the Note Purchase Agreement to the Prepetition Secured Obligations.

(gggggg)    "Third-Party Release" means the release set forth in Section 7.03 of the Plan.

(hhhhhh)    "Trade Agreement" means an agreement to continue to provide goods or services to the Reorganized Debtors, on the same or similar terms that existed immediately prior to the Petition Date, for the duration of the Chapter 11 Cases.

(iiiiii)    "Transaction Expenses" means all reasonable and documented fees, costs, and expenses of the Consenting Lender Advisors and DIP Agent Advisor in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation of the Definitive Documents, and/or enforcement of the Restructuring Support Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing.

(jjjjjj)    "Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of May 9, 2024, by and among the Debtors, the First Out Holders, and the Last Out Holder, as may be amended, modified or supplemented from time to time in accordance with its terms.

(kkkkkk)    "Unexpired Lease" means a lease to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

(llllll)    "Unimpaired" means a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

- 14 -

(mmmmmm)  "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

(nnnnnn)  "Vendor Secured Claims" means any Secured Claims held by any of the Debtor's vendors.

(oooooo)  "Voting Deadline" means __ p.m. (prevailing Eastern Time) on _____.

## Section 1.02   Rules of Interpretation

For the purposes of the Plan: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and neutral gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document, schedule or exhibit having been filed or to be filed shall mean that document, schedule or exhibit, as it may thereafter be amended, modified or supplemented; (iv) unless otherwise specified, all references herein to "Sections" and "Articles" are references to Sections and Articles hereof or hereto; (v) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions, headings to Articles and subheadings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (viii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (ix) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors, as applicable, in a manner that is consistent with the overall purpose and intent of the Plan without further Bankruptcy Court order; (x) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (xi) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xii) any reference herein to the word "including" or any word of similar import shall be read to mean "including without limitation"; (xiii) the word "or" shall not be exclusive; (xiv) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management/Electronic Case Files system; and (xv) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws.

## Section 1.03   Computation of Time

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act or deadline under the Plan is

- 15 -

required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

## Section 1.04    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation of the Debtors or Reorganized Debtors, as applicable.

## Section 1.05    References to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

## Section 1.06    Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Company, the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## Section 1.07    Consent Rights of Consenting Lenders

Notwithstanding anything herein to the contrary, any and all consent rights of the Consenting Lenders, and as set forth in the Restructuring Support Agreement (or otherwise) with respect to the form and substance of the Plan, the Plan Supplement and the other Definitive Documents, including any amendments, restatements, supplements or other modifications to such documents, or with respect to any other document, actions or anything else referred to herein, and any consents, waivers or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1.01 hereof) and fully enforceable as if stated in full herein.  In case of a conflict between the consent or approval rights of such parties set forth in the Restructuring Support Agreement with the consent rights of such parties set forth in the Plan, the Plan Supplement, and any other documents contemplated under the Plan, the consent or approval rights in the Restructuring Support Agreement shall control.

## Section 1.08    Controlling Document

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects, subject to the consent rights of the Consenting Lenders in

- 16 -

the Restructuring Support Agreement. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document or the Confirmation Order and subject to consent rights set forth in the Restructuring Support Agreement. In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, other than documents contained in the Plan Supplement, the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

## ARTICLE II
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III, are not entitled to vote on the Plan and shall receive the following treatment:

### Section 2.01   Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Expense Claim and the Debtors or Reorganized Debtors, as applicable, agrees to a less favorable treatment, or as otherwise provided in the Plan, each Holder of an Allowed Administrative Claim against any of the Debtors shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, within five (5) Business Days after the Effective Date, or as soon as reasonably practicable thereafter, (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than five (5) Business Days after such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; or (iii) at such time and upon such terms as set forth in an order of the Bankruptcy Code; provided that Administrative Claims incurred by any Debtor in the ordinary course of such Debtor's business may be paid in the ordinary course of business by the Debtors, consistent with past practice and in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

### Section 2.02   Professional Fee Claims

(a)   Final Fee Application and Payment of Professional Fee Claims

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the

- 17 -

procedures established by the Bankruptcy Court in the Chapter 11 Cases. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from (but not limited by the estimates provided for in Section 2.02(c)) the Professional Fee Escrow Account. Any objections to Professional Fee Claims must be filed and served on the Debtors and the Reorganized Debtors and the requesting party no later than twenty-one days after service of the final request for payment of Professional Fee Claims.

(b)      Professional Fee Escrow Account

Prior to the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors other than the Reorganized Debtors' reversionary interest therein. The amount of Professional Fee Claims owing to the Professionals on and after the Confirmation Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. When all Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(c)      Professional Fee Amount Estimates

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimate to the Debtors no later than one (1) Business Day before the Effective Date; *provided*, *however*, that such estimates shall not be considered an admission, cap or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the Estimates. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

(d)      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation of the Plan and Consummation, incurred by the Debtors or any Professional following the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

- 18 -

**Section 2.03    Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such Holder agree to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim within five (5) Business Days after the Effective Date; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installments over a period not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (iii) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

The Reorganized Debtors shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

**Section 2.04    DIP Facility**

On the Effective Date, all Allowed DIP Lien Claims and DIP Superpriority Claims due and owing under the DIP Facility shall be the subject of the DIP Lien Conversion into Exit Facility Claims.

**Section 2.05    Statutory Fees**

The Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee, including quarterly fees payable under 28 U.S.C. §1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business at the time of Confirmation.  On and after the Effective Date, to the extent the Chapter 11 Cases remain open, and for so long as any Reorganized Debtor remains obligated to pay quarterly fees, such Reorganized Debtor shall pay the applicable U.S. Trustee fees for that Reorganized Debtor when due in the ordinary course until such time as the Bankruptcy Court enters a final decree in the Reorganized Debtors' Chapter 11 Cases.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**Section 3.01    Deemed Substantive Consolidation**

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, Confirmation and distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the

- 19 -

Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

**Section 3.02   Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is in a particular Class for the purposes of voting on, and receiving distributions pursuant to, the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.

**Section 3.03   Summary of Classification for the Reorganized Debtors**

The following chart represents the general classification of Claims and Interests for the Debtors pursuant to the Plan.  To the extent there are no Allowed Claims or Allowed Interests in a particular Class, such Class is deemed to be omitted with respect to the Debtors.

| Class | Claim | Impairment | Entitled to Vote |
|:-----:|-------|:----------:|:----------------:|
| 1 | Prepetition Lien Claims | Impaired | Yes |
| 2 | Vendor Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | No (deemed to reject) |
| 7 | Noteholder Claims | Impaired | No (deemed to reject) |
| 8 | Seller Note Claims | Impaired | No (deemed to reject) |

| Class | Claim | Impairment | Entitled to Vote |
|-------|-------|------------|------------------|
| 9 | Convenience Class Claims | Impaired | Yes |
| 10 | Intercompany Claims | Impaired | No (deemed to reject) |
| 11 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 12 | Equity Interests in Optio Rx | Impaired | No (deemed to reject) |

**Section 3.04    Classification and Treatment of Claims and Interests**

Subject to Section 3.05 to the extent applicable, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the (i) Reorganized Debtors and, to the extent applicable under the Restructuring Support Agreement, the Consenting Lenders, and (ii) the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter or as soon as practicable after a particular Claim or Interest becomes Allowed.

(a)    Class 1 – Prepetition Lien Claims

*Classification*: Class 1 consists of any Prepetition Lien Claims against the Debtors.

*Treatment:* Except to the extent that a Holder of an Allowed Prepetition Lien Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition Lien Claim, each such Holder shall receive the following treatment in accordance with the Restructuring Support Agreement and the Plan Term Sheet:

i.    in connection with the Prepetition Lien Conversion, (a) a portion of the Holder's respective Prepetition Lien Claims shall constitute first-priority, perfected, enforceable and unavoidable Exit Facility Claims in full force and effect, which Exit Facility Claims and Exit Facility Liens shall be first-priority, enforceable, unavoidable and automatically perfected by virtue of entry of the Confirmation Order; provided, however, on the Effective Date, each of the Holders of the Prepetition Lien Claims shall (i) provide their proportionate share of the GUC Trade Gift to the holders of allowed General Unsecured Claims and (ii) provide their proportionate share

- 21 -

of the GUC Opt-In Gift, as applicable; and (b)(i) on the Effective Date, the Holder shall receive its respective portion of the Prepetition Lien Conversion Equity, and which shall fully vest and be entitled to such rights as may be detailed in the New Governance Documents and which on the Effective Date shall constitute all of the issued and outstanding equity shares or units, subject to the management incentive plan.

*Impairment and Voting*: Class 1 is Impaired under the Plan, and the Holders thereof are entitled to vote to accept or reject the Plan.

(b)     Class 2 – Vendor Secured Claims

*Classification*:  Class 2 consists of the Vendor Secured Claims against the Debtors.

*Treatment*: On the Effective Date, each Holder of an Allowed Vendor Secured Claims shall receive, in full satisfaction of such claim, at the election of the Reorganized Debtors: (a) Cash payment in full on the Effective Date, or as soon as reasonably practicable thereafter, in satisfaction of their respective allowed Secured Claims; (b) receive the return of their collateral; or (c) receive such other treatment as the Reorganized Debtors and such vendor agree.

*Impairment and Voting*: Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(c)     Class 3 – Other Secured Claims

*Classification*:  Class 3 consists of all Other Secured Claims against the Debtors.

*Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Secured Claim.

*Impairment and Voting*: Class 3 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(d)     Class 4 – Other Priority Claims

*Classification*:  Class 4 consists of all Other Priority Claims against the Debtors.

*Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Priority Claim.

*Impairment and Voting*:  Class 4 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(e)    Class 5 – General Unsecured Trade Claims

*Classification*:  Class 5 consists of all General Unsecured Trade Claims against the Debtors.

*Treatment:*  The Holders of Allowed General Unsecured Trade Claims are impaired by the Plan and shall, by virtue of the GUC Trade Gift, (x) on the Effective Date, receive [80%-95%] of their respective Allowed General Unsecured Trade Claim and (y) on the one-year anniversary of the Effective Date, receive the remaining [5%-20%] of their respective Allowed General Unsecured Trade Claim.

*Impairment and Voting*:  Class 5 General Unsecured Trade Claims are Impaired, and the Holders thereof are entitled to vote to accept or reject the Plan.

*GUC Opt-In Gift*:  The Holders of Allowed General Unsecured Trade Claims may also be entitled to receipt of their respective share of the GUC Opt-In Gift to the extent such Holder of an Allowed General Unsecured Trade Claim (i) votes to accept the Plan and (ii) opts-in to the releases in favor of the Released Parties.

(f)    Class 6 – Other General Unsecured Claims

*Classification*:  Class 6 consists of Other General Unsecured Claims against the Debtors.

*Treatment*: On the Effective Date, all Other General Unsecured Claims shall be cancelled, released, and extinguished without any distribution.

*Impairment and Voting*:  Class 6 is Impaired under the Plan.  Holders of Claims in Class 6 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(g)    Class 7 – Noteholder Claims

*Classification*:  Class 7 consists of Noteholder Claims against the Debtors.

*Treatment*: On the Effective Date, all Noteholder Claims shall be cancelled, released, and extinguished without any distribution.

*Impairment and Voting*: Class 7 is Impaired under the Plan.  Holders of Claims in Class 7 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(h)      Class 8 – Seller Note Claims

*Classification*:  Class 8 consists of Seller Note Claims against the Debtors.

*Treatment*: On the Effective Date, all Seller Note Claims shall be cancelled, released, and extinguished without any distribution.

*Impairment and Voting*: Class 8 is Impaired under the Plan.  Holders of Claims in Class 8 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(i)      Class 9 – Convenience Class Claims

*Classification*:   Class 9 consists of all Convenience Class Claims against the Debtors.

*Treatment*: The Holders of Allowed Convenience Claims shall, on the later of (i) the Effective Date and (ii) the date that is ten (10) business days after such Convenience Claim becomes an Allowed Claim, in full and final satisfaction of such Claim, receive payment in Cash equal to the lesser of (x) 100% of the Allowed amount of such Convenience Claim and (y) such Holder's pro rata share of the pool of Convenience Claims.

*Impairment and Voting*: Class 9 Convenience Class Claims are Impaired, and the Holders thereof are entitled to vote to accept or reject the Plan.

(j)      Class 10 – Intercompany Claims

*Classification*:  Class 10 consists of all Intercompany Claims.

*Treatment*: On the Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without any distribution.

- 24 -

*Impairment and Voting*:  Class 10 is Impaired under the Plan.  Holders of Claims in Class 10 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(k)     Class 11 – Intercompany Interests

*Classification*:  Class 11 consists of all Intercompany Interests.

*Treatment*: Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor(s), and with the consent of the Consenting Lenders, which consent shall not be unreasonably withheld, either (a) Reinstated or (b) canceled and released.

*Impairment and Voting*:  Class 11 is Unimpaired under the Plan.  Holders of Allowed Interests in Class 11 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Interests.

(l)     Class 12 – Equity Interests in Optio Rx

*Classification*:  Class 12 consists of all Equity Interests in Optio Rx.

*Treatment*:   On the Effective Date, all Equity Interests in Optio Rx shall be cancelled, released, and extinguished.

*Impairment and Voting:* Class 12 is Impaired under the Plan.  Holders of Claims in Class 12 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

**Section 3.05   Special Provisions Regarding Reinstated Unimpaired Claims**

Except as otherwise provided in the Plan, the Plan Supplement, the Restructuring Support Agreement or in the Confirmation Order, nothing in the Plan shall affect any, and the Debtors and the Reorganized Debtors shall retain all, rights regarding legal and equitable defenses, counterclaims, rights to setoff, and rights to recoupment, if any, as to Unimpaired Claims that are Reinstated.  Holders of Unimpaired Claims that are Reinstated shall not be required to file a proof of claim with the Bankruptcy Court and shall retain all their rights under applicable nonbankruptcy law to pursue their Unimpaired Claims.  Notwithstanding anything to the contrary in the Plan, subject to Article VII, Unimpaired Claims shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan, unless and until such Unimpaired Claim has been either (a) paid in full (i) on terms agreed to between the Holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as applicable, (ii) in the Allowed amount of

- 25 -

such Unimpaired Claim as determined by applicable law or (iii) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction.  If the Debtors or the Reorganized Debtors, as applicable, disputes any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

**Section 3.06    Voting Classes, Presumed Acceptance by Non-Voting Classes**

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**Section 3.07    Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of a Claim that is Reinstated, an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**Section 3.08    Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**Section 3.09    Intercompany Interests**

To the extent retained under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but solely for administrative convenience and due to the importance of maintaining the prepetition corporate structure.

**Section 3.10    Subordinated Claims**

The allowance, classification and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to Section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify

any Allowed Claim in accordance with any contractual, legal or equitable subordination relating thereto.

**Section 3.11    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

The Debtors reserve the right, subject to the prior consent of the Consenting Lenders, to modify the Plan in accordance with Article IX hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including the right to modify the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**Section 4.01    Restructuring Transactions**

On the Effective Date, and pursuant to the Plan, the Debtors or the Reorganized Debtors, as applicable, shall (as agreed to by the Consenting Lenders consistent with the terms of the Restructuring Support Agreement) consummate the Restructuring Transactions set forth in the Plan Term Sheet in order to effectuate the Debtors' financial reorganization consistent with the terms of the Plan.  Without limiting the foregoing, before, on or as soon as reasonably practicable after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and their respective officers and members of the Governing Body, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (i) the execution, delivery, filing, registration or recordation of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement and the Restructuring Support Agreement; (ii) the execution, delivery, filing, registration or recordation of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (iii) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Governance Documents; (iv) such other transactions that are required to effectuate the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law; provided that all such actions are consented to by the Consenting Lenders, which consent shall not be unreasonably withheld.  Pursuant to sections 363 and 1123 of the Bankruptcy Code, the Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan. The authorizations and approvals

contemplated by this Section 4.01 shall be effective notwithstanding any requirements under non-bankruptcy law.

**Section 4.02    Sources of Cash for Plan Distributions**

Any Cash payments or distributions required to be made hereunder shall be obtained from existing Cash of the Debtors and the Exit Facility.

**Section 4.03    Continued Corporate Existence**

Except as otherwise provided in the Plan, the Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date as separate corporate entities, limited liability companies, partnerships or other form, with all the powers of a corporation, limited liability company, partnership or other form, pursuant to the applicable law in the jurisdiction in which the Debtors are incorporated or formed pursuant to the New Governance Documents.

