# EXHIBIT A

## Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | **Related Docket No. 17** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL; (II)
GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS;
(III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL
HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion")[2] of Optio Rx, LLC and its affiliated debtors and

debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases

(collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order") and

a final order, under sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy

Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-2, and

9013-1; the Court having considered the DIP Motion, that certain Credit Agreement, dated as of

June [●], 2024 (the "DIP Credit Agreement"), by and among the Debtors, the lenders thereunder

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216).  The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061.

[2]     Capitalized terms used but not otherwise defined in this Interim Order have the meanings given to such terms in the DIP Motion.

(the "DIP Lenders"), and administrative agent thereunder (the "DIP Agent"), a copy of the DIP Credit Agreement is attached to this Interim Order as **Exhibit 1**, and the agreements, instruments, certificates, and other documents executed in connection therewith (the "DIP Loan Documents"), the Restructuring Support Agreement and the exhibits thereto, the *Declaration of Leo LaFranco in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 3] (the "First Day Declaration"), and the *Declaration of Tadd Crane in Support of the Debtors' DIP Financing Motion* (the "DIP Declaration"), the evidence submitted and arguments proffered or adduced at a hearing held before the Court; and upon the record of these Chapter 11 Cases; and adequate notice of the hearing on the DIP Motion having been given in accordance with Bankruptcy Rules 2002, 4001, and 9014 and the applicable Local Rules; and it appearing that no other or further notice need be provided; and all objections, responses, and reservations of rights with respect to the relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT**:[3]

A.    **Petition Date**.  On June 9, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") thereby commencing these Chapter 11 Cases.  On or about the date hereof, the Court entered an order providing for the joint administration for administrative purposes only of the Debtors' Chapter 11 Cases.

B.    **Debtors-in-Possession**.  The Debtors continue in possession of and to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of these Chapter 11 Cases.

C. **Jurisdiction and Venue**.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee**.  As of the date hereof, the Office of the United States Trustee for Region 3 (the "U.S. Trustee") has not appointed an official committee of unsecured creditors or any other committee (any such committee, the "Committee") under section 1102(a) of the Bankruptcy Code.

E. **Notice**.  Notice of the DIP Motion and this Interim Order has been sufficient and appropriate under the circumstances and no other or further notice is necessary or required.

F. **Debtors' Stipulations**.  Each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the stipulations set forth below, shall be binding upon the Debtors, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.  The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The Debtors, on their own behalf and on behalf of their estates (subject to Paragraph 37 below), admit, stipulate, acknowledge, and agree as follows (collectively, the "Debtors' Stipulations"):

    i. Prepetition Credit Agreement.  Prior to the Petition Date, the Debtors, the lenders from time to time party thereto (the "Prepetition Lenders"), and Loan Admin Co LLC, as the administrative agent (the "Prepetition Administrative Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties"), entered into that certain Credit Agreement dated as of

June 28, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain First Amendment to Credit Agreement dated as of September 3, 2019, that certain Second Amendment to Credit Agreement dated as January 8, 2020, that certain Third Amendment to Credit Agreement dated as of August 31, 2020, that certain Fourth Amendment to Credit Agreement, dated as of September 25, 2020, that certain Fifth Amendment to Credit Agreement, dated as of December 21, 2021, that certain Sixth Amendment to Credit Agreement, dated as of November 3, 2022, that certain Seventh Amendment to Credit Agreement, dated as of June 26, 2023, that certain Eighth Amendment to Credit Agreement, dated as of January 11, 2024, and that certain Ninth Amendment to Credit Agreement, dated as of May 14, 2024, the "Prepetition Credit Agreement").  The Prepetition Credit Agreement, each fee letter, guaranty, collateral document, and each subordination agreement related thereto, and all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Secured Parties in connection with, evidencing or securing the Prepetition Secured Obligations (as defined herein), each as the same may be amended, restated, renewed, replaced, supplemented or otherwise modified from time to time, are referred to herein as the "Prepetition Loan Documents".

ii.  Prepetition Secured Obligations.  As of the Petition Date, the Debtors were jointly and severally, justly and lawfully indebted and liable to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, in an amount not less than $126,400,000 in principal amount of loans and commitments outstanding, including accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition Loan Documents), charges, indemnities and all other Obligations (as defined in the Prepetition Credit

4870-3786-7207, v. 4

Agreement) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date) as provided in the Prepetition Loan Documents (collectively, the "Prepetition Secured Obligations").

iii. <u>Security for Prepetition Secured Obligations</u>.  As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Debtors granted to the Prepetition Secured Parties security interests in and liens on (the "Prepetition Liens") all of their right, title and interest in the Collateral (as defined in the Prepetition Loan Documents, the "Prepetition Collateral").

iv. <u>Validity of Prepetition Secured Obligations</u>.  The Prepetition Secured Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors, jointly and severally, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Secured Obligations owing to, or any transfers made to the Prepetition Secured Parties, is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other legal or equitable challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

v. <u>Validity, Extent, Perfection, and Priority of Prepetition Liens</u>.  The Prepetition Liens granted to the Prepetition Secured Parties constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral (including the proceeds thereof), at any time owned by any Debtor and thereafter acquired, were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value,

and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity or regulation by any person or entity, including in any Successor Cases.

vi.   No Challenges or Claims Related to Prepetition Secured Indebtedness.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.  The Debtors and their estates have no valid or meritorious Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action or basis for any equitable relief against the Prepetition Liens or other property of the Prepetition Secured Parties, or the Prepetition Secured Parties or any of their respective affiliates and its and their respective predecessors, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents.  The Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

vii. <u>No Challenges or Claims Related to DIP Facility</u>.   No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the DIP Liens or DIP Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the DIP Liens or DIP Obligations exist, and no portion of the DIP Liens or DIP Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.   The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action or basis for any equitable relief against the DIP Lenders or any of their respective affiliates and its and their respective predecessors, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the DIP Obligations, the DIP Liens, DIP Loan Documents or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents.

viii. <u>Release</u>.  Subject to entry of the Final Order, the Debtors, on behalf of themselves and their respective estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit the Prepetition Secured Parties, the DIP Lenders, and their respective affiliates and each of its and their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents,

- 7 -

related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case solely in their capacity as such (collectively, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the Prepetition Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Parties and/or the DIP Lenders (collectively, the "Released Claims") that exist or may exist prior to the entry of this Interim Order by the Court. Subject to entry of the Final Order, the Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations which the Debtors now have or may claim to have against the Released Parties arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order by the Court.

ix.  Indemnity. The Prepetition Secured Parties and the DIP Lenders have acted in good faith, and without negligence, misconduct, or violation of public policy or law, in respect of all

actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, except for claims relating to gross negligence and willful misconduct.  No exception or defense in contract, law or equity exists as to any obligation set forth in this paragraph, in the Prepetition Loan Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the Prepetition Secured Parties or DIP Lenders, as the case may be, and any such defenses are hereby waived.  Any pre-Petition Date indemnification obligations continue unimpaired by commencement of the Chapter 11 Cases or entry of this Interim Order.

x. <u>No Control</u>.  Neither the Prepetition Secured Parties nor the DIP Lenders control the Debtors or are insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the extension of the DIP Facility, the DIP Loan Documents, and/or the Prepetition Loan Documents.

xi. <u>Sale and Credit Bidding</u>.  The DIP Lenders and/or the Prepetition Secured Parties shall have the right, subject to section 363(k) of the Bankruptcy Code, to credit bid (independently or together) up to the full amount of the applicable outstanding Prepetition Secured Obligations and the DIP Obligations in each case, including, without limitation, any accrued fees, interest and expenses, in a sale of any DIP Collateral or Prepetition Collateral, as applicable, and whether such

sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

xii. <u>Cash Collateral</u>.  All of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

G.    **<u>Findings Regarding Postpetition Financing and Use of Cash Collateral</u>**.

i.    <u>Request for Postpetition Financing and Use of Cash Collateral</u>.  The Debtors seek authority to (a) enter into the Credit Agreement on the terms described in the DIP Motion, this Interim Order, and in the DIP Loan Documents, and (b) use Cash Collateral on the terms described herein to administer these Chapter 11 Cases and fund their operations in accordance with the Approved Budget (subject to Permitted Variances (as defined in the DIP Credit Agreement)), the DIP Credit Agreement, and the DIP Loan Documents.  As of the Petition Date, the prepetition revolver available to the Debtors was fully drawn upon and the commitments in respect thereof are cancelled and the Debtors have no access thereto on a postpetition basis.  The Debtors' use of Cash Collateral is limited to postpetition receipts of Prepetition Collateral or DIP Collateral.

ii.    <u>Priming of Prepetition Liens</u>.    The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Loan Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors, and the Debtors would not be able to obtain debtor-in-possession financing in a sufficient amount without granting such priming liens.  Consistent with the requirements of section 364(d) of the Bankruptcy Code, the Prepetition Secured Parties shall receive adequate protection as set forth in

- 10 -

this Interim Order under sections 361, 363, and 364 of the Bankruptcy Code for any decrease in the value of their interest in the Prepetition Collateral (including Cash Collateral) resulting from (A) the use, sale, or lease by the Debtors of the Prepetition Collateral during the pendency of these Chapter 11 Cases, (B) the DIP Liens and the Carve-Out pursuant to the DIP Loan Documents and this Interim Order, or (C) the imposition of the automatic stay under section 362 of the Bankruptcy Code (such potential diminution, collectively, "Diminution in Value").

iii.   Immediate Need for Postpetition Financing and Use of Cash Collateral.   The Debtors have an immediate and critical need to obtain financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (a) pay the fees, costs, and expenses incurred in connection with these Chapter 11 Cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of their businesses, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll and provide benefits to employees, and (f) satisfy other working capital and operational needs.   The incurrence of new debt under the DIP Loan Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.   Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.   The extensions of credit under the DIP Facility are fair and reasonable, and the Debtors' entry into the DIP Facility reflects the sound exercise of the Debtors' business judgment and are supported by reasonably equivalent value and fair consideration.

iv.   No Credit Available on More Favorable Terms.   The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.   Given their current financial condition, financing arrangements, and capital structure, and the circumstances of these Chapter

- 11 -

11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  Further, the Prepetition Secured Parties have consented to the Debtors incurring debtor-in-possession financing, the priming of their Prepetition Liens, and the use of their Cash Collateral, only on the terms of and subject to the conditions set forth in the DIP Loan Documents and this Interim Order.   The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Lenders: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and priming liens to the extent set forth in this Interim Order, the Credit Agreement, and the DIP Loan Documents, and (3) the other protections set forth in this Interim Order.

   v.  _Use of Cash Collateral and Proceeds of DIP Facility_.  As a condition to the Debtors' entry into the DIP Loan Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order (as may be amended and supplemented by the Final Order), the DIP Loan Documents, and the Approved Budget (subject to Permitted Variances).

H.   **Adequate Protection**.  In exchange for their consent to (i) the priming of the Prepetition Liens by the DIP Liens and (ii) the use of the Cash Collateral to the extent set forth in this Interim Order, the Prepetition Secured Parties shall receive, *inter alia*, adequate protection to the extent of any Diminution in Value of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

I.   **Sections 506(c) and 552(b)**.  Subject to entry of the Final Order, in light of (i) the DIP Lenders' agreement that their liens and superpriority claims shall be subject to payment of the Carve-Out and (ii) the Prepetition Secured Parties' agreement that, with respect to the Prepetition Collateral, their respective liens and claims, including any adequate protection liens and claims, shall be subject to payment of the Carve-Out, and subordinate to the DIP Liens, the DIP Lenders and the Prepetition Secured Parties have negotiated for, and the Debtors intend to seek in the Final Order, (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, (b) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, or the Prepetition Collateral, as applicable, and (c) a waiver of the surcharge provisions of section 506(c) of the Bankruptcy Code.

J.   Good Faith of DIP Lenders and Prepetition Secured Parties.

i.   Willingness to Provide DIP Financing.  The DIP Lenders have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility (as defined in the DIP Credit Agreement) and those set forth in the DIP Loan Documents, including the DIP Credit Agreement; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Loan Documents in good faith, and that the DIP Lenders'

claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

ii. <u>Business Judgment</u>.  Based on the DIP Motion, the First Day Declaration, and the DIP Declaration, and the record presented to the Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Loan Documents, including the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Loan Documents, and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Loan Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing and terms available under the circumstances.

iii. <u>Good Faith Under Section 364(e)</u>.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's-length among the Debtors, the DIP Lenders, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Lenders and the Prepetition Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

iv. <u>Consent to DIP Facility and Use of Cash Collateral</u>.  The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral,

and the Debtors' entry into the DIP Loan Documents, in accordance with and subject to the terms and conditions in this Interim Order and the DIP Loan Documents.

K.    **Good Cause**.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, their estates and their stakeholders.  Among other things, the Debtors have an immediate need for the liquidity provided by the DIP Facility on an interim basis and interim use of Cash Collateral in order to avoid immediate, irreparable harm, and the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to pay critical expenses necessary to maximize the value of their estates.  The extensions of credit under the DIP Facility, the use of Cash Collateral, and the proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

L.    **Immediate Entry**.    Sufficient cause exists for the immediate entry and effectiveness of this Interim Order under Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based upon the foregoing findings of fact, the DIP Motion, and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    **Motion Granted**.  The DIP Motion is GRANTED as set forth below.  Entry into the DIP Credit Agreement and the other DIP Loan Documents is hereby authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and in the DIP Loan Documents, including, without

limitation, the Approved Budget (subject to Permitted Variances).  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

**DIP Facility Authorization**

2. **Authorization of the DIP Facility.** The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Loan Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all DIP Loan Documents, including all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents (the DIP Liens are perfected by entry of this Interim Order and such perfection shall continue upon entry of the Final Order without the need of the Debtors or any DIP Lender to take any action, file or record any mortgage, lien, or notice, or attach or take possession of any DIP Collateral).  The Debtors are hereby authorized to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents and this Interim Order, as such amounts become due and owing, without the need to obtain further Court approval (except as otherwise provided in this Interim Order or in the DIP Loan Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, and to the extent applicable, any closing fees and commitment fees, as well as reasonable and documented fees and disbursements of counsel to the DIP Lenders and the Prepetition Secured Parties, as set forth in this Interim Order and in the DIP Loan Documents, whether or not such

professional fees and disbursements arose before, on, or after the Petition Date, and whether or not the transactions contemplated hereby or by the DIP Loan Documents are consummated, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Loan Documents.   Upon execution and delivery, the DIP Loan Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates, jointly and severally, in accordance with their terms.   Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

3.    **Authorization to Borrow**.   To prevent immediate and irreparable harm to the Debtors' estates, and to enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order, the Debtors are hereby authorized to borrow under the DIP Facility, subject to any limitations on, or conditions to, borrowing under the DIP Loan Documents, which borrowings shall be used solely for purposes permitted under the DIP Loan Documents, including, without limitation, to provide working capital for the Debtors and to pay adequate protection, interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Loan Documents, and the Approved Budget (subject to Permitted Variances).   The DIP Facility shall be made available for the purposes set forth in the DIP Credit Agreement and this Interim Order (1) in a principal amount of up to $2.75 million on or after the first business day following entry of this Interim Order and satisfaction of the "Conditions Precedent to All Credit Events" (the "Initial Draw"), and (2) in an additional aggregate principal amount of $10 million less the total amount of the Initial Draws on or after the first business day following the entry of

the Final Order (together with the Initial Draw, each a "<u>Draw</u>" and collectively the "<u>Draws</u>"), subject to, in each case to the terms of this Interim Order and the DIP Credit Agreement.  On or after the first business day following entry of this Interim Order, the Debtors [shall draw $2.75 million] from the DIP Facility.  All other Draws shall be either in the amount of $500,000 or in multiples of $500,000; <u>provided</u>, <u>however</u>, that the Debtors shall not make more than six (6) Draws following entry of the Final Order.

4.     **DIP Obligations**.  The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including without limitation, any trustee appointed in these Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>"). Upon entry of this Interim Order, the DIP Obligations will include all loans, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lenders, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses, and other amounts, in each case under the DIP Loan Documents.   The Debtors shall be jointly and severally liable for the DIP Obligations.  Absent an Event of Default, the DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date.  No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Loan Documents (including any DIP Obligation or DIP Liens) to the DIP Lenders, including in connection with any adequate protection provided hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and

547–550 of the Bankruptcy Code or under any applicable state or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.     **DIP Collateral**.  To secure the DIP Obligations, effective as of the Petition Date, under sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lenders are hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") the DIP Collateral.  The term "DIP Collateral" means, collectively, all assets, rights, and privileges of each Debtor and its respective estate of any nature whatsoever, including avoidance actions under chapter 5 of the Bankruptcy Code, subject to entry of a Final Order, now owned or hereafter acquired, wherever located, by whomsoever held and all proceeds thereof in whatever form received, whether first arising prior to, on, or following the Petition Date, including, but not limited to, any and all cash, cash equivalents and any investment of such cash or cash equivalents, inventory, goods, accounts, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, payment intangibles, documents, instruments, securities, chattel paper, interests in leaseholds (provided, however, that solely to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event there shall only be a lien on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code), real property, deposit

- 19 -

accounts (except for any account created to hold an adequate assurance deposit for utility providers, pursuant to separate order of this Court, but not excepting the Debtors' or their estates' interest in any excess funds in such account after satisfaction of any applicable obligations to utility providers), securities accounts, investment property, letters of credit, letter-of-credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, commercial tort claims, capital stock of subsidiaries, wherever located, and the proceeds, products, rents, accession and profits of the foregoing, including, but not limited to, (i) all assets constituting Prepetition Collateral, (ii) the Cash Collateral, (iii) all assets of the Debtors that, as of the Petition Date, were not otherwise subject to a security interest, (iv) to the extent a DIP Lien is not permitted by law to attach to any property of any Debtor or its estate, the proceeds of such property, and (v) subject to entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise from all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law (collectively, "Avoidance Actions").

6.     **DIP Liens**.  The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, other encumbrances on, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to payment of the Carve-Out, and shall otherwise be junior only to the Permitted Liens (as defined in the DIP Credit Agreement).  Other than as set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in these Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in these Chapter 11 Cases

or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.

7.     **DIP Superpriority Claims**.  Subject to payment of the Carve-Out, upon entry of this Interim Order, the DIP Lenders are hereby granted, under section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code, and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

8.     **No Obligation to Extend Credit**.  The DIP Lenders shall have no obligation to make any loan or advance under this Interim Order or the DIP Loan Documents unless all of the conditions precedent under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Lenders in accordance with the terms of the DIP Loan Documents.

9.     **Use of DIP Facility Proceeds**.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Loan Documents, and only in compliance with the Approved Budget

(subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Loan Documents.

10.    **No Monitoring Obligation**.  The DIP Lenders shall not have any obligation or responsibility to monitor any Debtor's respective use of the DIP Facility, and the DIP Lenders may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Loan Documents, including, but not limited to, the Approved Budget (subject to the Permitted Variances).

### Use of Cash Collateral

11.    **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the termination of the DIP Credit Agreement.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order, the DIP Loan Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), as applicable.

12.    **Consent of Prepetition Secured Parties**.  The Prepetition Secured Parties hereby consent to (a) the provisions of this Interim Order including the Debtors' entry into the DIP Facility on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, and (c) the Approved Budget (subject to the Permitted Variances).

13.    **Adequate Protection for Prepetition Secured Parties**.  As adequate protection for any Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition

Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve-Out or otherwise, the Prepetition Secured Parties shall receive:

a. <u>Adequate Protection Liens</u>.  Continuing valid, binding, enforceable, and perfected postpetition replacement liens under sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, and Permitted Liens (as defined in the Prepetition Loan Documents) (the "<u>Adequate Protection Liens</u>") and which (a) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (b) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.

b. <u>Adequate Protection Superpriority Claims</u>.  Administrative superpriority expense claims in each of the Chapter 11 Cases (the "<u>Adequate Protection Superpriority Claims</u>"), junior and subordinate only to payment of the Carve-Out and the DIP Obligations, pursuant to section 507(b) of the Bankruptcy Code, with priority over any and all other administrative expenses and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.

c. <u>Adequate Protection Payments</u>.  Upon the terms and conditions of the Prepetition Loan Documents, and subject to the Approved Budget (subject to the Permitted Variances), the First Out Holders (as defined in the DIP Credit Agreement) shall receive quarterly cash payments each in an amount equal to accrued interest on the Prepetition Obligations, in all respects subject

to the terms and conditions of that certain Agreement Among Lenders, dated as of November 3, 2022 (as amended, the "AAL").

  d. <u>Payment of Prepetition Secured Parties' Fees and Expenses</u>. The Prepetition Secured Parties shall receive monthly reimbursement of their respective reasonable and documented fees and expenses including any professional fees (in each case, without the need for the filing of formal fee applications), including as to any amounts arising before, on, or after the Petition Date, incurred in connection with the Chapter 11 Cases. For the avoidance of doubt, the foregoing shall be limited to the payment of (i) all reasonable and documented fees and out-of-pocket expenses of DLA Piper LLP (US); (ii) reasonable and documented fees and out-of-pocket expenses of [counsel to ACAP] up to $50,000.

  e. <u>Financial Reporting</u>. The Debtors shall provide the Prepetition Secured Parties with all reports, documents, and other materials, including financial reports, as may be required in this Interim Order and the DIP Credit Agreement, and shall continue to provide all financial reporting required by the Prepetition Loan Documents. In addition, upon reasonable notice, the Debtors shall provide the Prepetition Secured Parties and their representatives with access to the Debtors' premises, personnel (including, without limitation, senior management and any similar person or firm employed by the Debtors in the Chapter 11 Cases), advisors, books and records, and the Debtors shall cooperate fully in all reasonable requests for information and data made by the Prepetition Secured Parties.

  f. <u>Compliance with Approved Budget</u>. The Debtors shall comply with, and shall use cash, including Cash Collateral, solely in accordance with the Approved Budget (subject to the Permitted Variances).

14.     **Adequate Protection Reservation**.  Nothing in this Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

**General Provisions Regarding DIP Financing and Use of Cash Collateral**

15.     **Amendments to the DIP Loan Documents**.  The Debtors and the DIP Lenders may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case in the DIP Agent's sole discretion, and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Loan Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of, the rate of interest on, or the fees payable in connection with the DIP Facility, or (iii) change any Event of Default (as defined in the DIP Loan Documents), add any covenants, or amend the covenants to be materially more restrictive; provided, however, notice of any such amendment or other modification shall be provided by the Debtors to the U.S. Trustee and the Committee (if any) two (2) days in advance of its effectiveness, to the extent reasonably practicable and such amendment or other modification shall be filed on the docket of these Chapter 11 Cases.  No consent to any such amendment, waiver, consent, or

modification set forth in this paragraph shall be implied by any action, inaction, or acquiescence of the DIP Lenders and/or the Prepetition Secured Parties. After obtaining the DIP Lenders' and the Prepetition Secured Parties' prior written consent, the Debtors are authorized and empowered, without further notice and hearing or approval of this Court so long as such amendment, or modification is not of the type set forth in clauses (i)–(iii) above, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof.

      16.    **Approved Budget**.

      a.   Attached to this Interim Order as **Exhibit 2** is a 13-week budget approved by the DIP Lenders and the Prepetition Secured Parties, which sets forth, among other things, projected cash receipts and cash disbursements. Such budget shall be updated from time to time as set forth in the DIP Credit Agreement. As of any date of determination, the budget or the updated budget that has most recently become the "Approved Budget" in accordance with and as defined in the DIP Credit Agreement shall be referred to herein as the "Approved Budget." Until any updated budget has become the Approved Budget, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect (subject to Permitted Variances). As set forth in the DIP Credit Agreement, "Permitted Variance" means, with respect to the Approved Budget, tested on a four (4)-week rolling basis, cumulative actual cash receipts to be not less than 85% of cumulative budgeted receipts for the period ending with the most recently completed week or cumulative actual expenses for the most recently completed week to be not more than 115% of cumulative budgeted expenses for the period ending with the most recently completed week, in each case, as determined by the Lenders; provided that if for any four (4)-week rolling period, actual cash receipts exceed expected cash receipts and actual cash expenditures exceed expected cash expenditures, the Permitted Variance for cash expenditures for the period ending with that

week will be deemed to have been met if the cumulative actual net cash flow for such period is equal to or greater than the cumulative expected net cash flow for such period.  For the avoidance of doubt, documented fees and out-of-pocket expenses paid to the Lenders or their respective professionals shall not be included in the foregoing variance testing; provided, however, documented fees and out-of-pocket expenses paid to the Debtors' professionals or any professionals retained by any official committee formed during the Chapter 11 Cases shall be included in the foregoing variance testing.

b.   The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors in accordance with the Approved Budget (subject to Permitted Variances), this Interim Order, and the DIP Loan Documents.

c.   Other than with respect to the Carve-Out, neither the DIP Lenders' nor the Prepetition Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility or Cash Collateral beyond the Maturity Date (as defined in the DIP Credit Agreement) or a termination of the DIP Credit Agreement, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

d.   Notwithstanding anything to the contrary herein, the Debtors shall pay the reasonable and documented fees, costs, and expenses of the DIP Lender Professionals (as defined below) in accordance with the DIP Loan Documents and this Interim Order.

e.   Absent relief from the Court, any amendment or modification of the terms and conditions set forth in this Interim Order related to the Approved Budget, or any amendment or modification of the Approved Budget itself, shall be subject to prior written express consent and approval of the DIP Lenders and the Prepetition Secured Parties.  In the event of a dispute

concerning the Approved Budget, all rights of the Debtors, the DIP Lenders, and the Prepetition Secured Parties are reserved.

17. **Budget Reporting**.  The Debtors shall at all times comply with the Approved Budget (subject to the Permitted Variances) and shall further comply with the Permitted Variance and other reporting requirements set forth in the DIP Credit Agreement.

18. **Modification of the Automatic Stay**.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Lenders and/or the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

19. **Perfection of DIP Liens and Adequate Protection Liens**.  This Interim Order shall be sufficient and conclusive evidence of the creation, extent, validity, perfection, and priority of all liens granted in the DIP Credit Agreement, any security DIP Loan Document executed and delivered in connection therewith or herewith, or granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, attachment, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lenders and the Prepetition Secured Parties to the priorities granted in this Interim Order.  Notwithstanding the foregoing, the DIP Lenders and the Prepetition Secured Parties are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise

evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  Each of the DIP Lenders and the Prepetition Secured Parties may, in its discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.  To the extent that the Prepetition Secured Parties are, with respect to the DIP Collateral, a secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition Loan Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Lenders shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.

20.     **Proceeds of Subsequent Financing**.  If the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt under sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Documents which shall be cash collateralized) and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve-Out, and unless otherwise agreed by the DIP Lenders, all cash proceeds derived from such

credit or debt shall immediately be turned over to the DIP Lenders to be distributed in accordance with this Interim Order and the DIP Loan Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) under section 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full of the Prepetition Secured Obligations (other than unasserted contingent obligations that expressly survive termination of the Prepetition Loan Documents which shall be cash collateralized), the Prepetition Secured Parties' and/or the DIP Lenders' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

21.    **Maintenance of DIP Collateral**.  Until the payment in full of the DIP Obligations and the Prepetition Secured Obligations, or the conversion of such DIP Obligations or Prepetition Secured Obligations in accordance with a plan of reorganization filed in these Chapter 11 Cases, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Loan Documents or the Prepetition Loan Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order and the DIP Loan Documents.

22.    **Rights to Credit Bid**.

a.    Subject to entry of the Final Order, under section 363(k) of the Bankruptcy Code and the Prepetition Loan Documents, the Prepetition Secured Parties (subject to the terms and conditions of the AAL) may credit bid all or any portion of their claims, including, without limitation, the Prepetition Secured Obligations and the Adequate Protection Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets,

including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii), or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

b.   Under section 363(k) of the Bankruptcy Code and the DIP Loan Documents, the DIP Lenders may credit bid all or any portion of their claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claims, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, including, without limitation, any sale occurring pursuant to Bankruptcy Code section 363 or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii), or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

23.   **DIP Milestones**.  As a condition to the DIP Facility and the use of Cash Collateral, the Debtors have agreed to the following milestones (the "DIP Milestones"):

a.   the Debtors shall have obtained entry by the Court of this Interim Order no later than five (5) business days after the Petition Date;

b.   the Debtors shall obtain entry by the Court of the Final Order no later than 45 days after the Petition Date;

c.   the Debtors shall have assumed the Restructuring Support Agreement under section 365 of the Bankruptcy Code no later than 45 days after the Petition Date;

d.   the Debtors shall obtain entry by the Court of an order approving a disclosure statement with respect to the plan of reorganization contemplated under the Plan Term Sheet and the Restructuring Support Agreement, in form and substance reasonably acceptable to the DIP Lenders, no later than 45 days after the Petition Date; and

e.   the Debtors shall obtain entry by the Court of an order confirming the plan of reorganization contemplated under the Plan Term Sheet and the Restructuring

Support Agreement, in form and substance reasonably acceptable to the DIP Lenders, no later than 75 days after the Petition Date.

For the avoidance of doubt, unless waived by the DIP Lenders and the Prepetition Secured Parties, each in their sole discretion, or otherwise ordered by the Court, the failure of the Debtors to meet the DIP Milestones by the applicable specified deadlines set forth therefor shall constitute an Event of Default under the DIP Loan Documents and this Interim Order.

24.     **Termination Date**.   On the applicable Termination Date (defined below), all applicable DIP Obligations shall be immediately due and payable and all commitments to extend credit under the applicable DIP Facility will terminate.

25.     **Events of Default**.  Until the payment in full of the DIP Obligations, the occurrence of any of the events under Section 12 of the DIP Credit Agreement, unless waived by the Required Lenders (defined in the DIP Credit Agreement) in writing (which may be by electronic mail) and in accordance with the terms of the DIP Loan Documents, shall constitute an event of default hereunder (collectively, the "Events of Default").

26.     **Rights and Remedies Upon Event of Default**.   Upon the occurrence and continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, other than as set forth in this Interim Order: (a) the DIP Lenders may send a written notice to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration") declaring (1) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (2) the commitment of the DIP Lenders to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation

- 32 -

of the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice (as defined below) to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Loan Documents; (c) the DIP Lenders and/or the Prepetition Secured Parties, as applicable, may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, except to satisfy payroll, tax, and benefits obligations, and to pay required pharmaceutical licensing fees, in each case necessary to avoid immediate and irreparable harm to the Debtors and their estates.  The earliest date on which a Termination Declaration is delivered by the DIP Lenders shall be referred to herein as the "Termination Date."  Following a Termination Date, neither the DIP Lenders nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if any), and the U.S. Trustee.

27.    **Emergency Hearing**.  The Debtors may seek an emergency hearing during the five (5) business days following the date a Termination Declaration is delivered (such five (5) business day period, the "Remedies Notice Period") to contest whether an Event of Default has occurred or is continuing.  During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of Paragraph 26 of this Interim Order, solely to satisfy payroll, tax, and benefits obligations, and pay required pharmaceutical licensing fees, in each case necessary to avoid immediate and irreparable harm to the Debtors and their estates to assert that no Event of Default has occurred and is continuing.  Nothing in this paragraph shall preclude the Court from hearing anything in its discretion beyond what is expressly set forth above.

4870-3786-7207, v. 4

28.  **Rights and Remedies Following Termination Date**.  Following a Termination Date and unless the Court has entered an order prior to the expiration of the Remedies Notice Period finding that an Event of Default has not occurred, the DIP Lenders shall be entitled to exercise all rights and remedies in accordance with the DIP Loan Documents, this Interim Order, and applicable law, including causing a sale of the DIP Collateral.

29.  **Carve-Out**.

a.  Carve-Out Definition.   As used in this Interim Order and the DIP Facility Documents, the term "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors or the Committee pursuant to Sections 327, 328, 363, or 1103 of the Bankruptcy Code (the "Retained Professionals") at any time before or on the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Retained Professionals in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (including email or other

- 34 -

electronic means) by the DIP Lenders to the Debtors, their counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

b.  <u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>.  The DIP Lenders and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Case Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lenders or the Prepetition Secured Parties in any way to pay compensation to, or to reimburse expenses of, any of the Case Professionals, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any Professional Fees or Expenses of any of the Debtors, the Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lenders and/or the Prepetition Secured Parties to object to the allowance and payment of any such fees and expenses.

30.  **<u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>**.  The DIP Lenders and the Prepetition Secured Parties have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, the Prepetition Loan Documents (subject to entry of the Final Order), and this Interim Order, and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, and notwithstanding any reversal or

modification on appeal of any or all of the provisions of this Interim Order by a subsequent order of this Court or any other court, the DIP Lenders and Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.

