# EXHIBIT A

**(Blackline)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (*Joint Administration Pending*)(*Jointly Administered*) |

## DISCLOSURE STATEMENT RELATING TO THE AMENDED
## JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OPTIO RX, LLC, *et al.*

CHIPMAN, BROWN, CICERO & COLE, LLP

William E. Chipman, Jr.
David W. Carickhoff
Mark. D. Olivere
Alan M. Root
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Email:  Chipman@chipmanbrown.com
Carickhoff@chipmanbrown.com
Olivere@chipmanbrown.com
Root@chipmanbrown.com

*Counsel to the Debtors and
Debtors-in-Possession*

Dated: June 10July 29, 2024

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical, LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary, LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy, LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60062.

THIS SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT OR REJECT THE PLAN AND IN CONNECTION WITH THE FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"). THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. ~~AFTER THE COMMENCEMENT OF THE CHAPTER 11 CASES~~ON JUNE 24, 2024, THE DEBTORS ~~EXPECT TO PROMPTLY SEEK ORDERS OF~~FILED A MOTION WITH THE BANKRUPTCY COURT SEEKING AN ORDER APPROVING THE DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION~~,~~" AND APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE, AND CONFIRMING THE PLAN.

---

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON ~~[_____~~SEPTEMBER 3, 2024~~]~~ UNLESS EXTENDED BY THE DEBTORS IN WRITING.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS ~~[_____~~AUGUST 7, 2024~~]~~ (THE "VOTING
RECORD DATE")

---

### RECOMMENDATION BY THE DEBTORS

The Debtors have approved the transactions contemplated by the Plan (as defined below) and ~~recommends~~recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

---

### IMPORTANT NOTICE

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS, THE DEBTORS' BUSINESS, AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT A**.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO AMEND THE PLAN AND

RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE NEW PREFERRED AND COMMON EQUITY SHARES OR UNITS OF ONLINE PHARMACY HOLDINGS LLC DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER, THE "**SECURITIES ACT**"), OR ANY STATE SECURITIES LAWS ("**BLUE SKY LAWS**").

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

NO SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL OR REGULATORY AUTHORITY. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY THE SEC OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR BLUE SKY LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS INTEND TO RELY ON SECTIONS 3(A)(9) AND 18(B)(4)(E) OF THE SECURITIES ACT TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS THE OFFER OF CLASS B UNITS TO HOLDERS OF 2020 NOTES CLAIMS PRIOR TO THE FILING OF THE CHAPTER 11 CASES, INCLUDING IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE DEBTORS INTEND TO RELY ON SECTION 1145 OF THE BANKRUPTCY CODE, TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, THE ISSUANCE OF PREFERRED AND COMMON EQUITY SHARES OR UNITS OF ONLINE

PHARMACY HOLDINGS LLC TO HOLDERS OF PREPETITION LIEN CLAIMS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY PREFERRED AND COMMON EQUITY SHARES OR UNITS OF ONLINE PHARMACY HOLDINGS LLC PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH EQUITY INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY, SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," "CONTINUE," "INTEND", "WILL" OR THE NEGATIVES THEREOF, AS WELL AS ANY SIMILAR OR COMPARABLE LANGUAGE. THESE STATEMENTS OFTEN DISCUSS PLANS, STRATEGIES, EVENTS OR DEVELOPMENTS THAT THE DEBTORS EXPECT OR ANTICIPATE WILL OR MAY OCCUR IN THE FUTURE AND ARE BASED UPON THE BELIEFS AND ASSUMPTIONS OF THE DEBTORS' MANAGEMENT AND ON THE INFORMATION CURRENTLY AVAILABLE TO THEM. YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. EXCEPT AS REQUIRED BY LAW, THE DEBTORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. THE LIQUIDATION ANALYSIS, FEASIBILITY ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT EACH CREDITOR WHO IS ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH WILL BE FILED NO LATER THAN SEVEN CALENDAR DAYS PRIOR TO THE PLAN OBJECTION DEADLINE (AS DEFINED

BELOW), AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. (***PREVAILING*** EASTERN TIME) ON** ~~[          ]~~ **SEPTEMBER 3,** **2024**~~]~~, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND IF THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER

PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.   EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**TABLE OF CONTENTS**

**ARTICLE I** INTRODUCTION...........................................................................................1
    **1.1**    General............................................................................................................1

**ARTICLE II** PRELIMINARY STATEMENT....................................................................1

**ARTICLE III** QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE
STATEMENT AND THE PLAN........................................................................................2
    **3.1**    What is chapter 11?.......................................................................................2
    **3.2**    Why are the Debtors sending me this Disclosure Statement?......................2
    **3.3**    Why are votes being solicited prior to Bankruptcy Court approval of the
        Disclosure Statement?..................................................................................3
    **3.4**    Am I entitled to vote on the Plan?...............................................................3
    **3.5**    What will I receive from the Debtors if the Plan is consummated?..............4
    **3.6**    What will I receive from the Debtors if I hold an Allowed Administrative
        Claim, a Professional Fee Claim, or a Priority Tax Claim?.........................8
    **3.7**    Are any regulatory approvals required to consummate the Plan?..............11
    **3.8**    What happens to my recovery if the Plan is not confirmed or does not go
        effective?....................................................................................................11
    **3.9**    If the Plan provides that I get a distribution, do I get it upon Confirmation
        or when the Plan goes effective, and what is meant by "Confirmation,"
        "Effective Date," and "Consummation?".....................................................11
    **3.10**   What are the sources of Cash and other consideration required to fund the
        Plan?..........................................................................................................12
    **3.11**   Is there potential litigation related to the Plan?.........................................12
    **3.12**   How will the preservation of the Causes of Action impact my recovery
        under the Plan?...........................................................................................12
    **3.13**   Will there be releases and exculpation granted to parties in interest as part
        of the Plan?................................................................................................13
    **3.14**   When is the deadline to vote on the Plan?..................................................17
    **3.15**   How do I vote on the Plan?.....................................................................~~17~~18
    **3.16**   Why is the Bankruptcy Court holding a Confirmation Hearing?.............~~17~~18
    **3.17**   When is the Confirmation Hearing set to occur?........................................18
    **3.18**   What is the purpose of the Confirmation Hearing?....................................18
    **3.19**   What is the effect of the Plan on the Debtors' ongoing businesses?...........18
    **3.20**   Will any party have significant influence over the corporate governance
        and operations of the Reorganized Debtors?............................................~~18~~19
    **3.21**   Who do I contact if I have additional questions with respect to this
        Disclosure Statement or the Plan?.............................................................19
    **3.22**   Do the Debtors recommend voting in favor of the Plan?.........................~~19~~20
    **3.23**   Who Supports the Plan?...........................................................................~~19~~20

**ARTICLE IV** DEBTORS' CORPORATE HISTORY, ~~STUCTURE~~STRUCTURE,
AND BUSINESS OVERVIEW.........................................................................................20
    **4.1**    The Debtors' Prepetition Businesses...........................................................20
    **4.2**    Organizational Structure and Equity Ownership.........................................22

i

**4.3**    The Capital Structure ................................................................. ~~22~~23

**ARTICLE V** EVENTS LEADING TO CHAPTER 11 FILING .............................. 25
**5.1**    Declining Financial Performance ............................................... ~~25~~26
**5.2**    The Prepetition Marketing Process ............................................ ~~26~~27
**5.3**    The Restructuring Support Agreement ....................................... 27
**5.4**    Milestones ................................................................................ ~~28~~29

**ARTICLE VI** MATERIAL DEVELOPMENTS AND ANTICIPATED  EVENTS OF
THE CHAPTER 11 CASES ............................................................ ~~28~~29
**6.1**    First Day Relief ........................................................................ ~~28~~29
**6.2**    Proposed Confirmation Schedule .............................................. 29
**6.3**    Aves Global Settlement ............................................................ 30
**6.4**    Skin Medicinals Litigation ....................................................... 33
**6.5**    Financial Performance to Date .................................................. 33

**ARTICLE VII** SUMMARY OF THE PLAN ................................................... ~~30~~34
**7.1**    General Compromise and Settlement of Claims, Interests, and
Controversies ........................................................................... ~~30~~34
**7.2**    Restructuring Transactions ....................................................... ~~30~~34
**7.3**    Sources of Consideration for Plan Distributions ...................... ~~31~~35
**7.4**    Continued Corporate Existence ................................................ ~~31~~35
**7.5**    Existing Governance Documents .............................................. ~~31~~35
**7.6**    Members of the Governing Bodies ........................................... ~~32~~36
**7.7**    Vesting of Assets in the Reorganized Debtors .......................... ~~32~~36
**7.8**    Section 1145 Exemption .......................................................... ~~32~~36
**7.9**    Cancellation and Surrender of Instruments and Agreements ..... ~~32~~36
**7.10**   Corporate Action ...................................................................... ~~33~~37
**7.11**   Section 1146 Exemption from Certain Taxes and Fees ............. ~~33~~37
**7.12**   Preservation of Causes of Action ............................................. ~~34~~38
**7.13**   Single Satisfaction of Claims .................................................. ~~34~~38
**7.14**   Releases ................................................................................... ~~34~~38
**7.15**   Deemed Substantive Consolidation .......................................... ~~35~~39

**ARTICLE VIII** OTHER KEY ASPECTS OF THE PLAN ................................. ~~35~~39
**8.1**    Treatment of Executory Contracts and Unexpired Leases ......... ~~35~~39
**8.2**    Provisions Governing Distributions .......................................... ~~40~~44
**8.3**    Releases and Exculpations ....................................................... ~~44~~48
**8.4**    Conditions Precedent to Confirmation and Consummation of the Plan ..... ~~50~~54
**8.5**    Modification, Revocation, or Withdrawal of the Plan ............... ~~52~~56

**ARTICLE IX** RISK FACTORS ................................................................... ~~53~~57
**9.1**    Bankruptcy Law Considerations ............................................... ~~53~~57
**9.2**    Risks Related to Recoveries Under the Plan ............................. ~~58~~62

**ARTICLE X** SOLICITATION AND VOTING PROCEDURES ............................ ~~62~~66
**10.1**   Holders of Claims Entitled to Vote on the Plan ........................ ~~62~~66
**10.2**   Votes Required for Acceptance by a Class ................................ ~~62~~66
**10.3**   Certain Factors to Be Considered Prior to Voting .................... ~~63~~67

**10.4**    Solicitation Procedures........................................................................63 67

**ARTICLE XI** CONFIRMATION OF THE PLAN.................................................64 68
**11.1**    The Confirmation Hearing.................................................................64 68
**11.2**    Requirement for Confirmation of the Plan.......................................65 69
**11.3**    Feasibility..........................................................................................65 69
**11.4**    Acceptance by Impaired Classes......................................................65 69
**11.5**    Confirmation Without Acceptance by all Impaired Classes.............66 70
**11.6**    Liquidation Analysis..........................................................................67 71

**ARTICLE XII** CERTAIN SECURITIES LAW MATTERS...................................67 71
**12.1**    Exemption from Registration Requirements of the Securities Act and Blue Sky Laws..........................................................................................67 71

**ARTICLE XIII** CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES..............................................................................................68 72
**13.1**    Introduction.......................................................................................68 72
**13.2**    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor and the Reorganized Debtors..............................................69 73
**13.3**    U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims and Interests..........................................................................70 74

**ARTICLE XIV** RECOMMENDATION.............................................................72 76

4869-9662-5086, v. 7 10

Annexed as exhibits (the "**Exhibits**") to this Disclosure Statement are copies of the following documents:

EXHIBIT A           Plan of Reorganization

EXHIBIT B           Restructuring Support Agreement

EXHIBIT C           Liquidation Analysis

EXHIBIT D           Feasibility Analysis

EXHIBIT E           Aves Settlement Agreement

# ARTICLE I
# INTRODUCTION

1.1    *General.*

Optio Rx, LLC (**"Optio Rx"**), and certain of its above captioned direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the **"Debtors"** or the **"Company"**), hereby transmit this disclosure statement (as may be amended, supplemented or otherwise modified from time to time, the **"Disclosure Statement"**), pursuant to section 1125 of title 11 of the United States Code (the **"Bankruptcy Code"**), in connection with the solicitation of votes on the *Amended* Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al., (the **"Plan"**), dated as of ~~June 9~~July [●], 2024.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THAT THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

# ARTICLE II
# PRELIMINARY STATEMENT

Optio Rx is a Delaware limited liability company that has 26 direct and/or indirect subsidiaries.  Non-Debtor CBC Pharma HoldCo, LLC (**"CBC Pharma"**) is the direct or indirect parent company of Optio Rx and each of the other Debtors.

The Debtors operate in four primary specialty pharmacy business segments, including: (i) clinically focused retail dermatology pharmacies; (ii) compounding pharmacies; (iii) hospice pharmacies; and (iv) fertility treatments.  Overall, the Company employs approximately 260 employees in 18 locations located in 7 states and services more than 100,000 patients.  The Debtors also provide prescription fulfilling services to long term care facilities, among other things.

While the Debtors' businesses as a whole remain operationally sound, the Company has experienced a number of unexpected challenges in recent years, including the inability to service the Debtors' debt obligations and liquidity issues that have left the Debtors unable to repay or recapitalize the outstanding principal and interest under their Prepetition Credit Agreement which ~~matures~~matured on June 28, 2024.

In early 2024, the Debtors entered comprehensive restructuring discussions with certain Consenting Lenders (as defined below) to consummate a potential transaction to increase financial flexibility and create a stronger, sustainable capital structure moving forward.  In this regard, on May 9, 2024, the Debtors entered into a Restructuring Support Agreement, pursuant to

which the Debtors and the Consenting Lenders approved certain restructuring transactions with respect to the Debtors' capital structure as more fully set forth below.

