# EXHIBIT 2

Date:
July 25th, 2024

**trellis**

CASE NUMBER: 2024-L-008031

# Complaint Filed (Jury Demand) - Patel Complaint

Document prepared for:

Attorney Rafael Santiago

**CASE NAME**

Rinku Patel -vs- Optiorx, LLC,CBC Pharma Holdco, LLC,Insperity Holdings,Pharmacy Management LLC,Ashok Nayyar,Jeffrey Kelly,Jonathan Tunis,Barry Best

**DOCUMENT FILED DATE**

July 22nd, 2024

**CASE FILING DATE**

July 22nd, 2024

**COUNTY**

Cook county, IL

**JUDGE**

Calendar, I

**CATEGORY**

Whistleblower - Jury

**STATUS**

Pending

Law Division Motion Section Initial Case Management Dates for CCL, CCP (Atrium 2, F, H, X, Z) will be heard in person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 9/23/2024 9:30 AM

FILED
7/22/2024 5:02 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L008031
Calendar, I
28612376

FILED DATE: 7/22/2024 5:02 PM   2024L008031

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

**RINKU PATEL, PHARMD,**

       Plaintiff,

       *v.*

**OPTIORX, LLC, CBC PHARMA HOLDCO LLC,
INSPERITY HOLDINGS, PHARMACY
MANAGEMENT LLC, ASHOK NAYYAR**, an
individual, **JEFFREY KELLY**, an individual,
**JONATHAN TUNIS**, an individual, **BARRY BEST**, an
individual,

       Defendants.

Jury Trial Demanded

1.    Rinku Patel, PharmD ("Plaintiff" or "Dr. Patel") brings this action against Defendants OptioRx, LLC[1] ("OptioRx" or "Company"),  CBC Pharma Holdco LLC ("CBC Pharma Holdco"), Insperity Holdings ("Insperity"), Pharmacy Management LLC ("Pharmacy Management"), Ashok Nayyar ("Nayyar"), Jeffrey Kelly ("Kelly"), Jonathan Tunis ("Tunis"), and Barry Best ("Best") (collectively "Defendants") for violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA") and Illinois Whistleblower Act, 740 ILCS 174/1 *et esq.* ("Whistleblower Act"), retaliatory discharge, and breach of contract.

## NATURE OF ACTION

2.    Dr. Patel is a highly skilled and reputable Doctor of Pharmacy, who has been working in the pharmaceutical industry for more than twenty years. She was recruited to join OptioRx in February 2022 as Chief Executive Officer ("CEO") after founding and growing KloudScript, Inc., a specialty pharmacy software company that was acquired in 2020. Prior to that, Dr. Patel held senior-level executive positions with Diplomat Specialty Pharmacy, OptionCare,

---

[1] On June 7, 2024, OptioRx filed for Chapter 11 bankruptcy protection in U.S. Bankruptcy Court for the District of Delaware captioned Optio Rx, 24-11188. Plaintiff will be seeking to lift the automatic stay as to OptioRx.

FILED DATE: 7/22/2024 5:02 PM    2024L008031

Caremark, and Walgreens. She also regularly contributes to her field's advancement through her published research and speaking engagements at industry forums.

3.    Soon after Dr. Patel joined OptioRx, she discovered numerous regulatory issues under Sections 503A and 503B of the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), 21 U.S.C. §§ 353(a)-(b), the Compounding Quality Act ("CQA"), 21 U.S.C. § 301, and the Controlled Substance Act ("CSA"), 21 U.S.C.§ 829, that hobbled OptioRx's viability and growth.

4.    Dr. Patel attempted to resolve these issues by hiring new regulatory counsel for the company and developing new processes that would ensure OptioRx's compliance with the CQA, Sections 503A and B of the FDCA, and the CSA. She regularly communicated the need for these changes to OptioRx's Board of Directors—which included Kelly, Tunis, and Best—and Senior Lender MC Credit Partners ("MCCP")—which employs Nayyar as its Managing Director and Chief Investment Officer.

5.    Defendants, however, rejected Dr. Patel's efforts to improve OptioRx's regulatory standing because her compliance efforts negatively impacted the Company's bottom-line. Defendants continued to implement and cultivate processes prioritizing the Company's revenues over its patient's safety and regulatory compliance.

6.    In addition to disregarding Dr. Patel's compliance concerns, Defendants punished Dr. Patel for raising these issues by terminating her employment without cause on February 5, 2024, and withholding compensation Dr. Patel earned, including her 2023 bonus payment, severance pay and benefits, vested equity, and expenses accrued on the Company's behalf.

7.    Dr. Patel brings this action against Defendants for violations of the IWPCA. She also brings claims against OptioRx for violations of the Whistleblower Act, retaliatory discharge, and breach of contract.

FILED DATE: 7/22/2024 5:02 PM   2024L008031

## PARTIES

8.     Plaintiff Rinku Patel is a board-certified Doctor of Pharmacy who specializes in the pharmaceutical retail industry.

9.     Defendant OptioRx is a Delaware corporation headquartered in Northbrook, Illinois, operating compounding pharmacies in California, Florida, Illinois, New York, Ohio, Texas, and Wisconsin. OptioRx employed Dr. Patel from February 1, 2022 until February 5, 2024.

10.    Defendant CBC Pharma Holdco LLC is a Delaware corporation that is the parent company of Defendant OptioRx.

11.    Defendant Insperity Holdings is a Delaware corporation that is headquartered in Kingwood, Texas and is a Professional Employer Organization ("PEO") that Defendant OptioRx partnered with to co-employ Defendant OptioRx's employees.

12.    Defendant Pharmacy Management LLC is a Delaware corporation that has been the manager of Defendant OptioRx since September 2022.

13.    Defendant Ashok Nayyar is the Managing Director and Chief Investment Officer of MCCP, Defendant OptioRx's Senior Lender.

14.    Defendant Jeffrey Kelly is a Member of Defendant OptioRx's Board of Directors and a Managing Director at MCCP, Defendant OptioRx's Senior Lender.

15.    Defendant Jonathan Tunis is a Member of Defendant OptioRx's Board of Directors and a Managing Director and General Counsel for MCCP, Defendant OptioRx's Senior Lender.

16.    Defendant Berry Best is a Member of Defendant OptioRx's Board of Directors and a Managing Director at MCCP, Defendant OptioRx's Senior Lender.

## JURISDICTION AND VENUE

17.    Jurisdiction and venue are proper in this Court because the parties have provided

FILED DATE: 7/22/2024 5:02 PM    2024L008031

contractual consent. In the Employment Agreement, the parties agreed that Cook County, Illinois shall be the sole and exclusive venue for any proceeding between the parties in connection with the Agreement. *See* the Employment Agreement, attached hereto as Exhibit A ¶ 17(e).

18.     This case arises out of facts that occurred in Illinois and Defendants' violations of Illinois common and statutory law occurred in Illinois.

19.     Defendant OptioRx is headquartered and conducts business in Illinois.

20.     Defendant CBC Pharma Holdco LLC is headquartered in Delaware and is the parent company of Defendant OptioRx that conducts business in Illinois.

21.     Defendant Insperity Holdings is headquartered in Delaware and conducts business in Illinois by co-employing Defendant OptioRx's employees.

22.     Defendant Pharmacy Management LLC is a Delaware corporation that conducts business in Illinois as the manager of Defendant OptioRx.

23.     Defendant Nayyar conducted business in Illinois by exercising control over Defendant OptioRx as the Managing Director and Chief Investment Officer of MCCP, Defendant OptioRx's Senior Lender.

24.     Defendants Kelly, Best, and Tunis conducted business in Illinois by exercising control over Defendant OptioRx as members of Defendant OptioRx's Board of Directors.

25.     Dr. Patel is a resident of DuPage County, Illinois and provided professional services in Illinois.

## FACTS RELEVANT TO ALL CLAIMS

26.     OptioRx began to recruit Dr. Patel as the Company's CEO in the fall of 2021. Thereafter, OptioRx's leadership, the board of directors, Defendants Nayyar and Kelly and Dr. Patel engaged in extensive interviews and discussions where the former led Dr. Patel to believe

4

the Company was profitable and projected to grow its revenue by one-third in 2022.

27.     Based on this information, Dr. Patel accepted OptioRx's offer of employment on February 1, 2022, subject to the terms of the Parties' Employment Agreement. *See generally*, Exh. A. According to Dr. Patel's Employment Agreement, she was hired to serve as OptioRx's CEO and perform the duties and responsibilities commensurate with this position.

28.      OptioRx's initial capital resulted from debt financing, with MCCP as its Senior Lender. As a result, OptioRx's Board of Directors ("Board") included three MCCP employees—Defendants Kelly, Best, and Tunis—who comprised the Board's majority.

29.     Because MCCP is OptioRx's Senior Lender, any changes to the Company's operations—including the firing and hiring of employees and retail processes and operations—required the approval of MCCP's Managing Director and Chief Investment Officer, Defendant Nayyar, and the Board.

30.     Additionally, any changes or discussions concerning Dr. Patel's compensation required the approval of Nayyar and the Board.

31.     Defendants OptioRx, CBC Pharma Holdco, Insperity Holdings, Pharmacy Management, and Defendants Nayyar, Kelly, Best, and Tunis collectively exercised control over the terms and conditions of Dr. Patel's employment, making them Dr. Patel's joint employers.

32.     Defendants employed Dr. Patel until they terminated her without cause on February 5, 2024.

### Dr. Patel Learns OptioRx is Struggling Financially

33.     Dr. Patel quickly discovered that OptioRx's leadership had misrepresented the company's financial health during the interview process. Within ten days of her tenure, Caremark, a major pharmacy benefit manager, sent OptioRx a termination notices due to fraudulent billing

FILED DATE: 7/22/2024 5:02 PM    2024L008031

practices by certain OptioRx pharmacies prescribing medications outside of Caremark's benefit plan and provider manual that outlined a list of aberrant products.

34.    Caremark's contract cancellation, which accounted for thirty percent of OptioRx's gross profits, nearly rendered the company insolvent within Dr. Patel's first two weeks of employment.

35.    Shortly after, Dr. Patel discovered OptioRx defaulted on its debt in the third quarter of 2021 and was preparing to inform its lenders subordinate to MCCP of the Company's imminent default and decision to put a stop payment on all debt subordinate to MCCP . However, an equity infusion with improper documentation enabled OptioRx to rectify its default without highlighting its financial instability.

36.    Prior to recruiting Dr. Patel, OptioRx's leadership was aware of Caremark's impending contract cancellation and the 2021 debt default but did not disclose these facts to Dr. Patel. Instead, they misrepresented OptioRx's financial standing to Dr. Patel, leading her to accept employment under false pretenses.

37.    At this time, Defendant Nayyar who had been unhappy with the previous management of the company due to losses resulting from payor terminations, audits and termination of prescription dispensing practices resulting from aberrant products, instructed Dr. Patel to terminate the Company's former CEO, CFO, COO, and the CBC Pharma HoldCo Manager, Sergio Zepeda.  When Dr. Patel reminded Defendant Nayyar she needed the Board's permission and support of company counsel to execute these requests, Defendant Nayyar often said to Dr. Patel, "we are the board, we don't need anyone's permission"  In fact, Defendant Nayyar and Tunis often acted to make decisions and continued to insist Dr. Patel breach her fiduciary duties as a CEO to other lenders and equity holders in executing their decision, without

6

proper board governance, approval or discussion.

