## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*[1] | Case No. 24-11188 (TMH) |
| Debtors. | (Joint Administered) |

## AFFIDAVIT OF PUBLICATION FOR TAMI BACON
## OF THE NEW YORK TIMES

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical, LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compouding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary, LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy, LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216).  The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60062.



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

## PROOF OF PUBLICATION

July 5, 2024

I, Tami Bacon, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

 7/5/2024, NY & NATL, pg B3



Digitally signed
by John McGill
Date: 2024.07.05
11:07:28 -04'00'

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

*Tami Bacon*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    Chapter 11
Optio Rx, LLC, *et al.*,          Case No. 24-11188 (TMH)
          Debtors.[1]               (Jointly Administered)

**NOTICE OF DEADLINE FOR THE FILING OF PROOFS OF CLAIM, INCLUDING FOR CLAIMS ASSERTED UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE (GENERAL BAR DATE) IS AUGUST 7, 2024, AT 5:00 P.M. (PREVAILING EASTERN TIME)**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On June 7, 2024 (the "**Petition Date**"), Optio Rx, LLC and its affiliates, the debtors and debtors-in-possession (collectively, the "**Debtors**"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**"). On June 26, 2024, the Court entered an order [Docket No. 104] (the "**Bar Date Order**") establishing certain deadlines for the filing of proofs of claim in the chapter 11 cases of the following Debtors: **Debtors, Case No., Last Four Digits of EIN No.:** Optio Rx, LLC, 24-11188, 8436; Braun Pharma, LLC, 24-11189, 6643; HCP Pharmacy, LLC, 24-11190, 5216; Pet Apothecary LLC, 24-11191, 4315; The Pet Apothecary LLC, 24-11192, 6074; Crestview Holdings, LLC, 24-11193, 1907; Crestview Pharmacy, LLC, 24-11194, 8891; Dr. Bec's PharmaCare LLC, 24-11195, 2237; Enovex Pharmacy LLC, 24-11196, 0693; H&H Pharmacy LLC, 24-11197, 6793; SMC Pharmacy LLC, 24-11198, 5428; SMC Lyons Holdings LLC, 24-11199, 5441; SBH Medical LLC, 24-11200, 3260; SBH Medical, Ltd., 24-11201, 3230; Rose Pharmacy RM LLC, 24-11202, 4205; Rose Pharmacy SA LLC, 24-11203, 5738; Rose Pharmacy SF LLC, 24-11204, 1438; Baybridge Pharmacy, LLC, 24-11205, 5518; Central Pharmacy, LLC, 24-11206, 6195; Pro Pharmacy, LLC, 24-11207, 6299; Healthy Choice Compounding LLC, 24-11208, 8770; Healthy Choice Compounding LLC, 24-11209, 1745; Oakdell Compounding Pharmacy LLC, 24-11210, 7537; Concierge Pharmacy LLC, 24-11211, 5410; Firstcare Pharmacy LLC, 24-11212, 1203; Easycare Pharmacy LLC, 24-11213, 9408; Primecare Pharmacy LLC, 24-11214, 7645.

Pursuant to the Bar Date Order, each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, and trust) that holds or seeks to assert a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtors that arose, or is deemed to have arisen, prior to the Petition Date (including, without limitation, claims entitled to administrative priority status under section 503(b)(9) of the Bankruptcy code), **MUST FILE A PROOF OF CLAIM** on or before **5:00 p.m. (prevailing Eastern Time), on August 7, 2024** (the "**General Bar Date**"), by sending an original proof of claim form to Stretto, Inc. ("**Stretto**"), at the following address: Optio Rx, LLC, c/o Stretto, Inc., 410 Exchange, Suite 100, Irvine, California 92602, or by completing the online proof of claim form available at https://cases.stretto.com/OptioRx/ under Tab "File a Claim" or that it is *actually received* on or before the General Bar Date; *provided that*, solely with respect to governmental units (as defined in section 101(27) of the Bankruptcy Code), the deadline to set forth governmental units to file a proof of claim

against the Debtors is **December 4, 2024** at 5:00 p.m. (prevailing Eastern Time) (the "**Governmental Bar Date**"). Proofs of claim must be sent by overnight mail, courier service, hand delivery, regular mail, or in person, or completed electronically through Stretto's website. Proofs of claim sent by facsimile, telecopy, or electronic mail will **not** be accepted and will **not** be considered properly or timely filed for any purpose in these Chapter 11 Cases.

