### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | **Related D.I.: 294** |

### OBJECTION OF LOAN ADMIN CO LLC TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER: (1) GRANTING DERIVATIVE STANDING TO THE COMMITTEE OF UNSECURED CREDITORS TO COMMENCE, PROSECUTE AND RESOLVE CERTAIN CLAIMS AND CAUSES OF ACTION; AND (2) EXTENDING CHALLENGE PERIOD PENDING CONSIDERATION OF REQUEST FOR DERIVATIVE STANDING

Loan Admin Co LLC (the "Admin Agent"), in its capacity as administrative agent under the Prepetition Credit Agreement and DIP Credit Agreement (as defined below), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the *Motion of Official Committee of Unsecured Creditors for Entry of an Order: (1) Granting Derivative Standing to the Committee of Unsecured Creditors to Commence, Prosecute and Resolve Certain Claims and Causes of Action; and (2) Extending Challenge Period Pending Consideration of Request for Derivative Standing* [D.I. 294] (the "Motion"), filed by the Official Committee of Unsecured

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061.

Creditors (the "Committee").  In support of this Objection, the Admin Agent respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Despite its investigation, the Admin Agent's voluntary delivery of discovery materials, and the Admin Agent agreeing to an extension of the Challenge Period, the Committee has failed to produce an actionable motion for derivative standing.  Instead, the Committee's Motion is replete with bald, conclusory allegations unsupported by evidence.

2.      The Motion falls woefully short of meeting the standard for derivative standing in the Third Circuit.  The Committee does not present colorable claims that would survive even the low threshold for a motion to dismiss.  Nor has the Committee produced any evidence supporting a finding that the Debtors unjustifiably refused to pursue causes of action against the Prepetition Lenders.

3.      While the Admin Agent continues to negotiate in good faith with the Committee regarding a potential consensual resolution of the claims of unsecured creditors, the Admin Agent has no choice but to file this Objection alongside the Debtors' objection.  Accordingly, the Admin Agent respectfully requests that this Court deny the Committee's ill-contrived, unsupported Motion for standing.

## BACKGROUND

4.      On June 9, 2024 (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      The Debtors are party to that certain Credit Agreement, dated as of June 28, 2019 (as amended, supplemented, or otherwise modified, the "Prepetition Credit Agreement"), by and

among CBC Pharma HoldCo, LLC, Optio Rx, LLC, the Admin Agent, and the lenders party thereto (the "Prepetition Lenders").  As of the Petition Date, the Debtors owed approximately $127.6 million under the Prepetition Credit Agreement, inclusive of accrued interest and fees as of the Petition Date.  There is no question that the Prepetition Lenders are significantly undersecured.

6.    On June 14, 2024, the Debtors entered into that certain Credit Agreement (the "DIP Credit Agreement") by and among the Debtors, the Admin Agent, and the lenders party thereto (the "DIP Lenders"), who are the same as the Prepetition Lenders.  Among other things, the DIP Credit Agreement provides for a $10 million DIP loan secured by automatically perfected liens over all of the Debtors' assets, whether then existing or thereafter acquired, and whether encumbered, encumbered by a perfected lien or not.

7.    On June 21, 2024, the Office of the United States Trustee for Region 3 appointed the Committee [D.I. 67] and subsequently amended such appointment on June 25, 2024 [D.I. 81] and July 1, 2024 [D.I. 130].  The two-member Committee currently comprises Baybridge Pharmacy Corp. and PIA Holdings, Inc., each of which are holders of subordinated seller notes.

8.    On July 1, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Lenders; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [D.I. 133] (the "Final DIP Order").  Paragraph 5 of the Final DIP Order provides that the DIP Lenders have valid, binding, enforceable, non-avoidable, and automatically and

properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") the

DIP Collateral.[2]

9.      Paragraph 37(c)(i) of the Final DIP Order provides:

The Debtors' Stipulations and releases contained in Paragraph G hereof and in
section (b) immediately above shall be binding upon the Debtors' estates and each
other party-in-interest, including the Committee (and including any chapter 11
trustee or chapter 7 trustee), except to the extent such party in interest (A) first
obtains standing by no later than 75 calendar days following the date of entry of the
Interim Order, (such time period shall be referred to as the "Challenge Period," and
such date that is the next calendar day after the expiration of the Challenge Period
in the event that either (i) no Challenge (as defined below) is properly raised during
the Challenge Period or (ii) with respect only to those parties who properly file a
contested matter, adversary proceeding, or other Challenge, and with respect only
to the issues raised as a Challenge, such Challenge is fully and finally adjudicated,
(i) and (ii) shall be referred to as the "Challenge Period Termination Date")) and
(B) second, obtains a final, non-appealable order in favor of such party-in-interest
sustaining any such Challenge in any such timely-filed contested matter, adversary

