# **EXHIBIT B**

**Sur-Reply**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | **Related D.I.: 294, 332, 333, 341** |

**SUR-REPLY OF LOAN ADMIN CO LLC TO REPLY IN SUPPORT OF MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER: (1) GRANTING DERIVATIVE STANDING TO THE COMMITTEE OF UNSECURED CREDITORS TO COMMENCE, PROSECUTE AND RESOLVE CERTAIN CLAIMS AND CAUSES OF ACTION; AND (2) EXTENDING CHALLENGE PERIOD PENDING CONSIDERATION OF <u>REQUEST FOR DERIVATIVE STANDING</u>**

Loan Admin Co LLC (the "<u>Admin Agent</u>"), in its capacity as administrative agent under the Prepetition Credit Agreement and DIP Credit Agreement, by and through its undersigned counsel, hereby submits this sur-reply (the "<u>Sur-Reply</u>") to the *Reply in Support of Motion of Official Committee of Unsecured Creditors for Entry of an Order: (1) Granting Derivative Standing to the Committee of Unsecured Creditors to Commence, Prosecute and Resolve Certain Claims and Causes of Action; and (2) Extending Challenge Period Pending Consideration of Request for Derivative Standing* [D.I. 341] (the "<u>Reply</u>") and in further support of the *Objection*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061.

*of Loan Admin Co LLC to Motion of Official Committee of Unsecured Creditors for Entry of an Order: (1) Granting Derivative Standing to the Committee of Unsecured Creditors to Commence, Prosecute and Resolve Certain Claims and Causes of Action; and (2) Extending Challenge Period Pending Consideration of Request for Derivative Standing* [D.I. 332] (the "<u>Objection</u>").[2] In support of this Sur-Reply, the Admin Agent respectfully states as follows:

### **SUR-REPLY**

1. The Reply represents little more than the Committee's attempt at a second bite at the apple. Apparently recognizing the infirmity of its claim to derivative standing, the Committee now seeks to introduce new facts and arguments that should have been included in the initial motion. Included as exhibits to a declaration filed with the Reply are hundreds of pages of purported UCC-1 filings, DACAs, excerpts of the Debtors' schedules and statements, and a copy of Debtor Braun Pharma LLC's lease agreement. The Admin Agent objects to these trial by ambush tactics, especially given that the Motion only provided parties in interest with seven (7) days to object. Nonetheless, the Admin Agent has expended additional time and resources to respond to certain of the Committee's points and reserves the right to respond further at the hearing on the Motion.

2. This Sur-Reply is necessitated by the Committee's unjustified reliance on its statement in paragraph 3 of the Reply that the Admin Agent *implicitly admits* that its prepetition liens are unperfected as to certain categories of Collateral. The Admin Agent holds perfected, enforceable, unavoidable liens on all categories of the so-called Unencumbered Assets, excepting only a few depository accounts as to which the Admin Agent did not hold a DACA and prepetition

---

[2] Capitalized terms used but not otherwise defined in this Sur-Reply have the meanings given to such terms in the Objection.

commercial tort claims that may have accrued since none were listed and described in Annex G to the Security Agreement.

3.  Perfection of the Admin Agent's liens is not relevant to the motion for standing; the issue is whether the Committee can demonstrate the existence of colorable claims that will yield a benefit to the Debtors' estates. Neither through the Motion nor Reply has the Committee presented a prima facie case to support such a conclusion by this Court.

4.  The Committee still fails to identify commercial torts claims to which it purportedly associates value. Specifically, as to prepetition commercial tort claims, the Committee points to "$29 million in payments to creditors in the 90 days before the Petition Date." Reply at ¶ 17. The Committee argues, "Some or all of these transfers may be avoided pursuant to 11 U.S.C. § 547." *Id.* First, since these claims arise under the Bankruptcy Code, they did not exist prepetition. As postpetition potential claims, they are encumbered by the undisputably perfected DIP Liens. Second, the Committee has not conducted even a baseline affirmative defense analysis as to such transfers within the preference window. Upon information and belief, most, if not all, of the transfers in question were to trade vendors to ensure the continued supply of goods and services. Third, most, if not all of these general unsecured trade vendors will end up being made whole under the Plan, either by virtue of being treated as critical vendors, or benefitting from the GUC Trade Gift or the assumption and assignment of their respective contracts to the Reorganized Debtors (and associated cure payments).

