# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OPTIO RX, LLC, et al.,<br><br>*Debtors.*[1] | Chapter 11<br><br>Case No. 24-11188 (TMH)<br><br>(Jointly Administered) |
| SKIN MEDICINALS LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>OPTIO RX, LLC, BEN DAVID, ARUN SURESH KUMAR, and LISA BASSETT IPPOLITO,<br><br>*Defendants.* | Adversary No. 24-50079 (TMH) |

## PLAINTIFF SKIN MEDICINALS LLC'S MOTION TO WITHDRAW THE REFERENCE

Skin Medicinals LLC ("Skin Medicinals"), plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding") and claimant in the above-captioned bankruptcy cases (the "Bankruptcy Cases"), hereby moves (the "Motion") for entry of an order withdrawing the reference of all proceedings related to Skin Medicinals' claims and causes of action against the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical, LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary, LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy, LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60062.

above-captioned debtors (the "Debtors"), including: (i) the Adversary Proceeding, (ii) the resolution of Skin Medicinals' proofs of claim[2] (the "Proofs of Claim"), and (iii) the *Motion of Skin Medicinals LLC for Entry of an Order Granting an Allowed Administrative Expense Pursuant to Section 503(b) of the Bankruptcy Code* (D.I. 362) (the "Administrative Expense Motion", and together with the Adversary Proceeding and Proofs of Claim, the "Skin Medicinals Claims") from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to this Court (the "District Court"). In support of this Motion, Skin Medicinals respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Skin Medicinals seeks immediate withdrawal of the reference because resolving the Skin Medicinals Claims requires substantial and material consideration of nonbankruptcy law affecting interstate commerce, including the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), and the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). Withdrawing the reference is mandatory where, as here, "resolution of the proceeding requires consideration of both title 11 [the ("Bankruptcy Code")] and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

2. The Skin Medicinals Claims include claims under the DTSA for the Debtors' ongoing, postpetition use and exploitation of trade secrets that the Debtors misappropriated from Skin Medicinals prepetition. Skin Medicinals asserts that some or all its resulting damages claims should be granted administrative expense priority under section 503(b) of the Bankruptcy Code and related case law, including *Reading Co. v. Brown*, 391 U.S. 471 (1968), which provides that damages arising from torts committed by the debtor postpetition are allowable administrative

---

[2] *See* Proof of Claim Nos. 83, 87, 89, 102, 103, 105–15, 117–21, 123–26, 128–29.

expenses. Skin Medicinals asserts that it has such a claim under the DTSA. But the case law on when Skin Medicinals' claims arise under the DTSA is split and there is no controlling precedent in this Circuit. Therefore, adjudicating Skin Medicinals' claims will require substantial consideration of the DTSA.

3. Similarly, there is no controlling precedent in this Circuit and a split in the case law regarding a critical component of Skin Medicinals' claims under the CFAA. To establish a claim under the CFAA, Skin Medicinals must show, among other things, that OptioRx accessed Skin Medicinals' website knowingly and with the intent to cause "loss." Skin Medicinals has argued before the Bankruptcy Court that its accruing litigation expenses to remedy the harm caused by OptioRx and the other defendants constitutes "loss" under the CFAA, a position that OptioRx disputes. As a result, adjudicating Skin Medicinals' CFAA claims will also require substantial consideration of federal, nonbankruptcy law. Withdrawing the reference is therefore mandatory.

4. Skin Medicinals seeks permissive withdrawal of the reference in the alternative, including because Skin Medicinals has demanded a jury trial that can only be conducted by this Court and because withdrawing the reference will promote judicial economy. Moreover, the Skin Medicinals Claims include claims against nondebtor co-defendants that one defendant has argued are non-core and cannot be finally adjudicated by the Bankruptcy Court.

**JURISDICTION**

5. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue of these proceedings in this district is proper under 28 U.S.C. §§ 1408 and 1409.

