**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>OPTIO RX, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11188 (TMH)<br><br>(Jointly Administered)<br><br>**Hearing Date: TBD**<br><br>**Obj. Deadline: TBD** |

**MOTION OF SKIN MEDICINALS LLC FOR ENTRY OF AN ORDER**
**GRANTING AN ALLOWED ADMINISTRATIVE EXPENSE PURSUANT**
**TO SECTION 503(b) OF THE BANKRUPTCY CODE**

Skin Medicinals LLC ("Skin Medicinals"), a creditor of Optio Rx, LLC ("OptioRx") and

its affiliated debtors and debtors in possession (collectively with OptioRx, the "Debtors"), by and

through its undersigned counsel, hereby moves (this "Motion") as follows:

**RELIEF REQUESTED**

1.      Skin Medicinals files this Motion to assert and protect its right to recover as

administrative expenses any damages awarded in its pending adversary proceeding captioned *Skin*

*Medicinals LLC v. Optio Rx, LLC, et al.*, Adv. No. 24-50079 (TMH) (the "Adversary Proceeding")

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061.

that occurred after the Debtors filed for chapter 11 bankruptcy.  As further detailed in the Adversary Proceeding and below, Skin Medicinals asserts that the Debtors unlawfully accessed Skin Medicinals' web portal, misappropriated Skin Medicinals' trade secrets, and are currently using the misappropriated information to develop their own competing web portal and product lines.  Liability and damages—and the apportionment of those damages between prepetition, postpetition, and post-bankruptcy periods—will be determined at trial.  This Motion is filed to put the Debtors on notice of, and preserve, Skin Medicinals' right to administrative expense priority status for some or all the damages awarded at trial.  *See Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 237 (3d Cir. 2021) (claimant asserting an administrative expense may file a protective claim to preserve its rights and put the debtor on notice).[2]

**PRELIMINARY STATEMENT**

2.      Skin Medicinals operates an online health platform (the "Web Portal") through which physicians with personal login credentials can prescribe, and patients can receive, affordable and customized oral and topical medications for skin conditions.  Skin Medicinals' Web Portal was the first of its kind in the industry.  Skin Medicinals poured significant sums, countless hours, and its dermatologist founders' expertise into the business, including through design of the website and workflows, development of the associated code and software, and the creation of a proprietary compound list based on market research, prescriber input, and analysis.

---

[2]    Contemporaneously with filing this Motion, Skin Medicinals is filing a motion to withdraw the reference (the "Motion to Withdraw"), seeking mandatory or, in the alternative, permissive withdrawal of the reference of all proceedings related to Skin Medicinals' claims and causes of action against the Debtors, including the administrative expense asserted by this Motion.  Skin Medicinals does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment with respect to this Motion consistent with Article III of the United States Constitution.

3.       In March 2024, Skin Medicinals learned from an OptioRx whistleblower that OptioRx's new CEO, Ben David, and Director of Engineering, Arun Suresh Kumar, were using fraudulently obtained physician login credentials to access Skin Medicinals' Web Portal.  The purpose of OptioRx's unlawful access is to create and launch a copy-cat web portal relying on Skin Medicinals' trade secrets.  Indeed, OptioRx has repeatedly admitted that it intends to develop an online platform that operates in the same manner as the Web Portal.

4.       OptioRx should not be permitted to weaponize these chapter 11 cases to steal Skin Medicinals' trade secrets and then absolve itself and its principals of their unlawful conduct, while leaving Skin Medicinals with no meaningful relief.  For nearly six decades, Supreme Court precedent has recognized that basic principles of fairness require that damages arising from a debtor's postpetition, tortious conduct be treated as administrative expenses that must be paid.  Without question, the continued postpetition development and planned launch and use of OptioRx's new platform, developed using Skin Medicinals' misappropriated trade secrets obtained through unlawful access of Skin Medicinals' web-based platform, constitute ongoing postpetition tortious acts benefitting the Debtors and harming Skim Medicinals.  The resulting damages therefore must be granted administrative expense priority.

### BACKGROUND

**A.       Skin Medicinals designs and launches its proprietary Web Portal.**

5.       Skin Medicinals, launched in 2018 by two dermatologists, is dedicated to making dermatology medications and healthy skin more accessible.  In pursuit of that goal, the company created its Web Portal, an online platform that allows medical providers to prescribe, and

customers to purchase, prescription oral medications, and compounded topical medications online at an affordable price through partner pharmacies.

