## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (Jointly Administered) |

## DECLARATION OF GARY LEMBO IN SUPPORT OF
## CONFIRMATION OF SECOND AMENDED JOINT PLAN OF
## REORGANIZATION OF OPTIO RX, LLC, ET AL.

I, Gary Lembo, hereby declare (this "**Declaration**") under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1.  I am a Partner at Paladin Management Group, LLC ("**Paladin**"), the financial advisor to the above debtors and debtors-in-possession (the "**Debtors**") in the above captioned chapter 11 cases (the "**Chapter 11 Cases**").  I am authorized to submit this Declaration and am competent to testify to the matters contained herein.

2.  I have over 8 years of experience in providing financial advisory, restructuring and turnaround services and have advised companies, lenders, creditors, corporate boards and equity sponsors across a diverse range of industries both domestically and internationally.  I have assisted clients both in and outside of chapter 11, designed and evaluated financing packages and

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60062.

presentations to various types of lenders and equity investors, and acted as financial advisor to boards of directors, principal shareholders or other stakeholders in the purchase, sale or wind-down of businesses. I have led over five large-scale engagements and have assumed interim executive roles, including serving as a Chief Restructuring Officer in two assignments.

3.     Effective as of the Petition Date, Paladin was retained by the Company as restructuring financial advisor to provide certain advisory services in connection with the Company's ongoing evaluation, development and implementation of strategic alternatives to address its financial performance and capital structure. Since Paladin's retention, our team has provided strategic and financial advisory services to the Company's management team in concert with the other advisors retained by the Company in connection with preparing for the Chapter 11 Cases.

4.     In my capacity as financial advisor, I am familiar with the above-captioned Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' restructuring and liquidation efforts. I have also reviewed the *Second Amended Joint Plan of Reorganization of Optio Rx, LLC, et al.* [Docket No. 382] (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "**Plan**").[2] Accordingly, I am familiar with the terms of the Plan.

5.     Except as otherwise indicated, all matters set forth in this Declaration are based on: (a) my personal knowledge of the Debtors' business operations, my review of relevant information provided to me by other members of the Debtors' management and the Debtors' professional advisors, including Chipman Brown Cicero & Cole, LLP ("**CBCC**") and Paladin; (b) my opinion based upon my experience, knowledge, and information concerning the Debtors' operations; and

---

[2]     Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan, or the Confirmation Order, as applicable.

(c) my review of relevant documents. Additionally, in my professional career, I have been part of the formulation of plans of reorganization similar to the one contemplated by the Debtors. I am generally familiar with similar plans approved in other chapter 11 cases, as it is relevant to my professional career. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

**I.        GENERAL BACKGROUND AND THE DEVELOPMENT OF THE PLAN.**

6.        On June 7, 2024 (the **"Petition Date"**), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these cases (the **"Chapter 11 Cases"**). The Debtors continue to manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.        On June 21, 2024, the United States Trustee for the District of Delaware (the **"U.S. Trustee"**) appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the **"Committee"**) [Docket No. 67].

8.        These Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**).

9.        On June 24, 2024, the Debtors filed their *Motion for Entry of an Order (i) Approving Debtors' Disclosure Statement, (ii) Determining Dates, Procedures, and Forms Applicable to the Solicitation Process, (iii) Establishing Vote Tabulation Procedures, and (iv) Establishing Objection Deadline and Scheduling Hearing to Consider Confirmation of the Plan* [Docket No. 76] (the **"Solicitation Motion"**).

10.      On July 29, 2024, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al.* [Docket No. 257] and filed the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al.* [Docket

- 3 -

No. 258] (as modified, amended, or supplemented from time to time, the **"Disclosure Statement"**).

11.    On August 1, 2024, the Court entered the *Order (i) Approving Amended Disclosure Statement, (ii) Determining Dates, Procedures, and Forms Applicable to Solicitation Process, (iii) Establishing Vote Tabulation Procedures, and (iv) Establishing Objection Deadline and Scheduling Hearing to Consider Confirmation of the First Amended Plan* [Docket No. 276] **("Disclosure Statement Order")**.