**Section 4.04    Existing Governance Documents**

On or as soon as reasonably practicable after the Effective Date, subject in each case to the consent rights of the Consenting Lenders as set forth in the Restructuring Support Agreement, the Existing Governance Documents of the Debtors in effect prior to the Effective Date shall be amended or restated and replaced by the New Governance Documents.  Solely to the extent required under the Plan, the Bankruptcy Code, or applicable non-bankruptcy law or necessary to effectuate the transactions contemplated by the Plan, on or immediately prior to the Effective Date, the Reorganized Debtors shall file the New Governance Documents (in a manner acceptable to the Debtors and the Consenting Lenders and consistent with the Restructuring Support Agreement) with the applicable Secretary of State and/or other applicable authorities in the state of incorporation or formation or otherwise (as the case may be) in accordance with the applicable federal laws or state laws of the respective state.  The New Governance Documents shall be deemed to be amended pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable non-bankruptcy law).  The New Governance Documents shall be in the form filed with the Plan Supplement, shall be as set forth in the Governance Term Sheet and shall be acceptable in form and substance to the Consenting Lenders.  After the Effective Date, the Reorganized Debtors may amend and restate their New Governance Documents, as applicable, and may file such documents as permitted by the laws of the respective states without further authorization from the Bankruptcy Court.

**Section 4.05    Members of the Governing Bodies**

As of the Effective Date, and subject to the Restructuring Support Agreement, the existing members of the Reorganized Debtors' Governing Bodies shall remain in their current capacities as members of such Governing Body of the applicable Reorganized Debtor, unless or until replaced or removed in accordance with the New Governance Documents of the Reorganized Debtors in the sole discretion of such Reorganized Debtor.  To the extent any such officer of the Reorganized Debtors is an "insider" as defined in section 101(31) of the Bankruptcy Code, the

nature of any compensation to be paid to such trustee and officer shall also be disclosed in the Plan Supplement.

### Section 4.06   Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Restructuring Support Agreement or any agreement, instrument or other document incorporated therein, on the Effective Date, all property of the Estates and all Causes of Action of the Debtors (except those released pursuant to the Debtor Releases) shall vest in the applicable Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure the Reorganized Debtors' obligations under the Plan).   On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interest or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation order.

### Section 4.07   Section 1145 Exemption

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the offer, issuance, sale or distribution under the Plan of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC shall be exempt from registration under Section 5 of the Securities Act (or any State or local law requiring registration for offer or sale of a security) under section 1145 of the Bankruptcy Code.  The offer, issuance, sale or distribution under the Plan of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC will be subject to the restrictions on resale of securities held by Affiliates of an issuer.

### Section 4.08   Cancellation and Surrender of Instruments and Agreements

On the Effective Date, except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, (i) all rights of any Holder of Interests in the Debtors, including options or warrants to purchase Interests, or obligating the Debtors to issue, transfer or sell Interests in the Debtors, shall be cancelled; and (ii) all Seller Notes, Notes and indentures of the Debtors shall cease to be effective, and Aves Management LLC, as Administrative Agent under the Note Purchase Agreement shall not have any continuing duties or obligations thereunder and shall be discharged.

### Section 4.09   Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) to the extent undertaken, selection and appointment of the members of the Governing Body and officers of the Reorganized Debtors; (ii) adoption of or modification to the Existing Governance Documents, if required; (iii) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (iv) implementation of the Restructuring Transactions; and (v) all other actions contemplated by the

- 29 -

Plan (whether to occur before, on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan (including the grant of security interests set forth in the Plan) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, the members of the Governing Body or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by this Section 4.09 shall be effective notwithstanding any requirements under nonbankruptcy law.

**Section 4.10    Section 1146 Exemption from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtors to the Reorganized Debtors or to any other Person) of property under the Plan or pursuant to: (i) the issuance, reinstatement, distribution, transfer or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust, or other security interest or the securing of additional indebtedness by such or other means; (iv) the making, assignment or recording of any lease or sublease; or (v) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan, shall not be subject to any stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, recordation fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Section 4.11    Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Section 7.02 hereof), each of the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and each of the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VII of the Plan, which

shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date. Each of the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of such Reorganized Debtor. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that any of the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which any of the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Debtor Releases), each of the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, each of the Reorganized Debtors expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action as a consequence of the Confirmation or Consummation. Each of the Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

**Section 4.12   Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against the Debtors and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim plus applicable interest.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 5.01   Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed (or assumed and assigned to the respective Reorganized Debtor, as applicable) pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by a Debtor, pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan and the Rejected Executory

- 31 -

Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party on or before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by such order or the provisions of the Plan. All assumed Executory Contracts or Unexpired Leases shall be enforceable by the Reorganized Debtors or such party such Executory Contract or Unexpired Lease was assigned to in accordance with their terms notwithstanding any provision in such contract or lease that prohibits, restricts or conditions assumption, assignment or transfer. Any provision in any such contract or lease that permits a Person to terminate or modify such agreement or to otherwise modify the rights of any of the Debtors or the Reorganized Debtors or assignee, as applicable, based on the filing of the Chapter 11 Cases or the financial condition of any of the Debtors or the Reorganized Debtors, as applicable, shall be unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, any of the Debtors' assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party or parties thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. After the Effective Date, each of the Reorganized Debtors shall have the right to terminate, amend or modify any contracts, including intercompany contracts, leases or other agreements without approval of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

**Section 5.02    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all proofs of claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Section 7.06 of the Plan, notwithstanding anything in a proof of claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Section 3.04 of the Plan and may be objected to in accordance with the provisions of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**Section 5.03   Cure of Defaults and Objections to Cure Amounts and Assumption for Executory Contracts and Unexpired Leases Assumed**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned to the respective Reorganized Debtor, as applicable) pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash upon the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Debtors shall provide notices of proposed cure amounts (if any) to counterparties to Executory Contracts and Unexpired Leases to be assumed reflecting the Debtors' intention to assume or assume and assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any) or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). If a counterparty to any Executory Contract or Unexpired Lease that the Debtors or Reorganized Debtors intend to assume does not receive such a notice, the proposed cure amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0), subject to such counterparties' rights to dispute such proposed cure amount. In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. The cure notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by counsel to the Debtors on the confirmation objection deadline or other deadline that may be set by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount. Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption. Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

- 33 -

The payment of the cure amount shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (i) the amount of any payments to cure such a default; (ii) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption.

The Debtor or the Reorganized Debtor, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List.

### Section 5.04    Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan or specifically provided in the Plan Supplement, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by any of the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

### Section 5.05    Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan or Plan Supplement shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the relevant Debtor or Reorganized Debtor, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date. The deemed assumption provided for herein shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

- 34 -

**Section 5.06    Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any of the Debtors, including any Executory Contracts and Unexpired Leases assumed by any Debtor (or assumed and assigned, as applicable), will be performed by such Debtor or Reorganized Debtor, or the Entity to which such Executory Contract or Unexpired Lease was assigned, as applicable, in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order except as otherwise provided in the Plan.

**Section 5.07    Assumption of Insurance Policies**

Notwithstanding anything in the Plan or the Confirmation Order, including any provision that purports to be preemptory or supervening, the Insurance Policies (including all of the D&O Liability Insurance Policies) are hereby treated as Executory Contracts under the Plan and, on the Effective Date, shall be deemed assumed (and assigned to the Reorganized Debtors) under section 365 of the Bankruptcy Code and will re-vest in the Reorganized Debtors.  Regardless of whether any Insurance Policy is an Executory Contract, on and after the Effective Date, the Insurance Policies will remain valid and enforceable in accordance with their terms and shall not be impaired by the Plan or Confirmation Order, and the Debtors, the Reorganized Debtors or any such assignee, as applicable, and the Insurers will perform their respective obligations to one another, if any, under the Insurance Policies.  After the Effective Date, to the extent consistent with applicable law and New Governance Documents, the Reorganized Debtors (or any such assignee) may increase, reduce, restrict, or otherwise modify, in their sole discretion, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of each of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, proof of claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

**Section 5.08    Assumption of the Employee Compensation and Benefits Program**

Unless otherwise provided in the Plan (or the Plan Supplement), the Confirmation Order or any other order of the Bankruptcy Court in the Chapter 11 Cases, all employment agreements,

severance policies, indemnification agreements, compensation and benefit plans, policies, and programs of the Company including, without limitation, all workers' compensation programs, savings plans, retirement plans, deferred compensation plans, SERP plans, rabbi trusts, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans or other agreements with or applicable to any of its current or former employees, retirees, members of any Governing Body, officers or managers of the Debtors shall be treated as Executory Contracts under the Plan, shall be set forth in the Plan Supplement, and shall be deemed assumed (or assumed and assigned to the respective Reorganized Debtors, as applicable) pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**Section 5.09    Indemnification Obligations**

Consistent with applicable law, all indemnification provisions in place as of the Effective Date for the Released Parties only (whether in the by-laws, trust agreements, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other governance documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers and other professionals of, or acting on behalf of, any of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, any of the Debtors than the indemnification provisions in place prior to the Effective Date.

**Section 5.10    Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases, if any, pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**Section 6.01    Record Date for Distributions**

With respect to Impaired Claims, on the Distribution Record Date, the Claims Register and the various transfer registers for each of the Classes of Claims, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims.  The Debtors shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.

**Section 6.02    Timing of Distributions**

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against or an Allowed Interest in the Debtors shall receive the full amount of the distributions that the Plan provides for such an Allowed Claim or such an Allowed Interest in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**Section 6.03    Disbursing Agent**

The Debtors or Reorganized Debtors may retain a Disbursing Agent to assist with the distributions to be made under the Plan as directed by the Debtors or Reorganized Debtors. The Disbursing Agent shall make all distributions required under the Plan.

(a)    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out of pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out of pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.  The Disbursing Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Disbursing Agent seeks reimbursement, and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Disbursing Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Disbursing Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Disbursing Agent are unable to

resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

**Section 6.04    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent: (i) to the signatory set forth on any proof of claim or proof of interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no proof of claim or proof of interest is filed or if the Debtors have not been notified in writing of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related proof of claim or proof of interest; or (iii) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Distributions under the Plan on account of Allowed Claims and Allowed Interests shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.   None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

**Section 6.05    Fractional Distributions**

Whenever any payment of a fraction pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole share (up or down), with half or less being rounded down.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**Section 6.06    Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder of Claim or Interest is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred. Notwithstanding the foregoing under of the Plan, any Unimpaired Claims shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan, unless and until such Unimpaired Claim has been either (a) paid in full (i) on terms agreed to between the holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as

- 38 -

applicable, (ii) in the Allowed amount of such Unimpaired Claim as determined by applicable law or (iii) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

## Section 6.07    Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements

## Section 6.08    Compliance with Tax Requirements and Allocations

In connection with the Plan and all instruments issued in connection therewith, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.    Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they determine in good faith are reasonable and appropriate.  The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.  For the avoidance of doubt, any amounts withheld pursuant to this Section 6.08 shall be treated as if distributed to the Holder of the Allowed Claim.

Any Holder of an Impaired Claim entitled to receive any property as an issuance or distribution under the Plan shall, upon request by the Disbursing Agent, provide an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8.  If such request is made and such Holder of an Impaired Claim fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtors or the Reorganized Debtors, as applicable, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtors, the Reorganized Debtors and their respective property.

## Section 6.09    Allocation Between Principal and Interest

Except as otherwise provided in the Plan, for U.S. federal income tax purposes, distributions shall be allocated first to the principal amount of such Allowed Claims (as determined for U.S. federal income tax purposes), with any excess allocated to unpaid interest that accrued on such Claims.

## Section 6.10    Setoffs and Recoupment

Except as otherwise provided in the Plan and Confirmation Order, the Debtors and the Reorganized Debtors may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, withhold (but not set off except as set forth in the Plan) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim or Interest.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim or Interest and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim or Interest) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that any of the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim or Interest, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such holder, except as specifically provided herein.

**Section 6.11    No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy or non-bankruptcy law, postpetition and/or default interest shall not accrue or be paid on any prepetition Claims against any of the Debtors, and no Holder of a prepetition Claim against any of the Debtors shall be entitled to interest accruing on or after the Petition Date or interest at the contract default rate on any such prepetition Claim.

## ARTICLE VII
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

**Section 7.01    General Compromise and Settlement of Claims, Interests and Controversies**

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and, to the extent applicable, Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made or treatment provided on account of such Allowed Claim or Interest.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests and controversies pursuant to Bankruptcy Rule 9019.  The entry of

the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. Subject to Article VI hereof, all treatment of Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against and Interests in or against any of the Debtors and their Estate and Causes of Action against other Entities.

**Section 7.02   Releases by the Debtor**

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each of the Debtors, the Reorganized Debtors and their Estates, including any successors to the Debtors or any estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, that any of the Debtors, the Reorganized Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of a Holder of any Claim against, or Interest in, the Debtors or other Entity, based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership or operation thereof), purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Exit**

- 41 -

Facility, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.  For the avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date or (ii) the rights of any of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of any of the Debtors under any employment agreement with a current or former employee of any of the Debtors, subject to applicable nonbankruptcy law.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases, which include by reference each of the related provisions and definitions contained in the Plan, and further shall constitute the Bankruptcy Court's finding that the Debtor Releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Releases; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Debtors' Estates asserting any Cause of Action released pursuant to the Debtor Releases.

Section 7.03   Releases by Holders of Claims and Interests

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, including any derivative claims asserted on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership or operation thereof), the subject matter of or the transactions or events giving rise to any Claim or

**Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors any other Released Party, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among any of the Debtors or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) rights of Holders of Allowed Claims or Allowed Interests to receive distributions under the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

## Section 7.04   Discharge of Claims

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the

Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of claim or Interest based upon such debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

**Section 7.05   Exculpation**

**As of the Effective Date, except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim other than those arising out of or relating to any act by or omission of an Exculpated Party that have been determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on the Plan, distribution of consideration pursuant to the Plan and, to the extent applicable, the offer, issuance and sale or purchase of securities pursuant to the Plan and, therefore, are not, and on account of such solicitation, distribution and issuance shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan, such distributions made pursuant to the Plan and issuance of securities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) the rights of Holders of Allowed Claims or Allowed Interests to receive treatment in accordance with the Plan.**

**Section 7.06   Injunction**

**Effective as of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Enjoined Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any of the Debtors, any of the Reorganized Debtors, the Exculpated Parties or the Released**

**Parties and their respective assets and properties: (i) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting or enforcing any encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

### Section 7.07   Term of Injunctions or Stays

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### Section 7.08   Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entities, including Governmental Units, shall discriminate against any of the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such grant against, any of the Reorganized Debtors or another Entity with whom such Reorganized Debtor has been associated, solely because the Debtors have been a debtor under chapter 11 of the Bankruptcy Code, have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or have not paid a debt that is dischargeable in the Chapter 11 Cases.

### Section 7.09   Release of Liens, Claims and Interests

**Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all Claims, Interests or Liens, including but not limited to mortgages, deeds of trust, Liens, pledges or other security interests, against or in any property of the Estates**

- 45 -

shall be fully released, discharged, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Entity holding such Liens, Claims or Interests will, if necessary or reasonably requested by the Debtors or Reorganized Debtors, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments. Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtors held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. For the avoidance of doubt, the Exit Facility Claims effected through the Prepetition Lien Conversion and the DIP Lien Conversion pursuant to the Plan shall not be released, discharged, terminated or extinguished to effect the Exit Capital Structure attached to the Restructuring Support Agreement.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO CONFIRMATION
## OF THE PLAN AND THE EFFECTIVE DATE

**Section 8.01    Conditions Precedent to Confirmation**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 8.03.

1.    The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Consenting Lenders, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code (which, for the avoidance of doubt, may be the same order as the order confirming the Plan).

2.    The Plan and the Plan Supplement, including any schedules, documents, agreements, supplements and exhibits thereto (in each case in form and substance acceptable to the Debtors and the Consenting Lenders as provided for under the Restructuring Support Agreement) shall have been filed.

3.    The Restructuring Support Agreement shall not have been rejected by the Debtors, shall not have been terminated as of immediately prior to the Confirmation Date, nor shall there have been any breach thereof by any party.

**Section 8.02    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 8.03.

1.      Each document or agreement constituting the Definitive Documents shall have been executed and/or effectuated and shall be in form and substance consistent with the Restructuring Support Agreement, including any consent rights included therein.

2.      The Plan shall have been filed and the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement, including any consent rights included therein, and such Confirmation Order shall not have been stayed, modified, vacated, appealed or subjected to an injunction and shall have become a Final Order.