31.     **Approval of DIP Fees**.  In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the Prepetition Administrative Agent shall be paid its annual administrative agent fee in an amount equal to $100,000 (the "<u>Agency Fee</u>") under the DIP Loan Documents as such become due, including, without limitation, and to the extent applicable, commitment fees, exit fees, and the reasonable and documented fees and expenses of the DIP Lenders in connection with the DIP Facility, without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "<u>DIP Fees</u>").  The DIP Fees are hereby deemed to be fully earned and payable in accordance with the terms of the DIP Loan Documents without the need for any further order of this Court.  The DIP Fees shall be part of the DIP Obligations.

32.     **Lender Professional Fees**.  Professionals for the DIP Lenders (the "<u>DIP Lender Professionals</u>") and professionals for the Prepetition Secured Parties ("<u>Prepetition Professionals</u>," and together with the DIP Lender Professionals, the "<u>Lender Professionals</u>") shall not be required to file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses.  The DIP Lender Professionals shall submit copies of summary invoices to the Debtors, the U.S. Trustee, and counsel for any Committee prior to payment of such invoices.  The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines.  The Debtors, U.S. Trustee, or any Committee shall have ten (10)

business days after receipt of such invoices (which, for the avoidance of doubt, may be by email) to object to the reasonableness of the fees and expenses of any Lender Professional.  If an objection is timely asserted and cannot be resolved within ten (10) days of when it is asserted, then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such DIP Professional an objection (a "Fee Objection"), providing not less than ten (10) days for the Lender Professional to respond, and the Fee Objection will then be resolved by the Court at the next regularly scheduled omnibus hearing or such other hearing as the parties may agree (subject to Court availability) or the Court may order.  Any failure by any such party to (a) timely assert such objection within the ten (10) day period or (b) having timely asserted such objection, file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no objection has been timely asserted or Fee Objection has been timely filed.

33.    **Indemnification**.  Subject to entry of the Final Order, the Debtors shall jointly and severally indemnify and hold harmless the DIP Lenders and each of their affiliates and its and their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling persons, equity holders, partners, members, and other representatives and each of their respective successors and permitted assigns (each, an "Indemnified Party") against, and to hold each

Indemnified Party harmless from, any and all losses, claims, damages, liabilities, and reasonable, documented and invoiced out-of- pocket fees and expenses (including, without limitation, fees and disbursements of counsel but limited, in the case of counsel, to the extent set forth in the DIP Loan Documents) that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of, or in any way in connection with, or as a result of: (i) the execution or delivery of any of the DIP Loan Documents, the performance by the parties thereto of their respective obligations thereunder and the other transactions contemplated thereby; (ii) the use of the proceeds of the DIP Facility; (iii) the enforcement or protection of their rights in connection with any of the DIP Loan Documents; (iv) the negotiation of and consent to this Interim Order; or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Party is a party thereto and regardless of whether such matter is initiated by a third party or the Debtors or any of their subsidiaries or affiliates or creditors; provided that the foregoing indemnity shall not apply to any claims arising (i) prior to the Petition Date or (ii) out of, or in any way in connection with, or as a result of provisions of the Prepetition Loan Documents (for the avoidance of doubt, nothing in this Interim Order alters, amends, expands or minimizes any indemnification under the Prepetition Loan Documents, subject to applicable law); provided further that no Indemnified Party will be indemnified for any loss, claim, damage, liability, cost, or other expense to the extent such loss, claim, damage, liability, cost, or expense that (i) is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith, or willful misconduct of such Indemnified Party or (B) a material breach of the obligations of such Indemnified Party under the DIP Loan Documents or (ii) relates to any proceeding between or among Indemnified Parties other than

claims arising out of any act or omission on the part of the Debtors in accordance with this paragraph.

34.    **Proofs of Claim**.  The DIP Lenders shall not be required to file a proof of claim in any of the Chapter 11 Cases or Successor Cases, and the Debtors' stipulations herein shall be deemed to constitute a timely filed proof of claim.  Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in any of the Chapter 11 Cases or Successor Cases shall not apply to the DIP Lenders. Notwithstanding the foregoing, the DIP Lenders, on behalf of themselves, are hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases for any claim allowed herein.

35.    **Limitations on the Use of DIP Proceeds, Cash Collateral, the Carve-Out, and Other Funds**.  Except as otherwise permitted in this Interim Order and the Approved Budget, the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out may not be used, directly or indirectly, by any of the Debtors, the Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Cases) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with any of the following (each, a "Challenge") (a) seeking authorization to obtain liens or security interests that are senior to or *pari passu* with the DIP Liens or the Prepetition Liens or (b) investigating (including by way of examinations or discovery proceedings), preparing, asserting, joining, commencing, supporting or prosecuting any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse

to the interests of, in any capacity, the DIP Lenders and/or the Prepetition Secured Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under Chapter 5 of the Bankruptcy Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Adequate Protection Liens, the Prepetition Liens, the Prepetition Loan Documents or the Prepetition Secured Obligations, (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the Prepetition Secured Obligations, (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the DIP Lenders or the Prepetition Secured Parties under any of the DIP Loan Documents or this Interim Order, or (B) the Prepetition Secured Parties under any of the Prepetition Loan Documents or this Interim Order (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Lenders' or the Prepetition Secured Parties' assertions, enforcements, realizations or remedies on or against the DIP Collateral or the Prepetition Collateral, as applicable, in accordance with the DIP Loan Documents or the Prepetition Loan Documents, as applicable, and this Interim Order), or (vi) objecting to, contesting, or interfering with, in any way, the DIP Lenders' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or the Prepetition Collateral, as applicable, once an Event of Default has occurred, provided, however, that no more than $25,000 in the aggregate of the proceeds of the DIP Facility or the DIP Collateral (including

Cash Collateral) may be used by any Creditors' Committee (if one is formed) to investigate the Prepetition Secured Obligations and the Prepetition Liens.

36.    **Payments Held in Trust**.  Except as expressly permitted in this Interim Order or the DIP Loan Documents and other than with respect to the Prepetition Collateral, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Documents, and termination of the DIP Facility in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lenders and shall immediately turn over such proceeds to the DIP Lenders upon written notice, for application in accordance with the DIP Credit Agreement and this Interim Order.

37.    **Releases; Challenge Rights**.

a.    <u>Binding Effect on Debtors</u>.  Subject to entry of the Final Order, the Debtors' Stipulations and releases contained in Paragraph F of this Interim Order shall be binding in all circumstances upon the Debtors and upon their estates.

b.    <u>Release of DIP Lenders</u>.  Upon entry of this Interim Order, the Debtors, on their own behalf and their estates, forever and irrevocably: (a) release, discharge, and acquit the DIP Lenders and each of their affiliates and its and their respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest, in each case solely in their capacity as such, of and from any and all Challenges; and (b) waive, discharge and release any and all defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.  For the avoidance of doubt, in accordance with the Restructuring Support Agreement, none of the following shall receive any release, discharge, or acquittal by virtue of this Interim Order or any Final Order: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

      c.   <u>Binding Effect on Non-Debtor Third Parties</u>.

      i.   Subject to entry of the Final Order, the Debtors' Stipulations and releases contained in Paragraph F hereof and in section (b) immediately above shall be binding upon the Debtors' estates and each other party-in-interest, including the Committee (and including any chapter 11 trustee or chapter 7 trustee), except to the extent such party in interest first obtains standing by no later than 75 calendar days following the date of entry of the Interim Order, (such time period shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other Challenge, such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "<u>Challenge Period Termination Date</u>")) and second, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary

proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").

  ii. Except as otherwise expressly provided in this Interim Order, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Secured Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.

  iii. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; provided that all other stipulations (other

than those subject to a Successful Challenge) shall remain binding on any Committee or other party-in-interest.

iv. Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph or to require or permit an extension of the Challenge Period Termination Date.

38.    **Waivers**.  Subject to entry of a Final Order and as a further condition of the DIP Loan Documents and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Lenders to the payment of the Carve-Out to the extent provided herein and the consent of the Prepetition Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral):

a.    Limitation on Charging Expenses.  No costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against the DIP Lenders and/or the Prepetition Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lenders or the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Lenders or the Prepetition Secured Parties.

b.  <u>No Marshaling</u>.  In no event shall the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order, the DIP Credit Agreement, and the Prepetition Loan Documents, as applicable.

c.  <u>Equities of the Case</u>.  In no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or Prepetition Collateral.

39.  **No Lender Liability**.  In determining to make any loan (whether under the DIP Loan Documents or the Prepetition Loan Documents or otherwise) or to permit the use of Cash Collateral, neither the DIP Lenders nor the Prepetition Secured Parties are or will be in control of the Debtors and none shall owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

40.  **Limitation of Liability**.  Nothing in this Interim Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders or Prepetition Lenders of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates.  So long as the DIP Lenders or the Prepetition Lenders comply with their obligations under the DIP Loan Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Lenders

4870-3786-7207, v. 4

shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP

Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any

cause, (iii) any Diminution in Value thereof, or (iv) any act or default of any carrier, servicer,

bailee, custodian, forwarding agency, or other person and (b) all risk of loss, damage, or destruction

of the DIP Collateral shall be borne by the Debtors.

41.     **No Third Party Beneficiaries**.  Except as explicitly provided for in this Interim

Order, this Interim Order does not create any rights for the benefit of any third party, creditor,

landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

42.     **Insurance Proceeds and Policies**.  Upon entry of this Interim Order and to the

fullest extent provided by applicable law, the DIP Lenders and the Prepetition Secured Parties shall

be, and shall be deemed to be, without any further action or notice, named as additional insured

and loss payee on each insurance policy maintained by the Debtors that in any way relates to the

DIP Collateral.

43.     **No Waivers or Modifications of Interim Order**.  The Debtors irrevocably waive

any right to seek any modification or extension of this Interim Order without the prior written

consent of the DIP Lenders and the Prepetition Secured Parties and no such consent shall be

implied by any other action, inaction, or acquiescence of the DIP Lenders or the Prepetition

Secured Parties.

44.     **Binding Effect of this Interim Order**.  Immediately upon entry of this Interim

Order by this Court, the terms and provisions of this Interim Order shall become valid and binding

upon and inure to the benefit of the Debtors, the DIP Lenders, the Prepetition Secured Parties, all

other creditors of any of the Debtors, the Committee, if any, and all other parties-in-interest and

their respective successors and assigns, including any trustee or other fiduciary hereafter appointed

4870-3786-7207, v. 4

in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any chapter 11 case or Successor Case; provided, that neither the DIP Lenders nor the Prepetition Secured Parties shall have an obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

45.      **Discharge; Conversion of DIP Liens**.  Except as otherwise agreed in writing by the DIP Lenders or the Prepetition Secured Parties, as applicable, or as otherwise provided in the DIP Credit Agreement or this Interim Order, the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, paid in full) or, as applicable, converted to Exit Facility Claims, on or before the effective date of such confirmed plan of reorganization.

46.      **Joint and Several Liability**.  Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

47.      **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11

Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Lenders and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Loan Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms); and (ii) in respect of the Prepetition Loan Documents, all of the Prepetition Secured Obligations pursuant to the Prepetition Loan Documents and this Interim Order, have been paid in full. The terms and provisions concerning the indemnification of the DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Facility and/or the indefeasible repayment of the DIP Obligations. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the satisfaction in full or termination of the DIP Obligations until the satisfaction in full of the Prepetition Secured Obligations.

48. **Necessary Actions**. The Debtors are authorized and directed to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

49. **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d),

7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be effective immediately and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

50.     **Rights Reserved**.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Lenders or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Lenders or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Loan Documents, or the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lenders or the Prepetition Secured Parties.

51.     **Headings**.  All paragraph headings used in this Interim Order are for ease of reference only and are not to affect the construction hereof or to be taken into consideration in the interpretation hereof.

52.     **Final Hearing**.  The Final Hearing is scheduled for **July 1, 2024, at 2:00 p.m. (*prevailing* Eastern Time)**, at which time any party in interest may present any timely filed objections to the entry of the Final Order.  The Debtors shall promptly serve a copy of this Interim Order and a notice of the Final Hearing by regular mail upon (a) the parties that were provided

notice of the Interim Hearing; (b) any party that has filed prior to such date a request for notices with this Court; and (c) counsel for the Committee, if any appointed.  Such notice shall state that objections to the entry of a Final Order shall be in writing and shall be filed with the Court no later than **June 24, 2024, at 4:00 p.m. (*prevailing* Eastern Time)**, which objections shall be served so as to be received on or before such date by (i) proposed counsel to the Debtors, Chipman, Brown, Cicero & Cole LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (Attn: William Chipman, Esquire (Chipman@chipmanbrown.com) and Mark D. Olivere, Esquire (Olivere@chipmanbrown.com)); (ii) counsel to the DIP Lenders and the Prepetition Secured Parties, (a) DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, DE 19801, Attn: Stuart M. Brown (stuart.brown@us.dlapiper.com) and Matthew S. Sarna (matthew.sarna@us.dlapiper.com), and (iii) the Office of the U.S. Trustee for Region 3, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jonathan W. Lipshie, Esquire. (Jon.Lipshie@usdoj.gov).  Any objections by creditors or other parties in interest to any of the provisions of a Final Order incorporating the terms of this Interim Order, or including any other or different provisions, shall be deemed waived unless filed and served in accordance with this paragraph.

53.   **Retention of Jurisdiction**.  The Court shall retain jurisdiction with respect to all matters arising out of or related to the interpretation, implementation, or enforcement of this Interim Order or the DIP Facility.

4870-3786-7207, v. 4

## Exhibit 1

**DIP Credit Agreement**

SENIOR SECURED SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

OPTIO RX, LLC,
as Borrower and as Debtor and Debtor-in-Possession,

THE LENDERS FROM TIME TO TIME PARTY HERETO

AND

LOAN ADMIN CO LLC,
as Administrative Agent

Dated as of June [__], 2024

LOAN ADMIN CO LLC,

as Sole Lead Arranger and Book Runner

Table of Contents

Page

SECTION 1.      Definitions and Accounting Terms; Interpretation ........................................... 1
    1.01.   Defined Terms .......................................................................................... 1
    1.02.   Divisions ................................................................................................. 31
    1.03.   Leases ...................................................................................................... 31
    1.04.   Rates ........................................................................................................ 31

SECTION 2.      Amount and Terms of Loans ........................................................................ 32
    2.01.   The Loans ................................................................................................ 32
    2.02.   Minimum Amount of Each Borrowing ................................................... 32
    2.03.   Notice of Borrowing ............................................................................... 32
    2.04.   Disbursement of Funds ........................................................................... 32
    2.05.   Notes ....................................................................................................... 33
    2.06.   Conversions ............................................................................................ 34
    2.07.   Pro Rata Borrowings .............................................................................. 34
    2.08.   Interest .................................................................................................... 34
    2.09.   Interest Periods ....................................................................................... 35
    2.10.   Increased Costs, Illegality, etc .............................................................. 36
    2.11.   Compensation ......................................................................................... 39
    2.12.   Change of Lending Office ...................................................................... 40
    2.13.   Replacement of Lenders ......................................................................... 40
    2.14.   Alternate Rate of Interest ....................................................................... 41
    2.15.   Term SOFR Conforming Changes .......................................................... 42
    2.16.   Benchmark Replacement Setting ............................................................ 42

SECTION 3.      [Reserved] ................................................................................................... 43

SECTION 4.      Commitment Commission; Fees; Reductions of Commitment ...................... 43
    4.01.   Fees ........................................................................................................ 43
    4.02.   Mandatory Reduction of Commitments ................................................... 43

SECTION 5.      Prepayment Premium ................................................................................... 44
    5.01.   Prepayment Premium .............................................................................. 44

SECTION 6.      Prepayments; Payments; Taxes ..................................................................... 45
    6.01.   Voluntary Prepayments ........................................................................... 45
    6.02.   Mandatory Repayments ........................................................................... 45
    6.03.   Method and Place of Payment ................................................................ 48
    6.04.   Net Payments .......................................................................................... 48

SECTION 7.      Conditions Precedent to Credit Events on the Closing Date .......................... 52
    7.01.   Credit Agreement; Notes ........................................................................ 52

Table of Contents
(continued)

7.02. Officer's Certificate ............................................................................. 52

7.03. Company Documents; Proceedings; etc ............................................... 52

7.04. Adverse Change, Approvals ................................................................ 52

7.05. Litigation ............................................................................................ 53

7.06. Subsidiaries Guaranty; Intercompany Subordination Agreement ........ 53

7.07. Restructuring Transaction Related Deliverables ................................... 53

7.08. Financial Statements; Pro Forma Balance Sheet .................................. 54

7.09. Fees, etc .............................................................................................. 54

7.10. AML, KYC .......................................................................................... 54

7.11. Compliance with Statutes, etc ............................................................. 55

SECTION 8. Additional Conditions Precedent ........................................... 55

8.01. Conditions Precedent to All Credit Events .......................................... 55

8.02. Conditions Precedent to Borrowings of Additional Term Loans After the Closing Date ........................................................................................ 55

SECTION 9. Representations, Warranties and Agreements ......................... 57

9.01. Company Status ................................................................................... 57

9.02. Power and Authority ........................................................................... 57

9.03. No Violation ........................................................................................ 57

9.04. Approvals ............................................................................................ 58

9.05. [Reserved] ........................................................................................... 58

9.06. Litigation ............................................................................................ 58

9.07. True and Complete Disclosure ............................................................. 58

9.08. Use of Proceeds; Margin Regulations .................................................. 59

9.09. Tax Returns and Payments ................................................................... 59

9.10. [Reserved] ........................................................................................... 60

9.11. Security Documents ............................................................................. 60

9.12. [Reserved] ........................................................................................... 60

9.13. [Reserved] ........................................................................................... 60

9.14. [Reserved] ........................................................................................... 60

9.15. Compliance with Statutes, etc ............................................................. 60

9.16. Investment Company Act ..................................................................... 60

9.17. [Reserved] ........................................................................................... 60

9.18. Environmental Matters ........................................................................ 61

9.19. Employment and Labor Relations ....................................................... 61

9.20. Intellectual Property ............................................................................ 62

9.21. EEA Financial Institution .................................................................... 62

9.22. [Reserved] ........................................................................................... 62

Table of Contents
(continued)

9.23.   [Reserved] ........................................................................................ 62

9.24.   Necessary Authorizations ............................................................... 62

9.25.   Regulatory Status ............................................................................ 63

9.26.   Sanctions; Anti-Corruption ............................................................ 67

9.27.   No Default ....................................................................................... 68

9.28.   Approved Budget ............................................................................. 68

SECTION 10.      Affirmative Covenants .................................................... 68

10.01.  Information Covenants ...................................................................... 68

10.02.  Books, Records and Inspections ....................................................... 72

10.03.  Maintenance of Property; Insurance ................................................ 73

10.04.  Existence; Franchises ....................................................................... 74

10.05.  Compliance with Statutes, etc .......................................................... 74

10.06.  Compliance with Environmental Laws ............................................ 74

10.07.  ERISA ............................................................................................... 74

10.08.  End of Fiscal Years; Fiscal Quarters ................................................ 75

10.09.  [Reserved] ........................................................................................ 76

10.10.  Payment of Taxes ............................................................................. 76

10.11.  Use of Proceeds ................................................................................ 76

10.12.  [Reserved] ........................................................................................ 76

10.13.  [Reserved] ........................................................................................ 76

10.14.  [Reserved] ........................................................................................ 76

10.15.  Vendor Lien Agreement Documents ................................................ 76

10.16.  Sanctions; Anti-Corruption Laws .................................................... 76

10.17.  [Reserved] ........................................................................................ 76

10.18.  Maintenance of Company Separateness ........................................... 76

10.19.  [Reserved] ........................................................................................ 77

10.20.  Keepwell ........................................................................................... 77

10.21.  Payment of Principal, Premium and Interest ................................... 77

10.22.  Regulatory Status ............................................................................. 77

10.23.  Milestones ........................................................................................ 77

10.24.  Bankruptcy Related Matters ............................................................ 78

SECTION 11.      Negative Covenants ........................................................ 78

11.01.  Liens ................................................................................................. 78

11.02.  Consolidation, Merger, Purchase or Sale of Assets, etc ................... 81

11.03.  Dividends .......................................................................................... 84

11.04.  Indebtedness ..................................................................................... 84

Table of Contents
(continued)

11.05.   Advances, Investments and Loans ..................................................... 85

11.06.   Transactions with Affiliates ........................................................... 87

11.07.   Prepetition Note Purchase Agreement Payments ............................... 88

11.08.   Formation or Acquisition of Subsidiaries ........................................ 88

11.09.   [Reserved] .................................................................................... 88

11.10.   [Reserved] .................................................................................... 88

11.11.   Modifications of Certificate of Incorporation, By-Laws and Certain Other
         Agreements; Limitations on Voluntary Payments, etc ...................... 88

11.12.   Limitation on Certain Restrictions on Subsidiaries ........................... 89

11.13.   Limitation on Issuance of Equity Interests ...................................... 89

11.14.   Business; etc................................................................................. 90

11.15.   [Reserved] .................................................................................... 90

11.16.   Certain Deposit Accounts ............................................................... 90

11.17.   Sanctions; Anti-Corruption Use of Proceeds .................................... 90

11.18.   Hedge Agreements ........................................................................ 90

11.19.   Seller Notes .................................................................................. 90

11.20.   Chapter 11 Cases ........................................................................... 90

SECTION 12.      Events of Default.............................................................. 92

12.01.   Payments ...................................................................................... 92

12.02.   Representations, etc ....................................................................... 92

12.03.   Covenants...................................................................................... 92

12.04.   Default Under Other Agreements .................................................... 92

12.05.   Compliance with Regulations ......................................................... 93

12.06.   ERISA .......................................................................................... 93

12.07.   Security Documents ....................................................................... 93

12.08.   Guaranties .................................................................................... 93

12.09.   Judgments ..................................................................................... 93

12.10.   Change of Control .......................................................................... 94

12.11.   Subordination ................................................................................ 94

12.12.   Defaults Under Vendor Lien Agreement Documents .......................... 94

12.13.   Material Agreements ...................................................................... 94

12.14.   Closing Date.................................................................................. 94

12.15.   Chapter 11 Cases ........................................................................... 94

SECTION 13.      The Administrative Agent.................................................. 99

13.01.   Appointment ................................................................................. 99

13.02.   Nature of Duties ............................................................................ 99

13.03.   Lack of Reliance on the Administrative Agent................................. 100

- iv -

Table of Contents
(continued)

13.04. Certain Rights of the Administrative Agent .................................................. 102

13.05. Reliance .................................................................................................. 102

13.06. Indemnification ........................................................................................ 102

13.07. The Administrative Agent in its Individual Capacity ...................................... 103

13.08. Holders ................................................................................................... 103

13.09. Resignation by the Administrative Agent ..................................................... 103

13.10. Collateral Matters .................................................................................... 104

13.11. Delivery of Information .............................................................................. 105

13.12. Delegation of Duties ................................................................................. 105

13.13. No Reliance on the Administrative Agent's Customer Identification Program:  Certifications From Banks and Participants:  Patriot Act ................. 105

13.14. Subordination Agreements ......................................................................... 106

SECTION 14.      Miscellaneous .................................................................................. 106

14.01. Payment of Expenses, etc .......................................................................... 106

14.02. Right of Setoff ......................................................................................... 108

14.03. Notices ................................................................................................... 109

14.04. Benefit of Agreement; Assignments; Participations ....................................... 109

14.05. No Waiver; Remedies Cumulative ............................................................... 112

14.06. Payments Pro Rata .................................................................................... 113

14.07. Calculations; Computations ....................................................................... 113

14.08. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL ...................................................................... 114

14.09. Counterparts ........................................................................................... 115

14.10. Effectiveness ........................................................................................... 115

14.11. Headings Descriptive ................................................................................ 116

14.12. Amendment or Waiver; etc ........................................................................ 116

14.13. Survival .................................................................................................. 118

14.14. Domicile of Loans .................................................................................... 118

14.15. Register .................................................................................................. 118

14.16. Confidentiality ......................................................................................... 119

14.17. Special Provisions Regarding Pledges of Equity Interests in, and Promissory Notes Owed by, Persons Not Organized in the United States or Pledges over Assets Not Located in the United States .................................... 120

14.18. Patriot Act .............................................................................................. 121

14.19. Post-Closing Actions ................................................................................ 121

14.20. Interest Rate Limitation ............................................................................. 122

14.21. Entire Agreement ..................................................................................... 122

1609103405.14
4870-1742-7140, v. 3

Table of Contents
(continued)

14.22. Acknowledgement and Consent to Bail-In of EEA Financial Institutions ........ 122

14.23. Obligations Absolute ......................................................................... 122

1609103405.14
4870-1742-7140, v. 3

## <u>SCHEDULES</u>

SCHEDULE I          Commitments

SCHEDULE II         Credit Party Addresses

SCHEDULE III        Existing Seller Notes

SCHEDULE IV         Post-Closing Matters

## <u>EXHIBITS</u>

EXHIBIT A-1         Form of Notice of Borrowing

EXHIBIT A-2         Form of Notice of Conversion/Continuation

EXHIBIT B-1         Form of Initial Term Loan Note

EXHIBIT B-2         Form of Additional Term Loan Note

EXHIBIT C           Form of Section 6.04(b)(ii) Certificate

EXHIBIT D           Form of Officers' Certificate

EXHIBIT E           Form of Subsidiaries Guaranty

EXHIBIT F           Form of Compliance Certificate

EXHIBIT G           Form of Assignment and Assumption Agreement

EXHIBIT H           Form of Intercompany Note

1609103405.14
4870-1742-7140, v. 3

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of June [__], 2024, OPTIO RX, LLC, a Delaware limited liability company (the "**Borrower**"), the Lenders party hereto from time to time, LOAN ADMIN CO LLC, as Administrative Agent and LOAN ADMIN CO LLC, as Lead Arranger.  All capitalized terms used herein and defined in <u>Section 1.01</u> are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrower the respective credit facilities provided for herein;

WHEREAS, on June 7, 2024 (the "**Petition Date**"), the Borrower and certain of its affiliates and subsidiaries (each, a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") initiating their respective jointly administered cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") (Case No. [_____]) (collectively, the "**Chapter 11 Cases**"), and each Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide the Debtors with a senior secured super-priority multi-draw priming debtor-in-possession term loan credit facility consisting of (i) the Initial Term Loan funded by the Lenders on the Closing Date and (ii) the Additional Term Loans funded by the Lenders in accordance with the terms and conditions of this Agreement and the DIP Orders;

WHEREAS, the Lenders are willing to make term loans to the Borrower, subject to the terms and conditions set forth in this Agreement and the DIP Orders;

WHEREAS, this Agreement constitutes the "DIP Credit Agreement" and the Loans constitute the "DIP Facility", in each case, referred to in the Restructuring Support Agreement, and, upon entry by the Lenders into this Agreement, all obligations and agreements of the Consenting Lenders (as defined in the Restructuring Support Agreement) with respect to the DIP Facility (as defined in the Restructuring Support Agreement) set forth in the Restructuring Support Agreement shall be deemed satisfied to the fullest extent required by the Restructuring Support Agreement; and

WHEREAS, the Obligations of the Borrower are guaranteed by the Guarantors and, subject to the Carve-Out, secured by Liens on the Collateral, in each case, as set forth in, and subject to, the Credit Documents and the DIP Orders.

NOW, THEREFORE, IT IS AGREED:

**SECTION 1.**  <u>Definitions and Accounting Terms; Interpretation</u>.

1.01.  <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Accepting Lender**" shall have the meaning provided in Section 6.02(k).

"**Additional Security Documents**" shall mean any documents that may be requested by the Lenders to effect or document the grant of security interests in favor of the Lenders in Collateral in addition to the DIP Orders, including, without limitation, any security agreement, pledge agreement, or related document evidencing a grant of security interests.

"**Additional Term Loans**" shall mean the term loans in an aggregate principal amount not to exceed the Final Term Loan Commitment made to the Borrower after the Closing Date.

"**Adequate Protection Provisions**" shall mean the provisions in the Interim DIP Order or, once entered, in the Final DIP Order, granting adequate protection to the Prepetition Secured Parties under section 364(d) of the Bankruptcy Code.

"**Administrative Agent**" shall mean Loan Admin Co LLC, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any successor to the Administrative Agent appointed pursuant to Section 13.09.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly Controlling (including, but not limited to, all directors and senior executive officers of such Person), Controlled by, or under direct or indirect common Control with, such Person; provided, however, that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of the Borrower or any Subsidiary thereof.

"**Agreement**" shall mean this Credit Agreement, as it may be modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"**Agreement Among Lenders**" shall mean that certain Agreement Among Lenders, dated as of November 3, 2022, by and among the Administrative Agent, the Collateral Agent and the financial institutions party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time.

"**Applicable Margin**" shall mean (A) with respect to any SOFR Loan, a percentage per annum equal to 5.25% and (B) with respect to any Base Rate Loan, a percentage per annum equal to 4.25%.

"**Applicable Percentage**" shall mean, at any time, a fraction (expressed as a percentage) the numerator of which is equal to the aggregate principal amount of all Loans outstanding at such time held by the applicable Lender and the denominator of which is equal to the aggregate principal amount of all Loans outstanding at such time.

"**Approved Budget**" shall mean the line by line rolling budget presented in form and substance approved by the Lenders and the Administrative Agent detailing (a) expected cash receipts and cash expenditures (whether treated for GAAP purposes as expenses or capitalized) for each of the thirteen (13) consecutive calendar weeks from the week in which the Petition Date occurs through and including the thirteenth (13th) calendar week thereafter and (b) a professional fee accrual budget with respect to the anticipated fees and expenses to be incurred by professionals

1609103405.14
4870-1742-7140, v. 3

retained by the Credit Parties and other professionals (including the claims and solicitation agent, and U.S. Trustee fees) during the thirteen (13)-week period.  The Approved Budget will be updated each week to (i) report actual cash receipts and actual cash expenditures on a line by line basis as compared to the budgeted amount for such week and (ii) roll forward the line by line forecast of expected cash receipts and cash expenditures and professional fees, and such updated budget shall only become an Approved Budget once approved by the Lenders.  In the event any proposed budget is not approved by the Lenders, then the most recent Approved Budget shall remain the Approved Budget for all purposes hereunder.

"**Asset Sale**" shall mean any Disposition other than to the Borrower or a Wholly-Owned Subsidiary of the Borrower but excluding (x) Dispositions pursuant to Sections 11.02(b), (e), (f), (g), (h), (i), (j), (l) and (m), and (y) other Dispositions that generate Net Sale Proceeds of less than $250,000 individually (or with respect to a series of related Dispositions) or $500,000 in the aggregate in any fiscal year of the Borrower.

"**Assignment and Assumption Agreement**" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit G (appropriately completed).

"**Authorized Officer**" shall mean, with respect to (i) delivering the Notice of Borrowing and similar notices, any person or persons that has or have been authorized by the board of directors of the Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards or incumbency certificates on file with the Administrative Agent, (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, the treasurer or the principal accounting officer of the Borrower, and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of the Borrower.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.16(d).

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" shall have the meaning provided in the recitals.

"**Bankruptcy Court**" shall have the meaning provided in the recitals.

"**Base Rate**" shall mean, for any day, a rate per annum equal to the highest of (a) the Prime Rate, (b) the sum of one half of one percent (0.50%) per annum and the Federal Funds Rate, and

1609103405.14
4870-1742-7140, v. 3

(c) Term SOFR for a one-month tenor in effect on such day plus 100 basis points (1.00%), in each instance, as of such day. Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "base commercial lending rate", the Federal Funds Rate or Term SOFR for an Interest Period of one (1) month.

"**Base Rate Loan**" shall mean each Loan designated or deemed designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Base Rate SOFR Determination Day**" shall have the meaning provided in the definition of "Term SOFR".

"**Benchmark**" shall mean, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.16(a).

"**Benchmark Replacement**" shall mean, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent (in consultation with the Borrower) giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body for similarly situated loans or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for dollar-denominated floating rate syndicated commercial credit facilities and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than one and one-quarter percent (1.25%), such Benchmark Replacement will be deemed to be one and one-quarter percent (1.25%) for the purposes of this Agreement and the other Credit Documents; provided, further, that any Benchmark Replacement shall be administratively feasible as determined by the Administrative Agent in its sole discretion.

"**Benchmark Replacement Adjustment**" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by the Administrative Agent (in consultation with the Borrower) giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities.

"**Benchmark Replacement Date**" shall mean the earlier to occur of the following events with respect to the then-current Benchmark:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information

referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative or non-compliant with or non-aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided that such non-representativeness, non-compliance or non-alignment will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" shall mean in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" shall mean, the period (if any) (i) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.16 and (ii) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.16.

"**Beneficial Ownership Certification**" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" shall mean 31 C.F.R. § 1010.230.

"**Borrower**" shall have the meaning provided in the first paragraph of this Agreement.

"**Borrowing**" shall mean the borrowing of one Type of Loan of a single Tranche from all the Lenders having Commitments of the respective Tranche on a given date (or resulting from a conversion or conversions on such date) having in the case of SOFR Loans the same Interest Period, provided that Base Rate Loans incurred pursuant to Section 2.10(b) shall be considered part of the related Borrowing of SOFR Loans.