With Plan and key creditor support in place pursuant to the Restructuring Support Agreement, the Debtors expect to emerge positioned to capitalize on their asset base as the Company looks to continue its go-forward growth and operating plans.  Accordingly, the Restructuring Support Agreement contains certain milestones, including securing an order confirming the Plan no later than ~~seventy-five~~one hundred (~~75~~100) days after the Petition Date. The Debtors believe they can confirm the Plan and emerge from chapter 11 within these time periods without prejudicing the ability of any parties to assert their rights in the Chapter 11 Cases.

The Restructuring Support Agreement is a significant achievement for the Debtors and a welcomed culmination of the lengthy negotiations with the Debtors' key creditors.  A right-sized capital structure will allow the Company to capitalize on its business going forward and maximize value for the benefit of all stakeholders.  The Debtors strongly believe that the Plan is in the best interests of the Debtors' stakeholders and represents the best available transaction for the Debtors to maximize value.  **For these reasons, the Debtors strongly recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan vote to accept the Plan.  The Official Committee of Unsecured Creditors (the "Committee") has reviewed the Plan and is not making a formal recommendation on whether creditors should vote in favor or against** the Plan.

## ARTICLE III
## QUESTIONS AND ANSWERS REGARDING
## THIS DISCLOSURE STATEMENT AND THE PLAN

**3.1**    *What is chapter 11?*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**3.2     *Why are the Debtors sending me this Disclosure Statement?***

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**3.3     *Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?***

By sending this Disclosure Statement and soliciting votes for the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases.  The Debtors ~~will ask~~have asked the Bankruptcy Court to approve this Disclosure Statement~~, which may be scheduled as shortly as 45 days after commencing the Chapter 11 Cases~~ on August 1, 2024, with Confirmation of the Plan ~~as shortly as 75 days after commencing the Chapter 11 Cases~~on September 13, 2024, all subject to the Bankruptcy Court's approval and availability.

**3.4     *Am I entitled to vote on the Plan?***

Your ability to vote on the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of ~~———~~August 7, 2024).  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| CLASS | CLAIM | IMPAIRMENT | ENTITLED TO VOTE |
|-------|-------|------------|------------------|
| 1 | Prepetition Lien Claims | Impaired | Yes |
| 2 | Vendor Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | No |

- 3 -

| CLASS | CLAIM | IMPAIRMENT | ENTITLED TO VOTE |
|---|---|---|---|
| | | | (deemed to reject) |
| 7 | Noteholder Claims | Impaired | ~~No (deemed to reject)~~Yes |
| 8 | Seller Note Claims | Impaired | No (deemed to reject) |
| 9 | Convenience Class Claims | Impaired | Yes |
| 10 | Intercompany Claims | Impaired | No (deemed to reject) |
| 11 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 12 | Equity Interests in Optio Rx | Impaired | No (deemed to reject) |

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**3.5**   *What will I receive from the Debtors if the Plan is consummated?*

The following table provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|-------|-------------|-----------|------------------------------------------------------|----------------------|
| Class 1 | Prepetition Lien Claims | Except to the extent that a Holder of an Allowed Prepetition Lien Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition Lien Claim, each such Holder shall receive the following treatment in accordance with the Restructuring Support Agreement and the Plan Term Sheet:<br><br>i.      in connection with the Prepetition Lien Conversion, (a) a portion of the Holder's respective Prepetition Lien Claims shall constitute first-priority, perfected, enforceable and unavoidable Exit Facility Claims in full force and effect, which Exit Facility Claims and Exit Facility Liens shall be first-priority, enforceable, unavoidable and automatically perfected by virtue of entry of the Confirmation Order; provided, however, on the Effective Date, each of the Holders of the Prepetition Lien Claims shall (i) provide their proportionate share of the GUC Trade Gift to the holders of allowed General Unsecured Claims and (ii) provide their proportionate share of the GUC | $127,600,000 | N/A |

---

[2]    The amounts set forth in this chart reflect the Debtors' most current estimates of projected claim amounts.

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|-------|-------------|-----------|-----------------------------------------------------|----------------------|
| | | Opt-In Gift, as applicable; and (b) on the Effective Date, the Holder shall receive its respective portion of the Prepetition Lien Conversion Equity, and which shall fully vest and be entitled to such rights as may be detailed in the New Governance Documents and which on the Effective Date, except for the equity shares or units to be issued to the Noteholders pursuant to the Aves Settlement Agreement, shall constitute all of the issued and outstanding equity shares or units, subject to the management incentive plan. | | |
| Class 2 | Vendor Secured Claims | On the Effective Date, each Holder of an Allowed Vendor Secured Claims shall receive, in full satisfaction of such claim, at the election of the Reorganized Debtors: (a) Cash payment in full on the Effective Date, or as soon as reasonably practicable thereafter, in satisfaction of their respective allowed Secured Claims; (b) the return of their collateral; or (c) such other treatment as the Reorganized Debtors and such vendor agree. | $1,534,134 | Claims will be reinstated and, thus, no impact on recovery. |
| Class 3 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Secured Claim. | $0.00 | 100% |
| Class 4 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall | $0.00 | 100% |

4869-9662-5086, v. 710

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|---|---|---|---|---|
| | | receive Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Priority Claim. | | |
| Class 5 | General Unsecured Trade Claims | The holders of Allowed General Unsecured Trade Claims are impaired by the Plan and shall, by virtue of the GUC Trade Gift, (x) on the Effective Date, receive [80%-95%] of their respective Allowed General Unsecured Trade Claim and (y) on the one-year anniversary of the Effective Date, receive the remaining [5%-20%] of their respective Allowed General Unsecured Trade Claim.. | $2,033,751 | 100% |
| Class 6 | Other General Unsecured Claims | On the Effective Date, all Other General Unsecured Claims shall be cancelled, released, and extinguished without any distribution.~~.~~ | $379,970 | 0% |
| Class 7 | Noteholder Claims | ~~On the Effective Date, all Noteholder Claims shall be cancelled, released, and extinguished without any distribution.~~<u>On the Effective Date, (A) provided Aves and each of the Noteholders votes to accept the Plan, the Noteholders shall receive, all as set forth in the Aves Settlement Agreement, (i) the Cash Consideration, (ii) 1.5% of the common equity in Online Pharmacy Holdings LLC (prior to dilution for any management incentive plan),</u> | $73,809,454 | ~~0%~~<u>N/A</u> |

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|---|---|---|---|---|
| | | allocated pro rata to the Noteholders, and (iii) $3,000,000 (subject to the DIP Lender Clawback) in aggregate liquidation preference of junior preferred equity in Online Pharmacy Holdings LLC, allocated pro rata to the Noteholders; or (B) if Class 7 is a rejecting Class, then Class 7 shall receive no distribution under the Plan and retain no property of any Debtor. | | |
| Class 8 | Seller Note Claims | On the Effective Date, all Seller Note Claims shall be cancelled, released, and extinguished without any distribution. | $30,046,706 | 0% |
| Class 9 | Convenience Class Claims | The Holders of Allowed General Unsecured Claims in an amount of $500 or less, or who elect to reduce their respective claims below $500, shall, on the later of (i) the Effective Date and (ii) the date that is ten (10) business days after such Convenience Claim becomes an Allowed Claim, in full and final satisfaction of such Claim, receive payment in Cash equal to the lesser of (x) 100% of the Allowed amount of such Convenience Claim and (y) such Holder's pro rata share of the pool of Convenience Claims. | TBD | 100% |
| Class 10 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without any distribution. | TBD | 0% |
| Class 11 | Intercompany Interests | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor(s), and with the consent of the | N/A | N/A |

| Class | Description | Treatment | Estimated Amount of Claims or Interests in Class[2] | Estimated % Recovery |
|-------|-------------|-----------|-----------------------------------------------------|----------------------|
|  |  | Consenting Lenders, which consent shall not be unreasonably withheld, either (a) Reinstated or (b) canceled and released. |  |  |
| Class 12 | Equity Interests in Optio Rx | On the Effective Date, all Equity Interests in Optio Rx shall be cancelled, released, and extinguished of such Interests on account of such Interests. | N/A | 0% |

**3.6**   ***What will I receive from the Debtors if I hold an Allowed Administrative Claim, a Professional Fee Claim, or a Priority Tax Claim?***

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

       1.   <u>Administrative Claims</u>

Except to the extent that a Holder of an Allowed Administrative Expense Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, or as otherwise provided in the Plan, each Holder of an Allowed Administrative Claim against any of the Debtors shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, within five (5) Business Days after the Effective Date, or as soon as reasonably practicable thereafter, (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than five (5) Business Days after such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; or (iii) at such time and upon such terms as set forth in an order of the Bankruptcy Code; provided that Administrative Claims incurred by any Debtor in the ordinary course of such Debtor's business may be paid in the ordinary course of business by the Debtors, consistent with past practice and in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

       2.   <u>Professional Fee Claims</u>

          a.   <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court in the Chapter 11 Cases.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from (but not limited by the estimates provided for in Section 2.02(c) of the Plan) the Professional Fee Escrow Account.  Any objections to Professional Fee Claims must be filed and served on the Debtors and the Reorganized Debtors and the requesting party no later than thirty days after service of the final request for payment of Professional Fee Claims.

b.    Professional Fee Escrow Account

Prior to the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors other than the Reorganized Debtors' reversionary interest therein.  The amount of Professional Fee Claims owing to the Professionals on and after the Confirmation Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  When all Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

c.    Professional Fee Account Estimates

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimate to the Debtors no later than one (1) Business Day before the Effective Date; *provided*, *however*, that such estimates shall not be considered an admission, cap or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the Estimates. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

d.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation of the Plan and Consummation, incurred by the Debtors or any Professional following the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

3.     Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such Holder agree to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim within five (5) Business Days after the Effective Date; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installments over a period not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (iii) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

The Reorganized Debtors shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

4.     DIP Facility

On the Effective Date, all Allowed DIP Lien Claims and DIP Superpriority Claims due and owing under the DIP Facility shall be the subject of the DIP Lien Conversion into Exit Facility Claims.

5.     Statutory Fees

The Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee, including quarterly fees payable under 28 U.S.C. §1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business at the time of Confirmation.  On and after the Effective Date, to the extent the Chapter 11 Cases remain open, and for so long as any Reorganized Debtor remains obligated to pay quarterly fees, such Reorganized Debtor shall pay the applicable U.S. Trustee fees for that Reorganized Debtor when due in the ordinary course until such time as the Bankruptcy Court enters a final decree in the Reorganized Debtors' Chapter 11 Cases.

6.    Transaction Expenses

The Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the Restructuring Support Agreement, as applicable, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail and without any requirement for Bankruptcy Court's review or approval.  All Transaction Expenses to be paid on the Effective Date (to the extent not previously invoiced) shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Day before the anticipated Effective Date; provided, however, that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay when due the reasonable pre- and post-Effective Date Transaction Expenses related to the implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date, upon receipt of invoices therefor.

**3.7    *Are any regulatory approvals required to consummate the Plan?***

At this time, other than approvals to transfer certain pharmacy licenses, there are no known regulatory approvals that are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**3.8    *What happens to my recovery if the Plan is not confirmed or does not go effective?***

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of extended Chapter 11 Cases, or of a liquidation scenario, see Article 11.6 of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit C**.

**3.9**    ***If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"***

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date.  See 8.4 of this Disclosure Statement, titled "Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**3.10**    ***What are the sources of Cash and other consideration required to fund the Plan?***

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with Cash on hand, the GUC Trade Gift, and the GUC Opt-In Gift.

**3.11**    ***Is there potential litigation related to the Plan?***

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation. See Article 9.2(d)4 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  See 9.1(h) of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**3.12**    ***How will the preservation of the Causes of Action impact my recovery under the Plan?***

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Section 7.02 of the Plan), each of the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and each of the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in

Article VII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.  Each of the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of such Reorganized Debtor.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that any of the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which any of the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Debtor Releases), each of the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, each of the Reorganized Debtors expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action as a consequence of the Confirmation or Consummation.  Each of the Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.  The Debtors have not conducted a comprehensive investigation into the targets of any Causes of Action that the Estates may possess.  Likewise, the Debtors have not assigned a value to those Causes of Action that may be related to, referenced to, and/or released under the Plan.  Therefore, the Debtors make no representation regarding the value or loss of value to any Releasing Party in releasing said Causes of Action.

### 3.13    *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Lenders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.  The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Indeed, the Released Parties are integral to the facilitation of the transactions contemplated in the Plan and the releases, as proposed, are necessary to provide finality and permit the Debtors to move forward with the operations of their business without the threat of litigation against them.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND

FOREVER, RELEASED AND DISCHARGED ANY AND ALL CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (I) EACH OF THE RELEASED PARTIES; (II) ALL HOLDERS OF CLAIMS OR INTERESTS THAT VOTE TO ACCEPT OR REJECT THE PLAN AND OPT-INTO THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE FORM INDICATING THAT THEY OPT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (III) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ABSTAIN FROM VOTING ON THE PLAN AND WHO AFFIRMATIVELY OPT-INTO THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE FORM INDICATING THAT THEY OPT TO GRANT THE RELEASES PROVIDED IN THE PLAN; (IV) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (I) THROUGH THE FOLLOWING CLAUSE (V); AND (V) EACH RELATED PARTY WITH RESPECT TO EACH OF THE FOREGOING IN CLAUSES (I) THROUGH (V).