**Dr. Patel Discovers OptioRx is Violating Federal Regulations**

38.     Following Caremark's cancellation notice, Dr. Patel enlisted a regulatory compliance law firm to help OptioRx resolve its issues with Caremark. Under Dr. Patel's leadership, OptioRx and Caremark reached a settlement that required the Company to address its operational, sales, and claim billing practices, while safeguarding its financial viability. Without Dr. Patel's efforts, OptioRx's doors would have closed in 2022. OptioRx as a result of payor settlements had to stop dispensing various products in its pharmacies, resulting in significant loss in profits for OptioRx.

39.     As Dr. Patel delved deeper into her role at OptioRx, she discovered many of the Company's pharmacies were neglecting various federal statutes and regulations. In particular, she found these pharmacies were failing to: (1) implement proper data security procedures, (2) comply with HIPAA's requirement, (3) properly secure against controlled substance theft; and (4) comply with basic regulatory practices mandated by the CQA, Sections 503A and B of the FDCA, the CSA, and state pharmacy boards, including appropriate compounding facilities that complied with the required standards of practice and patient safety.

40.     Dr. Patel recognized that OptioRx's success depended on its pharmacies resolving the abovementioned failures. Consequently, she and her management team began implementing policies, procedures, and safety measures to ensure the Company adhered to these regulations.

41.     Dr Patel and the management team not only made appropriate personnel changes, but hired regulatory counsel to ensure there was appropriate assessment and budgeting of site specific changes needed in facilities, policies, and procedures, requesting board to approve budget in a timely manner to rectify these issues.

FILED DATE: 7/22/2024 5:02 PM    2024L008031

42.     While Dr. Patel and the OptioRx management team addressed these issues, Dr. Patel kept the Board and Mr. Nayyar regularly informed about the Company's operational failures and the steps being taken to remedy them. In fact, Dr. Patel documented and discussed these concerns not only in day-to-day communication but also in at least nine Board meetings.

43.     Despite the legal necessity of Dr. Patel's operational overhaul, Defendants Nayyar, Kelly, Best, and Tunis became increasingly unhappy with Dr. Patel because the changes Dr. Patel was attempting to implement negatively impacted OptioRx's profits.

44.     Despite Defendants Nayyar, Kelly, Best, and Tunis' dissatisfaction with Dr. Patel's attempts to clean up and standardize OptioRx's operations, Dr. Patel continued to focus on addressing the Company's regulatory compliance as best as possible with the board approved limited resources and budget approvals that were often intentionally delayed, causing the management team to take months to rectify regulatory issues, despite of repeated requests for budget approvals to do so as soon as possible.

45.     Through her efforts, Dr. Patel learned that one of the Company's pharmacies and that pharmacy's manager were engaging in an illegal kickback practice. Specifically, the pharmacy and pharmacy's former owner were paying a referring physician a "marketing fee" for sending prescriptions to the pharmacy for fulfillment. The pharmacy was also paying for the billboards advertising the referring physician's services.

46.     Dr. Patel immediately instructed Mr. Andrew Charter, the company's Chief Pharmacy Officer, to terminate the pharmacy's kickback practice due to its legal risks and fire the pharmacy manager. Instead, Mr. Charter engaged in back-channel conversations in February 2023 with Defendants Kelly and Best to retain the manager and replace Dr. Patel as CEO, positioning himself as her successor.

FILED DATE: 7/22/2024 5:02 PM     2024L008031

FILED DATE: 7/22/2024 5:02 PM    2024L008031

47.    Notably, Dr. Patel learned of Mr. Charter's conversation with Defendants Kelly and Best through subsequent communications with the pharmacy manager, and confronted Defendants Kelly and Best during a call with the Board. The Board, however, still failed to take Dr. Patel's recommended course of action against the pharmacy and pharmacy manager. Moreover, Defendants Kelly and Best have retaliated against Dr. Patel for addressing the kickbacks.

### Defendants Nayyar, Kelly, Best, and Tunis Retaliate Against Dr. Patel Because of Her Regulatory Overhaul of OptioRx's Operations and Pharmacies

48.    In the spring of 2023, Defendants failed to pay Dr. Patel and other management employees their earned 2022 bonuses. Dr. Patel contacted Defendant Nayyar to resolve the issue, which led to a contentious conversation on July 10 and 11, 2023, where Defendant Nayyar threatened and screamed at Dr. Patel. Defendant Nayyar's hostility during this interaction prompted Dr. Patel to ask Defendant Nayyar and the Board to set metrics that would determine management's 2023 bonuses.

49.    On August 16, 2023, Dr. Patel with the rest of the Company's management proposed metrics that were accepted by Defendant Nayyar and the Board. *See* Exh. B., 2023 Bonus Email Exchange.

50.    Thereafter, Dr. Patel continued to standardize and improve OptioRx's operations to ensure its pharmacies' regulatory compliance, even though Defendants Nayyar, Best, Tunis, and Kelly continued to complain about how Dr. Patel's legally required improvements in operations and operating policies, impacted the Company's growth and revenues.

51.    In December 2023, Defendants Kelly and Best called Dr. Patel to inform her that they hired an industry consultant, Ben David ("Mr. David").

52.    Prior to Defendants hiring him, Mr. David was the CEO of Wells Pharmacy

FILED DATE: 7/22/2024 5:02 PM    2024L008031

Network ("Wells"), which was required to recall 600 compound prescription products after Mr. David allowed prescriptions to be filled as the Well's facility underwent construction. *See* Exh. C, CNN Article.

53.     Additionally, under his supervision, the FDA issued at least ten 483-citations/violations to Wells after FDA inspectors observed conditions or practices at the Wells' facilities indicating FDA-regulated products were produced as FDA regulations require.

54.     After meeting with Dr. Patel on December 6, 2023, Mr. David and Defendant Best requested hundreds of documents from the Company's management team, visited every OptioRx pharmacy, and wrote an inaccurate analysis about the management team's efforts at OptioRx and the US pharmaceutical compounding market. In fact, Mr. David presented confidential documents of industry competitors such as pricing sheets and compounding formularies as his "future plan" to show support for the wishes of Defendants Nayyar, Best, and Kelly.

55.     On December 21, 2023, the Board called a meeting to discuss Mr. David's report with Dr. Patel and the rest of the management team, and to determine the Company's future. During that call, however, Defendant Nayyar and the Board openly criticized Dr. Patel and other management employees' efforts towards ensuring OptioRx's regulatory health and the management team's insistence on only adding regulatory compliant compounds to its formulary. Defendant Nayyar also complained about how Dr. Patel's efforts decreased the Company's revenues and commented OptioRx "is not a clinical or academic institution" and needs to be making money. Additionally, Mr. David argued that the Company should produce compounds that "make money" using non-FDA approved compound ingredients in its products, and even stated "everyone is doing it and the FDA is not shutting anyone down, referring to the competitors formulary and pricing documents he presented as recommendations."  In addition, the OptioRx

FILED DATE: 7/22/2024 5:02 PM   2024L008031

management team insisted on not compounding products that are commercially available such as testosterone against the recommendations of Mr. David, creating further divide between Dr. Patel and the Defendants on regulatory appropriateness of what should and should not be compounded as per the FDA guidelines and patient safety risks.

56.     After the call, Dr. Patel and the management team authored an 80-page rebuttal explaining why Mr. David's analysis and recommendations were wrong—which the Board failed to acknowledge and respond to.

57.     On January 24, 2024, OptioRx hired Mr. David as the Company's Executive Chairman. Defendants Tunis and Kelly spoke with Dr. Patel on January 29, 2024, informing her that the Company needed "fresh blood" and Mr. David would oversee OptioRx's compounding and retail businesses—which Dr. Patel previously oversaw.

58.     On January 30, 2024, Mr. David arrived at OptioRx's office and briefly met with Dr. Patel. He took over supervision of the Company's management team without addressing Dr. Patel's employment status.

59.     On Monday, February 5, 2024, Defendants Kelly and Tunis called Dr. Patel and told her, "It is best we go our separate ways, but we plan to honor your employment contracts and severance.".

60.     On February 16, 2024, Dr. Patel received her Severance Agreement and forwarded it to her former counsel for review.

61.     On February 21, 2024, Dr. Patel's former counsel engaged in good-faith negotiations with the Company by sending an edited version of the Severance Agreement to OptioRx's counsel.

62.     On March 12, 2024, the Company responded to Dr. Patel's former counsel with an

FILED DATE: 7/22/2024 5:02 PM    2024L008031

antagonistic letter that overlooked the Company's financial and regulatory woes prior to Dr. Patel joining OptioRx, and mischaracterized her tenure and performance in an attempt to intimidate her, disparage her, and get out of their contractual obligations to Dr. Patel.

63.     On March 20, 2024, the Company's counsel confirmed via email that OptioRx would pay for Dr. Patel's independent legal representation if she participated in a deposition on the Company's behalf. As a result, Dr. Patel sat for this deposition with her former counsel. The Company's legal representative told her she did a great job and OptioRx would finalize her Severance Agreement soon.

64.     In April and May 2024, Dr. Patel and her former counsel requested payment for the latter's representation of Dr. Patel during the deposition—which OptioRx ignored. As a result, the Company failed to reimburse Dr. Patel's former counsel despite its written promise to do so. *See* Exh. D.

65.     On May 1, 2024, Dr. Patel's former counsel emailed OptioRx's legal team, informing them Dr. Patel accepted the Company's latest version of Dr. Patel's Severance Agreement.

66.     On May 1, 2024, OptioRx's counsel emailed Dr. Patel's former counsel, stating the Company would not honor Dr. Patel's Employment Agreement and would not execute a Severance Agreement for her benefit.

67.     To date, OptioRx has refused to honor Dr. Patel's Employment Agreement and has withheld Dr. Patel's contractually guaranteed compensation, which includes: (1) one year of severance pay equal to Dr. Patel's annual compensation of $400,000; (2) one year of COBRA equaling $10,680; (3) payment of her 2023 bonus of $800,000; (4) equity that vested in accordance with the Management Profit Plan; (5) reimbursement of legal fees; and (6) lost wages since

OptioRx terminated her employment.

<div align="center">

**COUNT I – VIOLATION OF THE IWPCA**
**PLAINTIFF AGAINST ALL DEFENDANTS**

</div>

68.   Dr. Patel reincorporates and re-alleges all preceding allegations as if fully set forth herein.

69.   At all relevant times herein, the IWPCA was in effect. *See* 820 ILCS § 115/1, *et seq*. Section 2 of the IWPCA defines "final compensation," as including "the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employers." *See* 820 ILCS § 115/2.  Section 5 of the IWPCA provides that employers must pay an employee's final compensation no later than the next scheduled payroll date after termination of his employment. *See* 820 ILCS § 115/5. Final compensation includes contractually guaranteed severance pay.

70.   Defendants violated the IWPCA when they intentionally withheld Dr. Patel's contractually guaranteed severance pay of $400,000.

71.   The IWPCA mandates interest penalties for each month following the date of payment during which such underpayments remain unpaid should accrue at a rate of 5%. *See* 820 ILCS §115/14.