ABSENT FURTHER ORDER OF THE COURT, ANY PERSON OR ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM IN THESE CHAPTER 11 CASES WITH RESPECT TO A PARTICULAR CLAIM AGAINST THE DEBTORS, BUT THAT FAILS TO DO SO PROPERLY BY THE APPLICABLE BAR DATE, SHALL NOT BE TREATED AS A CREDITOR IN THESE CHAPTER 11 CASES WITH RESPECT TO SUCH CLAIM FOR PURPOSES OF VOTING AND DISTRIBUTION; PROVIDED, HOWEVER, THAT A HOLDER OF A CLAIM SHALL BE TREATED AS A CREDITOR FOR PURPOSES OF VOTING AND DISTRIBUTION AS TO ANY UNDISPUTED, NONCONTINGENT, AND LIQUIDATED CLAIMS IDENTIFIED IN THE SCHEDULES ON BEHALF OF SUCH HOLDER IN THE AMOUNT SET FORTH IN THE SCHEDULES.

The Schedules, the Proof of Claim Form, the Bar Date Notice, and the Bar Date Order may be obtained by contacting the Debtors' Claims Agent, in writing, at Optio Rx, LLC, c/o Stretto, Inc., 410 Exchange, Suite 100, Irvine, California 92602 or online at https://cases.stretto.com/OptioRx/ under the Tab "Court Docket" or "File a Claim", as applicable. The Bar Date Order can also be viewed on the Court's website at www.deb.uscourts.gov. If you have questions concerning the filing or processing of claims, you may contact the Debtors' claims agent, Stretto, at (866) 515-5505 (Toll-Free) and (949) 590-3286 (International).

Dated: June 26, 2024, Wilmington, Delaware, **CHIPMAN BROWN CICERO & COLE, LLP,** William E. Chipman, Jr., Esquire, David W. Carickhoff, Esquire, Mark D. Olivere, Esquire, Alan M. Root, Esquire, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Telephone: (302) 295-0191, Email: chipman@chipmanbrown.com, carickhoff@chipmanbrown.com, olivere@chipmanbrown.com, root@chipmanbrown.com, *Proposed Counsel for Debtors and Debtors in Possession*

The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Bec's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8891); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60062.

## EDUCATION | LABOR

# Despite End of Hiatus, Nearly Half of Student Borrowers Are Not Paying

FROM FIRST BUSINESS PAGE

federally managed loans were at least 30 days overdue on their payments at the end of 2023. That's the highest delinquency rate since 2016, as far back as the department's public records go. Because of a policy adopted by the Biden administration, those borrowers will face no penalties for their nonpayment until October at the earliest.

Millions more had their accounts frozen through deferment or forbearance (which allows borrowers to temporarily stop making payments), and nearly six million borrowers remain mired in defaults that began before the pandemic.

The reasons borrowers aren't paying are varied. Some say they can't afford it, while others are tangled in bureaucratic snafus. Many people are taking advantage of an "on-ramp" period that lasts through September, during which late payments will not be reported to credit bureaus and borrowers will not be placed into default, though interest will continue to accrue.

When President Biden ended the moratorium that began in March 2020 under President Donald J. Trump, he pledged to fix key parts of the long-troubled federal loan program. While the Supreme Court overturned Mr. Biden's most far-reaching policy — forgiving at least $10,000 in debt for each of millions of borrowers — his administration resurrected other pathways for eliminating debt.