---

[2]      Paragraph 5 of the Final DIP Order provides, in relevant part:

The term "DIP Collateral" means, collectively, all assets, rights, and privileges of each Debtor and
its respective estate of any nature whatsoever, including avoidance actions under chapter 5 of the
Bankruptcy Code now owned or hereafter acquired, wherever located, by whomsoever held and all
proceeds thereof in whatever form received, whether first arising prior to, on, or following the
Petition Date, including, but not limited to, any and all cash, cash equivalents and any investment
of such cash or cash equivalents, inventory, goods, accounts, accounts receivable, other rights to
payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures,
machinery, equipment, general intangibles, payment intangibles, documents, instruments,
securities, chattel paper, interests in leaseholds (provided, however, that solely to the extent that any
lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold
interest, then in such event there shall only be a lien on the economic value of, proceeds of sale or
other disposition of, and any other proceeds and products of such leasehold interests unless the
applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy
Code), real property, deposit accounts (except for any account created to hold an adequate assurance
deposit for utility providers, pursuant to separate order of this Court, but not excepting the Debtors'
or their estates' interest in any excess funds in such account after satisfaction of any applicable
obligations to utility providers), securities accounts, investment property, letters of credit, letter-of-
credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other
intellectual property, commercial tort claims, capital stock of subsidiaries, wherever located, and
the proceeds, products, rents, accession and profits of the foregoing, including, but not limited to,
(i) all assets constituting Prepetition Collateral, (ii) the Cash Collateral, (iii) all assets of the Debtors
that, as of the Petition Date, were not otherwise subject to a security interest, (iv) to the extent a
DIP Lien is not permitted by law to attach to any property of any Debtor or its estate, the proceeds
of such property, and (v) any proceeds or property recovered, unencumbered or otherwise from all
of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550
of the Bankruptcy Code and under any applicable state Uniform Fraudulent Transfer Act,
Uniform Fraudulent Conveyance Act, and similar statutes or common law (collectively, "Avoidance
Actions").

proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").

10.    On July 29, 2024, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* [D.I. 257] (as amended, the "Plan") and the *Amended Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* [D.I. 258] (the "Disclosure Statement").  A confirmation hearing is scheduled for September 13, 2024.

11.    Through negotiations with the Debtors, under the Plan, the Prepetition Lenders have agreed to provide a gift in an amount sufficient to satisfy unsecured trade creditor-claims in full through the "GUC Trade Gift," which provides that each unsecured trade creditor will be paid 85% of their respective allowed claims on the effective date of the Plan and the remaining 15% on the one-year anniversary thereof.  *See* Plan at § 3.04.

12.    On August 12, 2024, upon consent of the parties, the Court entered the *Order Extending Committee Challenge Period* [D.I. 289].

13.    On August 15, 2024, the Committee filed the Motion.  Among other things, the Motion asserts that the following Debtor-assets or proceeds thereof are unencumbered by the Prepetition Lenders' liens (the purported "Unencumbered Assets"): (i) commercial torts claims; (ii) leasehold, tenancy, or real property interests or any fixtures associates therewith;[3] (iii) insurance policy proceeds relating to director and officer or management liability; and (iv) certain deposit accounts.[4]  Attached to the Motion as Exhibit B is the Committee's proposed *Complaint*

---

[3]    The Admin Agent notes that this is limited to fixtures inextricably affixed to real estate and does not extend to trade fixtures inapplicable in the real estate context.  The Admin Agent, on behalf of the Prepetition Lenders, holds liens on all of the Debtors' fixtures.  *See* Security Agreement at § 1.1(a)(xii).

[4]    The Admin Agent, on behalf of the Prepetition Lenders, holds liens on the Debtors' accounts, but certain of such accounts may not be subject to DACAs.  *See* Security Agreement at § 1.1(a)(x).

*for Avoidance and Preservation of Liens Pursuant to 11 U.S.C. §§ 541 and 551* (the "<u>Proposed</u> <u>Complaint</u>"), which asserts only one cause of action for the avoidance of the Prepetition Lenders' liens on property of the Debtors' estates.  The Motion also seeks an order extending the Challenge Period pending the Court's adjudication of the Motion.