5.  Merely citing to the Debtors' schedules surely cannot form the foundation for the Committee's proposition that such postpetition commercial tort claims in the guise of avoidance actions, "are thus valuable assets subject to a colorable and well-pled avoidance claim," *Id.* at ¶ 19. The Bankruptcy Code itself supports the same conclusion. *See* 11 U.S.C. § 547(b) ("Except as

3

provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and *taking into account a party's known or reasonably knowable affirmative defenses* under subsection (c) …." (emphasis added). Colorability aside, the Committee has failed to satisfy the unjustifiable refusal standard for derivative standing.

6. Next, the Committee's belated argument and evidentiary support regarding the Debtors' leases falls flat. The Committee asserts that one of the Debtors' leases contains a lock-in provision at 90% fair market value, thereby providing inherent value to the estates. *Id.* at ¶¶ 20–21. The Committee goes on to hypothesize that "[t]he Debtors' other leases may also have inherent value. Starting with the latter, hope for value alone is not sufficient. As to the former, the specific lease in question is attached as Exhibit 6 to the Miller Declaration. To start, the Committee's initial position is incorrect. The Prepetition Lenders have validly perfected, enforceable, and unavoidable liens on any proceeds derived or generated from the sale of the Debtors' leases. Section 1.1 of the Security Agreement provides, in relevant part:

> (a) As security for the prompt and complete payment and performance when due of all of its Secured Obligations, each Assignor [Debtors] does hereby pledge, grant and assign to the Collateral Agent, for the benefit of the Secured Creditors, a continuing security interest in all of the right, title and interest of such Assignor in, to and under all of the following personal property and fixtures (and all rights therein) of such Assignor, or in which or to which such Assignor has any rights, in each case whether now existing or hereafter from time to time acquired: (vii) all Contracts, together with all Contract Rights arising thereunder; (xii) all Fixtures; (xiii) all General Intangibles; (xxvii) all other tangible and intangible personal property; (xxix) all Proceeds and products of any and all of the foregoing ….

7. The Admin Agent's prepetition liens on the Braun lease proceeds are perfected by virtue of UCC-1 financing statements filed against Braun Pharma, LLC and recorded in Illinois (Braun Pharma, LLC is an Illinois entity) in 2019 and again in 2022 listing all assets and the proceeds thereof as collateral. *See* Miller Decl. at Ex. 6, pg. 47, 49 of 441. The lien searches

attached to the Committee's Reply lead to the same conclusion for each other Debtor's interests in the proceeds of their respective leases.

8.  Despite two opportunities to do so, the Committee has failed to explain how it can disregard this clear language and the lien search results to assert invalid perfection with respect to proceeds received by the Debtors from the sale of their leases. Braun Pharma LLC is an assignor under the Security Agreement, under which it pledged all of its assets, including those specifically described above in exchange for the loans provided under the Prepetition Credit Agreement. While Section 1.1(b) of the Security Agreement may exclude real property to which Braun Pharma LLC is lessee, Section 1.1(b) does not negate the validly granted and perfected liens on Contracts and Contract Rights, General Intangibles, and Proceeds from the sale of its lease.

9.  The Committee asserts that the Braun lease has significant inherent value. However, looking at the lease itself, it has ten (10) years remaining on its term (if the option to extend is exercised). Notably, the 90% lock-in does not even kick in until 2034. At 90% of fair market value—which itself is an amorphous term and an unreliable baseline for actual fair market value, especially given recent rejections of Rite Aid pharmacy leases in the same area—yields approximately $20,000 to $30,000 per year in potential value. Of course, 2034 rents are too speculative for any party to purchase the lease. Discounted at 10% would provide approximately $180,000 if sold today. This is a far cry from the Committee's assertion of millions of dollars of leasehold value. In sum, even if the Committee can show that there is value in the Braun Pharma LLC lease given the lock-in clause that may arise years down the road, the Committee has failed to present a colorable argument as to perfection of any and all funds flowing from the sale of such lease.

10. Further, as is plain from the Debtors' monthly operating reports and upon information and belief, the "Unencumbered Accounts" no longer contain the prepetition cash upon which the Committee is focused. Logically, the Debtors have had ongoing operating expenses to keep the business afloat during the pendency of these chapter 11 cases and authority to use cash collateral and alleged unencumbered cash. Acknowledging the infirmity of the Motion, for the first time on Reply, the Committee raises an issue as to whether it can surcharge unidentified "Permitted Liens" (as that term in defined in the DIP Credit Agreement) to recover any prepetition cash in the deposit accounts identified in the Motion that the Debtors spent in the ordinary course throughout the pendency of these chapter 11 cases. *Id.* at ¶ 30. To start, the Committee points to no such holders or any extent of Permitted Liens, or any expense the Debtors incurred under the narrow confines of section 506(c). Next, while the Committee argues the Final DIP Order is silent as to the prohibition of surcharging "other liens," an action to surcharge under section 506(c) of the Bankruptcy Code constitutes an "Event of Default" under Section 11.20 of the DIP Credit Agreement. The Committee fails to reconcile how the cost of defaulting under the DIP Credit Agreement is outweighed by any purported value derived from surcharging unspecified, unidentified, and unquantified Permitted Liens. The Committee has failed to present colorable claims *and* has not countered the Debtors' justifiable refusal to pursue such claims. Accordingly, the Committee has failed to meet the standard for derivative standing.