6. The bases for the relief requested herein are 28 U.S.C. § 157(d), as supplemented by Rule 5011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 5011-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

## BACKGROUND

**A. Skin Medicinals designs and launches its proprietary Web Portal.**

7. Skin Medicinals, launched in 2018 by two dermatologists, is dedicated to making dermatology medications and healthy skin more accessible. In pursuit of that goal, the company created its web portal (the "Web Portal"), an online platform that allows medical providers to prescribe, and customers to purchase, prescription oral medications, and compounded topical medications online at an affordable price through partner pharmacies.

8. Skin Medicinals' model was revolutionary within the industry. In its first four years, Skin Medicinals worked with more than 8,000 medical providers to allow more than 400,000 patients access to affordable dermatological medication. It remains the only platform of its kind in the market today. The function and design of Skin Medicinals' Web Portal and the proprietary information within it—which, together, make up the company's entire business model—derive their value from being innovative, thoughtfully designed, carefully curated, and not known to the general public or Skin Medicinals' competitors.

9. Skin Medicinals' Web Portal has two logins: one for patients and one for physicians and other licensed medical providers. Once the user has credentials to access the physician and medical provider portion of the Skin Medicinals Web Portal, the user can review Skin Medicinals' carefully crafted compounded formulations, which are designed to allow customized care for a wide variety of dermatologic needs (the "Compound List"). The formulary list includes the price of each compounded medication, along with its primary ingredients and their quantities.

10. Provider credentials also permit access to private portions of the underlying software, code, and content used to operate the physician portion of the Web Portal.

11. Skin Medicinals has taken reasonable measures to protect the proprietary information on its Web Portal, including, among other things, through the use of confidentiality

and non-disclosure agreements; strict, plain language terms and conditions expressly prohibiting users from sharing, reproducing, or reverse-engineering any materials found within the Web Portal; password protections and access monitoring; and moderation of the company's public disclosures.

**B. OptioRx unlawfully accesses the Web Portal to create a copy-cat platform.**

12. OptioRx is a brick-and-mortar compounding pharmacy chain with eighteen locations nationwide. OptioRx does not currently have a platform allowing physicians to prescribe medications online.

13. In early 2024, Ben David was named OptioRx's Chief Executive Officer. Around this time, OptioRx tasked its software developers with designing a web platform to offer compounded dermatological medications. The mandate to the developers was explicit: build a website that looks, feels, and functions like the Skin Medicinals' Web Portal.

14. Mr. David and OptioRx's Director of Engineering, Arun Suresh Kumar met on January 30, 2024. On information and belief, Mr. David and Mr. Kumar discussed their desire to build a platform that would compete with Skin Medicinals at that meeting. On information and belief, Mr. David and Mr. Kumar also discussed this plan on other, undisclosed occasions.

15. On February 19, 2024, Mr. David texted Lisa Bassett Ippolito, a nurse practitioner and chiropractor licensed in Florida, asking for a "favor." Mr. David wanted access to the password-protected, prescribers-only portion of the Skin Medicinals' Web Portal. Mr. David was not shy about the purpose of his request. As he told Ms. Ippolito, his reasons for needing prescriber credentials were simple: "I want to get in and see how it works." Ms. Ippolito was happy to oblige Mr. David and provided him with her personal credentials.

16. Armed with Ms. Ippolito's login credentials, Mr. David, or others acting at his direction, proceeded to access the Skin Medicinals' Web Portal on more than half a dozen occasions over the course of February and March 2024.

17. On March 12, someone at OptioRx used Ms. Ippolito's credentials to login to the Web Portal from an Illinois IP address and download at least four documents from the physicians-only portion of the Web Portal, including: (1) a Business Associate Agreement between Skin Medicinals and medical provider users; (2) the Compound List; (3) a document for new and prospective patients that explains how the Skin Medicinals' platform works; and (4) a Written Prescription Report.

18. All the while, OptioRx was sprinting to develop a beta version of its copy-cat website, which was attracting substantial attention from the company's investors. On March 12, for example, Mr. David told one of the investors that he expected to have a beta version of the website ready for internal review by "April end." In the same email, Mr. David revealed that OptioRx had purchased the domains "dermadrugstore.com" and "dermdrugstore.com" and begun to create mockup pages.