6.      Skin Medicinals' model was revolutionary within the industry.  In its first four years, Skin Medicinals worked with more than 8,000 medical providers to allow more than 400,000 patients access to affordable dermatological medication.  The function and design of Skin Medicinals' Web Portal and the information within it derive their value from being innovative, thoughtfully designed, carefully curated, and not known to the general public or Skin Medicinals' competitors.

7.      Skin Medicinals' Web Portal has two logins: one for patients and one for physicians and other licensed medical providers.  Once the user has credentials to access the physician and medical provider portion of the Skin Medicinals' Web Portal, the user can review Skin Medicinals' carefully crafted compounded formulations, which are designed to allow customized care for a wide variety of dermatologic needs (the "Compound List").  The formulary list includes the price of each compounded medication, along with its primary ingredients and their quantities.

8.      Provider credentials also permit access to private portions of the underlying software, code, and content used to operate the physician portion of the Web Portal.

9.      Skin Medicinals has taken reasonable measures to protect the information on its Web Portal, including, among other things, through the use of confidentiality and non-disclosure agreements; strict, plain language terms and conditions expressly prohibiting users from sharing, reproducing, or reverse-engineering any materials found within the Web Portal; password protections and access monitoring; and moderation of the company's public disclosures.

**B.      OptioRx unlawfully accesses the Web Portal to create a copy-cat platform.**

10.      OptioRx is a brick-and-mortar compounding pharmacy chain with eighteen locations nationwide.  OptioRx does not currently have a platform allowing physicians to prescribe medications online.

11.      In early 2024, Ben David was named OptioRx's Chief Executive Officer.  Around this time, OptioRx tasked its software developers with designing a web platform to offer compounded dermatological medications.  The mandate to the developers was explicit: build a website that looks, feels, and functions like the Skin Medicinals' Web Portal.

12.      Mr. David and OptioRx's Director of Engineering, Arun Suresh Kumar met on January 30, 2024.  On information and belief, Mr. David and Mr. Kumar discussed their desire to build a platform that would compete with Skin Medicinals at that meeting.  On information and belief, Mr. David and Mr. Kumar also discussed this plan on other, undisclosed occasions.

13.      On February 19, 2024, Mr. David texted Lisa Bassett Ippolito, a nurse practitioner and chiropractor licensed in Florida, asking for a "favor."  Mr. David wanted access to the password-protected, prescribers-only portion of the Skin Medicinals' Web Portal. Mr. David was not shy about the purpose of his request.  As he told Ms. Ippolito, his reasons for needing prescriber credentials were simple: "I want to get in and see how it works."  Ms. Ippolito was happy to oblige Mr. David and provided him with her personal credentials.

14.      Armed with Ms. Ippolito's login credentials, Mr. David, or others acting at his direction, proceeded to access the Skin Medicinals' Web Portal on more than half a dozen occasions over the course of February and March 2024.

15.      On March 12, someone at OptioRx used Ms. Ippolito's credentials to login to the Web Portal from an Illinois IP address and download at least four documents from the physicians-only portion of the Web Portal, including: (1) a Business Associate Agreement between Skin

Medicinals and medical provider users; (2) the Compound List; (3) a document for new and prospective patients that explains how the Skin Medicinals platform works; and (4) a Written Prescription Report.

16.     All the while, OptioRx was sprinting to develop a beta version of its copy-cat website, which was attracting substantial attention from the company's investors.  On March 12, for example, Mr. David told one of the investors that he expected to have a beta version of the website ready for internal review by "April end."  In the same email, Mr. David revealed that OptioRx had purchased the domains "dermadrugstore.com" and "dermdrugstore.com" and begun to create mockup pages.

17.     On March 14, just days after OptioRx gained illegal access to the Web Platform and downloaded proprietary Skin Medicinals documents from the physicians-only portion of the site, Mr. David and Mr. Kumar scheduled a meeting to discuss a "Derma Website Feature matrix." Several other members of the OptioRx development team were also invited.

18.     The Feature matrix in question laid out a number of "must have" and "good to have" features for OptioRx's proposed website.  On information and belief, many, if not all, of the features on the matrix were drawn from the Skin Medicinals' Web Portal.