12.    It is my belief that the Debtors have fully complied with the notice requirements set forth in the Disclosure Statement Order.  On August 5, 2024, the Debtors caused Stretto, Inc. **("Stretto"** or the **"Voting and Solicitation Agent")** to distribute a Solicitation Package (as defined in the Disclosure Statement Order) to each of the parties entitled to vote to accept or reject the Plan.  Further, notice of the confirmation hearing was served on all creditors and interest holders.  If a creditor or interest holder was not entitled to vote on the Plan, such creditor or interest holder received a notice of non-voting status.  On August 15, 2024, the Voting and Solicitation Agent filed an affidavit of service reflecting the service of such notices and the Solicitation Package. See Docket No. 296.

13.    On August 27, 2024, the Debtors filed the Notice of Filing Plan Supplement to Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al. attaching the Plan Supplement (the **"Plan Supplement"**) [Docket No. 348].

14.    On September 10, 2024, the Debtors filed the *Certification of Stretto, Inc. Regarding Solicitation of Votes and Tabulation of Ballots in Connection with the Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* [Docket No. 378] (the "**Voting Report**").  The Voting Report reflects that each of the classes entitled to vote to accept or reject the Plan have voted to accept the Plan.

4888-4556-3099, v. 2

15.     On September 10, 2024, the Debtors filed their *Second Amended Joint Plan of Reorganization of Optio Rx, LLC, et al.* [Docket No. 382] making suggested revisions to the Plan by the U.S. Trustee, incorporating the UCC Settlement Agreement (as defined in the Plan) and addressing issues raised by certain parties that have filed objections to the Plan.

16.     A hearing to consider confirmation of the Plan (the **"Confirmation Hearing"**) is currently scheduled for September 13, 2024 at 10:00 a.m. (prevailing Eastern Time) pursuant to the Disclosure Statement Order.

17.     I believe that the Plan and the related transactions contemplated therein will provide sufficient liquidity to fund the Debtors' performance, pay all administrative and priority claims, and reflect the most efficient and appropriate means of maximizing the value of the Debtors' estates.

18.     Further, the compromises set forth in the Plan are critical to bringing closure to these and other matters addressed in the Plan and to permitting the Debtors to maximize the value of the estates for the benefit of all parties-in-interest and maximize recoveries for all Holders of Claims.  As a result, in light of the foregoing and as discussed herein, I believe that the prompt confirmation and consummation of the Plan is in the best interests of the Debtors, their creditors, and all other parties-in-interest.

## **THE PLAN**

19.     It is my understanding that the Plan: (a) complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code; (b) satisfies the mandatory requirements of section 1123(a) of the Bankruptcy Code; and (c) is consistent with section 1123(b) of the Bankruptcy Code.

I.      THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION.

   A.      **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

   20.      It is my understanding that the Plan complies with 11 U.S.C. § 1129(a)(1), which requires the Plan to comply with 11 U.S.C. §§ 1122 and 1123 in all respects.

   *i.      The Plan Satisfies the Requirements of Section 1122 of the Bankruptcy Code.*

   21.      Article III of the Plan places Claims and Interests into twelve (12) different Classes, except for Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims, United States Trustee statutory fees, and Other Priority Claims which are not classified. Each Claim or Interest placed in a particular class is substantially similar to the other Claims or Interests in that class.  In addition, valid business, legal and factual reasons exist for the separate classification of each of the classes of Claims and Interests created under the Plan, and there is no unfair discrimination between or among holders of Claims and Interests.

   22.      For example, the Plan properly and separately classifies the Prepetition Lien Claims (Class 1), Vendor Secured Claims (Class 2), Other Secured Claims (Class 3), Other Priority Claims (Class 4), General Unsecured Trade Claims (Class 5), Other General Unsecured Claims (Class 6), Noteholder Claims (Class 7), Seller Note Claims (Class 8), Convenience Class Claims (Class 9), Intercompany Claims (Class 10), Intercompany Interests (Class 11), and, Intercompany Interests (Class 12).  As discussed further below, and contrary to the contentions raised by objectors to the Plan, there is a valid and good faith business purpose for the separate classification of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims.