3.      The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption, assumption and assignment, and rejection, as applicable, of Executory Contracts and Unexpired Leases by the Debtors as contemplated herein.

4.      All (i) governmental and regulatory approvals, clearances and consents necessary and legally required, if any, under applicable non-bankruptcy law and (ii) material third-party consents and approvals, if any, in each case in connection with the transactions provided for in the Plan shall have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that restrains, prevents or enjoins the Restructuring Transactions.

5.      To the extent invoiced at least one (1) Business Day before the Effective Date, all amounts on account of invoiced and unpaid Transaction Expenses shall have been paid in full.

6.      The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount in accordance with Section 2.02.

7.      The transactions contemplated in the Restructuring Transactions shall have been executed and completed by all of the Entities that are parties thereto.

8.      The Restructuring Support Agreement shall have been assumed pursuant to the Confirmation Order.

9.      The New Governance Documents shall have been filed with the appropriate governmental authority, as applicable.

10.     The Existing Governance Documents shall have been amended, restated, or replaced by the New Governance Documents, respectively, in all cases consistent with the consent rights of the Consenting Lenders as set forth in the Restructuring Support Agreement.

11.     The Restructuring Support Agreement shall not have been terminated as of immediately prior to the Effective Date and there has been no breach thereof by any party.

**Section 8.03    Waiver of Conditions**

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article VIII may be waived, in whole or in part, at any time by the Debtors, with the prior written consent of the Consenting Lenders (email shall suffice), without notice, leave or order of the Bankruptcy Court or any formal action; *provided*, *however*, that the Debtors may not waive entry of the Confirmation Order.

**Section 8.04    Effect of Failure of Conditions**

If the Consummation of the Plan does not occur by the Outside Date (as defined in the Restructuring Support Agreement) as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (i) constitute a waiver or release of any claims by or Claims against or Interests in any of the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holder of Claims or Interests or any other Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by any of the Debtors, any Holder or any other Entity in any respect.

**Section 8.05    Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**ARTICLE IX**
**MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

**Section 9.01    Modification and Amendments**

Except as otherwise provided in the Plan, the Debtors (with the consent of the Consenting Lenders) reserve the right to modify the Plan as to material and/or immaterial terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019 and applicable restrictions on modifications set forth in the Plan, the Debtors (with the consent of the Consenting Lenders) expressly reserve their respective rights to revoke, withdraw, alter, amend or modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in each case in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article IX.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, any alterations, amendments or modifications of the Plan proposed in writing by the Debtors at any time prior to or after the Confirmation Date, but prior to the

- 48 -

Effective Date, and in all cases subject to the consent of the Consenting Lenders, Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, without the re-solicitation if the proposed alteration, amendment or modification do not materially and adversely change the treatment of the Claim of such Holder; *provided*, *however*, that any Holders of Claims or Interests that were deemed to accept the Plan because such Claims or Interests were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be Unimpaired.

**Section 9.02    Effect of Confirmation on Modifications**

Entry of a Confirmation Order, including under section 1127 of the Bankruptcy Code, shall mean that all modifications or amendments to the Plan occurring after the solicitation are approved pursuant to section 1127(a) of the Bankruptcy Code or section 1127(b) of the Bankruptcy Code, as applicable, and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**Section 9.03    Revocation or Withdrawal of the Plan**

The Debtors reserve the right, upon prior notice to and with the consent of the Consenting Lenders, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization, either entirely or as to any one or more of the Debtors.  If the Plan is revoked or withdrawn as to fewer than all of the Debtors, such revocation or withdrawal shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked or withdrawn.  If (i) the Debtors revoke or withdraws the Plan in its entirety in accordance with this Section 9.03, (ii) the Restructuring Support Agreement is terminated by the Outside Date (as defined in the Restructuring Support Agreement), or (iii) Confirmation or Consummation does not occur by the Outside Date (as defined in the Restructuring Support Agreement), then, absent further order of the Bankruptcy Court: (i) the Plan shall be null and void in all respects unless extended by the Debtors, with the prior written consent of the Consenting Lenders; (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity, including the Holders of Claims or Interests or the Consenting Noteholders; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity, including the Holders of Claims or Interests or the Consenting Noteholders.

**ARTICLE X**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases, the Plan and

- 49 -

all matters, arising out of or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.　　allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims or Interests;

2.　　decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.　　resolve any matters related to: (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor or Reorganized Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article IX, any Executory Contracts or Unexpired Leases; and (iv) any dispute regarding whether a contract or lease is, or was, executory or expired;

4.　　ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.　　adjudicate, decide or resolve any and all motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6.　　adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.　　enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, Plan Supplement or the Disclosure Statement;

8.　　enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.　　resolve any and all cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

4865-3582-3548, v. 5

10.     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any and all cases, controversies, suits, disputes or Causes of Action with respect to existence, nature, scope or enforcement of any discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article VII and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.     resolve any and all cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.     determine any and all matters that may arise in connection with, relate to or be necessary to execute, implement or consummate, the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

15.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

16.     consider any and all modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.     hear and determine disputes, cases, controversies or Causes of Action arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

19.     hear and determine any and all matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

20.     enforce any and all orders previously entered by the Bankruptcy Court;

21.     hear any other matter not inconsistent with the Bankruptcy Code; and

22.     enter an order and/or final decree concluding or closing the Chapter 11 Cases.

- 51 -

*provided, that,* on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement, including, among other documents, the New Governance Documents and any documents related thereto that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

### Section 11.01  Tax Structure

As reasonably determined by the Debtors, upon emergence from the Chapter 11 Cases, Optio Rx shall be structured as a limited liability company, and the Restructuring Transactions shall, subject to the terms and conditions of the Restructuring Support Agreement, be structured to achieve a tax-efficient structure, in a manner reasonably acceptable to the Reorganized Debtors and subject to the consent rights of the Consenting Lenders in the Restructuring Support Agreement.

### Section 11.02  Immediate Binding Effect

Subject to Section 8.02 hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### Section 11.03  Additional Documents

On or before the Effective Date, and consistent with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Subject to their respective obligations under the Restructuring Support Agreement, the Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be reasonably necessary or advisable to effectuate the provisions and intent of the Plan.

### Section 11.04  Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the filing of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

**Section 11.05  Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, trustee, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

**Section 11.06  Notices**

All notices, requests and demands to or upon the Debtors, the Reorganized Debtors or the Consenting Lenders, as applicable, or any required by or in connection with the Plan shall be in writing (including by facsimile or electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile and electronic transmission, when received and telephonically or electronically confirmed, addressed as follows:

If to the Debtors or the Reorganized Debtors:

Optio Rx, LLC
3701 Commercial Avenue
Suite 14
Northbrook, Illinois 60061
Attn:  Ben David, CEO
Email: bdavid@optiorx.com

With a copy to:

CHIPMAN BROWN CICERO & COLE, LLP
William E. Chipman, Jr.
Mark D. Olivere
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email: chipman@chipmanbrown.com
          olivere@chipmanbrown.com

4865-3582-3548, v. 5

If to the Consenting Lenders:

DLA Piper LLP (US)
1201 North Market Street
Suite 2100
Wilmington, DE  19801-1147
Attn: Stuart Brown
Email: stuart.brown@us.dlapiper.com

After the Effective Date, the Reorganized Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

**Section 11.07  Entire Agreement**

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

**Section 11.08  Severability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Consenting Lenders; and (iii) nonseverable and mutually dependent.

**Section 11.09  Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, or at the website of the Solicitation Agent, at OptioRXInquiries@stretto.com.  To the extent any

exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**Section 11.10  Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable nonbankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, trustees, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code and the applicable nonbankruptcy law in the offer, issuance, sale and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the securities offered and sold under the Plan and any previous plan.

**Section 11.11  Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; provided, however, that, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; provided further that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Nothing in the Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered. Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Bankruptcy Rule 3022-1(c).

**Section 11.12  Document Retention**

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified or supplemented by the Reorganized Debtors.

**Section 11.13  Further Assurances**

The Debtors, the Reorganized Debtors and all Holders of Claims or Interests receiving distributions hereunder and all other parties-in-interest agree to prepare, execute and deliver any agreements, instruments or documents and take any other actions, in addition to the matters specified in the Plan, as may be reasonably appropriate, necessary or advisable, or as may be

- 55 -

required by order of the Bankruptcy Court, from time to time, to effectuate the provisions and intent of the Plan.

## Section 11.14  Claims Against Other Debtors

Nothing in the Plan or the Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim against any other Debtor.

## Section 11.15  Transaction Expenses

The Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the Restructuring Support Agreement, as applicable, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail and without any requirement for Bankruptcy Court's review or approval.  All Transaction Expenses to be paid on the Effective Date (to the extent not previously invoiced) shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Day before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay when due the reasonable pre- and post-Effective Date Transaction Expenses related to the implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date, upon receipt of invoices therefor.

*[Remainder of page intentionally left blank]*

4865-3582-3548, v. 5

Dated:  June 10, 2024

Respectfully submitted,

**Optio Rx, LLC**
**Braun Pharma, LLC**
**Dr. Ike's PharmaCare, LLC**
**Rose Pharmacy SA LLC**
**Rose Pharmacy SF LLC**
**Rose Pharmacy RM LLC**
**Pet Apothecary, LLC**
**Crestview Holdings, LLC**
**SBH Medical, LLC**
**H&H Pharmacy, LLC**
**Enovex Pharmacy, LLC**
**SMC Pharmacy, LLC**
**SMC Lyons Holdings, LLC**
**Baybridge Pharmacy, LLC**
**Central Pharmacy, LLC**
**Pro Pharmacy, LLC**
**Healthy Choice Compounding LLC**
**Oakdell Compounding Pharmacy, LLC**
**The Pet Apothecary LLC**
**Crestview Pharmacy, LLC**
**SBH Medical, Ltd.**
**Concierge Pharmacy, LLC**
**Firstcare Pharmacy, LLC**
**Easycare Pharmacy, LLC**
**Primecare Pharmacy, LLC.**


By:      _/s/ Ben David_____
Name: Ben David
Title:   Chief Executive Officer

- 57 -

# **EXHIBIT B**

## **Restructuring Support Agreement**

## **(Attached)**

Execution Version

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE
WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A
CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY
CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE
SECURITIES LAWS OR PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING
CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN
ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE
AGREEMENT EFFECTIVE DATE (AS DEFINED BELOW) ON THE TERMS DESCRIBED
HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement") is made and entered into as of May 9, 2024 (the "Execution Date") by and among the following parties (collectively, the "Parties"):[1]

(i)     Optio Rx, LLC ("Optio"), organized and existing under the laws of the State of Delaware, and certain of its direct and indirect subsidiaries listed on Annex A to the Plan Term Sheet and signatory hereto (collectively, the "Company Parties" or the "Debtors", as applicable);

(ii)    the undersigned holders of first out term loans and/or first out revolving loans (each, a "First Out Holder" and collectively, the "First Out Holders") under that certain Credit Agreement, dated as of June 28, 2019 (as amended, the "Prepetition Credit Agreement"), by and among CBC Pharma Holdco, LLC, Optio Rx, LLC, Loan Admin Co LLC, as administrative agent and lead arranger (the "Prepetition Admin Agent"), and that certain Agreement Among Lenders, dated as of November 3, 2022 (the "AAL"), by and among each First Out Holder, each Last Out Lender (defined below), Loan Admin Co LLC, as administrative agent under the Prepetition Credit Agreement, and any other Lender party to the AAL; and

(iii)   the undersigned holder (the "Last Out Holder" and together with the First Out Holders, the "Consenting Lenders") of last out term loans (the "Last Out Term Loans") under the Credit Agreement and the AAL.

## RECITALS

**WHEREAS**, the Company Parties and the Consenting Lenders have, in good faith and at arms' length, negotiated or have approved of certain restructuring transactions with respect to the Company Parties' capital structure on the terms and conditions set forth in this Agreement and as specified in the term sheet attached hereto as **Exhibit B** (including all exhibits, annexes, and

---

[1]     Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to such terms in Section 1.01.

schedules thereto, the "Plan Term Sheet" and, such transactions as described in this Agreement and the Plan Term Sheet, the "Restructuring Transactions");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Chapter 11 Cases") in Delaware;

**WHEREAS**, in connection with this Agreement, the Company Parties and Consenting Lenders have, in good faith and at arms' length, negotiated the provision of debtor-in-possession to exit financing, to be provided by the DIP Lenders and the Consenting Lenders, as applicable, as specified in the term sheet attached as **Exhibit A** (including all exhibits, annexes, and schedules thereto, the "DIP Facility Term Sheet"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan Term Sheet.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agree as follows:

## AGREEMENT

**Section 1.    Definitions and Interpretation**

1.01.   Definitions.    Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Plan Term Sheet.  The following terms have the following definitions:

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached hereto (including the DIP Facility Term Sheet, and the Plan Term Sheet, which are expressly incorporated herein and made a part of this Agreement).

"**Agreement Effective Date**" has the meaning set forth in Section 2.01.

"**Alternative Restructuring**" means (a) any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (including any debtor-in-possession financing or exit financing), use of cash collateral, liquidation, tender offer, asset sale, share issuance, recapitalization, plan of reorganization, share exchange, business combination, joint venture, partnership, or similar transaction involving any one or more Company Parties or any affiliates of the Company Parties or the debt, equity, or other interests in any one or more Company Parties or any affiliates of the Company Parties, other than as contemplated by this Agreement, including the Plan Term Sheet, or (b) any other transaction involving one or more Company Parties or any

2

affiliates of the Company Parties that is an alternative to and/or materially inconsistent with the Restructuring Transactions.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to an Alternative Restructuring.

"**Bankruptcy Code**" means title 11 of the United States Code.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or interest in, any Company Party.

"**Company Parties**" has the meaning set forth in the preamble of this Agreement.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan of Reorganization.

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan of Reorganization.

"**Consenting Lender Advisors**" means DLA Piper LLP (US) and counsel to the Last Out Holder.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means Optio Rx, LLC and certain of its direct and indirect subsidiaries listed on **Annex A** to the Plan Term Sheet.

"**Definitive Documents**" means the documents listed in <u>Section 3.01</u>.

"**DIP Agent**" means Loan Admin Co LLC, the administrative agent and the collateral agent for the DIP Lenders with respect to the DIP Facility.

"**DIP Agent Advisor**" means DLA Piper LLP (US).

"**DIP Credit Agreement**" means the debtor-in-possession financing agreement by and among certain Company Parties, the DIP Agent, and the DIP Lenders setting forth the terms of the DIP Facility, in accordance with the DIP Facility Term Sheet.

3

"**DIP Documents**" means, collectively, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, and the Interim DIP Order and Final DIP Order.

"**DIP Facility**" means the loans under the debtor-in-possession financing facility on the terms and conditions set forth in the DIP Facility Term Sheet.

"**DIP Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**DIP Lenders**" means funds and vehicles managed by (i) MC Credit Partners LP and (ii) CION Investment Corporation, as First Out Holders under the Prepetition Credit Agreement (defined below), and Caprice Capital Partners, LLC (or its affiliates or related funds), as Last Out Holder under the Prepetition Credit Agreement.

"**DIP Superpriority Claims**" has the meaning set forth in the DIP Facility Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan of Reorganization that is prepared in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law, and all exhibits, schedules, supplements, modifications, and amendments thereto.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the related Solicitation Materials, which order may be the Confirmation Order.

"**Effective Date**" has the meaning set forth in the Plan Term Sheet.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Capital Structure**" means the capital structure chart attached to this Agreement as **Exhibit C**.

"**Exit Facility**" means that certain exit facility consistent with the terms, conditions, and provisions of an exit facility giving effect to the Exit Capital Structure (such definitive documents, the "Exit Facility Documents").

"**Final DIP Order**" means the order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, reasonably acceptable in all respects to the DIP Agent and the DIP Lenders.

"**Finance Documents**" means (a) the Prepetition Credit Agreement, (b) the AAL, and (c) all other documents entered into, pursuant to, or in connection with, the foregoing documents in

clauses (a) and (b) of this definition (including, but not limited to, any cash management arrangements and ancillary facilities).

"**Financing Orders**" means any orders entered in the Chapter 11 Cases authorizing debtor-in-possession financing or the use of cash collateral (whether interim or final), which shall be consistent with this Agreement and the Plan Term Sheet.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine, in consultation with the Consenting Lenders, are necessary or desirable to file.

"**First Out Holders**" has the meaning set forth in the preamble of this Agreement.

"**First Out Term Loans**" means the first out term loans provided by the First Out Holders under the Credit Agreement.