"**Business Day**" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, New York or Chicago, Illinois, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, SOFR Loans, any day which is a Business Day described in clause (i) above and which is also a day for trading by and between banks in U.S. dollar deposits in the interbank SOFR market.

"**Capital Expenditures**" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person.

"**Capitalized Lease Obligations**" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"**Cardinal Health**" shall mean, collectively, Cardinal Health 110, LLC, Cardinal Health, 112, LLC, and/or any other related entities that are or become parties to the Cardinal Health Agreement.

"**Cardinal Health Agreement**" shall mean, collectively, (i) that certain Prime Vendor Agreement, dated as of May 2017, by and between Cardinal Health and Braun Pharma, LLC and (ii) that certain Credit Application, dated as of April 29, 2018, by and between Cardinal Health and Braun Pharma, LLC, in each case, as amended, restated, supplemented or otherwise modified in accordance with this Agreement and the other Credit Documents.

"**Carve-Out**" shall mean an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court under section 156(c) of title 28 of the United States Code and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the applicable statutory rate (without regard to the notice set forth in clause (iii) below), which fees shall not be subject to any budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise (which order has not been vacated or stayed), all unpaid fees and expenses of professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code.

"**Cash Collateralized**" shall mean to have pledged and deposited with or delivered cash or deposit account balances to the issuer of a letter of credit. "**Cash Collateral**" shall have a meaning analogous to the foregoing and shall include the proceeds of such cash collateral.

"**Cash Equivalents**" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than six months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above,

- 7 -

(v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P 1 or the equivalent thereof by Moody's and in each case maturing not more than six months after the date of acquisition by such Person, (vi) Investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"**Cash Flow Deadline**" shall have the meaning provided in Section 10.01(q).

"**CEA**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"**CFTC**" shall mean the Commodity Futures Trading Commission.

"**Change of Control**" shall mean the Borrower shall at any time cease to own, directly or indirectly, 100% of the Equity Interests of each Subsidiary of the Borrower.

"**Chapter 11 Cases**" shall have the meaning provided in the recitals.

"**Chapter 11 Events and Circumstances**" shall have the meaning provided in the definition of "Material Adverse Effect".

"**Chapter 11 Order**" shall mean any order of the Bankruptcy Court in the Chapter 11 Cases, which shall be in form and substance, and on terms and conditions, satisfactory to the Lenders (including, as applicable, the DIP Orders).

"**Chapter 11 Plan**" shall mean a plan of reorganization or liquidation (as the case may be).

"**CIP Regulations**" shall have the meaning provided in Section 13.13.

"**Claims**" shall have the meaning provided in the definition of "Environmental Claims".

"**Closing Date**" shall have the meaning provided in Section 14.10.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**Collateral**" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to the DIP Orders or any Security Document, including, without limitation, all cash and Cash Equivalents delivered as collateral pursuant to Section 6.02 or Section 11.

"**Collateral Agent**" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

- 8 -

"**Commitment**" shall mean, for each Lender, such Lender's Initial Term Loan Commitment and Final Term Loan Commitment, as shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15. Schedule I sets forth as of the Closing Date, the name of each Lender with an Initial Term Loan Commitment and the name of each Lender with a Final Term Loan Commitment. The aggregate principal amount of the Commitments of all Lenders on the Closing Date is $10,000,000.

"**Commitment Expiration Date**" shall mean the earliest to occur of (i) the date on which the Loans have been funded fully, (ii) the date on which the Commitments are otherwise terminated (including upon any acceleration in the repayment of the Loans) and (iii) the Maturity Date.

"**Company**" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"**Conforming Changes**" shall mean, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Business Day", the definition of "U.S. Government Securities Business Day", the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.11 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides in its reasonable discretion that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines in its reasonable discretion that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Consolidated Net Income**" shall mean, for any period, the net income (or loss) of the Borrower and its Subsidiaries determined on a consolidated basis for such period (taken as a single accounting period) in accordance with GAAP, provided that the following items shall be excluded in computing Consolidated Net Income (without duplication): (i) the net income (or loss) of any Person in which a Person or Persons other than the Borrower and its Wholly-Owned Subsidiaries has an Equity Interest or Equity Interests to the extent of such Equity Interests held by Persons other than the Borrower and its Wholly-Owned Subsidiaries in such Person, (ii) the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary or all or substantially all of the Property or assets of such Person are acquired by a Subsidiary and (iii) the net income of any Subsidiary to the extent that the declaration or payment of cash Dividends by such Subsidiary of such net income is not at the time permitted by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary.

"**Contingent Obligation**" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, Dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) to pay contingent cash purchase price, earn-out, and other similar obligations incurred in connection with an acquisition or (v) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to (i) direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or (ii) vote 10% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Credit Documents**" shall mean, collectively, the following (as the same may be amended, modified, supplemented, renewed, restated or replaced from time to time): this Agreement, the Fee Letter, the Subsidiaries Guaranty, each Security Document, the DIP Orders, the Intercompany Notes, each subordination agreement relating to the Obligations and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note and each other Security Document and all other agreements, documents, certificates and instruments executed and delivered to the Administrative Agent, the Collateral Agent or any Lender in their capacity as such by any Credit Party in connection therewith, including, without limitation, all letters for the payments of fees, guaranties and collateral documents.

"**Credit Event**" shall mean the making of any Loan.

"**Credit Party**" shall mean the Borrower and each Subsidiary, and the "**Credit Parties**" shall mean all of them, collectively.

"**DACA**" shall mean a deposit account control agreement in form and substance acceptable to the Administrative Agent.

"**Debtor**" shall have the meaning provided in the recitals.

- 10 -

"**Declined Proceeds**" shall have the meaning provided in Section 6.02(k).

"**Default**" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"**Defaulting Lender**" shall mean any Lender with respect to which a Lender Default is in effect.

"**Deposit Account**" shall mean a depository account subject to a DACA.

"**DIP Orders**" shall mean, collectively, the Interim DIP Order and the Final DIP Order and separately, the Interim DIP Order or the Final DIP Order, as the context requires.

"**DIP Superpriority Claims**" shall mean the superpriority administrative expense claims under section 364(c) of the Bankruptcy Code against each of the Credit Parties, on a joint and several basis, which claims shall have priority, subject to the Carve-Out, over any and all administrative expense claims against the Credit Parties and their estates, now existing or hereafter arising, including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, with recourse against all Collateral.

"**Disposition**" shall mean any sale, transfer or other disposition of any asset (including, without limitation, any Equity Interests or other securities of another Person) by the Borrower or any of its Subsidiaries to any Person (including by way of redemption by such Person or by way of a sale and leaseback transaction).

"**Dividend**" shall mean, with respect to any Person, that such Person has declared or paid a dividend or distribution, or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common Equity Interests of such Person) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests) or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests). Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**Dollars**" and the sign "**$**" shall each mean freely transferable lawful money of the United States.

"**EEA Financial Institution**" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in

- 11 -

clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligibility Date**" shall mean, with respect to each Credit Party and each Swap, the date on which this Agreement or any Credit Document becomes effective with respect to such Swap (for the avoidance of doubt, the Eligibility Date shall be the effective date of such Swap if this Agreement or any Credit Document is then in effect with respect to such Credit Party, and otherwise it shall be the effective date of this Agreement and/or such Credit Document(s) to which such Credit Party is a party).

"**Eligible Contract Participant**" shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

"**Eligible Transferee**" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding the Borrower and its Subsidiaries and Affiliates; provided, that "Eligible Transferee" shall not include (x) any Lender (or any Affiliate thereof) that is, as of the date of the applicable assignment, a Defaulting Lender or (y) any natural Person.

"**Environmental Claims**" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of non-compliance or violation, investigations or proceedings (hereafter, "**Claims**") relating in any way to any Hazardous Materials, Environmental Law or any permit issued, or any approval given, under any such Environmental Law, including, without limitation, (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence, release of or exposure to Hazardous Materials.

"**Environmental Law**" shall mean any Law, relating to the environment, employee or worker workplace health and safety or Hazardous Materials, including, without limitation, CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 3803 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and

- 12 -

Health Act, 29 U.S.C. § 651 et seq.; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"**Equity Interests**" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Borrower or a Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) or (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" shall have the meaning provided in Section 12.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, and regulations promulgated thereunder, as amended.

"**Excluded Account**" shall mean (a) accounts which are used solely as an escrow account or as a fiduciary or trust account, (b) any other account that is contractually obligated to be segregated from the other assets of the Credit Parties, in each case, for the benefit of unaffiliated third parties, (c) any disbursement or payroll accounts used solely for such purposes, (d) any accounts solely holding withheld income taxes, payroll taxes or other employment-related taxes or amounts to be paid over to employee health or benefits plans, (e) cash collateral accounts subject to Permitted Liens under clause (l) or (r) of the definition thereof, (f) any Deposit Account that contains accounts receivables arising from any government payor where the Collateral Agent may not, under applicable Law, obtain a security interest in or lien on such Deposit Account receiving the proceeds of such accounts receivable, provided that amounts in such Deposit Account are automatically transferred on each Business Day into a Deposit Account that is not an Excluded Account and (g) any other accounts with a balance of less than $50,000 individually or $250,000 in the aggregate at any time.

"**Excluded Hedge Liability**" or "**Excluded Hedge Liabilities**" shall mean, with respect to each Credit Party, each of its Swap Obligations if, and only to the extent that, all or any portion of this Agreement or any Credit Document that relates to such Swap Obligation is or becomes illegal under the CEA, or any rule, regulation or order of the CFTC, solely by virtue of such Credit Party's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap. Notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement or any Credit Document, the foregoing is subject to the following provisos: (a) if a Swap Obligation arises under a master agreement governing more than one Swap, this definition shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which

such guaranty or security interest is or becomes illegal under the CEA, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Credit Party for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap; (b) if a guarantee of a Swap Obligation would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Swap Obligation shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Credit Party executing this Agreement or the Credit Documents and a Swap Obligation would be an Excluded Hedge Liability with respect to one or more of such Persons, but not all of them, the definition of "Excluded Hedge Liability or Liabilities" with respect to each such Person shall only be deemed applicable to (i) the particular Swap Obligations that constitute Excluded Hedge Liabilities with respect to such Person, and (ii) the particular Person with respect to which such Swap Obligations constitute Excluded Hedge Liabilities.

"**Excluded Subsidiary**" shall mean each Subsidiary that is a Non-Wholly Owned Subsidiary and which is not permitted by its certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents) to become a Subsidiary Guarantor (for so long as such Subsidiary remains a Non-Wholly Owned Subsidiary and such restriction is in effect) (solely to the extent that any such prohibition in such Subsidiary's certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents) was not included for the purpose of establishing such Subsidiary as an "Excluded Subsidiary" hereunder), provided that (a) no Subsidiary may be an Excluded Subsidiary hereunder unless it is an "Excluded Subsidiary" as defined in the Prepetition Note Purchase Agreement and (b) no Debtor shall be an Excluded Subsidiary.

"**Excluded Taxes**" shall have the meaning in Section 6.04(a).

"**Existing Indebtedness**" shall have the meaning provided in Section 11.04(b).

"**Existing Seller Notes**" shall mean those notes listed in Schedule III.

"**Fair Market Value**" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer, of the Borrower, or the Subsidiary of the Borrower selling such asset.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations, published guidance or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements (and any foreign legislation, regulations or published guidance implemented to give effect to such intergovernmental agreements) entered into to implement the foregoing.

- 14 -

"**FCPA**" shall have the meaning provided in <u>Section 9.26(a)</u>.

"**FDA**" shall mean the U.S. Food and Drug Administration.

"**Federal Funds Rate**" shall mean for any day the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by the Administrative Agent (an "**Alternate Source**") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by the Administrative Agent at such time (which determination shall be conclusive absent manifest error)); provided however, that if such day is not a Business Day, the Federal Funds Rate for such day shall be the "open" rate on the immediately preceding Business Day.  If and when the Federal Funds Rate changes, the rate of interest with respect to any advance to which the Federal Funds Rate applies will change automatically without notice to the Borrower, effective on the date of any such change.

"**Fee Letter**" shall mean that certain Fee Letter, dated as of the Closing Date, by and between the Borrower and the Administrative Agent, as the same may be amended, modified, restated and/or supplemented from time to time.

"**Fees**" shall mean all amounts payable pursuant to or referred to in the Credit Documents.

"**Final DIP Order**" shall mean an order of the Bankruptcy Court in the Chapter 11 Cases, which order (a) shall be in form and substance, and on terms and conditions, reasonably satisfactory to the Credit Parties, Lenders and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, to the Administrative Agent, (b) shall, subject to the foregoing, authorize and approve, on a final basis, among other things, (i) the Credit Parties' entry into the Credit Documents, (ii) the making of the Loans, (iii) the granting of the DIP Superpriority Claims and Liens against the Credit Parties and their assets in accordance with the Credit Documents with respect to the Collateral, (iv) the use of Cash Collateral (as defined in the Final DIP Order), and (v) the granting of adequate protection to the Prepetition Secured Parties, and (c) (i) shall not have been reversed, vacated, or stayed and (ii) shall not have been amended, supplemented or otherwise modified since entry thereof by the Bankruptcy Court.

"**Final Term Loan Commitment**" shall mean, for each Lender, the aggregate amount of Additional Term Loans such Lender is committed to make, as shall be evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 14.15</u>, as the same may be (x) terminated pursuant to <u>Section 4.02</u>, or (y) adjusted from time to time as a result of assignments to or from such Lender pursuant to <u>Section 2.13</u> or <u>Section 14.04</u>. The aggregate principal amount of the Final Term Loan Commitments of all Lenders on the Closing Date is $10,000,000 <u>minus</u> the aggregate amount of the Initial Term Loans made on the Closing Date.

1609103405.14
4870-1742-7140, v. 3

"**Flood Laws**" shall mean all applicable laws relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other applicable laws related thereto.

"**GAAP**" shall mean generally accepted accounting principles in the United States as in effect from time to time; provided that determinations in accordance with GAAP for purposes of Section 6.02 and Section 11, including defined terms as used therein, are subject (to the extent provided therein) to Section 14.07(a).

"**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision of the foregoing, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including, without limitation, the FDA, the U.S. Department of Health and Human Services and the U.S. Drug Enforcement Administration.

"**Governmental Payor**" shall mean Medicare, Medicaid, TRICARE, CHAMPVA, any state health plan adopted pursuant to Title XIX of the Social Security Act, any other state or federal health care program and any other Governmental Authority which presently or in the future maintains a Third-Party Payor Program.

"**Guarantor**" shall mean each Subsidiary Guarantor.

"**Guaranty**" shall mean the Subsidiaries Guaranty.

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos in any form and asbestos-containing materials, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, toxic mold, infectious or medical waste and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any Governmental Authority under any applicable Environmental Law.

"**Health Care Laws**" shall mean all health care regulatory Laws applicable to the business of the Borrower and its Subsidiaries and the services provided by any of them, including all Laws relating to: (i) the licensure, permits, certification, qualification or authority to transact the business of the Borrower and its Subsidiaries; (ii) the Federal Food, Drug and Cosmetic Act; (iii) billing, coding, reimbursement, claims submission, collections and payment related to third party payors, including any government payment program; (iv) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; (v) the Privacy Laws; (vi) any state insurance, health maintenance organization or managed care Laws (including Laws relating to Medicaid programs); (vii) state professional corporate practice and fee-splitting Laws; (viii) the Medicare Program Laws at Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh, including specifically, the Ethics in Patient Referrals Act (the "Stark Law"), as amended, 42 U.S.C. § 1395nn; (ix) Title XIX

- 16 -

of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); (x) the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); (xi) the False Claims Act, 31 U.S.C. §§ 3729-3733 (as amended); (xii) the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; (xiii) the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; (xiv) the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; (xv) the Exclusion Laws, 42 U.S.C. § 1320a-7; (xvi) the Federal Health Care Fraud Law (18 U.S.C. § 1347); (xvii) TRICARE, 10 U.S.C. § 1071; (xviii) the Patient Protection and Affordable Care Act (Pub. L. 111 148) as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111 152); (xix) the Federal Controlled Substances Act; (xx) any Laws governing the practice of pharmacy and pharmacy compounding, including all Laws enforced by state boards of pharmacy; (xi) United States Pharmacopeia standards for pharmacy compounding including general chapter 797 ("Pharmaceutical Compounding—Sterile Preparations"); and (xxii) all applicable regulations, rules, ordinances, judgments and orders promulgated under each of the foregoing, and any similar federal, state and local statutes, regulations, rules, ordinances, judgments and orders.

"**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and its implementing regulations set forth at 45 C.F.R. Parts 160 – 164.

"**Indebtedness**" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services, including the Existing Seller Notes, (ii) (x) the maximum amount available to be drawn or paid under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and (y) all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (viii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (A) the stated amount of such indebtedness and (B) the Fair Market Value of the property to which such Lien relates), (iv) all Capitalized Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person in respect of Indebtedness of any third Person of the types described in clause (i), (ii), (iii), (iv), (v) or (viii) of this definition, (vii) [reserved] and (viii) all Off-Balance Sheet Liabilities of such Person. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing, Indebtedness shall not include trade payables, accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the Ordinary Course of Business of such Person, except to the extent such items are reflected or are required to be reflected on the balance sheet of such Person as indebtedness pursuant to GAAP.

"**Indemnified Person**" shall have the meaning provided in Section 14.01(a).

1609103405.14
4870-1742-7140, v. 3

"**Indemnified Taxes**" shall mean (a) Taxes (other than Excluded Taxes) imposed on or with respect to any payment made by or on account of any Obligation of any Credit Party under this Agreement or any other Credit Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Initial Term Loan Commitment**" shall mean, for each Lender, the amount of Initial Term Loans such Lender is committed to make, as shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15, as the same may be (x) terminated pursuant to Section 4.02, or (y) adjusted from time to time as a result of assignments to or from such Lender pursuant to Section 2.13 or Section 14.04. The aggregate principal amount of the Initial Term Loan Commitments of all Lenders on the Closing Date is $2,750,000.

"**Initial Term Loans**" shall mean the term loans in an initial aggregate principal amount equal to the Initial Term Loan Commitment made to the Borrower on the Closing Date.

"**Insolvency Event**" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under the Bankruptcy Code), or regulatory restrictions, (b) has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due, (d) with respect to a Lender, such Lender is unable to perform hereunder to the application of applicable law or (e) in the good faith determination of the Administrative Agent or the Collateral Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Authority or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"**Intellectual Property**" shall mean property constituting a patent, copyright, trademark (or any application in respect of the foregoing), service mark, copyright, copyright application, trade name, mask work, trade secrets, or design right.

"**Intercompany Debt**" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by the Borrower or any Subsidiary of the Borrower to the Borrower or any other Subsidiary of the Borrower.

"**Intercompany Loans**" shall have the meaning provided in Section 11.05(h).

"**Intercompany Note**" shall mean a promissory note evidencing Intercompany Loans, duly executed and delivered substantially in the form of Exhibit H (or such other form as shall be

- 18 -

satisfactory to the Administrative Agent in its reasonable discretion), with blanks completed in conformity herewith.

"**Interest Determination Date**" shall mean, with respect to any Loan, the second Business Day prior to the commencement of any Interest Period relating to such Loan.

"**Interest Period**" shall have the meaning provided in <u>Section 2.09</u>.

"**Interim DIP Order**" shall mean an order of the Bankruptcy Court in the Chapter 11 Cases in connection with the DIP Facility (as defined in the Restructuring Support Agreement), which order shall (a) be in form and substance, and on terms and conditions, reasonably satisfactory to the Lenders and, with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, to the Administrative Agent, (b) subject to the foregoing, authorize and approve, on an interim basis, among other matters, (i) the Credit Parties' entry into the Credit Documents, (ii) the making of the Loans, (iii) the granting of the DIP Superpriority Claims and liens against the Credit Parties and their assets in accordance with the Credit Documents with respect to the Collateral, (iv) the use of cash collateral, and (v) the granting of adequate protection to the Prepetition Secured Parties, and (c) not have been reversed, vacated, stayed or amended, supplemented or otherwise modified (unless the Lenders shall have previously consented thereto in writing).

"**Investments**" shall have the meaning provided in <u>Section 11.05</u>.

"**Law**" shall mean laws, common law, statutes, judgments, decrees, rules, constitutions, treaties, conventions, regulations, codes, ordinances, orders, and enforceable policies, guidelines or similar requirements of all Governmental Authorities.

"**Lead Arranger**" shall mean Loan Admin Co LLC in its capacity as Sole Lead Arranger and Sole Book Runner any successor thereto in such capacities.

"**Leaseholds**" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"**Lender**" shall mean each Person that becomes a "Lender" hereunder on the Closing Date or pursuant to <u>Section 2.13</u> or <u>Section 14.04</u> in each case as evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 14.15</u>. For the purpose of any Credit Document which provides for the granting of a security interest or other Lien to the Collateral Agent for the benefit of Lenders as security for the Obligations, "**Lenders**" shall include any Affiliate of a Lender to which such Obligation is owed.

"**Lender Advisors**" shall mean Lenders' professionals and advisors.

"**Lender Default**" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender or the failure of such Lender to make available its portion of any Borrowing with respect to which it has a Commitment at the time of such Borrowing, (ii) such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, or (iii) such Lender having notified the Administrative Agent and/or any Credit Party (x) that it does not intend to comply with its

- 19 -

obligations under <u>Section 2.01</u> or in circumstances where such non-compliance would constitute a breach of such Lender's obligations under the respective Section or (y) of the events described in preceding clause (ii).

"**Licensed Personnel**" shall mean each Person employed by the Borrower or any of its Subsidiaries that is required to hold a Necessary Authorization or professional license in order to be involved in the delivery of health care or medical services or supplies on behalf of the Borrower or any Subsidiary.

"**Lien**" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"**Loan**" shall mean each Initial Term Loan and each Additional Term Loan.

"**Loan Admin**" shall mean Loan Admin Co LLC, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"**Margin Stock**" shall have the meaning provided in Regulation U.

"**Material Adverse Effect**" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, a material adverse effect on (i) the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries, taken as a whole, or (ii) (x) the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent under any of the Credit Documents, (y) the legality, validity or enforceability of any Credit Document or the existence, perfection or priority of any security interest granted to the Collateral Agent other than the failure of the Collateral Agent or its designee to maintain possession of possessory Collateral, or (z) the ability of the Credit Parties taken as a whole to perform their obligations under any Credit Document, including obligations to obtain any material approval of any Governmental Authority that is required for any action or transaction contemplated hereby. Notwithstanding the foregoing, the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that led to the commencement of the Chapter 11 Cases (including but not limited to any defaults under prepetition agreements), events that customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Credit Parties that are not subject to the automatic stay) and the consummation of the transactions contemplated by the Chapter 11 Orders or the Chapter 11 Plan and (the "**Chapter 11 Events and Circumstances**"), will each, and in the aggregate, not be deemed to have a Material Adverse Effect.

"**Material Agreement**" shall mean any agreement or series of related agreements to which any Credit Party is a party, the termination or breach of which, individually or in the aggregate,

- 20 -

would be reasonably expected to be materially adverse to the business of the Credit Parties taken as a whole, and which shall include, without limitation, each Vendor Lien Agreement Document and the Prepetition Loan Documents.

"**Maturity Date**" shall mean the earliest to occur of: (a) one hundred twenty (120) days after the Closing Date; provided that such date may be extended for up to forty five (45) days at the option of the Required Lenders, based on, among other things, the prior achievement of certain Milestones; (b) the effectiveness of the Chapter 11 Plan of any Credit Party, which has been confirmed by an order of the Bankruptcy Court in any of the Chapter 11 Cases and the conversion of the Loans into a portion of an exit facility; (c) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code; (d) the acceleration of the Loans and the termination of the commitments under this Agreement; and (e) the closing of a sale of all or substantially all assets or equity of the Credit Parties.

"**Maximum Rate**" shall have the meaning provided in Section 14.20.

"**McKesson**" shall mean McKesson Corporation, a Delaware corporation.

"**McKesson PVA**" shall mean (i) that certain Supply Agreement, dated as of May   , 2020, by and between the Borrower and McKesson and (ii) that certain Security Agreement, dated as of May   , 2020 and executed by the Borrower in favor of McKesson, as collateral agent, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the other Credit Documents.

"**Milestones**" shall have the meaning set forth in the Restructuring Support Agreement.

"**Minimum Borrowing Amount**" shall mean $2,500,000, or such lesser amount as the Administrative Agent may agree in its reasonable discretion.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean a mortgage, deed of trust, deed to secure debt or similar security instrument.

"**Mortgage Policy**" shall mean a Lender's title insurance policy (Form T-2).

"**Mortgaged Property**" shall mean any Real Property owned or leased by the Borrower or any of its Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"**Multiemployer Plan**" shall mean any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which a Credit Party makes, is making or is obligated to make contributions or has made or been obligated to make contributions during the preceding five years if a Credit Party has liability thereunder or to which the Credit Party has any liability (contingent or otherwise), including any liability on account of any ERISA Affiliate.

"**NAIC**" shall mean the National Association of Insurance Commissioners.

- 21 -

"**Necessary Authorizations**" shall mean all authorizations, consents, permits, approvals, waivers, licenses, accreditations and exemptions from, and all filings and registrations with, and all reports to, any Governmental Authority whether federal, state, local, and all agencies thereof, which are required for the transactions contemplated by the Credit Documents and necessary to the conduct of the businesses and the ownership (or licensure or lease) of the properties and assets of the Credit Parties, including, without limitation, permits administered by the FDA, U.S. Drug Enforcement Agency and state boards of pharmacy.

"**Net Cash Proceeds**" shall mean for any event requiring a repayment of Loans pursuant to Section 6.02, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of reasonable transaction costs (including, as applicable, any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses associated therewith).

"**Net Sale Proceeds**" shall mean for any Disposition, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such Disposition, net of (i) reasonable transaction costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer taxes arising therefrom), (ii) payments of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such Disposition, (iii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness of the Lenders pursuant to this Agreement) which is secured by the respective assets which were sold or otherwise disposed of, and (iv) the estimated net marginal increase in income taxes which will be payable by the Borrower's consolidated group or any Subsidiary of the Borrower with respect to the fiscal year of the Borrower in which the Disposition occurs as a result of such Disposition; provided, however, that such gross proceeds shall not include any portion of such gross cash proceeds which the Borrower determines in good faith should be reserved for post-closing adjustments (to the extent the Borrower delivers to the Lenders a certificate signed by an Authorized Officer as to such determination), it being understood and agreed that on the day that all such post-closing adjustments have been determined (which shall not be later than six (6) months following the date of the respective Disposition), the amount (if any) by which the reserved amount in respect of such sale or disposition exceeds the actual post-closing adjustments payable by the Borrower or any of its Subsidiaries shall constitute Net Sale Proceeds on such date received by the Borrower and/or any of its Subsidiaries from such Disposition.

"**Non-Qualifying Party**" shall mean any Credit Party that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"**Non-Wholly Owned Subsidiary**" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"**Note**" shall mean each Initial Term Loan Note and each Additional Term Loan Note.

"**Notice of Borrowing**" shall have the meaning provided in Section 2.03.

- 22 -

"**Notice of Conversion/Continuation**" shall have the meaning provided in <u>Section 2.06</u>.

"**Notice Office**" shall mean, for the Administrative Agent and Collateral Agent, the office located at: Loan Admin Co LLC, 2200 Atlantic Street, Suite 501, Stamford, CT 06902, Attention: Jonathan Tunis, Michael Raymond and Purvang Desai, Email: optio@mccp.com, legal@mccp.com (for the avoidance of doubt, emails shall be sent to both of the foregoing email addresses) or such other office or person as the Administrative Agent or Collateral Agent, as applicable, may hereafter designate in writing as such to the other parties hereto.

"**Obligations**" shall mean all amounts owing to the Administrative Agent, the Collateral Agent or any Lender pursuant to the terms of this Agreement or any other Credit Document (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of the Borrower or any of its Subsidiaries, whether or not allowed in such case or proceeding and any prepayment premium or penalty, including the Prepayment Premium).

"**OFAC**" shall have the meaning provided in <u>Section 9.26(a)</u>.

"**Off-Balance Sheet Liabilities**" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"**Ordinary Course of Business**" shall mean, with respect to each Credit Party, the ordinary course of such Credit Party's business as conducted on the Closing Date or any business that is reasonably related, similar, complementary, incidental, corollary, ancillary to or a reasonable extension, development or expansion of its business, which may, in each case, include past practices, industry standards or customs, or requirements of law.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document.

"**Participant**" shall have the meaning provided in <u>Section 14.04(e)</u>.

"**Patriot Act**" shall have the meaning provided in <u>Section 14.18</u>.

"**Payment Office**" shall mean the office of the Administrative Agent located at 2200 Atlantic Street, Suite 501, Stamford CT 06902 or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Periodic Term SOFR Determination Day**" shall have the meaning provided in the definition of "Term SOFR".

"**Permitted Encumbrance**" shall mean, with respect to any Mortgaged Property, such exceptions to title as are set forth in the Mortgage Policy delivered with respect thereto, all of which exceptions must be acceptable to the Administrative Agent in its reasonable discretion.

"**Permitted Liens**" shall have the meaning provided in Section 11.01.

"**Permitted Variances**" shall mean, with respect to the Approved Budget, tested on a four (4)-week rolling basis, cumulative actual cash receipts to be not less than 85% of cumulative budgeted receipts for the period ending with the most recently completed week or cumulative actual expenses for the most recently completed week to be not more than 115% of cumulative budgeted expenses for the period ending with the most recently completed week, in each case, as determined by the Lenders; provided that if for any four (4)-week rolling period, actual cash receipts exceed expected cash receipts and actual cash expenditures exceed expected cash expenditures, the Permitted Variance for cash expenditures for the period ending with that week will be deemed to have been met if the cumulative actual net cash flow for such period is equal to or greater than the cumulative expected net cash flow for such period.  For the avoidance of doubt, documented fees and out-of-pocket expenses paid to the Lenders or their respective professionals shall not be included in the foregoing variance testing; provided, however, documented fees and out-of-pocket expenses paid to the Debtors' professionals or any professionals retained by any official committee formed during the Chapter 11 Cases shall be included in the foregoing variance testing.

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"**Personal Information**" shall mean (i) any and all information about an individual that either contains data elements that identify the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, (ii) any information that enables a Person to contact the individual (such as information contained in a cookie or an electronic device fingerprint), (iii) Protected Health Information (as defined in HIPAA), and (iv) any and all personal information, personally identifiable information, or sensitive personal information as defined by applicable Laws, including, without limitation, section 101(41A) of the Bankruptcy Code.

"**Petition Date**" shall have the meaning provided in the recitals.

"**Plan**" shall mean any "plan" defined in Section 3(3) of ERISA (other than a Multiemployer Plan) which is subject to Title IV of ERISA, and which is contributed to by a Credit Party or any such plan to which a Credit Party is required to contribute or has any liability (contingent or otherwise), including any liability on account of any ERISA Affiliate.

"**Prepayment Premium**" shall have the meaning provided in Section 5.01(a).

"**Prepetition Credit Agreement**" means that certain Credit Agreement, dated as of June 28, 2019, by and among the Credit Parties, Loan Admin, as administrative agent, Loan Admin, as

- 24 -

lead arranger and the Lenders party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time.

"**Prepetition Credit Obligations**" means the "Obligations" or any other similar term under and as defined in the Prepetition Credit Agreement and the Agreement Among Lenders.

"**Prepetition Indebtedness**" shall mean the Prepetition Credit Obligations and the Prepetition Note Obligations.

"**Prepetition Loan Documents**" means, the "Credit Documents" as defined in the Prepetition Credit Agreement, including, without limitation, each fee letter, guaranty, collateral document, and each subordination agreement related thereto.

"**Prepetition Note Documents**" shall have the meaning provided in the Prepetition Note Purchase Agreement.

"**Prepetition Note Obligations**" means the "Obligations" or any other similar term under and as defined in the Prepetition Note Purchase Agreement.

"**Prepetition Note Purchase Agreement**" shall mean that certain Note Purchase Agreement dated as of September 25, 2020, by and among CBC Pharma Holdco, LLC, the Borrower, the purchasers party thereto from time to time, and Aves Management LLC, in its capacity as the administrative agent, as may be amended, restated or otherwise modified from time to time in accordance with the applicable Subordination Agreement.

"**Prepetition Secured Parties**" means the Secured Creditors (as such term is defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement.

"**Prime Rate**" shall mean a variable per annum rate, as of any date of determination, equal to the rate as of such date published in the "Money Rates" section of *The Wall Street Journal* as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates). The Prime Rate will change as of the date of publication in *The Wall Street Journal* of a Prime Rate that is different from that published on the preceding Business Day. In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the Prime Rate, the Administrative Agent shall choose a reasonably comparable index or source to use as the basis for the Prime Rate.