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

(a)     Releases by the Debtor

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties[3], the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each of the Debtors, the Reorganized Debtors and their Estates, including any successors to the Debtors or any estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, that any of the Debtors, the Reorganized Debtors or their**

---

[3]     "Released Parties" means, collectively, (a) each of the Debtors, (b) the Reorganized Debtors, (c) the Consenting Lenders, (d) the DIP Lenders, (e) the Admin Agent, (f) Aves, (g) the Noteholders; and (h) the Related Parties of each of the foregoing Entities in clauses (a) through (g) of this definition; provided, however, that if any of Aves and the Noteholders do not vote to accept the Plan, such non-accepting parties shall not be Released Parties. For the avoidance of doubt, the manager of Pharmacy Management LLC and its Related Parties shall be deemed Released Parties. For the further avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of a Holder of any Claim against, or Interest in, the Debtors or other Entity, based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership or operation thereof), purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Exit Facility, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.  For the avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date or (ii) the rights of any of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of any of the Debtors under any employment agreement with a current or former employee of any the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases, which include by reference each of the related provisions and definitions contained in the Plan, and further shall constitute the Bankruptcy Court's finding that the Debtor Releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Releases; (iii) in the best interests of the Debtors and all

Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Debtors' Estates asserting any Cause of Action released pursuant to the Debtor Releases.

      (b)     Releases by Holders of Claims and Interests

      **To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, including any derivative claims asserted on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership or operation thereof), the subject matter of or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors any other Released Party, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among any of the Debtors or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.**

      **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release the (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) rights of Holders of Allowed Claims or Allowed Interests to receive distributions under the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

4869-9662-5086, v. 710

(c)    Discharge of Claims

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of claim or Interest based upon such debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

(d)    Exculpation

**As of the Effective Date, except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim other than those arising out of or relating to any act by or omission of an Exculpated Party that have been determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on the Plan, distribution of consideration pursuant to the Plan and, to the extent applicable, the offer, issuance and sale or purchase of securities pursuant to the Plan and, therefore, are not, and on account of such solicitation, distribution and issuance shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan, such distributions made pursuant to the Plan and issuance of securities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) the rights of Holders of Allowed Claims or Allowed Interests to receive treatment in accordance with the Plan.**

**3.14    *When is the deadline to vote on the Plan?***

The Voting Deadline is [———September 3, 2024], at 5:00 p.m. (*prevailing* Eastern Time).

**3.15    *How do I vote on the Plan?***

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to holders of Claims that are entitled to vote on the Plan (the "**Ballot**").  For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is actually received by the Debtors' claims, noticing, and solicitation agent, Stretto, Inc. (the "**Solicitation Agent**") on or before the Voting Deadline, *i.e.* [———September 3, 2024], at 5:00 p.m. (*prevailing* Eastern Time).  If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise.  See Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**3.16    *Why is the Bankruptcy Court holding a Confirmation Hearing?***

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.  ~~Shortly after the commencement of the Chapter 11 Cases, the~~The Debtors ~~will request~~have requested that the Bankruptcy Court schedule the Confirmation Hearing on ~~or before a date that is Seventy Five (75) days after the Petition Date~~September 13, 2024.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

- 20 -

**3.17** *When is the Confirmation Hearing set to occur?*

The Debtors ~~intend to request~~have requested that the Bankruptcy Court schedule the Confirmation Hearing on ~~or before a date that is Seventy-Five (75) days after the Petition Date, or as such time determined by the Bankruptcy Court~~September 13, 2024.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Debtors ~~intend to request~~have requested that objections to Confirmation must be filed and served on the Debtors, and certain other parties, ~~at a time determined by the Bankruptcy Court~~on or before September 3, 2024.

**3.18** *What is the purpose of the Confirmation Hearing?*

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**3.19** *What is the effect of the Plan on the Debtors' ongoing businesses?*

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (see Articles 8.02 and 8.03 of the Plan).  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

4869-9662-5086, v. ~~7~~10

**3.20** ***Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?***

As of the Effective Date, and subject to the Restructuring Support Agreement, the existing members of the Reorganized Debtors' Governing Bodies shall remain in their current capacities as members of such Governing Body of the applicable Reorganized Debtor, unless or until replaced or removed in accordance with the New Governance Documents of the Reorganized Debtors. The New Governance Documents of the Reorganized Debtors shall be as set forth in the Plan Supplement and shall be acceptable in form and substance to the Consenting Lenders. To the extent any such officer of the Reorganized Debtors is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such trustee and officer shall also be disclosed in the Plan Supplement.

**3.21** ***Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?***

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, Inc., via one of the following methods:

*By regular mail, hand delivery or overnight mail at:*

Optio Rx
c/o Stretto, Inc
410 Exchange
Ste 100
Irvine, CA 9260

*By electronic mail at:*

OptioRXInquiries@stretto.com

*By telephone (toll free) at:*

Toll-free:  949.590.3286

Local:  866.515.5505

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://cases.stretto.com/OptioRX (free of charge) or~~, upon the filing of the Chapter 11 Cases,~~ via PACER at https://www.pacer.gov (for a fee).

**3.22    *Do the Debtors recommend voting in favor of the Plan?***

Yes.  The Debtors believe that the Plan provides for a larger recovery to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan contemplates a significant deleveraging of the Company's balance sheet and enables the Debtors to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent in the Plan.

**3.23    *Who Supports the Plan?***

The Plan is supported by the Debtors and the Consenting Lenders that have executed the Restructuring Support Agreement.

**ARTICLE IV**
**DEBTORS' CORPORATE HISTORY, ~~STUCTURE~~STRUCTURE, AND BUSINESS OVERVIEW**

**4.1    *The Debtors' Prepetition Businesses***

(a)    **Overview**[34]

The Debtors operate in four primary specialty pharmacy business segments, including: (i) clinically focused retail dermatology pharmacies; (ii) compounding pharmacies; (iii) hospice pharmacies; and (iv) fertility treatments.  Overall, the Company employs approximately 260 employees in 18 locations located in seven states and services more than 100,000 patients.  The Debtors also provide prescription fulfilling services to long term care facilities, among other things.

(b)    **Retail Pharmacies**

The Company owns and operates seven clinically focused retail dermatology pharmacies, five are located in California and two are located in New York (the "Retail Pharmacies").  The Retail Pharmacies accounted for approximately 59% of the Debtors 2023 revenue (approximately $98 million of a total of $166 million in revenue) and are one of the largest clinically focused dermatology pharmacy chains in the United States.  The Retail Pharmacies have storefronts, allowing patients to pick up their prescriptions, other retail items and a limited selection of over-the-counter medications.  If a patient is not located near one of the Retail Pharmacies, the Company can ship prescriptions directly.  As of the Petition Date, the Retail Pharmacies have 55 employees, including two salespeople that market the specialized services provided by the Retail Pharmacies directly to dermatologists.

---

[34]    While stated in the present tense, the information contained in this Overview section is accurate as of the date of this Disclosure Statement.

- 23 -

(c)     **Compounding Pharmacies and Other Pharmacy Lines**

11.  11.  The Company also operates compounding pharmacies (the **"Compounding Pharmacies"**).  Pharmacy compounding is the preparation of customized medications for human patients and animals.  The Company currently operates seven Compounding Pharmacies that ship prescriptions to patients nationwide, including one that is primarily a fertility pharmacy (as discussed below).  The Debtors' Compounding Pharmacies accounted for approximately $44 million of the Debtors' combined revenue in 2023, including $23 million in fertility treatments and $21 million in compounding, infusion, OTC, and DME revenues.  Despite accounting for a smaller percentage of the Company's overall revenue, the Compounding Pharmacies are the Company's most profitable business segment relative to the revenue they generate.  As of the Petition Date, the Compounding Pharmacies have 104 employees, including one salesperson to market the services offered.

Among other products, the Compounding Pharmacies provide Bio-Identical Hormone Replacement Therapy (**"BHRT"**) for both men and women.  BHRT is a personalized natural approach to hormone balancing, using hormones that are chemically identical to those produced by a patient's body.  This personalized treatment aims to restore hormonal balance, replenishing a patients' essential hormones that may have declined due to aging or other factors.

These conditions affect millions of men and women.  As the number of patients seeking hormone-related treatment has grown, so has the mass production of pills, patches and creams by the drug industry.  Each person's body is different and has its own unique needs, but commercially manufactured products tend to be "one size fits all," and they do not always account for the differences between individuals.  A growing population and longer life expectancies has expanded the number of patients experiencing the symptoms of hormonal imbalances.

For example, by the year 2025, the number of post-menopausal women (older than age 51) is expected to be more than 1.1 billion and nearly 30 percent of the total U.S. population is aged 55 and older.  A hormonal imbalance for women may cause several related health concerns, including, without limitation, a decreased libido, fibrocystic breasts, hot flashes, infertility, irregular menstrual cycle, night sweats, painful intercourse, PMS, post-partum depression, and weight gain.

The Company also provides personalized hormone replacement solutions for men.  Every man's body is different, and factors such as age, genetics, lifestyle, and existing health conditions significantly determine hormone levels.  There may be times when standard medications don't address the diverse needs of men.  Some of the conditions the Company's hormone replacement solutions for men address are adrenal fatigue, andropause, low testosterone and thyroid imbalance.

(d)     **Veterinary Compounding**

Compounding is an increasingly popular solution to veterinary patient problems.  When it comes to things like skin rashes, eye and ear infections, heart conditions, cancer, and diabetes, animals and humans have a lot in common.  However, giving animals medication presents a

- 24 -

unique set of challenges. Compounding techniques enable the Company's pharmacists to formulate medications as liquids, chewables, capsules, pills, or transdermal creams and gels for animals.

The Company specializes in customizing medications in unique dosages and forms to meet a animal's individual needs. In many cases, the Company can create medications that are not available in standard forms, allowing for a treatment program specifically tailored to individual animals.

      (e)    **Hospice Pharmacies**

The Company also operates four hospice pharmacies (the **"Hospice Pharmacies"**). The Debtors' Hospice Pharmacies provide medications for the compassionate care of people in the last phases of incurable diseases. The Debtors' Hospice Pharmacies accounted for approximately $23.5 million of the Debtors' combined revenue in 2023 and currently have 80 employees.

      (f)    **Fertility Treatments**

The Company also provides specialized fertility treatments (the **"Fertility Treatments"**) for its patients. The Company operates one pharmacy that specializes in Fertility Treatments (the **"Fertility Pharmacy"**) and compounding treatments as set forth above. The Company provides complete packages for a patient's Fertility Treatments, including syringes, needles, swabs and sharps containers and offers a full line of sterile and non-sterile fertility compounds. The Debtors' Fertility Treatments accounted for approximately $23 million of the Debtors' combined revenue in 2023. As of the Petition Date, the Fertility Pharmacy currently has 18 employees.

**4.2**    ***Organizational Structure and Equity Ownership.***

Non-Debtor CBC Pharma is the direct or indirect parent company of Optio Rx and each of the other Debtors. The organizational chart below shows the Company's current organizational structure:



(a)     **Employees**

Overall, the Company employs approximately 260 employees in 18 locations located in 7 states. To date, the Company has not experienced any significant work stoppages or other labor problems.

(b)     **Regulation of Company's Business**

The Company's operations are subject to various federal, state and local environmental, health, and safety laws, licenses and regulations governing the ongoing operation of its primary specialty pharmacy businesses.  More specifically, individual state boards of pharmacy govern the pharmacy licenses for each of the Debtors' locations.  The Debtors cannot operate without these state pharmacy licenses.  Any ownership changes for the Debtors will require state board of pharmacy approval.  To the extent the Debtors licenses cannot be transferred to the new owners of the Reorganized Debtors under the Plan, the Plan may not be able to go effective.

**4.3     *The Capital Structure***

As of the Petition Date, certain of the Debtors are obligated as borrowers, issuers, or guarantors on: (i) a secured credit facility, referred to as the Prepetition Credit Agreement; (ii) an unsecured Note Purchase Agreement; and (iii) various Seller Notes (each as defined below).  The Prepetition Credit Agreement is secured by a first-priority lien on and security interest in substantially all the Debtors' assets.

(a)     **Prepetition Credit Agreement**

Pursuant to that certain Credit Agreement, dated as of June 28, 2019 (as amended, the **"Prepetition Credit Agreement"**), by and among CBC Pharma, Optio Rx, Loan Admin Co

LLC, as administrative agent, and Loan Admin Co LLC, as lead arranger (the **"Prepetition Admin Agent"**) and the lenders party thereto from time to time (the **"Prepetition Secured Lenders"**), as of the Petition Date, the Debtors are indebted to the Prepetition Secured Lenders in an aggregate principal amount of approximately $127.6 million, including accrued and unpaid interest, fees and other claims (the **"Prepetition Secured Obligations"**).  The Prepetition Secured Obligations are secured by first-priority liens and security interests in substantially all the Debtors' assets (the **"Prepetition Liens"**).  At the time the Prepetition Credit Agreement was entered into, certain Prepetition Secured Lenders also acquired equity interests in CBC Pharma, representing approximately 11.6% of the fully diluted equity interests in CBC Pharma at that time.  Certain Prepetition Secured Lenders subsequently made additional investments in equity interests of CBC Pharma in connection with further acquisitions by CBC Pharma; as of the Petition Date, these Prepetition Secured Lenders own approximately 19.9% of the common equity interests in CBC Pharma.  The Last Out Lender additionally indirectly owns a minority interest in CBC Pharma.

On September 16, 2022, the Prepetition Admin Agent served a notice of default and exercise of certain remedies (the **"Notice of Default"**) under the Prepetition Loan Documents on CBC Pharma and Optio Rx.  The Notice of Default asserted CBC Pharma and Optio Rx's failure to comply with and/or cure certain material obligations under the Prepetition Loan Documents. In accordance with the terms thereunder, among other things, the Prepetition Admin Agent appointed Pharmacy Management LLC as the Prepetition Admin Agent's sub-agent for purposes of exercising remedies under the Prepetition Loan Documents.  Pursuant to the Prepetition Loan Documents, as directed by the Prepetition Secured Lenders, Pharmacy Management, as sub-agent, exercised the voting rights of the membership interests in Optio Rx pledged by CBC Pharma as collateral for the Prepetition Secured Obligations to amend the operating agreement of Optio Rx to (i) remove CBC Pharma as Manager of Optio Rx and (ii) appoint Pharmacy Management as Manager of Optio Rx.  As a result of this action, since September 16, 2022, Pharmacy Management, under the direction of its Board of Managers, has exercised operational control of Optio Rx and the other Debtors.  Initially, the Board of Managers of Pharmacy Management consisted of one independent manager, three designees of the Prepetition Secured Lenders, and the CEO of Optio Rx at the time.  Prior to the Petition Date, all members of the Board of Managers of Pharmacy Management other than the independent manager have resigned.