72.   The outstanding wages Defendants owe Dr. Patel began accruing interest at a rate of 5% per month as of March 2024.

73.   The IWPCA further mandates Dr. Patel recover her attorneys' fees and litigation expenses. *See* 820 ILCS §115/14.

74.   WHEREFORE, Plaintiff Dr. Patel, prays that this Court enter judgment in her favor and against Defendants as follows:

a.   Find that Defendants violated the IWPCA by failing to pay Plaintiff her

FILED DATE: 7/22/2024 5:02 PM   2024L008031

contractually guaranteed severance pay;

b.      Award Plaintiff $400,000, as Dr. Patel's Employment Agreement requires;

c.      Award Plaintiff pre-judgment interest at the rate of 5% per month for every month the contractually guaranteed severance pay remains outstanding;

d.      Award Plaintiff litigation costs and reasonable attorneys' fees; and

e.      Award Plaintiff any other or further relief as this Court deems necessary to effectuate the purpose of the IWPCA.

### COUNT II – VIOLATION OF THE IWPCA
### PLAINTIFF AGAINST ALL DEFENDANTS

75.     Dr. Patel reincorporates and re-alleges all preceding allegations as if fully set forth herein.

76.     At all relevant times herein, the IWPCA was in effect. *See* 820 ILCS § 115/1, *et seq*. Section 2 of the IWPCA defines "final compensation," as including "the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employers." *See* 820 ILCS § 115/2.  Section 5 of the IWPCA provides that employers must pay an employee's final compensation no later than the next scheduled payroll date after termination of his employment. *See* 820 ILCS § 115/5. Final compensation includes contractually guaranteed bonus pay.

77.     Defendants violated the IWPCA when they intentionally withheld Dr. Patel's 2023 Annual Bonus of $800,000 after Dr. Patel satisfied the metrics approved by the Board on August 16, 2023.

78.     The IWPCA mandates interest penalties for each month following the date of payment during which such underpayments remain unpaid should accrue at a rate of 5%. *See* 820 ILCS §115/14.

14

FILED DATE: 7/22/2024 5:02 PM  2024L008031

79.     The outstanding wages Defendants owe Dr. Patel began accruing interest at a rate of 5% per month as of March 2024.

80.     The IWPCA further mandates Dr. Patel recover her attorneys' fees and litigation expenses. *See* 820 ILCS §115/14.

81.     WHEREFORE, Plaintiff Dr. Patel, prays that this Court enter judgment in her favor and against Defendants as follows:

> f.     Find that Defendants violated the IWPCA by failing to pay Plaintiff her 2023 Annual Bonus;
>
> g.     Award Plaintiff $800,000 as Dr. Patel's Employment Agreement requires;
>
> h.     Award Plaintiff pre-judgment interest at the rate of 5% per month for every month the 2023 Annual Bonus remains outstanding;
>
> i.     Award Plaintiff litigation costs and reasonable attorneys' fees; and
>
> j.     Award Plaintiff any other or further relief as this Court deems necessary to effectuate the purpose of the IWPCA.

### COUNT III – VIOLATION OF THE IWPCA
### AGAINST ALL DEFENDANTS

82.     Dr. Patel reincorporates and re-alleges all preceding allegations as if fully set forth herein.

83.     At all relevant times herein, the IWPCA was in effect. *See* 820 ILCS § 115/1, *et seq*. Section 2 of the IWPCA defines "final compensation," as including "the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employers." *See* 820 ILCS § 115/2.  Section 5 of the IWPCA provides that employers must pay an employee's final compensation no later than the next scheduled payroll date after termination of his employment. *See* 820 ILCS § 115/5. Final compensation includes reimbursement for expenses

15

FILED DATE: 7/22/2024 5:02 PM    2024L008031

Dr. Patel accrued on the Company's behalf.

84.     Defendants violated the IWPCA when they intentionally failed to reimburse Dr. Patel for the legal fees she incurred on the Company's behalf.

85.     The IWPCA mandates interest penalties for each month following the date of payment during which such underpayments remain unpaid should accrue at a rate of 5%. *See* 820 ILCS §115/14.

86.     The outstanding wages Defendants owe Dr. Patel began accruing interest at a rate of 5% per month as of March 2024.

87.     The IWPCA further mandates Dr. Patel recover her attorneys' fees and litigation expenses. *See* 820 ILCS §115/14.

88.     WHEREFORE, Plaintiff Dr. Patel, prays that this Court enter judgment in her favor and against Defendants as follows:

a.     Find that Defendants violated the IWPCA by failing to reimburse her for the legal fees she incurred on the Company's behalf;

b.     Award Plaintiff the cost of Dr. Patel's former counsel's representation during the aforementioned deposition;

c.     Award Plaintiff pre-judgment interest at the rate of 5% per month for every month the 2023 Annual Bonus remains outstanding;

d.     Award Plaintiff litigation costs and reasonable attorneys' fees; and

e.     Award Plaintiff any other or further relief as this Court deems necessary to effectuate the purpose of the IWPCA.

**COUNT IV – VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT ("IWA")
PLAINTIFF AGAINST ALL DEFENDANTS.**

89.     Plaintiff Dr. Patel reincorporates and re-alleges all preceding allegations as if fully

FILED DATE: 7/22/2024 5:02 PM    2024L008031

set forth herein.

90.     At all relevant times, the IWA was in effect. *See* 740 ILCS §174. Section 20 of the IWA prohibits retaliation "against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Information Act." *See* 740 ILCS §174/20.

91.     Defendants violated the IWA when they terminated Dr. Patel for refusing to engage in activities that would violate the CQA, Sections 503A and B of the FDCA, the CSA, and state pharmacy board regulations.

92.     WHEREFORE, Plaintiff Dr. Patel, prays that this Court enter judgment in her favor and against Defendants as follows:

  a.  Find that Defendants violated the IWA by terminating Dr. Patel's employment because of her refusal to participate in OptioRx's statutory violations;

  b.  Award reinstatement with the same status Dr. Patel had prior to OptioRx's retaliation;

  c.  Award Dr. Patel back pay, with interest;

  d.  Award Dr. Patel compensatory damages for emotional distress;

  e.  Award Plaintiff litigation costs and reasonable attorneys' fees; and

  f.  Award Plaintiff any other or further relief as this Court deems necessary to effectuate the purpose of the IWA.

## COUNT V – RETALIATORY DISCHARGE
## AGAINST OPTIORX, LLC, CBC PHARMA HOLDCO LLC, INSPERITY HOLDINGS, AND PHARMACY MANAGEMENT LLC.

93.     Plaintiff Dr. Patel reincorporates and re-alleges all preceding allegations as if fully set forth herein.

FILED DATE: 7/22/2024 5:02 PM   2024L008031

94.     Beginning in February 2022, Dr. Patel regularly reported OptioRx's regulatory failures to Defendant Nayyar and the Company's Board of Directors, including but not limited to concerns regarding improper data security procedures, controlled substance theft, fraudulent kickback schemes, and violations of the CQA, Sections 503A and B of the FDCA, the CSA, HIPAA, and state pharmacy board violations.

95.     In retaliation for reporting these concerns, Defendants Nayyar, Kelly, Tunis and Best conspired together to terminate Dr. Patel's employment as OptioRx's CEO on February 5, 2024, and replacing her with a successor who has engaged in the illegal and unethical practices Dr. Patel refused to perpetuate.

96.     Dr. Patel's discharge was in violation of a clearly mandated public policy that emphasizes pharmaceutical compliance and patient safety. The federal government enacted the CQA, Sections 503A and B of the FDCA, and the CSA to ensure the safety, efficacy, security, and proper manufacturing of pharmaceutical products.

97.     Patient safety, ensuring patient safety, and ensuring health care providers can speak up patient safety without reprisal are clearly mandated public policies in the State of Illinois.

98.     OptioRx is responsible for its retaliatory discharge of Dr. Patel.

99.     As a result of OptioRx's retaliation, Dr. Patel has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, emotional distress, and damage to reputation.

100.    WHEREFORE, Plaintiff Dr. Patel, prays that this Court enter judgment in her favor and against OptioRx:

> A.     That a finding be entered that OptioRx retaliated against Dr. Patel for reporting statutory infractions in violation of public policy;

FILED DATE: 7/22/2024 5:02 PM    2024L008031

B.      That Plaintiff be awarded economic damages to compensate her for

the damages he sustained due to OptioRx's conduct and for the

psychological emotional turmoil that she has suffered;

C.      That Plaintiff be awarded attorneys' fees and costs incurred in pursuing this

action;

D.      That Plaintiff be awarded punitive damages to punish OptioRx's willful

conduct and to deter future violations; and

E.      That Plaintiff be awarded such other and further relief this Court

deems just and appropriate.

<div align="center">

**COUNT VI – BREACH OF CONTRACT**
**AGAINST OPTIORX, LLC, CBC PHARMA HOLDCO LLC, INSPERITY HOLDINGS,**
**AND PHARMACY MANAGEMENT LLC.**

</div>

101.    Plaintiff Dr. Patel reincorporates and re-alleges all preceding allegations as if fully

set forth herein.

102.    On February 1, 2022, Dr. Patel entered into an employment contract with OptioRx,

the terms of which are supplied by Dr. Patel's Employment Agreement. (*See* Exh. A).

103.    The Employment Agreement Section 15(b) entitled "Termination by the Company

Without Cause," states:

> (b)    **Termination by the Company Without Cause.** The Company may
> terminate Employee's employment hereunder for any reason other than Cause,
> Disability (defined below), or death, upon written notice to Employee. In the event
> of termination of Employee's employment pursuant to this Section 15(b), then:
>> (i)     the Company will provide to Employee the Accrued Rights;
>> (ii)    the Employee will receive full acceleration of the Employee's Portion
>> of the Management Profit Participation Plan;
>> (iii)   provided the Release becomes irrevocable pursuant to its terms, the
>> Company will pay to Employee the then current Base Salary for a period of
>> twelve (12) months following the Termination Date. Such payments will be
>> payable in accordance with the Company's regular payroll schedule (the
>> "Salary Continuation Payments"); and

<div align="center">19</div>

FILED DATE: 7/22/2024 5:02 PM   2024L008031

(iv)    provided the Release becomes irrevocable pursuant to its terms, the Company will pay the premium for any COBRA coverage elected by Employee provided that she timely elects COBRA continuation, and does not otherwise become eligible for comparable coverage by way of other employment prior to the end of Employee's COBRA eligibility.

104.    On February 5, 2024, OptioRx terminated Dr. Patel without cause, evidenced by Defendants Kelly and Tunis' promise to Dr. Patel that the Company would provide Dr. Patel with a Severance Agreement.

105.    OptioRx breached Dr. Patel's Employment Agreement by failing to pay Dr. Patel the Severance Pay and Health Care Continuation Payments outlined in section 15(b)(iii) and 15(b)(iv).