Mr. Trump's Education Department stymied relief programs for government and nonprofit workers, permanently disabled borrowers, and people defrauded by for-profit schools. Under Mr. Biden, the agency revamped and expanded those and other initiatives and used them to cancel $167 billion owed by nearly five million people.

Mr. Biden also created a new repayment program, SAVE, which slashed many borrowers' payments or reduced them to zero for millions of low-wage workers. Consumer advocates praised those moves as vital to ensuring that borrowers' bills are manageable.

But the plethora of changes to repayment rules, and a barrage of lawsuits from Republican-led states attacking them, have worsened the already challenging task of getting more than 40 million people back on a payment track. The Education Department and its five loan servicers are struggling to adapt their systems and guide borrowers through repayment options that sometimes change overnight.

Last week, federal judges in Kansas and Missouri temporarily blocked elements of the SAVE program, ruling in favor of states

that contested the president's authority to impose such generous terms without congressional approval. In the Kansas suit, the states called the president's debt relief maneuvers "a rushed product to evasively do what the Supreme Court already told defendants they cannot do."

But on Sunday, the U.S. Court of Appeals for the 10th Circuit temporarily reversed the Kansas decision, clearing the way for the department to proceed with planned payment reductions this month for millions of borrowers.

Travis Wattles, 39, has had his account in forbearance since the payment pause ended in the fall because his servicer, Aidvantage, has not been able to determine what his monthly bill should be. (Aidvantage declined to comment and referred questions to the Education Department.)

Mr. Wattles, who works in automotive product marketing, spent several years overseas. During that time, his earnings were below the limit for the foreign income exclusion (a tax break that shelters some income), so he had no taxable income and owed nothing for his student loan debt.

But Mr. Wattles, who moved near Nashville in early 2020, now makes a six-figure salary. He enrolled in the SAVE plan in August, and has twice sent paperwork to Aidvantage to have his payment recalculated based on his current earnings.

"They keep putting me back into forbearance because they can't figure it out," he said. "I don't want that. I don't mind making a payment; I understand I took out the loan."

Karlyn Granger, a 36-year-old graphic designer, received her master's degree in 2019. When the pandemic freed her of the obligation to pay her federal loans, she got married, bought a house in Atlanta and had a baby. The costs of caring for her family consume most of her paycheck and "feel much more present and dire" than her loan, she said.

A deluge of emails from Aidvantage has spurred her efforts to figure out which payment plan is best for her. But the choices confuse her: Should she try to keep her monthly bill as low as possible, or prioritize paying more to reduce what she owes in interest?

The shifting legal landscape has amplified her uncertainty. The SAVE plan, for example, waives unpaid interest for those who keep up with their monthly payments and forgives any debt remaining after 20 years. But those benefits may vanish if legal challenges to the plan succeed. And the Internal Revenue Service typically treats forgiven debts as income. Ms. Granger fears making a decision that might eventually stick her with an enormous tax

bill.

"I'm just kind of in analysis paralysis, where I don't do anything," she said.

The Education Department anticipated that millions of borrowers would need extra time, help and nudging. There's no historical parallel for pausing the entire loan system for years. But when natural disasters have occurred —

which affected borrowers can use as grounds to temporarily suspend their payments — "roughly a third of borrowers missed their payments in the first months after payments resumed," two senior officials wrote in an April blog post. "Their rates of payment recovered gradually over a two- to three-year period."

For loan servicers, alarm bells

start going off when a borrower is more than 90 days overdue, said Scott Buchanan, the executive director of the Student Loan Servicing Alliance. That's the point at which they normally file a negative credit report. But through September, the servicers have instead been instructed to place those borrowers into forbearance.

That complicates the data. With

so many borrowers being automatically routed into forbearance, it's hard to separate those who can afford to pay but are choosing not to from those who are genuinely struggling.