### **OBJECTION**

14.    This Court should deny the Committee's Motion for three reasons. First, the Committee has failed to satisfy the Third Circuit standing for derivative standing under *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) and its progeny.  Second, the Committee's efforts are futile—it has not evidenced that the value of any component of its Challenge or recovery therefrom is not barred by or would exceed the value of the DIP Liens.  Third, Delaware law expressly precludes parties other than members of Delaware limited liability companies from exercising derivative standing to pursue claims against such limited liability companies.  Finally, the Committee cannot fund their proposed Challenge with DIP proceeds or cash collateral.

**A.  The Motion fails to satisfy the Third Circuit standard for derivative standing.**

15.    The Third Circuit established a three-part test for derivative standing in *Cybergenics*, which courts in this district continue to follow.  To satisfy its burden for derivative standing, the movant must show "(i) the debtor-in-possession has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the debtor-in-possession; (ii) the moving party has alleged colorable claims; and (iii) the moving party has received leave to sue from the bankruptcy court."  *In re Amerifirst Financial, Inc.*, Case No. 23-11240 (TMH), at 6 (Bankr. D. Del. Aug. 14, 2024) (quoting *Cybergenics*, 330 F.3d at 567).

**i. The Committee's claims are not colorable.**

16.     First, despite its low bar, the Committee's Motion fails to allege colorable claims. The Committee correctly notes that the standard here is that of whether the claims alleged would survive a Rule 12(b)(6) motion to dismiss.  That standard necessarily requires the Committee to have alleged more than "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Bald, conclusory statements are not sufficient.  *Id.*

17.     In its Motion, the Committee merely states purported rationales for why each category of the Unencumbered Assets were unperfected as of the Petition Date.  Mot. at ¶ 22. Specifically, (i) the Committee merely cites UCC §§ 9-108(e) and 9-204(b)(2) regarding after-acquired commercial tort claims but fails to identify any that may exist; (ii) the Committee cites UCC § 9-109(d)(11) regarding the creation of liens on real property and alleges, "The Committee's investigation has uncovered no documents recorded in the applicable counties where the Debtors leased property or owned fixtures, so liens on these real estate interests are unperfected" but fails to describe which real estate interests may exist; (iii) the Committee cites case law regarding D&O insurance proceeds and alleges, "Since the Debtors did not own and could not transfer the proceeds of D&O insurance, liens on these assets are unperfected;" and (iv) cites UCC § 9-314(a) and alleges that while DACAs were in place for some of the Debtors' depository accounts, certain other accounts were not subject to DACAs.[5]  Mot. at ¶ 22.

---

[5]     Section 3.9 of the Security Agreement executed in connection with the Prepetition Credit Agreement, a copy of which is attached to the Motion, required, among other things, that the Debtors cause each of their depositories listed on Annex F thereto to execute a deposit account control agreement (a "DACA").  Similarly, Section 11.16 of the DIP Credit Agreement provides, in relevant part:

> None of the Credit Parties will maintain any deposit account (other than any Excluded Account), unless such deposit account is (x) subject to a "control agreement" referred to in Section 3.9 of the Security Agreement or (y) otherwise under the "control" (within the meaning of Section 9-104 of the New York UCC) of the Collateral Agent.

18.     The Committee's threadbare allegations do not satisfy even the low evidentiary threshold to survive a motion to dismiss.  Aside from attaching the Security Agreement to the Motion, the Committee has not attached nor cited to any documentation in support of these allegations and has not propounded any witness testimony.

19.     First, as to after-acquired commercial tort claims, a review of Section 1.1 of the Security Agreement, a copy of which is attached to the Motion, expressly disproves the Committee's assertion that "no such [commercial tort claims] are described in any security document associated with the Credit Agreement."  Specifically, Section 1.1(v) of the Security Agreement provides that the Debtors granted security interests in "all Commercial Tort Claims (including all Commercial Tort Claims described in Annex G hereto) …."  Even with respect to after-acquired commercial tort claims, the Motion is silent as to what purported commercial tort claims came into existence between the date of the Security Agreement and the Petition Date (the effective date of the DIP Liens).  Upon information and belief, including through discussions with the Debtors, there are no commercial tort claims that have accrued following the date of the Security Agreement and prior to the Petition Date, or during the pendency of these chapter 11 cases.  As the Committee has failed to identify commercial tort claims as of the filing of the Motion, and given the lack of any evidence that such claims exist, the Court should not grant the Committee carte-blanche standing to investigate further.