11. Moving on to the Committee's marshalling argument, the Committee has now gone back on its position in the lead up to the agreement on the form of Final DIP Order. The Committee points to paragraph 38 of the of the Final DIP Order for the proposition that the DIP Lenders must first seek to sell, liquidate, or otherwise monetize collateral that are not proceeds of Avoidance Actions. Reply at ¶ 27. However, the value purportedly flowing to general unsecured creditors

through this type of marshalling is based upon a fallacy. A secured lender has the right to apply proceeds from its collateral in any order, or no order, it decides. The Final DIP Order prevents the Committee or any other party in interest to seek to force the Admin Agent to marshal its prepetition claims and the DIP Obligations against any assets including the so-called Unencumbered Assets. Whether the Admin Agent has the right to collect from any portion of the Collateral is not the same as a party in interest having the right to force the Admin Agent to marshal against all other assets before collecting from the Unencumbered Assets. At no point during these chapter 11 cases has any party valued the Debtors' assets (other than the Debtors' hypothetical liquidation analysis attached as an exhibit to the Disclosure Statement)—the Committee certainly has not taken any steps to do so in its Motion or Reply to support a finding that the Debtors' assets far exceed $10 million. *See id.* at ¶ 28. This Court should not entertain the Committee's grossly overstated estimate based on pure speculation. In fact, the Admin Agent, on behalf of the DIP Lenders, agreed on this marshalling language in the Final DIP Order expressly on the understanding with the Committee that the Debtors' assets fell far below the full DIP Facility commitments, leaving the DIP Lenders significantly undersecured. To now argue the opposite would change the economics of the case and could cause the DIP Lenders to reexamine its options as to whether to exercise its rights under section 362(k) of the Bankruptcy Code.

12.     Finally, the Committee does little to remedy the concern over the source of litigation funding or how the Committee intends to operate in the face of a default under the DIP Credit Agreement and the DIP Lenders' exercise of remedies. Rather, the Committee relies on a policy argument regarding purported financial engineering of bankruptcy case budgets. *Id.* at ¶ 42. The Committee merely argues, "It is irrelevant to the standing analysis whether the costs of this Challenge are payable from the DIP Facility, because the value to the estate substantially

outweighs the minimal cost[3] to pursue them via the Complaint." *Id.* at ¶ 43. But the cost/benefit analysis embodied in the unjustifiable refusal prong of the test for derivative standing makes the cost of pursuing such claims a necessary prong of the Committee's prima facie showing in support of its Motion. As stated in the Objection, the Committee cannot use DIP proceeds or cash collateral to fund their litigation against the Prepetition Lenders. The Committee effectively acknowledges this point, and instead quickly glosses over the Debtors' incurrence of significant administrative expense to bankroll the Committee's litigation, further deteriorating value.

13. The DIP Lenders reserve all rights to exercise remedies in the event of such default, including, without limitation, cutting off the Debtors' right to use cash collateral except for payroll, collection of accounts receivable, and foreclosure on the remainder of the Debtors' assets.

**WHEREFORE**, the Admin Agent respectfully requests that the Court deny the Motion and grant such other and further relief as the Court deems just and proper.

Dated: August 27, 2024  
       Wilmington, Delaware

Respectfully submitted,

  */s/ Stuart M. Brown*  
Stuart M. Brown (DE No. 4050)  
Matthew S. Sarna (DE No. 6578)  
**DLA PIPER LLP (US)**  
1201 North Market Street, Suite 2100  
Wilmington, Delaware 19801  
Telephone:   (302) 468-5700  
Facsimile:    (302) 394-2341  
Email: stuart.brown@us.dlapiper.com  
       matthew.sarna@us.dlapiper.com

*Counsel for Loan Admin Co LLC*

---

[3] The Admin Agent notes that, while the Committee professionals have yet to file fee applications in these chapter 11 cases, the Committee's professional fees are expected to far exceed the allotted budget of $500,000.