19. On March 14, just days after OptioRx gained illegal access to the Web Portal and downloaded Skin Medicinals' proprietary documents from the physicians-only portion of the site, Mr. David and Mr. Kumar scheduled a meeting to discuss a "Derma Website Feature matrix." Several other members of the OptioRx development team were also invited.

20. The Feature matrix in question laid out a number of "must have" and "good to have" features for OptioRx's proposed website. On information and belief, many, if not all, of the features on the matrix were drawn from the Skin Medicinals' Web Portal.

21. In addition to the matrix, Mr. David and Mr. Kumar discussed the Skin Medicinals Compound List toward the end of March. On March 28, following that discussion, Mr. Kumar

redacted the Compound List to remove Skin Medicinals' name and logo, thus concealing the fact that the document was stolen from Skin Medicinals. Mr. David then emailed the Compound List to OptioRx Operations Manager Ben Gabaie and pharmacist Payam Tizabgar for review in connection with the launch of the website. Mr. Gabaie later, on separate occasions, circulated the Compound List internally among OptioRx employees, describing the document as the "preliminary formula" for the OptioRx web portal.

22. In late March 2024—as OptioRx was about to launch its internal beta—Skin Medicinals learned from a whistleblower that someone at OptioRx was using physician credentials to log into the Skin Medicinals' Web Portal without authorization and planning to build a competing platform and undercut Skin Medicinals' costs.

23. Skin Medicinals immediately expended significant resources and time to investigate the allegations and attempt to determine what accounts were being used and by whom.

24. After concluding with confidence that Ms. Ippolito's account was the source of the incursion, and that Mr. David was the person using the login credentials to access the website, Skin Medicinals directed its counsel to send cease and desist letters to Ms. Ippolito, Mr. David, and OptioRx.

25. Based on Skin Medicinals' investigation, it is patently clear that OptioRx was engaged in widespread copying and distribution of Skin Medicinals' proprietary information and paused its rapid development of a competing platform only because its CEO was caught red-handed. The full extent of OptioRx's unlawful access to and copying of the Skin Medicinals' Web Portal remains under investigation, and Skin Medicinals expects that discovery will reveal additional evidence of copying and misappropriation.[3]

---

[3] Skin Medicinals is not the only party with claims against OptioRx and its principals for their willingness to violate the law in order to boost the bottom-line. Dr. Rinku Patel, OptioRx's former chief
(Continued . . .)

**C.     OptioRx seeks absolution through chapter 11, forcing Skin Medicinals to commence the Adversary Proceeding.**

26.     On June 7, 2024, the Debtors filed voluntary petitions in the Bankruptcy Court commencing cases for relief under the Bankruptcy Code.

27.     To avoid the harm Skin Medicinals faces as a result of OptioRx's conduct, on June 17, 2024, Skin Medicinals commenced the Adversary Proceeding against OptioRx, Mr. David, Mr. Kuresh and Ms. Ippolito in the Bankruptcy Court, alleging misappropriation of Skin Medicinals' trade secrets and violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.801 *et seq*.[4] By the Complaint, Skin Medicinals seeks injunctive relief and monetary, exemplary and punitive damages for losses sustained as a result of OptioRx's conduct, as well as pre- and post-judgment interest and attorneys' fees. Skin Medicinals also requested a temporary restraining order and a preliminary injunction to put an immediate stop to OptioRx's use of Skin Medicinals' trade secrets to develop its own competing product offerings.[5] In the Complaint, Skin Medicinals asserts its right to a jury trial.

28.     On June 20, 2024, the parties agreed to a status quo order (A.D.I. 12) (the "Status Quo Order") pending determination on the request for a preliminary injunction. The Status Quo Order temporarily restrained OptioRx from, among other things, accessing Skin Medicinals' Web Portal, launching a competing physician-based web portal, or selling compounded dermatologic medications derived from Skin Medicinals' proprietary compound list pending trial.

---

executive officer, recently filed a complaint alleging that OptioRx unlawfully terminated her employment and withheld her compensation due to her taking action to address OptioRx's ongoing regulatory violations. *See Rinku Patel, PharmD v. OptioRx, LLC, et al.*, Case No. 2024-008031 (Ill. Ct. July 22, 2024).