19.     In addition to the matrix, Mr. David and Mr. Kumar discussed the Skin Medicinals' Compound List toward the end of March.  On March 28, following that discussion, Mr. Kumar redacted the Compound List to remove Skin Medicinals' name and logo, thus concealing the fact that the document was stolen from Skin Medicinals.  Mr. David then emailed the Compound List to OptioRx Operations Manager Ben Gabaie and pharmacist Payam Tizabgar for review in connection with the launch of the website.  Mr. Gabaie later, on separate occasions, circulated the

Compound List internally among OptioRx employees, describing the document as the "preliminary formula" for the OptioRx web portal.

20.     In late March 2024—as OptioRx was about to launch its internal beta—Skin Medicinals learned from a whistleblower that someone at OptioRx was using physician credentials to login into the Skin Medicinals' Web Portal without authorization and planning to build a competing platform and undercut Skin Medicinals' costs.

21.     Skin Medicinals immediately expended significant resources and time to investigate the allegations and attempt to determine what accounts were being used and by whom.

22.     After concluding with confidence that Ms. Ippolito's account was the source of the incursion, and that Mr. David was the person using the login credentials to access the website, Skin Medicinals directed its counsel to send cease and desist letters to Ms. Ippolito, Mr. David, and OptioRx.

23.     Based on Skin Medicinals' investigation, it is patently clear that OptioRx was engaged in widespread copying and distribution of Skin Medicinals' proprietary information and paused its rapid development of a competing platform only because its CEO was caught red-handed.  The full extent of OptioRx's unlawful access to and copying of the Skin Medicinals Web Portal remains under investigation, and Skin Medicinals expects that discovery will reveal additional evidence of copying and misappropriation.[3]

---

[3]   Notably, Skin Medicinals is not the only party with claims against OptioRx and its principals for their willingness to violate the law in order to boost the bottom-line.  Dr. Rinku Patel, OptioRx's former chief executive officer, recently filed a complaint alleging that OptioRx unlawfully terminated her employment and withheld her compensation due to her taking action to address OptioRx's ongoing regulatory violations. *Rinku Patel, PharmD v. OptioRx, LLC, et al.*, Case No. 2024-008031 (Ill. Ct. July 22, 2024).

**C.    OptioRx seeks absolution through chapter 11, forcing Skin Medicinals to commence the Adversary Proceeding.**

24.    On June 7, 2024 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under the Bankruptcy Code.

25.    To avoid the harm Skin Medicinals faces as a result of OptioRx's conduct, on June 17, 2024, Skin Medicinals commenced the Adversary Proceeding against OptioRx, Mr. David, Mr. Kuresh and Ms. Ippolito in this Court, alleging misappropriation of Skin Medicinals' trade secrets and violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.801 *et seq*. ("CADRA").[4] By the Complaint, Skin Medicinals seeks injunctive relief and monetary, exemplary and punitive damages for losses sustained as a result of OptioRx's conduct, as well as pre- and post-judgment interest and attorneys' fees.[5]  Skin Medicinals also requested a temporary restraining order and a preliminary injunction to put an immediate stop to OptioRx's use of Skin Medicinals' trade secrets to develop its own competing product offerings.[6]

26.    On June 20, 2024, the parties agreed to a status quo order (A.D.I. 12) (the "Status Quo Order") pending determination on the request for a preliminary injunction.  The Status Quo Order temporarily restrained OptioRx from, among other things, accessing Skin Medicinals' website, launching a competing physician-based web portal, or selling compounded dermatologic medications derived from Skin Medicinals' proprietary compound list pending trial.

---

[4]    The allegations of the *Complaint* (D.I. 14) are incorporated herein by reference *See Complaint* (A.D.I. 3).

[5]    Under compulsion of the claims bar date order entered in these cases (D.I. 104), Skin Medicinals also timely filed proofs of claims against each of the Debtors (Proof of Claim Nos. 83, 87, 89, 102, 103, 105–15, 117–21, 123–26, 128–29).

[6]    *See Plaintiff Skin Medicinal LLC's Motion for Temporary Restraining Order and Preliminary Injunction* (A.D.I. 4).