   23.      It is my understanding that valid factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  In each instance, the Plan classifies Claims based upon their different rights and attributes.  Additionally, each of

the Claims of Interests in each particular Class is substantially similar to the other Claims of Interests in such Class.  Accordingly, I believe the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

> ii. *The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.*

24.    I have been advised and believe that the Plan satisfies the seven applicable requirements set forth in section 1123(a) of the Bankruptcy Code because:

- Article III of the Plan satisfies this requirement by expressly classifying all Claims and Interests, other than Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims, United States Trustee statutory fees, which are not classified;

- Section III of the Plan satisfies this requirement by specifying that Vendor Secured Claims (Class 2), Other Secured Claims (Class 3), Other Priority Claims (Class 4), and Intercompany Interests (Class 11) are unimpaired;

- Article III of the Plan specifies that Claims in Class 1 (Prepetition Lien Claims); Class 5 (General Unsecured Trade Claims); Class 6 (Other General Unsecured Claims); Class 7 (Noteholder Claims); Class 8 (Seller Note Claims); Class 9 (Convenience Class Claims); Class 10 (Intercompany Claims); and Class 12 (Equity Interests in Optio Rx, are Impaired under the Plan.  The Plan sets for the treatment of each such Impaired Class;

- Article III of the Plan provides the same treatment to each Claim or Interest that is classified in a particular class under the Plan;

- Article IV of the Plan, the Restructuring Support Agreement, the Plan Term Sheet and other documents contemplated by the Plan Supplement, including the Exit Facility Term Sheet and the LLC Operating Agreement for Online Pharmacy Holdings LLC, satisfy this requirement by providing adequate and proper means for the implementation of the Plan, including the continued corporate existence of the Reorganized Debtors to consummate the Restructuring Transactions set forth in the Plan Term Sheet to effectuate the Debtors' financial reorganization;

- On the Effective Date, the charters or equivalent organizational documents of the Reorganized Debtors will be amended (to the extent necessary) to prohibit the issuance of nonvoting equity securities; and

- To the extent the standard under section 1123(a)(7) applies to the Reorganized Debtors, the manner of selecting officers, directors, and/or managers of the

Reorganized Debtors, as set forth in Section 4.09 of the Plan, is consistent with the interests of Holders of Claims and Interests and public policy.

*iii.*    *1123(b): The Plan Includes Appropriate Permissive Provisions.*

25.    It is my understanding that the Plan contains a number of permissive provisions, all of which are intended to facilitate a prompt resolution of these cases and are appropriate under the circumstances.  Among other things, the Plan provides for the treatment of executory contracts and unexpired leases, provides for the preservation and vesting of the Retained Causes of Action in the Reorganized Debtors, including Avoidance Actions, provides a structure for Claim allowance and disallowance by the Reorganized Debtors, and provides for the implementation of releases, exculpation, and injunction provisions.  In addition, the Plan incorporates the terms of the Aves Settlement Agreement, the UCC Settlement Agreement, and the Restructuring Support Agreement, to allow for the consummation of the Restructuring Transactions set forth in the Plan Term Sheet, the Exit Facility Term Sheet, and the LLC Operating Agreement for Online Pharmacy Holdings LLC, to effectuate the Debtors' financial reorganization, designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties-in-interest.  I believe that these discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the consideration provided by the Prepetition Secured Lenders, are supported by the Debtors and their key constituents, and are consistent with applicable precedent.  Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

### (1)    The Debtor Release is Appropriate

26.    I believe that the Debtor Release is appropriate, justified, in the best interests of the stakeholders, and an integral part of the Plan.  Article VII of the Plan provides for releases by the Debtors, and the Reorganized Debtors, as of the Effective Date, of, among things, certain Claims,

rights, and causes of action that the Debtors, the Reorganized Debtor, and their Estates may have against the Released Parties[3] (the "**Debtor Release**").

27.     I believe that Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' estates.    *First*, an identity of interest exists between the Debtors and the parties to be released.   Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan without the Debtor Releases.   Like the Debtors, these parties seek to confirm the Plan and implement the Restructuring Transactions contemplated in the Plan.