"**Governmental Entity**" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.  For the avoidance of doubt, the term Governmental Entity includes any Governmental Unit (as such term is defined in section 101(27) of the Bankruptcy Code).

"**Interim DIP Order**" means the order from the Bankruptcy Court approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, reasonably acceptable in all respects to the DIP Agent and the DIP Lenders.

"**Last Out Holder**" has the meaning set forth in the preamble of this Agreement.

"**Milestones**" has the meaning set forth in Section 6.03 to this Agreement.

"**Outside Date**" shall be December 31, 2024.

"**Parties**" means the Company Parties and the Consenting Lenders that are party to this Agreement.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, or any legal entity or association.

"**Petition Date**" has the meaning set forth in Section 6.03(a) to this Agreement.

"**Plan of Reorganization**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code, including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and this Agreement.

"**Plan Release**" means customary mutual releases in favor of the Released Parties to be included in the Plan as set forth under the "Releases and Exculpation" section of the Plan Term

Sheet and otherwise in form and substance reasonably acceptable to the Debtors and the Consenting Lenders.

"**Plan Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Prepetition Lien Claims**" has the meaning set forth in the Plan Term Sheet.

"**Released Parties**" has the meaning set forth in the Plan Term Sheet.

"**Reorganized Debtors**" means the Debtors, as reorganized entities under the Plan of Reorganization and the Confirmation Order on a post-Effective Date basis.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Solicitation Materials**" means all documents, ballots, forms, and other materials provided in connection with the solicitation of votes on the Plan under sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement).

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 10.

"**Transaction Expenses**" means all reasonable and documented fees, costs, and expenses of the Consenting Lender Advisors and DIP Agent Advisor in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation of the Definitive Documents, and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; provided, that any capitalized terms herein which are defined with reference to another agreement are defined with reference to such other agreement as of the date of this Agreement,

without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted from convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable limited liability company laws; and

(i)     the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.      Effectiveness of this Agreement**

2.01.   This Agreement shall become effective and binding upon each of the parties that has executed and delivered counterpart signature pages to this Agreement and effective on the date on which all of the following conditions have been satisfied or waived by the applicable Party or Parties in accordance with this Agreement (such date, the "Agreement Effective Date"):

(a)     each of the Company Parties shall have executed and delivered (email is sufficient) counterpart signature pages of this Agreement to counsel to the Company Parties and the Consenting Lender Advisors;

(b)     the Consenting Lenders shall have executed and delivered (email is sufficient) counterpart signature pages of this Agreement to counsel to the Company Parties;

(c)     all accrued and unpaid Transaction Expenses incurred up to (and including) the Agreement Effective Date shall be paid in full in cash;

(d)     counsel to the Company Parties shall have given notice to counsel to the Consenting Lender Advisors in the manner set forth in Section 11.11 hereof (by email or otherwise) that the other conditions precedent to the Agreement Effective Date set forth in this Section 2.01 have occurred; and

(e)     the Last Out Holder shall have purchased First Out Term Loans ratably from the First Out Holders in an aggregate principal amount of $25,000,000 and such loans shall have been converted from First Out Term Loans into Last Out Term Loans upon such purchase.

**Section 3.** **Definitive Documents**

3.01.   The Definitive Documents governing the Restructuring Transactions shall include this Agreement and all other agreements, instruments, pleadings, orders, forms, questionnaires, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring Transactions, including the following, as applicable:

(a)    any documents in connection with any First Day Pleadings or "second day" pleadings and all orders entered pursuant thereto, including any cash management orders;

(b)    the Disclosure Statement;

(c)    the Plan of Reorganization;

(d)    the Interim DIP Order;

(e)    the Final DIP Order;

(f)    the DIP Documents;

(g)    the Exit Facility Documents;

(h)    the Disclosure Statement Order

(i)    the Confirmation Order;

(j)    the New Governance Documents;

(k)    the Exit Capital Structure;

(l)    such other definitive documentation relating to a restructuring of the Company Parties as is necessary or desirable to consummate the Restructuring Transactions; and

(m)    any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents or agreements relating to any of the foregoing.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion, as applicable, and shall be in form and substance reasonably acceptable to the Consenting Lenders.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement and the applicable terms of the Plan Term Sheet and DIP Facility Term Sheet, as they may be modified, amended, or supplemented in accordance with <u>Section 11.01</u> below.

**Section 4.**      **Commitments of the Consenting Lenders**

4.01.   <u>Commitments, Forbearances, and Waivers</u>. During the Agreement Effective Period, and subject in all respects and giving full effect to the consent rights contained herein, each Consenting Lender, on a several and not joint basis, agrees to:

(a)      support the Restructuring Transactions with respect to all of its Claims now owned or hereafter acquired by such Consenting Lender (or for which such Consenting Lender serves as the nominee, investment manager, or advisor for holders thereof) and vote or consent, to the extent applicable, and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions; provided, that no Consenting Lender shall be obligated to waive (to the extent waivable by such Consenting Lender) any condition to the consummation of any part of the Restructuring Transactions set forth in (or to be set forth in) any Definitive Document or this Agreement (including in the section of the Plan Term Sheet entitled "Conditions Precedent to the Effective Date"), solely as such conditions precedent apply to the Consenting Lenders; <u>provided</u>, <u>further</u>, that the Consenting Lenders shall not directly or indirectly object to, delay, impede, or take any other action (including by directing or encouraging any other Entity or agent to take any action) to interfere with the acceptance, implementation, or consummation of the Restructuring under this Agreement or solicit (directly or indirectly) any other Restructuring Transaction;

(b)      use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders; provided that no Consenting Lender shall be obligated to amend, modify, or supplement any of the Definitive Documents to obtain such additional support (including any amendment, modification, or supplement that provides for different treatment of any Company Claims/Interests than the treatment provided to such Company Claims/Interests in the Plan Term Sheet);

(c)      as applicable, negotiate in good faith to enter into any necessary forbearance, waiver, or amendment agreement;

(d)      give any notice, order, instruction, or direction to the applicable agent under the applicable Finance Documents, in each case as necessary to implement or give effect to the Restructuring Transactions; <u>provided</u>, that no Consenting Lender shall be required hereunder to provide any agent or other Person under any applicable Finance Documents with any additional indemnities or similar undertakings in connection with taking any such action other than those contained in any applicable Finance Documents;

(e)      negotiate in good faith, and use commercially reasonable efforts to execute and implement, the Definitive Documents to which it will be a party in a manner consistent with this Agreement;

(f)      to the extent entitled to vote to accept or reject the Plan of Reorganization according to its terms, vote each of its Prepetition Lien Claims, to accept the Plan of Reorganization by delivering a duly executed and completed ballot accepting the Plan of Reorganization on a timely basis in accordance with the solicitation materials and Disclosure Statement Order;

(g)      to the extent permitted to elect whether to opt-in to the Plan Releases, elect to opt-in to the Plan Releases by timely delivering its duly executed and completed ballot(s) indicating such election; and

(h)      cooperate in good faith to consummate the transactions contemplated by the Restructuring Transactions and this Restructuring Support Agreement.

**Section 5.      Additional Provisions Regarding the Consenting Lenders' Commitments**

5.01.   Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, DIP Agent, or any other party in interest in the Chapter 11 Cases (including any official committee and the Office of the United States Trustee for Region 3); (b) impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Lender from enforcing this Agreement or contesting whether any action or inaction is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of a Consenting Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Lender's obligations hereunder; (e) limit the ability of a Consenting Lender to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof; (f) except as and to the extent explicitly set forth herein, constitute a waiver or amendment of any term or provision of any Finance Document; (g) except as and to the extent explicitly set forth herein, constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under any Finance Document; (h) except as and to the extent explicitly set forth herein, require any Consenting Lender to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Lender; (i) prevent a Consenting Lender from taking any action that is required in order to comply with applicable law; _provided_, if any Consenting Lender proposes to take any action that is otherwise inconsistent with this Agreement or the Restructuring Transactions in order to comply with applicable law, such Consenting Lender shall provide, to the extent possible without violating applicable law, at least five (5) business days' advance, written notice to the Parties; (j) prohibit any Consenting Lender from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (k)  require any Consenting Lender to fund or commit to fund any additional amounts (other than as agreed in connection with the Exit Facility and the DIP Facility) without such Consenting Lender's written consent; or (l) except as and to the extent explicitly set forth herein, limit the ability of any Consenting Lender to enforce the terms of the AAL (including exercising any rights or remedies available to the Consenting Lenders); _provided_, _however_, following the

10

Agreement Effective Date, any buy-out right available to the Last Out Holder will be governed by the Plan of Reorganization, the Confirmation Order, the Exit Facility Documents, or such other documents becoming effective on or after the Effective Date; provided, further, the Consenting Lenders agree that the Last Out Holder will have a buy-out right on the terms set forth in the AAL, which buy-out right shall be deemed available, notwithstanding anything to the contrary herein or in the AAL, (i) prior to the Petition Date if the Petition Date does not occur within 90 days of the Agreement Effective Date or (ii) following the termination of this Agreement prior to the consummation of the Restructuring Transactions (unless such termination is by reason of a breach or violation of this Agreement by the Last Out Holder).  The Last Out Holder agrees that it will not have a buy-out right during the Chapter 11 Cases.

## Section 6.        Commitments of the Company Parties

6.01.   <u>Affirmative Commitments</u>.  Except as expressly set forth in this Agreement, during the Agreement Effective Period, the Company Parties agree, on behalf of themselves and their subsidiaries and affiliates, to:

(a)      support, act in good faith, and take all reasonable actions necessary, or reasonably requested by the Consenting Lenders, to implement and consummate the Restructuring Transactions as contemplated by this Agreement and the Plan Term Sheet, including the Milestones;

(b)      comply in all respects with the Finance Documents;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the approval, confirmation, or consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary to address any such impediment, including, timely filing a formal objection to any motion, application, or other proceeding filed with the Bankruptcy Court by any Person seeking the entry of an order (i) directing the appointment of an examiner with expanded powers or a trustee; (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; (iv) approving an Alternative Restructuring Proposal; (v) for relief that (x) is inconsistent with this Agreement in any material respect, or (y) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions; (vi) modifying or terminating any Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization; or (vii) challenging (x) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Lenders, or (y) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interests of any of the Consenting Lenders; and join in any objection filed or sought to be filed by the Consenting Lenders with respect to (i)–(vii);

(d)      use commercially reasonable efforts to obtain any and all consents and/or any third-party approvals that are necessary or advisable for the implementation or consummation of any portion of the Restructuring Transactions, and assist in the filing of application to transfer any and all applicable licenses, permits, and privileges;

(e)     negotiate in good faith and use commercially reasonable efforts to execute, deliver, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders, as applicable, and to the extent reasonably prudent;

(g)     subject to any consent rights contemplated by this Agreement, (i) complete the preparation, as soon as reasonably practicable after the Execution Date, of the Plan of Reorganization, the Disclosure Statement, and any other Solicitation Materials in order to pursue the Restructuring Transactions in accordance with the Milestones, and (ii) provide drafts of the Disclosure Statement, the Plan of Reorganization, any other Solicitation Materials, and each other Definitive Document to, and afford a reasonable opportunity for comment and review of such documents by, the Consenting Lender Advisors, which opportunity of comment and review shall be not less than five (5) full business days in advance of any filing, execution, distribution, or use (as applicable) thereof;

(h)     maintain the good standing and legal existence of each Company Party under the laws of the state or jurisdiction in which it is incorporated, organized, or formed, except to the extent that any failure to maintain such Company Party's good standing arises solely as a result of the filing of the Chapter 11 Cases; and

(i)      maintain all material licenses, permits, and privileges.

6.02.   <u>Negative Covenants</u>.  During the Agreement Effective Period, each of the Company Parties shall not, and shall cause their affiliates and subsidiaries not to, without the prior written consent of the Consenting Lenders, directly or indirectly:

(a)     object to, delay, impede, or take any other action (including by directing or encouraging any other Entity or agent to take any action) to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions and/or the Plan of Reorganization under this Agreement;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement, any Finance Document, or any of the other Definitive Documents;

(c)     (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (1) the amount, validity, perfection, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Lenders, or (2) the validity, enforceability, or perfection of any lien or other encumbrance securing any Company Claims/Interests of any of the Consenting Lenders; (ii) otherwise seek to restrict any

rights of any of the Consenting Lenders; or (iii) support any Person in connection with any of the acts described in clause (i) or clause (ii) hereof;

(d)    except as contemplated by this Agreement, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements without the advance written consent of the Consenting Lenders;

(e)    assert, or support any assertion by any Person, that, in order to act on the provisions of this Agreement, the Consenting Lenders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and each of the Company Parties hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of any notice of termination in accordance with <u>Section 10</u>);

(f)    subject to the exercise of the Debtors' fiduciary duties, seek, solicit, support, encourage, propose, assist, consent to, vote for, enter, or participate in any discussions or any agreement with any Person regarding, pursue, or consummate, any Alternative Restructuring Proposal;

(g)    commence the solicitation with respect to the Plan of Reorganization, unless the Disclosure Statement and the other Solicitation Materials shall be in form and substance consistent with this Agreement, the Plan Term Sheet, or otherwise reasonably satisfactory to the Consenting Lenders; or

(h)    consummate the Restructuring Transactions unless each of the applicable conditions to the consummation of such transactions set forth in this Agreement, the Plan Term Sheet, and the applicable Definitive Documents has been satisfied or waived by the applicable Persons in accordance with the terms of this Agreement and the applicable Definitive Documents.

6.03.    <u>Milestones</u>.  Unless expressly stated otherwise in this Agreement, the Company Parties shall comply with the following milestones (each, a "<u>Milestone</u>" and collectively, the "<u>Milestones</u>"), each of which may be waived upon the written consent of the Consenting Lenders (such consent not to be unreasonably withheld or conditioned):

(a)    The Company Parties shall file the Chapter 11 Cases in the Bankruptcy Court no later than 60 days after the Agreement Effective Date (such filing date, the "<u>Petition Date</u>");

(b)    The Company Parties shall file the Plan of Reorganization and the Disclosure Statement (which, for the avoidance of doubt, may be a joint document), in form and substance satisfactory to the Consenting Lenders, no later than five (5) business days after the Petition Date;

(c)    The Company Parties shall obtain the Interim DIP Order from the Bankruptcy Court, in form and substance satisfactory to the Consenting Lenders, no later than five (5) business days after the Petition Date;

(d)    The Company Parties shall obtain the Final DIP Order from the Bankruptcy Court, in form and substance satisfactory to the Consenting Lenders, no later than 45 days after the Petition Date;

(e)    The Company Parties shall obtain the Disclosure Statement Order from the Bankruptcy Court, in form and substance satisfactory to the Consenting Lenders, no later than 45 days after the Petition Date;

(f)    The Company Parties shall obtain the Confirmation Order from the Bankruptcy Court, in form and substance satisfactory to the Consenting Lenders, no later than 75 days after the Petition Date; and

(g)    The Company Parties shall satisfy or otherwise waive the conditions to the Effective Date under the Plan of Reorganization no later than five (5) business days after the Company Parties obtain the last pharmaceutical license or other regulatory approval necessary for the Reorganized Debtors to conduct their business post-Effective Date.

6.04.    <u>Sale Toggle</u>.  In the event the Debtors, in consultation with the Consenting Lenders, determine that section 1129(a)(10) of the Bankruptcy Code cannot be satisfied or that the Debtors cannot otherwise confirm the Plan of Reorganization, the Debtors may seek to implement the material terms of the Restructuring Transactions, including the economic treatment of the Consenting Lenders set forth in the Plan Term Sheet (which economic treatment, for the avoidance of doubt, shall include both the applicable debt and equity provisions of the Plan Term Sheet), through the sale of substantially all of the Debtors' assets or equity through a sale under section 363 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, the Consenting Lenders and/or the DIP Lenders shall have the right to participate in the sale process and credit bid all or a portion of their secured claims under section 363(k) of the Bankruptcy Code toward the purchase price.

**Section 7.    Representations and Warranties of Consenting Lenders**

7.01.    Each Consenting Lender severally, and not jointly, represents and warrants that the following statements are true and correct, as of the date such Consent Lender executes and delivers this Agreement:

(a)    it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests, reflected in such Consenting Lender's signature page to this Agreement, as applicable (subject to any transfer by such Consenting Lender made after the Agreement Effective);

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims/Interests (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power and authority upon closing);

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially adversely affect such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)      it has the full power to vote, approve changes to, and transfer all of its Claims and/or Interests referable to it as contemplated by this Agreement subject to applicable law (or, with respect to Company Claims/Interests subject to an agreement to purchase which has not closed as of the date hereof, will have such power upon closing).