"**Privacy Laws**" shall mean all applicable Laws concerning the privacy, protection, storage, access, use, disclosure, processing and/or security of Personal Information, including without limitation HIPAA, state data breach notification Laws, state health information protection Laws, the Federal Trade Commission Act, the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the General Data Protection Regulation, the Personal Information Protection and Electronic Data Act, the Privacy Act of 1974, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, state social security number protection and consumer protection Laws, and state data breach notification Laws.

- 25 -

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Qualified ECP Credit Party**" shall mean each Credit Party that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a "commodity pool" as defined in Section 1a(10) of the CEA and CFTC regulations thereunder that has total assets exceeding $10,000,000 or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the CEA by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the CEA.

"**Quarterly Payment Date**" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"**Real Property**" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"**Recipient**" shall mean (a) the Administrative Agent and (b) any Lender, as applicable.

"**Recovery Event**" shall mean the receipt by the Borrower or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Subsidiaries and (ii) under any policy of insurance required to be maintained under Section 10.03.

"**Register**" shall have the meaning provided in Section 14.15.

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"**Regulation T**" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation U**" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation X**" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Release**" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Released Claims**" shall have the meaning provided in Section 13.02(c).

"**Releasees**" shall have the meaning provided in Section 13.02(c).

- 26 -

"**Relevant Governmental Body**" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"**Replaced Lender**" shall have the meaning provided in Section 2.13.

"**Replacement Lender**" shall have the meaning provided in Section 2.13.

"**Reportable Event**" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan other than those events as to which the 30-day notice period has been waived.

"**Required Lenders**" shall mean, at any time, collectively (i) one or more Lenders the sum of whose outstanding Loans and Commitments at such time represents more than 50% of the sum of all outstanding Loans and Commitments at such time and (ii) the Administrative Agent.

"**Required Prepayment Date**" shall have the meaning provided in Section 6.02(k).

"**Restructuring Support Agreement**" shall mean that certain Restructuring Support Agreement (including the Restructuring Term Sheet referred to therein and attached thereto, and all other exhibits, schedules, annexes and other attachments thereto), dated as of May 9, 2024, by and among the Consenting Lenders (as defined therein) and Company Parties (as defined therein), as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Returns**" shall have the meaning provided in Section 9.09.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"**Sanctions**" shall have the meaning provided in Section 9.26(a).

"**SEC**" shall have the meaning provided in Section 10.01(i).

"**Section 6.04(b)(ii) Certificate**" shall have the meaning provided in Section 6.04(b)(ii).

"**Secured Creditors**" shall have the meaning assigned that term in the respective Security Documents.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Security Documents**" shall mean and include, collectively, the DIP Orders, each Mortgage, each landlord waiver, each control agreement or DACA, and, after the execution and delivery thereof, each Additional Security Document.

"**SOFR**" with respect to any day shall mean the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**SOFR Loan**" shall mean each Loan that bears interest at Term SOFR (other than pursuant to clause (c) of the definition of "Base Rate"), as designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Subordinated Debt**" shall mean any unsecured Indebtedness of a Credit Party incurred from time to time that is subordinated in right of payment to the Obligations on terms and conditions reasonably acceptable to the Administrative Agent in its reasonable discretion.

"**Subordinated Provisions**" shall have the meaning provided in Section 12.11.

"**Subordination Agreement**" shall mean any subordination agreement entered into by a Credit Party, the Administrative Agent and the holder of any Subordinated Debt.

"**Subsidiaries Guaranty**" shall have the meaning provided in Section 7.06.

"**Subsidiary**" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" shall mean each Subsidiary (other than any Excluded Subsidiary).

"**Swap**" shall mean any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder, other than (a) a swap entered into, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (b) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

"**Swap Obligation**" shall mean any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap.

"**Synthetic Lease**" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"**Taxes**" (or "**Tax**" as the context may require) shall mean any taxes, imposts, duties, deductions, charges, fees, levies, penalties or other assessments imposed by any Taxing Authority, including, income, premium, excise, property, sales, use, value added, goods and services, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions to tax attributable thereto.

"**Taxing Authority**" shall mean any Governmental Authority with the authority to impose Tax.

"**Term SOFR**" shall mean:

(a)     for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**Base Rate Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate SOFR Determination Day;

provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or (b) above) shall ever be less than 5%, then Term SOFR will be deemed to be 5% for the purposes of this Agreement and the other Credit Documents.

"**Term SOFR Administrator**" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" shall mean the forward-looking term rate based on SOFR.

"**Third-Party Payor**" shall mean any Governmental Payor, private insurers, managed care plans and any other Person or entity which presently or in the future maintains Third-Party Payor Programs.

1609103405.14
4870-1742-7140, v. 3

"**Third-Party Payor Authorizations**" shall mean all participation agreements, provider or supplier agreements, enrollments, accreditations and billing numbers necessary to participate in and receive reimbursement from a Third-Party Payor Program, including all Medicare and Medicaid participation agreements.

"**Third-Party Payor Programs**" shall mean all health care payment and reimbursement programs, sponsored by a Third-Party Payor, in which the Borrower or any Subsidiary participates.

"**Tranche**" shall mean the respective facility and commitments utilized in making Loans hereunder, with there being two separate Tranches, i.e., Initial Term Loans and Additional Term Loans.

"**Transaction**" shall mean, collectively, (i) the incurrence of Loans on the Closing Date and the use of proceeds thereof, and (ii) the payment of all fees and expenses in connection with the foregoing.

"**Type**" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a SOFR Loan.

"**U.S. Government Securities Business Day**" shall mean any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the Fair Market Value of all plan assets allocable to such liabilities under Title IV of ERISA.

"**United States**" and "**U.S.**" shall each mean the United States of America.

"**Vendor Lien Agreement Documents**" shall mean, collectively, (i) the Cardinal Health Agreement or any document or agreement executed or delivered in connection therewith or (ii) the McKesson PVA, or any document or agreement executed or delivered in connection therewith or (iii) any agreement with a vendor or supplier of any Credit Party pursuant to which such Credit Party has granted a Lien in favor of such vendor or supplier or any other document or agreement executed or delivered in connection therewith.

"**Waivable Mandatory Prepayment**" shall have the meaning provided in Section 6.02(k).

"**Wholly-Owned Subsidiary**" shall mean, as to any Person, (i) any corporation 100% of whose Equity Interests are at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

"**Write-Down and Conversion Powers**" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.02.   <u>Divisions</u>.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

1.03.   <u>Leases</u>.  Notwithstanding any other provision contained herein, any lease (or similar arrangement conveying the right to use) that is or would have been treated as an operating lease for purposes of GAAP as of the Closing Date shall not be treated as Indebtedness or as Capitalized Lease Obligations for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the Closing Date.

1.04.   <u>Rates</u>.  The Administrative Agent and its Affiliates do not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

- 31 -

**SECTION 2.**  Amount and Terms of Loans.

2.01.   The Loans.  Subject to and upon the terms and conditions set forth herein, each Lender severally agrees to make the Loans to the Borrower, which Loans (i) shall be incurred pursuant to (A)  a drawing of the Initial Term Loans on the Closing Date and (B) no more than four (4) subsequent drawings of the Additional Term Loans on or before the Commitment Expiration Date, (ii) shall be denominated in Dollars, (iii) shall, at the option of the Borrower, be incurred and maintained as, and/or converted into, Base Rate Loans or SOFR Loans and (iv) shall be made by each such Lender in the aggregate principal amount which does not exceed the Commitment of such Lender on the date of each such borrowing.  Once repaid, Loans incurred hereunder may not be reborrowed.  All references herein to a "Loan" or "Loans", to "principal" or the "principal amount" of any Loan or Loans and other terms of like import shall mean Loans incurred by the Borrower hereunder, minus repayments and prepayments of Loans pursuant to this Agreement.

2.02.   Minimum Amount of Each Borrowing.  The aggregate principal amount of each Borrowing of Loans shall not be less under a respective Tranche than the applicable Minimum Borrowing Amount applicable to such Tranche.

2.03.   Notice of Borrowing.  Except with respect to any Borrowing to be requested on the Closing Date, whenever the Borrower desires to incur (x) SOFR Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least eight (8) Business Days' prior notice of each SOFR Loan to be incurred hereunder, and (y) Base Rate Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least eight (8) Business Days' prior notice of each Base Rate Loan to be incurred hereunder; provided that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 12:00 P.M. (New York City time) on such day.  Each such notice (each, a "**Notice of Borrowing**"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall be in writing, in the form of Exhibit A-1, appropriately completed to specify:  (i) the aggregate principal amount of the Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) whether the Loans being incurred pursuant to such Borrowing shall constitute Initial Term Loans or Additional Term Loans and (iv) whether the Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, SOFR Loans and, if SOFR Loans, the initial Interest Period to be applicable thereto. The Administrative Agent shall promptly give each Lender which is required to make Loans of the Tranche specified in the respective Notice of Borrowing, notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.  If the Borrower fails to specify the Type of Loan in a Notice of Borrowing, then the applicable Loans shall be made as Base Rate Loans.  If the Borrower requests a Borrowing of SOFR Loans in a Notice of Borrowing, it will be deemed to have specified an Interest Period of one (1) month.

2.04.   Disbursement of Funds.  No later than 2:00 P.M. (New York City time) on the date specified in each Notice of Borrowing, each Lender with a Commitment of the respective Tranche will make available its pro rata portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date.  All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will make

- 32 -

available to the Borrower at the Payment Office the aggregate of the amounts so made available by the Lenders. Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three (3) days and at the interest rate otherwise applicable to such Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.08. Nothing in this Section 2.04 shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

2.05.    Notes.

(a)    The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15 and shall, if requested by such Lender, also be evidenced (i) in the case of Initial Term Loans, by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B-1, with blanks appropriately completed in conformity herewith (each, an "**Initial Term Loan Note**" and, collectively, the "**Initial Term Loan Notes**"), and (ii) in the case of Additional Term Loans, each by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B-2, with blanks appropriately completed in conformity herewith (each, an "**Additional Term Loan Note**" and, collectively, the "**Additional Term Loan Notes**").

(b)    Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Loans.

(c)    Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Notes. No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any

manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents. Any Lender which does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (b). At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loans.

2.06.   Conversions. The Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least the Minimum Borrowing Amount of the outstanding principal amount of Loans made pursuant to one or more Borrowings (so long as of the same Tranche) of one or more Types of Loans into a Borrowing (of the same Tranche) of another Type of Loan, provided that, (i) except as otherwise provided in Section 2.10(b), SOFR Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted and no such partial conversion of SOFR Loans shall reduce the outstanding principal amount of such SOFR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount applicable thereto, (ii) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into SOFR Loans and SOFR Loans may only be continued if no Default or Event of Default is in existence on the date of the conversion or continuation and (iii) no conversion pursuant to this Section 2.06 shall result in a greater number of Borrowings of SOFR Loans than is permitted under Section 2.09(h). Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 12:00 P.M. (New York City time) at least (x) in the case of conversions of Base Rate Loans into SOFR Loans, three (3) Business Days' prior notice and (y) in the case of conversions of SOFR Loans into Base Rate Loans, one (1) Business Day's prior notice (each, a "**Notice of Conversion/Continuation**"), in each case in the form of Exhibit A-2, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were incurred and, if to be converted into SOFR Loans, the Interest Period to be initially applicable thereto. The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07.   Pro Rata Borrowings. All Borrowings of Loans under this Agreement shall be incurred from the Lenders pro rata on the basis of their Commitments. It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08.   Interest.

(a)   The Borrower agrees to pay cash interest in respect of the unpaid principal amount of each Base Rate Loan from and including the date of Borrowing thereof until the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such Base Rate Loan to a SOFR Loan pursuant to Section 2.06, Section 2.09 or Section 2.10, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin plus the Base Rate.

- 34 -

(b)     The Borrower agrees to pay cash interest in respect of the unpaid principal amount of each SOFR Loan from the date of Borrowing thereof until the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such SOFR Loan to a Base Rate Loan pursuant to <u>Section 2.06</u>, <u>Section 2.09</u> or <u>Section 2.10</u>, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin <u>plus</u> Term SOFR for such Interest Period.

(c)     While any Event of Default exists, (A) the Borrower shall pay cash interest on the outstanding principal balance of the Loans and, to the extent permitted by law, interest thereon, at a rate per annum equal to the rate which is 2.00% in excess of the rate then borne by the applicable Loans and (B) all other Obligations shall bear cash interest at a rate per annum equal to the rate which is 2.00% in excess of the rate applicable to Loans that are maintained as Base Rate Loans from time to time.  Interest that accrues under this <u>Section 2.08(c)</u> shall be payable in cash on demand.

(d)     Accrued (and theretofore unpaid) interest shall be payable in respect of each Loan (x) quarterly in arrears on the applicable Quarterly Payment Date (it being understood and agreed that such amount shall be calculated through, and payable in respect of, the end of such calendar quarter even if such Quarterly Payment Date is prior to the end of such calendar quarter), (y) on the date of any repayment or prepayment in full of all outstanding Loans, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)     Upon each Interest Determination Date, the Administrative Agent shall determine Term SOFR for each Interest Period applicable to the respective SOFR Loans and shall promptly notify the Borrower and the applicable Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

(f)     All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination.  The applicable Base Rate or Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

2.09.   <u>Interest Periods</u>.  At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any SOFR Loan (in the case of the initial Interest Period applicable thereto) or prior to 12:00 P.M. (New York City time) on the third Business Day prior to the expiration of an Interest Period applicable to such SOFR Loan (in the case of any subsequent Interest Period), the Borrower shall have the right to elect the interest period (each, an "**Interest Period**") applicable to such SOFR Loan, which Interest Period shall be a one (1) month period, <u>provided</u> that (in each case):

(a)     all SOFR Loans comprising a Borrowing shall at all times have the same Interest Period;

(b)     the initial Interest Period for any SOFR Loan shall commence on the date of Borrowing of such SOFR Loan (including the date of any conversion thereto from a

Base Rate Loan) and each Interest Period occurring thereafter in respect of such SOFR Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(c)    each Interest Period shall end on the numerically corresponding day in the calendar month that is one (1) month thereafter; provided that if any Interest Period for a SOFR Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(d)    if any Interest Period for a SOFR Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a SOFR Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(e)    no Interest Period may be selected at any time when an Event of Default under Section 12.01 or 12.05 is then in existence;

(f)    no Interest Period in respect of any Borrowing of any Tranche of Loans shall be selected which extends beyond the Maturity Date for such Tranche of Loans;

(g)    no Interest Period in respect of any Borrowing of Loans shall be selected which extends beyond any date upon which a mandatory repayment of such Loans will be required to be made under Section 6.02(b), as the case may be, if the aggregate principal amount of such Loans which have Interest Periods which will expire after such date will be in excess of the aggregate principal amount of such Loans then outstanding less the aggregate amount of such required repayment; and

(h)    at no time shall there be outstanding more than five (5) Borrowings of SOFR Loans in the aggregate for all Tranches of Loans.

If by 12:00 P.M. (New York City time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of SOFR Loans, the Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such SOFR Loans as provided above, the Borrower shall be deemed to have elected to continue such SOFR Loans as SOFR Loans with an Interest Period of one month.

2.10.    Increased Costs, Illegality, etc.

(a)    In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)    on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement, adequate and fair means do not exist for

- 36 -

ascertaining the applicable interest rate on the basis provided for in the definition of "Term SOFR";

(ii)      at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any SOFR Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to: (A) a change in law which subjects any Lender to any Taxes (other than Indemnified Taxes or Taxes described in clauses (ii) through (iv) of the definition of "Excluded Taxes") in respect of payments of the principal of or interest on the Loans or the Notes or commitments, or other obligations, or its deposits reserves, other liabilities or capital attributable thereto or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of Term SOFR and/or (y) other circumstances arising since the Closing Date affecting such Lender (including that Term SOFR with respect to such SOFR Loan does not adequately and fairly reflect the cost to such Lender of funding such SOFR Loan); or

(iii)      at any time, that the making or continuance of any SOFR Loan has been made (x) unlawful by any law or governmental rule, regulation or order or (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law);

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, SOFR Loans shall automatically convert at the end of their respective Interest Periods into Loans that accrue interest at the Base Rate and no Loans that accrue interest at the Term SOFR shall be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, (y) in the case of clause (ii) above, the Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its reasonable discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto), provided that no such additional amounts shall be owing by the Borrower in respect of increased costs or reductions in amounts received by such Lender for any period prior to the 180th day preceding the date on which such Lender shall have given its notice to the Administrative Agent and the Borrower pursuant to this paragraph and (z) in the case of clause (iii) above, the Borrower shall take

- 37 -

one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

(b)     At any time that any SOFR Loan is affected by the circumstances described in Section 2.10(a)(ii), the Borrower may, and in the case of a SOFR Loan affected by the circumstances described in Section 2.10(a)(iii), the Borrower shall, either (x) if the affected SOFR Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent written notice or telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected SOFR Loan is then outstanding, upon at least three (3) Business Days' written notice to the Administrative Agent, require the affected Lender to convert such SOFR Loan into a Base Rate Loan, provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

(c)     If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation Controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay promptly, but in any event within fifteen (15) Business Days, to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital (except for Indemnified Taxes or Excluded Taxes).  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 2.10(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts, although the failure to give any such notice shall not release or diminish the Borrower's obligation to pay additional amounts pursuant to this Section 2.10(c) upon the subsequent receipt of such notice.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.10 for any increased costs incurred or reductions suffered more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the change or changes specified in this Section 2.10 giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the change giving rise to such increased costs or reductions is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof).

- 38 -

(d)      If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate or Term SOFR, or to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans shall be suspended, and (b) the interest rate on which Base Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate", in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate"), on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such SOFR Loans to such day, and (ii) if necessary to avoid such illegality, the Administrative Agent shall during the period of such suspension compute the Base Rate without reference to clause (c) of the definition of "Base Rate," in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate or Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.11.

(e)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation.

2.11.   Compensation.  The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its SOFR Loans but excluding loss of anticipated profits) which such Lender may sustain:  (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, SOFR Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 6.01, Section 6.02 or as a result of an acceleration of the Loans pursuant to Section 12) or a conversion of any of its SOFR Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its SOFR Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any

- 39 -

other default by the Borrower to repay SOFR Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to Section 2.10(b).

2.12.    Change of Lending Office.  Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or Section 6.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10 and Section 6.04.

2.13.    Replacement of Lenders.  (x) Upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or Section 6.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders or (y) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement which has been approved by the Required Lenders as (and to the extent) provided in Section 14.12(b), the Borrower shall have the right, in accordance with Section 14.04(b), if no Default or Event of Default then exists or would exist after giving effect to such replacement, to replace such Lender (the "**Replaced Lender**") with one or more other Eligible Transferees (collectively, the "**Replacement Lender**") and each of which shall be reasonably acceptable to the Administrative Agent, to replace the Commitments and/or outstanding Loans of such Lender in respect of each Tranche where the consent of such Lender would otherwise be individually required, with identical Commitments and/or Loans of the respective Tranche provided by the Replacement Lender; provided that:

(a)    at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 14.04(b) (and with all fees payable pursuant to said Section 14.04(b) to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans (or, in the case of the replacement of only (a) the Initial Term Loan Commitment, the Initial Term Loan Commitment and outstanding Initial Term Loans and/or (b) the Final Term Loan Commitment, the Final Term Loan Commitment and outstanding Additional Term Loans) of the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender under each Tranche with respect to which such Replaced Lender is being replaced, (B) an amount equal to all accrued, but theretofore unpaid, fees owing to the Replaced Lender pursuant to the Credit Documents (but only with respect to the relevant Tranche, in the case of the replacement of less than all Tranches of Loans then held by the respective Replaced Lender) pursuant to Section 4.01 and Section 5.01; and

- 40 -

(b)     all obligations of the Borrower then owing to the Replaced Lender (other than those (a) specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.11 or (b) relating to any Tranche of Loans and/or Commitments of the respective Replaced Lender which will remain outstanding after giving effect to the respective replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 14.04.  Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 14.15 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Loans hereunder, the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Section 2.10, Section 2.11, Section 6.04, Section 13.06, Section 14.01 and Section 14.06), which shall survive as to such Replaced Lender.

2.14.    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for any SOFR Loan:

(a)     the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining Term SOFR for such Interest Period, and

(b)     the Administrative Agent shall have received notice from the Required Lenders that, by reason of any changes arising after the date of this Agreement, Term SOFR determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders in writing as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (or until a Benchmark Replacement is implemented in accordance with Section 2.16) (which it shall do promptly upon becoming aware thereof), (x) the obligation of the Lenders to make or maintain SOFR Loans shall be suspended (to the extent of the affected SOFR Loans or Interest Periods), (y) Term SOFR component shall no longer be utilized in determining the Base Rate, in each case, until such time a Benchmark Replacement is implemented in accordance with Section 2.16, and (z) all SOFR Loans shall automatically be converted to Base Rate Loans at the end of the applicable Interest Period (or sooner if the Administrative Agent cannot continue to lawfully

- 41 -

maintain such affected SOFR Loans at Term SOFR) until such time a Benchmark Replacement is implemented in accordance with <u>Section 2.16</u>. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans (subject to the foregoing <u>clause (y)</u>) in the amount specified therein.

2.15.   <u>Term SOFR Conforming Changes</u>.  In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

2.16.   <u>Benchmark Replacement Setting</u>.

(a)   <u>Benchmark Replacement</u>.  Notwithstanding anything to the contrary herein or in any other Credit Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this <u>Section 2.16(a)</u> will occur prior to the applicable Benchmark Transition Start Date.

(b)   <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Conforming Changes will become effective upon delivery of the same to Borrower but without any further action or consent of any other party to this Agreement or any other Credit Document.

(c)   <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Borrower and the Lenders in writing (for the avoidance of doubt, including via email) of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will promptly notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to <u>Section 2.16(d)</u> and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this <u>Section 2.16</u>, including any determination with respect

- 42 -

to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.16.

(d)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    Benchmark Unavailability Period.  Upon the Borrower's receipt of written notice (for the avoidance of doubt, including via email) of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Loan of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

**SECTION 3.**  [Reserved].

**SECTION 4.**  Commitment Commission; Fees; Reductions of Commitment.

4.01.    Fees.  The Borrower agrees to pay to the Administrative Agent and the Collateral Agent such fees as may be agreed to in the Fee Letter or otherwise in writing from time to time by the Borrower or any of its Subsidiaries and the Administrative Agent and/or the Collateral Agent.

4.02.    Mandatory Reduction of Commitments.  In addition to any other mandatory commitment reductions pursuant to this Agreement, the Commitments shall terminate in their

- 43 -

entirety on the earlier to occur of (i) the date on which the aggregate principal amount of Loans equals the Commitments and (ii) the Commitment Expiration Date (in either case after giving effect to the making of the Loans on such date).

**SECTION 5.**  Prepayment Premium.

5.01.   Prepayment Premium.

(a)     Upon the occurrence of any prepayment or repayment of all or a portion of the principal of the Loans pursuant to Section 6.01 (whether or not a Default exists) or as a result of an acceleration of the Loans pursuant to Section 12 (or upon the occurrence of any prepayment or repayment of all or a portion of the principal of the Loans pursuant to Section 6.02, but solely to the extent that the action giving rise to such prepayment or repayment constitutes a Default hereunder), then, in addition to the payment of the principal amount of the Loans, accrued and unpaid interest, and Fees, the Borrower shall pay a prepayment or repayment premium (a "**Prepayment Premium**") to the Lenders equal to 5.00% of the principal amount of the Loans prepaid or repaid at such time, provided that no Prepayment Premium shall be payable if the Loans are converted to exit facility loans in accordance with the Chapter 11 Plan.

(b)     The Borrower agrees that the prepayment premiums and repayment fees required under Section 5.01(a) are a reasonable calculation of the Lenders' lost profits in view of the difficulties and impracticality of determining actual damages resulting from a prepayment of the Loan.  All prepayment premiums and repayment fees under this Section 5.01 shall be in addition to all other amounts which may be due to the Lenders from time to time pursuant to the terms of this Agreement and the other Credit Documents. All of the Loans shall be subject to the prepayment premiums set forth in Section 5.01(a) and the payment of one prepayment premium on a portion of the Loans shall not excuse or reduce the payment of a premium on any subsequent prepayment or repayment of the Loans.

(c)     THE CREDIT PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM AND REPAYMENT FEE IN CONNECTION WITH ANY ACCELERATION, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW.  The Credit Parties expressly agree that (i) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Credit Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Premium, (iv) the Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 5.01(c), (v) their agreement to pay the Prepayment Premium is a material inducement to the Lenders to make the Loans, and (vi) the Prepayment Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the

- 44 -

Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such event.

**SECTION 6.** Prepayments; Payments; Taxes.

6.01.   Voluntary Prepayments.  The Borrower shall have the right to prepay the Loans in whole or in part at any time, subject to the Prepayment Premium, if applicable.  All prepayments of Loans are subject to the following terms and conditions:  (i) the Borrower shall give the Administrative Agent prior to 12:00 P.M. (New York City time) at the Notice Office (x) at least three (3) Business Days' (or such shorter period as the Administrative Agent shall agree in its sole discretion) prior written notice of its intent to prepay Base Rate Loans and (y) at least three (3) Business Days' (or such shorter period as the Administrative Agent shall agree in its sole discretion) prior written notice of its intent to prepay SOFR Loans, which notice (in each case) may be conditioned on the occurrence of a specified transaction and revoked if such transaction does not occur and shall specify whether Initial Term Loans or Additional Term Loans shall be prepaid, the amount of such prepayment and the Types of Loans to be prepaid and, in the case of SOFR Loans, the specific Borrowing or Borrowings pursuant to which such SOFR Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; (ii) each partial prepayment of Loans pursuant to this Section 6.01 shall be in an aggregate principal amount of at least $1,500,000, provided that if any partial prepayment of SOFR Loans made pursuant to any Borrowing shall reduce the outstanding principal amount of SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, then such Borrowing may not be continued as a Borrowing of SOFR Loans (and same shall automatically be converted into a Borrowing of Base Rate Loans) and any election of an Interest Period with respect thereto given by the Borrower shall have no force or effect; and (iii) each voluntary prepayment of Loans pursuant to this Section 6.01 shall be applied to the Loans on a pro rata basis (with the Applicable Percentage of the aggregate amount of such prepayment to be applied as a prepayment of the Loans).

6.02.   Mandatory Repayments.

(a)      [Reserved].

(b)      [Reserved].

(c)      [Reserved].

(d)      In addition to any other mandatory repayments or commitment reductions pursuant to this Section 6.02, within five (5) Business Days following each date on or after the Closing Date upon which the Borrower or any of its Subsidiaries receives any cash proceeds from any issuance or incurrence by the Borrower or any of its Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to Section 11.04), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment and/or commitment reduction in accordance with the requirements of Section 6.02(h).

(e)      In addition to any other mandatory repayments or commitment reductions pursuant to this Section 6.02, within five (5) Business Days following each date on or after

- 45 -

the Closing Date upon which the Borrower or any of its Subsidiaries receives any cash proceeds from any Asset Sale (or other sale or disposition of assets pursuant to Section 11.02(g) and (n)), an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such date as a mandatory repayment and/or commitment reduction in accordance with the requirements of Section 6.02(h); provided, however, that such Net Sale Proceeds shall not be required to be so applied on such date so long as no Event of Default then exists and such Net Sale Proceeds shall be used to purchase assets (other than inventory and working capital) used or to be used in the businesses permitted pursuant to Section 11.14 within ninety (90) days following the date of such Asset Sale (or other sale or disposition of assets pursuant to Section 11.02(g) and (n)), and provided further, that if all or any portion of such Net Sale Proceeds not required to be so applied as provided above in this Section 6.02(e) are not so reinvested within such ninety (90)-day period (or such earlier date, if any, as the Borrower or the relevant Subsidiary determines not to reinvest the Net Sale Proceeds from such Asset Sale (or other sale or disposition of assets pursuant to Section 11.02(g) and (n)) as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 6.02(e) without regard to the preceding proviso.

(f)     [Reserved].

(g)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 6.02, within five (5) Business Days following each date on or after the Closing Date upon which the Borrower or any of its Subsidiaries receives any cash proceeds from any Recovery Event (other than Recovery Events where the Net Cash Proceeds therefrom do not exceed $500,000), an amount equal to 100% of the Net Cash Proceeds from such Recovery Event shall be applied on such date as a mandatory repayment and/or commitment reduction in accordance with the requirements of Section 6.02(h); provided, however, that such Net Cash Proceeds shall not be required to be so applied on such date so long as no Default or Event of Default then exists and the Borrower has delivered a certificate to the Administrative Agent on such date stating that such Net Cash Proceeds shall be used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within ninety (90) days following the date of the receipt of such Net Cash Proceeds (which certificate shall set forth the estimates of the Net Cash Proceeds to be so expended), and provided further, that if all or any portion of such Net Cash Proceeds not required to be so applied pursuant to the preceding proviso are not so used within ninety (90) days after the date of the receipt of such Net Cash Proceeds (or such earlier date, if any, as the Borrower or the relevant Subsidiary determines not to reinvest the Net Cash Proceeds relating to such Recovery Event as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 6.02(g) without regard to the immediately preceding proviso.

(h)     [Reserved].

(i)     In addition to any other mandatory repayments pursuant to this Section 6.02, (i) all then outstanding Loans of a respective Tranche shall be repaid in full on the Maturity Date, and (ii) unless the Required Lenders otherwise agree in writing, all

- 46 -

then outstanding Loans shall be repaid in full on the date on which a Change of Control occurs.

(j)    [Reserved].

(k)    Anything contained herein to the contrary notwithstanding, in the event the Borrower is required to make any mandatory prepayment (a "**Waivable Mandatory Prepayment**") of the Loans in accordance with clauses (b) through (g) above, not later than 12:00 p.m., New York City time, three (3) Business Days prior to the date (the "**Required Prepayment Date**") on which the Borrower elects (or are otherwise required) to make such Waivable Mandatory Prepayment, the Borrower shall notify Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's pro rata share of such Waivable Mandatory Prepayment and such Lender's option to refuse such amount. Each such Lender may exercise such option by giving written notice to the Administrative Agent of its election to do so not later than 12:00 p.m., New York City time, the second Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Administrative Agent of its election to exercise such option on or before the first Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Required Prepayment Date, the Borrower shall pay to the Administrative Agent the amount of the Waivable Mandatory Prepayment less the amount of the Declined Proceeds (as defined below), which amount shall be applied by the Administrative Agent to prepay the Loans of those Lenders that have elected to accept such Waivable Mandatory Prepayment (each, an "**Accepting Lender**") (which prepayment shall be applied to the scheduled installments of principal of the Loans in accordance with Section 6.02(h)). The portion of the Waivable Mandatory Prepayment otherwise payable to those Lenders that have elected to exercise such option and decline such Waivable Mandatory Prepayment (such declined amounts, the "**Declined Proceeds**") and which has not been accepted by other Lenders may be retained by the Borrower and used for any purpose not prohibited by this Agreement. For the avoidance of doubt, the Declined Proceeds shall be offered to each Accepting Lender based on each such Lender's pro rata share until such time as there are either (x) no remaining Accepting Lenders or (y) no remaining Declined Proceeds.

(l)    With respect to each repayment of Loans required by this Section 6.02, the Borrower may designate the Types of Loans of the respective Tranche which are to be repaid and, in the case of SOFR Loans, the specific Borrowing or Borrowings of the respective Tranche pursuant to which such SOFR Loans were made, provided that: (i) repayments of SOFR Loans pursuant to this Section 6.02 may only be made on the last day of an Interest Period applicable thereto unless all SOFR Loans of the respective Tranche have been paid in full; (ii) if any repayment of SOFR Loans made pursuant to a single Borrowing shall reduce the outstanding SOFR Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, such Borrowing shall be automatically converted into a Borrowing of Base Rate Loans; and (iii) each repayment of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans. In the absence of a designation by the Borrower as described in the preceding

- 47 -

sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion.