In connection with the Prepetition Credit Agreement, on or about November 3, 2022, certain of the Prepetition Secured Lenders entered into an Agreement Among Lenders, (as amended, the **"AAL"**).  The AAL is between and among: (i) holders (each, a **"First Out Holder"** and collectively, the **"First Out Holders"**) of first out term loans (the **"First Out Term Loans"**) and revolving loans under the Prepetition Credit Agreement and the AAL; (ii) the holder (the **"Last Out Holder"**) of last out term loans (the **"Last Out Term Loans"**) under the Prepetition Credit Agreement and the AAL; (iii) the Prepetition Admin Agent, and (iv) any other lender party to the AAL.  One part of the transactions at the time the AAL was entered into provided additional liquidity to Optio Rx, in the form of new money last out term loans from the Last Out Holder.  Prior to acquiring the Last Out Term Loans, the Last Out Holder had provided financing to certain equity holders of CBC Pharma to fund their equity investments in CBC Pharma.

The AAL is a subordination agreement under section 510(a) of the Bankruptcy Code that sets forth specific remedies, priorities, voting rights and other rights between the Last Out Holder and the First Out Holders under the Prepetition Credit Agreement and AAL until the First Out Term Loans are repaid in full.  In general terms, the rights of the Last Out Holder have been subordinated to the rights of the First Out Holders.

As of the Petition Date, interest on the Prepetition Secured Obligations is accruing at approximately 15% to 19 % per annum, depending upon the tranche.  With respect only to the Last Out Term Loans, in addition to cash interest, the Debtors accrued additional interest at a rate equal to 2.00% per annum on the then outstanding principal amount of the Last Out Term Loans in kind (**"Last Out PIK Interest"**), which Last Out PIK Interest was capitalized by adding such amount to the then outstanding principal amount of the Last Out Term Loans.  The Debtors have been in default of the Prepetition Credit Agreement since September of 2022.  The Prepetition Secured Obligations ~~mature~~matured on June 28, 2024.  As of the Petition Date, and at all times since September 16, 2022, Pharmacy Management LLC, as the manager of Optio Rx, has one independent director.

As of the Petition Date, the Prepetition Credit Agreement consists of (a) Term Loans  in the approximate principal amount of $32,986,997.19, (b) Healthy Choice Incremental Term Loans in the approximate principal amount of $9,859,596,28, (c) Revolving Loans in the approximate principal amount of $5,000,000.00, (d) Last Out Term Loans in the approximate principal amount of $57,143,815.64, (e) First Out Term Loans in the approximate principal amount of $5,000,000.00, and (f) accrued fees and interest of $17,592,726.

The Committee is investigating, among other things, the validity of purported liens against the Debtors' assets.  Depending on the outcome of this investigation, such assets may prove to be a source of recovery for unsecured creditors.

(b)    **Note Purchase Agreement**

Pursuant to that certain Note Purchase Agreement, dated as of September 25, 2020 (the **"Note Purchase Agreement"**), Optio Rx issued $50,000,000 in unsecured notes (the **"Notes"**) to note purchasers from time to time (the **"Noteholders"**).  Aves Management LLC (**"Aves"**) serves as the Administrative Agent for the Noteholders.  All of the Debtor subsidiaries of Optio Rx have guaranteed the Notes.  Interest on the Notes was set to accrue at 16.5% per annum, paid by adding and capitalizing the full amount of such interest to the principal amount of the Notes in kind (the **"PIK Interest"**).  Under the terms of the Note Purchase Agreement, the Notes mature on March 25, 2025.

The Notes are subject to a Subordination Agreement, dated as of September 25, 2020, subordinating the Noteholders' claims under the Note Purchase Agreement to the Prepetition Secured Obligations.  As of the Petition Date, the Debtors are indebted to the Noteholders in an aggregate principal amount of approximately $73.8 million, including accrued and unpaid PIK Interest, fees and other claims (the **"Prepetition Noteholder Obligations"**).

(c)    **Seller Notes**

Several of the Debtors are obligated under unsecured notes issued to prior owners of certain businesses that were purchased by the Debtors (the **"Seller Notes"**).  As of the Petition Date, the Debtors are indebted on the Seller Notes in an aggregate principal amount of approximately $29.9 million, including accrued and unpaid interest, fees and other claims (the **"Seller Note Obligations"**).

(d)    **Other Creditors**

As of the Petition Date, the Debtors had approximately $2.4 million in unsecured trade debt and $1.5 million in secured trade debt owing to certain to vendors under supply and security agreements (the **"Vendor Secured Claims"**).  To the extent any supplier has a valid, fully perfected, and unavoidable lien, that is senior to the Prepetition Liens held by the Prepetition Secured Lenders, they are considered permitted liens (**"Permitted Liens"**) under the ~~proposed~~Final DIP ~~financing~~Order and Plan.

## ARTICLE V
## EVENTS LEADING TO CHAPTER 11 FILING

While the Company's business remains operationally sound, it has experienced several unexpected challenges in recent years as described below, including the inability of the Debtors to service the Company's debt obligations.  In addition, the Debtors face liquidity issues that leave them unable to repay or recapitalize the outstanding principal and interest due to the Prepetition Secured Lenders under the Prepetition Credit Agreement coming due in June.  Consequently, the Debtors negotiated with the Consenting Lenders the terms of the Plan Term Sheet, the Restructuring Support Agreement, the Plan and the Restructuring Transactions (as defined below).  These transactions, when effectuated, are expected to leave the Company's business intact, de-lever the balance sheet of the Debtors, enhance long-term growth prospects, and improve operational performance.

**5.1    *Declining Financial Performance***

The Company was formed in 2018.  Through 2020, the Company had acquired nineteen pharmacies, some of which were purchased as part of multi-pharmacy groups.  The Company funded these acquisitions with a mix of equity, third-party senior secured debt and subordinated debt, and seller financing through the takeback of certain notes by the pharmacy owners selling their businesses.  Operationally, the Company largely left the pharmacies to run autonomously.

Apart from the growth stemming from acquisitions, the Company began experiencing difficulty generating organic growth and boosting profitability at the individual pharmacies.  The Company likewise experienced difficulty achieving expectations around the full year cash flow potential of the pharmacies.  In 2021, the Company earned $16.1 million in reported EBITDA from all business operations but has been eroding ever since.

By the end of 2021, the Company's investors elected to install new leadership—a new chief executive officer was elected in early 2022.  In early 2022, the Company and an important

- 29 -

payor, with which the Company was dispensing and billing pharmaceuticals, got into a significant dispute regarding the scope of their contract. This ultimately led the Company to discontinue certain products, which contributed to a material decline in the Company's revenue and profitability.

Starting in early 2022, the Company's new management team sought to refocus the Company on compounding rather than retail products—2022 concluded with $14.5 million in EBITDA. At the same time earnings were declining, interest rates began to increase, causing the Company's debt service to increase dramatically.

In 2023, several factors caused a dramatic reduction in earnings, resulting in only $6.2 million in EBITDA for 2023. The Company no longer had the benefit of ~~the~~dispensing specific highly profitable ~~products~~pharmaceuticals that Caremark asserted were not covered under their payor contract that were discontinued in 2022 (the **"Caremark Dispute"**). The new strategy to focus on compounding failed, and an expensive sales force and corporate infrastructure hired to support the transition further increased costs. In addition, in 2023, former employees opened two competing pharmacies, significantly reducing revenues at two of the Debtors' profitable pharmacies—several productive sales representatives also left the Company.

Legal expenses also increased significantly in 2023 related to, among other things: (i) a lawsuit filed by Optio RX and Crestview Pharmacy versus Crestview City Pharmacy, *et al*., Case Number 3:23-cv-08993-MCR-HTC, pending in the United States District Court for the Northern District of Florida, Pensacola Division; (ii) a lawsuit filed by Mark H. Wank versus Optio RX, Case Number 23C2046, pending in the Circuit Court for Davidson County, Tennessee at Nashville; (iii) a negotiated settlement with the sellers of the Baybridge Pharmacy regarding their Seller Note and equity interests; and (iv) the Caremark Dispute referenced above, further reducing earnings. The Company's failure to turn around profitability in 2022 and 2023 led the Company to bring in a new chief executive officer, who began in early 2024.

At the end of the first quarter of 2024, the Company's year to date EBITDA was $500,000, translating into an annualized EBITDA of only $2 million. Currently, the Company's cash interest payment obligations under the Prepetition Loan Documents are $4 million per quarter (or, $16 million annually). As of the Petition Date, the Company has only approximately $1.8 million in cash on hand and no remaining availability on its Revolving Loans. Given the Company's current cash position, the Company does not have the ability to pay its upcoming interest payments due to Prepetition Secured Lenders and risks failing to pay operating costs in the ordinary course of business. The inability to pay interest on the Prepetition Secured Obligations, coupled with the pending June 28, 2024 maturity date, has created the need for the Company to restructure all its obligations through the RSA and Plan.

**5.2    *The Prepetition Marketing Process***

On July 10, 2023, the Debtors retained Triangle Heath Advisors~~,~~. LLC (**"Triangle"**) to market the Debtors' Retail Pharmacies (the **"Retail Pharmacy Marketing Process"**), its largest operating segment in terms of both revenue and EBITDA. The Retail Pharmacy Marketing

Process was related to pharmacy operations of the Debtors five Retail Pharmacies in California and two in New York.

The Retail Pharmacy Marketing Process ran through April 30, 2024.  During the Retail Pharmacy Marketing Process, Triangle reached out to 279 potential strategic and financial buyers, of which 41 executed a non-disclosure agreement (**"NDA"**).  Triangle sent a confidential information memorandum (**"CIM"**) to all interested buyers that executed an NDA.  Despite having numerous calls and meetings with several of the potential buyers, an acceptable offer for the Retail Pharmacies that cleared the Company's senior secured debt obligations was not received.

On July 20, 2023, the Debtors also retained Triangle to market the Hospice Pharmacies (the **"Hospice Marketing Process"**).  The Hospice Marketing Process also ran through April 30, 2024 without success.  During the Hospice Marketing Process, Triangle reached out to 192 potential strategic and financial buyers, of which eight executed an NDA.  Triangle sent a CIM to all interested buyers that executed an NDA.  Despite having numerous calls with several of the potential buyers, an offer for the Hospice Pharmacies that cleared the Company's senior secured debt obligations was not received.  Accordingly, no offers for the Retail Pharmacies and the Hospice Pharmacies cleared the Company's senior secured debt obligations.

Given the unsuccessful marketing processes, the Debtors approached the Prepetition Secured Lenders to discuss restructuring alternatives.

**5.3** *The Restructuring Support Agreement*

On May 9, 2024, the Debtors, the First Out Holders, the Last Out Holder (and together with the First Out Holders, the **"Consenting Lenders"**), and the Prepetition Admin Agent, entered into that certain Restructuring Support Agreement, pursuant to which the Debtors and the Consenting Lenders approved certain restructuring transactions with respect to the Debtors' capital structure on the terms and conditions set forth in therein and as specified in the term sheet attached thereto as Exhibit B (including all exhibits, annexes, and schedules thereto, the **"Plan Term Sheet"** and, such transactions as described in the Restructuring Support Agreement and the Plan Term Sheet, the **"Restructuring Transactions"**).  The Restructuring Transactions have been incorporated into the Plan filed contemporaneously herewith.

The Plan contemplates a partial debt for equity swap, as follows (the **"Debt for Equity Swap"**):

      a.      on the Effective Date of the Plan, the First Out Holders and the Last Out Holder will convert (i) a portion of their Prepetition Secured Obligations into exit facility claims (the **"Prepetition Lien Conversion"**) on such terms as to effect the Exit Capital Structure attached as an exhibit to the RSA (the **"Exit Facility Claims"**) and (ii) the remaining portion of their Prepetition Secured Obligations into preferred and common equity shares or units of Online Pharmacy Holdings LLC (the **"Prepetition Lien Conversion Equity"**), the new holding company formed on May 22, 2024 to issue preferred and common equity shares or units in connection with the Prepetition Lien Conversion, which Prepetition Lien Conversion Equity shall constitute consideration for the First Out Holders and Last Out Holder committing to such

- 31 -

Prepetition Lien Conversion, all to effect the Exit Capital Structured attached as an exhibit to the RSA; and

b.      on the Effective Date, the DIP Lenders will convert 100% of their DIP Superpriority Claims into Exit Facility Claims, all to effect the Exit Capital Structure attached as an exhibit to the RSA.

On the Effective Date, after consummation of the transactions contemplated in the Debt for Equity Swap described above, the Prepetition Secured Obligations and related claims shall constitute first-priority, perfected, enforceable and unavoidable Exit Facility Claims in full force and effect, which Exit Facility Claims and liens shall be first-priority, enforceable, unavoidable and automatically perfected by virtue of the Confirmation Order (defined below) entered by the Bankruptcy Court; provided, however, each of the holders of the Prepetition Secured Claims will gift (the **"GUC Trade Gift"**) to the holders of allowed general unsecured trade claims (the **"GUC Trade Claims"**) and transfer into an escrow account their proportionate share to satisfy (x) 80-95% of all allowed GUC Trade Claims on the Effective Date and (y) the remaining 5%-20% of such allowed GUC Trade Claims on the one year anniversary of the Effective Date. Additionally, any impaired creditors eligible to vote who vote to accept the Plan of Reorganization and elect to opt-in to the Plan releases shall receive their respective pro rata share of the GUC Opt-In Gift under the Plan. Finally, there is a provision for convenience class claims under the Plan.