106.    WHERFORE Plaintiff, Dr. Patel, prays for judgment in her favor and against Defendant OptioRx, and for the following relief:

A.    That a finding be entered that Defendant OptioRx breached Dr. Patel's Employment Agreement;

B.    That Plaintiff be awarded all economic and compensatory damages including but not limited to lost wages and health care benefits since the time of Plaintiff's termination;

C.    That the restrictive covenants in the Employment Agreement be ordered to be unenforceable;

D.    That Plaintiff be awarded punitive damages;

E.    That Plaintiff be awarded his costs of maintaining this action including reasonable attorney's fees, together with all costs and expenses of suit; and

F.    That Plaintiff be awarded such other and further relief as this Honorable Court deems necessary.

FILED DATE: 7/22/2024 5:02 PM    2024L008031

## COUNT VII – BREACH OF CONTRACT
## AGAINST OPTIORX, LLC, CBC PHARMA HOLDCO LLC, INSPERITY HOLDINGS, AND PHARMACY MANAGEMENT LLC.

107.    Plaintiff Dr. Patel reincorporates and re-alleges all preceding allegations as if fully set forth herein.

108.    On February 1, 2022, Dr. Patel entered into an employment contract with OptioRx, the terms of which are supplied by Dr. Patel's Employment Agreement. (*See* Exh. A).

109.    The Employment Agreement Section 15(b) entitled "Termination by the Company Without Cause," states:

> (b)    **Termination by the Company Without Cause.** The Company may terminate Employee's employment hereunder for any reason other than Cause, Disability (defined below), or death, upon written notice to Employee. In the event of termination of Employee's employment pursuant to this Section 15(b), then:
> (i)    the Company will provide to Employee the Accrued Rights;
> (ii)    the Employee will receive full acceleration of the Employee's Portion of the Management Profit Participation Plan;
> (iii)    provided the Release becomes irrevocable pursuant to its terms, the Company will pay to Employee the then current Base Salary for a period of twelve (12) months following the Termination Date. Such payments will be payable in accordance with the Company's regular payroll schedule (the "Salary Continuation Payments"); and
> (iv)    provided the Release becomes irrevocable pursuant to its terms, the Company will pay the premium for any COBRA coverage elected by Employee provided that she timely elects COBRA continuation, and does not otherwise become eligible for comparable coverage by way of other employment prior to the end of Employee's COBRA eligibility.

110.    The Employment Agreement Section 4(e) entitled "Management Profit Participation" states Dr. Patel is eligible to "participate in the Management Profit Participation Plan described in the Operating Agreement" in accordance with the Employment Agreement Section 4(f) entitled "Vesting Schedule."

111.    On February 5, 2024, OptioRx terminated Dr. Patel without cause, evidenced by Defendants Kelly and Tunis' promise to Dr. Patel that the Company would provide Dr. Patel with

FILED DATE: 7/22/2024 5:02 PM    2024L008031

a Severance Agreement.

112.    OptioRx breached Dr. Patel's Employment Agreement by failing to accelerate Dr. Patel's equity in the Management Profit Participation Plan as outlined in Section 15 (ii).

113.    WHERFORE Plaintiff, Dr. Patel, prays for judgment in her favor and against Defendant OptioRx, and for the following relief:

G.    That a finding be entered that Defendant OptioRx breached Dr. Patel's Employment Agreement;

H.    That Plaintiff be awarded all economic and compensatory damages including but not limited to the value of Ms. Patel's equity in the Management Profit Participation Plan;

I.    That the restrictive covenants in the Employment Agreement be ordered to be unenforceable;

J.    That Plaintiff be awarded punitive damages;

K.    That Plaintiff be awarded her costs of maintaining this action including reasonable attorney's fees, together with all costs and expenses of suit; and

L.    The Plaintiff be awarded such other and further relief as this Honorable Court deems necessary.

## COUNT IIX– BREACH OF CONTRACT
## AGAINST OPTIORX, LLC, CBC PHARMA HOLDCO LLC, INSPERITY HOLDINGS, AND PHARMACY MANAGEMENT LLC.

114.    Plaintiff Dr. Patel reincorporates and re-alleges all preceding allegations as if fully set forth herein.

115.    On February 1, 2022, Dr. Patel entered into an employment contract with OptioRx, the terms of which are supplied by Dr. Patel's Employment Agreement. (*See* Exh. A).

FILED DATE: 7/22/2024 5:02 PM   2024L008031

116.    The Employment Agreement Section 4(d) entitled "Discretionary Annual Bonus Plan," states:

> **Discretionary Annual Bonus Plan.** During the term of Employee's employment under this Agreement, the Employee will be eligible for an annual bonus, the amount which will be up to 200% of Employee's Base Salary (the "Discretionary Bonus"). The Discretionary Bonus will be based on achieving annual goals set by the Company. The Discretionary Bonus, if any, will be paid to the Employee no later than 90 days following the end of the Company's fiscal year in which such Discretionary Bonus was earned. The Discretionary Bonus shall be determined annually by the Company and shall be aligned with the annual plan of the Company.

117.    On August 16, 2023, OptioRx's Board of Directors adopted metrics to determine Dr. Patel 2023 Annual Bonus. Dr. Patel satisfied these metrics, entitling her to a 2023 Annual Bonus of $800,000 under Section 4(d) of her Employment Agreement.

118.    OptioRx breached Dr. Patel's Employment Agreement by failing to pay Dr. Patel her 2023 Annual Bonus as outlined in Section 4(d) of the Employment Agreement.

119.    WHERFORE Plaintiff, Dr. Patel, prays for judgment in her favor and against Defendant OptioRx, and for the following relief:

M.    That a finding be entered that Defendant OptioRx breached Dr. Patel's Employment Agreement;

N.    That Plaintiff be awarded all economic and compensatory damages including but not limited to the value of Dr. Patel's 2023 Annual Bonus;

O.    That the restrictive covenants in the Employment Agreement be ordered to be unenforceable;

P.    That Plaintiff be awarded punitive damages;

Q.    That Plaintiff be awarded her costs of maintaining this action including reasonable attorney's fees, together with all costs and expenses of suit; and

FILED DATE: 7/22/2024 5:02 PM    2024L008031

R.     The Plaintiff be awarded such other and further relief as this Honorable

Court deems necessary.

<div align="center">

**COUNT IX– BREACH OF CONTRACT**
**AGAINST OPTIORX, LLC, CBC PHARMA HOLDCO LLC, INSPERITY HOLDINGS,**
**AND PHARMACY MANAGEMENT LLC.**

</div>

120.    Plaintiff Dr. Patel reincorporates and re-alleges all preceding allegations as if fully

set forth herein.

121.    On March 30, 2024, OptioRx's legal counsel and agent confirmed via email to Dr.

Patel's former counsel that the Company would reimburse Dr. Patel for any legal fees she incurred

by participating in a deposition on the Company's behalf. *See* Exh. D.

122.    Dr. Patel participated in the deposition but OptioRx has failed to reimburse Dr. Patel

for the legal fees she incurred. As a result, OptioRx breached its contract with Dr. Patel and owes

her damages.

123.    WHERFORE Plaintiff, Dr. Patel, prays for judgment in her favor and against

Defendant OptioRx, and for the following relief:

S.     That a finding be entered that Defendant OptioRx breached its contract with

Dr. Patel to reimburse Dr. Patel for the legal fees she incurred on the

Company's behalf;

T.     That Plaintiff be awarded all economic and compensatory damages

including but not limited to the value of the feels she incurred;

U.     That Plaintiff be awarded punitive damages;

V.     That Plaintiff be awarded her costs of maintaining this action including

reasonable attorney's fees, together with all costs and expenses of suit; and

W.     The Plaintiff be awarded such other and further relief as this Honorable

<div align="center">24</div>

Court deems necessary.

## **JURY DEMAND**

124.    Dr. Patel demands a trial by jury of all issues raised in this Complaint.

Dated: July 22, 2024

<div style="margin-left:50%">

Respectfully submitted,

Rinku Patel, PharmD


By:    /s/    Kristen Prinz
       One of Plaintiff's Attorneys

</div>

The Prinz Law Firm, P.C.
Kristen Prinz kprinz@prinz-lawfirm.com
Kristin Hendriksen khendriksen@prinz-lawfirm.com
1 East Wacker Dr., Suite 1800
Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822
 Firm ID: 46338

FILED DATE: 7/22/2024 5:02 PM    2024L008031

FILED
7/22/2024 5:02 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L008031
Calendar, I
28612376

FILED DATE: 7/22/2024 5:02 PM   2024L008031

# Exhibit A

FILED DATE: 7/22/2024 5:02 PM    2024L008031

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "**Agreement**") is entered into as of December 10, 2021 by and between Optio Rx, LLC, a Delaware limited liability company (the "**Company**"), and Rinku Patel ("**Employee**," and, together with the Company, the "**Parties**," and each a "**Party**").

A.      The Company owns various pharmacies and related businesses.

B.      The Company wishes to employ Employee under the terms of this Agreement, and Employee wishes to be so employed.

In consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1.      **EMPLOYMENT/TERM**.

(a)      The Company hereby employs the Employee and the Employee hereby agrees to be employed by the Company for an initial period commencing on February 1, 2022 (the "**Effective Date**") and ending on the second anniversary of the Effective Date (the "**Initial Term**"). Following the Initial Term, unless Employee's employment has been previously terminated as provided herein, commencing on the second anniversary of the Effective Date and on each anniversary of the Effective Date thereafter (each, an "**Extension Date**"), the term of Employee's employment under this Agreement will be automatically extended for an additional one (1) year period (each, a "**Renewal Term**") unless the Company or the Employee provides the other at least ninety (90) days' prior written notice before the next Extension Date that the Initial Term or Renewal Term, as applicable, will not be so extended.

(b)      Notwithstanding anything in <u>Section 1(a)</u>, and subject to the terms of <u>Section 15</u>, Employee's employment may be terminated by the Company or by Employee at any time, with or without Cause, and with or without notice.

2.      **DUTIES**. Employee will hold the title of Chief Executive Officer and will perform the duties and responsibilities commensurate with such position and otherwise as may be assigned to Employee from time to time by the Company's Manager (the "**Manager**"). Employee will report to the Manager. Employee will work remotely from Lemont, Illinois. During Employee's employment with the Company, Employee will devote Employee's best efforts and full business time, skill, and attention to the performance of Employee's duties on behalf of the Company and will have a seat on the Board of Directors of the Company's parent company, CBC Pharma HoldCo, LLC, a Delaware limited liability company ("**HoldCo**").

3.      **POLICIES AND PROCEDURES**. Employee will be subject to and will comply with the written policies and procedures of the Company that are not inconsistent with this Agreement, as such policies and procedures may be modified, added to, or eliminated from time to time at the sole discretion of the Company. The Company and Employee each acknowledge and agree that any written or oral policies and procedures of the Company do not constitute contracts between the Company and Employee.

4.      **COMPENSATION**. For all services rendered and to be rendered by Employee hereunder, the Company will pay to Employee, and Employee will accept, the following:

(a)      **Base Salary**. The Company will pay to Employee an annualized base salary of $400,000 ("**Base Salary**"), payable in accordance with the Company's standard payroll policy, subject to

1

FILED DATE: 7/22/2024 5:02 PM    2024L008031

such deductions and withholdings as the Company is required to make pursuant to law or by agreement with or direction of Employee.