"For some time, we're going to have this group of borrowers who will see, 'I went delinquent and nothing happened,' so they think, 'Why am I making a payment?'" Mr. Buchanan said. "That was always the risk of the on-ramp. You want to encourage people to make payments. If you self-cure for them, that doesn't encourage payments."

Mr. Biden frequently casts his approach to student debt as a signature accomplishment. "My administration has taken the most significant action to provide student debt relief ever in the history of this country," he said in April. "This relief can be life changing."

And for millions of people, it has been, despite the rockiness and legal turmoil of the past year.

Clayton Lundgren, 25, earned a master's degree in engineering physics in 2021 — then moved to Los Angeles to work as a self-employed content creator. Had the Supreme Court allowed Mr. Biden's mass-debt cancellation program to stand, nearly half the $21,000 that Mr. Lundgren owes would have vanished.

But because of the SAVE program, which exempts income of up to 225 percent of the federal poverty line, Mr. Lundgren owes nothing on his monthly loan bill. That helps him afford his rent and other living expenses. "It gives some breathing room," he said.

And because SAVE prevents interest from accruing, Mr. Lundgren's balance isn't growing. That's a sea change from how federal student loans used to operate: Previously, millions of borrowers on income-driven plans made payments every month but saw their tabs keep rising, because their payments weren't enough to cover even the interest on their debts.

Mr. Lundgren said he was grateful for SAVE, but also felt a bit whiplashed by the loan system's gyrations.

"I am just resigned to the fact that there is almost certainly no reality where the socially just thing happens, which would be loan forgiveness and the institution of universally affordable public college," he said.

Representative Virginia Foxx of North Carolina, a Republican and the chairwoman of the House Committee on Education and the Workforce, praised the court rulings against the SAVE plan.

Mr. Biden "has opted to give away taxpayer money and illegally rewrite loan contracts," she said. "It's a blatant attempt to buy votes from college graduates on the backs of the working class."



New changes to student loan repayment rules, and a barrage of lawsuits from Republican-led states attacking them, have worsened the already challenging task of getting more than 40 million people back on a payment track.　　KENNY HOLSTON/THE NEW YORK TIMES



WILLIAM DESHAZER FOR THE NEW YORK TIMES

**'They keep putting me back into forbearance.'**

Travis Wattles, 39, who hasn't paid on his loan because his servicer can't determine his monthly bill amount.

---

# Judge Backs Initial Challenge to F.T.C.'s Noncompete Ban, at Least for Now

**By DANIELLE KAYE**

A federal judge on Wednesday backed an initial legal challenge to the Federal Trade Commission's ban on noncompete agreements, which is scheduled to take effect in September.

Judge Ada Brown granted an injunction requested by several plaintiffs, saying the ban cannot be enforced against them pending a final ruling.

But while the ruling is preliminary, she said that the F.T.C. lacked "substantive rule-making authority" with respect to unfair methods of competition and that the plaintiffs were "likely to succeed on the merits" of their challenge.

Judge Brown, of U.S. District Court for the Northern District of Texas, said she expected to issue a final decision by the end of August.

The commission "stands by our clear authority, supported by statute and precedent, to issue this rule," said Douglas Farrar, an F.T.C. spokesman. He added that the agency would "keep fighting" noncompetes in an effort to promote worker mobility and economic growth.

In April, the tax firm Ryan L.L.C. sued to block the near-total ban on noncompetes, just hours after the F.T.C. voted 3 to 2 to adopt the rule. The U.S. Chamber of Commerce later joined the case as a plaintiff, as did the Business Roundtable and two Texas business groups.

Banning noncompete agreements, which prohibit workers from switching jobs within an industry, would increase workers' earnings by at least $400 billion over the next decade, the F.T.C. estimates. The agreements affect roughly one in five American workers, or around 30 million people, according to the agency, whose purview includes antitrust

and consumer protection issues.

"If you're not working in the most productive place you could be working because of a noncompete, that's a loss for the economy," Aviv Nevo, director of the F.T.C.'s Bureau of Economics, said at a conference in April.