20.     As to liens on leases and real property and insurance proceeds, as discussed further below, the Committee has not sufficiently alleged that there is value to such rights or whether such value would flow past the DIP Lenders.  Nor has the Committee explained how or why they intend to pursue such claims if granted standing given the assumption and vesting of all non-rejected leases and D&O policies under the Plan in the Reorganized Debtors; the leases are not being sold.

21.     Finally, the Committee does not provide any evidence as to whether DACAs are in place with respect to all of the Debtors' bank accounts, as the Prepetition Credit Agreement and Security Agreement required.  Rather, the Committee asks this Court to find that the absence of evidence is evidence of absence.  The Committee has not put forth a declarant or statements provided by the banks in question as to the existence of DACAs to evidence control for purposes of perfection.  But even if the Admin Agent were to concede as to the nonexistence of DACAs as to certain accounts, as discussed further below, the Committee fails the cost-benefit analysis associated with showing unjustifiable refusal for the Debtors to pursue such claims.  Accordingly, the Committee has failed to allege colorable claims.

### ii.   The Committee has failed to show that the Debtors' refusal to prosecute claims against the Prepetition Lenders is unjustifiable.

22.     Given the lack of colorable claims, the net value of such claims to the estates cannot be said to exceed the costs of pursuing such claims or the extent of the DIP Liens, the Court need not conduct a cost-benefit analysis regarding whether the Debtors' refusal to prosecute claims against the Prepetition Lenders is unjustifiable.  However, assuming arguendo that the Committee has raised colorable claims, the Court's analysis is straight forward.  The Committee's Motion fails to assert any evidentiary support as to the value of any of the purported Unencumbered Assets, has not detailed the time and expense of pursuing such causes of action, and further seems not to have contemplated the effect of pursuing causes of action in the face of the DIP Lenders' claims and DIP Liens encumbering those assets.

23.     The Committee has not propounded any expert witness testimony as to the value of the purported Unencumbered Assets or even taken testimony of the Debtors' or Prepetition Lenders' representatives.  While this Court need not conduct a "mini-trial," there must be some evidence to support a finding that the Committee's pursuit of causes of action against the

Prepetition Lenders on behalf of the Debtors "is likely to benefit the reorganization of the estate[s]." *In re Amerifirst Financial, Inc.*, Case No. 23-11240 (TMH), at 8 (Bankr. D. Del. Aug. 14, 2024) (quoting *In re MIG, Inc.*, Case No. 09-12118 (KG), 2009 Bankr. LEXIS 4313, at \*4 (Bankr. D. Del. Dec. 18, 2009)). The Court must consider (i) the probability of success and financial recovery; (ii) the expenses incurred by the movant in pursuing the causes of action; and (iii) the anticipated delay and expense caused thereby that litigation will produce. *See id.* (quoting *PW Enters. V. N.D. Racing Comm'n* (*In re Racing Servs.*), 540 F.3d 892, 901 (8th Cir. 2008)).

24.     Most telling, even if the Admin Agent were to concede that certain of the Debtors' depository accounts are not covered by DACAs because the Debtors failed to comply with Section 3.9 of the Security Agreement and Section 11.16 of the Prepetition Credit Agreement, the Committee has flatly failed to support a finding that the Debtors were unjustified in their refusal to bring such claim. The Motion attaches a list of bank accounts—and nothing else. There is no allegation as to the total funds is such bank accounts on the Petition Date. Further, the DIP Lenders committed to lending $10 million to the Debtors through the DIP Credit Agreement and the Final DIP Order and the DIP Lenders have an all-asset DIP Lien. Certainly, to the extent these depository accounts constitute Unencumbered Assets, they are encumbered by the DIP Liens. Notwithstanding any of the foregoing, as the funds on deposit are liquid, upon information and belief, the Debtors have exhausted such funds through payment of authorized prepetition and administrative expenses postpetition. Recovering on such claims would provide no additional value to the estates. Accordingly, the Debtors have not unjustifiably refused to bring such claims.[6]

---

[6]     The Committee's flawed position on the Debtors' bank accounts is almost identical to that of the committee's motion for standing in *In re Amerifirst Financial, Inc.*, on which the Court ruled on August 14, 2024. After reviewing the testimony of the committee's two witnesses and the dozens of exhibits entered into evidence, the Court determined, among other things, "The Committee does not allege a total amount held in the accounts. In addition, because any funds in the accounts serve as RCP's collateral as DIP-lender, any recovery from the accounts would end up with RCP to no additional benefit to the estate. The Debtors did not unjustifiably refuse to bring the claims." *Id.* at 36.