[4]     The allegations of the *Complaint* (A.D.I. 3, 14) are incorporated herein by reference.

[5]     *See Plaintiff Skin Medicinal LLC's Motion for Temporary Restraining Order and Preliminary Injunction* (A.D.I. 4).

29. On July 12, 2024, the Bankruptcy Court denied Skin Medicinals' request for a preliminary injunction in a bench ruling (A.D.I. 56) and entered an order to that effect on July 15, 2024 (A.D.I. 58). The Bankruptcy Court's order was subsequently vacated on appeal on August 5, 2024. *Skin Medicinals LLC v. Optio Rx, LLC, et al.*, C.A. No. 24-828 (MN) (D. Del. Aug. 8, 2024). On August 13, 2024, the Bankruptcy Court issued a supplemental ruling (the "<u>Supplemental Ruling</u>") again denying Skin Medicinals' request for a preliminary injunction (A.D.I. 80). On August 16, 2024, Skin Medicinals filed a motion to reconsider (A.D.I. 92) the Bankruptcy Court's Supplemental Ruling, which was denied by the Bankruptcy Court at a hearing on August 29, 2024. As a result of the Bankruptcy Court's Supplemental Ruling and denial of the motion for reconsideration, OptioRx is currently free to continue developing and to launch its new copy-cat platform and, on information and belief, is actively engaged in doing so.

30. On August 16, 2024, each of the defendants in the Adversary Proceeding moved to dismiss the Complaint. *See Def. OptioRx, LLC's Partial Mot. to Dismiss* (A.D.I. 86); *Defs. Ben David and Arun Suresh Kumar's Partial Mot. to Dismiss Pl.'s Compl.* (A.D.I. 88); *Def., Lisa Bassett Ippolito's, Mot. to Dismiss Compl. on Jurisdictional Grounds* (A.D.I. 90). Ms. Ippolito states in her opening brief in support of her motion to dismiss that she does not consent to the entry of final orders against her by the Bankruptcy Court. *See Def., Lisa Bassett Ippolito's, Mot. to Dismiss Compl. on Jurisdictional Grounds* 13 (A.D.I. 91). The parties have engaged in some initial discovery but have not produced documents or engaged in motions practice.

31. On July 29, 2024, the Debtors filed their *Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* (the "<u>Plan</u>") (A.D.I. 259) and *Disclosure Statement Relating to the* Joint *Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* (A.D.I. 260). The hearing for the Bankruptcy Court to consider confirmation of the Plan is currently scheduled for September 13, 2024.

32. On August 6, 2024, under compulsion of the claims bar date order entered in the Bankruptcy Cases (D.I. 104), Skin Medicinals filed its Proofs of Claim against each of the Debtors for all claims related to and arising out of OptioRx's illegal scheme.[6] In each of its Proofs of Claim, Skin Medicinals expressly stated that the proof of claim was "conditional only and is not intended, nor should it be construed, as Skin Medicinals' consent to jurisdiction in the United States Bankruptcy Court, or as a waiver of Skin Medicinals' right to a trial by jury in any action or proceeding." *See, e.g.*, Proof of Claim No. 83 Ex. A, at 2.

33. On September 3, 2024, Skin Medicinals filed its Administrative Expense Motion seeking entry of an order allowing Skin Medicinals an administrative expense for damages arising from OptioRx's unlawful, postpetition acts. In the Administrative Expense Motion, Skin Medicinals expressly reserved its rights, stating that the motion "is not intended, nor should it be construed, as Skin Medicinals' consent to jurisdiction in the United States Bankruptcy Court, or as a waiver of Skin Medicinals' right to a trial by jury in any action or proceeding." Administrative Expense Mot. at 15.

**BASIS FOR RELIEF**

34. As non-Article III courts, bankruptcy courts derive their jurisdiction from the district courts' referral of bankruptcy matters to them pursuant to 28 U.S.C. § 157(a). Section 157(a) provides that "[e]ach district court may provide that . . . any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a); *Stern v. Marshall*, 564 U.S. 462, 473-76 (2011); *Wellness Int'l. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939–40 (2015). The District Court has entered its "Amended Standing Order of Reference" providing that "any or all cases under Title 11 and any

---

[6] *See* Proof of Claim Nos. 83, 87, 89, 102, 103, 105–15, 117–21, 123–26, 128–29.

or all proceedings arising under Title 11 or arising in or related to a case under Title 11 are referred to the bankruptcy judges for this district[.]".