27.    On July 12, 2024, the Court denied Skin Medicinals' request for a preliminary injunction in a bench ruling (A.D.I. 56) and entered an order to that effect on July 15, 2024 (A.D.I. 58).  The Court's order was subsequently vacated on appeal on August 5, 2024.  *Skin Medicinals LLC v. Optio Rx, LLC, et al.*, C.A. No. 24-828 (MN) (D. Del. Aug. 8, 2024).  On August 13, 2024, the Court issued a supplemental ruling (the "Supplemental Ruling") again denying Skin Medicinals' request for a preliminary injunction (A.D.I. 80).

28.    On August 16, 2024, Skin Medicinals filed a motion to reconsider (A.D.I. 92) the Court's Supplemental Ruling, which the Court denied at the hearing on August 29, 2024. As a result of the Court's Supplemental Ruling and the denial of the motion to reconsider, OptioRx is currently free to continue developing and to launch its new copy-cat platform and, on information and belief, is actively engaged in doing so.

29.    On July 29, 2024, the Debtors filed their *Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* (the "Plan") (A.D.I. 259) and *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* (the "Disclosure Statement") (A.D.I. 260).  The hearing for the Court to consider confirmation of the Plan is currently scheduled for September 13, 2024.

**BASIS FOR RELIEF**

30.    Skin Medicinals is entitled to an allowed administrative expense for damages arising from or related to OptioRx's postpetition access to and use of Skin Medicinals' trade secrets under the Supreme Court's holding in *Reading Co. v. Brown,* 391 U.S. 471 (1968).  Under the so-called *Reading* doctrine, "a postpetition tort committed by a debtor-in-possession within the course and scope of its continued operation of the estate's business may, itself, be considered a cost of doing business and is, therefore, entitled to administrative expense priority under section

503(b)(1)(A)." *In re Mallinckrodt PLC*, 2021 WL 4876908, at *3 (Bankr. D. Del. Oct. 19, 2021) (Dorsey, J.) (internal citation and quotation omitted).  The *Reading* doctrine allows administrative expense priority for damages from claims arising from a post-petition tort committed by the debtor—even if the debtor's actions have no discernable benefit to the estate.  *See id.* (*citing In re Philadelphia Newspapers, L.L.C.*, 690 F.3d 161, 173 (3d Cir. 2012), as corrected (Oct. 25, 2012)).

31.     In *Reading*, victims of property loss asserted administrative expenses against the debtor arising from the destruction of their property due to a fire allegedly caused by the trustee's negligence.  *See Reading*, 391 U.S. at 473.  The trustee moved to expunge the claims, arguing that they were not entitled to administrative expense priority, an argument accepted by the lower courts. *Id.* at 474.  The Supreme Court reversed, explaining that the fundamental statutory objective of "fairness" in bankruptcy requires that claims arising from postpetition tortious conduct by the trustee or debtor in possession be treated as administrative expenses.  *Id.* at 475–77.  Accordingly, the Supreme Court interpreted the phrase "actual and necessary costs" used in section 64a of the Bankruptcy Act—language which now appears in section 503(b) of the Bankruptcy Code—to include damages arising from a trustee's tortious conduct as "costs ordinarily incident to operation of a business."  *Id.* at 483.  As a result, the Supreme Court held that the damages resulting from the negligence of the trustee were entitled to administrative expense priority.  *Id.* at 485.

32.     In *Reading*, the Supreme Court eschewed the traditional requirements for administrative expenses—postpetition transaction and benefit to the estate—when it comes to torts committed by the trustee or debtor in possession.

33.     This Court has consistently followed *Reading* to provide administrative expense priority to damages claims resulting from postpetition torts committed by the debtor.  *See, e.g.*, *Mallinckrodt*, 2021 WL 4876908, at *3-4 (Bankr. D. Del. Oct. 19, 2021) (Dorsey, J.)

(discussed *infra*); *In re Promise Healthcare Grp., L.L.C.* 2021 WL 4528461, at *1 (Bankr. D. Del. Oct. 4, 2021) (Goldblatt, J.) (patient held administrative expense under *Reading* for alleged injuries resulting from debtors' postpetition negligent operation of hospital); *In re Lucky's Mkt. Parent Co.*, 2021 WL 1100066, at *12 (Bankr. D. Del. Mar. 17, 2021) (Dorsey, J.) (stating that damages resulting from post-petition torts committed by debtor are entitled to administrative priority); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del. 2006) (Walrath, J.) (finding that debtor had converted lessor's property postpetition by stripping parts from [lessor's] equipment for use in debtor's equipment, giving rise to an administrative expense); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 123 (Bankr. D. Del. 2005) (Walrath, J.) (stating that postpetition tort can create an administrative expense).