28.     *Second*, the substantial contributions are clear.   The Released Parties played an integral role in the formation of the Plan, the Restructuring Transactions, and have expended significant time and resources analyzing and negotiating a resolution of the many issues present in these Chapter 11 Cases.   The DIP Lenders have provided loans to the Debtors to fund these Chapter 11 Cases and the Debtors' ongoing business operations.   Moreover, the Consenting Lenders have provided substantial value to the Debtors' Estates through: (i) the GUC Trade Gift; (ii) the GUC Opt-In Gift; (iii) the Prepetition Lien Conversion; (iv) the Aves Settlement Agreement; (v) the UCC Settlement Agreement; and (vi)  payments to holders of Vendor Secured Claims and General Unsecured Trade Claims, all of which value would otherwise have gone to the Prepetition Secured

---

[3]    Released Parties under the Plan means, collectively, (a) each of the Debtors, (b) the Reorganized Debtors, (c) the Consenting Lenders, (d) the DIP Lenders, (e) the Admin Agent; and (f) the Related Parties of each of the foregoing Entities in clauses (a) through (e) of this definition.  For the avoidance of doubt, the manager of Pharmacy Management LLC and its Related Parties shall be deemed Released Parties.  For the further avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

Lenders, providing a significant recovery to almost all creditors under the Plan. Without the contributions of each of these parties, the Plan and transactions contemplated therein would not be possible.

29.      *Third*, the Debtor Release is integral to the Debtors' reorganization. Indeed, absent the Debtor Release, the Debtors understand that the Released Parties would not have agreed to support the Plan and the Restructuring Transactions contemplated therein. As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors. In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan and emerge from chapter 11. The Debtor Release, therefore, is essential to the Debtors' reorganization.

30.      *Fourth*, as evidenced by the Voting Report and noted herein, in the aggregate, an overwhelming majority of the Debtors' general unsecured creditors support the Plan and the Releases set forth therein. One hundred (100%) percent in number and amount of holders of Prepetition Lien Claims in Class 1, Noteholder Claims in Class 7, and Convenience Class Claims in Class 9 that voted, voted in favor of the Plan. In excess of ninety-seven (97.3%) in amount and ninety (90%) percent in number of holders of General Unsecured Trade Claims in Class 5 that voted, voted in favor of the Plan. Given the critical nature of the Debtor Release, these figures evidence the Debtors' key stakeholders' support for the Debtor Release and the Plan. For the avoidance of doubt, all voting classes voted to accept the Plan.

31.      *Fifth*, the Plan provides for meaningful recoveries under the circumstances for all creditors potentially giving up colorable claims under the releases. As demonstrated by the Liquidation Analysis, the ranges of recoveries are materially higher under the Plan than they would have been in a chapter 7 liquidation scenario.

32.     I believe the Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release is fair, reasonable, and in the best interests of the Debtors' Estates.

**(2)     The Third-Party Releases is Wholly Consensual and is Appropriate**

33.     In addition to the Debtor Release, the Plan provides for releases by certain Holders of Claims and Interests.  Specifically, Section 7.03 of the Plan provides, in greater detail, that each Releasing Party shall release any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities such parties could assert against the Released Party (the **"Third-Party Release,"** and together with the Debtor Release, the **"Releases"**).  The Third-Party Release is fully consensual, consistent with established Third Circuit law and recent Supreme Court rulings, and integral to the Plan and therefore should be approved.

34.     I believe the Third-Party Release is consensual.  Here, the Debtors have proposed an <u>opt in</u> release – whereby only creditors eligible to vote on the Plan that affirmatively opt into the Third-Party Release are granting the release.  Therefore, all voting parties had ample opportunity to evaluate and exercise their right to opt in to the Third-Party Release.  The ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release provision in the Plan and clearly, and conspicuously, informed such Holders of the steps they should take if they agreed to be bound by the Third-Party Release.  Thus, all voting parties were put on notice of the Third-Party Release and of their ability to opt in.  As such, the Third-Party Release is consensual as to all Claims and Interest Holders who decided to affirmatively opt into the Third-Party Release.  To be sure, certain parties did not opt-in to the Third-Party Release and, accordingly, upon the Effective Date of the Plan, will not be deemed to have released the

- 11 -

Released Parties.  To that end, and out of an abundance of caution, the Debtors have revised

Section 7.03 of the Plan by adding the following language **"For the avoidance of doubt, no direct**

**third-party claims are non-consensually released herein"** to avoid any possible ambiguity as

to whether the third-party releases are non-consensual and to avoid any indirect conflict with the

Supreme Court's recent ruling in Purdue.  As such, I believe the Third-Party Release is consensual

as to all Claims and Interest Holders who decided to affirmatively opt into the Third-Party Release.