## Section 8.      Representations and Warranties of Company Entities

8.01.   Each Company Entity represents and warrants that as of the date such Company Entity executes and delivers this Agreement and as of the Transaction Effective Date:

(a)      to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution of such Company Entity passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer is respect of such Company Entity;

(b)      except as expressly provided for in this Agreement, it has not entered into any arrangement (including with any individual creditor, irrespective of whether it is or is to become a Consenting Lender), other than in the ordinary course of business, on terms that are materially inconsistent with this Agreement;

(c)      to the best of its knowledge, the execution and delivery by it of this Agreement does not result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party; and

(d)      to the best of its knowledge, the diligence materials and other information concerning the Company Entities that such Company Entity or its advisors provided to any Consenting Lender in connection with an actual or potential restructuring of the Company Entities did not, taken as a whole and as of the date such materials or information were so provided, contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading (provided that, with respect to any projected financial information, forecasts, estimates, or forward-looking information, each Company Entity represents only that such information was prepared in good faith based upon assumptions it believed to be reasonable at the time).

## Section 9.      Mutual Representations, Warranties, and Covenants

9.01.   Each of the Parties, on a several and not joint basis, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement:

(a)      it is validly existing and in good standing under the laws of the state or jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan of Reorganization, and the Bankruptcy Code, no consent or approval is required by any other Person in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any law or regulation applicable to it or with any of its Organizational Documents; and

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement.

## Section 10.    Termination Events

10.01.   <u>Consenting Lender Termination Events</u>.  This Agreement may be terminated with respect to all Parties by the Consenting Lenders upon the delivery to each other Party of a written notice in accordance with <u>Section 11.11</u> upon the occurrence of the following events (each, a "<u>Termination Event</u>"):

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, covenants, or other obligations or agreements of the Company Parties set forth in this Agreement that remains uncured (if susceptible to cure) for five (5) business days after such terminating Consenting Lenders transmit a written notice to the Company Parties in accordance with <u>Section 11.11</u> detailing any such breach;

(b)      any of the Milestones is not achieved, except where such Milestone has been waived or extended by each of the applicable Parties; <u>provided</u>, that the right to terminate this Agreement shall not be available to a Consenting Lender if the failure of such Milestone to be achieved is caused by, or results from, the material breach by that Consenting Lender of its covenants, agreements, or other obligations under this Agreement;

(c)      the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (a)(i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for twenty (20) calendar days after such terminating Consenting Lenders receive a written notice from the Company Parties in accordance with <u>Section 11.11</u> hereof detailing any such issuance or (b) impacts the utility of any license, permit, or privilege to operate; <u>provided</u>, that this termination right may not be exercised by any Consenting Lenders that directly sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)      the occurrence of an event that shall have made any of the conditions precedent to the consummation of the Restructuring Transactions as set forth in this Agreement or the Plan Term Sheet, if applicable, incapable of being satisfied prior to the Outside Date, except where such condition precedent has been waived by the applicable Parties; <u>provided</u>, that the right to terminate

this Agreement shall not be available to any Consenting Lenders if the happening or existence of such event is directly caused by, or results from, the breach by such Consenting Lenders of its covenants, agreements, or other obligations under this Agreement;

(e)      any Company Party, without the express written consent of the Consenting Lenders, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or a material portion of the property or assets of any Company Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any assignment for the benefit of its creditors;

(f)      (i) the commencement of an involuntary case against any Company Party under the Bankruptcy Code that is not dismissed or withdrawn within twenty-five (25) calendar days; or (ii) a court of competent jurisdiction enters a ruling, judgment, or order that appoints, or that authorizes or permits the taking of possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party, any Interests held by any Company Party, or a material portion of the property or assets of any Company Party;

(g)      any Company Party or any other Consenting Lender (i) terminates its pursuit of the Restructuring Transactions; (ii) publicly announces, or communicates in writing to any other Party, its intention not to support or pursue the Restructuring Transactions; or (iii) announces, or communicates in writing to any other Party, that it intends to enter into, or has entered into, an Alternative Restructuring;

(h)      the Effective Date has not occurred by the Outside Date (as such date may have been extended in accordance with the provisions of this Agreement); provided, however, that the right to terminate this Agreement shall not be available to any Consenting Lender if the failure of the Effective Date to have occurred by the Outside Date is directly caused by, or results from, the breach by such Consenting Lender of its covenants, agreements, or other obligations under this Agreement;

(i)      the Bankruptcy Court enters an order denying approval of the DIP Facility or Confirmation of the Plan of Reorganization and such order remains in effect for five (5) business days after entry of such order;

(j)      the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement or the Plan Term Sheet in any material respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions;

(k)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Consenting Lenders), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company

Party, (C) dismissing any of the Chapter 11 Cases, (D) approving an Alternative Restructuring Proposal, or (E) rejecting this Agreement;

(l)    the Bankruptcy Court enters an order terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization or the Company Parties let such periods/rights lapse;

(m)    any of the Company Parties (A) files any motion or proceeding seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests, lien, or interest held by any Consenting Lender in any capacity; or (B) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding subsection (A) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(n)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any asset of the Company Parties having an aggregate fair market value in excess of $250,000 without the prior written consent of the Consenting Lenders;

(o)    the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing or limiting, as applicable, any of the Prepetition Lien Claims, or any of the encumbrances that secure (or purport to secure) the Prepetition Lien Claims;

(p)    except as set forth in the Plan Term Sheet, any Debtor obtains debtor-in-possession financing, cash collateral usage, exit financing and/or other financing arrangement that is in an amount, on terms and conditions, or otherwise in form and substance, that is/are not reasonably acceptable to the Consenting Lenders;

(q)    the Company Parties file any motion or proceeding to terminate, or the Bankruptcy Court enters an order terminating, the DIP Documents or Financing Orders, other than at the request of the Consenting Lenders or the DIP Lenders or upon the mutual consent of the Debtors and the Consenting Lenders or the DIP Lenders;

(r)    after entry by the Bankruptcy Court of any Financing Order (including any adequate protection order), Disclosure Statement Order, or Confirmation Order, such order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended, in each case, in a manner materially inconsistent with this Agreement without the written consent of the Consenting Lenders;

(s)    the failure to meet any Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Lender in violation of its obligations under this Agreement; or

(t)    the occurrence of any default or event of default caused by any of the Company Parties under the DIP Documents or Financing Orders, as applicable, that has not been cured or

waived (if susceptible to cure or waiver) by the applicable percentage of lenders in accordance with the terms of the DIP Documents or Financing Orders, as applicable.

10.02. <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with <u>Section 11.11</u> upon occurrence of any of the following events (unless waived in writing by the Company Parties):

(a)      the breach in any material respect by the Consenting Lenders of any of the representations, warranties, covenants or other obligations or agreements of the Consenting Lenders set forth in this Agreement, and such breach remains uncured (if susceptible to cure) for ten (10) business days after the Company Parties transmit a written notice to the breaching Consenting Lenders in accordance with <u>Section 11.11</u> detailing any such breach; or

(b)      the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for twenty (20) business days after such terminating Company Party transmits a written notice in accordance with <u>Section 11.11</u> detailing any such issuance; <u>provided</u>, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

10.03. <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company Parties and the Consenting Lenders.

10.04. <u>Automatic Termination</u>.  This Agreement shall terminate with respect to all Parties automatically (a) without any further required action or notice immediately after the occurrence of the Effective Date (other than with respect to the Company Parties' obligations (or the obligations of their successors in interest) to pay the Transaction Expenses, which obligations will survive automatic termination), or (b) on the Outside Date.

10.05. <u>Effect of Termination</u>.

(a)      No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply directly or indirectly causing, or resulting in, the occurrence of the Termination Event on which such termination is based.  Upon the occurrence of the Termination Date as to any Party, this Agreement shall be of no further force and effect with respect to such Party and such Party shall be released from its commitments, undertakings, rights, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action; provided, however, that in no event shall any such termination relieve any Party from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the Termination Date

or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement;

(b)       Upon the occurrence of the Termination Date and prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties before the Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement, or otherwise;

(c)       If this Agreement is terminated in accordance with this Section 10.01, each Consenting Lender shall have an opportunity to change or withdraw (or cause to change or withdraw) its vote to accept the Plan or its consent (regardless of whether any deadline for votes or consents, or for withdrawal thereof, set forth in the Disclosure Statement has passed) and no Company Party shall oppose any attempt by such Consenting Lender to change or withdraw (or cause to change or withdraw) such vote or consent at such time; provided, that any such Consenting Lender that intends to change or withdraw its vote has not breached and is not otherwise in violation of the terms of this Agreement;

(d)       Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date;

(e)       Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Lender, and (b) any right of any Consenting Lender, or the ability of any Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Lender; and

(f)       Upon the delivery of a notice of termination by one or more Parties (the "Terminating Party"), the other Parties shall have the opportunity to contest in good faith whether a Termination Event has occurred or is continuing by delivering to counsel to the Terminating Party a written notice (a "Dispute Notice") within five (5) business days of receipt of such notice of termination (the "Dispute Notice Period").  The Dispute Notice shall contain reasonable detail regarding the basis for contesting the occurrence or continuation of the Termination Event.  During the Dispute Notice Period, any Party may request an emergency hearing before a court of competent jurisdiction in the State of Delaware, which, for the avoidance of doubt, shall be the Bankruptcy Court during the pendency of the Chapter 11 Cases (for purposes of this Section 10, the "Chosen Court") (which they shall seek on an expedited basis) solely to determine whether a Termination Event has occurred.  If any Party seeks such an expedited hearing, until the Chosen Court has entered an order ruling on whether a Termination Event has occurred, this Agreement shall not terminate and all Parties shall continue to comply with the terms of this Agreement.

**Section 11.     Miscellaneous**

11.01.  <u>Amendments and Waivers</u>.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except upon the prior written consent of all Parties (such consent not to be unreasonably withheld or conditioned).

(b)     Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 11.01</u> shall be ineffective and void *ab initio*.

(c)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by law.

11.02.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws, provisions of the Bankruptcy Code, and/or other applicable law.

11.03.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

11.04.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

11.05.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

11.06.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; FORUM SELECTION</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO

CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto; and (d) waives any objection to the power of the Bankruptcy Court to enter a final order under Article III of the United States Constitution.

11.07. <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.08. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party. The words "execution", "signed", "signature", "delivery" and words of like import in or relating to this Agreement and any Joinder shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Without limiting the generality of the foregoing, each Party hereby waives any argument, defense or right to contest the validity or enforceability of this Agreement or any Joinder based solely on the lack of paper original copies of such document, including with respect to any signature pages hereto.

11.09. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

11.10.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.

11.11.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the below addresses (or at such other addresses as shall be specified by like notice).  Any notice given by deliver, mail, or courier shall be effective when received, and any notice delivered or given by electronic mail shall be effective when received.

(a)    If to a Company Party, to:

1420 Kensington Road, Suite 102
Oak Brook, IL 60523
Attn: Ben David, Chief Executive Officer
     Leo LaFranco, Chief Financial Officer
Email: bdavid@optiorx.com
     llafranco@optiorx.com

with copies to:

Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
Attn: William E. Chipman Jr.
Email: chipman@chipmanbrown.com

(b)    If to First Out Holders, to:

MC Credit Partners LP
2200 Atlantic Street, 5th Floor
Stamford, CT 06902
Attn: Legal
Email: legal@mccp.com

CION Investment Corporation
1 Federal Street, 3rd Floor
Boston, MA 02110
Email: cdo.cion@cdo.usbank.com

with copies to:

DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801

23

        Attn: Stuart M. Brown
        Email: stuart.brown@us.dlapiper.com

(c)       If to Last Out Holder, to:

        MB Almanor LLC
        1230 Rosecrans Avenue, Suite 425
        Manhattan Beach, CA 90266

11.12.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Under Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

11.13.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

11.14.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

11.15.  [Reserved].

11.16.  <u>No Recourse</u>.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or causes of action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein).  No past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney, or other representative of any party hereto (including any person negotiating or executing this Agreement on behalf of a party hereto), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a Party hereto) (any such Person, a "No Recourse Party"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of an entity against its owners or affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

11.17.  <u>Computation of Time</u>.  Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed by this Agreement.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be duly executed on the date first above written.

<u>DEBTORS</u>:

OPTIO RX, LLC

By: *Leo LaFranco*
Name: Leo LaFranco
Title: CFO


BRAUN PHARMA, LLC
DR. IKE'S PHARMACARE, LLC
PET APOTHECARY, LLC
THE PET APOTHECARY LLC
CRESTVIEW HOLDINGS, LLC
CRESTVIEW PHARMACY, LLC
SBH MEDICAL, LLC
SBH MEDICAL, LTD.
H&H PHARMACY, LLC
ENOVEX PHARMACY, LLC
CONCIERGE PHARMACY, LLC
SMC PHARMACY, LLC
FIRSTCARE PHARMACY, LLC
SMC LYONS HOLDINGS, LLC
EASYCARE PHARMACY, LLC
BAYBRIDGE PHARMACY, LLC
PRIMECARE PHARMACY, LLC
CENTRAL PHARMACY, LLC
PRO PHARMACY, LLC
HEALTHY CHOICE COMPOUNDING LLC
ROSE PHARMACY SA LLC
ROSE PHARMACY SF LLC
ROSE PHARMACY RM LLC
OAKDELL COMPOUNDING PHARMACY, LLC


By: *Leo LaFranco*
Name: Leo LaFranco
Title: CFO

FIRST OUT HOLDERS:

MC CREDIT FUND I LP, WITH RESPECT TO CLASS IA
MC CREDIT FUND I LP, WITH RESPECT TO CLASS IB
MC CREDIT FUND III (CAYMAN MASTER) LP
MC CREDIT FUND III (DELAWARE) LP
MC CREDIT FUND III (LOAN FUNDING) LP
MC CREDIT FUND III-U (DELAWARE) LP
MC CREDIT FUND N (CAYMAN MASTER) LP
MC CREDIT FUND N (DELAWARE) LP
MC CREDIT FUND N (LOAN FUNDING) LP
MC CREDIT SM (LOAN FUNDING) LP
MC CREDIT SM (MASTER) LP
HYGIEIA ONE CREDIT FUND (DELAWARE) LP

By: _Ashok Nayyar_
Name: Ashok Nayyar
Title: Authorized Signatory

34TH STREET FUNDING, LLC
CION INVESTMENT CORPORATION
MURRAY HILL FUNDING II LLC

By: _____
Name:  Gregg Bresner
Title:    President

LAST OUT HOLDER:

**MB ALMANOR LLC**

By: _____

Name: David Lake

Title: Manager

Exhibit A

(See attached)

# DIP FACILITY TERM SHEET

# Optio Rx, LLC

This DIP FACILITY TERM SHEET (together with all annexes, exhibits, and schedules attached hereto, this "<u>DIP Facility Term Sheet</u>") sets forth certain material terms of the proposed DIP Facility (defined below).  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement, dated as of May 9, 2024 (together with all annexes, exhibits, and schedules attached thereto, including the Restructuring Term Sheet (as defined therein) attached thereto, in each case, as amended, supplemented, or modified in accordance with its terms, the "<u>Restructuring Support Agreement</u>"), to which this DIP Facility Term Sheet is attached, or that certain Plan Term Sheet attached as an exhibit to the Restructuring Support Agreement.