6.03.   Method and Place of Payment.  Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 1:00 P.M. (New York City time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  Any payments received by the Administrative Agent after such time shall be deemed to have been received on the next Business Day and any applicable interest or fee shall continue to accrue.  Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.  Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

6.04.   Net Payments.

(a)      All payments made by any Credit Party hereunder and under any Credit Document will be made without setoff, counterclaim or other defense.  All such payments will be made free and clear of, and without deduction or withholding for, any Taxes now or hereafter imposed by any Taxing Authority with respect to such payments (other than (i) any Tax imposed on or measured by the net income (however denominated), franchise Taxes and branch profits Taxes imposed on a Recipient pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Recipient is located or any subdivision thereof or therein or as the result of any present or former connection with such jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement or any other Credit Document, or sold or assigned an interest in any Loan or Credit Document), (ii) in the case of a Lender, U.S. federal income withholding Taxes imposed on amounts payable to or for the account of such Lender pursuant to a law in effect on the date on which such Lender becomes a party hereto (other than pursuant to an assignment request by the Borrower under Section 2.13) or such Lender changes its lending office, except that this clause (ii) shall not apply to the extent that, pursuant to this Section 6.04(a), amounts claimed with respect to such Taxes are not greater than the amounts that were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with Section 6.04(b) and (iv) any withholding Taxes imposed under FATCA (all such Taxes referred to in clauses (i) through (iv) above, collectively as "**Excluded Taxes**")).  If any Indemnified Taxes are so levied or imposed as required by applicable Law, the relevant Credit Party shall pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary to the applicable Recipient, so that the payment of such amounts due under this Agreement or under any Credit Document, after withholding or deduction for or on

- 48 -

account of any Indemnified Taxes, will not be less than the amount such applicable Recipient would have been provided for herein or in such Credit Document had no such withholding or deduction been made.  If any amounts are payable or paid or required to be withheld in respect of Indemnified Taxes under applicable Law pursuant to the preceding sentence, the relevant Credit Party will furnish to the Administrative Agent as soon as reasonably practicable after the date the payment of any Indemnified Taxes is due pursuant to applicable law, certified copies of Tax receipts evidencing such payment by such Credit Party.  Each of the Credit Parties agrees to indemnify and hold harmless each Recipient, and reimburse such Recipient within ten (10) days upon its written request, for the amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to additional amounts payable under this Section 6.04) so levied or imposed and paid by (or withheld upon payment made to) such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Taxing Authority.

(b)     Each Lender that is a United States Person (as such term is defined in Section 7701(a)(30) of the Code), shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), a copy of an executed Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax.  Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes, to the extent that it is legally entitled to do so, agrees to deliver to the Borrower and the Administrative Agent on or prior to the Closing Date or, in the case of a Lender that is an assignee or transferee of an interest under this Agreement pursuant to Section 2.13 or Section 14.04(b) (unless the respective Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender, (i) two accurate and complete signed copies of Internal Revenue Service Form W-8ECI, W-8IMY (with required attachments), Form W-8BEN-E or Form W-8BEN (with respect to an exemption, or reduction of deduction or withholding under an income tax treaty) (or successor forms) certifying to such Lender's entitlement as of such date to an exemption from, or reduction of United States withholding tax with respect to payments to be made under this Agreement and under any Credit Document, or (ii) if the Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to an exemption from, or reduction of withholding taxes under an income tax treaty) (or any successor forms), as applicable, pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit C (any such certificate, a "**Section 6.04(b)(ii) Certificate**") and (y) two accurate and complete signed copies of Internal Revenue Service Form W-8BEN-E or Form W-8BEN (with respect to the portfolio interest exemption) (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Credit Document.  If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall

- 49 -

deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of the previous sentence, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  In addition, each Lender agrees that from time to time after the Closing Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, such Lender will deliver to the Borrower and the Administrative Agent two new accurate and complete signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN-E or Form W-8BEN (with respect to the portfolio interest exemption) and a Section 6.04(b)(ii) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Credit Document, or such Lender shall immediately notify the Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Lender shall not be required to deliver any such Form or Certificate pursuant to this Section 6.04(b).  Notwithstanding anything to the contrary contained in Section 6.04(a), but subject to Section 14.04(b) and the immediately succeeding sentence, the Borrower shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or similar Taxes imposed by the United States (or any political subdivision or Taxing Authority thereof or therein) from any amounts payable hereunder for the account of any Recipient for U.S. federal income tax purposes to the extent that such Recipient has not provided to the Borrower such Internal Revenue Service Forms and other documentation required to be provided to the Borrower pursuant to this Section 6.04(b) that establish an exemption from, or reduction of such deduction or withholding and (y) the Borrower shall not be obligated pursuant to Section 6.04(a) to gross-up payments to be made to a Recipient, or reimburse amounts paid or payable by a Recipient, in respect of such Taxes imposed by the United States if such Recipient is able to (as in such Recipient's reasonable judgment such completion, execution or submission would not subject it to any material unreimbursed cost or expense or would not materially prejudice the legal or commercial position of such Recipient) but has not provided to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to this Section 6.04(b). Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 6.04 and except as set forth in Section 14.04(b), the Credit Parties agree to pay any amounts and to indemnify each Recipient in the manner set forth in Section 6.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any additional amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes that are effective after the Closing Date in any applicable law, treaty, governmental rule, regulation, guideline or

- 50 -

order, or in the interpretation thereof, relating to the deducting or withholding of such Taxes.

(c)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already reimbursed the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 14.04(e)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable out of pocket expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to (at its option) set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>clause (c)</u>.  Failure or delay on the part of the Administrative Agent to demand compensation pursuant to this <u>Section 6.04(c)</u> shall not constitute a waiver of the Administrative Agent's right to demand such compensation.

(d)     <u>Payment of Other Taxes by the Borrower</u>.  The Borrower shall timely pay to the relevant Taxing Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(e)     Each party's obligations under this <u>Section 6.04</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

(f)     If any Lender or the Administrative Agent, as applicable, receives a refund of an Indemnified Tax for which a payment has been made by the Borrower pursuant to this Agreement or any other Credit Document, which refund in the good faith judgment of such Lender or the Administrative Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender or the Administrative Agent, as the case may be, shall reimburse the Borrower for such amount (net of all reasonable out-of-pocket expenses (including Taxes) of such Lender or the Administrative Agent, as the case may be, and without interest (other than any interest received thereon from the relevant Governmental Authority with respect to such refund)) as the Lender or Administrative Agent, as the case may be, determines in its reasonable discretion to be the proportion of the refund as will leave it, after such reimbursement, in no worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the Indemnified Tax giving rise to such refund had not been imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid in the first instance; <u>provided</u>, that the Borrower, upon the request of the Lender or the Administrative Agent, agrees to repay the amount paid over to the Borrower (plus any penalties, interest

- 51 -

or other charges imposed by the relevant Governmental Authority) to the Lender or the Administrative Agent in the event the Lender or the Administrative Agent is required to repay such refund to such Governmental Authority.  No Lender nor the Administrative Agent shall be obliged to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower in connection with this clause (f) or any other provision of this <u>Section 6.04</u>.

**SECTION 7.**   <u>Conditions Precedent to Credit Events on the Closing Date</u>.   The obligation of each Lender to make Initial Term Loans on the Closing Date, is subject at the time of the making of such Initial Term Loans to the satisfaction of the following conditions:

7.01.   <u>Credit Agreement; Notes</u>.   On or prior to the Closing Date, (i) the Borrower shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent, and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same, Initial Term Loan Notes executed by the Borrower, in each case in the amount, maturity and as otherwise provided herein.

7.02.   <u>Officer's Certificate</u>.   On the Closing Date, the Administrative Agent shall have received a certificate in the form of <u>Exhibit D</u>, dated the Closing Date and signed on behalf of the Borrower by the Chairman of the Board, the Chief Executive Officer, an Authorized Officer, the President or any Vice President of each such Credit Party, certifying on behalf of such Credit Party that (i) there exists no Default or Event of Default, (ii) all representations and warranties contained herein and in the other Credit Documents are true and correct and (iii) all of the conditions in this <u>Section 7</u> have been satisfied.

7.03.   <u>Company Documents; Proceedings; etc</u>.

(a)   On the Closing Date, all Company and legal proceedings and all instruments and agreements in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be reasonably satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received all information and copies of all documents and papers, including records of Company proceedings, governmental approvals, good standing certificates and bring-down telegrams or facsimiles, if any, which the Administrative Agent reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper Company or Governmental Authorities.

7.04.   <u>Adverse Change, Approvals</u>.

(a)   Since the date of the Restructuring Support Agreement, nothing shall have occurred (and neither the Administrative Agent nor any Lender shall have become aware of any facts or conditions not previously known) which the Administrative Agent or the Required Lenders shall determine has had, or would reasonably be expected to have, (i) a Material Adverse Effect or (ii) a material adverse effect on the Transaction, in each case, other than the Chapter 11 Events and Circumstances.

(b)     On or prior to the Closing Date, all necessary governmental and material third party authorizations, approvals and/or consents in connection with the Transaction the other transactions contemplated hereby and the granting of Liens under the Credit Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the Transaction or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.  On the Closing Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the Transaction or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein, other than the Chapter 11 Events and Circumstances.

7.05.   <u>Litigation</u>.  On the Closing Date, there shall be no actions, suits or proceedings pending or threatened (i) with respect to the Transaction, this Agreement or any other Credit Document, or (ii) which the Administrative Agent shall determine has had, or would reasonably be expected to have, a Material Adverse Effect, other than the Chapter 11 Events and Circumstances.

7.06.   <u>Subsidiaries Guaranty; Intercompany Subordination Agreement</u>.

(a)     On the Closing Date, each Subsidiary of the Borrower shall have duly authorized, executed and delivered the Subsidiaries Guaranty in substantially the form of <u>Exhibit E</u> (as amended, modified and/or supplemented from time to time, the "**Subsidiaries Guaranty**"), and the Subsidiaries Guaranty shall be in full force and effect.

(b)     On the Closing Date, each Credit Party and each other Subsidiary of the Borrower which is an obligee or obligor with respect to any Intercompany Debt shall have duly authorized, executed and delivered the Intercompany Note, and the subordination provisions therein shall be in full force and effect.

7.07.   <u>Restructuring Transaction Related Deliverables</u>.

(a)     The Credit Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court in accordance with the requirements of the Restructuring Support Agreement no later than June 7, 2024.

(b)     The Interim DIP Order (i) shall have been entered by the Bankruptcy Court in the Chapter 11 Cases not later than five (5) Business Days after the Petition Date, (ii) shall be in full force and effect, (iii) shall not have been vacated or reversed, (iv) shall not be subject to a stay, and (v) shall not have been modified or amended in any respect without the prior written consent of the Lenders (and, in respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, the Administrative Agent).

1609103405.14
4870-1742-7140, v. 3

(c)     The Credit Parties shall have delivered to the Administrative Agent the Approved Budget, which shall be in form and substance reasonably acceptable to the Administrative Agent.

(d)     The Interim DIP Order shall be effective to create, in favor of the Administrative Agent, for the benefit of the Secured Creditors, a valid, binding, enforceable, non-avoidable, and automatically and fully perfected Liens on, and security interests in, the Collateral, on the basis and with the priority set forth therein.

(e)     The Restructuring Support Agreement shall be in full force and effect and no material default or event of default shall have occurred and be continuing thereunder.

(f)     All first day motions filed by the Credit Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Lenders (and, in respect to matters therein that affect the rights, obligations, liabilities and duties of the Administrative Agent, the Administrative Agent).

(g)     Each Milestone required to be satisfied prior to the Closing Date shall have been satisfied (or waived) in accordance with the terms hereof.

(h)     The Closing Date shall have occurred on or before the date that is three (3) calendar days after the date of entry of the Interim DIP Order.

7.08.     <u>Financial Statements; Pro Forma Balance Sheet</u>.  On or prior to the Closing Date, the Administrative Agent shall have received true and correct copies of the historical financial statements and the pro forma financial statements referred to in <u>Section 9.05(a)</u>, which historical financial statements and pro forma financial statements shall be in form and substance reasonably satisfactory to the Administrative Agent.

7.09.     <u>Fees, etc</u>.  On the Closing Date, the Borrower shall have paid to the Administrative Agent and the Collateral Agent all documented or invoiced premiums, payments, costs, fees and expenses (including, without limitation, (a) the fees and expenses of the Lender Advisors (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date and (b) legal fees and expenses reimbursable hereunder) and other compensation contemplated hereby payable to the Administrative Agent, Collateral Agent or Lenders; <u>provided</u> that any such fees and expenses of the Lender Advisors and all other counsel financial advisors, and other professionals of the Lenders and the Administrative Agent to be paid on the Closing Date must be invoiced at least five (5) days prior to the Closing Date.

7.10.     <u>AML, KYC</u>.  Each of the Administrative Agent and Collateral Agent shall have received, not less than three (3) Business Days (or such shorter period as the Administrative Agent shall agree in its sole discretion) prior to the Closing Date, all requested information in connection with OFAC, know your customer and anti-money laundering reviews of each Credit Party, to the extent such information was reasonably requested not less than three (3) Business Days, or, to the extent requested in writing, not less than five (5) Business Days, prior to the Closing Date. Not

- 54 -

less than three (3) Business Days prior to the Closing Date, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall deliver a Beneficial Ownership Certification in relation to the Borrower.

7.11.    Compliance with Statutes, etc.  On the Closing Date, the Borrower and each of its Subsidiaries shall be in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business, the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), and the holding of, or operation using, the Necessary Authorizations except such non-compliances (a) as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect or (b) as are permitted by the Bankruptcy Code.

**SECTION 8.**  Additional Conditions Precedent.

8.01.    Conditions Precedent to All Credit Events.  The obligation of each Lender to make Loans (including Loans made on the Closing Date) is subject, at the time of each such Credit Event (except as hereinafter indicated), to the reasonable satisfaction or waiver of the following conditions.

(a)    No Default; Representations and Warranties.  At the time of each such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default under Section 12.01 or Section 12.15 and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of the Borrowing (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

(b)    Notice of Borrowing.  Prior to the making of each Loan, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03.

8.02.    Conditions Precedent to Borrowings of Additional Term Loans After the Closing Date.  The obligation of each Lender to make Additional Term Loans after the Closing Date is subject, at the time of each such Credit Event (except as hereinafter indicated), to the reasonable satisfaction or waiver of the following conditions.

(a)    Final DIP Order.  The Final DIP Order (i) shall have been entered by the Bankruptcy Court in the Chapter 11 Cases not later than forty five (45) days after the Petition Date, (ii) shall be in full force and effect, (iii) shall not have been vacated or reversed, (iv) shall not be subject to a stay, and (v) shall not have been modified or amended in any respect without the prior written consent of the Lenders (and, in respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the Administrative Agent, the Administrative Agent).

- 55 -

(b)     Officer's Certificate.  The Administrative Agent shall have received a certificate in the form of Exhibit D, dated the date of such Credit Event and signed on behalf of the Borrower by the Chairman of the Board, the Chief Executive Officer, an Authorized Officer, the President or any Vice President of each such Credit Party, certifying on behalf of such Credit Party that (i) there exists no Default or Event of Default, (ii) all representations and warranties contained herein and in the other Credit Documents are true and correct in all material respects, and (iii) all of the conditions in this Section 8 have been satisfied.

(c)     Material Agreements.  On the date of such Credit Event, the Borrower shall have delivered to the Administrative Agent an updated or "bring-down" Material Agreements Certificate.

(d)     Adverse Change.  Since the Closing Date, nothing shall have occurred (and neither the Administrative Agent nor any Lender shall have become aware of any facts or conditions not previously known) which the Administrative Agent or the Required Lenders shall determine has had, or would reasonably be expected to have, (i) a Material Adverse Effect or (ii) a material adverse effect on the Transaction, in each case, other than the Chapter 11 Events and Circumstances.

(e)     Fees, etc.  The Borrower shall have paid to the Administrative Agent, the Collateral Agent and each Lender (and each of their relevant affiliates) all documented or invoiced costs, fees and expenses (including, without limitation, legal fees and expenses reimbursable hereunder) and other compensation contemplated hereby payable to the Administrative Agent, Collateral Agent or such Lender.

In determining the satisfaction of the conditions specified in Section 7 or this Section 8, (x) to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date or the date of each Credit Event after the Closing Date that the respective item or matter does not meet its satisfaction and (y) in determining whether any Lender is aware of any fact, condition or event that has occurred and which would reasonably be expected to have a Material Adverse Effect or a material adverse effect of the type described in Section 7.04, each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the applicable Credit Event of such fact, condition or event shall be deemed not to be aware of any such fact, condition or event on the date of such Credit Event.  Upon the Administrative Agent's good faith determination that the conditions specified in Section 7 and this Section 8 have been met (after giving effect to the preceding sentence), then the applicable conditions precedent to such Credit Event be deemed to have been satisfied, regardless of any subsequent determination that one or more of the conditions thereto had not been met (although the occurrence of the applicable Credit Event shall not release the Borrower from any liability for failure to satisfy one or more of the applicable conditions contained in Section 7 and this Section 8).

The acceptance of the benefits of each Credit Event on or after the Closing Date shall constitute a representation and warranty by such Credit Party to the Administrative Agent and each of the Lenders that all the conditions applicable to such Credit Event specified in Section 7 and this Section 8 are satisfied in full as of such date or have been waived.  All of the Notes, certificates,

- 56 -

legal opinions and other documents and papers referred to in <u>Section 7</u> and this <u>Section 8</u>, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

**SECTION 9.** <u>Representations, Warranties and Agreements</u>.   In order to induce the Lenders to enter into this Agreement and to make the Loans, each Credit Party makes the following representations, warranties and agreements, in each case after giving effect to the Transaction, all of which shall survive the execution and delivery of this Agreement and the Notes and the making of the Loans, with the occurrence of each Credit Event on or after the Closing Date being deemed to constitute a representation and warranty that the matters specified in this <u>Section 9</u> are true and correct in all material respects on and as of the Closing Date and on the date of each such other Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

9.01.   <u>Company Status</u>.   Subject to the entry of the DIP Orders, each Credit Party and each of its respective Subsidiaries (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified or authorized which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.   Subject to the entry of the DIP Orders, no certifications by any Governmental Authority are required for operation of the business of the Borrower and its Subsidiaries that are not in place, except for such certifications or agreements, the absence of which would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

9.02.   <u>Power and Authority</u>.   Subject to the entry of the DIP Orders, each Credit Party and each of its respective Subsidiaries has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents.   Subject to the entry of the DIP Orders, each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

9.03.   <u>No Violation</u>.   Neither the execution, delivery or performance by any Credit Party or any Subsidiary of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (a) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority the contravention of which would reasonably be expected to have a Material Adverse Effect, (b) will

- 57 -

conflict with or result in any material breach of any of the terms, covenants, conditions or provisions of, or constitute a default under the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject (including, without limitation, any Subordinated Debt), where any such conflict, breach or default would reasonably be expected to result in a Material Adverse Effect, (c) will result in the creation or imposition of (or the obligation to create or impose) any Lien (except (i) pursuant to the Security Documents and (ii) Permitted Liens) upon any of the property or assets of any Credit Party or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject (including, without limitation, any Subordinated Debt), or (d) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Subsidiaries, in each case, except where failure or non-compliance is permitted by the Bankruptcy Code.

9.04.    <u>Approvals</u>.  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (w) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date, (x) filings which are necessary to perfect the security interests created or intended to be created under the Security Documents, (y) those the absence of which would not reasonably be expected to have a Material Adverse Effect, or (z) non-compliances arising under any agreement that the applicable Credit Party has rejected under section 365 of the Bankruptcy Code not in prohibition of this Agreement or the DIP Orders), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary in connection with, (a) the execution, delivery and performance of any Credit Document or (b) the legality, validity, binding effect or enforceability of any such Credit Document.

9.05.    [Reserved].

9.06.    <u>Litigation</u>.  Other than the commencement of the Chapter 11 Cases, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened (a) with respect to the Transaction or any Credit Document or (b) that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

9.07.    <u>True and Complete Disclosure</u>.  All factual information (taken as a whole) furnished by or on behalf of the Borrower, to the Administrative Agent or any Lender (including, without limitation, all information contained in the Credit Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of the Borrower to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such

- 58 -

information was provided, it being understood and agreed that for purposes of this Section 9.07, such factual information shall not include any pro forma financial information. All Material Agreements of the Borrower and its Subsidiaries existing as of the Closing Date have been furnished by or on behalf of the Borrower or the Borrower to the Administrative Agent at least three (3) Business Days (or such shorter time as the Administrative Agent may permit in its sole discretion) prior to the Closing Date.

9.08.    Use of Proceeds; Margin Regulations.

(a)    All proceeds of the Initial Term Loans made on the Closing Date will be used by the Borrower for working capital, including for the payment of budgeted items for (i) adequate protection payments pursuant to the Adequate Protection Provisions, (ii) administrative costs of the Chapter 11 Cases, (iii) payment of fees and expenses in connection with selling or exiting one or more businesses or facilities, (iv) capital expenditures approved by the Administrative Agent in its sole discretion, and (v) general corporate purposes.

(b)    All proceeds of the Additional Term Loans made after the Closing Date will be used by the Borrower for working capital, including for the payment of budgeted items for (i) adequate protection payments pursuant to the Adequate Protection Provisions, (ii) administrative costs of the Chapter 11 Cases, (iii) payment of fees and expenses in connection with selling or exiting one or more businesses or facilities, (iv) capital expenditures approved by the Administrative Agent in its sole discretion, and (v) general corporate purposes.

(c)    No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

9.09.    Tax Returns and Payments. Except as permitted by the Bankruptcy Code, each of the Borrower and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate Taxing Authority all Tax returns, statements, forms and reports for Taxes (the "**Returns**") required to be filed by, or with respect to the income, properties or operations of, the Borrower and/or any of its Subsidiaries, and such Returns accurately reflect in all material respects all liability for Taxes of the Borrower and its Subsidiaries, as applicable, for the periods covered thereby. Except as permitted by the Bankruptcy Code, each of the Borrower and each of its Subsidiaries has paid all Taxes and assessments payable by it which have become due, other than those that are being contested in good faith and adequately disclosed and fully provided for on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP. There is no action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of the Borrower or any of its Subsidiaries, threatened by any authority regarding any Taxes relating to the Borrower or any of its Subsidiaries, except in connection with the Chapter 11 Cases. As of the Closing Date, none of the Borrower or any of its Subsidiaries has entered into an agreement or waiver or been requested in writing to enter into an agreement or waiver extending any statute of

- 59 -

limitations relating to the payment or collection of Taxes of the Borrower or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Borrower or any of its Subsidiaries not to be subject to the normally applicable statute of limitations.  Neither the Borrower nor any of its Subsidiaries has incurred, nor will any of them incur, any Tax liability in connection with the Transaction or any other transactions contemplated hereby (it being understood that the representation contained in this sentence does not cover any future Tax liabilities of the Borrower or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business).

9.10.   [Reserved].

9.11.   Security Documents.  Pursuant to and to the extent provided in the DIP Orders or any Security Document, the Obligations of the Credit Parties under this Agreement will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Credit Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code on a joint and several basis and all superpriority administrative expense claims granted to any other Person, subject only to the Carve-Out and other exceptions set forth in the DIP Orders, which claims shall have recourse to all of the Credit Parties' assets.

9.12.   [Reserved].

9.13.   [Reserved].

9.14.   [Reserved].

9.15.   Compliance with Statutes, etc.  Each of the Borrower and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business, the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), and the holding of, or operation using, the Necessary Authorizations, except such non-compliance (a) as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (b) arising under any agreement that the applicable Credit Party has rejected under section 365 of the Bankruptcy Code not in prohibition of this Agreement or the DIP Orders.  None of the Borrower or any of its Subsidiaries has received any notice or communication from any Governmental Authority of non-compliance with any such applicable statutes, regulations, and orders that has not been fully cured as of the date of this Agreement.

9.16.   Investment Company Act.  None of the Borrower or any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

9.17.   [Reserved].

9.18.   <u>Environmental Matters</u>.

(a)    Each of the Borrower and each of its Subsidiaries is, and for the past four years, has been, in compliance with all applicable Environmental Laws and the requirements of any permits issued to the Borrower or any of its Subsidiaries under such Environmental Laws except for any non-compliances which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  There are no pending or, to the knowledge of the Borrower, threatened Environmental Claims against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries nor are there any pending or, to the knowledge of any Credit Party, threatened, Environmental Claims against the Borrower or any of its Subsidiaries or with respect to any Real Property currently or formerly owned, leased or operated by the Borrower or any of its Subsidiaries except for any Environmental Claims which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  There are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Borrower or any of its Subsidiaries, or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries nor, to the knowledge of any Credit Party, are there any facts, circumstances, conditions or occurrences with respect to any Real Property formerly owned, leased or operated by the Borrower or any of its Subsidiaries or with respect to any property adjoining or adjacent to any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that would be reasonably expected (i) to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that would, individually or in the aggregate with any other Environmental Claims existing at such time and any other facts, circumstances, conditions or occurrences described in this <u>Section 9.18(a)</u>, reasonably be expected to have a Material Adverse Effect or (ii) to cause any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy, use or transferability of such Real Property by the Borrower or any of its Subsidiaries under any applicable Environmental Law where any such restrictions would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower or the Borrower, any property adjoining or adjacent to any Real Property, where such generation, use, treatment, storage, transportation or Release has violated or would be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim against the Borrower or any Subsidiary or with respect to any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries, in each case, which would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

9.19.   <u>Employment and Labor Relations</u>.  None of the Borrower or any of its Subsidiaries is engaged in any unfair labor practice that would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower,

- 61 -

threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, (b) no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries, (c) no union representation question exists with respect to the employees of the Borrower or any of its Subsidiaries, (d) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries and (e) no wage and hour department investigation has been made of the Borrower or any of its Subsidiaries, except (with respect to any matter specified in clauses (a) through (e) above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

9.20.   Intellectual Property.  Each of the Borrower and each of its Subsidiaries owns or has the right to use all Intellectual Property, whether owned or licensed pursuant to a license agreement (including, but not limited to, rights in computer programs, databases and formulas, or rights with respect to the foregoing) necessary for the present conduct of its business, without conflict with the Intellectual Property rights of others which, or the failure to own or have which, as the case may be, would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

9.21.   EEA Financial Institution.  No Credit Party is an EEA Financial Institution.

9.22.   [Reserved].

9.23.   [Reserved].

9.24.   Necessary Authorizations.

(a)   Each Credit Party and each Subsidiary of a Credit Party has obtained all material Necessary Authorizations, and all such material Necessary Authorizations are in full force and effect.  No other person has any right, title, or interest in or with respect to such material Necessary Authorizations.  Each Credit Party has performed all of its respective obligations required to have been performed under such material Necessary Authorizations.  There is no non-compliance under the terms of any material Necessary Authorization, nor has any Credit Party received any notice of any such non-compliance, which permits or, after notice or lapse of time or both, could reasonably be expected to permit revocation, cancellation, non-renewal, suspension or adverse modification of any material Necessary Authorization.  To each Credit Party's knowledge, the Necessary Authorizations will be renewed in the ordinary course and there is no event, condition or circumstance which could reasonably be expected to present a substantial risk that any material Necessary Authorization would not be renewed in the ordinary course or could be revoked, cancelled or suspended or materially adversely modified or that any substantial fine or forfeiture could be imposed against the holder of any material Necessary Authorization.

(b)     No material Necessary Authorization is the subject of any pending or, to each Credit Party's knowledge, threatened attack, application, objection, or enforcement action or any other petition with a Governmental Authority for revocation, termination, suspension, denial or material modification of such material Necessary Authorization, by the grantor of such material Necessary Authorization.  The actions of any applicable Governmental Authority granting all material Necessary Authorizations have not been reversed, stayed, enjoined, annulled or suspended.  Each Credit Party has duly and timely filed all material reports, statements and filings, and paid all required regulatory fees in accordance with the applicable rules and regulations of each applicable Governmental Authority, that are required to be filed or paid by any of them other than, in each case, to the extent any such failure would not give rise to a material liability, and are in all material respects in compliance therewith.

9.25.   <u>Regulatory Status</u>.

(a)     Each Licensed Personnel holds all material Necessary Authorizations necessary or required by such Licensed Personnel to render health care or pharmacy services, as required by any Health Care Law. There is no litigation, investigation or proceeding pending or, to the knowledge of any Credit Party, threatened with respect to any Licensed Personnel who renders health care services that could reasonably be expected to result in the limitation, loss, restriction or suspension of any Necessary Authorizations held by such persons, except where the same could not reasonably be expected to result in a Material Adverse Effect.

(b)     Each Credit Party and each Subsidiary of a Credit Party holds and has held since January 1, 2017 in full force and effect all material Third-Party Payor Authorizations necessary to participate in and be reimbursed by all Third-Party Payor Programs in which a Credit Party or Subsidiary participates.  There is no investigation, audit, claim review, or other action pending or, to the knowledge of any Credit Party, threatened in writing, which could result in a suspension, revocation, termination, restriction, limitation, modification or nonrenewal of any Third-Party Payor Authorizations or result in the exclusion of any Credit Party or Subsidiary or any Licensed Personnel from any Third-Party Payor Programs.  All claims and reports submitted by any Credit Party or Subsidiary or any Licensed Personnel under any Third-Party Payor Programs are, and at all times have been, complete and accurate in all material respects and are, and at all times have been, prepared in material compliance with all applicable Health Care Laws and the claims submission standards made applicable by the governmental or commercial payor to which the claim or report is submitted in each case.  No Credit Party or Subsidiary has received since January 1, 2017, any notice from a Third-Party Payor Program, of allegations that the Credit Party or Subsidiary has billed such Third-Party Payor Program in excess of amounts allowed by any Health Care Law other than in connection with a routine non-material audit or post payment review by such Third-Party Payor Program that has been resolved in compliance with applicable Health Care Laws.  No officer or director of any Credit Party or Subsidiary has received oral or written notice that they are subject to any audit or investigation by any Third-Party Payor Program other than routine audits and reviews occurring in the ordinary course of business.  No Credit Party or Subsidiary has received any notice indicating that its qualification as a participating provider in any Governmental Payor may be suspended,

- 63 -

terminated or withdrawn other than any such suspension, termination or withdrawal that could not reasonably be expected to have a Material Adverse Effect. None of the execution, delivery and performance of the Credit Documents or the consummation of the Transactions will require the consent or approval of any Third-Party Payor Program, or as a result of the consummation of, the Transactions contemplated hereby or the consummation of the Transactions contemplated by any of the Credit Documents.

(c)     None of the Credit Parties or Subsidiaries, and to the knowledge of any Credit Party, no Licensed Personnel, is in violation of any Health Care Laws. Since January 1, 2017, none of the Credit Parties or Subsidiaries and, to the knowledge of any Credit Party, no Licensed Personnel has received any notice of any alleged violation of, or any citation for noncompliance with, any Law, including, without limitation, Health Care Laws other than any such violations or noncompliances that could not reasonably be expected to have a Material Adverse Effect. None of the Credit Parties or Subsidiaries has received any written, or oral notice or inquiry from any Governmental Authority regarding any failure to comply with any applicable Law other than any notices of such failure to comply that could not reasonably be expected to have a Material Adverse Effect.

(d)     None of the Credit Parties or Subsidiaries, and to the knowledge of any Credit Party, no employee, contractor, vendor, or agent thereof, since January 1, 2017, (A) has been convicted of or charged with any material violation of any Laws related to any Governmental Payor; (B) has been convicted of, charged with, or, to the knowledge of any Credit Party investigated for, any violation of Laws related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation, or controlled substances; (C) has been excluded, suspended or debarred from participation, or is otherwise ineligible to participate, in any Governmental Payor; (D) has had a civil monetary penalty assessed against such Person under Section 1128A of the Social Security Act (42 U.S.C. ch. 7); (E) is listed on the General Services Administration published list of parties excluded from federal procurement programs and non-procurement programs; (F) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. § § 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.; or (viii) to the knowledge of any Credit Party, is the target or subject of any current or potential investigation relating to any Medicare, Medicaid or any other Federal Health Care Program-related offense. To the extent not covered above, for all Credit Parties and Subsidiaries, since January 1, 2017, no Credit Party or Subsidiary, nor to the knowledge of the Credit Parties or Subsidiaries, any of their respective employees, contractors, vendors, or agents: (i) has been convicted of, charged with, or, to the knowledge of any Credit Party investigated for, any material violation of Laws related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation, or controlled substances; or (ii) has been named in a U.S. Attorney complaint made or any other material action taken pursuant to the False Claims Act under 31 U.S.C. § § 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 et seq. No Credit Party or Subsidiary is currently excluded, suspended or debarred from participation, or is otherwise ineligible to participate, in any Governmental Payor. The Credit Parties and Subsidiaries conduct and have conducted background checks as required by applicable Law and screen and have screened all of their members, directors, officers, employees, contractors, agents, and vendors against the List of Excluded

- 64 -

Individuals and Entities maintained by the Office of Inspector General of the Department of Health and Human Services and the System for Award Management excluded parties data maintained by the General Services Administrations.

(e)     Since January 1, 2017, none of the Credit Parties or Subsidiaries, nor, to the knowledge of the Credit Parties and their Subsidiaries, any of their Licensed Personnel has (i) knowingly and willfully made or caused to be made a false statement or representation of a material fact in any application for any benefit or payment under any Governmental Payor; (ii) knowingly and willfully made or caused to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Governmental Payor; (iii) failed to disclose knowledge by a claimant of the occurrence of any material event affecting the initial or continued right to any benefit or payment under any Governmental Payor on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (iv) knowingly and willfully solicited or received any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offered to pay such remuneration in violation of Health Care Laws (1) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Governmental Payor, or (2) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part by any Governmental Payor; (v) presented or caused to be presented a claim for reimbursement for services that is for an item or service that was known or reasonably should have been known to be (1) not provided as claimed, or (2) false or fraudulent, in each case, in violation of Health Care Laws; or (vi) knowingly and willfully made or caused to be made or induced or sought to induce the making of any false statement or representation (or omission to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to any certification under any Governmental Payor or any information required to be provided under 42 U.S.C. § 1320a-3.