Creditors that hold allowed Vendor Secured Claims will, at the election of the Reorganized Debtors: (a) be paid in cash in full on the Effective Date of the Plan in satisfaction of their respective allowed secured claims; (b) receive the return of their collateral; or (c) receive such other treatment as the Reorganized Debtors and such vendor agree. The Plan also provides for the payment in full of administrative, priority and other secured claims.

The Notes, Seller Notes and all equity in Optio Rx, held by CBC Pharma, shall be cancelled, released, and extinguished under the Plan.

**5.4    *Milestones***

Pursuant to the ~~RSA~~Restructuring Support Agreement, the Debtors are required to comply with certain milestones (each, a **"Milestone"** and collectively, the **"Milestones"**), including: (i) the filing of the Chapter 11 Cases no later than 60 days after the Agreement Effective Date (as defined in the Restructuring Support Agreement); (ii) the filing of the Plan and the Disclosure Statement no later than five (5) business days after the Petition Date; (iii) entry of an interim DIP order (the **"Interim DIP Order"**) no later than five (5) business days after the Petition Date; (iv) the entry of a final DIP Order (the **"Final DIP Order"**) no later than forty-five (45) days after the Petition Date; (v) the entry of a disclosure statement order (the **"Disclosure Statement Order"**) no later than ~~45~~60 days after the Petition Date; (vi) the entry of a confirmation order (the **"Confirmation Order"**) no later than ~~75~~100 days after the Petition Date; and (vii) the satisfaction or waiver of the conditions to the Effective Date under the Plan no later than five (5) business days after the Debtors obtain the last pharmaceutical license or other

regulatory approval necessary for the Reorganized Debtors to conduct their business post-Effective Date.

The Plan and the transactions contemplated thereby are vital to preserve the Debtors' operations, employment, and ability to continue to provide uninterrupted services to their patients.  The Plan provides the most efficient and cost-effective path forward for the Debtors, will maximize recovery for creditors, and will preserve jobs for the Debtors' employees.

## ARTICLE VI
## MATERIAL DEVELOPMENTS AND ANTICIPATED
## EVENTS OF THE CHAPTER 11 CASES

### 6.1    *First Day Relief*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the **"Petitions"**), the Debtors ~~intend to file~~filed several motions (the **"First Day Motions"**) designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  The First Day Motions, and all interim and/or final orders for relief entered in the Chapter 11 Cases, are available and can be viewed free of charge, at ~~https://cases.stretto.com/OptioRX~~https://cases.stretto.com/OptioRX.

Among other final orders granting the First Day Motions, on July 1, 2024, the Bankruptcy Court entered the Final DIP Order [D.I. 133], which, among other things, authorized the Debtors to obtain postpetition financing from the DIP Lenders pursuant to that certain DIP Credit Agreement, granted adequate protection, and granted related relief.

### 6.2    *Proposed Confirmation Schedule*

The Restructuring Support Agreement requires that the Debtors comply with the Restructuring Support Agreement Milestones, including securing confirmation of the Plan no later than ~~seventy-five~~one hundred (~~75~~100) days after the Petition Date.  In light of the Debtors' extensive prepetition restructuring efforts, the timeline from the anticipated Petition Date to the confirmation hearing provides more than sufficient time to administer these Chapter 11 Cases in a manner that gives all parties in interest a full and fair opportunity to participate in the process consistent with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Following commencement of the Chapter 11 Cases, the Debtors ~~will file~~filed a scheduling motion seeking approval of the confirmation schedule based on the ~~anticipated~~ Petition Date, which proposed timeline is as follows:

| EVENT | PROPOSED DATE/DEADLINE |
|---|---|
| ~~Voting Record Date~~ | ~~, 2024~~ |
| ~~Solicitation Commencement Date~~ | ~~Within three (3) business days following the entry of the Disclosure Statement Order~~ |
| ~~Rule 3018(a) Motion Deadline~~ | ~~, 2024~~ |

| ~~Voting Deadline~~ | ~~, 2024~~ |
|---|---|
| ~~Plan Objection Deadline~~ | ~~, 2024~~ |
| ~~Deadline to File Confirmation Brief~~ | ~~, 2024~~ |
| ~~Deadline to File Voting Report~~ | ~~, 2024~~ |
| ~~Confirmation Hearing~~ | ~~, 2024~~ |

| EVENT | PROPOSED DATE/DEADLINE |
|---|---|
| Voting Record Date | August 7, 2024 |
| Solicitation Commencement Date | Within three (3) business days following the entry of the Disclosure Statement Order |
| Rule 3018(a) Motion Deadline | August 14, 2024 |
| Plan Supplement Deadline | August 27, 2024 |
| Voting Deadline | September 3, 2024 |
| Plan Objection Deadline | September 3, 2024 |
| Deadline to File Confirmation Brief | September 10, 2024 |
| Deadline to File Voting Report | September 10, 2024 |
| Confirmation Hearing | September 13, 2024 |

The Debtors ~~will request~~have requested that the Court require any responses or objections to the adequacy of the information contained in the Disclosure Statement or confirmation of the Plan must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) state the name and address of the objecting party and the amount and nature of the claim or interest beneficially owned by such entity; (d) state with particularity the legal and factual basis for such objections, and, if practicable, a proposed modification to the Plan that would resolve such objections; and (e) be filed with the Court with proof of service thereof and served on the following parties (the "**Notice Parties**") so as to be actually received by the Objection Deadline: (a) proposed counsel for the Debtors, Chipman, Brown, Cicero & Cole LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (Attn: William Chipman, Esquire (Chipman@chipmanbrown.com) and Mark D. Olivere, Esquire (Olivere@chipmanbrown.com)); (b) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jonathan W. Lipshie, Esquire); (c) counsel to the Consenting Lenders, DLA Piper LLP (US), 1201 North

Market Street, Suite 2100, Wilmington, Delaware 19801 (Attn: Stuart Brown, Esquire (stuart.brown@dlapiper.com) and Matthew Sarna, Esquire (matthew.sarna@dlapiper.com)); and (d) any other party entitled to notice under Bankruptcy Rule 2002.

**6.3** *Aves Global Settlement*

On June 29, 2024, Aves, the Noteholders, the First Out Holders, and the Last Out Holder entered into that certain Settlement Term Sheet (the "**Aves Settlement Agreement**"), a true and correct copy of which is attached hereto as **Exhibit E**.[5]  In addition to Aves' and the Noteholders' support of the Plan, including the releases therein, a summary of the Aves Settlement Agreement is set forth below:

> **Consideration to Noteholders**.  Upon the Effective Date, $350,000 (the "**Cash Consideration**"), subject to the DIP Lender Clawback (as defined below), and the common equity allocation and preferred equity allocation, as described below, provided Aves and each Noteholder vote to accept the Plan.

> **New Equity Allocations (Common Equity)**.  1.5% of the common equity in Online Pharmacy Holdings LLC (prior to dilution for any management incentive program) to be allocated pro rata to the Noteholders, provided Aves and each Noteholder vote to accept the Plan.

> **New Equity Allocations (Preferred Equity)**.  $3,000,000 (subject to the DIP Lender Clawback (as defined below) in aggregate liquidation preference of junior preferred equity in Online Pharmacy Holdings LLC will be allocated to the Noteholders pro rata, , provided Aves and each Noteholder vote to accept the Plan, which preferred equity will have the following terms, and otherwise be reasonably acceptable to the Prepetition Secured Lenders and Aves:

> > • Junior in right of payment to the junior preferred equity to be received by the Last Out Holder upon the Effective Date;

> > • The preferred equity will accrue dividends (which will be payable in kind) at a rate equal to the interest rate applicable to the last out term loans under the Exit Term Loan (as defined below), which accrued dividends and additional preferred equity will be on par with the priority of the preferred equity;

> > • So long as the preferred equity is outstanding, the Debtors will be subject to the following (with customary exceptions and other exceptions to be agreed):

> > > o Limitations on non-arm's length affiliate transactions;

> > > o Limitations on adverse or disproportionate amendments to its operating agreement; and

---

[5]    For the avoidance of doubt, in the event of any discrepancy between the summary provided this Section 6.3 and the terms of the Aves Settlement Agreement, the terms of the Aves Settlement Agreement shall control.

- 35 -

- o  Limitations on common equity dividends and repurchases.

- • The preferred equity will enjoy customary preemptive and tag along rights.

**DIP Lender Clawback**.  The Cash Consideration will be reduced, dollar for dollar, by the actual fees of the Committee professionals allowed on account of final fee applications of such professionals up to $100,000.  If the actual fees of Committee professionals allowed on account of final fee applications of such professionals exceed $100,000, no Cash Consideration will be payable.

Additionally, if the sum of (x) the actual fees of Committee professionals allowed on account of final fee applications of such professionals plus (y) the expenses and professional costs incurred by the Debtors, the Prepetition Secured Lenders and the DIP Lenders, and their respective agents, in defending or opposing any actions, motions or objections brought by the Committee exceed $350,000, the amount and liquidation preference of the preferred equity will each be reduced dollar for dollar for such excess.

**Exit Term Loan Terms**.  The DIP Lenders will agree that the exit term loan (the "**Exit Term Loan**") to be entered into by the Company upon the Effective Date, provided Aves and each Noteholder votes to accept the Plan, will contain the following terms:

- • The Exit Term Loan will not have scheduled amortization prior to maturity;

- • The Debtors will have the ability to pay interest on the Exit Term Loan in kind as additional loans under the Exit Term Loan, rather than in cash, based on conditions to be determined, which additional loans will be on par with the priority of the Exit Term Loan.

**Information Rights**.  So long as the Noteholders hold any preferred equity, such Noteholders will have reasonable reporting and information rights to be agreed.

**Committee**.  As of the execution of the Aves Settlement Agreement or as soon as reasonably practicable thereafter (but in no event later than three (3) days after the date of the Aves Settlement Agreement), Aves, each Noteholder, and their respective affiliates were required to remove themselves from the Committee and agree not to be appointed as a member of the Committee at any time thereafter, which removal has occurred as of the date hereof.

Any breach of the foregoing agreement shall permit the Prepetition Secured Lenders to terminate the Aves Settlement Agreement without further obligation to Aves or any Noteholder.

**Voting**.  As of the execution of the Aves Settlement Agreement, the Court has not approved any disclosure statement in the Chapter 11 Cases.  The Aves Settlement Agreement is not a solicitation of a vote to accept or reject the Company's Plan.  The Aves Settlement Agreement is in settlement of disputed issues and claims.

Aves and each Noteholder must vote in favor of the Company's Plan, as may be amended, and provide additional support (but not be required to advance any funds or waive any claims or rights under the Aves Settlement Agreement) that is requested by the Company in connection with the approval of the Plan and the consummation thereof in order to receive the consideration under the Aves Settlement Agreement.  If (x) the class of creditors consisting of Aves, any Noteholder, or any of their respective affiliates fails to vote in favor of the Company's Plan or (y) Aves or any Noteholder fails to provide the additional support contemplated by the additional support contemplated by the preceding sentence, none of the consideration flowing to Aves and the Noteholders under the Aves Settlement Agreement, including releases, the expense reimbursement, common equity or preferred equity will be released, or payable or issuable to Aves or any Noteholder.

**Release**.  Upon the Effective Date, (x) Aves and each Noteholder will opt into (and shall not opt out of) the third-party releases under the Plan and (y) be deemed Released Parties, provided Aves and each Noteholder vote to accept the Plan.

**6.4**     ***Skin Medicinals Litigation***

On June 17, 2024 Skin Medicinals LLC (**"Skin Medicinals"**) filed an adversary complaint in the Bankruptcy Court [Adversary No. 24-50079-TMH] asserting the following claims against OptioRx: (1) trade secret misappropriation under the Defend Trade Secrets Act; (2) trade secret misappropriation under the Illinois Trade Secrets Act and Florida Uniform Trade Secrets Act; (3) violation of the Computer Fraud and Abuse Act (**"CFAA"**); (4) violation of the Florida Computer Abuse and Data Recovery Act (**"CADRA"**); (5) unfair competition; and (6) unjust enrichment.  Skin Medicinals also filed a motion for temporary restraining order and preliminary injunction (the **"PI Motion"**).  Skin Medicinals relied solely on the trade secret misappropriation and CFAA/CADRA claims to support its motion for injunctive relief.

After full briefing and depositions of declarants, the Bankruptcy Court heard argument on the PI Motion on July 1, 2024.  On July 12, 2024, the Bankruptcy Court issued its oral ruling denying the PI Motion.  Specifically, the Bankruptcy Court concluded that Skin Medicinals had failed to "identify the alleged trade secrets with sufficient specificity, as required under the DTSA and the relevant case law."  On July 15, 2024, the Bankruptcy Court entered an order denying the PI Motion (the **"PI Order"**)[Docket No. 58].

On July 17, 2024, Skin Medicinals appealed the PI Order (the **"PI Appeal"**) [Docket No. 59] to the United States District Court for the District of Delaware [C.A. No. 1:24-cv-00828-MN] (the **"District Court"**).  Skin Medicinals also filed a related Motion for Leave to File Interlocutory Appeal [Docket No. 61], a Motion to Expedite and for Stay or Injunction Pending Appeal (the **"Motion to Expedite"**) [District Court Docket No. 3], and related pleadings.  On July 23, 2024, the Debtors filed their Answering Briefing in Opposition to Plaintiff's Emergency Motion to Expedite and for a Stay or Injunction Pending Appeal [District Court Docket No. 14].  On July 26, 2024, Skin Medicinals filed their Reply in Support of Motion to Expedite and for Stay or Injunction Pending Appeal [District Court Docket No. 20].  The

Motion to Expedite and the PI Appeal are currently pending before United States District Court Judge Maryellen Noreika.