(b)    **Sign-on Bonus**. No later than March 31, 2022, the Company will pay the employee a one-time cash bonus of $150,000 payable in accordance with the Company's standard payroll policy, subject to such deductions and withholds as the Company is required to make pursuant to law or by agreement with or direction of Employee; provided, however; if Employee's employment with the Company is terminated by the Company for Cause or by the Employee for any reason other than her death, Disability or Constructive Termination: (i) during the first 12-month period of Employee's employment hereunder, then Employee shall immediately return the entire $150,000 bonus to the Company; (ii) during the second 12-month period of Employee's employment hereunder, then Employee shall immediately return $100,000 of such bonus to the Company; and (iii) during the third 12-month period of Employee's employment hereunder, then Employee shall immediately return $50,000 of such bonus to the Company.

(c)    **2022 Sale Bonus**. If a Sale of the Company occurs prior to January 1, 2023 and, as a result of such Sale of the Company, the value of the Employee's Portion of the Management Profit Participation Plan is: (i) less than or equal to $2,000,000, then the Company will pay the employee a one-time cash bonus of $1,000,000; or (ii) greater than $2,000,000 and less than $3,000,000, then the Company will pay the employee a one-time cash bonus equal to (1) $3,000,000 less (2) the value of the Employee's Portion of the Management Profit Participation Plan. Any amount payable under this Section 4(c) shall be payable in accordance with the Company's standard payroll policy, subject to such deductions and withholds as the Company is required to make pursuant to law or by agreement with or direction of Employee.

(d)    **Discretionary Annual Bonus Plan**. During the term of Employee's employment under this Agreement, the Employee will be eligible for an annual bonus, the amount which will be up to 200% of Employee's Base Salary (the "**Discretionary Bonus**"). The Discretionary Bonus will be based on achieving annual goals set by the Company. The Discretionary Bonus, if any, will be paid to the Employee no later than 90 days following the end of the Company's fiscal year in which such Discretionary Bonus was earned. The Discretionary Bonus shall be determined annually by the Company and shall be aligned with the annual plan of the Company.

(e)    **Management Profit Participation Plan**. The Employee will be eligible to participate in the Management Profit Participation Plan described in the Operating Agreement (the "**Operating Agreement**") of HoldCo. The Employee will receive 10% of the total Management Profit Participation Plan, (the "**Employee's Portion of the Management Profit Participation Plan**") subject to the vesting schedule in Section 4(f). Notwithstanding anything contained in the Operating Agreement to the contrary, the Parties acknowledge and agree that Employee's Portion of the Management Profit Participation Plan is not subject to dilution. Subject to the terms of the Operating Agreement, the Management Profit Participation Plan is set between 0 and 20% of the total equity in Holdco depending on Holdco's Multiple On Invested Capital ("**MOIC**") (as defined in the Operating Agreement) to investors after fees, all of which is measured by the Manager, and such MOIC will be calculated upon the Sale of the Company. Subject to the terms of the Operating Agreement, the Management Profit Participation Plan tiers are as follows:

(i)    MOIC < 2.0x: plan equity = 0%;

(ii)    2.0x ≤ MOIC < 2.5x: plan equity = 10%;

(iii)    2.5x ≤ MOIC < 3.0x: plan equity = 15%; and

FILED DATE: 7/22/2024 5:02 PM   2024L008031

(iv)     MOIC ≥ 3.0x: plan equity maximizes at 20%.

(f)     **Vesting Schedule**. Forty percent (40%) of the Employee's Portion of the Management Profit Participation Plan will vest upon the first anniversary of the Effective Date. Twenty percent (20%) of the Employee's Portion of the Management Profit Participation Plan will vest upon the second anniversary of the Effective Date and upon each anniversary of the Effective Date thereafter, until all of the Employee's Portion of the Management Profit Participation Plan has vested on the fourth anniversary of the Effective Date; provided, however, that such scheduled vesting will immediately cease upon a termination of Employee's employment by the Company for Cause under Section 15(a) or the Employee's voluntary termination of employment with Company under Section 15(f); provided, further, that the vesting of all unvested Employee's Portion of the Management Profit Participation Plan will immediately accelerate in full upon a Sale of the Company, a termination by the Company without Cause under Section 15(b), a termination as a result of Employee's Disability under Section 15(d), a termination as a result of Employee's death under Section 15(e), or Constructive Termination of Employee under Section 15(g). For purposes of clarity, notwithstanding the vesting of the Employee's Portion of the Management Profit Participation Plan granted hereunder, no Employee's Portion of the Management Profit Participation Plan will be exercisable and therefore entitle the Employee to receive any cash or other value with respect to the Employee's Portion of the Management Profit Participation Plan unless and until such Employee's Portion of the Management Profit Participation Plan is vested (either by time or by acceleration as described herein) and a Sale of the Company occurs. A "**Sale of the Company**" means: (i) the sale, transfer or assignment of all or substantially all of Holdco's or the Company's assets, (ii) the sale, transfer or assignment of Holdco's or the Company's common units, or (iii) the merger or consolidation of Holdco or the Company with another person or entity; provided however, that in each case in clauses (ii) and (iii) above, only under circumstances in which none of the holders of Holdco's or the Company's common units immediately prior to such transaction possess more than 50% of the voting power of the outstanding equity interests of the resulting or surviving entity or acquirer, as the case may be, immediately following such transaction or series of related transactions. A sale (or multiple related sales) of one or more subsidiaries of the Company which constitutes all or substantially all of the consolidated assets of the Company will be deemed a Sale of the Company. Notwithstanding the foregoing, the sale of assets or common units of Holdco or the Company to, or a merger or consolidation of Holdco or the Company with, a person that is a member of Holdco or the Company (or any of such person's Affiliates) will not constitute a Sale of the Company.

5.     **OTHER BENEFITS.** While employed by the Company:

(a)     **Employee Benefits**. The Company will offer for Employee's participation all benefits it offers to other similarly situated employees of the Company, subject to all terms and conditions of each benefit plan or program (the "**Benefits**"). The Company reserves the right to change or cancel the Benefits from time to time at the Company's discretion, with or without advance notice, subject to applicable legal requirements.

(b)     **Expense Reimbursement.** Employee will be entitled to reimbursement for reasonable out-of-pocket expenses incurred in connection with the performance of Employee's duties hereunder, according to the Company's policies pertaining to expense reimbursement as are in effect from time to time, including requirements regarding preapproval and documentation of such expenses.

(c)     **Paid Time Off.** Employee will be entitled to paid time off ("**PTO**") in accordance with the Company's policies and practices pertaining to PTO as are in effect from time to time and in accordance with applicable state and local law.

6.     **ACKNOWLEDGMENTS OF EMPLOYEE.** Employee acknowledges as follows:

12526627

FILED DATE: 7/22/2024 5:02 PM    2024L008031

(a)     Employee will have access to Confidential Information (as defined herein) during employment with the Company. Confidential Information is not generally available to the public and is difficult to replicate, and Employee would not have access to Confidential Information but for Employee's employment with the Company.

(b)     The Company has invested and will continue to invest considerable resources, time, and energy to develop and maintain Confidential Information, and disclosed Confidential Information solely to those of its employees who have a "need to know" to carry out their job duties.

(c)     The Company derives substantial economic benefit from the confidentiality of Confidential Information and has instituted procedures to maintain such confidentiality.

(d)     The Company's competitors would obtain an unfair economic and competitive advantage, and the Company would suffer irreparable and continuing injury, if the Confidential Information were divulged or used in competition with the Company.

(e)     The Company's relationships with its customers are the result of a substantial investment of time, energy, and resources, and as a result of such investment of time, energy, and resources, the Company has built up significant goodwill with its customers. The Company has a reasonable expectation of entering into long-term relationships with its customers, and the Company historically has been successful in its efforts to enter into and maintain long-term relationships with its customers.

(f)     The Company has expended and continues to expend a considerable amount of time, energy, and resources recruiting, hiring, and training its employees, which makes such individuals valuable assets of the Company.

(g)     Employee's unfair competition with the Company, disruption of the Company's business relationships, or misappropriation or unauthorized use or disclosure of Confidential Information in the manner prohibited in this Agreement would have a materially adverse impact on the Company and its business operations.

(h)     The covenants set forth in Sections 7-10 are fair and reasonable in all respects and necessary to protect the Company's legitimate business interests, and will not prevent Employee from becoming gainfully employed, earning a living in Employee's chosen profession, or otherwise providing for the support of Employee and Employee's dependents.

(i)     The provisions of Sections 7-10 will survive termination of this Agreement for any reason.

7.     **NO UNFAIR COMPETITION.** During the Restricted Period, Employee will not engage in, assist, become employed or engaged by, or have any interest in a Competitive Business in any state in which the Company is then engaged in business. During the Extended Restricted Period, Employee will not engage in, assist, become employed or engaged by, or have any interest in a business that is specifically implementing a roll up of specialty or compounding pharmacies. This Section 7, however, does not prohibit Employee from having a passive ownership interest of less than 3% in a publicly traded company that is a Competitive Business.

8.     **NON-INTERFERENCE.** Employee acknowledges as follows:

(a)     During the Restricted Period, Employee will not, directly or by encouraging or assisting any other person or entity in any manner competitive with or adverse to the Company:

12526627

FILED DATE: 7/22/2024 5:02 PM    2024L008031

(i)       (A) solicit, attempt to solicit, pursue, sell to, attempt to sell to, accept business from, accept any remuneration with respect to, or otherwise provide or agree to provide services to any Customer; or (B) assist, request, induce, or influence in any way any Competitive Business to solicit, attempt to solicit, pursue, sell to, attempt to sell to, or accept business from, or otherwise agree to provide services to, any Customer; or

(ii)      Recruit, solicit, or otherwise induce or influence any employee, of the Company to diminish, discourage the development of, discontinue, or otherwise adversely affect their relationship with the Company.

(b)       Notwithstanding the foregoing, <u>Section 8(a)</u> does not prohibit Employee from contacting, soliciting, accepting business from, or offering to transact business following Employee's separation from employment with the Company with any person or entity whom Employee can establish, to the Company's reasonable satisfaction, that Employee had an existing business relationship prior to the commencement of Employee's employment with the Company (the "**Excluded Customers**"); provided, however, that a customer will constitute an "**Excluded Customer**" only in respect of business activities of the same nature in which Employee was involved with such person or entity before Employee began employment with the Company.

(c)       As used in this Agreement:

(i)       "**Competitive Business**" means any person or entity, other than the Company and its Affiliates, that is engaged in the business of the Company or its Affiliates.

(ii)      "**Customer**" means any person or entity: (A) during the 24-month period prior to termination of Employee's employment with the Company for any reason (whether such termination is initiated by Employee or by the Company), (1) who received any services or goods from the Company or (2) whom the Company solicited or to whom it submitted a proposal for the sale of services or goods; or (B) with whom, during employment with the Company, Employee had contact related to the actual or attempted sale of services or goods, or about whom, during employment with the Company, Employee learned Confidential Information.

(iii)     "**Restricted Period**" means the period during which Employee is employed with the Company and for a period of one (1) year following termination of Employee's employment with the Company for any reason (whether such termination is initiated by Employee or the Company).

(iv)      "**Extended Restricted Period**" means the period during which Employee is employed with the Company and for a period of three (3) years following termination of Employee's employment with the Company for any reason (whether such termination is initiated by Employee or the Company).