Business groups argue that the ban would limit their ability to protect trade secrets and confidential information. The Chamber of Commerce and other groups assert that the F.T.C. lacks constitutional and statutory authority to adopt its proposed rule, with Ryan L.L.C. calling it "arbitrary, capricious, and otherwise unlawful." Another lawsuit seeking to block the rule is pending in federal court in Pennsylvania.

But the three Democrats on the five-member commission maintain that it can legally issue rules defining unfair methods of competition under the F.T.C. Act of 1914, the law that created the agency. Their position has garnered some bipartisan support, too: Representative Matt Gaetz, Republican of Florida, argued in a brief filed in the Texas case that the noncompete ban falls "squarely within" the rule-making authority granted to the commission by Congress.

The Supreme Court's decision last week to limit the broad regulatory power of federal agencies could raise the agency's legal hurdles.

Mark Goldstein, a labor and employment lawyer at Reed Smith in New York, said that while limited to only the plaintiffs at this stage, Judge Brown's injunction was a strong indication that she would deem the F.T.C.'s rule invalid, preventing it from going into effect nationwide.

"The writing is on the wall there," Mr. Goldstein said. "I have never seen a court issue a prelimi-

nary injunction and then, absent some extremely unusual circumstances, issue a final decision that wasn't consistent with the preliminary injunction."

As litigation over the noncompete rule drags on, some lawyers are already advising employers to start relying more heavily on different agreements to protect trade secrets and business interests.

In a blog post after the F.T.C. adopted its noncompete ban, the

law firm Winston & Strawn suggested that employers adopt alternative measures, such as narrowly tailored nondisclosure agreements and requirements that employees repay the company for training costs if they leave before a set period — known as training repayment agreement provisions, or TRAPs.

"Focus on these additional protections has become greater," said Kevin Goldstein, an antitrust partner at Winston & Strawn.

But even those agreements are under increasing scrutiny. The commission's final rule encompasses "de facto noncompetes" — measures that, in effect, prevent a worker from switching jobs within an industry, even if they aren't labeled noncompete clauses. And employers are eyeing the shifting landscape of state and federal restrictions on such covenants, including nondisclosure agreements, beyond the F.T.C.'s rule.

While the commission's vote to ban noncompetes has garnered the most attention, moves from other federal agencies and state legislatures against agreements

that restrict worker mobility are simultaneously on the rise.

"There's been increased hostility toward these agreements in general, across the country," said Christine Bestor Townsend, cochair of the unfair competition and trade secrets practice group at Ogletree Deakins.

Last month, a National Labor Relations Board judge ruled for the first time that a noncompete clause is an unfair labor practice, as part of her decision in an unfair-termination case. The judge also broke new ground by barring a nonsolicitation clause, which restricts soliciting clients or employees of a former employer; she argued that both types of agreements could chill protected activity, including union organizing.

That ruling followed a memo last year from the labor board's general counsel, Jennifer Abruzzo, that clarified her view that noncompete provisions in employment contracts violate the National Labor Relations Act, except in limited circumstances.

"It's one thing to get a guidance memo from the general counsel, which is significant and important," said Jonathan F. Harris, an associate professor at Loyola Law School in Los Angeles who studies contracts and employment law. "And it's another thing to see the adjudication side of the N.L.R.B. agree with her."

These kinds of restrictive covenants tend to scare workers away from labor organizing, Mr. Harris said, "because the consequences of being fired for organizing become that much greater if you can't get another job afterwards."

Other federal agencies have jumped in as well, eyeing a range of employment provisions that they argue unfairly constrain workers. It's part of a the whole-of-

government approach by the Biden administration to what it considers anticompetitive restraints on worker mobility.

The Consumer Financial Protection Bureau, for example, issued a report last summer on the dangers of provisions requiring workers to repay training costs if they leave a job before a certain time elapses.