Instead, the decision to release claims against the Prepetition Lenders was a calculated decision to not waste value estate resources.

25.     With respect to leasehold interests, upon information and belief, the Debtors do not have any valuable under-market leases.  The Committee has not introduced any evidence to the contrary.  Evidence of value under the circumstances would necessarily need to take the form of expert testimony—the Committee, to the Admin Agent's knowledge, has not retained any professionals to examine the market or the Debtors' lease economics.  Allowing the Committee standing to pursue avoidance of the Prepetition Lenders' liens on such interests will only serve to grow the administrative costs of these chapter 11 cases (which the DIP Lenders are funding).  Further, the Plan contemplates the assumption and assignment to the Reorganized Debtors of any and all leases not previously rejected.  Accordingly, the Debtors have not unjustifiably refused to pursue these claims.

26.     Upon information and belief, there are no claims or D&O policies available for the Committee to pursue, nor has the Committee alleged any acts giving rise to such claims.  Under the Plan, all of the Debtors' D&O policies are proposed to be assumed and assigned to the Reorganized Debtors.  Further, the Debtors are expressly retaining causes of action against certain former members of management of the Debtors for the Reorganized Debtors to pursue (e.g., against entities and individuals expressly excluded from the list of "Released Parties" under the Plan).  Should the Reorganized Debtors, in their business judgment, determine to pursue such causes of action against the non-Released Parties, they will do so.  Accordingly, the Debtors have made a calculated, justifiable decision under the circumstances to not pursue the purported Unencumbered Assets on this front.

27.     Finally, as noted above, the Committee has put forth no evidence regarding (or even alleged) the value of commercial tort claims accrued postpetition.  The Motion is silent as to basic concepts regarding potential targets of such claims, the potential value of such claims, or the time and expense necessary to pursue these hypothetical claims.  This Court should not permit the Committee to go on a fishing expedition at the expense of the DIP Lenders, which may ultimately hamper the success of these chapter 11 cases.

28.     In sum, the Debtors have not unjustifiably failed to prosecute claims with respect to any of the Unencumbered Assets.  The Committee cannot support the value proposition of the Unencumbered Assets and whether any value would flow past the DIP Lenders, the cost and expense of pursuing such claims (or how the Committee intends to proceed absent DIP proceeds or use of cash collateral in the face of the consequent Debtors' default under the DIP Credit Agreement), or the impact of litigation and the accompanying delay on the confirmation schedule and reorganization of the Debtors.  The Committee's motion for derivative standing must fail.

**B.  Delaware law precludes derivative standing for the Committee.**

29.     As this Court is aware, there exists a split in this District with respect to the application of *CML V, LLC v. Bax*, 28 A.3d 1037 (Del. 2011) to whether to grant derivative standing to the creditors of a Delaware limited liability company.  Delaware law is clear, section 18-1002 of the DLLCA prohibits creditors from asserting derivative claims against an LLC's members and officers outside of a bankruptcy case, even if the applicable LLC is insolvent.  Rather, only members or an assignee of such LLC can obtain derivative standing.  This contrasts with applicable law regarding corporations.

30.     A number of courts in this District have rightly followed *Bax* precedent.  *See, e.g.*, *In re Citadel Watford City Disposal Partners, L.P.*, 603 B.R. 897 (Bankr. D. Del. 2019); *In re HH*

*Liquidation, LLC*, 590 B.R. 211 (Bankr. D. Del. 2018) (holding the DLLCA and *Bax* prohibit creditors from pursuing fiduciary duty claims against an LLC's managers); *In re PennySaver USA Publishing, LLC*, 587 B.R. 445 (Bankr. D. Del. 2018).  However, as will likely be cited by the Committee on reply, Judge Goldblatt in *In re Pack Liquidating, LLC*, Case No. 22-10797 (CTG) Bankr. D. Del. Feb. 2, 2024) found otherwise.