35. Because the Bankruptcy Court has acquired its jurisdiction over the Skin Medicinals Claims only by reference from the District Court, the reference may be withdrawn from the Bankruptcy Court on either of two separate grounds enumerated in 28 U.S.C. § 157(d):

> [(1)] The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. [(2)] The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d).

36. As more fully set forth below, withdrawing the reference is mandatory under 28 U.S.C. § 157(d) because resolution of the Skin Medicinals Claims requires substantial consideration of the federal DTSA and CFAA. Alternatively, if the Court determines that withdrawal of the reference is not mandatory, more than sufficient cause nonetheless exists for the Court to withdraw the reference.

**A. Withdrawing the reference is mandatory because resolving the Skin Medicinals Claims requires substantial consideration of the federal DTSA and CFAA.**

37. Withdrawal of the reference is required in this case because resolving the Skin Medicinals Claims requires substantial and material consideration of the federal DTSA and CFAA.

38. Withdrawing the reference is mandatory under 28 U.S.C. § 157(d) where the matter involves "substantial and material consideration of federal law outside the Bankruptcy Code[.]" *United States v. Delfasco, Inc.*, 409 B.R. 704, 707 (D. Del. 2009); *Hatzel & Buehler, Inc. v. Orange & Rockland Utils.*, 107 B.R. 34, 38 (D. Del. 1989). "Substantial and material consideration" means that the court must meaningfully consider federal nonbankruptcy law rather than engage in the "simple application" of well-settled law. *See Homeland Stores, Inc. v. Burris (In re Homeland*

*Stores, Inc.)*, 204 B.R. 427, 430 (D. Del. 1997). In determining whether withdrawal is mandatory, the court "need not evaluate the merits of the parties' positions," but rather, must merely determine that the resolution of the proceeding will necessitate substantial consideration of other federal law. *Bear, Stearns Sec. Corp. v. Gredd*, 2001 WL 840187 at *4 (S.D.N.Y. 2001); *see also Homeland Stores*, 204 B.R. at 430–31 (granting withdrawal because even though debtor only "asserted two common law claims," the "Trustees have interposed ERISA preemption as an affirmative defense to the contract claim").

39. Resolving the Skin Medicinals Claims requires substantial and material consideration of the DTSA and CFAA, thereby mandating that the reference be withdrawn. As an initial matter, the DTSA and CFAA are federal laws "regulating organizations or activities affecting interstate commerce" as required by 28 U.S.C. § 157(d). Section 1836 of the DTSA, which provides the right of a private federal civil action under the statute, provides that "an owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b). Similarly, section 1830(e) of the CFAA defines a "protected computer" as one "which is used in or affect[s] interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2). Skin Medicinals' Web Portal and related trade secrets at issue here easily meet those tests. Skin Medicinals' Web Portal is designed to allow patients to purchase dermatological compounds from Skin Medicinals' Compound List online. It is well-established in the Third Circuit that "[t]he Internet . . . is both 'an instrumentality and channel of interstate commerce.'" *United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006) (quoting *United States v. MacEwan*, 445 F.3d 237,

246 (3d Cir. 2006); *see also United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (finding that the online auction site eBay was an "avenue of interstate commerce").

40. And resolving the Skin Medicinal Claims involves substantial and material consideration of the DTSA and CFAA. First, in what appears to be a matter of first impression in this Circuit, the question of whether theft of trade secrets that occurs prior to a tortfeasor's filing for bankruptcy, but where the tortfeasor continues to use or benefit from the stolen trade secrets while in bankruptcy, constitutes a single prepetition claim or alternatively both a prepetition and postpetition claim, remains an unsettled question of federal law that requires the *interpretation* of the DTSA and not merely the straightforward *application* of facts to the elements of the cause of action. The question raised is not one only of what constitutes an administrative claim under section 503(b) of the Bankruptcy Code, but of precisely when a "misappropriation" occurs under the DTSA such that it would give rise to a "claim" under the Bankruptcy Code.