34.     Moreover, a claimant may be entitled to an allowed administrative expense even where the unlawful or tortious conduct began prepetition.  Judge Dorsey's ruling in *Mallinckrodt* is instructive.  *In re Mallinckrodt PLC, et al.*, 2021 WL 4876908 (Bankr. D. Del. Oct. 19, 2021).  In *Mallinckrodt*, a group of health insurers asserted an administrative expense for alleged antitrust violations committed by the debtor, culminating in the debtor charging a supracompetitive price for a drug called Acthar.  *Id.* at *1.  The insurers argued that their damages—representing the difference between the price they paid for Acthar postpetition and what an actual but for market price would be absent the debtor's conduct—constituted administrative expenses.  *Id.* at *3.

35.     In response, the debtor moved for summary judgment, arguing that the insurers could not have an administrative expense because the debtor ceased any alleged anticompetitive conduct prepetition.  *Id.* at *5.  Any alleged overpayment postpetition, the debtor argued, was merely a "ripple effect" of the debtor's prior unlawful prepetition act that did not represent new antitrust injuries but instead continuing injuries.  *Id.*  Judge Dorsey rejected the debtor's argument

and denied the debtor's request for summary judgment, ruling that claims based on the debtor's postpetition sale of the prescription drug "arose after the petition date and are thus post-petition claims" and could therefore be entitled to administrative expense priority under *Reading*, even if the alleged unlawful conduct enabling the supracompetitive pricing ceased prepetition. *Id.* at 8.

36.     *Mallinckrodt* is consistent with other courts holding even if a claim originates from prepetition tortious conduct, a claimant may be entitled administrative expense priority based on continuing harm that occurs postpetition.  For example, in *In re Charlesbank Laundry*, 755 F.2d 200, 201–02 (1st Cir. 1985), the First Circuit found that although the debtor's wrongful behavior giving rise to a compensatory fine commenced prepetition, the claimant had an allowable administrative expense for fines accruing postpetition under *Reading* as a result of the debtor's postpetition failure to cease the conduct that began prepetition.  *See id.* at 202-03 ("The debtor in this case *deliberately* continued a violation of law month after month presumably because it was more lucrative for the business to operate outside [applicable law].").

37.     Skin Medicinals has an allowable administrative expense claim under *Reading* and its progeny.  To be sure, the Debtors' initial theft of Skin Medicinals' trade secrets and unlawful access to the Web Portal occurred prepetition.  But, as Skin Medicinals expects discovery in the Adversary Proceeding will show, the Debtors are continuing to use and rely on the trade secrets they misappropriated from Skin Medicinals in their ongoing postpetition development and planned launch of their competing website.  And claims for OptioRx's postpetition use or disclosure of Skin Medicinals' trade secrets, or unlawful access to the Web Portal, constitute postpetition torts that are entitled to administrative expense priority status under bankruptcy and applicable trade secrets law.

38.     Trade secret misappropriation is defined broadly under the federal Defend Trade Secrets Act (the "<u>DTSA</u>") and Illinois law to include the unauthorized acquisition, disclosure, or use of a trade secret.  *See Oakwood Labs L.L.C. v. Thanoo*, <u>999 F.3d 892, 904</u> (3d Cir. 2021) (stating that misappropriation is defined "broadly as the knowing improper acquisition, *or use or disclosure* of the secret."); *J.S.T. Corp. v. Foxconn Interconnect Tech.*, <u>965 F.3d 571, 576</u> (7th Cir. 2020) (stating that misappropriation is the "unauthorized acquisition, disclosure, or use of a trade secret"); *see also Brand Energy & Infrastructure Servs.., Inc. v. Irex Contracting Grp.*, <u>2017 WL 1105648</u> (E.D. Pa. 2017) ("The 'use' of another's trade secret 'explicitly qualifies as an act of misappropriation under the DTSA.'").  Moreover, the Third Circuit has held that "use" encompasses a broad range of activity not limited to replication, which includes "assist[ing] or accelerat[ing] research or development." *Oakwood Labs.*, <u>999 F.3d at 910</u> (internal citations omitted).