### (3)    The Exculpation Provision Is Appropriate

35.    Section 7.05 of the Plan provides for the exculpation of each Exculpated Party[4].. I

believe the exculpation is fair and appropriate under both applicable law and the facts and

circumstances of these Chapter 11 Cases.  The Plan's exculpation provision is the product of arm's-

length negotiations, was critical to obtaining the support of various constituencies for the Plan,

and, as part of the Plan, has received support from the Debtors' major stakeholders.   The

exculpation provision was important to the development of a feasible, confirmable Plan, and the

Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded

to those constituents by the exculpation.

36.    The Exculpated Parties have participated in good faith in formulating and

negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from

exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.  Moreover, the

exculpation provision and the liability standard it sets represents a conclusion of law that flows

logically from certain findings of fact that the Court must reach in confirming the Plan as it relates

---

[4]    "Exculpated Party" means, collectively, and in each case in its capacity as such:  (i) each of the Debtors; (ii) any statutory committees appointed in the Chapter 11 Cases and the members thereof; (iii) the Debtors' officers, directors, and managers, specifically including Pharmacy Management LLC and its Affiliates and lenders (solely in their fiduciary capacities, if any), and (iv) the Debtors' and Committee's professionals retained under sections 327 or 1103 of the Bankruptcy Code (each in their capacities as such) that served in such capacities at any time between the Petition Date and the Effective Date.

to the Debtors.  As discussed above, the Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, the Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, retained professionals, and the Committee.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

37.    Here, the Debtors and their officers, directors, and professionals, and the Committee actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive, and the resulting agreements embodied in the Restructuring Transactions were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys overwhelming support from Holders of Claims entitled to vote. See Voting Report at ¶ 14.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, the Plan Term Sheet, and related documents in furtherance of the transactions contemplated by the Plan.  Furthermore, the exculpation provision is limited to acts during these Chapter 11 Cases and does not extend beyond such time period.  Accordingly, the Court's findings of good faith vis-a-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

38.    Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties, as fiduciaries in these Chapter 11 Cases, played a key role in developing the Plan that paved the way for a successful reorganization, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.  Under the circumstances,

4888-4556-3099, v. 2

it is appropriate for the Court to approve the exculpation provision, and to hold that the Exculpated

Parties have acted in good faith and in compliance with the law.

### (4)    The Injunction Provision Is Appropriate

39.    It is my understanding that the injunction provision set forth in Section 7.06 of the

Plan merely implements the Plan's release, discharge, and exculpation provisions, in part, by

permanently enjoining all entities from commencing or maintaining any action against the Debtors,

or the other Released Parties on account of or in connection with or with respect to any such claims

or interests released, discharged, or subject to exculpation.  Thus, the injunction provision is a key

provision of the Plan because it enforces the release, discharge, and exculpation provisions that

are centrally important to the Plan.  As such, to the extent the Court finds that the exculpation and

release provisions are appropriate, the Debtors respectfully submit that the injunction provision

must be appropriate.  Moreover, this injunction provision is narrowly tailored to achieve its

purpose.

**B.    1129(a)(2): The Debtors Have Complied with all Applicable Provisions of the Bankruptcy Code.**

40.    It is my understanding that, the Debtors have satisfied section 1129(a)(2) of the

Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of

the Bankruptcy Code.  As set forth below, I have been advised that the Debtors have complied

with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as

Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting

acceptances of the Plan through their Voting and Solicitation Agent in accordance with the

Disclosure Statement Order.

4888-4556-3099, v. 2

*i.     The Debtors Complied with Section 1125 of the Bankruptcy Code.*

41.     Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement in accordance with section 1125(a)(1) of the Bankruptcy Code.  *See* Docket No. 276. The Court also approved the contents of the solicitation materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan. *See Id.*  As stated in the Voting Report, the Debtors, through the Voting and Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code. *See* Voting Report at ¶ 7; *see also* Certificate of Service [Docket No. 296].  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan. *See* Voting Report ¶ 7; *see also generally* Certificate of Service [Docket No. 296].