| Borrower | Optio Rx, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), in its capacity as a debtor and debtor in possession. |
|---|---|
| Guarantors | Each of the Subsidiary Guarantors (as such term is defined in the Prepetition Credit Agreement) (collectively, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>Loan Parties</u>"), each in their respective capacity as debtors and debtors in possession.  All obligations of the Borrower in connection with the DIP Loans will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| Administrative Agent & Collateral Agent | Loan Admin Co LLC, the administrative agent and the collateral agent for the DIP Lenders (defined below) with respect to the DIP Facility (in such capacities, the "<u>DIP Agent</u>"). |
| DIP Lenders | Funds and vehicles managed by (i) MC Credit Partners LP and (ii) CION Investment Corporation, as First Out Holders under the Prepetition Credit Agreement (defined below), and Caprice Capital Partners, LLC (or its affiliates or related funds) (each, a "<u>DIP Lender</u>" and together, the "<u>DIP Lenders</u>"), as Last Out Holder under the Prepetition Credit Agreement (defined below).  As discussed herein, each DIP Lender shall provide the DIP Commitments on a pro rata basis. |
| Prepetition Loan Agreement | That certain Credit Agreement, dated as of June 28, 2019 (as amended, the "<u>Prepetition Credit Agreement</u>"), by and among CBC Pharma Holdco, LLC, Optio Rx, LLC, Loan Admin Co LLC, as administrative agent, and Loan Admin Co LLC, as lead arranger (the "<u>Prepetition Admin Agent</u>") and the Lenders party thereto from time to time (the "<u>Prepetition Secured Lenders</u>"); the obligations thereunder and under related loan documents, including the AAL (defined below) (the "<u>Prepetition Secured Obligations</u>"); the liens and security interests granted in connection therewith (the "<u>Prepetition Liens</u>"). |
| | In connection with the Prepetition Credit Agreement, reference is made to that certain Agreement Among Lenders, dated as of November 3, 2022 (the "<u>AAL</u>"), by and among each Lender thereto as a First Out Holder (as defined in the AAL), each Lender thereto as a Last Out Lender (as defined in the AAL), Loan Admin Co LLC, as administrative agent under the Prepetition Credit Agreement, and any other Lender party to the AAL.  For the avoidance of doubt, the AAL is a |

| | |
|---|---|
| | subordination agreement enforceable under section 510 of the Bankruptcy Code. |
| **Permitted Liens** | Any valid and unavoidable liens that are (i) in existence as of the Petition Date, (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, and (iii) senior in priority to the Prepetition Liens or by operation of applicable non-bankruptcy law. |
| **Interim and Final DIP Orders** | The order approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, reasonably acceptable in all respects to the DIP Agent and the DIP Lenders (the "Interim DIP Order"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the DIP Documents (defined below), (ii) the making of the DIP Loans (defined below), (iii) the granting of the superpriority claims and liens against the Loan Parties and their assets in accordance with the DIP Documents with respect to the DIP Collateral (as defined below), (iv) those items set forth below in "Waivers, Releases, and Protections", (v) the use of Cash Collateral (defined below), and (vi) the granting of adequate protection to the Prepetition Secured Lenders (collectively, the "DIP Matters"). |
| | The order approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, reasonably acceptable in all respects to the DIP Agent and the DIP Lenders (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"), shall authorize and approve, among other matters, the DIP Matters. |
| **Adequate Protection** | As adequate protection against the risk of any diminution in the value of the Prepetition Liens in all Collateral (as such term is defined in the Prepetition Credit Agreement) securing the Prepetition Liens (the "Prepetition Collateral"), which results from, arises from, or is attributable to, the priming of the Prepetition Liens, the imposition of the automatic stay under section 362 of the Bankruptcy Code, or the use, sale, or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "Diminution in Value"), the Prepetition Secured Lenders shall be granted the following adequate protection, subject in all cases to the Carve-Out (defined below), the DIP Liens (defined below), DIP Superpriority Claims (defined below), and the Permitted Liens: |
| | (i) Quarterly payments of cash equal to interest accrued during the prior calendar quarter; provided, however, that the Last Out Holder shall only be entitled to cash payments equal to the accrued interest on the obligations outstanding under the Last Out Term Loans if the Fixed Charge Coverage Ratio is in excess of 1.5x. |
| | (ii) To the extent of any Diminution in Value of the Prepetition Liens in the Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP |

| | |
|---|---|
| | Collateral (defined below) (the "<u>Adequate Protection Liens</u>"), which adequate protection liens shall have the priority set forth in "Priorities" below, as applicable; (B) to the extent of any Diminution in Value of the Prepetition Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claim shall have priority over any and all administrative expense claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code (other than the Carve-Out (defined below)) (the "<u>Adequate Protection Claims</u>"), which claims shall be subject to the priorities set forth in "Priorities" below, as applicable;  (C) payment of accrued but unpaid pre- and postpetition interest in cash at the post-default rate (as set forth the Prepetition Credit Agreement) as the same becomes due and payable under the Prepetition Credit Agreement;  (D) the payment of the reasonable and documented out-of-pocket fees and expenses of the Prepetition Admin Agent and the Prepetition Secured Lenders; <u>provided</u>, <u>however</u>, that the foregoing shall be limited to the prepetition and postpetition fees and expenses of DLA Piper LLP (US), as counsel to the DIP Agent and First Out Holders, (E) the Borrower shall provide copies of any financial reports (including the weekly delivery of a rolling 13 week cash flow, budget, and supporting information) to the extent otherwise provided to the DIP Lenders; and (F) the "first day" orders shall be reasonably acceptable to the DIP Lenders. |
| **Carve-Out** | The Prepetition Liens, the liens and security interests in the DIP Collateral (defined below), the Adequate Protection Liens, and all superpriority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve-Out. |
| | For purposes of this DIP Facility Term Sheet, "<u>Carve-Out</u>" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "<u>Statutory Fees</u>"), which Statutory Fees shall not be subject to any budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all unpaid fees and expenses of professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Professionals</u>" and such claims, |

| | |
|---|---|
| | the "<u>Allowed Professional Claims</u>") subject to an aggregate cap, in amount to be agreed between the Borrower and the DIP Lenders (the "<u>Carve-Out Cap</u>"). |
| **Type and Amount of DIP Facility** | Senior secured superpriority multi-draw priming debtor-in-possession term loan credit facility (the "<u>DIP Facility</u>", and the loans outstanding thereunder, the "<u>DIP Loans</u>"), in the principal sum of commitments not to exceed $10,000,000 (the "<u>DIP Loan Commitment</u>"), in accordance with which the DIP Lenders shall provide new money term loans as set forth below:<br><br>(i) an initial borrowing on the Closing Date in an aggregate principal amount to be agreed between the Borrower and the DIP Lenders (the "<u>Initial DIP Loan</u>"); and<br><br>(ii) additional borrowings following the Closing Date up to an aggregate principal amount to be determined between the Borrower and the DIP Lenders (the "<u>Final DIP Loan</u>").<br><br>In no event shall the aggregate advances exceed the DIP Loan Commitment. |
| **Priorities** | The liens and related claims set forth herein shall be subject to the following priority schedule:<br><br><u>First</u>: Carve-Out and Permitted Liens<br><br><u>Second</u>: DIP Liens and DIP Superpriority Claims<br><br><u>Third</u>: Prepetition Liens and Prepetition Secured Claims, subject in all respect to the Exit Facility Claims arising under the Exit Capital Structure attached as an exhibit to the Restructuring Support Agreement. |
| **Use of Proceeds** | Solely in accordance with and subject to the credit agreement governing the terms of the DIP Facility (the "<u>DIP Credit Agreement</u>", and together with all security and collateral agreements related thereto, the "<u>DIP Documents</u>"), the proceeds of (x) the Initial DIP Loan shall be used only for working capital, including for the payment of budgeted items for (i) adequate protection payments as required in the DIP Documents and the DIP Orders, (ii) administrative costs of the Chapter 11 Cases, (iii) payment of fees and expenses in connection with selling or exiting one or more businesses or facilities, (iv) pre-approved capital expenditures, and (v) general corporate purposes. |
| **Closing Date** | The date of the satisfaction (or waiver) of each of the conditions precedent to the Initial DIP Loan after entry of the Interim DIP Order (the "<u>Closing Date</u>"). |
| **Maturity** | The DIP Facility shall mature on the earliest to occur of:<br><br>(i) ninety (90) days after the Closing Date; <u>provided</u>, such date may be extended for up to 45 days at the option of the DIP Lenders based on, among other things, the prior achievement of certain Milestones; |

| | |
|---|---|
| | (ii)  the effective date of a chapter 11 plan of any Loan Party, which has been confirmed by an order of the Bankruptcy Court in any of the Chapter 11 Cases and the conversion of the DIP Loans into a portion of an exit facility; |
| | (iii)  dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code; |
| | (iv)  the acceleration of the DIP Loans and the termination of the commitments under the DIP Facility; and |
| | (v)  the closing of a sale of all or substantially all assets or equity of the Loan Parties. |
| **Payments and Interest Rates** | SOFR + 525. |
| **Collateral and Priority** | As security for the prompt payment and performance of all amounts due under the DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities, or other amounts (collectively, the "DIP Obligations"), effective as of the Petition Date, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted automatically and properly perfected liens and security interests (the "DIP Liens") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal, or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Loan Parties (including under any trade names, styles, or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Loan Parties' rights, title, and interests in (1) all Prepetition Collateral, (2) all money, cash, and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts, or other accounts (together with all money, cash, and cash equivalents, instruments, and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds, (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of credit and letter of credit rights; (18) all commercial tort claims; (19) all claims and causes of action arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions") and the proceeds of or property recovered, whether by judgment, settlement or otherwise, from Avoidance Actions |

("Avoidance Action Proceeds"), subject to entry of the Final DIP Order; (20) all permits, licenses, employment contracts, and license agreements, books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (21) to the extent not covered by the foregoing, all other goods, assets or properties of the Loan Parties, whether tangible, intangible, real, personal or mixed; and (22) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Loan Party from time to time with respect to any of the foregoing, now owned or hereafter acquired (collectively, the "DIP Collateral").  For the avoidance of doubt, the First Out Holders and Last Out Holder, each as DIP Lenders, shall share *pari passu* in the DIP Liens and respective DIP Superpriority Claims.

The DIP Liens, subject to the Carve-Out, shall have the following priorities (subject in all cases to the Carve-Out):

(i)    *Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to Permitted Prior Liens (collectively, "Unencumbered Property"), including Avoidance Actions and Avoidance Action Proceeds, which DIP Liens shall be subject and subordinate only to the Carve-Out.

(ii)   *Priming DIP Liens and Liens Junior to Certain Other Liens*.  Under sections 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in clause (i) above), which DIP Liens (a) shall be subject and subordinate only to (1) the Carve-Out and (2) Permitted Liens, (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the Prepetition Liens (including, without limitation, any Adequate Protection Liens), and (c) shall otherwise be subject to the priorities set forth herein.

(iii)  *Liens Senior to Other Liens*.  Except to the extent expressly permitted hereunder, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims (defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases,

6

| | |
|---|---|
| | including any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Loan Parties, (b) any lien or security interest that is avoided or preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien, or security interest of the Loan Parties or their affiliates, or (d) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| **Guarantees** | Each Guarantor shall unconditionally guarantee, on a joint and several basis, all DIP Obligations arising under or in connection with the DIP Facility. |
| **DIP Superpriority Claims** | The DIP Obligations shall be allowed superpriority administrative expense claims under section 364(c) of the Bankruptcy Code against each of the Loan Parties, on a joint and several basis, which claims shall have priority, subject to the Carve-Out, over any and all administrative expense claims against the Loan Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, with recourse against all DIP Collateral (the "<u>DIP Superpriority Claims</u>"). |
| **Use of Cash Collateral** | The Loan Parties shall be permitted to use cash collateral for the purposes and to the extent provided for in the Approved DIP Budget, subject to Permitted Variances (defined below), the Interim DIP Order and the Final DIP Order. |
| **Milestones** | The Loan Parties shall comply with certain customary DIP milestones (the "<u>DIP Milestones</u>"), which DIP Milestones shall be incorporated into the DIP Credit Agreement, including, without limitation: |
| | (i)     the Loan Parties shall commence respective voluntary cases under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") by June 9, 2024 (the "<u>Petition Date</u>"); |
| | (ii)    the Loan Parties shall obtain entry by the Bankruptcy Court of the Interim DIP Order no later than five (5) business days after the Petition Date; |
| | (iii)   the Loan Parties shall obtain entry by the Bankruptcy Court of the Final DIP Order no later than 45 days after the Petition Date; |
| | (iv)   the Loan Parties shall have assumed the Restructuring Support Agreement under section 365 of the Bankruptcy Code no later than 45 days after the Petition Date; |

(v) the Loan Parties shall obtain entry by the Bankruptcy Court of an order approving a disclosure statement with respect to the plan of reorganization contemplated under the Plan Term Sheet and the Restructuring Support Agreement, in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders, no later than 45 days after the Petition Date; and

(vi) the Loan Parties shall obtain entry by the Bankruptcy Court of an order confirming the plan of reorganization contemplated under the Plan Term Sheet and the Restructuring Support Agreement, in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders, no later than 75 days after the Petition Date.

In the event the Loan Parties pursue a sale of substantially all of their assets or equity under section 363 of the Bankruptcy Code to the Consenting Lenders and/or the DIP Lenders (or an entity or entities designated by the Consenting Lenders and/or DIP Lenders), the Loan Parties shall comply with certain customary sale milestones (the "Sale Milestones"), which Sale Milestones shall be incorporated into the purchase agreement.

For the avoidance of doubt, such Sale Milestones shall include, without limitation:

(i) Within 10 business days after the toggle to a sale process under section 363 of the Bankruptcy Code (the "Sale Toggle") in accordance with the terms of the Restructuring Support Agreement, the Loan Parties shall file with the Bankruptcy Court a motion seeking approval of bidding procedures, in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders;

(ii) Within 45 days after the Sale Toggle, the Loan Parties shall have obtained from the Bankruptcy Court an order approving the bidding procedures and, to the extent applicable, designating the Consenting Lenders and/or the DIP Lenders as stalking horse purchasers entitled to bid protections, all in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders (the "Bidding Procedures Order");

(iii) Within 60 days after the Sale Toggle, the Loan Parties shall conduct an auction, or otherwise designate the successful bidder(s) without an auction, in accordance with the Bidding Procedures Order; and

(iv) Within 75 days after the Sale Toggle, the Loan Parties shall have obtained from the Bankruptcy Court an order approving the sale of substantially all of the Debtors' assets

| | |
|---|---|
| | and/or equity, in form and substance reasonably acceptable to the DIP Agent and the DIP Lenders. |
| **Representations and Warranties** | The DIP Documents shall contain usual and customary representations and warranties. |
| **Cash Flow and Variance Reporting; Testing** | The Company Parties shall comply with the following reporting requirements:<br><br>(i) weekly delivery of 13-week cash flow (which shall include, without limitation, actual bank balances);<br><br>(ii) continued reporting consistent with and under Section 10.01 of the Prepetition Credit Agreement; and<br><br>(iii) monthly delivery of CEO and CFO expense reports. |
| **Financial Covenants** | None. |
| **Affirmative and Negative Covenants** | The DIP Documents shall contain usual and customary affirmative and negative covenants for facilities of this type, provided, the DIP Documents shall require, without limitation:<br><br>(i) two (2) business days' advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Loan Parties in the Chapter 11 Cases to the DIP Lender Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing);<br><br>(ii) monthly financial statements within thirty (30) days of the end of each calendar month;<br><br>(iii) drug inventories and regulatory compliance reporting; and<br><br>(iv) at the reasonable request of the DIP Lender Advisors or the DIP Lenders, weekly conference calls or video calls among the Loan Parties' relevant senior management, the Loan Parties' advisors, the DIP Lender Advisors, and the DIP Lenders, which update calls may cover the Loan Parties' financial performance, the latest budget approved for variance testing, the Loan Parties' variance reports, and the other information provided pursuant to the reporting covenant described above. |
| **Conditions Precedent to Closing, Initial Borrowing, and Additional Borrowing** | The Closing Date under the DIP Facility, the Initial DIP Loan, and the Final DIP Loan shall be subject to customary conditions to closing for facilities of this type, including, without limitation, the following:<br><br>(i) no later than five (5) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed without the prior written consent of the DIP Lenders; |

(ii)    no later than 45 days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order, and the Final DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified, amended, or stayed without the prior written consent of the DIP Lenders;

(iii)   the preparation, authorization and execution of the DIP Documents with respect to the DIP Facility, in form and substance consistent with this DIP Facility Term Sheet and otherwise reasonably acceptable to the Loan Parties, the DIP Lenders, and the DIP Agent;

(iv)    the delivery of a 13-week cash flow projection (the "Approved DIP Budget") in form and substance acceptable to the DIP Lenders, subject to standard and customary permitted variances, determined on a line by line basis of actual receipts and expenses against budgeted receipts and expenses provided for in the Approved DIP Budget not to be less than 90% of receipts for the applicable measuring period or more than 110% of expenses for the applicable measuring period], as determined by the DIP Lenders (the "Permitted Variances") reflecting (i) the Loan Parties' anticipated cash receipts and disbursements for each calendar week during the period from the week in which the Petition Date occurs through and including the end of the thirteenth (13th) calendar week thereafter and (ii) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals retained by the Loan Parties and other professionals during the thirteen (13) week period;