(f)     None of the Credit Parties or Subsidiaries has conducted any material recalls of, nor disseminated any material safety alerts, field notifications, or "Dear Doctor" letters relating to, any products produced, prepared, compounded, manufactured, held, sold, dispensed, or distributed.

(g)     None of the Credit Parties or Subsidiaries, or to the knowledge of any Credit Party, Licensed Personnel, is a party to any material corporate integrity agreements, deferred prosecution agreements, monitoring agreements, consent decrees, settlement orders, or similar agreements with or imposed by any Governmental Authority.  Since January 1, 2017, to the knowledge of any Credit Party or Subsidiary, no Person has filed or has threatened to file against any Credit Parties or Subsidiaries, an action under any federal or state whistleblower statute, including without limitation, under the False Claims Act, 31 U.S.C. §§ 3729-3733.

(h)     None of the Credit Parties or Subsidiaries, and to each Credit Party's knowledge, no Licensed Personnel, is, or has been since January 1, 2017, subject to any

1609103405.14
4870-1742-7140, v. 3

civil or criminal suit, case, claim, administrative hearing or investigation by any federal, state or local government or quasi-governmental body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the U.S. Department of Health and Human Services): (i) that would reasonably be expected to result in the imposition of a material fine or sanction, or a materially lower reimbursement rate for services rendered; (ii) that pertains to a potential overpayment matter involving the submission of claims to such payor by any Credit Party or any Subsidiary (excluding any resolved overpayment investigated in an audit conducted in the ordinary course, *e.g.*, a standard CMS recovery audit contractor audit); or (iii) that would reasonably be expected to result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, Third-Party Payor Authorization or Necessary Authorizations of any Credit Party or Subsidiary, or any Licensed Personnel.

(i)     None of the Credit Parties or Subsidiaries or, to the knowledge of each Credit Party, any employee, contractor, or agent of such entity (i) has knowingly retained any material overpayment received from, or failed to refund any amount due to, any Third-Party Payor Programs, in violation of any Health Care Law or contract, (ii) has received notice of, or has knowledge of, any material overpayment or refunds due to any Third-Party Payor Programs or (iii) has received notice of, or has knowledge of, any payment suspension or withholding by any Third-Party Payor Programs.

(j)     None of the Credit Parties or Subsidiaries has received any notice or communication from the FDA or any other Governmental Authority alleging material noncompliance with any Health Care Law, including, without limitation, any Form FDA 483, notice of inspectional observation, notice of adverse finding, notice of violation, warning letters, untitled letters or other notices from the FDA.  No product has been seized, withdrawn, recalled, detained, or subject to a suspension by any Governmental Authority. No Credit Party is aware of any facts or circumstances that could result in any recall of any product.

(k)     To the knowledge of each Credit Party, all products, manufactured, distributed, sold, prescribed, marketed and promoted or delivered by or on behalf of the Credit Parties and their Subsidiaries, that are subject to the jurisdiction of the FDA and any other Governmental Authority have been and are being manufactured, prepared, assembled, packaged, labeled, distributed, sold, prescribed, marketed and promoted and delivered in compliance in all material respects with all Health Care Laws.

(l)     Each Covered Entity and Business Associate (each as defined in HIPAA) owned, managed or operated by any Credit Party or Subsidiary is, and for the last three (3) years has been, in compliance in all material respects with the applicable requirements of Privacy Laws, including but not limited to having business associate or confidentiality agreements in effect with all Business Associates and/or Subcontractors (as defined by HIPAA) where required pursuant to 45 CFR §§ 164.308(b)(1) and 164.502(e)(1). Each Credit Party and Subsidiary is and has been in compliance in all material respects with: (i) all contracts or other arrangements in effect between any Credit Party or Subsidiary and any Third Party, Covered Entity, Subcontractor or Business Associate that apply to or restrict the use, disclosure or security of Personal Information by such Credit Party or

- 66 -

Subsidiary, or by any Third Party, Covered Entity, Subcontractor or Business Associate of a Credit Party or Subsidiary (collectively, "**Privacy Agreements**"); (ii) privacy policies or terms of use pursuant to which a Credit Party or any Subsidiary collects, processes, uses, or transfers Personal Information; and (iii) the terms of any consents, authorizations, waiver of authorization or other permission pursuant to which any Credit Party or Subsidiary accesses, uses, or discloses Personal Information (collectively, "**Privacy Consents**"). Each Credit Party and Subsidiary have not and do not distribute marketing communications to any data subject, except as permitted by and in compliance with the Privacy Laws. Each Credit Party and Subsidiary has in place, and each Credit Party and Subsidiary complies and has complied in all material respects with, written policies to protect the security and privacy of Personal Information. Each Credit Party and Subsidiary has the right pursuant to the Privacy Agreements, the Privacy Consents and their respective privacy and security policies to use and disclose Personal Information for the purpose such information is and has been used and disclosed. Each Credit Party and Subsidiary has, and has since inception maintained, commercially reasonable physical, technical, organizational and administrative security safeguards to protect Personal Information collected by or on behalf of any Credit Party or Subsidiary from and against unauthorized access, use and/or disclosure and that comply with all Privacy Agreements, all Privacy Consents and applicable Privacy Laws. No Credit Party or Subsidiary has received a complaint from any Person or Governmental Authority regarding any Credit Party's or Subsidiary's, or any of their respective agents, employees or contractors', uses or disclosures of, or security practices or security incidents regarding, Personal Information. In the last three (3) years, there have not been any non-permitted uses or disclosures, security incidents, or breaches involving Personal Information held or collected by or on behalf of any Credit Party or Subsidiary. No Credit Party or Subsidiary is subject to any pending Claim, or, to the knowledge of any Credit Party, is any Claim threatened against any Credit Party or Subsidiary by any third party or entity, including any Governmental Authority, alleging (i) a violation of any third party or entity's privacy, personal or confidentiality rights under any Privacy Laws, or (ii) the failure of any Credit Party or Subsidiary with respect to any security audit.

9.26.   Sanctions; Anti-Corruption.

(a)   None of the Credit Parties nor any of their directors, officers, or employees, nor to the knowledge of the Credit Parties, any Affiliates, agents, representatives, or other Persons acting for or on behalf of any Credit Parties is owned or Controlled by Persons that are: (i) the subject or target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State, the United Nations Security Council, the European Union, His Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, currently, Crimea, Cuba, Iran, North Korea and Syria).

(b)   The Credit Parties and their respective directors, officers and employees, and, to the knowledge of the Credit Parties, any Affiliates of any Credit Parties, and their respective agents, representatives, or other Persons acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, are in compliance with all

- 67 -

applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") and any other applicable anti-corruption Law, in all material respects.

9.27.    No Default.    Except where failure or non-compliance is permitted by the Bankruptcy Code, none of the Borrower or any of its Subsidiaries is in default with respect to any other note, indenture, loan agreement, mortgage, lease, deed, or other agreement to which the Borrower or such Subsidiary is a party or by which it is bound (other than the Prepetition Loan Documents, the Prepetition Note Documents, or the Existing Seller Notes) except as would not reasonably be expected to have a Material Adverse Effect.

9.28.    Approved Budget.    The Approved Budget is based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact, such financial information as it relates to future events are subject to uncertainties and contingencies, many of which are beyond the Borrower's control, no assurance can be given that such financial information as it relates to future events will be realized and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein and such differences may be material.

**SECTION 10.**    Affirmative Covenants.    Each Credit Party hereby covenants and agrees that on and after the Closing Date and until the Commitments have terminated and the Loans and Notes (in each case together with interest thereon), fees and all other Obligations (other than indemnities described in Section 14.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

10.01.    Information Covenants.    The Borrower will furnish to each Lender:

(a)    Monthly Reports.    Within forty (40) days (or such longer time as the Administrative Agent may permit in its sole discretion) after the end of each fiscal month of the Borrower, (i) the consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month and each of the preceding twelve (12) fiscal months and the related consolidated and consolidating statements of income and consolidated statements of retained earnings and cash flows for such fiscal month and each of the preceding twelve (12) fiscal months, and for the elapsed portion of the fiscal year ended with the last day of such fiscal month, all of which shall be certified by the chief financial officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes and (ii) operating summaries in a form reasonably satisfactory to the Administrative Agent, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year and comparable budgeted figures for such fiscal month as set forth in the applicable budget delivered pursuant to Section 10.01(f).

- 68 -

(b)     Quarterly Financial Statements.  Within sixty (60) days (or such longer time as the Administrative Agent may permit in its sole discretion) after the close of each of the quarterly accounting periods in each fiscal year of the Borrower, (i) the consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated and consolidating statements of income and consolidated statements of retained earnings and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year and comparable budgeted figures for such quarterly accounting period as set forth in the applicable budget delivered pursuant to Section 10.01(f), all of which shall be certified by the chief financial officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, (ii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period, and (iii) a quarterly EBITDA forecast on a consolidated basis for the remainder of such fiscal year, a historical summary of EBITDA to such date from the beginning of such fiscal year, together with an EBITDA forecast for the next fiscal year, in each case on a consolidated basis.

(c)     [Reserved].

(d)     [Reserved].

(e)     Management Letters.   Promptly after the Borrower's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(f)     Budgets.   Within forty five (45) days (or such longer time as the Administrative Agent may permit in its sole discretion) after the close of each fiscal year of the Borrower, a budget in form reasonably satisfactory to the Administrative Agent (including budgeted statements of income, cash flows and stockholders equity, balance sheets and operating figures) (i) for each of the twelve (12) months of such fiscal year prepared in detail and (ii) for the three immediately succeeding fiscal years prepared in summary form, in each case setting forth, with appropriate discussion, the principal assumptions upon which such budget is based.

(g)     Officer's Certificates.  At the time of the delivery of the financial statements provided for in Section 10.01(b), a compliance certificate from an Authorized Officer of the Borrower in the form of Exhibit F.

(h)     Notice of Default, Litigation and Material Events.  Other than with respect to the Chapter 11 Events and Circumstances, promptly, and in any event within three (3) Business Days after any officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default, (ii) any material litigation or governmental investigation or proceeding

- 69 -

or Environmental Claim pending against the Borrower or any of its Subsidiaries which would reasonably be expected to result in a liability in excess of $250,000, (iii) any material audits or post payment reviews by any Third-Party Payor relating to amounts greater than $200,000 in the aggregate which would reasonably be expected to result in a liability in excess of $250,000 upon completion of final disposition, (iv) any litigation or governmental investigation or proceeding or Environmental Claim with respect to any Credit Document, or (v) any other material event, change or circumstance that would reasonably be expected to have a Material Adverse Effect.

(i)     <u>Other Reports and Filings</u>.  Promptly after the filing, delivery or receipt thereof, copies of all financial information, proxy materials, reports, notices and other material communications if any, which the Borrower or any of its Subsidiaries shall (i) publicly file with the Securities and Exchange Commission or any successor thereto (the "**SEC**") or any Governmental Authority or (ii) deliver to or receive from holders (or any trustee, agent or any other representative therefor) of any Subordinated Debt or any of its material Indebtedness pursuant to the terms of the documentation governing the same. Promptly after the delivery or receipt thereof, any material notices, reports or other information to or from any Governmental Authority with regulatory authority over the Borrower or any of its Subsidiaries.

(j)     <u>Environmental Matters</u>.  Promptly after any officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, would reasonably be expected to result in a liability in excess of $250,000 or otherwise have a Material Adverse Effect:

(i)     any pending or threatened Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries;

(ii)     any condition or occurrence on or arising from any Real Property currently or formerly owned, leased or operated by the Borrower or any of its Subsidiaries that (a) results in noncompliance by the Borrower or any of its Subsidiaries with any applicable Environmental Law or permit or (b) would reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries or any such Real Property;

(iii)     any condition or occurrence on any Real Property currently or formerly owned, leased or operated by the Borrower or any of its Subsidiaries that would reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Borrower or any of its Subsidiaries of such Real Property under any applicable Environmental Law; and

(iv)     the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property currently or formerly owned, leased or operated by the Borrower or any of its Subsidiaries to

the extent required by applicable Environmental Law; provided that in any event the Borrower shall deliver to each Lender all notices received by the Borrower or any of its Subsidiaries from any Governmental Authority under, or pursuant to, CERCLA which identify the Borrower or any of its Subsidiaries as potentially responsible parties for remediation costs or which otherwise notify the Borrower or any of its Subsidiaries of potential liability under CERCLA.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Borrower's or such Subsidiary's response thereto.

(k)    Insurance. Prior to the end of each fiscal year of the Borrower, the Borrower shall deliver a report by the Credit Parties' insurance broker(s) in form and substance satisfactory to the Administrative Agent outlining all material insurance coverage maintained as of the date of such report and updated insurance certificates evidencing all insurance policies of the Borrower and its Subsidiaries maintained in accordance with Section 10.03 hereof, together with an explanation of any projected changes to such insurance coverage for the forthcoming fiscal year.

(l)    Notices with Respect to Vendor Lien Agreement Documents. Promptly, and in any event within three (3) Business Days after receipt or delivery thereof, as applicable, copies of default notices, material amendments and other material deliverables (other than in the ordinary course of business) which any Credit Party receives or delivers with respect to any Vendor Lien Agreement Document.

(m)    Other Information. From time to time, such other information or documents (financial or otherwise) with respect to the Borrower or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

(n)    Lender Calls. Upon the reasonable request of the Administrative Agent, Lender Advisors or the Lenders, the Credit Parties shall hold weekly conference calls or video calls among the Credit Parties' relevant senior management, the Credit Parties' advisors, the Lender Advisors, and the Lenders, which update calls may cover the Credit Parties' financial performance, the latest budget approved for variance testing, the Credit Parties' variance reports, the other information provided pursuant to Section 10.01, and such other matters as may be reasonably requested by the Administrative Agent.

(o)    Governmental Authorities. Promptly upon receipt by the Borrower or any of its Subsidiaries, notice of a written recommendation from any Governmental Authority or other regulatory body that the Borrower or any of its Subsidiaries should have its Necessary Authorization, licensure, provider or supplier number or accreditation suspended, revoked, or limited in any material way, or have its eligibility to participate in Medicare, Medicaid or any other Governmental Payor to accept assignments or rights to reimbursement under Medicare, Medicaid, or any other Governmental Payor regulations suspended, revoked, or limited in any material way.

(p)    <u>Subordinated Debt Notices</u>.  Promptly following receipt, copies of any notices (including notices of default or acceleration) received from any agent, holder or trustee of, under or with respect to any Subordinated Debt.

(q)    <u>Weekly Cash Flow</u>.  Not later than 5:00 p.m. New York City time on every Friday following the Closing Date (the "**Cash Flow Deadline**"), deliver to the Lenders a statement of cash flows (including actual bank balances) covering the thirteen (13)-week period that commences with the Monday of the calendar week immediately preceding such Cash Flow Deadline.

(r)    <u>Chapter 11 Cases</u>.  Promptly, and in any event within two (2) Business Days after receipt or delivery thereof, as applicable, of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Credit Parties in the Chapter 11 Cases to the Lender Advisors, unless not reasonably practicable under the circumstances (in which case, as soon as reasonably practicable prior to filing).

(s)    <u>Regulatory Notices</u>.  Promptly following receipt, copies of any and all notices or communications from the FDA or any other Governmental Authority alleging material noncompliance with any Health Care Law, including, without limitation, any Form FDA 483, notice of inspectional observation, notice of adverse finding, notice of violation, warning letters, untitled letters or other notices from the FDA.

10.02.  <u>Books, Records and Inspections</u>.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP and all requirements of law shall be made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent or the Collateral Agent to visit, upon reasonable prior notice, and inspect, under guidance of officers of the Borrower or such Subsidiary, any of the properties of the Borrower or such Subsidiary, and to examine the books of account of the Borrower or such Subsidiary and discuss the affairs, finances and accounts of the Borrower or such Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or the Collateral Agent may reasonably request.  Subject to the term of the Interim DIP Order, the Borrower shall pay to the Administrative Agent and the Collateral Agent, as applicable, promptly at the conclusion of any evaluation performed by or for the benefit of the Lenders (whether such examination is performed by the Administrative Agent's or Collateral Agent's employees or by a third party retained by the Administrative Agent or the Collateral Agent) after the occurrence and during the continuation of an Event of Default, all reasonable and documented costs and disbursements incurred by the Administrative Agent or the Collateral Agent in the performance of such examination or analysis, and, if third parties are retained to perform such evaluations, either at the request of the Administrative Agent or the Collateral Agent or for extenuating reasons determined by the Administrative Agent or the Collateral Agent in its sole discretion, such fees charged by such third parties plus all costs and disbursements incurred by such third party.

10.03.  <u>Maintenance of Property; Insurance</u>.

(a)      The Borrower will, and will cause each of its Subsidiaries to, subject to any entry of any required orders of the Bankruptcy Court including the entry of the DIP Orders, as applicable, (i) keep all property necessary to the business of the Borrower and its Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events, natural catastrophe and other covered occurrences or events that may cause damage to, or partial or complete loss of, the property, (ii) maintain or cause to be maintained in full force and effect all policies of insurance with respect to the property and business of the Borrower and its Subsidiaries (including, without limitation, policies with respect to (a) commercial general liability, (b) commercial auto, (c) workers compensation and employers liability; (d) umbrella and excess liability, (e) commercial property including coverage for material damages and business interruption, (f) errors and omissions, (g) directors and officers liability, (h) employment practices liability, (i) crime, and (j) fiduciary liability) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Borrower and its Subsidiaries (other than with respect to business interruption policies, which such policies shall provide for actual loss sustained of not less than one year in coverage), and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried. In addition to the requirements of the immediately preceding sentence, the Borrower will at all times cause insurance to be maintained (with the same scope of coverage as that described above) at levels which are consistent with their practices immediately before the Closing Date unless such change is mutually agreed by the Borrower and the Administrative Agent.  The Borrower shall take all actions reasonably requested by Administrative Agent or the Collateral Agent to assist in ensuring that each Lender is in compliance with the Flood Laws, including, but not limited to, providing such agent with the address and/or GPS coordinates of each structure located upon any Real Property that will be subject to a Mortgage (if any) in favor of the Collateral Agent, for the benefit of Lenders, and, to the extent required, obtaining flood insurance through the National Flood Insurance Program for any such property, structures and contents located in a special flood hazard area prior to such property, structures and contents becoming Collateral.

(b)      The Borrower will, and will cause each of its Subsidiaries to, at all times maintain (i) property insurance providing that the Borrower and the Collateral Agent are loss payees, and (ii) commercial general liability insurance adding the Collateral Agent as an additional insured.  Such policies (x) shall state that such insurance policies shall not be canceled or materially revised without at least 30 days' (or 10 days' for cancellation due to nonpayment of premium) prior written notice thereof by the respective insurer to the Collateral Agent; <u>provided</u>, <u>however</u>, that if the relevant insurer is unable to state that the Collateral Agent will receive notice of any material revisions, the Borrower shall be responsible for providing such advance notice and (y) shall provide with respect to the commercial general liability, workers compensation, and commercial property insurance that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors.

- 73 -

(c)    If the Borrower or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 10.03, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all costs and expenses of procuring such insurance.

10.04.  Existence; Franchises.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to (x) preserve and keep in full force and effect its existence and its rights, franchises, licenses, permits, copyrights, trademarks and patents, each of which shall be held in the name of the Borrower, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and (y) maintain all material Necessary Authorizations, each of which shall be held in the name of the Borrower; provided, however, that nothing in this Section 10.04 shall prevent (i) sales of assets and other transactions by the Borrower or any of its Subsidiaries in accordance with Section 11.02 or (ii) the withdrawal by the Borrower or any of its Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.05.  Compliance with Statutes, etc.  The Borrower will, and will cause each of its Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.06.  Compliance with Environmental Laws.  The Borrower will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to the Borrower or any of its Subsidiaries, or required of the Borrower or any of its Subsidiaries by, the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, except such noncompliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses required of the Borrower or any of its Subsidiaries in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws.  None of the Borrower or any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of at or transported from any such Real Properties in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and maintenance of the business or operations of the Borrower or any of its Subsidiaries.

10.07.  ERISA.  As soon as possible and, in any event, within ten (10) days after the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, the Borrower will deliver a written notification to the Administrative Agent setting forth the full details as to such occurrence and the action, if any, that the Borrower, such Subsidiary or such ERISA Affiliate is required or proposes to take, together

- 74 -

with any notices required or proposed to be given or filed by the Borrower, such Subsidiary, the Plan administrator or such ERISA Affiliate to or with the PBGC or any other Governmental Authority, or a Plan participant and any notices received by the Borrower, such Subsidiary or ERISA Affiliate from the PBGC or any other Governmental Authority, or a Plan participant with respect thereto:  that a Reportable Event has occurred (except to the extent that the Borrower has previously delivered to the Lenders a certificate and notices (if any) concerning such event pursuant to the next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that a failure to satisfy the minimum funding standards of ERISA or the Code has occurred in any plan year or part thereof or a waiver of such standards or extension of any amortization period is sought or granted under Section 412 of the Code; that any contribution required to be made with respect to a Plan has not been timely made; that a Plan has been or could reasonably be expected to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA; that a Plan has an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds the aggregate amount of such Unfunded Current Liabilities that existed on the Closing Date by $2,500,000; that proceedings could reasonably be expected to be or have been instituted to terminate or appoint a trustee to administer a Plan; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate will or could reasonably be expected to incur any liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or any material liability with respect to a Plan under Section 401(a)(29), 4971, 4975 or 4980 of the Code or Section 409, 502(i) or 502(l) of ERISA or, with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code), will or is expected to incur material liability under Section 4980B of the Code; or that the Borrower or any Subsidiary of the Borrower could reasonably be expected to incur any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA).  The Borrower will deliver to each of the Lenders copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA.  In addition to any certificates or notices delivered to the Administrative Agent pursuant to the first sentence hereof, copies of any reports, records, documents or other information required to be furnished to the PBGC or any other Governmental Authority, and any material notices received by the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate with respect to any Plan, shall be delivered to the Administrative Agent no later than ten (10) days after the date such records, documents and/or information has been furnished to the PBGC or any other Governmental Authority, as applicable, or such notice has been received by the Borrower, the Subsidiary or the ERISA Affiliate, as applicable.

10.08.  <u>End of Fiscal Years; Fiscal Quarters</u>.  The Borrower will cause (i) its and each of its Subsidiaries' fiscal years to end on December 31 of each calendar year and (ii) its and each of its Subsidiaries' fiscal quarters to end on March 31, June 30, September 30 and December 31 of each calendar year.

10.09.  [Reserved].

10.10.  <u>Payment of Taxes</u>.  The Borrower will timely pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, as such amount becomes due and payable, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Borrower or any of its Subsidiaries not otherwise permitted under <u>Section 11.01(a)</u>; <u>provided</u> that none of the Borrower or any of its Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

10.11.  <u>Use of Proceeds</u>.  The Borrower will use the proceeds of the Loans only as provided in <u>Section 9.08</u>.

10.12.  [Reserved].

10.13.  [Reserved].

10.14.  [Reserved].

10.15.  <u>Vendor Lien Agreement Documents</u>.  No Credit Party will, and no Credit Party will permit any Subsidiary to, enter into, acquire or otherwise become bound by any Vendor Lien Agreement Document (other than any agreement currently as in effect on the Closing Date and any amendment thereto permitted hereunder), unless the terms of such Vendor Lien Agreement Document and any documents executed in connection therewith, including, without limitation, any subordination terms or agreements, are in form and substance satisfactory to the Administrative Agent in its reasonable discretion.

10.16.  <u>Sanctions; Anti-Corruption Laws</u>.  From and after the date that is 90 days after the Closing Date, the Credit Parties shall maintain in effect policies and procedures designed to promote compliance by the Credit Parties and their respective Subsidiaries, directors, officers, employees, and agents with applicable Sanctions and with the FCPA and any other applicable anti-corruption Laws.

10.17.  [Reserved].

10.18.  <u>Maintenance of Company Separateness</u>.  The Borrower will, and will cause each of its Subsidiaries to, satisfy customary Company formalities, including, as applicable, (i) the holding of regular board of directors' and shareholders' meetings or action by directors or shareholders without a meeting, (ii) the maintenance of separate Company records and (iii) the maintenance of separate bank accounts in its own name.  None of the Borrower or any of its Subsidiaries shall take any action, or conduct its affairs in a manner, which is likely to result in the Company existence of the Borrower or any of its Subsidiaries being ignored, or in the assets and liabilities of the Borrower or any of its Subsidiaries being substantively consolidated with those of any other such Person in a bankruptcy, reorganization or other insolvency proceeding.

10.19.  [Reserved].

10.20.  Keepwell.  If it is a Qualified ECP Credit Party, then jointly and severally, together with each other Qualified ECP Credit Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Swap Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any other Credit Document in respect of Swap Obligations (provided, however, that each Qualified ECP Credit Party shall only be liable under this Section 10.20 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.20, or otherwise under this Agreement or any other Credit Document, voidable under applicable law, including applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Credit Party under this Section 10.20 shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the other Credit Documents.  Each Qualified ECP Credit Party intends that this Section 10.20 constitute, and this Section 10.20 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of the Borrower and each Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the CEA.

10.21.  Payment of Principal, Premium and Interest.  Subject to Bankruptcy Court approval, the Borrower shall duly and punctually pay the principal and all interest on the Loans and all other fees, costs and expenses owed hereunder in accordance with the terms of this Agreement.  The Borrower shall pay interest on overdue principal (including post-petition interest in a proceeding under Title 11 of the United States Code and/or any similar legislation in a relevant jurisdiction), and interest on overdue interest, to the extent lawful, at the rate specified in this Agreement.

10.22.  Regulatory Status.  The Borrower will, and will cause each of its Subsidiaries to, comply with all Health Care Laws as set forth in Section 9.25. The Borrower will, and will cause each of its Subsidiaries to, (i) maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any facility for its current use, all Necessary Authorizations under Health Care Laws to continue to receive reimbursement under all material Third-Party Payor Programs in which the Borrower and any of its Subsidiaries participates except where any such failure could not reasonably be expected to have a Material Adverse Effect, and (ii) provide upon request, an accurate, complete and current list of all payor agreements.  The Borrower will, and will cause each of its Subsidiaries to, at all times comply with all requirements, contracts, conditions and stipulations applicable to the Borrower or any of its Subsidiaries in order to maintain in good standing and without default or limitation all such payor agreements except where any such failure could not reasonably be expected to have a Material Adverse Effect.

10.23.  Milestones.  The Credit Parties shall satisfy the requirements of each Milestone, including by the time, to the extent, and in the manner required thereby (or as otherwise agreed to by the Lenders in writing).

10.24.  Bankruptcy Related Matters.

(a)     The Credit Parties shall cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Obligations and/or the Credit Documents, the Prepetition Indebtedness and applicable loan documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) the Chapter 11 Plan and/or the disclosure statement related thereto, (v) orders concerning the financial condition of the Debtors, or other Indebtedness of the Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors, to be in accordance with the terms of this Agreement and the Restructuring Support Agreement, to the extent applicable.

(b)     The Credit Parties shall comply in all respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases and with the terms of the Restructuring Support Agreement.

(c)     The Credit Parties shall deliver to the Administrative Agent not less than two (2) full Business Days (or, if not reasonably practicable as a result of exigent circumstances, as soon as reasonably practicable) prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Credit Parties with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect any of the Secured Creditors, or distributed by or on behalf of the Credit Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest, and shall consult in good faith with the Lenders regarding the form and substance of any such document.

(d)     The Credit Parties shall if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Credit Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest.

**SECTION 11.**          Negative Covenants.

Each Credit Party hereby covenants and agrees that on and after the Closing Date and until the Commitments have terminated and the Loans and Notes (in each case, together with interest thereon), fees and all other Obligations (other than any indemnities described in Section 14.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

11.01.  Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to the Borrower or any of its Subsidiaries), or assign any right to receive

income; provided that the provisions of this Section 11.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "**Permitted Liens**"):

(a)      inchoate Liens for Taxes not yet due or Liens for Taxes being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)      Liens in respect of property or assets of the Borrower or any of its Subsidiaries imposed by law, which were incurred in the Ordinary Course of Business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the Ordinary Course of Business, and (x) which do not in the aggregate materially detract from the value of the Borrower's or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of the Borrower or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)      Liens in existence on the Closing Date and the property subject thereto, plus renewals, replacements and extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension (except in the case of obligations owing to Cardinal Health under the Cardinal Health Agreement or to McKesson under the McKesson PVA, so long as in each case the obligations secured under such agreements are limited to obligations arising with respect to items sold or supplied to Borrower by Cardinal Health or McKesson, as applicable, under such agreements). and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of the Borrower or any of its Subsidiaries;

(d)      Liens created by or pursuant to this Agreement, the Security Documents and the DIP Orders;

(e)      (x) licenses, sublicenses, leases or subleases granted by the Borrower or any of its Subsidiaries to other Persons that are not materially interfering with, the conduct of the business of the Borrower or any of its Subsidiaries and (y) any interest or title of a lessor, sublessor or licensor under any lease or license agreement not prohibited by this Agreement to which the Borrower or any of its Subsidiaries is a party;

(f)      Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 11.04(d), provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligations and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of the Borrower or any Subsidiary of the Borrower;

(g)      Liens placed upon property, equipment or machinery acquired after the Closing Date and used in the Ordinary Course of Business of the Borrower or any of its

- 79 -

Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within ninety (90) days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such property, equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 11.04(d) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any other asset of the Borrower or any of its Subsidiaries;

(h)    easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(i)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the Ordinary Course of Business;

(j)    Liens arising out of the existence of judgments or awards that would not result in an Event of Default under Section 12.09, for which adequate reserves have been established in accordance with GAAP;

(k)    statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(l)    Liens (other than Liens imposed under ERISA) incurred in the Ordinary Course of Business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the Ordinary Course of Business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business and consistent with past practices (exclusive of obligations in respect of the payment for borrowed money); provided that the aggregate amount of all cash and the Fair Market Value of all other property subject to all Liens permitted by this clause (l) shall not at any time exceed $750,000;

(m)    Permitted Encumbrances;

(n)    [reserved];

(o)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the Ordinary Course of Business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(p)    Liens (x) incurred in the Ordinary Course of Business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

- 80 -

(q)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the Ordinary Course of Business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(r)    Liens on cash deposits of a Credit Party pledged to secure performance bonds, surety bonds, appeal bonds or customs bonds; provided that the aggregate amount of all cash subject to Liens permitted by this clause (r) shall not at any time exceed the amounts permitted under Section 11.04(i);

(s)    Liens on Cash Collateral, to the extent securing Indebtedness permitted pursuant to Section 11.04(j);

(t)    Liens on insurance premiums securing Indebtedness incurred by any Credit Party pursuant to Section 11.04(o);

(u)    Liens in favor of collecting banks arising under Section 4-210 of the UCC;

(v)    Liens consisting of an agreement to sell, transfer or otherwise dispose of any property in a disposition permitted by Section 11.02, solely to the extent such disposition would have been permitted under this Agreement on the date of the creation of such Lien;

(w)    Liens that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the Ordinary Course of Business;

(x)    Subject to Section 10.15, Liens granted pursuant to Vendor Lien Agreement Documents;

(y)    Liens securing the Prepetition Credit Obligations; and

(z)    additional Liens of the Borrower or any of its Subsidiaries not otherwise permitted by this Section 11.01 that do not secure obligations in excess of $500,000 in the aggregate for all such Liens at any time.