**6.5     *Financial Performance to Date***

The Debtors' post-petition revenue is approximately 15% below budgeted amounts as of June 30, 2024, primarily due to the bankruptcy filing, however the Debtors are working to increase sales and are in compliance with the DIP Facility budget.

**ARTICLE VII
SUMMARY OF THE PLAN**

The Plan contemplates the following key terms, among others described herein and therein:

**7.1     *General Compromise and Settlement of Claims, Interests, and Controversies***

Pursuant to section 1123 of the Bankruptcy Code and, to the extent applicable, Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made or treatment provided on account of such Allowed Claim or Interest.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests and controversies pursuant to Bankruptcy Rule 9019, expressly incorporating the Aves Settlement Agreement.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  Subject to Article VI of the Plan, all treatment of Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against and Interests in or against any of the Debtors and their Estates and Causes of Action against other Entities.

**7.2**    *Restructuring Transactions*

On the Effective Date, and pursuant to the Plan, the Debtors or the Reorganized Debtors, as applicable, shall (as agreed to by the Consenting Lenders consistent with the terms of the Restructuring Support Agreement) consummate the Restructuring Transactions set forth in the Plan Term Sheet in order to effectuate the Debtors' financial reorganization consistent with the terms of the Plan.    Without limiting the foregoing, before, on or as soon as reasonably practicable after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and their respective officers and members of the Governing Body, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (i) the execution, delivery, filing, registration or recordation of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement and the Restructuring Support Agreement; (ii) the execution, delivery, filing, registration or recordation of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (iii) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Governance Documents; (iv) such other transactions that are required to effectuate the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law; provided that all such actions are consented to by the Consenting Lenders, which consent shall not be unreasonably withheld.    Pursuant to sections 363 and 1123 of the Bankruptcy Code, the Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan. The authorizations and approvals contemplated by 4.01 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**7.3**    *Sources of Consideration for Plan Distributions*

Any Cash payments or distributions required to be made hereunder shall be obtained from existing Cash of the Debtors and the Exit Facility.

**7.4    *Continued Corporate Existence***

Except as otherwise provided in the Plan, the Debtors, as Reorganized Debtors, shall continue to exist after the Effective Date as separate corporate entities, limited liability companies, partnerships or other form, with all the powers of a corporation, limited liability company, partnership or other form, pursuant to the applicable law in the jurisdiction in which the Debtors are incorporated or formed pursuant to the New Governance Documents.

**7.5    *Existing Governance Documents***

The Existing Governance Documents of the Debtors in effect prior to the Effective Date shall be amended or restated and replaced by the New Governance Documents on or prior to the Effective Date, subject in each case to the consent rights of the Consenting Lenders as set forth in the Restructuring Support Agreement. Solely to the extent required under the Plan, the Bankruptcy Code, or applicable non-bankruptcy law or necessary to effectuate the transactions contemplated by the Plan, on or immediately prior to the Effective Date, the Reorganized Debtors shall file the New Governance Documents (in a manner acceptable to the Debtors and the Consenting Lenders and consistent with the Restructuring Support Agreement) with the applicable Secretary of State and/or other applicable authorities in the state of incorporation or formation or otherwise (as the case may be) in accordance with the applicable federal laws or state laws of the respective state. The New Governance Documents shall be deemed to be amended pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable non-bankruptcy law). The New Governance Documents shall be in the form filed with the Plan Supplement and shall be acceptable in form and substance to the Consenting Lenders. After the Effective Date, the Reorganized Debtors may amend and restate their New Governance Documents, as applicable, and may file such documents as permitted by the laws of the respective states without further authorization from the Bankruptcy Court.

**7.6    *Members of the Governing Bodies***

As of the Effective Date, and subject to the Restructuring Support Agreement, the existing members of the Reorganized Debtors' Governing Bodies shall remain in their current capacities as members of such Governing Body of the applicable Reorganized Debtor, unless or until replaced or removed in accordance with the New Governance Documents of the Reorganized Debtors in the sole discretion of such Reorganized Debtor. To the extent any such officer of the Reorganized Debtors is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such trustee and officer shall also be disclosed in the Plan Supplement.

**7.7    *Vesting of Assets in the Reorganized Debtors***

Except as otherwise provided in the Plan, the Restructuring Support Agreement or any agreement, instrument or other document incorporated therein, on the Effective Date, all property of the Estates and all Causes of Action of the Debtors (except those released pursuant to the Debtor Releases) shall vest in the applicable Reorganized Debtor, free and clear of all Liens,

Claims, charges or other encumbrances (except for Liens, if any, granted to secure the Reorganized Debtors' obligations under the Plan). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interest or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation order.

**7.8**    *Section 1145 Exemption*

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code, the offer, issuance, sale or distribution under the Plan of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC shall be exempt from registration under Section 5 of the Securities Act (or any State or local law requiring registration for offer or sale of a security) under section 1145 of the Bankruptcy Code. The offer, issuance, sale or distribution under the Plan of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC will be subject to the restrictions on resale of securities held by Affiliates of an issuer.

**7.9**    *Cancellation and Surrender of Instruments and Agreements*

On the Effective Date, except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, (i) all rights of any Holder of Interests in the Debtors, including options or warrants to purchase Interests, or obligating the Debtors to issue, transfer or sell Interests in the Debtors, shall be cancelled; and (ii) all Seller Notes, Notes and indentures of the Debtors shall cease to be effective, and Aves Management LLC, as Administrative Agent under the Note Purchase Agreement shall not have any continuing duties or obligations thereunder and shall be discharged.

4869-9662-5086, v. 710

**7.10**    *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) to the extent undertaken, selection and appointment of the members of the Governing Body and officers of the Reorganized Debtors; (ii) adoption of or modification to the Existing Governance Documents, if required; (iii) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (iv) implementation of the Restructuring Transactions; and (v) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan (including the grant of security interests set forth in the Plan) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, the members of the Governing Body or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by Section 4.09 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

**7.11**    *Section 1146 Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtors to the Reorganized Debtors or to any other Person) of property under the Plan or pursuant to: (i) the issuance, reinstatement, distribution, transfer or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust, or other security interest or the securing of additional indebtedness by such or other means; (iv) the making, assignment or recording of any lease or sublease; or (v) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan, shall not be subject to any stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, recordation fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**7.12** ***Preservation of Causes of Action***

- 43 -

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Article III(a) hereof), each of the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and each of the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.  Each of the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of such Reorganized Debtor.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that any of the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which any of the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Debtor Releases), each of the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, each of the Reorganized Debtors expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action as a consequence of the Confirmation or Consummation.  Each of the Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

**7.13**    *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against the Debtors and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim plus applicable interest.

**7.14**    *Releases*

The Plan contains certain releases (as described more fully in Section 3.13 of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"), including mutual releases among the Debtors, Reorganized Debtors, and certain of their key stakeholders.  Additionally, (i) each Released Party; (ii) all Holders of Claims or Interests that vote to accept or reject the Plan and opt-in to the releases provided by the Plan by checking the box on the applicable form indicating that they opt to grant

the releases provided in the Plan; (iii) all Holders of Claims or Interests that abstain from voting on the Plan and who affirmatively opt-in to the releases provided by the Plan by checking the box on the applicable form indicating that they opt to grant the releases provided in the Plan; (iv) each current and former Affiliate of each Entity in clause (i) through the following clause (v); and (v) each Related Party with respect to each of the foregoing in clauses (i) through (v), conclusively, absolutely, unconditionally, irrevocably and forever consents to the release and discharge of any and all Causes of Action against the Debtors and the Released Parties to the extent set forth in the Plan, provided that, as to Aves and the Noteholders the foregoing is subject to the terms of the Aves Settlement Agreement.

**7.15**   *Deemed Substantive Consolidation*

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, Confirmation and distribution. As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

## ARTICLE VIII
## OTHER KEY ASPECTS OF THE PLAN

**8.1**   *Treatment of Executory Contracts and Unexpired Leases*

(a)     **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed (or assumed and assigned to the respective Reorganized Debtor, as applicable) pursuant to sections 365(a) and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by a Debtor, pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified on the Rejected Executory Contract and Unexpired Lease List; provided, however, for the avoidance of doubt no Seller Note shall be assumed. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan and the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party on or before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may be modified by such order or the provisions of the Plan.

All assumed Executory Contracts or Unexpired Leases shall be enforceable by the Reorganized Debtors or such party such Executory Contract or Unexpired Lease was assigned to in accordance with their terms notwithstanding any provision in such contract or lease that prohibits, restricts or conditions assumption, assignment or transfer.  Any provision in any such contract or lease that permits a Person to terminate or modify such agreement or to otherwise modify the rights of any of the Debtors or the Reorganized Debtors or assignee, as applicable, based on the filing of the Chapter 11 Cases or the financial condition of any of the Debtors or the Reorganized Debtors, as applicable, shall be unenforceable.  To the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, any of the Debtors' assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party or parties thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  After the Effective Date, each of the Reorganized Debtors shall have the right to terminate, amend or modify any contracts, including intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.  Notwithstanding anything to the contrary in the Plan, as set forth in Section 5.01 of the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

(b)     **Claims Based on the Rejection of Executory Contracts or Unexpired Leases.**

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable.   Unless otherwise provided by a Final Order of the Bankruptcy Court, all proofs of claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Section 7.06 of the Plan, notwithstanding anything in a proof of claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Section 3.04 of the Plan and may be objected to in accordance with the provisions of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

(c)      **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned to the respective Reorganized Debtor, as applicable) pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash upon the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  The Debtors shall provide notices of proposed cure amounts (if any) to counterparties to Executory Contracts and Unexpired Leases to be assumed reflecting the Debtors' intention to assume or assume and assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any) or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  If a counterparty to any Executory Contract or Unexpired Lease that the Debtors or Reorganized Debtors intend to assume does not receive such a notice, the proposed cure amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).  In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  The cure notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by counsel to the Debtors on the confirmation objection deadline or other deadline that may be set by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.  Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

The payment of the cure amount shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (i) the amount of any payments to cure such a default; (ii) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption.

The Debtor or the Reorganized Debtor, as applicable, shall be authorized to reject any Executory Contract or Unexpired Lease to the extent the Debtor or the Reorganized Debtor, as

applicable, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List.

(d)     **Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in the Plan or specifically provided in the Plan Supplement, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by any of the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

(e)     **Reservation of Rights**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan or Plan Supplement shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the relevant Debtor or Reorganized Debtor, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date. The deemed assumption provided for herein shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

(f)     **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any of the Debtors, including any Executory Contracts and Unexpired Leases assumed by any Debtor (or assumed and assigned, as applicable), will be performed by such Debtor or Reorganized Debtor, or the Entity to which such Executory Contract or Unexpired Lease was assigned, as applicable, in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order except as otherwise provided in the Plan.

(g)      **Assumption of Insurance Policies**

Notwithstanding anything in the Plan or the Confirmation Order, including any provision that purports to be preemptory or supervening, the Insurance Policies (including all of the D&O Liability Insurance Policies) are hereby treated as Executory Contracts under the Plan and, on the Effective Date, shall be deemed assumed (and assigned to the Reorganized Debtors) under section 365 of the Bankruptcy Code and will re-vest in the Reorganized Debtors. Regardless of whether any Insurance Policy is an Executory Contract, on and after the Effective Date, the Insurance Policies will remain valid and enforceable in accordance with their terms and shall not be impaired by the Plan or Confirmation Order, and the Debtors, the Reorganized Debtors or any such assignee, as applicable, and the Insurers will perform their respective obligations to one another, if any, under the Insurance Policies. After the Effective Date, to the extent consistent with applicable law and New Governance Documents, the Reorganized Debtors (or any such assignee) may increase, reduce, restrict, or otherwise modify, in their sole discretion, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of each of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, proof of claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

(h)      **Assumption of the Employee Compensation and Benefits Program**

Unless otherwise provided in the Plan (or the Plan Supplement), the Confirmation Order or any other order of the Bankruptcy Court in the Chapter 11 Cases, all employment agreements, severance policies, indemnification agreements, compensation and benefit plans, policies, and programs of the Company including, without limitation, all workers' compensation programs, savings plans, retirement plans, deferred compensation plans, SERP plans, rabbi trusts, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans or other agreements with or applicable to any of its current or former employees, retirees, members of any Governing Body, officers or managers of the Debtors shall be treated as Executory Contracts under the Plan, shall be set forth in the Plan Supplement, and shall be deemed assumed (or assumed and assigned to the respective Reorganized Debtors, as applicable) pursuant to section 365(a) of the Bankruptcy Code as of the

- 49 -

Effective Date. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(i)      **Indemnification Obligations**

Consistent with applicable law, all indemnification provisions in place as of the Effective Date for the Released Parties only (whether in the by-laws, trust agreements, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other governance documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers and other professionals of, or acting on behalf of, any of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, any of the Debtors than the indemnification provisions in place prior to the Effective Date.

(j)      **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases, if any, pursuant to section 365(d)(4) of the Bankruptcy Code.

**8.2    *Provisions Governing Distributions***

(a)      **Record Date for Distributions**

With respect to Impaired Claims, on the Distribution Record Date, the Claims Register and the various transfer registers for each of the Classes of Claims, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims. The Debtors shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.