9.        **PROTECTION OF CONFIDENTIAL INFORMATION**. Employee acknowledges as follows:

(a)       The Company has developed and will develop, and Employee may be provided with or gain access to, Confidential Information during employment with the Company. As used in this Agreement, "**Confidential Information**" means any and all information of a confidential, proprietary, or secret nature, which is related to (i) the present or future business of the Company or its Affiliates, (ii) the registration of patents, trademarks, or inventions of the Company or its Affiliates, or (iii) the skills of any employees of the Company or its Affiliates. Confidential Information includes the identity, authority, and responsibilities of key contacts and decision-makers employed by customers of the Company and its

12526627

FILED DATE: 7/22/2024 5:02 PM    2024L008031

Affiliates; pricing, data, analysis, and information relating to the services and goods provided by the Company and its Affiliates; business plans, marketing plans, and marketing strategies; financial data and statements; and information furnished in confidence to the Company and its Affiliates by customers and any third parties. The term "**Confidential Information**" does not, however, include information which (i) is or becomes publicly known or generally available to persons or entities operating in the Company's industry, other than as the result of a breach of this provision by Employee, or (ii) is obtained by Employee from a third party, as long as such third party is not in breach of an obligation of confidentiality with respect to such information. The term "**Affiliate**" means any person or entity controlling, controlled by, or under common control with, the Company.

(b)    Due to the importance and sensitivity of the Confidential Information and its value to the Company and its Affiliates, Employee agrees as follows:

(i)    Confidential Information is and will remain the sole and exclusive property of the Company and its Affiliates.

(ii)    During employment with the Company and thereafter, Employee will treat all Confidential Information as confidential and will not: (A) disclose Confidential Information, in whole or part, to any third party without the prior written consent of the Manager; (B) permit the use or appropriation of Confidential Information by any third party, except in connection with any transaction or business with or relating to the Company; (C) use or appropriate Confidential Information for any purpose other than the performance of Employee's job duties; or (D) otherwise use or appropriate Confidential Information for Employee's own account, or as an agent, employee, contractor, partner, director, or stockholder of, or in concert with, any other person or organization.

(iii)    Employee will use any passwords and access codes provided by the Company and its Affiliates solely to perform Employee's job duties and will not disclose any such passwords or access codes to anyone, including, but not limited to, other persons employed or engaged by the Company or its Affiliates, unless so directed by the Manager.

(iv)    Notwithstanding the foregoing, (A) Employee will not be in breach of this Agreement if Employee is compelled by law or legal process to disclose Confidential Information, provided that in each such event, Employee will provide the Manager with prompt written notice prior to any such disclosure so that the Company or an Affiliate (as applicable) may obtain a protective order or other confidential treatment for the Confidential Information, and in the event that such a remedy is not obtained by the Company or its Affiliate, Employee will furnish only that portion of Confidential Information which Employee is advised by opinion of the Company's legal counsel is legally required to be furnished; (B) neither this Agreement nor any of the Company's policies prohibits Employee from providing truthful information to a government agency; and (C) Employee will not be in breach of this Agreement if Employee (1) discloses Confidential Information to Employee's own attorney in connection with any court proceeding brought by Employee against the Company alleging retaliation in respect of Employee's reporting of a suspected violation of law, or (2) uses Confidential Information in such court proceeding, provided that all documents containing Confidential Information are filed under seal and are not disclosed except by court order.

(c)    Upon termination of Employee's employment for any reason (whether termination is initiated by Employee or by the Company):

(i)    Employee will promptly return to the Company all property belonging to the Company and its Affiliates, including all computers and other electronic devices, wireless devices, credit cards, keys, and other property belonging to the Company and its Affiliates which is in Employee's

FILED DATE: 7/22/2024 5:02 PM    2024L008031

possession or under Employee's control, all of which will be delivered to the Company in good condition (ordinary wear and tear excepted), as well as all originals and copies of Confidential Information and all associated notes, data, reference material, memoranda, documents, and records, including electronic storage devices (such as thumb drives);

(ii)     Employee will not retain any copies (including electronic copies) or abstracts of Confidential Information, will permanently delete all electronic copies of Confidential Information that reside on Employee's personally owned computers and devices, and if Employee later discovers Confidential Information that inadvertently remained in his possession, he will immediately delete it, and Employee will, upon request by the Company, sign a verification that Employee has complied with this Section;

(iii)     Employee will provide the Company with all passwords necessary for the Company to have access to Confidential Information which was in Employee's possession or under Employee's control; and

(iv)     Employee will provide to the Company a summary itemizing in reasonable detail all work projects Employee was involved with as of the last day of employment with the Company and the status of all such projects.

10.     **NON-DISPARAGEMENT.** At all times during and following Employee's employment with the Company, Employee will not make any statement that is intended to or could be reasonably expected to disparage or reflect unfavorably on the Company, its Affiliates, or their services or goods; provided, however, that any statement made by Employee that is not intended to, but could be reasonably expected to, reflect unfavorably on the Company, its Affiliates, or their services or goods, if such statement is reasonably able to be cured, will not be a breach of this Section 10 until Employee receives notice from the Company that the Company believes such statement violates this Section 10 and provides Employee with a period of ten (10) days to cure such violation to the reasonable satisfaction of the Company; provided, further, that this <u>Section 10</u> does not prohibit Employee from testifying truthfully in response to a lawful subpoena or court order or from providing truthful information to a government agency. At all times during and following Employee's employment with the Company, the Company will not make any statement that is intended to or could be reasonably expected to disparage or reflect unfavorably on Employee or Employee's abilities or performance of duties for the Company; provided, however, that any statement made by the Company that is not intended to, but could be reasonably expected to, reflect unfavorably on Employee or Employee's abilities or performance of duties for the Company, if such statement is reasonably able to be cured, will not be a breach of this Section 10 until the Company receives notice from Employee that Employee believes such statement violates this Section 10 and provides the Company with a period of ten (10) days to cure such violation to the reasonable satisfaction of Employee; provided, further, that this <u>Section 10</u> does not prohibit the Company from testifying truthfully in response to a lawful subpoena or court order or from providing truthful information to a government agency.

11.     **RETENTION OF PROPRIETARY INFORMATION**. The Company acknowledges Employee has pre-existing proprietary knowledge and information related to the industry in which the Company operates ("**Employee Proprietary Information**"). Employee Proprietary Information includes business templates, processes and contacts held by or known to Employee prior to the date Employee started providing services to the Company. Employee Proprietary Information does not include any proprietary knowledge or information of the Company. Employee will be entitled to retain and utilize Employee Proprietary Information upon termination of Agreement for any reason.

12.     **INVENTIONS ASSIGNMENT.** Employee acknowledges that all intellectual property, inventions, innovations, improvements, developments, methods, designs, analyses, reports and all similar

FILED DATE: 7/22/2024 5:02 PM    2024L008031

or related information (whether or not patentable) (any, an "**Invention**") relating to the Company's or its Affiliates' actual or anticipated business, research and development, or existing or future products or services that are conceived, developed or made by Employee during employment with the Company (collectively, "**Work Product**") belong to the Company and its Affiliates. Employee will promptly disclose such Work Product to the Manager and, at the Company's expense, perform all actions reasonably requested by the Company or its Affiliates (whether during or after Employee's employment with the Company) to establish and confirm such ownership (including, but not limited to, executing any necessary assignments, consents, powers of attorney, and other instruments). This Section 12, however, does not apply to any Invention for which no equipment, supplies, facilities, or trade secret information of the Company or its Affiliates was used and which was developed entirely on Employee's own time, unless (a) the Invention relates to the business of the Company or its Affiliates or to the Company's or its Affiliates' actual or demonstrably anticipated research or development or (b) the Invention results from any work performed by Employee for the Company or its Affiliates.

13.    **REMEDIES**.

(a)    **Injunctive Relief**. Employee understands that the business of the Company and its Affiliates is highly competitive and the Company and its Affiliates will not have an adequate remedy at law for the material breach or threatened breach by Employee of any one or more of the covenants set forth in Sections 7, 8, 9 or 10 of this Agreement. Without limiting any of the other remedies available at law or in equity, or the right or ability of the Company or its Affiliates to collect money damages, Employee agrees that if Employee actually breaches or threatens breach of Sections 7, 8, 9, or 10 of this Agreement, then the Company and its Affiliates will be entitled, in addition to any other available remedies (including, but not limited to, liquidated damages), to injunctive relief (without bond) to enjoin Employee, and all others acting in concert with Employee, from the breach or threatened breach of such covenants.

(b)    **Enforcement**. If any provision of this Agreement is, for any reason, found to be invalid, illegal, or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability will not affect (i) any other provision of this Agreement (unless the invalid provision is a material provision of this Agreement) or (ii) this Agreement's validity, legality and enforceability in any other jurisdiction. If a court of competent jurisdiction refuses to enforce any provision herein or finds that the term or scope of any provision is invalid or unreasonably broad, then the invalid or unreasonably broad provision will be modified by such court to the minimum extent necessary so that it will be valid and enforceable to the maximum extent permitted by applicable law. If such modification is not permitted by applicable law, then the invalid or unreasonably broad provision will be severed from this Agreement, and the remainder of the Agreement will be enforced as written.

(c)    **Tolling**. If Employee breaches any of the covenants set forth in Section 7 or Section 8 of this Agreement, then the Restricted Period will be extended by the amount of time that Employee was in breach of such covenants (if permitted by applicable law).

14.    **NO CONFLICTING OBLIGATIONS OR USE**.

(a)    Employee represents and warrants that neither Employee's execution of this Agreement, nor Employee's employment with the Company, nor Employee's performance of Employee's duties hereunder, will constitute a breach of any agreement to which Employee is a party.

(b)    Employee represents and warrants that Employee will not use in connection with employment hereunder, nor will Employee disclose to the Company, nor will Employee induce the Company to use, any confidential or proprietary information or material belonging to any other person or entity.

FILED DATE: 7/22/2024 5:02 PM       2024L008031

(c)       In the event that Employee becomes permanently enjoined by a court of competent jurisdiction from being employed by the Company because of a breach of Section 14(a) or (b), or in the event that the Company becomes enjoined from continuing to employ Employee because of such a breach, then this Agreement will terminate on the earlier of (i) the effective date of such injunction, or (ii) such date as deemed to be in the best interest of the Company, as determined by the Company in its sole discretion, and such termination will be deemed to have been pursuant to <u>Section 15(a)</u>.

15.       **TERMINATION.** Either the Company or the Employee may terminate the Employee's employment with the Company pursuant to this <u>Section 15</u>. Employee's employment will terminate automatically upon the expiration of the Initial Term or Renewal Term, as applicable, if either party has elected not to extend Initial Term or Renewal Term in accordance with <u>Section 1</u>. Such termination on the part of the Company will be deemed to have been pursuant to <u>Section 15(b)</u>, and such termination on the part of Employee will be deemed to have been pursuant to <u>Section 15(f)</u>.