It's not just a federal push: State governments are also stepping in to promote worker mobility — a trend that was in motion before the F.T.C. voted to ban noncompetes in April, but one that has gained momentum since.

Last month, the Rhode Island legislature passed a bill to ban noncompetes, joining Minnesota,

California, Oklahoma and North Dakota. Dozens more states have enacted partial restrictions.

"Minnesota didn't turn into a gaping crater," said Pat Garofalo, the director of state and local policy at the American Economic Liberties Project, a progressive think tank, referring to the state's wide-reaching ban on noncompetes that went into effect last year. "Once a domino falls over, a bunch of other dominoes fall over after."

State laws can also prove more resilient to challenges than federal rules.

"State legislatures obviously have a lot of interest in getting these rules on the books right now," Mr. Garofalo said.

**Agency vows to 'keep fighting' to promote worker mobility.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:　　　　Chapter 11
Optio Rx, LLC, et al.,　Case No. 24-11188 (TMH)
Debtors.[1]　　　(Jointly Administered)

NOTICE OF DEADLINE FOR THE FILING OF PROOFS OF
CLAIM, INCLUDING FOR CLAIMS ASSERTED UNDER
SECTION 503(b)(9) OF THE BANKRUPTCY CODE
(GENERAL BAR DATE IS AUGUST 7, 2024, AT 5:00 P.M.
(PREVAILING EASTERN TIME))

PLEASE TAKE NOTICE OF THE FOLLOWING:

On June 7, 2024 (the "Petition Date"), Optio Rx, LLC and its affiliates, the debtors and debtors in possession (collectively the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). On June 26, 2024, the Court entered an order (Docket No. 104) (the "Bar Date Order"), establishing certain deadlines for the filing of proofs of claim in the chapter 11 cases of the following Debtors: Optio Rx, LLC, Case No. 24-11188; Braun Pharma, LLC, Case No. 24-11189; Asaki Pharmaceuticals, LLC, Case No. 24-11190; Braun Pharma LLC, 24-11191; Bryant Ranch Prepack, Inc., 24-11193; Delaney Pharmaceuticals, LLC, 24-11194; Diamondback Drugs of Delaware, LLC, 24-11195; Encore Pharmacy LLC, 24-11196; KVP Pharma Inc., 24-11197; Lakeview Pharmacy of Racine, Inc., 24-11198; 542 Main Loop Enterprises, LLC, 24-11199; LP1 Mott Holdings, LLC, 24-11200; LP2 Main Street, LLC, 24-11201; SMO Loris Holdings LLC, 24-11202; SMO Meadville, LLC, 24-11203; SMO Niles Holdings, LLC, 24-11204; SMO RH Pharma LLC, 24-11205; SMO Tamarac, LLC, 24-11206; Main Pharmacy, LLC, 24-11208; Main Pharmacy, LLC, 24-11209; SMO Vienna Pharmacy, LLC, 24-11212; SMO Vacuum Pharmacy, LLC, 24-11218; Main Street Family Pharmacy, LLC, 24-11214; Park.

Pursuant to the Bar Date Order, each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, and trust) that holds or seeks to assert a claim as defined in section 101(5) of the Bankruptcy Code) against the Debtors that arose or is deemed to have arisen prior to the Petition Date (including, without limitation, claims entitled to administrative priority status under section 503(b)(9) of the Bankruptcy Code) MUST FILE A PROOF OF CLAIM on or before 5:00 p.m. (prevailing Eastern Time) on August 7, 2024 (the "General Bar Date"), by sending an original proof of claim form to Stretto, Inc., (the "Claims and Noticing Agent"), either by completing the online form at http://cases.stretto.com/OptioRx or by mailing a hard copy of the completed proof of claim form to Optio Rx Claims Processing, c/o Stretto, 410 Exchange, Ste. 100, Irvine, CA 92602. For more information on filing a proof of claim, or for copies of proof of claim forms, please visit the website maintained by the Claims and Noticing Agent at http://cases.stretto.com/OptioRx.