31.     In *Pack*, the bankruptcy court concluded that the committee's standing to assert a derivative action was grounded in federal bankruptcy law and otherwise was not dependent on Delaware state law.  The bankruptcy court found that the Third Circuit's decision in *Cybergenics* and the DLLCA "operate in separate spheres." *Id.* at 27.  Even if the two bodies of law overlapped, the court asserted that federal preemption would take effect. *Id.*  But the court did not cite to which statutory provision of the Bankruptcy Code conflicts directly with the DLLCA.  Furthermore, this position is at odds with a debtor's obligation to comply with applicable state law.  Specifically, 28 U.S.C. § 959(b) provides, in relevant part:

> [A] trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

32.     It would be illogical to force the Debtors to simultaneously violate both federal law and state law to permit the Committee to exercise rights creditors would not otherwise have against limited liability companies.

33.     Respectfully, the Admin Agent requests that this Court follow the majority of decisions in this District and preclude the Committee from derivatively suing on behalf of the Debtors, each of which are LLCs.  Despite any contentions to the contrary in the Committee's Motion, the Final DIP Order did not implicitly waive any argument with respect to the DLLCA.

At the hearing on the Final DIP Order, the parties noted that they would revisit this issue as needed

in the event the Committee sought standing to bring a Challenge.

**C. The Committee cannot use DIP proceeds or use cash collateral to funds their proposed Challenge.**

34.    Section 11.20(f) of the DIP Credit Agreement provides that the Debtors shall not,

directly or indirectly:

> [U]se any cash collateral, proceeds of the Loans, or any cash or other amounts to
> (a) investigate, challenge, object to or contest the extent, validity, enforceability,
> security, perfection or priority of any of the Liens securing the Loans, the Liens
> securing the Prepetition Indebtedness or the Obligations hereunder, (b) investigate
> or initiate any claim or cause of action against any of the Administrative Agent, the
> Collateral Agent or the Lenders or Prepetition Secured Parties, (c) object to or seek
> to prevent, hinder or delay or take any action to adversely affect the rights or
> remedies of the Lenders or the Prepetition Secured Parties, (d) seek to approve
> superpriority claims or grant liens or security interests (other than those expressly
> permitted under the Credit Documents and the DIP Orders) that are senior to or *pari
> passu* with the Liens securing the Prepetition Indebtedness, the DIP Superpriority
> Claims or the adequate protection liens or claims granted under the DIP Orders or
> (e) take any other actions prohibited by the DIP Orders ….

35.    Plainly, DIP proceeds and cash collateral cannot be used to fund a Committee

Challenge of the Prepetition Lenders' liens on the purported Unencumbered Assets.  Doing so

would constitute an "Event of Default" under Section 12.03 of the DIP Credit Agreement and

would permit the DIP Lenders to exercise all rights and remedies afforded to them under the DIP

Credit Agreement and the Final DIP Order, including, without limitation, the extinguishment of

the DIP Lenders' commitments, foreclosure on all or any portion of the DIP Collateral, the

collection of any and all accounts receivable, the prohibition of the Debtors' use of cash collateral

for any purpose other than payroll, and any other remedies permitted by applicable nonbankruptcy

law.  DIP Credit Agreement, § 12.

36.    The Committee has not proffered (and cannot proffer) any explanation for how it

intends to fund its proposed Challenges against the Prepetition Lenders without upending these

chapter 11 cases.  This Court should not permit the Committee to cause the Debtors to accrue significant administrative expenses without any evidence of the resultant benefit.

37.     At bottom, the Admin Agent respectfully requests that the Court deny the Committee's Motion for standing.

<u>**RESERVATION OF RIGHTS**</u>

38.     Nothing in this Objection is intended to, nor shall be deemed to, be a waiver of any rights, claims, or defenses with respect to any of the causes of action asserted in the Committee's Proposed Complaint and the Admin Agent expressly reserves such rights, claims, and defenses in the event this Court grants the Motion, in whole or in part.  Further, the Admin Agent reserves all rights to object or otherwise respond to any new allegations or argument raised or evidence improperly introduced for the first time by the Committee in any reply brief, whether through the Admin Agent's filing of a sur-reply or during the hearing on the Motion.

**WHEREFORE**, the Admin Agent respectfully requests that the Court deny the Motion and grant such other and further relief as the Court deems just and proper under the circumstances.

Dated:  August 22, 2024
       Wilmington, Delaware

Respectfully submitted,

  */s/ Stuart M. Brown*
Stuart M. Brown (DE No. 4050)
Matthew S. Sarna (DE No. 6578)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:     (302) 468-5700
Facsimile:     (302) 394-2341
Email: stuart.brown@us.dlapiper.com
       matthew.sarna@us.dlapiper.com

*Counsel for Loan Admin Co LLC*