41. The case law across jurisdictions is split on the question of when DTSA claims arise. On the one hand, a line of cases has expressly held that violations of DTSA can occur both before the DTSA effective date and after, and rejected the theory that a continuing misappropriation constitutes a single claim. *See Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1348–49 (N.D. Ga. 2017) ("Instead, Plaintiff contends that Hall has violated the DTSA by misappropriating both before the DTSA effective date (acquisition) and after (use and disclosure)."); *Adams Arms, L.L.C. v. Unified Weapon Sys., Inc.*, 2016 WL 5391394 at *6 (M.D. Fla. 2016) ("At the least, this language [section 2(e) of DTSA] suggests that when an 'act' occurs after the effective date, a partial recovery is available on a misappropriation claim."); *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, 2017 WL 1105648 at *4 (E.D. Pa. 2017) (finding that "use" of another's trade secret "explicitly qualifies as an act of misappropriation" under DTSA and such "acts" constitute continuing misappropriations); *see also*

*Attia v. Google L.L.C.*, 983 F.3d 420, 424–25 (9th Cir. 2020) ("While the DTSA states that 'a continuing misappropriation constitutes a single claim of misappropriation,' it does so only in the context of the limitations period for claims pursuant to the DTSA."). Further, it also appears to be an unsettled question as to whether one would be permitted only a partial recovery or a full recovery for illegal conduct that occurred both before and after the statute's effective date. *See Sonoma Pharms., Inc. v. Collidion Inc.*, 2018 WL 3398940 at *5 (N.D. Cal. 2018) (citing *Adams Arms*, 2016 WL 5391394 at *6 n.1).

42. On the other hand, an alternate line of cases has held to the contrary. *See Arrivia Inc. v. Rowley*, 2023 WL 7386384 at *4–6 (D. Ariz. 2023) (holding that continued use and disclosure of trade secrets after an initial misappropriation constitute single claim); *iBall Instruments, L.L.C. v. Butler*, 2024 WL 3642195 at *6–8 (W.D. Okla. 2024) (citing *B&P Littleford, L.L.C. v. Prescott Machinery, L.L.C.*, 2021 WL 3732313 at *6 (6th Cir. 2021)) (holding that "single claim theory" applies not only to the state law Uniform Trade Secrets Act ("UTSA") but also DTSA, which is modeled on the UTSA).

43. Thus, the state of the law on this issue is far from "well-settled" such that the Bankruptcy Court would be required to perform merely a "simple application" of the trade secrets law to the facts of this case. The DTSA was only enacted in 2016, there is no controlling precedent on this issue in the Third Circuit, and as discussed above, there is a clear split in the case law as to whether continuing misappropriation of trade secrets constitutes a single or multiple "claims" under the DTSA. Further, there appears to be no case law that has dealt with evaluating when a DTSA claim for a continuing misappropriation accrues in the specific context of section 503(b) of the Bankruptcy Code and the pre- and postpetition periods created by a chapter 11 bankruptcy filing.

44. Second, there is also a split in the case law regarding what constitutes a "loss" under the CFAA, requiring substantial consideration of the CFAA. This provides an independent basis for mandatory withdrawal of the reference under section 157(d). *See Hatzel & Buehler, Inc. v. Orange & Rockland Utils.*, 107 B.R. 34, 38–39 (D. Del. 1989) (discussing substantial and material consideration of nonbankruptcy federal law in terms of the resolution of the underlying adversary *proceeding*, rather than independent *causes of action* or *counts*); *United States v. Delfasco, Inc.*, 409 B.R. 704, 707 (D. Del. 2009) (same); *Homeland Stores, Inc. v. Burris (In re Homeland Stores, Inc.)*, 204 B.R. 427, 431–32 (D. Del. 1997) (discussing several different possible substantial and material issues of nonbankruptcy federal law present in several of the counts brought in the adversary proceeding's complaint, but not requiring such an issue be present for each and every count).