39.     Plus, courts have expressly held that continuing violations of the DTSA give rise to new claims, rejecting the theory that misappropriation constitutes a single claim. *See Agilysys, Inc. v. Hall*, <u>258 F.Supp.3d 1331, 1348</u>–49 (N.D. Ga. 2017) (rejecting the argument that a continuing misappropriation of a trade secret constitutes a single claim); *Adams Arms, L.L.C. v. Unified Weapon Sys., Inc.*, <u>2016 WL 5391394</u> at *6 (M.D. Fla. 2016) (same); *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, <u>2017 WL 1105648</u> (E.D. Pa. 2017) (same); *see also Attia v. Google L.L.C.*, <u>983 F.3d 420, 424</u>–25 (9th Cir. 2020) ("While the DTSA states that 'a continuing misappropriation constitutes a single claim of misappropriation,' it does so only in the context of the limitations period for claims pursuant to the DTSA.").[7]

---

[7]    As explained in the Motion to Withdraw, certain courts have held to the contrary. Mot. To. Withdraw at 14.

13

40.     Therefore, the Debtors' continued use or disclosure of Skin Medicinals' trade secrets to create their competing platform gives rise to new claims for misappropriation under both Illinois law and the DTSA, which are entitled to administrative expense status under *Reading*.

41.     Finally, to allow the Debtors to unlawfully access and misappropriate a competitor's trade secrets and then promptly file for bankruptcy to escape any liability to the victim would clearly violate the fairness considerations underlying the Supreme Court's *Reading* decision.  *See Reading*, 391 U.S. at 477.  Such obvious bad faith use of the bankruptcy laws cannot be permitted.  As Judge Dorsey explained in *Mallinckrodt*:

> The "fresh start" provided by the Bankruptcy Code cannot be both a sword and a shield.  The Debtors made the decision to wield the sword when they filed for bankruptcy in order to escape the crushing volume of litigation they faced.  But they also decided to continue, post-petition, to sell Acthar at the prepetition price despite the allegations of that price violating antitrust law, because the high price was needed to fund the bankruptcy . . . The policy of the "fresh start" does not give a debtor immunity to continue to violate the law at the expense of captive creditors who have no alternative but to pay the Debtors' high price.

2021 WL 4876908, at *11.  The same is true here.  OptioRx bases its business pivot, and thus reorganization, around launching a new website to offer dermatological compounds online. It has insisted on proceeding with the launch and development of a dermatology web vertical and opposed extension of the status quo order that governed temporarily at the start of the bankruptcy proceeding.  To the extent OptioRx is continuing to benefit from trade secrets misappropriated from captive, involuntary creditor Skin Medicinals, OptioRx cannot be granted immunity and must instead be made to pay Skin Medicinals' damages as an allowed administrative expense.

42.     In sum, Skin Medicinals has suffered harm due to Optio's unlawful conduct.  The Debtors continue to benefit from the postpetition unlawful use and disclosure of Skin Medicinals' trade secrets to guide, accelerate, and otherwise aid the development of a competing OptioRx web

platform. Therefore, Skin Medicinals' claims arising out of OptioRx's postpetition misconduct should be afforded administrative expense priority pursuant to section 503(b) of the Bankruptcy Code and *Reading*.

## RESERVATION OF RIGHTS

43.     The filing of this Motion shall not be construed as a waiver or release of any of Skin Medicinals' claims, rights, or remedies. Furthermore, the filing of this Motion is not intended, nor should it be construed, as Skin Medicinals' consent to jurisdiction in the United States Bankruptcy Court, or as a waiver of Skin Medicinals' right to a trial by jury in any action or proceeding. Skin Medicinals reserves the right to supplement or amend this Motion in any manner and for any purpose including without limitation to assert additional administrative expenses for any period.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Skin Medicinals respectfully requests that the Court enter an order, (a) allowing Skin Medicinals an allowed administrative expense in an amount to be determined following adjudication of its claims subject to the Adversary Proceeding, and (b) granting such other and further relief as is just and proper under the circumstances.

Dated: September 3, 2024

Respectfully submitted,

*/s/ Matthew O. Talmo*
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
MORRIS NICHOLS ARSHT &
TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
E-mail: mharvey@morrisnichols.com
          mtalmo@morrisnichols.com

-and-

Howard Kaplan
Jed W. Glickstein
Annie Garau Kelly
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
(312) 852-2641
howard@kaplangrady.com
jglickstein@kaplangrady.com
annie@kaplangrady.com