42.     Based on the foregoing, it is my understanding that the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

*ii.     The Debtors Complied with Section 1126 of the Bankruptcy Code.*

43.     The Debtors solicited votes only from the Voting Classes, Holders of Allowed Claims and Interests in Classes 1, 5, 7 and 9, because each of these Classes is Impaired and entitled to receive a distribution under the Plan.  The Debtors did not solicit votes on the Plan from the following Classes:

- Class 2 (Vendor Secured Claims), Class 3 (Other Secured Claims), Class 4 (Other Priority Claims), and Class 11 (Intercompany Interests), are Unimpaired under the Plan (collectively, the "**Unimpaired Classes**").  *See* Plan at Art. III.   Pursuant to

- 15 -

section 1126(f) of the Bankruptcy Code, holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Classes 6 (Other General Unsecured Claims), 8 (Seller Note Claims), 10 (Intercompany Claims), and 12 (Equity Interests in Optio Rx) are Impaired under the Plan (the "**Deemed Rejecting Classes**"). *Id*. Pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

44.     The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  The Voting Report reflects that one hundred percent (100%) in amount and one hundred percent (100%) in number of the valid ballots received in Classes 1, 7 and 9 voted in favor of the Plan, and in excess of ninety-seven (97.3%) in amount and ninety (90%) percent in number of the valid ballots received in Class 5 voted in favor of the Plan.   Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### C.     1129(a)(3): The Plan was Proposed in Good Faith.

45.     The Plan was proposed with honesty, good intentions, and with the goal of maximizing stakeholder recoveries.   Throughout these cases, the Debtors and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.  The Plan follows an extensive arm's-length negotiation among the Debtors, the Consenting Lenders, Aves Management LLC, the DIP Lenders, the Committee, and other parties interested in ensuring that stakeholders realize the highest possible recoveries under the circumstances.   Importantly, the Plan is supported by the Committee and the Debtors' creditor body as a whole.  The Debtors respectfully submit that the Plan was negotiated with the objective of ensuring that economic stakeholders in the estates realize the best possible recovery under the circumstances.

46.     Accordingly, I have been advised that the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

**D.     1129(a)(4): The Plan Provides for Court Approval of all Payments for Services in Connection with these Cases.**

47.     It is my understanding that all payments made or to be made by the Debtors for services or for costs in connection with these Chapter 11 Cases prior to the Effective Date, including all Accrued Professional Compensation Claims, have been approved by, or are subject to the approval of, the Court.   Pursuant to Section 2.02 of the Plan, Accrued Professional Compensation Claims ultimately are subject to approval of this Court.   Therefore, it is my understanding that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

**E.     1129(a)(5): The Plan Discloses Directors and Officers.**

48.     It is my understanding that the Plan Supplement attached the Reorganized Debtors New Governance Documents providing the identity and affiliations of the persons proposed to serve as the initial directors and officers of the Reorganized Debtors after Confirmation of the Plan.   In addition, Section 4.09 of the Plan provides that from and after the Effective Date, the Reorganized Debtors may take any and all necessary or appropriate actions to appoint directors, officers, and managers of the Reorganized Debtors consistent with the charter, articles of incorporation, and/or by-laws of the Reorganized Debtors, subject to any limitations in applicable non-bankruptcy law.  Based on the foregoing, it is my understanding that the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.     1129(a)(6): The Plan does not Affect any Change in Publicly Regulated Rates.**

49.     It is my understanding that there is no governmental regulatory commission that has jurisdiction over the Debtors' rates.

G.      **1129(a)(7): The Plan is in the "Best Interests" of Creditors.**

50.     I have been advised that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.  Exhibit C to the Disclosure Statement sets forth the Debtors' liquidation analysis (the "**Liquidation Analysis**").  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.

51.     Based on the Liquidation Analysis, and the assumptions included therein the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, Holders of Claims and Interests in all Impaired Classes will recover at least as much, and in most cases much more, as a result of confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.  As discussed further below, in a hypothetical chapter 7 liquidation and without the Plan, most parties would receive nothing.  Based on the recoveries set forth in the Plan, the Plan satisfies the best interests test as required by the Bankruptcy Code.