(v)     the delivery of (i) a secretary's (or other officer's) certificate of the Borrower and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Borrower;

(vi)    all premiums, payments, fees, costs, and expenses (including, without limitation, the fees and expenses of the DIP Lender Advisors (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) shall have been paid; provided that any such fees and expenses of the DIP Lender Advisors and all other counsel, financial advisors, and other professionals of the DIP Lenders and DIP Agent to be paid on the Closing Date must be invoiced at least five (5) calendar days prior to the Closing Date;

|  | (vii) | the DIP Lenders shall have received from the Borrower and each of the Loan Parties, at least three (3) business days prior to the Closing Date, to the extent requested in writing at least five (5) business days prior to the Closing Date, (a) documentation and other information requested by any DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (b) if a Borrower qualifies as a "legal entity customer" under the beneficial ownership regulations, the DIP Lenders shall have received from such Borrower, at least three (3) business days prior to the Closing Date, a beneficial ownership certification in relation to such Borrower; |
|  | (viii) | the DIP Agent shall have a fully perfected lien on the DIP Collateral pursuant to the Interim DIP Order to the extent required by the DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order; |
|  | (ix) | the Closing Date shall have occurred on or before the date that is three (3) calendar days after the date of entry of the Interim DIP Order unless the DIP Lenders consent to a later date; |
|  | (x) | the Restructuring Support Agreement shall have been executed and be in full force and effect; and |
|  | (xi) | the Last Out Holder shall have purchased First Out Term Loans ratably from the First Out Holders in an aggregate principal amount of $25,000,000 and such loans shall have been converted from First Out Term Loans into Last Out Term Loans upon such purchase. |
| **Final DIP Order** | | The Final DIP Order shall be subject to customary conditions and shall be subject to DIP Lenders providing reasonable consent over the documentation to be entered into with respect to which the proceeds of such Final DIP Loan is intended to be used. |
| **Events of Default** | | The DIP Documents will contain customary events of default (each, an "Event of Default"), and others appropriate for the DIP Loans to be mutually and reasonably agreed among the Borrower and the DIP Lenders, including, without limitation: |
|  | (i) | the Final DIP Order, in form and substance reasonably satisfactory to the DIP Lenders, shall not have been entered within 45 days following the Petition Date; |
|  | (ii) | the Debtors fail to comply with the Approved DIP Budget (subject to permitted variances); |

| | |
|---|---|
| | (iii)    the Debtors fail to satisfy any of the DIP Milestones; |
| | (iv)    the use by the Debtors of DIP Collateral not authorized by the DIP Orders and the DIP Documents; |
| | (v)    the DIP Orders shall (a) have been vacated, stayed, amended, modified, or reversed (without the prior written consent of the DIP Lenders, which consent may be withheld by the DIP Lenders in their respective sole discretion) or (b) cease to create a valid and perfected lien with such priority required by this term sheet; |
| | (vi)    upon written notice from the DIP Lenders that the DIP Orders shall have been violated or breached; |
| | (vii)    the Restructuring Support Agreement shall have been terminated; |
| | (viii)    the Loan Parties' failure to pay professional fees when due under the DIP Documents or the DIP Orders; |
| | (ix)    the Loan Parties failure to materially comply with all regulations applicable to the Loan Parties' operations; and |
| | (x)    In the event the Debtors, in consultation with the DIP Lenders, determine that section 1129(a)(10) of the Bankruptcy Code cannot be satisfied or that the Debtors cannot otherwise confirm the Plan of Reorganization, the Loan Parties' failure to toggle to a 363 sale of substantially all of the Debtors' assets or equity, subject in all respects to the Sale Milestones. |
| **Stipulations, Waivers, Releases, and Protections** | Upon entry of the Interim DIP Order:<br><br>(i)    The Loan Parties shall stipulate (a) to the validity, extent, security, enforceability, priority, and perfection of the Prepetition Liens, (b) to the amount, validity, and lack of defense, counterclaim or offset of any kind to the Prepetition Secured Obligations, and (c) that all cash of the Loan Parties constitutes "cash collateral" of the Prepetition Secured Lenders for purposes of section 363 of the Bankruptcy Code (the "<u>Cash Collateral</u>") (subject to a challenge period acceptable to the DIP Lenders).<br><br>(ii)    The Loan Parties shall waive any right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral with respect to the DIP Lenders, and the Prepetition Collateral with respect to the Prepetition Secured Lenders, subject to entry of the Final DIP Order.<br><br>(iii)    The Loan Parties shall waive the equitable doctrine of "marshalling" against the DIP Collateral with respect to the |

<table>
<tr>
<td></td>
<td colspan="2">DIP Lenders, and the Prepetition Collateral with respect to the Prepetition Secured Lenders, subject to entry of the Final DIP Order.</td>
</tr>
<tr>
<td></td>
<td>(iv)</td>
<td>The Prepetition Secured Lenders shall be entitled to the benefit of section 552(b) of the Bankruptcy Code, and the Loan Parties shall waive the "equities of the case exception" under section 552(b) of the Bankruptcy Code with respect to the Prepetition Secured Lenders, subject to entry of the Final DIP Order.</td>
</tr>
<tr>
<td></td>
<td>(v)</td>
<td>The Loan Parties shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Lenders and Prepetition Secured Lenders (and their respective related parties and representatives) as of the date of the applicable DIP Order.</td>
</tr>
<tr>
<td></td>
<td>(vi)</td>
<td>No Cash Collateral, proceeds of the DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to, or contest the validity, extent, enforceability, security, perfection, or priority of any of the DIP Liens, Prepetition Liens, DIP Obligations, or Prepetition Secured Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Lenders or Prepetition Secured Lenders, (c) object to or seek to prevent, hinder, or delay or take any action to adversely affect the rights or remedies of the DIP Lenders or the Prepetition Secured Lenders, or (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the DIP Documents and the DIP Orders) that are senior to or *pari passu* with the DIP Liens, DIP Superpriority Claims, the Adequate Protection Liens or claims granted hereunder, or the Prepetition Liens.</td>
</tr>
<tr>
<td></td>
<td>(vii)</td>
<td>The DIP Lenders and the Prepetition Secured Lenders shall be entitled to good faith protection under section 364(e) of the Bankruptcy Code.</td>
</tr>
<tr>
<td>**Automatic Relief from Stay**</td>
<td colspan="2">In the event of a default or upon the occurrence and during the continuance of an Event of Default, after the passage of any cure period, upon the giving of a minimum of five (5) business days' written notice of default (the "<u>Remedies Notice Period</u>") to the Company, the Prepetition Term Agent, the Official Committee of Unsecured Creditors (if appointed) and the U.S. Trustee, as provided for in the DIP Documents, the DIP Lenders may exercise all rights and remedies against the DIP Collateral and, as to an event of default related to non-payment of adequate protection, the Prepetition Admin Agent may exercise all rights and remedies. In any hearing during the Remedies Notice Period to modify the automatic stay or in any other hearing regarding any exercise of rights or remedies by the DIP Lenders, the</td>
</tr>
</table>

| | only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Borrower hereby waives its rights to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lenders set forth in the DIP Orders or the DIP Documents. |
|---|---|
| **Credit Bidding** | The DIP Lenders shall have the right to credit bid any or all of the obligations under the DIP Loans in connection with any disposition of property of the Debtors under section 363(k) of the Bankruptcy Code. For the avoidance of doubt, the Prepetition Agent has the right to credit bid under the terms of the AAL. |
| **Expenses and Indemnification** | The DIP Credit Agreement shall provide for the payment of all costs and expenses of the DIP Agent and the DIP Lenders, including, without limitation, the payment of all reasonable and documented fees and expenses of the DIP Lenders' professionals and advisors (the "DIP Lender Advisors"). |
| | The DIP Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the DIP Lenders (together with their related parties and representatives). |
| **Assignments** | The DIP Credit Agreement shall contain assignment provisions that are usual and customary for financings of this type and shall also require that each assignee or participant shall become a party to the Restructuring Support Agreement prior to or concurrently with acquiring any DIP Loans. |
| **Amendments** | Usual and customary for facilities of this type requiring the consent of the DIP Lenders. |
| **Governing Law** | Federal bankruptcy law and the laws of the State of New York. |
| **Counsel to the DIP Lenders** | DLA Piper LLP (US) |

Exhibit B

(See attached)

Execution Version

## PLAN TERM SHEET

## Optio Rx, LLC

This PLAN TERM SHEET (together with all annexes, exhibits, and schedules attached hereto, this "Plan Term Sheet") sets forth certain material terms of the proposed comprehensive restructuring transactions (the "Restructuring") by and among (x) Optio Rx, LLC ("Optio") and certain of its direct and indirect subsidiaries listed on Annex A to this Plan Term Sheet (collectively, the "Company" or the "Debtors"), (y) the lenders (the "Prepetition Secured Lenders") under that certain Credit Agreement, dated as of June 28, 2019 (as amended, the "Prepetition Credit Agreement"), by and among CBC Pharma Holdco, LLC, Optio Rx, LLC, Loan Admin Co LLC, as administrative agent and lead arranger (the "Prepetition Admin Agent"), who, pursuant to that certain Agreement Among Lenders, dated as of November 3, 2022 (the "AAL"), by and among each Lender thereto as a First Out Holder (the "First Out Holders"), each Lender thereto as a Last Out Lender (the "Last Out Holder" and together with the First Out Holders, the "Consenting Lenders"), Loan Admin Co LLC, as administrative agent under the Prepetition Credit Agreement, and any other Lender party to the AAL, respectively have provided first out term loans (the "First Out Term Loans") and a commitment to provide first out revolving loans (the "First Out Revolving Loans") and hold First Out Term Loan secured claims (the "First Out Term Lien Claims") and/or First Out Revolving Loan secured claims (the "First Out Revolving Lien Claims") or last out term loans (the "Last Out Term Loans" and together with the First Out Term Loans, the "Prepetition Term Loans") and hold Last Out Term Loan secured claims (the "Last Out Term Lien Claims" and together with the First Out Term Lien Claims and First Out Revolving Lien Claims, the "Prepetition Lien Claims" and the obligations arising thereunder, the "Prepetition Lien Obligations"), in accordance with which the Debtors shall pursue a reorganization pursuant to a plan of reorganization (the "Plan of Reorganization") and the Restructuring Support Agreement, to which this Plan Term Sheet is attached.

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement, dated as of May 9, 2024 (together with all annexes, exhibits, and schedules attached thereto, in each case, as amended, supplemented, or modified in accordance with its terms, the "Restructuring Support Agreement").

**THIS PLAN TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.**

**THIS PLAN TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN.**

**ANY BINDING AGREEMENT AND/OR COMMITMENT TO EXTEND CREDIT ON THE TERMS AND CONDITIONS OUTLINED HEREIN SHALL BE SUBJECT TO, AND EXCLUSIVELY EVIDENCED BY, DEFINITIVE LEGAL DOCUMENTATION IN FORM AND SUBSTANCE SATISFACTORY TO THOSE PARTIES AS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT.**

| TRANSACTION OVERVIEW | |
|---|---|
| **Implementation** | The Restructuring will be accomplished through the Debtors commencing voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the District of Delaware (the "Bankruptcy Court"), through which the Debtors will file a chapter 11 plan of reorganization (the "Plan of Reorganization"), which shall be filed and prosecuted with the support and approval of the Consenting Lenders (and possibly other parties or classes of creditors), all on the terms and conditions set forth in the Restructuring Support Agreement, and be materially consistent in all respects with the Restructuring Support Agreement and otherwise reasonably acceptable to the Consenting Lenders in all respects.<br><br>On or about the Petition Date, the Debtors shall file the Plan of Reorganization and an accompanying disclosure statement, in form and substance reasonably acceptable to the Consenting Lenders in all respects. |
| **Summary of Restructuring Transactions** | The general description of the Plan of Reorganization is a partial debt for equity swap:<br><br>First: On the Effective Date (defined below), the First Out Holders shall receive 50% and Last Out Holder shall receive 50% of the common equity issued in the Reorganized Debtors (the "Reorganization Securities"); provided, a portion of the Reorganization Securities shall be allocated to the First Out Holders and Last Out Holder in their capacities as DIP Lenders under the DIP Facility, respectively, maintaining a 50/50 relationship; provided, further, that the common equity in the Reorganized Debtors evidenced by the Reorganization Securities to be held by the First Out Holders and Last Out Holder shall be subject to dilution resulting from the issuance, or designation for potential future issuance, of Reorganized Securities to management of the Reorganized Debtors under a management incentive plan, as set forth in "Management Incentive Plan – MIP".<br><br>Second: (i) the First Out Holders and Last Out Holder shall roll a portion of their respective Prepetition Lien Claims into exit facility claims (the "Exit Facility Claims"), and shall convert the balance of such Prepetition Lien Claims into preferred and common equity shares or units (the "Prepetition Lien Conversion"), and (ii) the DIP Lenders shall convert 100% of their respective DIP Superpriority Claims (the "DIP Lien Conversion") into Exit Facility Claims, all as to effect the Exit Capital Structure attached as an exhibit to the Restructuring Support Agreement.<br><br>Third: As set forth below in "Treatment of General Unsecured Claims (Trade)", the Consenting Lenders shall fund the GUC Trade Gift for the benefit of designated impaired accepting general unsecured trade creditors.<br><br>Fourth: The Consenting Lenders shall fund an escrow account for the benefit of creditors who vote to accept the Plan of Reorganization and |

| | |
|---|---|
| | opt-in to releases in favor of the Consenting Lenders (the "GUC Opt-In Gift"). |
| | Fifth: All equity in Optio held by CBC Pharma HoldCo, LLC shall be cancelled, released, and extinguished. |
| | The Plan of Reorganization shall provide for the deemed substantive consolidation of the Debtors for voting purposes only. |
| **363 Sale Toggle** | In the event the Debtors, in consultation with the Consenting Lenders, determine that section 1129(a)(10) of the Bankruptcy Code cannot be satisfied or that the Debtors cannot otherwise confirm the Plan of Reorganization, the Debtors may seek to implement the material terms of the Restructuring Transactions, including the economic treatment of the Consenting Lenders set forth in this Plan Term Sheet (which economic treatment, for the avoidance of doubt, shall include both the applicable debt and equity provisions of this Plan Term Sheet), through the sale of substantially all of the Debtors' assets or equity through a sale under section 363 of the Bankruptcy Code, subject to certain sale milestones provided for in the DIP Facility Term Sheet; provided, however, the Consenting Lenders and/or the DIP Lenders shall have the right to participate in the sale process and, subject to the AAL, credit bid all or a portion of their secured claims under section 363(k) of the Bankruptcy Code toward the purchase price, which sale shall be documented in a purchase agreement in form and substance reasonably acceptable to the Consenting Lenders and/or DIP Lenders, as applicable. |
| **Milestones** | The Debtors shall implement the Restructuring in accordance with the Plan Milestones set forth in the Restructuring Support Agreement. |
| **TREATMENT OF CLAIMS OR INTERESTS** ||
| Pursuant to the terms of the Restructuring Support Agreement, holders of claims and equity interests in the Debtors shall receive the following treatment in full and final satisfaction of such claims and interests, which shall be released and discharged under the Plan. ||
| **Treatment of DIP Superpriority Claim** | On the Effective Date (defined below), each holder of a DIP Superpriority Claim (as defined in the DIP Facility Term Sheet) shall exchange the obligations arising under the DIP Facility (the "DIP Facility Obligations") for Reorganization Securities and Exit Facility Claims to effect the Exit Capital Structure set forth in an exhibit to the Restructuring Support Agreement. |
| **Treatment of Administrative Expense, Priority Tax, and Other Priority Claims** | On or as soon as practicable following the date on which the Debtors shall consummate the transactions contemplated by the Plan and otherwise satisfy or waive the conditions precedent thereunder (the "Effective Date"), each holder of an allowed administrative expense claim, priority tax claim, or other priority claim, other than administrative expense claims for professional fees and expenses, shall receive (i) payment in full in cash in the ordinary course of business, (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, or (iii) such other terms as agreed to among the Debtors and the holders thereof, subject to the consent of the Consenting Lenders. |