In connection with the granting of Liens of the type described in clauses (c), (f), (g), (i) and (n) of this Section 11.01 by the Borrower or any of its Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

11.02.    Consolidation, Merger, Purchase or Sale of Assets, etc.    The Borrower will not, and will not permit any of its Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, plan of division, transaction of merger or consolidation, or convey, sell,

- 81 -

divide, lease or otherwise dispose of all or any part of its property or assets (other than sales of inventory in the Ordinary Course of Business), or enter into any sale-leaseback transactions, or purchase or otherwise acquire (in one or a series of related transactions) any part of the property or assets (other than purchases or other acquisitions of inventory, materials, assets and equipment in the Ordinary Course of Business) of any Person (or agree to do any of the foregoing at any future time), except that:

(a) Capital Expenditures by the Borrower and any of its Subsidiaries shall be permitted;

(b) the Borrower and its Subsidiaries may, in the Ordinary Course of Business, (i) liquidate or otherwise dispose of obsolete, surplus or worn-out property or property no longer used or useful in the operations of the Borrower and its Subsidiaries and (ii) conduct sales of inventory in the Ordinary Course of Business;

(c) Investments may be made to the extent permitted by Section 11.05;

(d) the Borrower and its Subsidiaries may sell assets (other than the capital stock or other Equity Interests of any Wholly-Owned Subsidiary), so long as (v) no Default or Event of Default then exists or would result therefrom, (w) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value, (x) the consideration received by the Borrower or such Subsidiary consists of at least 75% cash and is paid at the time of the closing of such sale, (y) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 6.02(e) and (z) the aggregate amount of the cash and non-cash proceeds received from all assets sold pursuant to this clause (d) shall not exceed $1,000,000 in any fiscal year of the Borrower (for this purpose, using the Fair Market Value of property other than cash);

(e) the Borrower and its Subsidiaries may lease (as lessee) or license (as licensee) real or personal property (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 11.04(d));

(f) the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the Ordinary Course of Business, accounts receivable arising in the Ordinary Course of Business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(g) the Borrower and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the Ordinary Course of Business and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries;

(h) (i) any Credit Party may convey, sell or otherwise transfer all or any part of its business, properties and assets to any other Credit Party and (ii) any Subsidiary that is not a Credit Party may convey, sell or otherwise transfer all or any part of its business, properties and assets to the Borrower or any of its Subsidiaries, in each case, so long as with respect to the Collateral, any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the Collateral so

- 82 -

transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer) and all actions required to maintain said perfected status have been taken;

(i)    the Borrower and its Subsidiaries may merge or consolidate with and into, or be dissolved or liquidated into, the Borrower or any of its Subsidiaries, so long as (i) in the case of any such merger, consolidation, dissolution or liquidation involving the Borrower, the Borrower is the surviving or continuing entity of any such merger, consolidation, dissolution or liquidation, (ii) in all other cases of any such merger, consolidation, dissolution or liquidation involving a Subsidiary Guarantor, such Subsidiary Guarantor is the surviving or continuing corporation of any such merger, consolidation, dissolution or liquidation, and (iii) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of the Borrower or such Subsidiary Guarantor shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been taken;

(j)    the surrender or waiver of contractual rights or the settlement, release or surrender of contract or tort claims in the Ordinary Course of Business;

(k)    [reserved];

(l)    the Borrower and its Subsidiaries may liquidate or otherwise dispose of cash and Cash Equivalents in the Ordinary Course of Business, in each case for cash at Fair Market Value and in a transaction not otherwise prohibited by the other terms of this Agreement;

(m)    the abandonment or other disposition of Intellectual Property that is, in the reasonable good faith judgment of a Credit Party, as applicable, no longer economically practicable or commercially desirable to maintain or used or useful in the conduct of the business of such Credit Party; and

(n)    the Borrower and its Subsidiaries may dispose of property pursuant to sale-leaseback transactions, so long as (v) no Default or Event of Default then exists or would result therefrom, (w) each such transaction is in an arm's-length transaction and the Borrower or the Subsidiary, as applicable, receives at least Fair Market Value, (x) the consideration received by the Borrower or the Subsidiary, as applicable, consists of at least 90% cash, (y) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 6.02(e) and (z) the Fair Market Value of all property so disposed of shall not exceed $250,000 in any fiscal year.

To the extent the Required Lenders waive the provisions of this Section 11.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 11.02 (other than to the Borrower or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents and the Lien on any such Collateral shall be deemed automatically released (provided that such Lien shall continue as to any proceeds of such sale to

- 83 -

the extent such assets constituted Collateral), and the Administrative Agent and the Collateral Agent shall take, at the Borrower's expense, any actions reasonably requested by the Borrower in order to effect the foregoing.

11.03.  <u>Dividends</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to the Borrower or any of its Subsidiaries, except that any Subsidiary of the Borrower may pay cash Dividends to the Borrower or to any Wholly-Owned Subsidiary of the Borrower.

11.04.  <u>Indebtedness</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(a)  Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(b)  Indebtedness outstanding on the Closing Date (the "**Existing Indebtedness**") (as reduced by any repayments of principal thereof), including (other than with respect to Existing Seller Notes) any subsequent extension, renewal or refinancing thereof; <u>provided</u> that the aggregate principal amount of the Indebtedness to be extended, renewed or refinanced does not increase from that amount outstanding at the time of any such extension, renewal or refinancing; <u>provided</u> further, that any Intercompany Debt (and subsequent extensions, refinancings, renewals, replacements and refundings thereof as permitted pursuant to this <u>Section 11.04(b)</u>) shall be subject to the requirements of the proviso to <u>Section 11.05(h)</u>;

(c)  (i) Prepetition Credit Obligations and (ii) Indebtedness incurred pursuant to the Prepetition Note Documents to the extent permitted under the applicable Subordination Agreement;

(d)  Indebtedness of the Borrower and its Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness described in <u>Section 11.01(g)</u>; <u>provided</u> that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this <u>clause (d)</u> exceed $1,000,000 at any time outstanding;

(e)  Indebtedness constituting Intercompany Loans to the extent permitted by <u>Section 11.05(h)</u>;

(f)  Indebtedness consisting of guaranties by the Borrower and the Wholly-Owned Subsidiaries of the Borrower that are Subsidiary Guarantors of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement;

(g)  [reserved];

(h)  Indebtedness arising from (i) customary cash management services, netting arrangements, overdraft protection and automated clearing house transfers, (ii) the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business, so long as such

Indebtedness is extinguished within five Business Days of the earlier its incurrence or any Credit Party becoming aware thereof and (iii) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(i)      Indebtedness of the Borrower and its Subsidiaries with respect to performance bonds, surety bonds, appeal bonds or customs bonds required in the Ordinary Course of Business or in connection with the enforcement of rights or claims of the Borrower or any of its Subsidiaries or in connection with judgments that do not result in an Event of Default;

(j)      Indebtedness of the Borrower or any of its Subsidiaries constituting letters of credit, to the extent Cash Collateralized, in an aggregate amount not to exceed $1,000,000 at any one time outstanding;

(k)      Indebtedness of the Borrower or any of its Subsidiaries which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations in connection with the acquisition or disposition of assets in accordance with the requirements of this Agreement, so long as any such obligations are those of the Person making the respective acquisition or sale, and are not guaranteed by any other Person except as permitted by Section 11.04(f);

(l)      Existing Seller Notes;

(m)      [reserved];

(n)      Indebtedness in connection with sale-leaseback transactions permitted pursuant to Section 11.02(n);

(o)      Indebtedness owing to insurance carriers and incurred to finance insurance premiums of any Credit Party in the Ordinary Course of Business in a principal amount not to exceed at any time the amount of insurance premiums to be paid by such Credit Party;

(p)      Contingent Obligations with respect to bank guarantees, workers' compensation claims, employee benefits or property, casualty or liability insurance but excluding obligations for the payment of borrowed money; and

(q)      Indebtedness arising in the Ordinary Course of Business and consistent with past practice in connection with commercial credit card, merchant card and purchase or procurement card services.

11.05.  Advances, Investments and Loans.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (in each case, including by a division of any Person) (each of the foregoing an "**Investment**" and, collectively, "**Investments**"), except that the following shall be permitted:

- 85 -

(a)     the Borrower and its Subsidiaries may acquire and hold accounts receivables owing to any of them, if created or acquired in the Ordinary Course of Business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(b)     the Borrower and its Subsidiaries may acquire and hold cash and Cash Equivalents;

(c)     the Borrower and its Subsidiaries may hold the Investments held by them on the Closing Date, provided that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 11.05;

(d)     the Borrower and its Subsidiaries may acquire and own Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the Ordinary Course of Business;

(e)     the Borrower and its Subsidiaries may make loans and advances to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the Ordinary Course of Business in an aggregate amount not to exceed $100,000 at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(f)     [reserved];

(g)     [reserved];

(h)     subject in all respects to a cash management order entered by the Bankruptcy Court on a final basis, in form and substance reasonably acceptable to the Lenders in all respects, (i) any Credit Party may make intercompany loans and advances to any other Credit Party, and (ii) any Subsidiary which is not a Credit Party may make intercompany loans and advances to any Credit Party or any other Subsidiary (such intercompany loans and advances referred to in preceding clauses (i) and (ii), collectively, the "**Intercompany Loans**"), provided, that (x) each Intercompany Loan shall be evidenced by an Intercompany Note, (y) each such Intercompany Note owned or held by a Credit Party shall be pledged to the Collateral Agent pursuant to the relevant Security Document and (z) any Intercompany Loans made to any Subsidiary Guarantor pursuant to this clause (h) shall cease to be permitted by this clause (h) if such Subsidiary Guarantor ceases to be a Subsidiary Guarantor;

(i)     any Credit Party may make Investments in any other Credit Party; provided, that (x) any security interest granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in any assets so contributed shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such contribution) and all actions required to maintain said perfected status have been taken and (y) any Investment made in or to any Subsidiary Guarantor pursuant to this clause (i) shall cease to be permitted hereunder if such Subsidiary Guarantor ceases to be a Subsidiary Guarantor;

- 86 -

(j)    the Borrower and its Subsidiaries may own the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement (so long as all amounts invested in such Subsidiaries are independently justified under another provision of this <u>Section 11.05</u>);

(k)    Contingent Obligations permitted by <u>Section 11.04</u>, to the extent constituting Investments;

(l)    [reserved];

(m)    the Borrower and its Subsidiaries may receive and hold promissory notes and other non-cash consideration received in connection with any Disposition permitted by <u>Section 11.02(d)</u>;

(n)    the Borrower and its Subsidiaries may make (i) advances in the form of a prepayment of expenses to vendors, suppliers and trade creditors consistent with their past practices, so long as such expenses were incurred in the Ordinary Course of Business and (ii) deposits of cash in the Ordinary Course of Business to secure performance of operating leases and other contractual obligations that do not constitute Indebtedness, in an aggregate amount not to exceed $250,000 at any one time outstanding; and

(o)    to the extent constituting Investments, Capital Expenditures permitted under <u>Section 11.02</u>.

11.06.    <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Borrower or any of its Subsidiaries (other than the Borrower or any of its Subsidiaries), other than in the Ordinary Course of Business or on terms and conditions substantially as favorable to the Borrower or such Subsidiary as would reasonably be obtained by the Borrower or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(a)    Dividends may be paid to the extent provided in <u>Section 11.03</u>;

(b)    loans may be made and other transactions may be entered into by the Borrower and its Subsidiaries to the extent permitted by <u>Section 11.02</u>, <u>Section 11.04</u> and <u>Section 11.05</u>;

(c)    customary fees, indemnities and reimbursements may be paid to non-officer directors of the Borrower and its Subsidiaries in an amount not to exceed $25,000 per director and $100,000 in the aggregate, in each case in any fiscal year;

(d)    [reserved];

(e)    the Borrower and its Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers,

- 87 -

employees and directors of the Borrower and its Subsidiaries in the Ordinary Course of Business; and

(f)     the Borrower and its Subsidiaries may enter into transactions otherwise expressly permitted under the Credit Documents.

Notwithstanding anything to the contrary contained above in this <u>Section 11.06</u>, unless approved in writing by the Administrative Agent, in no event shall the Borrower or any of its Subsidiaries pay any management, consulting or similar fee to any of their respective Affiliates.

11.07.  <u>Prepetition Note Purchase Agreement Payments</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, make any payments on the Obligations (as defined in the Prepetition Note Purchase Agreement) under the Prepetition Note Documents except such payments that are not prohibited by the applicable Subordination Agreement.

11.08.  <u>Formation or Acquisition of Subsidiaries</u>.  Other than pursuant to the Chapter 11 Plan, no Credit Party shall form a new Subsidiary or acquire Equity Interests in any Person that is not a Subsidiary on the Closing Date.

11.09.  [Reserved].

11.10.  [Reserved].

11.11.  <u>Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc</u>.  The Borrower will not, and will not permit any of its Subsidiaries to:

(a)     amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or other Equity Interests, or enter into any new agreement with respect to its capital stock or other Equity Interests, unless such amendment, modification, change or other action contemplated by this <u>clause (a)</u> could not reasonably be expected to be materially adverse to the interests of the Lenders;

(b)     amend, modify, change or waive any Necessary Authorization or Material Agreement unless such amendment, modification, change or waiver could not reasonably be expected to be adverse to the interests of the Lenders or be materially adverse to the Credit Parties;

(c)     designate any Indebtedness (or related interest obligations) as "Designated Senior Debt" or similar term except for the Obligations;

(d)     on and after the execution and delivery thereof, amend, modify or waive, or permit the amendment, modification or waiver of, any provision of the Intercompany Note without the prior consent of the Administrative Agent unless such amendment,

- 88 -

modification or waiver could not reasonably be expected to be adverse to the interests of the Lenders;

(e)     make any principal or interest payment on, or any redemption or acquisition for value of, or any other payment with respect to any Subordinated Debt except as permitted by the subordination terms of the Subordinated Debt;

(f)     amend or otherwise modify, or waive any rights under any provisions of any Subordinated Debt except as not prohibited by the applicable Subordination Agreements; and

(g)     amend or otherwise modify, or waive any rights under, any provisions of any Prepetition Loan Documents without obtaining the prior written consent of the Administrative Agent and the Lenders.

11.12.   <u>Limitation on Certain Restrictions on Subsidiaries</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other Equity Interests or participation in its profits owned by the Borrower or any of its Subsidiaries, or pay any Indebtedness owed to the Borrower or any of its Subsidiaries, (b) make loans or advances to the Borrower or any of its Subsidiaries or (c) transfer any of its properties or assets to the Borrower or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Borrower or any of its Subsidiaries, (iv) customary provisions restricting assignment of any licensing agreement (in which the Borrower or any of its Subsidiaries is the licensee) or other contract entered into by the Borrower or any of its Subsidiaries in the Ordinary Course of Business, (v) restrictions on the transfer of any asset pending the close of the sale of such asset, and (vi) restrictions on the transfer of any asset subject to a Lien permitted by <u>Section 11.01(c)</u>, <u>(f)</u>, <u>(g)</u>, <u>(o)</u> or <u>(p)</u>.

11.13.   <u>Limitation on Issuance of Equity Interests</u>.

(a)     The Borrower will not, and will not permit any of its Subsidiaries to, issue any redeemable common stock or other redeemable common Equity Interests other than (x) common stock or other redeemable common Equity Interests that is or are redeemable at the sole option of the Borrower or such Subsidiary, as the case may be or (y) redeemable common stock or other redeemable common Equity Interests that are not redeemable prior to ninety one (91) days following the Maturity Date.

(b)     The Borrower will not permit any of its Subsidiaries to issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other Equity Interests, (ii) for stock splits, stock dividends and other issuances which do not decrease the percentage ownership of the Borrower or any of its Subsidiaries

- 89 -

in any class of the capital stock or other Equity Interests of such Subsidiary, (iii) for issuances by Subsidiaries of the Borrower which are newly created or acquired in accordance with the terms of this Agreement and (iv) Non-Wholly Owned Subsidiary or Excluded Subsidiary may issue Equity Interests, subject to compliance with Section 6.02(d).

11.14.  Business; etc.

(a)     The Borrower will not, and will not permit any of its Subsidiaries to, engage directly or indirectly in any business other than the businesses engaged in by the Borrower and its Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary or complementary thereto.

(b)     The Borrower will not make any significant change in accounting treatment or reporting practices, except as required by GAAP.

11.15.  [Reserved].

11.16.  Certain Deposit Accounts.  None of the Credit Parties will maintain any deposit account (other than any Excluded Account), unless such deposit account is (x) subject to a DACA, (y) otherwise under the "control" (within the meaning of Section 9-104 of the New York UCC) of the Collateral Agent, or (z) is otherwise authorized by cash management order entered by the Bankruptcy Court on a final basis, in form and substance reasonably acceptable to the Lenders in all respects.

11.17.  Sanctions; Anti-Corruption Use of Proceeds.  The Borrower will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable anti-corruption Law, or (b) (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as Administrative Agent, Lead Arranger, Lender, underwriter, advisor, investor, or otherwise).

11.18.  Hedge Agreements.   The Borrower will not, and will not permit any of its Subsidiaries to, enter into any hedging agreements.

11.19.  Seller Notes.  The Borrower will not, and will not permit any of its Subsidiaries to, make any payments on any Existing Seller Note.

11.20.  Chapter 11 Cases.  The Borrower shall not (and shall not permit any Subsidiary to), directly or indirectly:

(a)     except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is pari passu with, or senior to, the Obligations (except as may be set forth in the DIP Orders or the Credit Documents);

- 90 -

(b)  incur, create, assume, suffer to exist or permit or file any motion seeking, any lien which is pari passu with, or senior to, the liens granted hereunder or under the Prepetition Credit Agreement (except as may be set forth in the DIP Orders or the Credit Documents);

(c)  make or permit to be made any amendment, modification, supplement or change to the DIP Orders, as applicable, (other than technical modifications to correct grammatical, ministerial or typographical errors) without the prior written consent of the Lenders;

(d)  (i) make payments under any management incentive, severance, retention or other bonus or compensation plan or on account of claims or expenses arising under any section of the Bankruptcy Code, except, in each case, (1) as is consistent with the terms and conditions of the Restructuring Support Agreement or (2) as approved in writing by the Required Lenders, or (ii) (1) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan, except, in each case, (A) as is consistent with the terms and conditions of the Restructuring Support Agreement or (B) as approved in writing by the Lenders or (2) pay or cause to be paid any amount contemplated by such agreements or plans and which are consistent with the terms and conditions of the Restructuring Support Agreement before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case;

(e)  commence any adversary proceeding, contested matter or other action (or otherwise support any party) asserting any claims or defenses or otherwise against (or asserting any surcharge under section 506(c) of the Bankruptcy Code or otherwise against) the Administrative Agent, any Lender, any other Secured Creditor and any Prepetition Secured Parties, the other Credit Documents, the transactions contemplated hereby or thereby, the Prepetition Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby;

(f)  use any cash collateral, proceeds of the Loans, or any cash or other amounts to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the Liens securing the Loans, the Liens securing the Prepetition Indebtedness or the Obligations hereunder, (b) investigate or initiate any claim or cause of action against any of the Administrative Agent, the Collateral Agent or the Lenders or Prepetition Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the Lenders or the Prepetition Secured Parties, (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the Credit Documents and the DIP Orders) that are senior to or pari passu with the Liens securing the Prepetition Indebtedness, the DIP Superpriority Claims or the adequate protection liens or claims granted under the DIP Orders or (e) take any other actions prohibited by the DIP Orders; or

(g)  except as otherwise provided herein, file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Credit Parties without consulting with the Lenders and providing the Lenders five (5)

Business Days' (or as soon thereafter as is practicable) notice and the opportunity to review and comment on each such motion.

**SECTION 12.**    Events of Default.

Upon the occurrence of any of the following specified events (each, an "**Event of Default**"):

12.01.  Payments.  The Borrower shall (i) default in the payment when due of any principal or Prepayment Premium of any Loan or any Note or (ii) default, and such default shall continue unremedied for three (3) or more Business Days, in the payment when due of any interest on any Loan or Note or any Fees or any other amounts owing hereunder or under any other Credit Document or the DIP Orders; or

12.02.  Representations, etc.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent, the Collateral Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

12.03.  Covenants.  The Borrower or any of its Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 10.01(a), (b), (d), (f), (g), (h) and (i)(i), Section 10.04, Section 10.11, Section 10.12, Section 10.22, Section 10.23, Section 10.24, or Section 11 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document (other than those set forth in Sections 12.01 and Section 12.02) and such default under this clause (ii) of Section 12.03 shall continue unremedied for a period of 30 days after the after the earlier to occur of (A) the date upon which any senior executive officer of any Credit Party becomes aware of such default and (B) the date upon which written notice thereof is given to the Borrower by the Administrative Agent or Required Lenders; or

12.04.  Default Under Other Agreements.  Except with respect to any already existing and continuing prior Defaults or Events of Default under the Prepetition Credit Agreement the Prepetition Note Documents and/or the Existing Seller Notes, (a) The Borrower or any of its Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond any period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its stated maturity, or (b) any Indebtedness (other than the Obligations) of the Borrower or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid (other than by (x) a regularly scheduled required prepayment or (y) a mandatory prepayment (unless such required prepayment or mandatory prepayment results from a default thereunder or an event of the type that constitutes an Event of Default)) beyond any period of grace, prior to the stated maturity thereof; provided that it shall not be a Default or an Event of

- 92 -

Default under this Section 12.04 unless (A) the aggregate principal amount of all Indebtedness as described in preceding clauses (a) and (b) is at least $1,000,000 and (B) any such default arises by reason of a prohibition on payment or performance contained in a Credit Document; or

12.05.  Compliance with Regulations.  Any Credit Party fails to materially comply with all regulations applicable to such Credit Party's operations; or

12.06.  ERISA.  (a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code or Section 303 or 304 of ERISA; a Reportable Event shall have occurred; a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following thirty (30) days; any determination that any Plan or Multiemployer Plan is considered at-risk or in endangered or critical status as defined in Section 303, 304 and 305 of ERISA or Sections 430, 431 and 432 of the Code; any Plan or Multiemployer Plan shall have had or is likely to have a trustee appointed to administer such Plan or Multiemployer Plan; any Plan or Multiemployer Plan is, shall have been or is likely to be the subject of termination proceedings under ERISA, a contribution required to be made with respect to a Plan or a Multiemployer Plan has not been timely made, the Borrower or any Subsidiary of the Borrower or any ERISA Affiliate has incurred or is likely to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4071, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code, a "default" (within the meaning of Section 4219(c)(5) of ERISA) shall occur with respect to any Plan; (b) there shall result from any such event or events described in clause (a) the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, described in clause (b) individually and/or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect; or

12.07.  Security Documents.  Any of the Security Documents shall fail or cease to be in full force and effect, or shall fail or cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 11.01)), and subject to no other Liens (except as permitted by Section 11.01); or

12.08.  Guaranties.  Any Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party; or

12.09.  Judgments.  One or more judgments or decrees shall be entered against the Borrower or any Subsidiary of the Borrower involving in the aggregate for the Borrower and its Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance

- 93 -

company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of sixty (60) consecutive days, and the aggregate amount of all such judgments equals or exceeds $1,000,000; provided, that any judgement or order for payment that is subject to the automatic stay as a result of the commencement of the Chapter 11 Cases shall not be an Event of Default under this Section 12.09; or

12.10.  Change of Control.  A Change of Control shall occur; or

12.11.  Subordination.  (i) The subordination provisions of the documents evidencing or governing any Subordinated Debt (the "**Subordinated Provisions**") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of applicable subordinated Indebtedness; or (ii) the Borrower or any other Credit Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordinated Provisions, (B) that the Subordinated Provisions exist for the benefit of the Administrative Agent, the Collateral Agent and the Lenders or (C) that all payments of principal of or premium and interest on the applicable subordinated Indebtedness, or realized from the liquidation of any property of any Credit Party, shall be subject to any of the Subordinated Provisions; or

12.12.  Defaults Under Vendor Lien Agreement Documents.  Except as arising out of the Chapter 11 Events and Circumstances, a delinquency, default, event of default, acceleration or other exercise of remedies occurs pursuant to any Vendor Lien Agreement Document with respect to which the collateral granted to such vendor has a value in excess of $100,000; or

12.13.  Material Agreements.  Except as arising out of the Chapter 11 Events and Circumstances, any default or event of default (monetary or otherwise) by a Credit Party shall occur with respect to any Material Agreement that could reasonably be expected to have a Material Adverse Effect, and which, if curable, has not been cured in accordance with the provisions of the applicable Material Agreement; or

12.14.  Closing Date.  The Closing Date shall not have occurred within three (3) days of the Petition Date; or

12.15.  Chapter 11 Cases.  There shall have occurred any of the following in the Chapter 11 Cases:

(a)     the Final DIP Order, in form and substance reasonably satisfactory to the Lenders, shall not have been entered within forty five (45) days following the Petition Date;

(b)     the Debtors fail to comply with the Approved Budget (subject to Permitted Variances);

(c)     the Debtors fail to satisfy any Milestone within five (5) Business Days of the due date of such Milestone;

(d)     the bringing of a motion by any Credit Party in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) except as provided

- 94 -

in this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, obtaining additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash; (ii) granting any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral; (iii) except as provided in this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, authorizing use of cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders; (iv) that (in the case of any Credit Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Credit Party) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent and the Lenders hereunder or their interest in the Collateral; or (v) the consensual use of prepetition cash collateral is terminated or modified, or the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of cash collateral other than as provided in this Agreement and the DIP Orders, in each case, without the prior written consent of the Required Lenders;

(e)     the filing by any Credit Party of any disclosure statement or other document or instrument relating to any Chapter 11 Plan;

(f)     the reduction, expiry or termination of any Credit Party's exclusive right to file and solicit acceptances of a Chapter 11 Plan;

(g)     the entry of an order in any of the Chapter 11 Cases confirming a Chapter 11 Plan other than as contemplated by the Restructuring Support Agreement and Plan Term Sheet and as deemed reasonably satisfactory in form and substance to the Consenting Lenders and the Administrative Agent;

(h)     the entry of an order in the Chapter 11 Cases amending, supplementing, staying, reversing, vacating or otherwise modifying any Credit Document or the DIP Orders or impairing or modifying any of the liens, security interests, claims, rights, remedies, privileges, benefits or protections of the Administrative Agent and the Lenders under the DIP Orders or the Credit Documents, in each case, without the prior written consent of the Lenders and the Administrative Agent (which consent may be withheld by the Lenders and the Administrative Agent in their respective sole discretion);

(i)     the payment of, or granting adequate protection (except pursuant to the Adequate Protection Provisions), or application by any Credit Party for authority to pay or grant adequate protection (except pursuant to the Adequate Protection Provisions), any Prepetition Indebtedness or other prepetition claim without the Required Lenders' prior written consent other than (1) as provided in any "first day order" in form and substance reasonably acceptable to the Required Lenders, or (2) to the extent such payment is expressly permitted pursuant to this Agreement or consented to by the Required Lenders;

(j)     the entry of an order by the Bankruptcy Court appointing, the filing of an application by any Credit Party, for an order seeking the appointment of, or the appointment otherwise of, in each case, without the prior written consent of the Required

Lenders, an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of a responsible officer, receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (including any powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrowers or with the power to conduct an investigation of (or compel discovery from) any of the Secured Creditors or against any of the Prepetition Secured Parties; or the sale without the Required Lenders' consent, of any Credit Party's assets (including through a sale under section 363 of the Bankruptcy Code), except to the extent expressly permitted hereunder and the DIP Orders;

(k)    the dismissal of the Chapter 11 Cases, or if any Credit Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases;

(l)    the conversion of any Chapter 11 Case from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code, or into any other bankruptcy proceeding under any debtor relief laws, as applicable, or any Credit Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(m)    the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Administrative Agent or the Prepetition Secured Parties, in each case, subject to any Permitted Liens;

(n)    the entry of an order in the Chapter 11 Cases, avoiding, recharacterizing, subordinating, disgorging or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Credit Documents;

(o)    the failure of any Credit Party to perform any of its obligations under the Interim DIP Order or the Final DIP Order or any violation of any of the terms of the Interim DIP Order or the Final DIP Order, subject to any applicable grace or cure periods;

(p)    the entry of an order in any of the Chapter 11 Cases granting any super priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and the Lenders without the consent in writing of the Required Lenders, except (A) in respect of the Carve-Out in accordance with the DIP Orders and (B) as expressly provided in the Adequate Protection Provisions;

(q)    the filing of a motion by any Credit Party requesting, or the entry of any order granting, any super-priority administrative expense claim which is senior to or pari passu with the Lenders' claims or with the claims of the Prepetition Secured Parties without the consent in writing of the Required Lenders, except (A) in respect of the Carve-Out and (B) as expressly provided in the Adequate Protection Provisions;

(r)  the entry of an order precluding any administrative agent or the applicable agent under any Prepetition Loan Documents from having the right to or being permitted to "credit bid" with respect to the assets of the Credit Parties;

(s)  (i) any Credit Party shall (1) challenge or contest the validity or enforceability of the DIP Orders or any Credit Document or deny that it has further liability thereunder, (2) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims, Credit Documents, Adequate Protection Provisions, the Prepetition Credit Obligations, the Liens securing the Prepetition Credit Obligations or the Prepetition Loan Documents, (3) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the Obligations, Liens securing the Obligations, the DIP Superpriority Claims, Credit Documents, Adequate Protection Provisions, the Prepetition Credit Obligations, the Liens securing the Prepetition Credit Obligations or the Prepetition Loan Documents, (4) investigate, join or file any motion, application or other pleading in support of, or publicly support any other Person that has asserted any of the claims, challenges or other requested relief contemplated in clauses (1) through (3) above, or fails to timely contest such claims, challenges or other requested relief in good faith; or (ii) the entry of a judgment or order in any of the Chapter 11 Cases sustaining any of the claims, challenges, causes of action or other relief contemplated in clauses (1) through (3) above;

(t)  either the Interim DIP Order or the Final DIP Order (i) at any time ceases to be in full force and effect, (ii) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Required Lenders, or (iii) upon written notice from the Lenders, has been violated or breached;

(u)  failure of the Credit Parties to pay any professional fees when due under the Credit Documents or the DIP Orders;

(v)  the entry of any order in any of the Chapter 11 Cases (i) charging any of the Collateral with respect to the Secured Creditors, whether under Section 506(c) of the Bankruptcy Code or otherwise or (i) charging any of the Collateral (as defined in the Prepetition Credit Agreement) with respect to the Prepetition Secured Parties, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(w)  any Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other disposition of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code or otherwise (other than in ordinary course of business and that is expressly permitted by the Approved Budget and this Agreement), without the prior written consent of the Required Lenders;

(x)  an application for any of the DIP Orders described in this Section 12.15(x) shall be (i) made, joined in or supported by any of the Credit Parties or (ii) made by any other Person (other than the Administrative Agent and the Lenders) and such application is not, to the extent requested by the Administrative Agent or the Lenders, contested by the

- 97 -

Credit Parties in good faith, and the relief requested is granted in an order that is not stayed pending appeal;

(y) cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected (in the case of any Liens) and enforceable in all respects;

(z) the Restructuring Support Agreement is terminated by any party thereto, or otherwise terminates, in each case, in accordance with the terms thereof except with respect to any termination resulting from a breach by the Lenders;

(aa) the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Credit Documents, the DIP Orders, the Liens granted under the Security Documents and the Collateral; or

(bb) in the event the Debtors, in consultation with the Lenders, determine that section 1129(a)(10) of the Bankruptcy Code cannot be satisfied or that the Debtors cannot otherwise confirm the Plan of Reorganization (as defined in the Restructuring Support Agreement), the Credit Parties' failure to effect the sale of substantially all of the Debtors' assets or equity through a sale under section 363 of the Bankruptcy Code in accordance with Section 6.04 of the Restructuring Support Agreement;

then, and in any such event, and at any time thereafter, except as set forth in the DIP Orders, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party: (i) declare the Commitments terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder (including for the avoidance of doubt any prepayment premium or penalty, including the Prepayment Premium) to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) enforce, as the Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents; and (iv) enforce each Guaranty. The Credit Parties acknowledge, and the parties hereto agree, that each Lender has the right to maintain its investment in the Loans free from repayment by the Credit Parties (except as herein specifically provided for) and that the provision for the obligation to pay the Prepayment Premium by the Credit Parties in the event that the Loans are prepaid or are accelerated is intended to provide compensation for the deprivation of such right under such circumstances. The Credit Parties further acknowledge, and the parties hereto also agree, that actual damages to the Lenders from the loss of the bargained-for yield for the term of the Loans as a result of early repayment (or the fixing of the obligation to do so as the result of acceleration) are difficult at this time to determine and calculate and that the Prepayment Premium is a reasonable estimate of, and certainly not disproportionate to, such likely actual damages. EACH OF THE CREDIT PARTIES EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. Each of the Credit Parties expressly acknowledges that

its agreement to pay the premium to the Lenders as herein described is a material inducement to the Lenders to make the Loans and the Commitments and shall be estopped hereafter from claiming differently than as agreed to in this paragraph.

For the avoidance of doubt, upon the occurrence of and ongoing Event of Default, absent the Credit Parties timely curing such existing Events of Default, the Administrative Agent, on behalf of the Lenders, shall have automatic relief from the automatic stay under section 362 of the Bankruptcy Code and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, occupy the Credit Parties' premises to sell or otherwise dispose of the Collateral, or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law.

**SECTION 13.**        The Administrative Agent.

13.01.  Appointment.  The Lenders hereby irrevocably designate and appoint Loan Admin as Administrative Agent (for purposes of this Section 13 and Section 14.01, the term "Administrative Agent" also shall include Loan Admin in its capacity as Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

13.02.  Nature of Duties.

(a)        The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents. Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).   The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b)        Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, the Lead Arranger is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities

- 99 -

with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Lead Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Section 13.06 and Section 14.01.  Without limitation of the foregoing, the Lead Arranger shall not, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or any other Person.