(b)      **Timing of Distributions**

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against or an Allowed Interest in the Debtors shall receive the full amount of the distributions that the Plan provides for such an Allowed Claim or such an Allowed Interest in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. Except as otherwise provided herein, Holders of Claims shall not be entitled

to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

(c)    **Disbursing Agent**

The Debtors or Reorganized Debtors may retain a Disbursing Agent to assist with the distributions to be made under the Plan as directed by the Debtors or Reorganized Debtors. The Disbursing Agent shall make all distributions required under the Plan.

(i)    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(ii)    Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out of pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out of pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.  The Disbursing Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Disbursing Agent seeks reimbursement, and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Disbursing Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Disbursing Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Disbursing Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(d)    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent: (i) to the signatory set forth on any proof of claim or proof of interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no proof of claim or proof of interest is filed or if the Debtors have not been notified in writing of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related proof of claim or proof of interest; or (iii) on any

- 51 -

counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Distributions under the Plan on account of Allowed Claims and Allowed Interests shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan. None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

(e)     **Fractional Distributions**

Whenever any payment of a fraction pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole share (up or down), with half or less being rounded down. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(f)     **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder of Claim or Interest is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred. Notwithstanding the foregoing under of the Plan, any Unimpaired Claims shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan, unless and until such Unimpaired Claim has been either (a) paid in full (i) on terms agreed to between the holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as applicable, (ii) in the Allowed amount of such Unimpaired Claim as determined by applicable law or (iii) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

(g)     **Manner of Payment**

At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements

- 52 -

(h)    **Compliance with Tax Requirements and Allocations**

In connection with the Plan and all instruments issued in connection therewith, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they determine in good faith are reasonable and appropriate.  The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.  For the avoidance of doubt, any amounts withheld pursuant to Section 6.08 of the Plan shall be treated as if distributed to the Holder of the Allowed Claim.

Any Holder of an Impaired Claim entitled to receive any property as an issuance or distribution under the Plan shall, upon request by the Disbursing Agent, provide an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8.  If such request is made and such Holder of an Impaired Claim fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtors or the Reorganized Debtors, as applicable, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtors, the Reorganized Debtors and their respective property.

(i)    **Allocation Between Principal and Interest**

Except as otherwise provided in the Plan, for U.S. federal income tax purposes, distributions shall be allocated first to the principal amount of such Allowed Claims (as determined for U.S. federal income tax purposes), with any excess allocated to unpaid interest that accrued on such Claims.

(j)    **Setoffs and Recoupment**

Except as otherwise provided in the Plan and Confirmation Order, the Debtors and the Reorganized Debtors may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, withhold (but not set off except as set forth in the Plan) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim or Interest.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim or Interest are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy

- 53 -

Code or applicable non-bankruptcy law, set off against any Allowed Claim or Interest and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim or Interest) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that any of the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim or Interest, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such holder, except as specifically provided herein.

(k)    **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy or non-bankruptcy law, postpetition and/or default interest shall not accrue or be paid on any prepetition Claims against any of the Debtors, and no Holder of a prepetition Claim against any of the Debtors shall be entitled to interest accruing on or after the Petition Date or interest at the contract default rate on any such prepetition Claim.

**8.3    *Releases and Exculpations***

(a)    **General Compromise and Settlement of Claims, Interests and Controversies**

As discussed in detail herein and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and, to the extent applicable, Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made or treatment provided on account of such Allowed Claim or Interest.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests and controversies pursuant to Bankruptcy Rule 9019.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  Subject to Article VI of the Plan, all treatment of Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against and Interests in or against any of the Debtors and their Estates and Causes of Action against other Entities.

(b)      **Releases by the Debtors**

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by each of the Debtors, the Reorganized Debtors and their Estates, including any successors to the Debtors or any estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, that any of the Debtors, the Reorganized Debtors or their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of a Holder of any Claim against, or Interest in, the Debtors or other Entity, based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership or operation thereof), purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Exit Facility, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.  For the avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber,**

**(xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date or (ii) the rights of any of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of any of the Debtors under any employment agreement with a current or former employee of any the Debtors.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Releases, which include by reference each of the related provisions and definitions contained in the Plan, and further shall constitute the Bankruptcy Court's finding that the Debtor Releases are: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Releases; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Debtors' Estates asserting any Cause of Action released pursuant to the Debtor Releases.**

(c)    **Releases by Holders of Claims and Interests**

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, effective as of the Effective Date, except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, including any derivative claims asserted on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership or operation thereof), the subject matter of or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors any other Released Party, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against any of the Debtors), intercompany transactions between or among any of the Debtors or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of the Restructuring Support Agreement and related prepetition transactions, any Definitive Document, the Disclosure Statement, the New Governance Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, contract, instrument, release or other agreement or document created or entered into in**

- 56 -

connection with the Restructuring Support Agreement, the New Governance Documents, the Disclosure Statement, the Plan, the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC pursuant to the Plan, to the extent applicable, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event or other occurrence related or relating to any of the foregoing, in each case taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) rights of Holders of Allowed Claims or Allowed Interests to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

(d)        **Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of claim or Interest based upon such debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

(e)        **Exculpation**

**As of the Effective Date, except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim other than those arising out of or relating to any act by or omission of an Exculpated Party that have been determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on the Plan, distribution of consideration pursuant to the Plan and, to the extent applicable, the offer, issuance and sale or purchase of securities pursuant to the Plan and, therefore, are not, and on account of such solicitation, distribution and issuance shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan, such distributions made pursuant to the Plan and issuance of securities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth above do not release (i) any liabilities arising after the Effective Date, (ii) the rights of any current employee of any of the Debtors under any employment agreement or plan or (iii) the rights of Holders of Allowed Claims or Allowed Interests to receive treatment in accordance with the Plan.**

    (f)    **Injunction**

Effective as of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Enjoined Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any of the Debtors, any of the Reorganized Debtors, the Exculpated Parties or the Released Parties and their respective assets and properties: (i) commencing or continuing in any manner any action, suit or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting or enforcing any encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

(g)      **Term of Injunctions and Stays**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

(h)      **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entities, including Governmental Units, shall discriminate against any of the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any of the Reorganized Debtors or another Entity with whom such Reorganized Debtor has been associated, solely because the Debtors have been a debtor under chapter 11 of the Bankruptcy Code, have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or have not paid a debt that is dischargeable in the Chapter 11 Cases.

(i)      **Release of Liens, Claims and Interests**

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all Claims, Interests or Liens, including but not limited to mortgages, deeds of trust, Liens, pledges or other security interests, against or in any property of the Estates shall be fully released, discharged, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Entity holding such Liens, Claims or Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.  Any Holder of a Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of the Debtors held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  For the avoidance of doubt, the Exit Facility Claims

effected through the Prepetition Lien Conversion and the DIP Lien Conversion pursuant to the Plan shall not be released, discharged, terminated or extinguished to effect the Exit Capital Structure attached to the Restructuring Support Agreement.

**8.4**    ***Conditions Precedent to Confirmation and Consummation of the Plan***

(a)    **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 8.03 of the Plan.

1.    The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtors and the Consenting Lenders, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code (which, for the avoidance of doubt, may be the same order as the order confirming the Plan).

2.    The Plan and the Plan Supplement, including any schedules, documents, agreements, supplements and exhibits thereto (in each case in form and substance acceptable to the Debtors and the Consenting Lenders as provided for under the Restructuring Support Agreement) shall have been filed.

3.    The Restructuring Support Agreement shall not have been rejected by the Debtors, shall not have been terminated as of immediately prior to the Confirmation Date, nor shall there have been any breach thereof by any party.

(b)    **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 8.03 of the Plan:

1.    Each document or agreement constituting the Definitive Documents shall have been executed and/or effectuated and shall be in form and substance consistent with the Restructuring Support Agreement, including any consent rights included therein.

2.    The Plan shall have been filed and the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the Restructuring Support Agreement, including any consent rights included therein, and such Confirmation Order shall not have been stayed, modified, vacated, appealed or subjected to an injunction and shall have become a Final Order.

3.    The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption, assumption and assignment, and rejection, as applicable, of Executory Contracts and Unexpired Leases by the Debtors as contemplated herein.

4.        All (i) governmental and regulatory approvals, clearances and consents necessary and legally required, if any, under applicable non-bankruptcy law and (ii) material third-party consents and approvals, if any, in each case in connection with the transactions provided for in the Plan shall have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that restrains, prevents or enjoins the Restructuring Transactions.

5.        All statutory fees and obligations then due and payable to the Office of the U.S. Trustee shall have been paid and satisfied.

6.        To the extent invoiced at least one (1) Business Day before the Effective Date, all amounts on account of invoiced and unpaid Restructuring Fees have been paid in full.

7.        The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount in accordance with Section 2.02 of the Plan.

8.        The transactions contemplated in the Restructuring Transactions shall have been executed and completed by all of the Entities that are parties thereto.

9.        The Restructuring Support Agreement shall have been assumed pursuant to the Confirmation Order.

10.        The New Governance Documents shall have been filed with the appropriate governmental authority.

11.        The Existing Governance Documents shall have been amended, restated, or replaced by the New Governance Documents, respectively, in all cases consistent with the consent rights of the Consenting Lenders as set forth in the Restructuring Support Agreement.

12.        The Restructuring Support Agreement shall not have been terminated as of immediately prior to the Effective Date and there has been no breach thereof by any party.

(c)     **Waiver of Conditions**

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article VIII of the Plan may be waived, in whole or in part, at any time by the Debtors, with the prior written consent of the Consenting Lenders (email shall suffice), without notice, leave or order of the Bankruptcy Court or any formal action; *provided*, *however*, that the Debtors may not waive entry of the Confirmation Order.

(d)     **Effect of Failure of Conditions**

If the Consummation of the Plan does not occur by the Outside Date (as defined in the Restructuring Support Agreement) as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (i) constitute a waiver or release of any claims by or Claims against or Interests in any of the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holder of Claims or Interests or any other Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by any of the Debtors, any Holder or any other Entity in any respect.

(e)     **Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**8.5     *Modification, Revocation, or Withdrawal of the Plan***

(a)     **Modification and Amendments**

Except as otherwise provided in the Plan, the Debtors (with the consent of the Consenting Lenders) reserve the right to modify the Plan as to material and/or immaterial terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019 and applicable restrictions on modifications set forth in the Plan, the Debtors (with the consent of the Consenting Lenders) expressly reserve their respective rights to revoke, withdraw, alter, amend or modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in each case in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article IX of the Plan.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, any alterations, amendments or modifications of the Plan proposed in writing by the Debtors at any time prior to or after the Confirmation Date, but prior to the Effective Date, and in all cases subject to the consent of the Consenting Lenders, Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, without the re-solicitation if the proposed alteration, amendment or modification do not materially and

- 63 -

adversely change the treatment of the Claim of such Holder; *provided*, *however*, that any Holders of Claims or Interests that were deemed to accept the Plan because such Claims or Interests were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be Unimpaired.

### (b)    Effect of Confirmation on Modifications

Entry of a Confirmation Order, including under section 1127 of the Bankruptcy Code, shall mean that all modifications or amendments to the Plan occurring after the solicitation are approved pursuant to section 1127(a) of the Bankruptcy Code or section 1127(b) of the Bankruptcy Code, as applicable, and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### (c)    Revocation or Withdrawal of the Plan

The Debtors reserve the right, upon prior notice to and with the consent of the Consenting Lenders, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization, either entirely or as to any one or more of the Debtors. If the Plan is revoked or withdrawn as to fewer than all of the Debtors, such revocation or withdrawal shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked or withdrawn. If (i) the Debtors revoke or withdraw the Plan in its entirety in accordance with this Section 9.03, (ii) the Restructuring Support Agreement is terminated by the Outside Date (as defined in the Restructuring Support Agreement), or (iii) Confirmation or Consummation does not occur by the Outside Date (as defined in the Restructuring Support Agreement), then, absent further order of the Bankruptcy Court: (i) the Plan shall be null and void in all respects unless extended by the Debtors, with the prior written consent of the Consenting Lenders; (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity, including the Holders of Claims or Interests or the Consenting Lenders; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity, including the Holders of Claims or Interests or the Consenting Lenders.

## ARTICLE IX
## RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER**

DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES

### 9.1    *Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

(a)    **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

Subject to the terms of the Restructuring Support Agreement, if the Restructuring Transactions are not consummated, the Debtors will thereafter consider all available restructuring alternatives, including filing an alternative chapter 11 plan, selling assets, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to fund the reorganization transactions;
- the Debtors' liquidity; and
- how the Debtors' businesses are viewed by investors and lenders.

(b)    **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. ~~The~~While the Debtors have proposed that some unsecured creditors will receive a larger distribution than other unsecured creditors, the Debtors

believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Furthermore, Debtors believe that such classification risk is mitigated because any discrimination between classes of creditors is being funded by a gift from the Prepetition Secured Lenders.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(c)     **The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.**

The Debtors have not obtained or requested an opinion from any bank or other firm as to the fairness of the consideration under the Plan.

(d)     **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the Debtors' cash interest expense, improve the Debtors' liquidity and provide the Debtors greater flexibility to generate long-term growth.  Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry and changes in commodity prices. As a result of these risks, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

(e)     **The Restructuring Support Agreement May Be Terminated**

As more fully set forth in the Restructuring Support Agreement, it may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified Milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Consenting Lenders of their respective obligations under the Restructuring Support Agreement.  In the event that the Restructuring Support Agreement is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.  Termination of the Restructuring Support Agreement could result in the loss of support for the Plan by important creditor constituencies and could result in the withdrawal of the Plan and protracted Chapter 11 Cases.

(f)     **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article VIII of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and the Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan.  If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

(g)     **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the Restructuring Support Agreement.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

(h)     **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their businesses and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

The Debtors, subject to the terms and conditions of the Plan and the consent rights of the Consenting Lenders on terms set forth in the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could

include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(i)    **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).    The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.    Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.    In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

(j)    (i) **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses.    *See* Article 9.2(d) of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.    As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.    The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.    If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.    Adequate funds may not be available when needed or may not be available on favorable terms.