(a)       **Termination by the Company for Cause**. The Company may terminate Employee's employment hereunder for Cause, effective immediately upon written notice to Employee. For purposes hereof, "**Cause**" means the occurrence of any one of the following on the part of Employee: (i) fraud, theft, or embezzlement, (ii) conviction of a felony, or conviction of any crime involving moral turpitude, (iii) behavior that reflects on the Company or any Affiliate in a materially negative manner and materially adversely affects the business, reputation, or relationships of the Company or any Affiliate, (iv) failure to meet the Company's performance standards as determined by the Manager and subsequent failure to cure such underperformance pursuant to a formal performance improvement plan consisting of reasonable and measurable objectives as established by the Manager, (v) material breach of and subsequent failure to cure any term, covenant, representation or warranty contained in this Agreement, (vi) violation of any law or regulation pertaining to the business of the Company or any Affiliate, or (vii) any willful, intentional, reckless, or negligent conduct that has a materially adverse effect on the Company or any Affiliate. In the event of termination of Employee's employment pursuant to this <u>Section 15(a)</u>, the Company will pay to Employee the then current Base Salary and all vacation time (if any) that Employee has earned but has not used through the effective date of termination (the "**Termination Date**"), will provide to Employee all Benefits in which Employee then participates through the Termination Date, and will pay to Employee any approved expenses for which Employee is entitled to be reimbursed up to and including the Termination Date (collectively, the "**Accrued Rights**"). Employee's vested equity in Employee's Portion of the Management Profit Participation Plan will be automatically forfeited if Employee is terminated for Cause within 18 months of the Effective Date. Employee will not be entitled to any further payments or benefits as a result of termination of employment pursuant to this <u>Section 15(a)</u>.

(b)       **Termination by the Company Without Cause**. The Company may terminate Employee's employment hereunder for any reason other than Cause, Disability (defined below), or death, upon written notice to Employee. In the event of termination of Employee's employment pursuant to this <u>Section 15(b)</u>, then:

(i)       the Company will provide to Employee the Accrued Rights;

(ii)       the Employee will receive full acceleration of the Employee's Portion of the Management Profit Participation Plan;

(iii)       provided the Release becomes irrevocable pursuant to its terms, the Company will pay to Employee the then current Base Salary for a period of twelve (12) months following the Termination Date. Such payments will be payable in accordance with the Company's regular payroll schedule (the "**Salary Continuation Payments**"); and

FILED DATE: 7/22/2024 5:02 PM    2024L008031

(iv)    provided the Release becomes irrevocable pursuant to its terms, the Company will pay the premium for any COBRA coverage elected by Employee provided that she timely elects COBRA continuation, and does not otherwise become eligible for comparable coverage by way of other employment prior to the end of Employee's COBRA eligibility.

(c)    **Salary Continuation**. Notwithstanding anything in Section 15(b), Employee's entitlement to the Salary Continuation Payments, health care continuation payments, and Employee's Portion of the Management Profit Participation Plan pursuant to Section 15(b) is subject to Employee's (i) compliance with Sections 7-10 of this Agreement, and (ii) execution and delivery to the Company of a general release in a form acceptable to the Company (the "**Release**") within a period that is no longer than 60 calendar days following the Termination Date and such other administrative documents as the Company may reasonably request consistent with its customary policies and practices (together, the "**Salary Continuation Conditions**"). Except as specifically set forth in Section 15(b), Employee will not be entitled to any further payments or benefits as a result of termination of Employee's employment pursuant to Section 15(b).

(d)    **Termination as a Result of Employee's Disability**. The Company may terminate Employee's employment hereunder in the event of Employee's Disability (as defined herein), effective immediately upon written notice to Employee. For purposes hereof, "**Disability**" means the inability of Employee to perform Employee's job duties without accommodation required by applicable law by reason of a physical or mental disability or infirmity (i) for more than 90 calendar days in any consecutive 180 calendar day period or (ii) at such earlier time as Employee submits or the Company receives satisfactory medical evidence that Employee has a physical or mental disability or infirmity which will likely prevent Employee from returning to the performance of Employee's duties for more than 90 consecutive calendar days. In the event of any dispute regarding the determination of Employee's Disability, such determination will be made by a physician selected by the Company at the Company's sole expense; provided, however, that Employee's Disability will be conclusively presumed if such determination is made by an insurer providing disability insurance coverage to Employee or the Company in respect of Employee. Employee will submit to a medical examination by such physician and execute and provide to such physician (with a copy to the Company) a release allowing disclosure to the Manager of all information pertaining to such medical examination. In the event of termination of Employee's employment pursuant to this Section 15(d), Employee will be entitled to the Accrued Rights, the Employee will receive full acceleration of the Employee's Portion of the Management Profit Participation Plan, and neither Employee nor Employee's legal representative will be entitled to any further payments or benefits as a result of termination of Employee's employment pursuant to this Section 15(d).

(e)    **Termination in the Event of Employee's Death**. Employee's employment will terminate immediately in the event of Employee's death. In the event of termination of Employee's employment pursuant to this Section 15(e), Employee's estate will be entitled to the Accrued Rights, the Employee's estate will receive full acceleration of the Employee's Portion of the Management Profit Participation Plan and Employee's estate will not be entitled to any further payments or benefits as a result of termination of Employee's employment pursuant to this Section 15(e).

(f)    **Termination by Employee**. Employee may voluntarily terminate employment with the Company at any time upon not less than 90 days written notice to the Company; provided, however, that any time during such 90-day period, the Company may direct Employee to vacate the Company's office and cease to perform services for or on behalf of the Company except those assigned by the Manager. In the event of termination of Employee's employment pursuant to this Section 15(f) within 18 months of the Effective Date, Employee will be entitled to the Accrued Rights, Employee's vested equity in Employee's Portion of the Management Profit Participation Plan will be forfeited, and Employee will not be entitled to any further payments or benefits as a result of termination of employment pursuant to this Section 15(f). In

FILED DATE: 7/22/2024 5:02 PM    2024L008031

the event of termination of Employee's employment pursuant to this Section 15(f) beyond 18 months of the Effective Date, Employee will be entitled to the Accrued Rights, Employee's non-vested interest in the Management Profit Participation Plan will be forfeited, and Employee will not be entitled to any further payments or benefits as a result of termination of employment pursuant to this Section 15(f).

(g)    **Constructive Termination**. "Constructive Termination" shall be deemed to occur if (i) there is a material reduction or change in job duties, responsibilities and requirements inconsistent with Employees position with the Company and prior duties, (ii) an adverse change in Employee's annual compensation or benefits, (iii) a requirement to relocate in excess of fifty (50) miles from Employees then current place of employment or (iv) the breach by the Company of any material provision of this Agreement, other than a breach that is remedied by the Company within 10 days after receipt of notice of such breach. Constructive Termination shall be deemed a termination without Cause pursuant to Section 15(b).

16.    **CODE SECTION 409A COMPLIANCE.**

(a)    The Company intends that all severance payments made under this Agreement comply with, or be exempt from, the requirements of Section 409A of the Code and the regulations and other guidance thereunder and any state law of similar effect (collectively "**Section 409A**") so that none of the payments or benefits will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply or be exempt. Employee and the Company agree to work together in good faith to consider amendments to this Agreement and to take such reasonable actions that are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to Employee under Section 409A.

(b)    Notwithstanding anything to the contrary in this Agreement, no severance pay or benefits to be paid or provided to Employee, if any, pursuant to this Agreement that, when considered together with any other severance payments or separation benefits, are considered deferred compensation under Section 409A (together, the "**Deferred Payments**") will be paid or otherwise provided until Employee has a "separation from service" within the meaning of Section 409A. Each payment and benefit payable under this Agreement is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

(c)    To the extent that reimbursements or in-kind benefits under this Agreement constitute non-exempt "nonqualified deferred compensation" for purposes of Section 409A, (i) all reimbursements hereunder will be made on or prior to the last day of the calendar year following the calendar year in which the expense was incurred by Employee, (ii) any right to reimbursement or in-kind benefits will not be subject to liquidation or exchange for another benefit, and (iii) the amount of expenses eligible for reimbursement or in-kind benefits provided in any calendar year will not in any way affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other calendar year.

(d)    In no event will the Company reimburse or indemnify Employee for any taxes that may be imposed on Employee as a result of Section 409A or Code Section 4999 (imposed as a result of application of the golden parachute rules under Code Section 280G and the regulations promulgated thereunder), as applicable.

17.    **MISCELLANEOUS.**

(a)    **Taxes.** Employee agrees to be responsible for the payment of any taxes due on any and all compensation and benefits provided by the Company pursuant to this Agreement except those taxes that are the responsibility of Company. The Company will be entitled to deduct and withhold all applicable taxes from any compensation and benefits provided by the Company pursuant to this Agreement. Employee

FILED DATE: 7/22/2024 5:02 PM    2024L008031

expressly acknowledges that the Company has not made, nor herein makes, any representation about the tax consequences of any consideration provided by the Company to Employee pursuant to this Agreement.

(b)      **Modification/Waiver.** This Agreement may not be amended, modified, superseded, canceled, renewed, or expanded, or any terms or covenants hereof waived, except by a writing executed by each of the Parties or, in the case of a waiver, by the Party waiving compliance (and the case of an amendment or waiver on behalf of the Company, the Manager). Failure of any Party at any time or times to require performance of any provision hereof will in no manner affect such Party's right at a later time to enforce the same. No waiver by a Party of a breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances will be deemed to be or construed as a further or continuing waiver of agreement contained in this Agreement.

(c)      **Successors and Assigns.** This Agreement will be binding upon and will inure to the benefit of any successor or assignee of the business of the Company. This Agreement and Employee's rights and obligations hereunder are not assignable by Employee, and any assignment or delegation in violation of this sentence is void.

(d)      **Notices.** Each Party must deliver all notices or other communications required under this Agreement in writing to the other Party at the address listed on the signature page, by email, by courier, by certified or registered mail (postage prepaid and return receipt requested), or by a nationally-recognized express mail service. Notice will be effective upon receipt or refusal of such delivery. If delivered by certified or registered mail, any such notice will be considered to have been given five business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, any such notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt. Each Party may change its address for receipt of notice by giving notice of such change to the other Party. Employee promptly will notify Company of any change in Employee's address.

(e)      **Governing Law; Personal Jurisdiction and Venue; Waiver of Jury Trial.** This Agreement and all disputes arising out of or relating to this Agreement will be construed under and be governed in all respects by the laws of the State of Illinois without giving effect to the conflict of laws principles of such State. The Parties hereby consent to the exclusive jurisdiction of the Circuit Court of Cook County in Chicago, Illinois or in the U.S. District Court for the Northern District of Illinois in connection with any such matter or dispute. Accordingly, with respect to any such court action, the Parties (i) submit to the personal jurisdiction of such courts; (ii) consent to service of process; and (iii) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LEGAL REQUIREMENTS THAT CANNOT BE WAIVED, THE PARTIES WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR THE NEGOTIATION, TERMS OR PERFORMANCE HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE. THE PARTIES AGREE THAT EACH OF THEM MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES. THE PARTIES FURTHER AGREE TO IRREVOCABLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING AND ANY SUCH PROCEEDING WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

(f)      **Attorneys' Fees.** If either Party takes any action against the other for relief, declaratory or otherwise, arising out of this Agreement, then the prevailing Party will have the right to recover its reasonable attorneys' fees and costs (including experts' fees) from the other Party, regardless of

FILED DATE: 7/22/2024 5:02 PM    2024L008031

whether a lawsuit is filed, and including those incurred in connection with any appeal or review proceeding. If neither Party prevails entirely, the presiding adjudicator will award fees and costs in accordance with the disposition of the matter.