45. "Loss" under the CFAA is defined as "any reasonable cost to any victim, *including the cost of responding to an offense, conducting a damage assessment*, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]" 18 U.S.C. § 1030(e)(11) (emphasis added). Many courts recognize, as Skin Medicinals argues, that "loss" includes attorneys' fees and litigation costs. *NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1065–66 (S.D. Iowa 2009); *see also 2008 River Walck Saloon v. Beard*, 2017 WL 4453557 at *3 (M.D. Pa. Sept. 8, 2017*), report and recommendation adopted*, 2017 WL 4435254 (M.D. Pa. Oct. 5, 2017); *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 778 (N.D. Cal. 2017) ("[A]ttorney's fees and investigation and enforcement costs . . . are compensable [under CFAA] as long as those costs were reasonably incurred responding to the offense."), *aff'd*, 749 Fed. Appx. 557 (9th Cir. 2018); *Estes Forwarding Worldwide L.L.C. v. Cuellar*, 239 F. Supp. 3d 918, 927–28 (E.D. Va. 2017).

46. Some courts, however, have determined that litigation expenses, including attorneys' fees, do not fall within the definition of "loss" under the CFAA. *See Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1071–72 (D. Ariz. 2015) ("such [litigation expenses] are not a cognizable loss under the CFAA"); *see also Brooks v. AM Resorts, L.L.C.*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) ("fees paid to an expert to assist in litigation" do not constitute a "loss" under CFAA); *First Mortg. Corp. v. Baser*, 2008 WL 4534124 at *3 (N.D. Ill. Apr. 30, 2008) ("costs unrelated to the computer itself, such as litigation expenses or speculative future damages do not qualify.").

47. In addition to the other damages suffered by Skin Medicinals, the mounting litigation costs are substantial and form a critical component of Skin Medicinals' CFAA claims. As with the DTSA claims, determination of the scope of "loss" under the CFAA will require substantial and material consideration of federal law. Accordingly, withdrawal of the reference is mandatory under 28 U.S.C. § 157(d).

**B.    In the alternative, sufficient cause exists for the Court to withdraw the reference.**

48. Even if withdrawal of the reference were not mandatory, there is good cause for the Court to withdraw the reference under section 157(d)'s first sentence. Courts have "broad discretion in determining whether to withdraw a matter from the bankruptcy court." *Enviro-Scope Corp. v. Westinghouse Elec. Corp. (In re Enviro-Scope Corp.)*, 57 B.R. 1005, 1008 (E.D. Pa 1985).

49. The statute does not define "cause shown," but this Court has identified a number of factors to be considered, including whether a jury trial is sought. *See Alameda Research Ventures L.L.C. v. Kives (In re FTX Trading Ltd.)*, 2024 WL 21542 at *2 (D. Del. Jan. 2, 2024); *see also Michaelson v. Golden Gate Private Equity, Inc. (In re Appleseed's Intermediate Holdings, LLC)*, 2011 WL 6293251 at *2 (D. Del. Dec. 15, 2011) (relevant "is whether defendants are entitled to a jury trial, and if so, whether the trial is likely and whether the bankruptcy court has

the power to hold such a jury trial"). This Court also considers factors listed in *In re Pruitt*, 910 F.2d 1160 (3d Cir. 1990): "promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *Appleseed's*, 2011 WL 6293251 at *2 (quoting *Pruitt*, 910 F.2d at 1168). Permissive withdrawal also includes considerations of judicial economy and the nature of the proceedings—that is, whether the proceedings are core or non-core. *See Hatzel & Buehler, Inc. v. Orange & Rockland Utils.*, 107 B.R. 34, 39 (D. Del. 1989). Each of the foregoing factors weigh in favor of withdrawal of the reference.