H.      **1129(a)(8): The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

52.     As will be discussed in greater detail below, I have been advised that although the Classes of Claims entitled to vote on the Plan voted to accept the Plan, certain Classes of Claims

and Interests are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code because holders of Claims and Interests in such Classes are not entitled to receive or retain any property under the Plan.  Notwithstanding this deemed rejection, it is my understanding that the Plan is confirmable because it satisfies section 1129(b) of the Bankruptcy Code.

**I.      1129(a)(9): The Plan Complies with the Required Treatment of Administrative Claims and Priority Claims.**

53.     I have been advised that the Plan satisfies the requirements of section 1129(a)(9). *First*, Section 2.10 of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that, except to the extent that the Holder of an Allowed Administrative Claim agrees to less favorable treatment, or as otherwise provided in the Plan, each Holder of an Allowed Administrative Claim against any of the Debtors shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, within five (5) Business Days after the Effective Date, or as soon as reasonably practicable thereafter, (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than five (5) Business Days after such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; or (iii) at such time and upon such terms as set forth in an order of the Bankruptcy Code; provided that Administrative Claims incurred by any Debtor in the ordinary course of such Debtor's business may be paid in the ordinary course of business by the Debtors, consistent with past practice and in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

54.     *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because Section 3.04(d) of the Plan provides that each Holder of an Allowed Other Priority Claim of the types of Claims specified by 1129(a)(9)(B) shall receive in full satisfaction, settlement, discharge

and release of, and in exchange for, such Allowed Other Priority Claim, Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Priority Claim.

55.     *Third*, Section 2.03 of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that, except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such Holder agree to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim within five (5) Business Days after the Effective Date; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installments over a period not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (iii) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

56.     *Fourth*, the Debtors are not aware of any Secured Tax Claims subject to section 1129(a)(9)(D) of the Bankruptcy Code.  To the extent there are any such Secured Tax Claims, they would be treated as Class 3 Other Secured Claims under the Plan, are unimpaired and would receive payment in full in Cash equal to the amount of such Allowed Other Secured Claim as set forth in the Plan.  I believe that the Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.      1129(a)(10): Acceptance of the Plan by One Impaired Class of Claims.**

57.      As discussed above, each of the Voting Classes, which are Impaired, overwhelmingly accepted the Plan independent of any insiders' votes.  Thus, it is my belief that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      1129(a)(11): The Plan is Feasible.**

58.      I believe the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing for a clear path to emergence from these Chapter 11 Cases and the ability of the Debtors to satisfy all of their obligations under the Plan.  The Debtors and their advisors have analyzed their ability post-confirmation to meet their obligations under the Plan and continue as a going concern without the need for further financial restructuring.  As set forth in the Disclosure Statement, prior to the Petition Date, the Debtors had significant funded liabilities that they could not service, which necessitated the commencement of these Chapter 11 Cases. Confirmation and consummation of the Plan will allow the Debtors to deleverage the company's balance sheet and enable the Debtors to emerge from chapter 11 expeditiously with an appropriately reduced debt structure.

59.      Moreover, as set forth in the Disclosure Statement, the Debtors prepared projections of the Debtors' ability to satisfy their obligations on the Effective Date.  See Disclosure Statement, Ex. D.   These financial projections reflect a series of assumptions regarding the Debtors' obligations and demonstrate the Debtors' ability to use their cash and access to their Exit Facility to meet all of their obligations under the Plan.  On the basis of these projections, which were prepared by the Debtors and their advisors, the Debtors believe their financial future, taking into account the provisions of the Plan, is sound.  The Debtors, therefore, submit that the Plan is feasible, and confirmation will not be followed by further liquidation.  Accordingly, I believe the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

- 21 -

**L.      1129(a)(12): The Plan Provides for Payment of all Statutory Fees.**

60.      It is my understanding that the Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Section 2.05 of the Plan, provides that the Debtors or Reorganized Debtors will pay fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interests payable to the United States Trustee, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.   Accordingly, it is my understanding that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.      1129(a)(13) Retiree Benefits.**

61.      It is my understanding that the Plan satisfies section 1129(a)(13).   Section 5.08 of the Plan provides that from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.   Accordingly, it is my understanding that the Plan fully complies with and satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**N.      Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a) (14) and (15), and (16)).**

62.      It is my understanding that sections 1129(a)(14) through 1129(a)(16) do not apply to the Plan because the Debtors are not subject to domestic support obligations, are not "individuals," and are moneyed, business, or commercial corporations.