3

| Treatment of Prepetition Lien Claims – Impaired Voting | The outstanding Prepetition Lien Claims, after consummating the Prepetition Lien Conversion and DIP Lien Conversion into Exit Facility Claims, shall be deemed to be allowed in the full amount outstanding, in accordance with the Prepetition Credit Agreement, including all principal, accrued, and unpaid interest at the applicable default rate, make wholes, premiums, and other amounts due, and all accrued and unpaid fees, costs, expenses, and non-contingent indemnities payable under the Prepetition Credit Agreement.<br><br>On the Effective Date, after consummation of the transactions contemplated in "Debt for Equity Swap" above, the Prepetition Lien Obligations shall ride through the Chapter 11 Cases and remain in full force and effect and with the same priority as immediately prior to the Petition Date; provided, however, on the Effective Date, each of the holders of the Prepetition Lien Claims shall gift (the "GUC Trade Gift") to the holders of allowed general unsecured trade claims (the "GUC Trade Claims") and transfer into an escrow account equal amounts aggregate to satisfy (x) 80-95% of all allowed general unsecured trade claims on the Effective Date and (y) the remaining 5%-20% of such allowed general unsecured trade claims on the one year anniversary of the Effective Date. |
|---|---|
| Treatment of Vendor Secured Claims - Unimpaired | Vendors that hold allowed secured claims shall at the election of the Reorganized Debtors: (a) be paid in cash in full on the Effective Date of the Plan in satisfaction of their respective allowed secured claims; (b) receive the return of their collateral; or (c) receive such other treatment as the Reorganized Debtors and such vendor agree. |
| Treatment of Mezzanine Unsecured Claims – Impaired, No Distribution, Deemed to Reject | Allowed unsecured mezzanine claims shall be cancelled, released, and extinguished without any distribution.<br><br>The holders of allowed unsecured mezzanine claims shall not be entitled to vote and shall be deemed to reject the Plan of Reorganization. |
| Treatment of General Unsecured Claims (Trade) – Impaired Voting | The holders of allowed general unsecured trade claims that continue to do business with the Reorganized Debtors following the Effective Date are impaired by the Plan of Reorganization and shall, by virtue of the GUC Trade Gift, (x) on the Effective Date, receive 80%-95% of their respective allowed general unsecured trade claims and (y) on the one year anniversary of the Effective Date, receive the remaining 5%-20% of their respective allowed general unsecured trade claims.<br><br>The holders of such allowed general unsecured trade claims shall be entitled to vote to accept or reject the Plan of Reorganization. |
| Treatment of Unsecured Seller Notes – Impaired, No Distribution, Deemed to Reject | On the Effective Date, the unsecured seller notes held by creditors of certain of the Debtors and non-trade unsecured creditors shall be cancelled, released, and extinguished without any distribution.<br><br>The holders of allowed unsecured seller notes shall not be entitled to vote and shall be deemed to reject the Plan of Reorganization. |
| Treatment of Convenience Claims – Impaired Voting | The holders of allowed general unsecured claims, in an amount to be determined, or who elect to reduce their respective claims below a maximum amount to be determined, shall, on the later of (i) the Effective |

| | Date and (ii) the date that is ten (10) business days after such Convenience Claim becomes an allowed claim, in full and final satisfaction of such claim, receive payment in cash equal to the lesser of (x) a percentage (to be determined) of the allowed amount of such Convenience Claim and (y) such holder's pro rata share of the pool of Convenience Claims. |
|---|---|
| | The holders of allowed Convenience Claims shall be entitled to vote to accept or reject the Plan of Reorganization. |
| **Treatment of Intercompany Claims – Impaired, No Distribution, Deemed to Reject** | On the Effective Date, the intercompany claims will be cancelled or otherwise extinguished through substantive consolidation. |
| **Treatment of Equity Interests – Impaired, No Distribution, Deemed to Reject** | On the Effective Date, the equity interests in Optio held by CBC Pharma Holdco, LLC shall be cancelled, released, and extinguished. |
| **FINANCING TERMS SUMMARY** | |
| **DIP Financing and Use of Cash Collateral** | The Chapter 11 Cases will be financed by (i) the Debtors' use of cash collateral and (ii) a postpetition senior secured superpriority multi-draw priming debtor-in-possession term loan credit facility, to be converted into a portion of the exit facility, in the principal sum of commitments not to exceed $10,000,000. The terms, conditions, and provisions of the DIP Facility shall be consistent with the DIP Facility Term Sheet attached as an exhibit to the Restructuring Support Agreement (the "DIP Facility Term Sheet"). |
| **Exit Facility** | The exit of the Chapter 11 Cases will be financed by an exit facility to effect the Exit Capital Structure attached as an exhibit to the Restructuring Support Agreement, comprising $80,000,000 in exit facility commitments, plus certain exit revolving commitments. |
| **Preferred Equity** | As set forth above, on the Effective Date, the First Out Holders and Last Out Holder shall receive Reorganization Securities issued by the Reorganized Debtors, which Reorganization Securities shall comprise (i) senior preferred equity shares or units to the First Out Holders and (ii) junior preferred equity shares or units to the Last Out Holder. |
| **OTHER TERMS OF THE RESTRUCTURING TRANSACTIONS** | |
| **Organizational and Governance Matters** | All corporate governance documents for the Reorganized Debtors, including, without limitation, any charters, bylaws, operating agreements, stockholder agreements, or other organizational documents (collectively, the "New Governance Documents") shall be determined by the Consenting Lenders. |
| **Board of Reorganized Optio** | The initial board of directors of Reorganized Optio (the "New Board") shall contain five (5) members, comprising (i) two directors appointed by the First Out Lender, (ii) two directors appointed by the Last Out Lender, and (iii) Jarlath Johnston, as independent director, or such other |

| | |
|---|---|
| | person qualifying as an independent director, as selected by the Prepetition Admin Agent. |
| | Provisions regarding the removal, appointment, and replacement of members of the New Board will be set forth in the New Governance Documents. |
| **Management Incentive Plan - MIP** | Up to 20% of the voting interests, comprising common equity shares or units, in the Reorganized Debtors with the Consenting Lenders to be diluted equally. |
| **Tax Matters** | The Restructuring (including, for the avoidance of doubt, the Exit Facility) shall be structured in a tax efficient manner acceptable to the Debtors and the Consenting Lenders. |
| | The Debtors will cooperate with any advisors selected by the Consenting Lenders in respect of all tax structuring matters. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that executory contracts and unexpired leases will be assumed, assumed and assigned, or rejected under section 365 of the Bankruptcy Code as to be determined by the Debtors with the consent of the Consenting Lenders. |
| | The Debtors and the Consenting Lenders will work together in good faith to determine which executory contracts and unexpired leases shall be designated to be assumed, assumed and assigned, or rejected in the Chapter 11 Cases. |
| | In the Chapter 11 Cases, the Debtors shall seek to reject that certain contract with Rinku Patel. |
| **Employment Obligations** | On or after the Effective Date, the Reorganized Debtors shall either (i) offer employment on the same or better terms to the Debtors' employees, or (ii) assume the Debtors' obligations to such employees for accrued benefits and seniority. |
| **Key Employee Retention Program – KERP** | The Company Parties shall set aside funds in an amount to be determined to provide retention bonuses to designated employees who remain employees of the Reorganized Debtors for a minimum of 6-months after the Effective Date, subject to the consent of the Consenting Lenders. |
| **1145 Exemption** | The issuance of securities under the Plan of Reorganization will be exempt from section 1145 of the Bankruptcy Code to the full extent, if any, permitted thereby. |
| **Retained Causes of Actions** | The Reorganized Debtors shall retain all rights to commence and pursue any action, interest, Claim, cause of action, controversy, demand, right, action, lien, indemnity, Equity Interest, guaranty, suit, obligation, liability, damage, remedy, proceeding, agreement, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of |

| | |
|---|---|
| | law (the "<u>Causes of Action</u>"), other than any Causes of Action that the Company has released pursuant to the release and exculpation provisions outlined in this Plan Term Sheet and implemented pursuant to the Plan and avoidance actions against trade creditors that continue to conduct business with the Debtors throughout the Chapter 11 Cases. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest claims or interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws. Notwithstanding the foregoing, the Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action as specified in the Plan supplement, including without limitation any chapter 5 causes of action (other than against Released Parties), unless such causes of action are settled or resolved prior to the Effective Date with the consent of the Consenting Lenders. |
| **Releases and Exculpation** | The Plan of Reorganization will include customary mutual releases (the "<u>Plan Releases</u>") in favor of, among others, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Lenders, (iv) the DIP Lenders, (v) the Admin Agent, and (vi) each of their respective current and former predecessors, successors, assigns, affiliates, and subsidiaries, and its and their respective managed accounts or funds or investment vehicles, and equity holders (regardless of whether such equity interests are held directly or indirectly), officers, directors, managers, principals, shareholders, trustees, nominees, independent contractors, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors, direct and indirect parent entities, "controlling persons" (within the meaning of the federal securities law), heirs, participants, administrators and executors, other professionals and related parties (the "<u>Released Parties</u>") that shall provide for, among other things, releases from liability for their actions in connection with (A) the management, ownership or operation of the Debtors, (B) the business or contractual arrangements between any Debtor and any other entity, (C) these Chapter 11 Cases, (D) the Debtors' in- or out-of-court restructuring efforts, and (E) any other act or omission, transaction, agreement, event, or other occurrence related to the foregoing taking place on or before the Effective Date, with customary carve-outs for actual fraud and willful misconduct, to the extent permitted by law. |
| | For the avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria |

| | |
|---|---|
| | Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, and (xvi) Cold Bore Capital. |
| | The Plan of Reorganization and related solicitation documents shall include an opt-in mechanism for impaired creditors eligible to vote to accept or reject the Plan of Reorganization.  Any impaired creditors eligible to vote who vote to accept the Plan of Reorganization and elect to opt-in to the Plan Releases shall receive its respective pro rata share of the GUC Opt-In Gift. |
| **Injunction** | Except as otherwise expressly provided in the Plan of Reorganization or for obligations issued or required to be paid pursuant to the Plan of Reorganization, all holders of claims, interests, or Causes of Action that have been released pursuant to the Plan of Reorganization, shall be discharged pursuant to the Plan of Reorganization, or are subject to exculpation pursuant to the Plan of Reorganization, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the parties exculpated under the Plan of Reorganization, or any of the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims, interests or Causes of Action; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims, interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims, interests or Causes of Action unless such Entity has filed a motion requiting the right to perform such setoff on or before the Effective Date or has filed a proof of Claim or proof of Interest indicating that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, interests or Causes of Action released, settled or subject to exculpation pursuant to the Plan. |
| **Retention of Jurisdiction** | The Plan of Reorganization will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Conditions Precedent to Effective Date** | The occurrence of the Effective Date shall be subject to the satisfaction of certain conditions precedent customary in transactions of the type described in this Plan Term Sheet (the "<u>Conditions Precedent</u>"), including, without limitation, the following: |
| | (i)       Entry of a confirmation order, in form and substance reasonably acceptable to the Consenting Lenders, shall have been entered by the Bankruptcy Court and has not been |

|  | stayed, reversed, modified, or vacated on appeal, and shall have become a final order; |
|  | (ii) All authorizations, consents, and approvals required, if any, in connection with the Plan of Reorganization's effectiveness shall have been obtained; |
|  | (iii) All pharmaceutical licenses or other regulatory approvals necessary for the Reorganized Debtors to conduct their business post-Effective Date shall have been obtained; |
|  | (iv) All actions, documents, certificates, and agreements necessary to implement the Plan of Reorganization shall have been effected or executed, and, to the extent required, filed with the applicable governmental units; and |
|  | (v) All allowed professional fee claims approved by the Bankruptcy Court shall have either been paid in full or sufficiently reserved pending approval of such professional fee claims; |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in this Plan Term Sheet or the Plan of Reorganization, all notes, instruments, certificates, and other documents evidencing claims or interests, including credit agreements and indentures, shall be cancelled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Other Customary Plan Provisions** | The Plan of Reorganization will provide for other standard and customary provisions, including in respect of the cancellation of existing claims and interests, the vesting of assets, the compromise and settlement of claims, the retention of jurisdiction by the Bankruptcy Court and the resolution of disputed claims. |

## ANNEX A

### List of Debtors

- Optio Rx, LLC
- Braun Pharma, LLC
- Dr. Ike's PharmaCare, LLC
- Pet Apothecary, LLC
- The Pet Apothecary LLC
- Crestview Holdings, LLC
- Crestview Pharmacy, LLC
- SBH Medical, LLC
- SBH Medical, Ltd.
- H&H Pharmacy, LLC
- Enovex Pharmacy, LLC
- Concierge Pharmacy, LLC
- SMC Pharmacy, LLC
- Firstcare Pharmacy, LLC
- SMC Lyons Holdings, LLC
- Easycare Pharmacy, LLC
- Baybridge Pharmacy, LLC
- Primecare Pharmacy, LLC
- Central Pharmacy, LLC
- Pro Pharmacy, LLC
- Healthy Choice Compounding LLC
- Rose Pharmacy SA LLC
- Rose Pharmacy SF LLC
- Rose Pharmacy RM LLC
- Oakdell Compounding Pharmacy, LLC

Exhibit C

(See attached)

## Optio Rx, LLC
($ thousand)

| | |
|---|---|
| First Out Term Loan (MCCP) | $55,000 |
| Last Out Term Loan (Caprice) | 25,000 |
| Total secured debt | 80,000 |
| | |
| Senior preferred equity (MCCP) | 15,000 |
| Junior preferred equity (Caprice) | 40,000 |
| | |
| Total debt plus preferred | 135,000 |

**EXHIBIT C**

**Liquidation Analysis**

**(Attached)**

**Optio Rx**
**Hypothetical Liquidation Analysis as of June 2024**
*(000's)*

| | Note | Est Amt. | Estimated Recovery % | | Estimated Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **Assets** | | | | | | |
| Cash | A | $ 1,564 | 100% | 100% | $ 1,564 | $ 1,564 |
| Accts. Rec. | B | 18,291 | 75% | 90% | 13,718 | 16,462 |
| Inventory | C | 7,393 | 50% | 80% | 3,696 | 5,914 |
| Other Current Assets | D | 750 | 0% | 0% | 0 | 0 |
| Fixed Assets, net | E | 3,177 | 0 | 0 | 318 | 953 |
| Right of Use Asset | F | 4,674 | 0% | 0% | 0 | 0 |
| Intangible Assets, net | G | 12,039 | 0% | 0% | 0 | 0 |
| Goodwill, net | H | 79,410 | 0% | 0% | 0 | 0 |
| Other Assets | I | 426 | 5% | 25% | 21 | 107 |
| Deferred Tax Asset, net | J | 2,319 | 0% | 0% | 0 | 0 |
| **Total Assets** | | **$ 102,045** | | | | |
| **Total Proceeds** | | | | | **$ 19,317** | **$ 24,999** |
| ***Costs to Liquidate*** | | | | | | |
| Total Wind Down Costs | K | | | | $ 1,739 | $ 2,573 |
| **Net Proceeds Available** | | | | | **17,578** | **22,426** |
| **Secured Claims** | | | | | | |
| Secured Trade Vendors | L | $ 1,534 | | | 1,534 | 1,534 |
| *% Recovery* | | | | | *100%* | *100%* |
| **Funds Available for Senior Debt** | | | | | **16,044** | **20,892** |
| **Senior Secured Lender Claim** | M | **$ 126,700** | | | **$ 16,044** | **$ 20,892** |
| *% Recovery* | | | | | *13%* | *16%* |
| **Fund Available Other Creditors** | | | | | **$ -** | **$ -** |
| **Unsecured Creditors** | N | **106,270** | | | **$ -** | **$ -** |
| | | | | | *0%* | *0%* |

### Notes

A   Estimated cash on hand as of 6/9

B   Accounts Receivable are estimated to be 75 to 90% recoverable

C   Inventory is estimated to be liquidated at recoveries of 50 to 80% of book value

D   Based on the composition of the Other Current Assets are assumed to be of zero value

E   Estimated recovery on the Fixed Assets is assumed to have a 10 to 30% recovery

F   Right of Use Assets relates to lease accounting and has no value

G   For the purpose of Chapter 7 liquidation, it is assumed intangible assets have no value

H   Goodwill is assumed to have no value in a Chapter 7 liquidation

I   Other Assets are assumed to have 5 to 25% recovery

J   Deferred Tax assets reflecting accounting treatments and have no value in a Chapter 7 liquidation

K   Estimated costs associated with the wind-down and liquidation in Chapter 7 process

L   Based on the Company's books and records as of June 7th.

M   Based on the Company's books and records as of June 7th.

N   GUC per the 6/7 AP: Estimated unsecured creditors as of June 7th, comprised Trade creditors, general unsecured creditors, seller notes, other note holders. This estimate excludes any potential lease or contract rejection claims or unknown claims

# **EXHIBIT D**

**Feasibility Analysis**

**(To be provided in the Plan Supplement)**