(c)     Each Lender unconditionally and irrevocably acquits and fully forever releases and discharges the Administrative Agent and all its affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and its respective heirs, legal representatives, successors and assigns (collectively, the "**Releasees**") on the date each interest payment on the Loans is made by the Borrower from any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which such party hereto ever had or now has against any of the Releasees and which has arisen at any time prior to the date of such interest payment out of this Agreement, the other Credit Documents or any other related documents, instruments, agreements or matters or the enforcement or attempted or threatened enforcement by any of the Releasees of any of their respective rights, remedies or recourse related thereto (collectively, the "**Released Claims**") (but in each case referred to in this clause (c), excluding any claims, demands, causes of actions, obligations, remedies, suits, damages or liabilities to the extent same occurred by reason of the gross negligence, bad faith or willful misconduct of the Releasee to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)). Each Lender covenants and agrees never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Releasees any action or other proceeding based upon any of the Released Claims.

13.03.   Lack of Reliance on the Administrative Agent.

(a)     Each Lender from time to time party to this Agreement (i) confirms that it has received a copy of this Agreement and the other Credit Documents, together with copies of the financial statements referred to therein, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to become a Lender under this Agreement, (ii) agrees that it has made and will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Credit Documents and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, (iii) acknowledges and agrees that no fiduciary or advisory relationship between the Administrative Agent and any Lender is intended to be or has been created in respect of any of the transactions contemplated by this Agreement, (iv) acknowledges and agrees that the Administrative Agent, on the one hand, and each Lender

- 100 -

on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, and no Lender relies on, any fiduciary duty on the Administrative Agent's part, (v) acknowledges and agrees that each Lender is capable of evaluating and understanding, and each such Lender understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement, (vi) acknowledges and agrees that the Administrative Agent or any of its Affiliates may have received fees or other compensation from any Credit Party or any Affiliate of any Credit Party in connection with this Agreement which may or may not be publicly disclosed and such fees or compensation do not affect any Lender's independent credit decision to enter into the transactions contemplated by this Agreement, (vii) acknowledges and agrees that notwithstanding that no fiduciary or similar relationship exists between the Administrative Agent and any Lender, each such Lender hereby waives, to the fullest extent permitted by law, any claims it may have against the Administrative Agent or its Affiliates for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Administrative Agent and its Affiliates shall have no liability (whether direct or indirect) to any Lender in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of any Lender, including any such Lender's affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and respective heirs, legal representatives, successors and assigns and creditors, in each case subject to and without limiting the terms of Section 13.02(a), and (viii) agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Credit Documents are required to be performed by it as a Lender. The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Borrower or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of the Borrower or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

(b)      To the full extent permitted by applicable law, each party hereto and each Indemnified Person shall not assert, and hereby waives, any claim against any other party hereto or any other Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document, any other agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby or any Loan or the use of the proceeds thereof; provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 14.01(a) to the extent any Indemnified Person is found liable for any such damages.  No party hereto and no Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such

- 101 -

Person results from such Person's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final and non-appealable decision); provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 14.01(a) to the extent any Indemnified Person is found liable for any such damages.

13.04. <u>Certain Rights of the Administrative Agent</u>. If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, the Administrative Agent shall be entitled to refrain from any act or action, and neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent refraining from such act or action, unless or until the Administrative Agent shall have received, pursuant to an escrow arrangement reasonably satisfactory to it, from the Borrower or the Lenders instructing the Administrative Agent to take the applicable act or action an amount initially equal to $500,000 and supplemented or increased thereafter on a monthly basis to the extent necessary (in the reasonable judgment of the Administrative Agent) to reimburse the Administrative Agent for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature that may be imposed on, asserted against or incurred by the Administrative Agent as a result of such act or action and for which the Administrative Agent would be entitled to indemnification pursuant to Section 13.06 or Section 14.01 hereof. Any amounts subject to such escrow arrangement remaining after payment in full of all such indemnification obligations shall be returned to the Lenders or the Borrower, as applicable.

13.05. <u>Reliance</u>. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, e-mail, facsimile, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

13.06. <u>Indemnification</u>. To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature (including, without limitation, any customary indemnifications provided to a deposit account bank pursuant to a DACA which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence, bad

- 102 -

faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

13.07.  <u>The Administrative Agent in its Individual Capacity</u>.  The Person serving as the Administrative Agent hereunder shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein as Administrative Agent; and the terms "**Lender**," "**Required Lenders**," "**holders of Notes**" or any similar terms shall, unless the context clearly indicates otherwise, include the Person serving as Administrative Agent hereunder in its respective individual capacities.  Such Person and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement which may or may not be publicly disclose and otherwise without having to account for the same to the Lenders.

13.08.  <u>Holders</u>.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

13.09.  <u>Resignation by the Administrative Agent</u>.

(a)    The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 3 Business Days' prior written notice to the Lenders and, unless a Default or an Event of Default under <u>Section 12.05</u> then exists, the Borrower.  Any such resignation by an Administrative Agent hereunder shall also constitute its resignation as the Collateral Agent in which case the resigning Administrative Agent shall not be required to discharge any duties of the "Collateral Agent" under the Security Documents.  Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (<u>provided</u> that the Borrower's approval shall not be required if an Event of Default then exists).

(c)    If no successor Administrative Agent has been appointed pursuant to clause (b) above by the 3rd Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective

- 103 -

and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)    Upon a resignation of the Administrative Agent pursuant to this Section 13.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 13 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

(e)    Loan Admin may, by giving three (3) days' written notice to the Borrower, designate any Affiliate of Loan Admin to act as Administrative Agent hereunder, in which case Loan Admin shall be deemed to have resigned as Administrative Agent pursuant to preceding clause (a) and such designee shall be deemed to have been appointed as a successor Administrative Agent pursuant to preceding clause (b).

13.10.  Collateral Matters.

(a)    Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors. Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)    The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than the Borrower and its Subsidiaries) upon the sale or other disposition thereof in compliance with Section 11.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 14.12) or (iv) as otherwise may be expressly provided in the relevant Security Documents. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 13.10.

- 104 -

(c)     The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 13.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

13.11.    Delivery of Information.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

13.12.    Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub agents appointed by the Administrative Agent (including, without limitation, Loan Admin Co LLC or any of its Affiliates).  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective officers, directors, employees, representatives, agents, sub-agents or advisors thereof.  The Administrative Agent shall not be responsible for the negligence or misconduct of any respective sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence, bad faith or willful misconduct in the selection of such sub agents.

13.13.    No Reliance on the Administrative Agent's Customer Identification Program: Certifications From Banks and Participants:  Patriot Act.

(a)     Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participants or assignee customer identification program, or other requirements imposed by the Patriot Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121, as hereafter amended or replaced ("**CIP Regulations**"), or any other Laws relating to the prevention of money laundering or the equivalent on any applicable jurisdiction, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates

- 105 -

or their agents, the Credit Documents or the transactions hereunder or contemplated hereby (1) any identity verification procedures, (2) any recordkeeping (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations; or other regulations issued under the Patriot Act, Each Lender, Affiliate, participant or assignee subject to Section 326 of the Patriot Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations or any equivalent provisions in any applicable jurisdiction.

(b)    Each Lender or assignee or participant of a Lender that is not incorporated under the laws of the United States or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Administrative Agent the certification or if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the Patriot Act and the applicable regulations:  (1) within ten days after the Closing Date, and (2) as such other times as are required under the Patriot Act.

(c)    The Patriot Act requires all financial institutions to obtain verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution.  Consequently, the Administrative Agent or Lender may from time to time request, and each Credit Party shall provide to such agents or Lender, the Borrower's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the Patriot Act and any other Sanctions.

13.14.  <u>Subordination Agreements</u>.  Each Lender hereby irrevocably appoints, designates and authorizes Administrative Agent to enter into a Subordination Agreement or any other subordination or intercreditor agreement pertaining to any Subordinated Debt, on its behalf and to take such action on its behalf under the provisions of any such agreement (subject to the last sentence of this <u>Section 13.14</u>).  Each Lender further agrees to be bound by the terms and conditions of such Subordination Agreement or such other subordination or intercreditor agreement pertaining to such Subordinated Debt. Each Lender hereby authorizes Administrative Agent to issue blockages notices in connection with such Subordination Agreement and such Subordinated Debt at the direction of Required Lenders.

**SECTION 14.**       <u>Miscellaneous</u>.

14.01.  <u>Payment of Expenses, etc</u>.

(a)    The Borrower hereby agrees to: (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of the Administrative Agent (including, without limitation, advisor fees, consultant fees, costs and expenses, third party diligence, lien searches, filing fees, and the reasonable and documented fees and disbursements of the Administrative Agent's consultants and DLA

- 106 -

Piper LLP (US) or a single replacement counsel, one specialist counsel for each applicable specialty and one additional local counsel in each applicable jurisdiction) in connection with the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of the Administrative Agent and its Affiliates in connection with its or their syndication efforts with respect to this Agreement and, after the occurrence and during the continuation of an Event of Default, each of the Administrative Agent and Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to the Chapter 11 Cases or similar proceedings (including, in each case without limitation, the reasonable and documented fees and disbursements of counsel (limited to one counsel in each applicable jurisdiction) and consultants for the Administrative Agent and, after the occurrence and during the continuation of an Event of Default, counsel for the Lenders); (ii) pay all reasonable out-of-pocket costs and expenses of the Lenders and Lender Advisors (including, without limitation, advisor fees, consultant fees, costs and expenses, third party diligence, lien searches, filing fees, and the reasonable and documented fees and disbursements of the Lenders' and Lender Advisors' consultants and a single legal counsel, one specialist counsel for each applicable specialty and one additional local counsel in each applicable jurisdiction) in connection with the negotiation and execution of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto; (iii) pay and hold the Administrative Agent and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary Taxes with respect to the foregoing matters (other than Excluded Taxes) and save the Administrative Agent and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Administrative Agent or such Lender) to pay such Taxes (other than Excluded Taxes); and (iv) indemnify the Administrative Agent and each Lender, and each of their respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors (each, an "**Indemnified Person**") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable and documented attorneys' (limited to one counsel in each applicable jurisdiction) and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (x) any investigation, litigation or other proceeding (whether or not the Administrative Agent or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (y) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased

or operated by the Borrower or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by the Borrower or any of its Subsidiaries at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, the non-compliance by the Borrower or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against the Borrower, any of its Subsidiaries or any Real Property at any time owned, leased or operated by the Borrower or any of its Subsidiaries, including, in each case, without limitation, the reasonable and documented fees and disbursements of counsel (limited to one counsel in each applicable jurisdiction) and other consultants incurred in connection with any such investigation, litigation or other proceeding **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PERSON** (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence, bad faith or willful misconduct of the Indemnified Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.  For the avoidance of doubt, each Credit Party expressly waives any and all causes of action under section 549 of the Bankruptcy Code arising out of or related to any payments of expenses contemplated by this Section 14.01.

(b)     To the full extent permitted by applicable law, the Borrower shall not assert, and each hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

14.02.  Right of Setoff.  In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived to the extent permitted by applicable law, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender or any Affiliate, branch or agency thereof (including, without

- 108 -

limitation, by branches and agencies of the Administrative Agent or such Lender or Affiliate wherever located) to or for the credit or the account of the Borrower or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 14.04(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, provided, that any exercise by the Administrative Agent or any Lender of the right of setoff provided under this Section 14.02 shall not be permitted except to the extent of the Obligations that are then due and owing to the Administrative Agent or such Lender at such time.

14.03.  Notices.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including e-mail for facsimile communications) and mailed, or delivered by electronic mail or facsimile:  if to any Credit Party, at the address specified on Schedule II or in the other relevant Credit Documents; if to any Lender, at its address specified to the Administrative Agent; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed (certified return receipt required), delivered by facsimile or electronic mail, or sent by overnight courier, be effective when deposited in the mails, delivered to overnight courier, as the case may be, or sent by facsimile or electronic mail (with electronic confirmation of receipt), except that notices and communications to the Administrative Agent and any Credit Party shall not be effective until received by the Administrative Agent or the Borrower or any Credit Party, as the case may be.

14.04.  Benefit of Agreement; Assignments; Participations.

(a)    This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, no Credit Party may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Lenders and, provided further, that, no Lender may transfer or assign its rights hereunder, except as provided in Section 2.12 and Section 14.04(b), (c) and (d).

(b)    Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to (i)(A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(i)(A)), (B) to one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company or (C) to any bank or financial institution that has provided financing to such Lender, or (ii) in the case of any Lender that is a fund or other entity that invests in loans, any other fund or other entity that

- 109 -

invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $1,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (i) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Loans after giving effect to such assignment, (ii) in connection with any such assignment pursuant to clause (y) above, the consent of the Administrative Agent and, so long as no Default or Event of Default pursuant to Section 12.01 or Section 12.05 then exists, the Borrower, shall be required (such consent, in any case, not to be unreasonably withheld, delayed or conditioned), provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof, (iii) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $5,000 (which may be waived by the Administrative Agent in its sole discretion) and (iv) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 14.15.  To the extent of any assignment pursuant to this Section 14.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans.  At the time of each assignment pursuant to this Section 14.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms (and, if applicable, a Section 6.04(b)(ii) Certificate) described in Section 6.04(b).  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.13 or this Section 14.04(b) would, at the time of such assignment, result in increased costs under Section 2.10 or Section 6.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative

- 110 -

Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)    Any Lender which assigns all of its Commitments and/or Loans hereunder in accordance with Section 14.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Section 2.10, Section 2.11, Section 6.04, Section 13.06, Section 14.01 and Section 14.06), which shall survive as to such assigning Lender.

(e)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or any Credit Party or any Credit Party's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Credit Parties, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement; and, provided further, that no Lender shall transfer or grant any participation under which the Participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (x) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 14.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (y) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (z) release, compromise or subordinate all or substantially all of the value of the Guaranties or all or substantially all of the Collateral (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

- 111 -

The Credit Parties agree that each Participant shall be entitled to the benefits of <u>Section 2.10</u> and <u>Section 6.04</u> (subject to the requirements and limitations therein (it being understood that the documentation required under <u>Section 6.04(b)</u> shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 14.04</u>; <u>provided</u> that such Participant (A) agrees to be subject to the provisions of <u>Section 2.12</u> and <u>Section 2.13</u> as if it were an assignee under <u>Section 14.04</u>; and (B) shall not be entitled to receive any greater payment under <u>Section 2.10</u> or <u>Section 6.04</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

14.05. <u>No Waiver; Remedies Cumulative</u>. No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing among the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand. Notwithstanding anything herein or in the other Credit Documents to the contrary, each Lender hereby agrees with the Administrative Agent and each other Lender that no Lender shall take any action to protect or enforce its rights against any Credit Party arising out of this Agreement or any other Credit Document (including exercising any rights of setoff) without first obtaining the prior written consent of the Administrative Agent, it being the intent of the Lenders that any such action to protect or enforce rights under the Agreement and the other Credit Documents shall be taken in

1609103405.14
4870-1742-7140, v. 3

concert and at the direction or with the consent of the Administrative Agent or the Required Lenders.

14.06.  <u>Payments Pro Rata</u>.

(a)    Except as otherwise expressly provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than (i) if Lender that has expressly consented in writing to waive its <u>pro rata</u> share of any such payment, in which case such amounts shall be reallocated on a <u>pro rata</u> basis among the other Lenders or (ii) if all Lenders shall have expressly consented in writing to waive their <u>pro rata</u> share of such payment, such payment shall be returned to the Borrower) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)    Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, realization upon security, exercise of the right of setoff or banker's lien, counterclaim or cross action, enforcement of any right under the Credit Documents, or otherwise) from, by or on behalf of a Credit Party, which is applicable to the payment of the principal of or interest on the Loans and such amount, with respect to the related amounts received by other Lenders that are entitled to the same type of amount, is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; <u>provided</u> that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

14.07.  <u>Calculations; Computations</u>.

(a)    The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders); <u>provided</u> that, notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitted a Person to value its financial liabilities at the fair value thereof.  In the event of any change in GAAP (any such change, for the purpose of this <u>Section 14.07</u>, an "**Accounting Change**") that occurs after the date of this Agreement, then the Credit Parties and the Administrative Agent, on behalf of the Lenders, agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect any such Accounting Change with the desired result that the criteria for evaluating the financial condition of the Borrower and its Subsidiaries shall be the same after such Accounting Change as if such Accounting Change had not been made, and until

- 113 -

such time as such an amendment shall have been executed and delivered by the Credit Parties and Required Lenders, (i) all financial standards and terms in this Agreement shall be calculated and/or construed as if such Accounting Change had not been made, and (ii) the Borrower shall prepare footnotes to each certificate and the financial statements required to be delivered pursuant to Section 10.01(a), (b) and (f) that show the differences between the financial statements delivered (which reflect such Accounting Change).

(b)     All computations of interest and other Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day and the last day) occurring in the period for which such interest or Fees are payable, except that interest computed by reference to Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

14.08.    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.

(a)     THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER AND ANY CLAIMS, CONTROVERSIES, DISPUTES OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE OR ANY SECURITY DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION).  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT, AND SOLELY TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER THE MATTER, THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK (OR (X) IN THE CASE OF ANY SECURITY DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT OR COLLATERAL AGENT IN THE STATE OR OTHER JURISDICTION IN WHICH THE RESPECTIVE COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION AND (Y) IN THE CASE OF ANY BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS WITH RESPECT TO ANY CREDIT PARTY, ACTIONS OR PROCEEDINGS RELATED TO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY BE BROUGHT IN SUCH COURT HOLDING SUCH BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS), AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, THE BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER, AND AGREES NOT TO PLEAD OR

CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORE-MENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER.  EACH OF THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND THE LENDERS FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PERSON AT ITS ADDRESS SET FORTH ON SCHEDULE II, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  EACH OF THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(b)     THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

14.09.  Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of any original executed counterpart hereof.

14.10.  Effectiveness.  This Agreement shall become effective on the date (the "**Closing Date**") on which the Borrower, the Administrative Agent, the Lead Arranger and each of the

- 115 -

Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent at the Notice Office or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it.  The Administrative Agent will give the Borrower and each Lender prompt written notice of the occurrence of the Closing Date.

14.11.  <u>Headings Descriptive</u>.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

14.12.  <u>Amendment or Waiver; etc</u>.

(a)  Except as otherwise provided in this <u>Section 14.12</u>, neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be amended, modified, changed, waived, discharged or terminated unless such amended, modification, change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), <u>provided</u> that no such change, waiver, discharge or termination shall, without the written consent of each Lender (with Obligations being directly affected in the case of following clause (i)), (i) extend the final scheduled maturity of any Loan or Note, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce (or forgive) the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to <u>Section 14.07(a)</u> shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i)), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents as of the Closing Date) under all the Security Documents, (iii) amend, modify or waive any provision of this <u>Section 14.12(a)</u> (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Loans and Commitments on the Closing Date), (iv) reduce the "majority" voting threshold specified in the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Closing Date) or change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder, (v) consent to the assignment or transfer by any Credit Party of, or the release of any Credit Party from, any of its rights and obligations under this Agreement, or (vi) change or have the effect of changing the priority or pro rata treatment of, or subordinating, any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments (including as a result in whole or in part of allowing the issuance or

- 116 -

incurrence, pursuant to this Agreement or otherwise, of new loans or other Indebtedness having any priority over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for any Obligations or otherwise); provided further, that no such amendment modification, change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Commitments shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) [reserved], (3) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision of this Agreement or any other Credit Document as same relates to the rights or obligations of the Administrative Agent, (4) without the written consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (5) [reserved], (6) reduce the amount of, or extend the date of any scheduled payment hereunder to any Lender without the consent of such affected Lender, other than as otherwise expressly provided herein as of the Closing Date or (7) amend Section 14.06(a) hereof to provide that payments received and distributed by the Administrative Agent to the Lenders shall be made on a basis other than pro rata, without the consent of each Lender adversely affected by such amendment.

(b)     If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (v), inclusive, of the first proviso to Section 14.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described below, to replace each such non-consenting Lender or Lenders (or, at the option of the Borrower, if the respective Lender's consent is required with respect to less than all Tranches of Loans (or related Commitments), to replace only the Loans of the respective non-consenting Lender which gave rise to the need to obtain such Lender's individual consent) with one or more Replacement Lenders pursuant to Section 2.13 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination; provided that, the Borrower shall not have the right to replace a Lender solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to Section 14.12(a).

(c)     Notwithstanding the foregoing, (x) this Agreement may be amended by an agreement in writing entered into by the Borrower, the Required Lenders and the Administrative Agent if (i) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment (including pursuant to an assignment to a replacement Lender in accordance with Section 14.04) in full of this principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement and (y) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent

- 117 -

and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

(d)　　[reserved].

(e)　　Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents may be made with the consent of the Borrower and the Administrative Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency, without any further action by any other party.

14.13.　Survival.　All indemnities set forth herein including, without limitation, in Section 2.10, Section 2.11, Section 6.04, Section 13.06 and Section 14.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

14.14.　Domicile of Loans.　Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 14.14 would, at the time of such transfer, result in increased costs under Section 2.10, Section 2.11 or Section 6.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes occurring after the date of the respective transfer).

14.15.　Register.　The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 14.15, to maintain a register (the "**Register**") at one of its offices in the United States on which it will record the Commitments from time to time of each of the Lenders, the Loans made by (and stated interest owing to) each of the Lenders and each repayment in respect of the principal (and stated interest) amount of the Loans of each Lender. Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans. With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 14.04(b). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate

- 118 -

principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower, at any reasonable time and from time to time upon reasonable prior notice; provided, that only the names of the Lenders shall be provided and not the amount of their respective Loans and Commitments, except to the extent that disclosure is necessary in connection with an audit or other proceeding to establish that any Loan or Commitment is in registered form under Section 5f.103-1(c) of the Treasury Regulations.  The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this <u>Section 14.15</u>.

14.16.  <u>Confidentiality</u>.

(a)    Subject to the provisions of clause (b) of this <u>Section 14.16</u>, each Lender agrees that it will use its reasonable efforts not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel to another Lender if such Lender or such Lender's holding or parent company in its reasonable discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this <u>Section 14.16</u> to the same extent as such Lender) any information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, <u>provided</u> that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this <u>Section 14.16(a)</u> by the respective Lender, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent or the Collateral Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this <u>Section 14.16</u>, (vii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender, <u>provided</u> that such prospective transferee agrees to be bound by the confidentiality provisions contained in this <u>Section 14.16</u>, and (viii) to (A) any bank or financial institution and (B) S&P, Moody's, Fitch Ratings Inc. and/or other ratings agencies, as such Lender deems necessary or appropriate in connection with such Lender's obtaining financing; <u>provided</u>, <u>however</u>, that such financial institution or ratings agency shall be informed of the confidentiality of such information or (ix) to its investors or potential investors as such Lender reasonably deems necessary or appropriate; <u>provided</u> that any such investor or potential investor agrees to be bound by the confidentiality provisions contained in this <u>Section 14.16</u>.

- 119 -

(b)      The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to the Borrower or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of the Borrower and its Subsidiaries), provided such Persons shall be subject to the provisions of this <u>Section 14.16</u> to the same extent as such Lender.

(c)      Notwithstanding anything to the contrary contained in this <u>Section 14.16</u>, the Borrower hereby agrees that the Administrative Agent and its Affiliates may publicize its services in connection with this Agreement and the other Credit Documents and the transactions contemplated herein and therein, including, without limitation, through granting interviews with and providing information to the financial press and other media and by publicizing such services on its web-site or other electronic medium; <u>provided</u>, <u>however</u>, that the Administrative Agent and its Affiliates shall not publicize as contemplated above in this clause (c) until the earlier to occur of (i) the fifth day following the Closing Date and (ii) such date as the Borrower shall have publicly announced the consummation of the Transaction.  In addition, the Administrative Agent and its Affiliates shall not publicize the names of any of the Subsidiaries with the exception of the Borrower.  The Borrower hereby authorizes the Administrative Agent to place, subject to the restriction set forth in the preceding sentence, a customary "tombstone" advertisement regarding this Agreement and the transactions contemplated herein related hereto in publications of its choice at the Administrative Agent's expense.

14.17.  <u>Special Provisions Regarding Pledges of Equity Interests in, and Promissory Notes Owed by, Persons Not Organized in the United States or Pledges over Assets Not Located in the United States</u>.  The parties hereto acknowledge and agree that the provisions of the various Security Documents executed and delivered by the Credit Parties require that, among other things, all promissory notes executed by, and capital stock and other Equity Interests in, various Persons owned by the respective Credit Party be pledged, and delivered for pledge, pursuant to the Security Documents.  The parties hereto further acknowledge and agree that each Credit Party shall be required to take all actions under the laws of the jurisdiction in which such Credit Party is organized or where the respective assets are located to create and perfect all security interests granted pursuant to the various Security Documents in accordance with such Security Documents and to take all actions under the laws of the applicable jurisdiction (including the United States and any State) thereof to perfect the security interests in the assets, capital stock and other Equity Interests of, and promissory notes issued by, any Person organized under the laws of said jurisdictions (in each case, to the extent said capital stock, other Equity Interests or promissory notes are owned by any Credit Party).  Except as provided in the immediately preceding sentence, to the extent any Security Document requires or provides for the pledge of assets or promissory notes issued by, or capital stock or other Equity Interests in, any Person organized under the laws of a jurisdiction other than those specified in the immediately preceding sentence, it is acknowledged that, as of the Closing Date, no actions have been required to be taken to perfect, under local law of the jurisdiction where the respective assets are located or of the Person who issued the respective promissory notes or whose capital stock or other Equity Interests are pledged, under Security Documents in accordance with the Security Documents.  The Borrower hereby agrees that, following any request by the Administrative Agent or the Required Lenders to do so, the Borrower will, and will cause its Subsidiaries to, take such actions under the local law of any

- 120 -

jurisdiction with respect to which such actions have not already been taken as are determined by the Administrative Agent or the Required Lenders to be necessary or desirable in order to fully perfect, preserve or protect the security interests granted pursuant to the various Security Documents under the laws of such jurisdictions. If requested to do so pursuant to this Section 14.17, all such actions shall be taken in accordance with the provisions of this Section 14.17 and Section 10.12 and within the time periods set forth therein. All conditions and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing and so that same are not violated by reason of the failure to take actions under local law (but only with respect to capital stock of, other Equity Interests in, and promissory notes issued by, Persons organized under laws of jurisdictions other than the United States and any State thereof or assets located in jurisdictions other than the United States and any State thereof) not required to be taken in accordance with the provisions of this Section 14.17, provided that to the extent any representation or warranty would not be true because the foregoing actions were not taken, the respective representation of warranties shall be required to be true and correct in all material respects at such time as the respective action is required to be taken in accordance with the foregoing provisions of Section 10.12 and this Section 14.17.

14.18. Patriot Act. Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Borrower and the other Credit Parties in accordance with the Patriot Act.

14.19. Post-Closing Actions. The Credit Parties hereby agree to deliver or take the actions described on Schedule IV hereto, within the applicable time periods set forth therein (which periods may be extended by the Administrative Agent in its sole discretion), in form and substance reasonably acceptable to the Administrative Agent. All conditions precedent and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Credit Documents), provided that (x) to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Closing Date, the respective representation and warranty shall be required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 14.19 and (y) all representations and warranties relating to the Security Documents shall be required to be true immediately after the actions required to be taken by this Section 14.19 have been taken (or were required to be taken). The acceptance of the benefits of each Credit Event shall constitute a representation, warranty and covenant by the Borrower to each of the Lenders that the actions required pursuant to this Section 14.19 will be, or have been, taken within the relevant time periods referred to in this Section 14.19 (including extensions thereof) and that, at such time, all representations and warranties contained in this Agreement and the other Credit Documents shall then be true and correct without any modification pursuant to this Section 14.19, and the parties hereto acknowledge and agree that the failure to take any of the actions required above, within the relevant time periods required above, shall give rise to an immediate Event of Default pursuant to this Agreement.

14.20.  <u>Interest Rate Limitation</u>.  Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

14.21.  <u>Entire Agreement</u>.   THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

14.22.  <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution and (b) the effects of any Bail-In Action on any such liability, including, if applicable:  (i) a reduction in full or in part or cancellation of any such liability:  (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document:  or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

14.23.  <u>Obligations Absolute</u>.  To the fullest extent permitted by applicable Law, all obligations of the Credit Parties hereunder shall be absolute and unconditional irrespective of:

(a)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Credit Party;

(b)     any lack of validity or enforceability of any Credit Document or any other agreement or instrument relating thereto against any Credit Party;

1609103405.14
4870-1742-7140, v. 3

(c)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Credit Document or any other agreement or instrument relating thereto;

(d)      any release or amendment or waiver of or consent to any departure from any guarantee for all or any of the Obligations;

(e)      any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any other Credit Document; or

(f)      any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Credit Parties.

*      *      *

1609103405.14
4870-1742-7140, v. 3

**Exhibit 2**

**Initial 13-Week Budget**

# Optio Rx
**DIP Projection**

| Week Ending Saturday | 6/16 | 6/23 | 6/30 | 7/7 | 7/14 | 7/21 | 7/28 | 8/4 | 8/11 | 8/18 | 8/25 | 9/1 | 9/8 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | |
| **Revenue Forecast** | $2,851 | $2,851 | $2,851 | $2,595 | $2,595 | $2,595 | $2,595 | $2,595 | $2,825 | $2,825 | $2,825 | $2,825 | $2,825 | $35,658 |
| **CASH FLOW** | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Net Sales Receipts | 2,593 | 2,593 | 2,593 | 2,851 | 2,851 | 2,851 | 2,851 | 2,595 | 2,595 | 2,595 | 2,595 | 2,595 | 2,595 | 34,757 |
| **Total Cash Receipts** | **2,593** | **2,593** | **2,593** | **2,851** | **2,851** | **2,851** | **2,851** | **2,595** | **2,595** | **2,595** | **2,595** | **2,595** | **2,595** | **34,757** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll | 815 | 0 | 815 | 0 | 815 | 0 | 815 | 0 | 815 | 0 | 815 | 0 | 815 | 5,705 |
| Unsecured Product Vendors | 0 | 1,250 | 1,250 | 1,250 | 1,264 | 1,264 | 1,264 | 1,250 | 1,250 | 1,000 | 950 | 815 | 815 | 13,622 |
| Secured Vendors | 1,250 | 750 | 1,250 | 850 | 1,350 | 850 | 1,350 | 750 | 750 | 1,250 | 750 | 750 | 750 | 12,650 |
| Shipping | 0 | 157 | 79 | 79 | 114 | 114 | 114 | 114 | 104 | 104 | 104 | 104 | 104 | 1,290 |
| Lease Rental Payments | 0 | 0 | 241 | 0 | 0 | 0 | 241 | 0 | 0 | 0 | 0 | 241 | 0 | 723 |
| Insurance Payments | 0 | 500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 500 |
| Other SG&A | 0 | 174 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 87 | 1,131 |
| **Operating Disbursements** | **2,065** | **2,831** | **3,722** | **2,266** | **3,630** | **2,315** | **3,871** | **2,201** | **3,006** | **2,441** | **2,706** | **1,997** | **2,571** | **35,621** |
| **Operating Cash Flow** | **528** | **(238)** | **(1,129)** | **586** | **(779)** | **536** | **(1,020)** | **394** | **(410)** | **155** | **(110)** | **599** | **25** | **(864)** |
| | | | | | | | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| DIP Fees & Interest | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Sr Debt Interest | 0 | 0 | 0 | 2,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,600 |
| Debtor Professionals | 0 | 284 | 99 | 99 | 74 | 72 | 72 | 72 | 82 | 84 | 84 | 84 | 84 | 1,190 |
| Lender Professioinals | 0 | 600 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 2,250 |
| Committee Professionals | 0 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 42 | 500 |
| US Trustee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 120 | 0 | 0 | 0 | 0 | 105 | 225 |
| BK Deposits | 0 | 0 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| **Non-Operating Disbursements** | **0** | **926** | **307** | **2,911** | **266** | **264** | **264** | **384** | **274** | **276** | **276** | **380** | **276** | **6,801** |
| **Total Disbursements** | **2,065** | **3,757** | **4,029** | **5,176** | **3,896** | **2,579** | **4,135** | **2,585** | **3,279** | **2,716** | **2,981** | **2,377** | **2,846** | **42,422** |
| **Net Cash Flow** | **528** | **(1,164)** | **(1,435)** | **(2,325)** | **(1,044)** | **273** | **(1,283)** | **11** | **(684)** | **(121)** | **(386)** | **218** | **(251)** | **(7,665)** |
| **Total Operating Cash Balance** | **2,093** | **3,679** | **2,243** | **3,918** | **3,873** | **4,146** | **3,863** | **3,873** | **3,189** | **3,068** | **2,682** | **2,900** | **2,649** | **2,649** |
| **Ending DIP Balance** | **0** | **2,750** | **2,750** | **6,750** | **7,750** | **7,750** | **8,750** | **8,750** | **8,750** | **8,750** | **8,750** | **8,750** | **8,750** | **8,750** |