(k)    ~~(j)~~ **The Chapter 11 Cases May Be Converted to a Case under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (b) additional expenses and Claims, some of which would be entitled to priority, would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

(l)    ~~(k)~~ **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the Restructuring Support Agreement.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(m)    ~~(l)~~ **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

(n)    ~~(m)~~ **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such

differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

(o)    (n) **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VII of the Plan.  Certain parties in interest may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions established by the United States Court of Appeals for the Third Circuit.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.

**9.2**    *Risks Related to Recoveries Under the Plan*

(a)    **Estimated Valuations of the Debtors, and Estimated Recoveries to Holders of Allowed Claims and Interests, Are Not Intended to Represent Potential Market Values**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.   The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the financial results included in the Feasibility Analysis; and (d) the assumption that capital and equity markets remain consistent with current conditions.

Accordingly, the estimated recoveries do not necessarily reflect, and should not be construed as reflecting, values that may be attained for the Debtors' securities in the public or private markets.

(b)    **The Reorganized Debtors May Be Forced to Take Other Actions to Satisfy their Obligations**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on the financial condition and operating performance of their businesses, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face liquidity issues and there may be a need to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt.  These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

(c)     **Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtor**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Case may adversely affect the Reorganized Debtors and holders of certain Claims.

(d)     **Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

1.     The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends primarily its financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  Some of the factors that may affect the Company's business or financial condition include: the demand for the Reorganized Debtors' products or services; the prices of raw materials; disruptions to the Reorganized Debtors' supply chain; competition from other industry participants; technology advances; significant delays in the collection of accounts or notes receivable; customer, counterparty, supplier or vendor defaults; costs of complying with, or liabilities imposed under, environmental, health and safety laws; the impact of pending and future legal proceedings; the interruption, disruption, failure or malfunction of our information technology systems including due to cyberattack; the impact of changes in tax law that could adversely affect the tax treatment for federal income tax purposes; economic and political instability; disruptions in the capital and credit markets; and access to available capital to meet operating requirements.

2.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.   These risks include, among other things, the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability of the Debtors to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability of the Debtors to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts

and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.  These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

           3.        The Debtors May Not Be Able to Achieve Their Financial Results or Meet Their Post-Restructuring Debt Obligations.

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.  Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, the Reorganized Debtors' future revenues, inflation, and other unanticipated market and economic conditions.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs.

The Feasibility analysis, attached hereto as **Exhibit D**, relies on certain financial projections related to the Reorganized Debtors' operations, which represent the best estimate of the Debtors' management and financial advisor of the future financial performance of Reorganized Debtors based on currently known facts and assumptions about future operations of Reorganized Debtors, as well as the U.S. and world economy in general and the relevant industries in which the Company operates.  The financial projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, including those risks that affect the Company's businesses as discussed herein, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics and/or pandemics may affect the actual financial results achieved.  There is no

guarantee that the financial projections will be realized, and actual financial results may differ significantly from the financial projections.

4.    The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

5.    The Company's Operations May be Impacted By the Continuing COVID-19 Pandemic

The business and financial results of the Company have been and may continue to be negatively impacted by the outbreak of COVID-19 and could be similarly negatively impacted by other pandemics or epidemics in the future.  In 2020, COVID-19 has significantly impacted economic activity and markets around the world, and it could negatively impact the Company's business in numerous ways.  These impacts of the COVID-19 pandemic or other global or regional health pandemics or epidemics could have the effect of heightening many of the other risks described in this "Risk Factors" section, such as those relating to the Company's results of operations or financial condition.  The Company might not be able to predict or respond to all impacts on a timely basis to prevent near- or long-term adverse impacts to their results.  The ultimate impact of these disruptions also depends on events beyond the knowledge or control of the Company, including the duration and severity of any outbreak and actions taken by parties other than the Company to respond to them.  Any of these disruptions could have a negative impact on the Company's business operations, financial performance and results of operations, which impact could be material.

6.    Natural Disasters Could Have a Material Adverse Effect on the Company

Natural disasters can potentially destroy numerous business structures and homes and could disrupt the Company's supply chain.  Disruptions in supply could have a material adverse effect on the Company.  Damage and higher prices caused by natural disasters could also have an adverse effect on the Company due to the impact on the financial condition of its customers.  To the extent the frequency or magnitude of significant weather events and natural disasters increases, the resulting increase in disruptions also could have adverse impacts on the Company on both the supply and demand side.

7.    The Pharmaceutical Business is Highly Competitive, and Competition May Negatively Affect the Company's Operations

The Company is affected by the competition for customers among all of the participants in the pharmaceutical business.  The Company competes with a number of large national and

regional firms and several thousand small independent firms. Because of the relatively low barriers to entry into the pharmaceutical market, there is the potential for small independent companies, as well as other companies not previously engaged in the Debtors business segments, to compete with the Company. As a result, the Company is subject to the risk of additional competition in the future. Some of the Company's competitors may have greater financial resources or lower costs than the Company does. Should a competitor attempt to increase market share by reducing prices, the Company's operating margins and customer base may be negatively impacted.

**ARTICLE X**
**SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a ballot (the "<u>Ballot</u>") to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.

**10.1    *Holders of Claims Entitled to Vote on the Plan***

The Debtors are soliciting votes to accept or reject the Plan only from holders of Claims or Interests in Classes 1, 5 and 9 (the **"Voting Class"**). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan. The Debtors are not soliciting votes from Holders of Claims or Interests in Classes 2, 3, 4, 5, 6, 7, 8, 10, 11 and 12.

**10.2    *Votes Required for Acceptance by a Class***

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**10.3    *Certain Factors to Be Considered Prior to Voting***

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**10.4**   *Solicitation Procedures*

(a)    **Solicitation Agent**

The Debtors have retained Stretto, Inc. to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)    **Solicitation Package**

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Classes (collectively, the **"Solicitation Package"**):

(i)    cover letter in support of the Plan;

(ii)   the appropriate Ballot and applicable voting instructions, together with a preaddressed, postage pre-paid return envelope; and

(iii)  this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto (which may be distributed in paper or USB-flash drive format).

(c)    **Distribution of the Solicitation Package and Plan Supplement**

[                    ]August 7, 2024 (the **"Voting Record Date"**) is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package or grant access to the Solicitation Package via the Solicitation Agent's website to Holders of Claims in the Voting Classes in, 5 and 9, which is twenty (20) Business Days before the Voting Deadline (*i.e.*, 5:00 p.m. (Eastern Daylight Time) on [_____]September 3, 2024). The Solicitation Package (except the Ballot) may also be obtained from the Solicitation Agent by: (a) calling the Debtor's restructuring hotline at 866.515.5505 (domestic toll-free) or 949.590.3286 (local/international toll), (b) emailing OptioRXInquiries@stretto.com, and/or (c) writing to the Solicitation Agent at OptioRx Ballot Processing, c/o Stretto, Inc, 410 Exchange, Suite 100, Irvine, CA 92602.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/OptioRX, or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days before the Objection Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

## ARTICLE XI
## CONFIRMATION OF THE PLAN

### 11.1    *The Confirmation Hearing*

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Debtors will requesthave requested that the Bankruptcy Court set hearing dates to approve the Plan and Disclosure Statement at a hearing schedule for August 1, 2024 and schedule the Confirmation Hearing for September 13, 2024. The Disclosure Statement and/or Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, will requesthave requested that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan.  An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### 11.2    *Requirement for Confirmation of the Plan*

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and

- 76 -

equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## 11.3   *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).  To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors. The Feasibility Analysis attached hereto as **Exhibit D** and is incorporated herein by reference. Based upon the Feasibility Analysis, the Debtors believe that the Plan will meet the feasibility requirements of the Bankruptcy Code.  Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision. Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.

## 11.4   *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in

amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Section 3.06 of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**11.5    *Confirmation Without Acceptance by all Impaired Classes***

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

(a)    **No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)    **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class. The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to

- 78 -

the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.  There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan.

**11.6**   *Liquidation Analysis*

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7. Attached hereto as **<u>Exhibit C</u>** and incorporated herein by reference is a liquidation analysis (the **"Liquidation Analysis"**) prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code

## ARTICLE XII
## CERTAIN SECURITIES LAW MATTERS

**12.1**   *Exemption from Registration Requirements of the Securities Act and Blue Sky Laws*

(a)      **Section 1145 of the Bankruptcy Code (After Filing Chapter 11 Cases)**

The Debtors are relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act to exempt the offering, issuance and distribution of the new preferred and common equity shares or units of Online Pharmacy Holdings LLC (the **"Section 1145 Securities"**) pursuant to the Plan after the filing of Chapter 11 Cases. Section 1145(a)(1) of the Bankruptcy Code provides that registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of securities by a debtor under a plan of reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for cash and property.  Recipients of the Section 1145 Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act, any applicable state Blue Sky Law, other local law.

# ARTICLE XIII
# CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**13.1**   *Introduction*

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the **"Tax Code"**), the U.S. Treasury Regulations promulgated thereunder (the **"Treasury Regulations"**), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the **"IRS"**), and other applicable authorities (collectively, **"Applicable Tax Law"**), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. Except as discussed in Section 13.3 hereof, no opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, broker-dealers, mutual funds, governmental authorities or agencies, persons who are not U.S. Holders (defined below), pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors or the Reorganized Debtors within the meaning of the Tax Code, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, Persons who prepare "applicable financial statements" (as defined in section 451 of the Tax Code), Persons using a mark-to- market method of accounting, Persons who are themselves in bankruptcy or regulated investment companies). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various third-party debt and other arrangements to which the Debtors and the Reorganized Debtors, as applicable, are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (b) that are not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a

corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust, if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) the trust has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

Furthermore, this discussion assumes that all separate plans of reorganization under the Bankruptcy Code constituting the Plan will be consummated. If less than all of such plans of reorganization will be consummated, their federal income tax consequences may be materially different than the consequences described below. The following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim. All Holders of Claims should seek tax advice based on their particular circumstances from an independent tax advisor regarding the federal, state, local, and other tax consequences of the transactions contemplated by the Plan.

**13.2    *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor and the Reorganized Debtors***

In general, absent an exception, a debtor will realize and recognize cancellation of debt income (**"COD"**) income for U.S. federal income tax purposes if outstanding indebtedness is satisfied for total consideration less than the amount of such indebtedness. In general, the amount of COD income is the excess of (a) the adjusted issue price of the satisfied indebtedness over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the debtor issued, and (iii) the fair market value of any other new consideration (including stock or a partnership interest of the debtor or a party related to the debtor), in each case, given in satisfaction of such indebtedness at the time of the exchange.

The Debtors may incur COD income as a result of the implementation of the Plan. Specifically, Optio Rx may incur COD income as a result of satisfying Allowed Class 1 Claims by issuing new preferred and common equity shares or units of Online Pharmacy Holdings LLC to the Holders of those Claims.

- 81 -

Under section 108 of the Tax Code, a taxpayer is not required to include COD income in gross income if (a) the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the **"Bankruptcy Exception"**), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the **"Insolvency Exception"**).

**13.3** ***U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims and Interests.***

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Interests. This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local, or estate and gift taxation is addressed.

**EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

(a)    **Tax Consequences to the Debtors**

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD Income to the extent that such taxpayer's indebtedness is

discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

The recognition of COD Income may be treated differently in the context of a confirmed chapter 11 plan. For example, under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income. The Tax Attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards. If the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, the excess still is excluded from income. Pursuant to section 108(b)(4)(A), the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized. Section l08(e)(2) provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

(b)    **Tax Consequences for Holders of Claims**

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one (1) year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Combined Plan and Disclosure Statement, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary

- 83 -

loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Combined Plan and Disclosure Statement on account of its Claim.

## ARTICLE XIV
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

*[Remainder of page intentionally left blank]*

4869-9662-5086, v. 710

Dated: ~~June 10~~<u>July 29</u>, 2024

Respectfully submitted,

**Optio Rx, LLC**
**Braun Pharma, LLC**
**Dr. Ike's PharmaCare, LLC**
**Rose Pharmacy SA LLC**
**Rose Pharmacy SF LLC**
**Rose Pharmacy RM LLC**
**Pet Apothecary, LLC**
**Crestview Holdings, LLC**
**SBH Medical, LLC**
**H&H Pharmacy, LLC**
**Enovex Pharmacy, LLC**
**SMC Pharmacy, LLC**
**SMC Lyons Holdings, LLC**
**Baybridge Pharmacy, LLC**
**Central Pharmacy, LLC**
**Pro Pharmacy, LLC**
**Healthy Choice Compounding LLC**
**Oakdell Compounding Pharmacy, LLC**
**The Pet Apothecary LLC**
**Crestview Pharmacy, LLC**
**SBH Medical, Ltd.**
**Concierge Pharmacy, LLC**
**Firstcare Pharmacy, LLC**
**Easycare Pharmacy, LLC**
**Primecare Pharmacy, LLC.**

By:     */s/ Ben David*_____
Name: Ben David
Title:   Chief Executive Officer

## EXHIBIT A

**Plan**

**(Attached)**

## EXHIBIT B

## Restructuring Support Agreement

## (Attached)

**EXHIBIT C**

**Liquidation Analysis**

**(Attached)**

# EXHIBIT D

## Feasibility Analysis

## (To be provided in the Plan Supplement)

# EXHIBIT E

## Aves Settlement Agreement

Document comparison by Workshare Compare on Monday, July 29, 2024
5:05:32 PM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://4869-9662-5086/7 |
| Description | Disclosure Statement with Committee Comments |
| Document 2 ID | netdocuments://4869-9662-5086/10 |
| Description | Disclosure Statement with Committee Comments |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 201 |
| Deletions | 157 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 358 |