(g)    **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the Parties with regard to the employment of Employee by the Company and supersedes any and all prior agreements, arrangements and understandings, written or oral, pertaining to the subject matters hereof. No representation, promise or inducement relating to the subject matter hereof has been made to a Party that is not embodied in these Agreements, and no Party will be bound by or liable for any alleged representation, promise or inducement not so set forth.

(h)    **Covered Person**. For the avoidance of doubt, the Parties acknowledge and agree that Employee is a "Covered Person" under Section 9.10 of the Operating Agreement.

**[Remainder of page intentionally left blank - Signature page follows]**

12526627

The Parties have each duly executed this Employment Agreement as of the day and year first above written.

**Optio Rx, LLC**

By:    CBC Pharma HoldCo, LLC, its Manager
By:    Cold Bore Capital Management, LLC, its Manager


By:    _____
Name:  Sergio Zepeda
Title:   Manager

Address:  311  South  Wacker,  Suite  2640, Chicago, IL 60606


**EMPLOYEE**

_____
Rinku Patel

Address:  1424  Oak  Bluff  Lane,  Lemont,  IL 60439

12526627

FILED DATE: 7/22/2024 5:02 PM   2024L008031

# Exhibit B

FILED DATE: 7/22/2024 5:02 PM    2024L008031

| | |
|---|---|
| **From:** | Jarlath A. Johnston |
| **To:** | Barry Best (BBest@MCCP.com); Jeffrey P. Kelly (JKelly@MCCP.com); Jonathan Tunis (JTunis@MCCP.com); Jon Finch (WJonathanFinch@GMail.com) |
| **Cc:** | Rinku Patel; Leo LaFranco |
| **Subject:** | Management"s Thoughts on Incentives for 2023 Operating Results for Board Discussion |
| **Date:** | Wednesday, August 16, 2023 5:53:20 PM |
| **Attachments:** | Management Incentives-Transaction & 2023 Operational Performance 2023-08-16.docx |

Board Members,

To follow up on the board's request, management has outlined in the attached document some key goals to consider as possible benchmarks of 2023 operating performance.  It is meant to be a starting point for discussion with the board tomorrow, and the specific metrics, executives to be included, relative weight for each factor, and aggregate cost would be fleshed out after feedback from the board.

In addition, management has requested that pro-ration of any transaction bonus begin at $80 MM rather than the $85 MM discussed previously.  $80 MM represents the net proceeds necessary for full repayment of the First Out Senior Debt and related First Out fees.

Jarlath

**Jarlath A. Johnston**
Managing Director
**(212) 763-0351 Direct**   |  (917) 841-1548 Mobile
**Bentley Associates L.P.**  |  437 Madison Avenue, 24th Floor | New York, NY 10022 | www.BentleyLP.com

[EXTERNAL SENDER - Use caution]

FILED DATE: 7/22/2024 5:02 PM   2024L008031

| | |
|---|---|
| **From:** | Rinku Patel |
| **To:** | jajohnston@bentleylp.com |
| **Cc:** | Leo LaFranco |
| **Subject:** | Bonus Update |
| **Date:** | Wednesday, August 16, 2023 11:06:03 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | 2023 Bonus Response Aug-2023.docx |

Jarlath:

Based on my discussion with Leo, our response is attached.  We request that the transaction bonus be prorated to 50% payout at 80MM instead of 85, followed by straight-line proration for the rest.

Leo and I have also provided some key objectives that we need to continue to deliver on for the Management bonus 2023.

Best,
Rinku

## Rinku A. Patel, RPh, PharmD
### Chief Executive Officer

| | |
|---|---|
| **Phone:** | 6307457468 |
| **Email:** | RPatel@OptioRx.com |
| **Web:** | www.OptioRx.com |
| **Address:** | 1420 Kensington Road, Suite 102, Oak Brook, IL 60523 |



This communication is for its intended recipient only and contains information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited. Further, if you are not the intended recipient, you should not open any attached document(s) or further distribute this communication or the attached document(s). If you have received this communication in error, please notify us immediately at compliance@optiorx.com, and delete it from your system, as well as destroy any hard copy you may have printed. Thank you.

FILED DATE: 7/22/2024 5:02 PM    2024L008031

# Exhibit C

FILED DATE: 7/22/2024 5:02 PM    2024L008031

# Wells Pharmacy Network recalls hundreds of products

By Debra Goldschmidt, CNN

2 minute read  Updated 6:26 PM EDT, Thu September 22, 2016

 



Wells Pharmacy Network is recalling 616 products. From Wells Pharmacy

**CNN —** A major recall has been issued for all sterile products recently produced by the compounding pharmacy Wells Pharmacy Network. The recall was prompted by concern from the US Food and Drug Administration "over a lack of sterility assurance," according to the recall announcement issued Thursday.

"Administration of a drug product intended to be sterile that has microbial contamination may result in infections that may be serious and life-threatening," the announcement said, adding, "no vial or portion of any lot of these medications has been found to be nonsterile." There have been no reports of adverse reactions related to these products.

"Our facilities are undergoing an expansion and enhancement and the FDA would have preferred that we stop production during construction. They have asked that we recall medications made during that time period even though no adverse events or sterility issues have been reported," Ben David, CEO of Wells Pharmacy Network, said in a statement. He added, "We take the utmost care to ensure patient safety. Out of an abundance of caution we are complying with the FDA's request."



**RELATED ARTICLE**

Meningitis outbreak: What is a compounding pharmacy?

The voluntary recall is for all products prepared between February 22 and September 16. That's 616 products, including injectable solutions of the hormones progesterone, testosterone and gonadotropin. Though the majority of the items are for humans, 31 of the recalled products are for pets.

Any products with a Wells Pharmacy Network label that are not expired are included.

Wells Pharmacy Network specializes in "wellness, anti-aging, weight management, urology, ophthalmology, and veterinary compounding solutions," according to its website. Founded in 2011, it has locations in Ocala, Florida, and Dyersburg, Tennessee, but serves customers nationwide.

**FOLLOW CNN HEALTH ON FACEBOOK AND TWITTER**

Consumers who have these products should not use them. Contact the company to determine whether your product is subject to recall and for information on returning it. Any

7/3/24, 11:38 AM

Wells Pharmacy Network recall: 1,300,000 of products | CNN

See the latest news and share your comments with CNN Health on Facebook and Twitter.

adverse events related to these medications should be reported to the FDA.

FILED DATE: 7/22/2024 5:02 PM    2024L008031

FILED DATE: 7/22/2024 5:02 PM    2024L008031

# Exhibit D

FILED DATE: 7/22/2024 5:02 PM    2024L008031

| | |
|---|---|
| **From:** | Hawkins, Bryan L. |
| **To:** | Ashley, Anthony J. |
| **Subject:** | RE: [EXT] OptioRx/Patel |
| **Date:** | Wednesday, March 20, 2024 3:06:32 PM |
| **Attachments:** | image003.png |
| | image001.png |

Tony,

This is confirmed. Optio will reimburse Dr. Patel for reasonable and documented fees solely related to the deposition. Let me know if you have any questions.

Thanks.

**Bryan Hawkins** | Partner

Direct: (916) 319-4648 | Mobile: (916) 261-3249

**From:** Ashley, Anthony J. <aashley@vedderprice.com>
**Sent:** Wednesday, March 20, 2024 11:37 AM
**To:** Hawkins, Bryan L. <bryan.hawkins@stoel.com>
**Subject:** RE: [EXT] OptioRx/Patel

Thanks, Bryan. Has Optio confirmed that they will reimburse Dr. Patel for my attorneys' fees in doing so as required by her indemnification agreement? I am guessing it will take some time to prep her, review the relevant documents, coordinate with company counsel, and defend the deposition.

Thanks, Tony

**Anthony J. Ashley**
Shareholder and Attorney at Law

**Vedder**Price℠

T +1 312 609 7884
Assistant: Christine Esposito +1 312 609 7624
web | email | offices | biography

**From:** Hawkins, Bryan L. <bryan.hawkins@stoel.com>
**Sent:** Wednesday, March 20, 2024 11:39 AM
**To:** Ashley, Anthony J. <aashley@vedderprice.com>; Rosenbaum, Laura E. <laura.rosenbaum@stoel.com>
**Subject:** RE: [EXT] OptioRx/Patel

Tony,

Nice to meet you. I am still catching up on this but our client has confirmed that they are ok with you representing her at the upcoming deposition.

I will circle back once I receive additional information.

Thank you.

**Bryan Hawkins** | Partner

Direct: (916) 319-4648 | Mobile: (916) 261-3249

**From:** Ashley, Anthony J. <aashley@vedderprice.com>
**Sent:** Wednesday, March 20, 2024 8:42 AM
**To:** Rosenbaum, Laura E. <laura.rosenbaum@stoel.com>
**Cc:** Hawkins, Bryan L. <bryan.hawkins@stoel.com>
**Subject:** RE: [EXT] OptioRx/Patel

Thanks, Laura. Hi Bryan, thanks for filling in. Let me know if you would like to have a quick call to discuss status, not sure if Laura had much time to download you before she left.

FILED DATE: 7/22/2024 5:02 PM    2024L008031

We have one pressing issue that we need input from Optio. Dr. Patel is scheduled to be deposed next week (March 28) in the Crestview matter, and because her separation arrangements have not yet been finalized, she has requested that I represent her at the deposition or another independent counsel, and that Optio cover the costs of same pursuant to the parties' indemnification agreement, and we have not yet heard back. Of course, if her separation agreement is signed, she would permit the Company's counsel to represent her.

Thanks. Tony

**Anthony J. Ashley**
Shareholder and Attorney at Law

**Vedder**Price℠

T +1 312 609 7884

Assistant: Christine Esposito +1 312 609 7624

web | email | offices | biography

**From:** Rosenbaum, Laura E. <laura.rosenbaum@stoel.com>
**Sent:** Tuesday, March 19, 2024 5:51 PM
**To:** Ashley, Anthony J. <aashley@vedderprice.com>
**Cc:** Hawkins, Bryan L. <bryan.hawkins@stoel.com>
**Subject:** [EXT] OptioRx/Patel

Tony,

Thanks for your call this morning. I am introducing you via email to my partner, Bryan Hawkins. Bryan will take over this matter while I am out of the office. Once we have an update from our client, Bryan will be in touch. He is aware that you are waiting to hear about the separation agreement and about counsel for Dr. Patel for her deposition.

Thanks,

Laura

**Laura Rosenbaum** | Partner
**STOEL RIVES LLP** | 760 SW Ninth Ave, Suite 3000 | Portland, OR 97205
Direct: (503) 294-9642 | Mobile: (503) 201-7278
laura.rosenbaum@stoel.com | Bio | vCard | www.stoel.com



This email may contain material that is confidential, privileged, and/or attorney work product for the sole use of the intended recipient. Any unauthorized review, use, or distribution is prohibited and may be unlawful.

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, Vedder Price (FL) LLP, which operates in Florida, and Vedder Price Pte. Ltd., which operates in Singapore.

CONFIDENTIALITY NOTE: This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 609-5038 and also indicate the sender's name. Thank you.