50. First, Skin Medicinals has demanded and is entitled to a jury trial for the claims it asserts in the Adversary Proceeding. This Court has explained that this factor is "important" because absent the consent of the parties and special designation of jurisdiction, the bankruptcy court may not hold a jury trial. *See NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 908 (D. Del. 1996); *see also In re Visteon Corp.,* 2011 WL 1791302 at *4 (D. Del. May 9, 2011) (sufficient cause for permissive withdrawal existed where claim involved state law and party had expressed intention to seek jury trial); *Troisio v. Poirier (In re U.S.A. Floral Prods., Inc.)*, 2005 WL 3657096 at *2 (D. Del. July 1, 2005) ("Because it is essentially conceded that Defendants are entitled to a jury trial, it will likely be more efficient for this court to manage the case through the pretrial process."); *accord Taxel v. Elec. Sports Rsch. (In re Cinematronics, Inc.)*, 916 F.2d 1444, 1451 (9th Cir. 1990) (observing that "grave Seventh Amendment problems would arise if a jury trial is conducted by the bankruptcy court, because section 157(c)(1) requires *de novo* review by the district court of noncore matters").

51. Second, the claims asserted by Skin Medicinals against the nondebtor defendants are non-core claims over which the Court does not have authority to enter a final order. A claim is "core" under section 157(b)(1) of title 28 "if it invokes a substantive right provided by title 11

or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *In re G-I Holdings, Inc.*, 580 B.R. 388, 415–16 (Bankr. D.N.J. 2018) (citation omitted). Neither of these elements is present here. Skin Medicinals asserts against the nondebtor defendants in the Adversary Proceeding claims under the DTSA, CFAA, and various state law causes of action, including fraudulent misrepresentation, breach of contract, and civil conspiracy. None of these claims against the nondebtor defendants invoke a substantive right provided by the Bankruptcy Code or could arise only in the context of the Debtors' chapter 11 cases. Rather, each of these claims are created by nonbankruptcy law and could arise outside of bankruptcy. Because the claims against the nondebtor defendants are non-core, the Bankruptcy Court lacks the statutory authority to enter a final judgment on those claims. Indeed, Ms. Ippolito has expressly stated in her motion to dismiss the Complaint in the Adversary Proceeding that she does not consent to entry of final orders by the Bankruptcy Court. *See Def., Lisa Bassett Ippolito's, Mot. to Dismiss Compl. on Jurisdictional Grounds* 13 (A.D.I. 91).

52. In light of Skin Medicinals' jury trial right and the presence of non-core claims, withdrawal of the reference furthers judicial economy, will reduce the expenditure of resources by the parties and will expedite the bankruptcy process. Absent withdrawal of the reference, the parties will be required to expend their resources to litigate in front of the Bankruptcy Court, which does not have authority to hold a jury trial. Even if the Bankruptcy Court were to override Skin Medicinals' jury trial rights, moreover, the Bankruptcy Court could not enter final judgment on the non-core claims asserted in the Complaint and could only offer proposed findings of fact and conclusions of law under Bankruptcy Rule 9033. Such a process is not only inefficient, placing an unwarranted burden on both the Bankruptcy Court and this Court, but it would also risk prejudicing Skin Medicinals, since this Court would need to make critical factual determinations

on a cold record, without observing the witnesses to evaluate credibility. Accordingly, there is good cause to withdraw the refence under 28 U.S.C. § 157(d).

## CONCLUSION

WHEREFORE, Skin Medicinals respectfully requests that this Court (i) grant this Motion and the relief requested herein and (ii) grant such other and further relief as it deems appropriate.

Dated: September 3, 2024

>
> Respectfully submitted,
>
> */s/ Matthew O. Talmo*
> Matthew B. Harvey (No. 5186)
> Matthew O. Talmo (No. 6333)
> MORRIS NICHOLS ARSHT &
> TUNNELL LLP
> 1201 North Market Street, 16th Floor
> P.O. Box 1347
> Wilmington, Delaware 19899-1347
> Telephone: (302) 658-9200
> Facsimile: (302) 658-3989
> E-mail: mharvey@morrisnichols.com
>       mtalmo@morrisnichols.com
>
> -and-
>
> Howard Kaplan
> Jed W. Glickstein
> Annie Garau Kelly
> KAPLAN & GRADY LLC
> 2071 N. Southport Ave., Ste. 205
> Chicago, IL 60614
> (312) 852-2641
> howard@kaplangrady.com
> jglickstein@kaplangrady.com
> annie@kaplangrady.com