**O.      The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code.**

63.      Classes 1, 5, 7 and 9, which are Impaired Classes of Claims entitled to vote on the Plan, have voted overwhelmingly in favor of the Plan.   However, the Deemed Rejecting Classes have or are deemed to have rejected the Plan.   It is my understanding that nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code.

- 22 -

i.      *The Plan is Fair and Equitable.*

64.     I believe the Plan satisfies section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have or are deemed to have rejected the Plan, respectively, the Plan is confirmable.  There are no Claims or Interests that are junior to the Deemed Rejecting Classes that are receiving any recovery under the Plan before any Class that is senior in priority, nor is any Holder of a Claim or Interest receiving more than payment in full of its Claim or Interest.  Accordingly, I believe the Plan is "fair and equitable" with respect to all Impaired Classes and Interests and satisfies section 1129(b) of the Bankruptcy Code.

ii.     *The Plan Does Not Discriminate Unfairly.*

65.     Under the Plan, Holders of Allowed General Unsecured Trade Claims in Class 5, by virtue of the GUC Trade Gift, will receive 85% of their respective claims on the Effective Date and the remaining 15% on the one-year anniversary of the Effective Date.  All Other General Unsecured Claims in Class 6 and Seller Note Claims in Class 8 were going to be cancelled, released, and extinguished without any distribution under the first amended Plan, however, by virtue of the UCC Settlement Agreement, the UCC Settlement Amount ($275,000) will be Distributed pro rata to Holders of Allowed Claims in Classes 6 and 8.

66.     Neither Class 6 nor Class 8 creditors are harmed by any alleged discrimination in the Plan.  Even a cursory review of the liquidation analysis attached as Exhibit C to the Disclosure Statement shows that under any scenario, all unsecured creditors will recover nothing in a hypothetical chapter 7 liquidation.  In a chapter 7 liquidation, the Prepetition Secured Lenders will only recover approximately 13% to 16% of their allowed claims of approximately $126,700,000, plus their rights as DIP Lenders.  All other creditors would receive nothing.  Therefore, the baseline recovery for general unsecured creditors in these cases is $0 under the absolute priority rule.

67.     Distributions to holders of General Unsecured Trade Claims in Class 5 have no impact on the distributions to holders of unsecured claims in Classes 6 or 8.  Unsecured creditors are entitled to nothing under the Bankruptcy Code's priority scheme, and a gift from the Admin Agent and DIP Agent resulting in an increased distribution to unsecured creditors holding trade claims in Class 5 does not diminish the distribution to holders of claims in Classes 6 or 8.  If holders of General Unsecured Trade Claims did not receive their increased recovery, the surplus distribution would revert to the Prepetition Secured Lenders and DIP Lenders, not holders of claims in Classes 6 or 8.  Because holders of claims in Classes 6 and 8 are not entitled to a distribution in the first place, providing a greater distribution to a different class of unsecured creditors does not alter the distribution to which they are entitled.

68.     The GUC Trade Gift is a gift from the Prepetition Secured Lenders and DIP Lenders to the Holders of allowed General Unsecured Trade Claims that will have a future relationship with the Reorganized Debtors, providing goods and services necessary for the Reorganized Debtors' continued business operations upon emergence from bankruptcy.  The classification of Classes 6 and 8 separately from trade creditors in Class 5 distinguishes trade claimants under a valid good faith business basis – those with whom Debtors will have a go-forward business relationship and provide goods and services necessary for Debtors' continued operations – from other general unsecured claimants.

69.     Accordingly, I believe the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes.

4888-4556-3099, v. 2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated as of September 10, 2024

_/s/ Gary Lembo_

Gary Lembo
Paladin Management Group, LLC