## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br><br>Optio Rx, LLC, *et al.*,<br><br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11188 (TMH)<br><br>(*Jointly Administered*) |

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION OF OPTIO RX, LLC, et al.

Dated:  September 10, 2024

**CHIPMAN BROWN CICERO & COLE, LLP**
William E. Chipman, Jr.
David Carickhoff
Mark. D. Olivere
Alan M. Root
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:      (302) 295-0191
Facsimile:      (302) 295-0199
Email:          Chipman@chipmanbrown.com
                Carickhoff@chipmanbrown.com
                Olivere@chipmanbrown.com
                Root@chipmanbrown.com

*Counsel for the Debtors and Debtors-In-Possession*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows:  (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061.

## <u>TABLE OF CONTENTS</u>

**Page No.**

TABLE OF AUTHORITIES ................................................................................iii-vii

I. INTRODUCTION ................................................................................ 1

II. STATEMENT OF THE FACTS ........................................................ 1

III. ARGUMENT IN SUPPORT OF PLAN CONFIRMATION ............................................ 4

    A.      1129(a)(1): THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. ................................................................................ 4

         *1.*      *The Plan Satisfies the Requirements of Section 1122 of the Bankruptcy Code.* ........................................................................... 4

         *2.*      *The Plan Complies with the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.* ................................................ 6

         *3.*      *The Debtor Release is Appropriate.* ......................................... 10

         *4.*      *The Third-Party Release is Wholly Consensual and is Appropriate.* ....... 14

         *5.*      *The Exculpation Provision is Appropriate.* .............................. 16

         *6.*      *The Injunction Provision is Appropriate.* ................................. 18

    B.      1129(a)(2): The Debtors Have Complied with all Applicable Provisions of the Bankruptcy Code........................................................................... 19

         *1.*      *The Debtors Complied with Section 1125 of the Bankruptcy Code.* ......... 19

         *2.*      *The Debtors Complied with Section 1126 of the Bankruptcy Code.* ......... 20

    C.      1129(a)(3): The Plan was Proposed in Good Faith................................. 22

    D.      1129(a)(4): The Plan Provides for Court Approval of all Payments for Services in Connection with these Cases............................................. 23

    E.      1129(a)(5): The Plan Discloses Directors and Officers. ....................... 24

    F.      1129(a)(6): The Plan does not Affect any Change in Publicly Regulated Rates.................................................................................. 25

    G.      1129(a)(7): The Plan is in the "Best Interests" of Creditors................. 25

H.    1129(a)(8): The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ...................................... 27

I.    1129(a)(9): The Plan Complies with the Required Treatment of Administrative Claims and Priority Claims. ........................................ 28

J.    1129(a)(10): Acceptance of the Plan by One Impaired Class of Claims. ............. 30

K.    1129(a)(11): The Plan is Feasible. ........................................................ 31

L.    1129(a)(12): The Plan Provides for Payment of all Statutory Fees. .................... 33

M.    1129(a)(13) Retiree Benefits. ............................................................... 34

N.    Sections 1129(a)(14) and (15) do not Apply to Corporate Debtors. .................... 34

O.    Section 1129(a)(16) Is Inapplicable. ..................................................... 34

P.    The Plan Complies with the Requirements of Section 1129(b) of the Bankruptcy Code. ............................................................................ 34

  1.    *The Plan is Fair and Equitable.* .............................................. 35

  2.    *The Plan Does Not Discriminate Unfairly.* ............................... 35

IV. PLAN OBJECTIONS ................................................................................. 42

A.    Objection of Dr. Rinku Patel .............................................................. 42

B.    Objection of the Office of the United States Trustee. .............................. 44

C.    Objection of Skin Medicinals ............................................................. 45

RESERVATION OF RIGHTS ............................................................................ 46

VI.    CONCLUSION ................................................................................. 46

4871-9848-6481, v. 5

# TABLE OF CASES

**Page No.**

**Cases**

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankruptcy Code, N.Y.* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996) ........................................................................... 5

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ................................................................................................................. 30

*Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apts. (In re Sea Garden Motel & Apts.)*, 195 B.R. 294, 304-05 (D.N.J. 1996) ................................................................... 37

*Computer Task Grp. Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191-92 (B.A.P. 9th Cir. 2003) ................................................................................................................. 36

*Earth Pride Organics, LLC v. Off. Comm. of Unsecured Creditors of EarthPride Organics, LLC*, No. BR 17-13816, 2021 WL 1553787, at *7 (E.D. Pa. Apr. 20, 2021) .................. 44

*Genesis Health Ventures*, 266 B.R. at 611 ................................................................... 44

*In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) ......... 41

*In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284 (Bankr. D. Del. 2016) ...................... 13

*In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) ............ 30

*In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990) ................................. 36

*In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989) .................................. 44

*In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) ..... 15

*In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ............................................. 41

*In re Century Glove, Inc.*, 1993 U.S. Dist. LEXIS 2286, at *14-15 (D. Del. Feb. 10, 1993) ....... 25

*In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) .......... 15

*In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004) ............. 11

*In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) .................. 17

*In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (E.D. Pa. 1995) ...................... 37

4871-9848-6481, v. 5

iii

*In re Elm Creek Joint Venture*, 93 B.R. 105, 110 (Bankr. W.D. Tex. 1988)................................. 36

*In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) .......................................... 28

*In re Emerge Energy Services LP*, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019) ..... 17

*In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005)............................................................... 19

*In re Exaeris, Inc.*, 380 B.R. 741, 746-47 (Bankr. D. Del. 2008).................................................. 11

*In re FAH Liquidation Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014).................... 18

*In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) .......................... 41

*In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ....................................... 28

*In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34, 38 (Bankr. S.D. Ind. 1986) ........................................ 26

*In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016)................ 16

*In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) ................................. 12

*In re Johns-Mansville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986).................................... 22

*In re Kemp*, 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991) ............................................................... 26

*In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) ................................................. 25

*In re Mallinckrodt PLC*, 639 B.R. 837, 857 (2022)...................................................................... 47

*In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)..................... 12

*In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987).................................................... 26

*In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 92 (D. Del. 2018) ................................................. 44

*In re One Aviation Corp.*, No. 18-12309 (CSS) Bankr. D. Del. Sept. 18, 2019)......................... 15

*In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000)....................................................... 19

*In re Resorts Int'l, Inc.*, 145 B.R. 412, 475 (Bankr. D.N.J. 1990) ............................................... 27

*In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017)................ 15

*In re Shoen*, 193 B.R. 302, 318 (Bankr. D. Ariz. 1996) ............................................................... 25

*In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).................................................... 11

*In re Sun Country Development, Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) ................................... 25

*In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ................................................ 21

*In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018)............................ 15

*In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020).................................................................. 42

*In re VIP Motor Lodge, Inc.*, 133 B.R. 41, 44 (Bankr. D. Del. 1991) ........................................ 26

*In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011)..................................... 12

*In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) .......................................... 12

*Indianapolis Downs*, 486 B.R. at 305 ........................................................................................ 16

*Jersey City Medical Ctr.*, 817 F.2d 1055, 1059-60 (3d Cir. 1987)............................................ 26

*John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 158 (3d Cir.

  1993) ........................................................................................................................................ 5

*Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ............................................ 25

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (Bankr. D. Conn. 2006).. 36

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132,

  1136 (2d Cir. 1994)................................................................................................................ 22

*Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir.

  1985) ...................................................................................................................................... 35

*Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989) ................................................. 25

*Steelcase v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994)................................... 5

*Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir.

  1990) ...................................................................................................................................... 25

*United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549 (1990)................................... 10

**Rules**

11 U.S.C. § 1122(a) ..................................................................................................................... 4

11 U.S.C. § 1122(b) ..................................................................................................................... 5

11 U.S.C. § 1123(a) ..................................................................................................................... 6

11 U.S.C. § 1123(a)(1)................................................................................................................. 6

11 U.S.C. § 1123(a)(2)................................................................................................................. 6

11 U.S.C. § 1123(a)(3)................................................................................................................. 6

11 U.S.C. § 1123(a)(4) ................................................................................................ 7

11 U.S.C. § 1123(a)(7) ................................................................................................ 8

11 U.S.C. § 1123(b) ..................................................................................................... 6

11 U.S.C. § 1123(b)(6) ................................................................................................ 8

11 U.S.C. § 1125(b) ................................................................................................... 19

11 U.S.C. § 1126 ....................................................................................................... 20

11 U.S.C. § 1129(a)(11) ............................................................................................ 30

11 U.S.C. § 1129(a)(16) ............................................................................................ 33

11 U.S.C. § 1129(a)(3) .............................................................................................. 21

11 U.S.C. § 1129(a)(4) .............................................................................................. 23

11 U.S.C. § 1129(a)(5) .............................................................................................. 24

11 U.S.C. § 1129(a)(6) .............................................................................................. 24

11 U.S.C. § 1129(a)(7) .............................................................................................. 25

11 U.S.C. § 1129(a)(8) .............................................................................................. 26

11 U.S.C. § 1129(a)(9) .............................................................................................. 27

11 U.S.C. § 1129(b)(1) .............................................................................................. 34

11 U.S.C. §§ 1126(f) and 1129(a)(8) ....................................................................... 26

11 U.S.C. §§ 1129(a)(14) and (15) ........................................................................... 33

11 U.S.C. §1123(a)(5) ................................................................................................. 7

11 U.S.C. §1123(a)(6) ................................................................................................. 8

28 U.S.C § 1930(a) .................................................................................................... 32

**Constitutional Provisions**

Bankruptcy Code. S. Rep. No. 95-989, at 126 (1978) ............................................. 18

**10**

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) .............................................. 4

**13**

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr.

L.J. 228, 249 (1998).................................................................................................................. 36

Optio RX, LLC and its affiliated debtors (collectively, the "**Debtors**"), respectfully submit this memorandum of law (this "**Memorandum**") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al.*, as such plan may be further amended or modified (the "**Plan**")[1] [Docket No. 382].  Attached hereto as **Exhibit A** is the Debtors' proposed order confirming the Plan (the "**Confirmation Order**").  In support of confirmation of the Plan and in response to the objection(s) thereto (the "**Objections**"), the Debtors respectfully state as follows.

## I.    INTRODUCTION

This memorandum, together with the evidence to be adduced in support of Confirmation, will establish that the Plan meets the requirements for confirmation pursuant to section 1129 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**").  As set forth below, the Plan has been overwhelmingly accepted by all impaired voting classes: Classes 1, 5, 7 and 9 under the Plan.  The Plan also satisfies each of the substantive requirements of section 1129(a) of the Bankruptcy Code other than subsection (a)(8), which requires acceptance by each impaired class.  Because the Plan was rejected by the Deemed Rejecting Classes (*as defined below*), the Debtors seek to confirm the Plan under section 1129(b) of the Bankruptcy Code.

## II.    STATEMENT OF THE FACTS

On June 7, 2024 (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these cases (the "**Chapter 11 Cases**").  The Debtors continue to manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings set forth in the Plan.

On June 21, 2024, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Committee**") [Docket No. 67].

These Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these Chapter 11 Cases is set forth in detail in the *Declaration of Leo LaFranco in Support of First Day Pleadings* [Docket No. 3], which is incorporated herein by reference.

On June 24, 2024, the Debtors filed their *Motion for Entry of an Order (i) Approving Debtors' Disclosure Statement, (ii) Determining Dates, Procedures, and Forms Applicable to the Solicitation Process, (iii) Establishing Vote Tabulation Procedures, and (iv) Establishing Objection Deadline and Scheduling Hearing to Consider Confirmation of the Plan* [Docket No. 76] (the "**Solicitation Motion**").

On July 29, 2024, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al.* [Docket No. 257] and filed the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al.* [Docket No. 258] (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**").

On August 1, 2024, the Court entered the *Order (i) Approving Amended Disclosure Statement, (ii) Determining Dates, Procedures, and Forms Applicable to Solicitation Process, (iii) Establishing Vote Tabulation Procedures, and (iv) Establishing Objection Deadline and*

*Scheduling Hearing to Consider Confirmation of the First Amended Plan* [Docket No. 276] ("**Disclosure Statement Order**").

The Debtors have fully complied with the notice requirements set forth in the Disclosure Statement Order. On or about August 5, 2024, the Debtors caused Stretto, Inc. ("**Stretto**" or the "**Voting and Solicitation Agent**") to distribute a Solicitation Package (as defined in the Disclosure Statement Order) to each of the parties entitled to vote to accept or reject the Plan. Further, notice of the confirmation hearing was served on all creditors and interest holders. If a creditor or interest holder was not entitled to vote on the Plan, such creditor or interest holder received a notice of non-voting status. On August 15, 2024, the Voting and Solicitation Agent filed an affidavit of service reflecting the service of such notices and the Solicitation Package. *See* Docket No. 296.

On August 27, 2024, the Debtors filed the *Notice of Filing Plan Supplement to Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al.* attaching the Plan Supplement (the "**Plan Supplement**") [Docket No. 348].

On September 10, 2024, the Debtors filed the *Certification of Stretto, Inc. Regarding Solicitation of Votes and Tabulation of Ballots in Connection with the Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC, et al.* [Docket No. 378] (the "**Voting Report**"). The Voting Report reflects that each of the classes entitled to vote to accept or reject the Plan have voted to accept the Plan.

On September 10, 2024, the Debtors filed their *Second Amended Joint Plan of Reorganization of Optio Rx, LLC, et al.* [Docket No. 382] making suggested revisions to the Plan by the U.S. Trustee, incorporating the UCC Settlement Agreement (as defined in the Plan) and addressing issues raised by certain parties that have filed objections to the Plan.

4871-9848-6481, v. 5

On September 10, 2024, the Debtors filed the *Declaration of Gary Lembo in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Reorganization of Optio RX, LLC, et al.* [Docket No. 385] (the "**Lembo Declaration**").

A hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") is currently scheduled for September 13, 2024 at 10:00 a.m. (*prevailing* Eastern Time) pursuant to the Disclosure Statement Order.

## III.   ARGUMENT IN SUPPORT OF PLAN CONFIRMATION

Section 1129(a) of the Bankruptcy Code states that a court shall confirm a chapter 11 plan where each of its thirteen sub-sections are satisfied. As set forth below, the Plan satisfies the requirements for confirmation and therefore should be confirmed.

**A.     1129(a)(1): THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.**

Pursuant to section 1129(a)(1) of the Bankruptcy Code, a chapter 11 plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative history of this subsection indicates that it embodies and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the requisite mandatory contents of a plan. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977). As demonstrated below, the Plan complies with both sections 1122 and 1123, and with all other applicable provisions of the Bankruptcy Code, and thus satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

*1.     The Plan Satisfies the Requirements of Section 1122 of the Bankruptcy Code.*

Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class." 11 U.S.C. § 1122(a). By its plain language, section 1122 prohibits

only the classification of dissimilar claims in the same class. *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993); *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankruptcy Code, N.Y.* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."). As such, courts have broad discretion to determine the propriety of classification schemes in light of the facts of each case. *See Steelcase v. Johnston* (*In re Johnston*), 21 F.3d 323, 327 (9th Cir. 1994) ("bankruptcy court judges must have discretionary power in classifying claims under §1122(a)"). Additionally, section 1122(b) of the Bankruptcy Code expressly permits separate classification of certain claims for purposes of administrative convenience. 11 U.S.C. § 1122(b).

Article III of the Plan places Claims and Interests into twelve (12) different Classes, except for Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims, United States Trustee statutory fees, and Other Priority Claims which are not classified. Each Claim or Interest placed in a particular class is substantially similar to the other Claims or Interests in that class. In addition, valid business, legal and factual reasons exist for the separate classification of each of the classes of Claims and Interests created under the Plan, and there is no unfair discrimination between or among holders of Claims and Interests.

For example, the Plan properly and separately classifies the Prepetition Lien Claims (Class 1), Vendor Secured Claims (Class 2), Other Secured Claims (Class 3), Other Priority Claims (Class 4), General Unsecured Trade Claims (Class 5), Other General Unsecured Claims (Class 6), Noteholder Claims (Class 7), Seller Note Claims (Class 8), Convenience Class Claims (Class 9), Intercompany Claims (Class 10), Intercompany Interests (Class 11), and, Intercompany Interests (Class 12). As discussed further below, and contrary to the contentions

raised by objectors to the Plan, there is a valid and good faith business purpose for the separate classification of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims.

      2.      *The Plan Complies with the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.*

Section 1123(a) of the Bankruptcy Code sets forth seven mandatory requirements for the contents of a corporate debtor's chapter 11 plan. 11 U.S.C. § 1123(a).  Additionally, section 1123(b) sets forth various provisions that may, but need not, be included within a chapter 11 plan. 11 U.S.C. § 1123(b).  As shown below, the Plan complies with all of these requirements.

      a.      **1123(a)(1): The Plan Designates Classes of Claims and Interests.**

Section 1123(a)(1) of the Bankruptcy Code requires that a chapter 11 plan designate classes of claims and interests other than claims of a kind specified in section 507(a)(2) (administrative expense claims), section 507(a)(3) (claims arising during the "gap" period in an involuntary bankruptcy case), and in section 507(a)(8) (priority tax claims). 11 U.S.C. § 1123(a)(1).  As noted, Article III of the Plan satisfies this requirement by expressly classifying all Claims and Interests, other than Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Facility Claims, United States Trustee statutory fees, which are not classified.

      b.      **1123(a)(2): The Plan Identifies Unimpaired Classes of Claims and Equity Interests.**

Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). Section III of the Plan satisfies this requirement by specifying that Vendor Secured Claims (Class 2), Other Secured Claims (Class 3), Other Priority Claims (Class 4), and Intercompany Interests (Class 11) are unimpaired.

c.  **1123(a)(3): The Plan Specifies the Treatment of Impaired Classes.**

Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3).  Article III of the Plan specifies that Claims in Class 1 (Prepetition Lien Claims); Class 5 (General Unsecured Trade Claims); Class 6 (Other General Unsecured Claims); Class 7 (Noteholder Claims); Class 8 (Seller Note Claims); Class 9 (Convenience Class Claims); Class 10 (Intercompany Claims); and Class 12 (Equity Interests in Optio Rx), are Impaired under the Plan. The Plan sets for the treatment of each such Impaired Class.  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

d.  **1123(a)(4): The Plan Provides for the Same Treatment of Claims Within Each Class.**

Section 1123(a) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest in a particular class. 11 U.S.C. § 1123(a)(4).  Article III of the Plan satisfies this requirement by providing the same treatment to each Claim or Interest that is classified in a particular class under the Plan.

e.  **1123(a)(5): The Plan Provides for Adequate Means of Implementation.**

Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and sets forth examples of typical means for implementing a plan. 11 U.S.C. §1123(a)(5).  Article IV of the Plan, the Restructuring Support Agreement, the Plan Term Sheet and other documents contemplated by the Plan Supplement, including the Exit Facility Term Sheet and the LLC Operating Agreement for Online Pharmacy Holdings LLC, satisfy this requirement by providing adequate and proper means for the implementation of the Plan, including the continued corporate existence of the Reorganized Debtors to consummate the

7

Restructuring Transactions set forth in the Plan Term Sheet to effectuate the Debtors' financial reorganization.

> **f.      1123(a)(6): Prohibitions on the Issuance of Non-Voting Securities.**

Section 1123(a)(6) of the Bankruptcy Code requires that, with respect to a corporate debtor, a chapter 11 plan provide for the inclusion in the reorganized debtor's charter a prohibition against the issuance of non-voting equity securities and related protections for holders of preferred shares. 11 U.S.C. §1123(a)(6).  On the Effective Date, the charters or equivalent organizational documents of the Reorganized Debtors will be amended (to the extent necessary) to prohibit the issuance of nonvoting equity securities.[2]  Accordingly, the Plan complies with section 1123(a)(6) of the Bankruptcy Code.

> **g.      1123(a)(7): The Plan Only Contains Provisions that are Consistent with the Interests of Creditors and Equity Security Holders with Respect to Officers and Directors.**

Finally, section 1123(a)(7) of the Bankruptcy Code provides that a plan must "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director or trustee." 11 U.S.C. § 1123(a)(7).  To the extent the standard under section 1123(a)(7) applies to the Reorganized Debtors, the manner of selecting officers, directors, and/or managers of the Reorganized Debtors, as set forth in Section 4.09 of the Plan, is consistent with the interests of Holders of Claims and Interests and public policy.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

---

[2]    For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, reserve the right post-Effective Date of the Plan to issue equity securities as deemed prudent for the operation of the Reorganized Debtors on a post-Effective Date basis.

### h.      1123(b): The Plan Includes Appropriate Permissive Provisions.

In addition to the provisions required by section 1123(a) of the Bankruptcy Code, section 1123(b) permits inclusion in a plan of "any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). This is a broad grant of authority. As stated by the United States Supreme Court: "The Code … grants the bankruptcy courts residual authority to approve reorganization plans including any appropriate provision not inconsistent with the applicable provisions of this title." *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549 (1990) (internal quotations omitted).

The Plan contains a number of permissive provisions, all of which are intended to facilitate a prompt resolution of these cases and are appropriate under the circumstances. Among other things, the Plan provides for the treatment of executory contracts and unexpired leases, provides for the preservation and vesting of the Retained Causes of Action in the Reorganized Debtors, including Avoidance Actions, provides a structure for Claim allowance and disallowance by the Reorganized Debtors, and provides for the implementation of releases, exculpation, and injunction provisions. In addition, the Plan incorporates the terms of the Aves Settlement Agreement, the UCC Settlement Agreement, and the Restructuring Support Agreement, to allow for the consummation of the Restructuring Transactions set forth in the Plan Term Sheet, the Exit Facility Term Sheet, and the LLC Operating Agreement for Online Pharmacy Holdings LLC to effectuate the Debtors' financial reorganization, designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties-in-interest. These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the consideration provided by the Prepetition Secured Lenders, are supported by the Debtors and their key constituents, and are consistent with applicable precedent.

3.      *The Debtor Release is Appropriate.*

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004) (holding that "standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019").  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *In re Exaeris, Inc.*, 380 B.R. 741, 746-47 (Bankr. D. Del. 2008) (citations and internal quotations omitted).  Further a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).  Article VII of the Plan provides for releases by the Debtors, and the Reorganized Debtors, as of the Effective Date, of, among things, certain Claims, rights, and causes of action that the Debtors, the Reorganized Debtors, and their Estates may have against the Released Parties[3] (the "**Debtor Release**").

Courts in this jurisdiction generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R.

---

[3]     Released Parties under the Plan means, collectively, (a) each of the Debtors, (b) the Reorganized Debtors, (c) the Consenting Lenders, (d) the DIP Lenders, (e) the Admin Agent; and (f) the Related Parties of each of the foregoing Entities in clauses (a) through (e) of this definition.  For the avoidance of doubt, the manager of Pharmacy Management LLC and its Related Parties shall be deemed Released Parties.  For the further avoidance of doubt, the following individuals are not, and shall not be deemed to be, Released Parties: (i) Greg Savino, (ii) Jordana Siegel, (iii) Rinku Patel, (iv) Crestview City Pharmacy, Inc., (v) Jennifer Reshay Densman, (vi) Chistopher Neil Densman, (vii) Bryan Henderson, (viii) Amanda Davey, (ix) Claudia Barnett, (x) Kari Waites, (xi) Victoria Ballard, (xii) Morgan Meeks, (xiii) Kyndall Barber, (xiv) Ellen Stafford, (xv) Sergio Zepeda, (xvi) Cold Bore Capital Management, LLC, and (xvii) Marc Wank.

930, 937 (Bankr. W.D. Mo. 1994).  The analysis includes an inquiry into whether there is: (1) identity of interest between the debtor and non-debtor; (2) substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders. *See In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases. *Id*.

The Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' estates.  As described in the Lembo Declaration, and as an analysis of the *Zenith* factors demonstrates, the Debtor Release embodied in Article VII of the Plan should be approved.

First, an identity of interest exists between the Debtors and the parties to be released. Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan without the Debtor Releases.  Like the Debtors, these parties seek to confirm the Plan and implement the Restructuring Transactions contemplated in the Plan. *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284 (Bankr. D. Del. 2016) (finding that "there is an identity of interest between the Debtors and the [r]eleased [p]arties arising out of the shared common goal of confirming and implementing the Plan."); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

*Second*, the substantial contributions are clear.  The Released Parties played an integral role in the formation of the Plan, the Restructuring Transactions, and have expended significant time and resources analyzing and negotiating a resolution of the many issues present in these Chapter 11 Cases.  The DIP Lenders have provided loans to the Debtors to fund these Chapter 11 Cases and the Debtors' ongoing business operations.  Moreover, the Consenting Lenders have provided substantial value to the Debtors' Estates through: (i) the GUC Trade Gift; (ii) the GUC Opt-In Gift; (iii) the Prepetition Lien Conversion; (iv) the Aves Settlement Agreement; (v) the UCC Settlement Agreement; and (vi) payments to holders of Vendor Secured Claims and General Unsecured Trade Claims, all of which value would otherwise have gone to the Prepetition Secured Lenders, providing a significant recovery to almost all creditors under the Plan.  Without the contributions of each of these parties, the Plan and transactions contemplated therein would not be possible.

*Third*, the Debtor Release is integral to the Debtors' reorganization.  Indeed, absent the Debtor Release, the Debtors understand that the Released Parties would not have agreed to support the Plan, and the Restructuring Transactions contemplated therein.  As described above and in the Lembo Declaration, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan and emerge from chapter 11.  The Debtor Release, therefore, is essential to the Debtors' reorganization.

*Fourth*, as evidenced by the Voting Report and noted herein, in the aggregate, an overwhelming majority of the Debtors' general unsecured creditors support the Plan, and the Releases set forth therein.  One hundred (100%) percent in number and amount of holders of

12

Prepetition Lien Claims in Class 1, Noteholder Claims in Class 7, and Convenience Class Claims in Class 9 that voted, voted in favor of the Plan.  In excess of ninety-seven (97.3%) in amount and ninety (90%) percent in number of holders of General Unsecured Trade Claims in Class 5 that voted, voted in favor of the Plan.  Given the critical nature of the Debtor Release, these figures evidence the Debtors' key stakeholders' support for the Debtor Release and the Plan.  For the avoidance of doubt, all voting classes voted to accept the Plan.  However, even if the Court determined that this support does not constitute "overwhelming acceptance," as noted above, these factors are neither exclusive nor conjunctive. *See In re Washington Mut., Inc.*, 442 B.R. at 346.

*Fifth*, the Plan provides for meaningful recoveries under the circumstances for all creditors potentially giving up colorable claims under the releases.  As demonstrated by the Liquidation Analysis, the ranges of recoveries are materially higher under the Plan than they would have been in a chapter 7 liquidation scenario.

For the reasons set forth above, and as supported by the Lembo Declaration, the Zenith factors support approval of the Debtor Release.  Moreover, the breadth of the Debtor Release is consistent with those regularly approved in this jurisdiction and others. *See, e.g.*, *In re ONE Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sept. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same).  The Debtors have

satisfied the business judgment standard in granting the Debtor Release under the Plan.  The

Debtor Release is fair, reasonable, and in the best interests of the Debtors' Estates and, therefore,

meets the applicable standard.  Thus, the Court should approve the Debtor Release in the Plan.

4.    *The Third-Party Release is Wholly Consensual and is Appropriate.*

Section 7.03 of the Plan provides, in greater detail, that each Releasing Party[4] shall

release any and all Claims, Causes of Action and any other debts, obligations, rights, suits,

damages, actions, remedies, and liabilities such parties could assert against the Released Party

(the "**Third-Party Release**," and together with the Debtor Release, the "**Releases**").  The Third-

Party Release is fully consensual, consistent with established Third Circuit law and recent

Supreme Court rulings, and integral to the Plan and therefore should be approved.

Numerous courts have recognized that a chapter 11 plan may include a release of non-

debtors by other non-debtors when such release is consensual. *See, e.g.*, *Indianapolis Downs*,

486 B.R. at 305 (collecting cases); *Spansion*, 426 B.R. at 144 (stating that "a third-party release

may be included in a plan if the release is consensual").  Consensual releases are permissible on

the basis of general principles of contract law. *Coram Healthcare*, 315 B.R. at 336.  The law is

clear that a release is consensual where parties have received sufficient notice of a plan's release

provisions and have had an opportunity to object to or opt out of the release (including where

such holder abstains from voting altogether). *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 306

("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject

---

[4]    "Releasing Party" means, collectively, and in each case in their capacity as such: (i) each of the Released
Parties; (ii) all Holders of Claims or Interests that vote to accept or reject the Plan and opt-into the releases
provided by the Plan by checking the box on the applicable form indicating that they opt to grant the releases
provided in the Plan; (iii) all Holders of Claims or Interests that abstain from voting on the Plan and who
affirmatively opt-into the releases provided by the Plan by checking the box on the applicable form indicating
that they opt to grant the releases provided in the Plan; (iv) each current and former Affiliate of each Entity in
clause (i) through the following clause (v); and (v) each Related Party with respect to each of the foregoing in
clauses (i) through (v).

4871-9848-6481, v. 5

the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *but see In re Emerge Energy Services LP*, No. 19-11563, WL 7634308 (Bankr. D. Del. Dec. 5, 2019) (holding that a opt out is nonconsensual for parties failing to return a ballot or opt-out form).  In these cases, the Debtors have proposed an <u>opt in</u> release – whereby only creditors eligible to vote on the Plan that affirmatively opt into the Third-Party Release are granting the release in exchange for consideration (namely, the Opt-In Gift).

All voting parties had ample opportunity to evaluate and exercise their right to opt in to the Third-Party Release.  The ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release provision in the Plan and clearly, and conspicuously, informed such Holders of the steps they should take if they agreed to be bound by the Third-Party Release.  Thus, all voting parties were put on notice of the Third-Party Release and of their ability to opt in.  As such, the Third-Party Release is consensual as to all Claims and Interest Holders who decided to affirmatively opt into the Third-Party Release. To be sure, certain parties did not opt-in to the Third-Party Release and, accordingly, upon the Effective Date of the Plan, will not be deemed to have released the Released Parties.  To that end, and out of an abundance of caution, the Debtors have revised Section 7.03 of the Plan by adding the following language **"For the avoidance of doubt, no direct third-party claims are non-consensually released herein"** to avoid any possible ambiguity as to whether the third-party releases are non-consensual and to avoid any indirect conflict with the Supreme Court's recent ruling in *Purdue*.

4871-9848-6481, v. 5

Based on the foregoing, the Debtors have established that the Third-Party Release is fully consensual and should be approved.

    5.    *The Exculpation Provision is Appropriate.*

Section 7.05 of the Plan provides for the exculpation of each Exculpated Party.[5]   The exculpation is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases. *See In re FAH Liquidation Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)).   The exculpation provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations. *See, e.g.*, *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005).   Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence are customary and generally approved in this district under appropriate circumstances. *See Wash. Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).   Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of

---

[5]    "Exculpated Party" means, collectively, and in each case in its capacity as such:  (i) each of the Debtors; (ii) any statutory committees appointed in the Chapter 11 Cases and the members thereof; (iii) the Debtors' officers, directors, and managers, specifically including Pharmacy Management LLC and its Affiliates and lenders (solely in their fiduciary capacities, if any), and (iv) the Debtors' and Committee's professionals retained under sections 327 or 1103 of the Bankruptcy Code (each in their capacities as such) that served in such capacities at any time between the Petition Date and the Effective Date.

4871-9848-6481, v. 5

gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring. *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000).

The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.  Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, managers, and retained professionals.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

Here, the Debtors and their officers, directors, and professionals, and the Committee actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive, and the resulting agreements embodied in the Restructuring Transactions were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys overwhelming support from Holders of Claims entitled to vote. *See* Voting Report at ¶ 14.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, the Plan Term Sheet, and related documents in furtherance of the transactions contemplated by the Plan.  Furthermore, the exculpation provision is limited to acts during these Chapter 11

17

Cases and does not extend beyond such time period. Accordingly, the Court's findings of good faith *vis-a-vis* the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations. All of the Exculpated Parties, as fiduciaries in these Chapter 11 Cases, played a key role in developing the Plan that paved the way for a successful reorganization, and likely would not have been so inclined to participate in the plan process without the promise of exculpation. Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability. Under the circumstances, it is appropriate for the Court to approve the exculpation provision, and to hold that the Exculpated Parties have acted in good faith and in compliance with the law.

6.      *The Injunction Provision is Appropriate.*

The injunction provision set forth in Section 7.06 of the Plan merely implements the Plan's release, discharge, and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, or the other Released Parties on account of or in connection with or with respect to any such claims or interests released, discharged, or subject to exculpation. Thus, the injunction provision is a key provision of the Plan because it enforces the release, discharge, and exculpation provisions that are centrally important to the Plan. As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision must be appropriate. Moreover, this injunction provision is narrowly tailored to achieve its purpose.

4871-9848-6481, v. 5

**B.      1129(a)(2): The Debtors Have Complied with all Applicable Provisions of the Bankruptcy Code.**

Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent "comply with the applicable provisions of [title 11]."  The legislative history to section 1129(a)(2) explains that this provision incorporates the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code. S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of Chapter 11, such as Section 1125 requiring disclosure."). *See also In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988); *In re Johns-Mansville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *rev'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd* 843 F.2d 636 (2nd Cir. 1988).  As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Voting and Solicitation Agent in accordance with the Disclosure Statement Order.

*1.      The Debtors Complied with Section 1125 of the Bankruptcy Code.*

Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).  Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.  *See Momentum Mfg. Corp. v. Emp. Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to

4871-9848-6481, v. 5

engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

Section 1125 is satisfied here. Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement in accordance with section 1125(a)(1) of the Bankruptcy Code. *See* Docket No. 276. The Court also approved the contents of the solicitation materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan. *See Id.* As stated in the Voting Report, the Debtors, through the Voting and Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code. *See* Voting Report at ¶ 7; *see also* Certificate of Service. The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class. Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan. *See* Voting Report ¶ 7; *see also generally* Certificate of Service.

Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

2.    *The Debtors Complied with Section 1126 of the Bankruptcy Code.*

Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan. *See* 11 U.S.C. § 1126. As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

4871-9848-6481, v. 5

- Class 2 (Vendor Secured Claims), Class 3 (Other Secured Claims), Class 4 (Other Priority Claims), and Class 11 (Intercompany Interests), are Unimpaired under the Plan (collectively, the "**Unimpaired Classes**").  *See* Plan at Art. III.   Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Classes 6 (Other General Unsecured Claims), 8 (Seller Note Claims), 10 (Intercompany Claims), and 12 (Equity Interests in Optio Rx) are Impaired under the Plan (the "**Deemed Rejecting Classes**"). *Id.*  Pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

Accordingly, the Debtors solicited votes only from the Voting Classes, Holders of Allowed Claims and Interests in Classes 1, 5, 7 and 9, because each of these Classes is Impaired and entitled to receive a distribution under the Plan.   With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  The Voting Report reflects that one hundred percent (100%) in amount and one hundred percent (100%) in number of the valid ballots received in Classes 1, 7 and 9 voted in favor of the Plan, and in excess of ninety-seven (97.3%) in amount and ninety (90%) percent in number of the valid ballots received in Class 5 voted in favor of the Plan. Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

4871-9848-6481, v. 5

### C.    1129(a)(3): The Plan was Proposed in Good Faith.

Pursuant to section 1129(a)(3) of the Bankruptcy Code, a chapter 11 plan may be confirmed only if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Although not defined in the Bankruptcy Code, "good faith" has been described by the courts to include: (i) the debtor's "'legitimate . . . hope of success,'" *In re Century Glove, Inc.*, Civ. A. Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) (quoting *In re Sun Country Development, Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)); *see also*, *In re Shoen*, 193 B.R. 302, 318 (Bankr. D. Ariz. 1996); (ii) a showing that the plan was proposed with "honesty and good intentions," *see Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); (iii) the existence of "'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code,'" *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *see Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir. 1990); *Ryan v. Loui* (*In re Corey*), 892 F.2d 829, 835 (9th Cir. 1989); and (iv) whether the debtor's bankruptcy filing was designed to abuse the judicial process and the purpose of the reorganization provisions of the Bankruptcy Code. *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *In re VIP Motor Lodge, Inc.*, 133 B.R. 41, 44 (Bankr. D. Del. 1991) (finding of good faith where debtor did not seek to use the bankruptcy process for dilatory purposes).

A court should consider the totality of the circumstances surrounding a plan to determine if it was proposed in good faith. *See Mann Farms*, 917 F.2d at 1214.  Additionally, the mere allegation of bad faith is insufficient to demonstrate lack of compliance with section 1129(a)(3) of the Bankruptcy Code. *See In re Jersey City Medical Ctr.*, 817 F.2d 1055, 1059-60 (3d Cir.

4871-9848-6481, v. 5

1987) (creditors' objection based on lack of good faith, which was not supported by credible evidence, was properly overruled).

The primary objectives of the Bankruptcy Code that are advanced by a Chapter 11 case are the reorganization of the debtor and the maximization of the value of the estate, *see In re Bonner Mall P'ship*, 2 F.3d 899, 916 (9th Cir. 1993) *abrogated on other grounds by In re Juarez*, 836 Fed.Appx. 557 (9th Cir. 2020), and "'the expeditious resolution of disputes and speedy payment to creditors.'" *In re Kemp*, 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991) (quoting *In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34, 38 (Bankr. S.D. Ind. 1986)).  There is no question that the Plan accomplishes each of these goals.

The Plan was proposed with honesty, good intentions, and with the goal of maximizing stakeholder recoveries.  Throughout these cases, the Debtors and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.  The Plan follows an extensive arm's-length negotiation among the Debtors, the Consenting Lenders, Aves Management LLC, the DIP Lenders, the Committee, and other parties interested in ensuring that stakeholders realize the highest possible recoveries under the circumstances.  Importantly, the Plan is supported by the Committee and the Debtors' creditor body as a whole.  The Debtors respectfully submit that the Plan was negotiated with the objective of ensuring that economic stakeholders in the estates realize the best possible recovery under the circumstances.  Accordingly, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

### D.     1129(a)(4): The Plan Provides for Court Approval of all Payments for Services in Connection with these Cases.

Section 1129(a)(4) of the Bankruptcy Code requires that a payment "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident

to the case, has been approved by, or is subject to approval of, the court as reasonable."   11 U.S.C. § 1129(a)(4).  This section has been construed to require that all payments of professional fees that are made from estate assets be subject to bankruptcy court review and approval as to their reasonableness. *See In re Resorts Int'l, Inc.*, 145 B.R. 412, 475 (Bankr. D.N.J. 1990); *Johns-Manville*, 68 B.R. at 632.

Pursuant to Section 2.02 of the Plan, Accrued Professional Compensation Claims ultimately are subject to approval of this Court.  As such, the Plan complies with section 1129(a)(4) of the Bankruptcy Code. *See In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (section 1129(a)(4) satisfied where plan provides for payment of "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Court approval of payments for services and expenses is governed by various [Bankruptcy] Code provisions – *e.g.*, §§ 328, 329, 330, 331 and 503(b) – and need not be explicitly provided for in a [c]hapter 11 plan.").

E.      **1129(a)(5): The Plan Discloses Directors and Officers.**

Section 1129(a)(5) of the Bankruptcy Code requires: (i) that the proponent of a plan disclose the identity of any individual proposed to serve after confirmation as a director, officer, or voting trustee of the debtor; (ii) that the appointment of such individuals be consistent with the interests of creditors and shareholders and with public policy; and (iii) that the proponent disclose the nature of any insider that will be employed by the reorganized debtor and the nature of the compensation to be provided to such insider. 11 U.S.C. § 1129(a)(5).  Here, the Plan Supplement attached the Reorganized Debtors New Governance Documents provides the identity and affiliations of the persons proposed to serve as the initial directors and officers of the Reorganized Debtors after Confirmation of the Plan.  In addition, Section 4.09 of the Plan

provides that from and after the Effective Date, the Reorganized Debtors may take any and all necessary or appropriate actions to appoint directors, officers, and managers of the Reorganized Debtors consistent with the charter, articles of incorporation, and/or by-laws of the Reorganized Debtors, subject to any limitations in applicable non-bankruptcy law.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.      1129(a)(6): The Plan does not Affect any Change in Publicly Regulated Rates.**

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission with jurisdiction over the rates of a debtor approve any changes in rate regulations provided in a plan. 11 U.S.C. § 1129(a)(6).  The Debtors are not subject to any such regulation and the Plan does not propose any rate changes.  Section 1129(a)(6) therefore is not applicable, and consent from a regulatory agency is not required.

**G.      1129(a)(7): The Plan is in the "Best Interests" of Creditors.**

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part:

> With respect to each impaired class of claims or interests –
> (A) each holder of a claim or interest of such class –
> | (i) | has accepted the plan; or |
> |-----|---------------------------|
> | (ii) | will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date …. |

11 U.S.C. § 1129(a)(7).  The best interest test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of the debtor's estate against the estimated recoveries under that debtor's plan of reorganization.

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999)

("The 'best interests' test applies to individual creditors holding impaired claims, even if the

class as a whole votes to accept the plan."); *Century Glove*, Civ. A. Nos. 90-400-SLR, 90-401-

SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993); *In re Adelphia Commc'ns. Corp.*, 368

B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an

impaired holder of claims would receive "no less than such holder would receive in a

hypothetical chapter 7 liquidation").  As section 1129(a)(7) of the Bankruptcy Code makes clear,

the best interests test applies only to holders of non-accepting impaired claims or interests.  All

of the Voting Classes have accepted the Plan.  The Deemed Rejecting Classes did not vote on the

Plan.  Accordingly, to satisfy the best interests test, the Debtors must demonstrate that each

Holder of a Claim in the Deemed Rejecting Classes will receive at least as much under the Plan

as that Holder would receive in a chapter 7 liquidation.

The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.

Exhibit C to the Disclosure Statement sets forth the Debtors' liquidation analysis (the

"**Liquidation Analysis**").  The Liquidation Analysis compares the projected range of recoveries

that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the

Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests

under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and

liabilities as of a certain date and incorporates various estimates and assumptions, including a

hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation

Analysis is subject to potential material changes, including with respect to economic and

business conditions and legal rulings.

4871-9848-6481, v. 5

Based on the Liquidation Analysis, and the assumptions included therein the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, Holders of Claims and Interests in all Impaired Classes will recover at least as much, and in most cases much more, as a result of confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.  As discussed further below, in a hypothetical chapter 7 liquidation and without the Plan, most parties would receive nothing.  Based on the recoveries set forth in the Plan, the Plan satisfies the best interests test as required by the Bankruptcy Code.

**H.      1129(a)(8): The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims and interests established under a plan either accepts the plan or is not impaired under the plan. 11 U.S.C. § 1129(a)(8).  A class of claims accepts a plan if holders of at least two-third in dollar amount and a majority in number of claims in that class vote to accept the plan, counting only those claims whose holders actually vote. 11 U.S.C. § 1126(c); *see also* 11 U.S.C. § 1126(d) (governing classes of interests).  A class of claims or interests that is not impaired is deemed to have accepted the plan. 11 U.S.C. §§ 1126(f) and 1129(a)(8).  A class of claims or interests that does not receive or retain any property under the plan is deemed to reject a plan. 11 U.S.C. § 1126(g).

Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, thus, were not entitled to vote[6].  Consequently, while the Plan does not

---

[6]   All Other General Unsecured Claims in Class 6 and Seller Note Claims in Class 8 were going to be cancelled, released, and extinguished without any distribution under the first amended Plan, however, by virtue of the UCC Settlement Agreement, the UCC Settlement Amount ($275,000) will be Distributed pro rata to Holders of Allowed Claims in Classes 6 and 8.

satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Deemed Rejecting Classes,

the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the

Bankruptcy Code, as discussed below.

**I.     1129(a)(9): The Plan Complies with the Required Treatment of Administrative Claims and Priority Claims.**

Section 1129(a)(9) of the Bankruptcy Code requires that, unless the holder of a particular

claim agrees to a different treatment of such claim, persons holding the following types of claims

shall receive under the plan the following treatment:

> i.    the holder of a claim entitled to priority under section 507(a)(2) or (3) must receive cash in the allowed amount of its claim on the effective date of the plan;
>
> ii.   the holder of a claim entitled to priority under sections 507(a)(1), (4), (5), (6), or (7) must receive deferred cash payments with a present value equal to the allowed amount of the claim (if the class accepts the plan) or cash in the allowed amount of such claim on the effective date of the plan (if the class does not accept the plan);
>
> iii.  the holder of a tax claim entitled to priority under section 507(a)(8) must receive regular cash installment payments with a present value equal to the allowed amount of the claim, over a period ending no later than 5 years after the order for relief, and in a manner no less favorable than the most favors class of nonpriority unsecured claims provided for under the plan (other than cash payments to a convenience class under section 1122(b), and
>
> iv.   with respect to a secured claim that otherwise would qualify as a priority claim under section 507(a)(8) but for its secured status, the holder must receive cash payments, over a period and in the manner described in the prior subsection (C).

*See* 11 U.S.C. § 1129(a)(9).

The Plan satisfies the requirements of section 1129(a)(9). First, Section 2.10 of the Plan

satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that, except to the

extent that the Holder of an Allowed Administrative Claim agrees to less favorable treatment, or

28

as otherwise provided in the Plan, each Holder of an Allowed Administrative Claim against any of the Debtors shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, within five (5) Business Days after the Effective Date, or as soon as reasonably practicable thereafter, (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than five (5) Business Days after such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; or (iii) at such time and upon such terms as set forth in an order of the Bankruptcy Code; provided that Administrative Claims incurred by any Debtor in the ordinary course of such Debtor's business may be paid in the ordinary course of business by the Debtors, consistent with past practice and in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  For the avoidance of doubt, nothing herein is intended to, nor shall be deemed to be, a waiver of any arguments the Debtors or other parties in interest may have with respect to the administrative expense claim asserted by Skin Medicinals LLC.

*Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because Section 3.04(d) of the Plan provides that each Holder of an Allowed Other Priority Claim of the types of Claims specified by 1129(a)(9)(B) shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Other Priority Claim, Cash on the Effective Date, or as soon as reasonably practicable thereafter, in an amount equal to such Allowed Other Priority Claim.

*Third*, Section 2.03 of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that, except to the extent that a Holder of an Allowed Priority Tax Claim has

4871-9848-6481, v. 5

been paid by the Debtors before the Effective Date, or the applicable Reorganized Debtor and such Holder agree to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim within five (5) Business Days after the Effective Date; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installments over a period not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (iii) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

*Fourth*, the Debtors are not aware of any Secured Tax Claims subject to section 1129(a)(9)(D) of the Bankruptcy Code.  To the extent there are any such Secured Tax Claims, they would be treated as Class 3 Other Secured Claims under the Plan, are unimpaired and would receive payment in full in Cash equal to the amount of such Allowed Other Secured Claim as set forth in the Plan.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.      1129(a)(10): Acceptance of the Plan by One Impaired Class of Claims.**

Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by an insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

As discussed above, each of the Voting Classes, which are Impaired, overwhelmingly accepted the Plan independent of any insiders' votes.  *See* Voting Report.  Thus, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      1129(a)(11): The Plan is Feasible.**

Section 1129(a)(11) of the Bankruptcy Code requires that a court find that a plan is feasible as a condition precedent to confirmation.  *See* 11 U.S.C. § 1129(a)(11).  Specifically, the Bankruptcy Court must determine that "[confirmation of the plan] is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; the plan need only offer a reasonable assurance of success.  *See Johns-Manville Corp.*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012) ("the test is whether the things which are to be done after confirmation can be done as a practical matter under the facts" (internal citations and quotations omitted)); *Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir. 1985) (same); *In re Rivers End Apartments*, 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994) (stating to establish feasibility, "a [plan] proponent must demonstrate that its plan offers 'a reasonable prospect of success' and is workable"); *In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990) (providing that guarantee of success is not required to meet feasibility standard of section 1129(a)(11); *In re Elm Creek Joint Venture*, 93 B.R. 105, 110 (Bankr. W.D. Tex. 1988) (finding that a guarantee of success is not required under section 1129(a)(11) of the Bankruptcy Code, only reasonable expectation that payments will be made).

To satisfy this feasibility requirement, the Debtors must exceed only a relatively low threshold of proof. *See Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (Bankr. D. Conn. 2006), *remanded*, Case No. 04-30511, 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008), *stay denied*, Case No. 04-330511, 2008 WL 2003118 (Bankr. D. Conn. May 7, 2008), *appeal denied*, Case No. 08-107, 2008 WL 2079126 (D. Conn. May 16, 2008) ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement." (*quoting Computer Task Grp. Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P 9th Cir. 2003))); *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apts. (In re Sea Garden Motel & Apts.)*, 195 B.R. 294, 304-05 (D.N.J. 1996); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (E.D. Pa. 1995) ("[T]he feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively broad parameters articulated in the statute."). Indeed, "[t]he mere prospect of [] uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

The Plan is feasible. As set forth in the Lembo Declaration, the Debtors and their advisors have thoroughly analyzed their ability post-confirmation to meet their obligations under the Plan and continue as a going concern without the need for further financial restructuring. *See* Lembo Declaration, ¶ 58. As set forth in the Disclosure Statement, prior to the Petition Date, the Debtors had significant funded liabilities that they could not service, which necessitated the commencement of these Chapter 11 Cases. Confirmation and consummation of the Plan will allow the Debtors to deleverage the company's balance sheet and enable the Debtors to emerge from chapter 11 expeditiously with an appropriately reduced debt structure.

Moreover, as set forth in the Disclosure Statement, the Debtors prepared projections of the Debtors' ability to satisfy their obligations on the Effective Date.  *See* Disclosure Statement, Ex. D.  These financial projections reflect a series of realistic assumptions regarding the Debtors' obligations and demonstrate the Debtors' ability to use their cash and access to their Exit Facility to meet all of their obligations under the Plan. *See* Lembo Declaration, ¶ 59.  On the basis of these projections, which were prepared by the Debtors and their advisors, the Debtors believe their financial future, taking into account the provisions of the Plan, is sound.  *See* Lembo Declaration, ¶ 59.  As set forth in the financial projections and the Exit Facility Term Sheet, the Debtors will have the ability to operate in the ordinary course of business and satisfy all of their obligations on the Effective Date and beyond under the Plan.  The Debtors, therefore, submit that the Plan is feasible, and confirmation will not be followed by further liquidation. *See* Lembo Declaration, ¶ 59.  Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**L.     1129(a)(12): The Plan Provides for Payment of all Statutory Fees.**

Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Section 2.05 of the Plan, provides that the Debtors or Reorganized Debtors will pay fees payable under 28 U.S.C § 1930(a), including fees, expenses, and applicable interests payable to the United States Trustee, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**M.      1129(a)(13) Retiree Benefits.**

Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.   Section 5.08 of the Plan provides that from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.   Accordingly, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

**N.      Sections 1129(a)(14) and (15) do not Apply to Corporate Debtors.**

Sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to individual Debtors, and thus are inapplicable. *See* 11 U.S.C. §§ 1129(a)(14) and (15).

**O.      Section 1129(a)(16) Is Inapplicable.**

Section 1129(a)(16) of the Bankruptcy Code places limits on the permissible transfers of property by a nonprofit entity or a trust under a chapter 11 plan. 11 U.S.C. § 1129(a)(16).   As the Debtors are not nonprofit entities or trusts, this requirement is inapplicable.

**P.      The Plan Complies with the Requirements of Section 1129(b) of the Bankruptcy Code.**

Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.   To confirm a plan that has not been accepted by all impaired classes (therefore failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.

34

As noted above, Classes 1, 5, 7 and 9, which are Impaired Classes of Claims entitled to vote on the Plan, have voted overwhelmingly in favor of the Plan. However, the Deemed Rejecting Classes have or are deemed to have rejected the Plan. Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code.

       1.      *The Plan is Fair and Equitable.*

A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule. *See Bank of Am.*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(1), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'"). This requires that an impaired class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest. *Id.*

The Plan satisfies section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have or are deemed to have rejected the Plan, respectively, the Plan is confirmable. There are no Claims or Interests that are junior to the Deemed Rejecting Classes that are receiving any recovery under the Plan before any Class that is senior in priority, nor is any Holder of a Claim or Interest receiving more than payment in full of its Claim or Interest. Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes and Interests and satisfies section 1129(b) of the Bankruptcy Code.

       2.      *The Plan Does Not Discriminate Unfairly.*

Section 1129(b)(1) of the Bankruptcy Code requires that a plan "does not discriminate unfairly... with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists. *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (*"203 N. LaSalle I"*) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. 203 N. LaSalle II*, 526 U.S. 434 (1999).  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists. *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires the court to "consider all aspects of the case and the totality of all the circumstances").

The Third Circuit addressed "unfair discrimination" in *Tribune*, emphasizing that the requirement does not prohibit all disparities in recoveries and promotes flexibility in assessing unfair discrimination: "'Discriminate unfairly' is simple and direct: you can treat differently (discriminate) but not so much as to be unfair. *In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020).  "There is, as is typical in reorganizations, a need for flexibility over precision.  The test becomes one of reason circumscribed so as not to run rampant over creditors' rights." *Id.*  At the conclusion of its *Tribune* opinion, the Third Circuit recognized that such flexibility was critical in the chapter 11 context:

> Unfair discrimination is rough justice. It exemplifies the Code's tendency to
> replace stringent requirements with more flexible tests that increase the likelihood

that a plan can be negotiated and confirmed. This flexibility is balanced by the Code's inherent concern with equality of treatment. We seek to maintain this balance in our interpretation of § 1129(b)(1) here.

*Id.* at 245.

The Third Circuit endorsed the *Tribune* bankruptcy court's application of the "rebuttable presumption" test for unfair discrimination (attributed to Professor Bruce Markell). Under that test:

> A rebuttable presumption of unfair discrimination exists when there is "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution."
>
> …
>
> Under this test, a presumption of unfair discrimination may be overcome if the court finds that "a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization. The presumption of unfairness based on differing risks may be overcome by a showing that the risks are allocated in a manner consistent with the prebankruptcy expectations of the parties."

*Id.* at 241 (quoting Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 228, 249 (1998).

Although it endorsed the "rebuttable presumption" test, the Third Circuit made clear that bankruptcy courts have broad discretion in determining both (a) whether the presumption of unfair discrimination arises and (b) what is required to overcome such presumption. With respect to whether a presumption exists, the Third Circuit noted:

> …to presume unfair discrimination, there must be a "materially lower" percentage recovery for the dissenting class or a "materially greater risk to the dissenting class in connection with its proposed distribution." The rebuttable presumption test intentionally leaves opaque what is, under the circumstances, "material."

37

Such line drawing has been left primarily to bankruptcy courts. We too leave this for judicial development.

*Tribune Co.*, 972 F.3d at 243 (internal citations omitted).

Similarly, with respect to whether a presumption of unfair discrimination has been rebutted, the Third Circuit noted:

…if courts find plans materially discriminate against the dissenting class and follow the rebuttable presumption test or some variation, that finding is by definition presumptive and can be rebutted. Though we could make general suggestions for what qualifies as an adequate rebuttal (e.g., contributions to the reorganization by a preferred class may rebut unfair discrimination), those determinations are for bankruptcy courts to decide initially.

*Id.* at 244 (internal citations omitted).

Courts in the Third Circuit, both before and after *Tribune*, have found that the circumstances under which a presumption of unfair discrimination are rebutted are not limited to those outlined by Professor Markell in his articulation of the "rebuttable presumption" test. For example, the United States District Court for the District of Delaware has noted that "neither Markell nor any of the cases cited by Appellant suggest any limitations on the case-specific facts and circumstances which might rebut the presumption of unfair discrimination." *In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 92 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), as amended (Feb. 2, 2021)). Other courts, noting that "the Third Circuit [in *Tribune*] did not explicitly adopt the Markell test to be applied under all circumstances," have emphasized commonalities amongst various tests, concluding that whether discrimination is unfair boils down to whether there is a "reasonable basis for discrimination":

Under the four-factor test [articulated in *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989)], the majority of the discussion by the parties is based on the related first and fourth factors, and whether the settlement agreement provides "a reasonable basis for discrimination." Under the Markell test, the considerations are the same, if worded differently.

*Earth Pride Organics, LLC v. Off. Comm. of Unsecured Creditors of EarthPride Organics, LLC*, No. BR 17-13816, 2021 WL 1553787, at *7 (E.D. Pa. Apr. 20, 2021). *See also In re Genesis Health Ventures*, 266 B.R. 591, 611 (Bankr. D. Del. 2001) ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination").

Another critical principle is that "unfair discrimination is determined from the perspective of the dissenting class." *Tribune Co.*, 972 F.3d at 242. (The Third Circuit noted that, "What this means, however, is subject to interpretation. Courts and commentators nearly always consider this a comparison between the allegedly preferred class and the dissenting class."). As the Tribune court observed, a comparison between the recovery of the preferred class and the dissenting class is often the typical, but not always the only acceptable, approach, and that "[o]ther measures that allow courts to assess the magnitude of harm to the dissenting class may also be appropriate in some cases." *Id.* at 242-43. For example, courts in this district have found it appropriate to evaluate unfair discrimination by comparing a dissenting class's recovery under the proposed plan to its baseline entitlement under the absolute priority rule, and found no discrimination where the rejecting class's plan recovery exceeded its baseline entitlement, even where other classes of similarly situated creditors received recoveries that were far greater relative to their baseline entitlements.[7] Put another way, the focus is on whether the dissenting

---

[7]    *In re Nuverra Environmental Solutions, Inc.*, 590 B.R. 75, n. 12 (D. Del. 2018) ("*See also In re 203 N. LaSalle St. Ltd. P'ship*, 126 F.3d 955, 969 (7th Cir. 1997) (factually predating Markell, and finding, in part, that, "the disparity between [the trade claims and the nonrecourse deficiency claims], with the trade creditors receiving 100 percent and Bank America receiving sixteen percent, is not unfair [because] Bank America does better than it would have under chapter 7, and the trade creditors do no worse."); *see also In re Tribune Co.*, 972 F.3d 242-243 ("a comparison between the recovery of the preferred class and the dissenting class is by far the preferred but not always the only acceptable approach. Other measures that allow courts to assess the magnitude of harm to the dissenting class may also be appropriate in some cases.").

class was actually harmed by the alleged discrimination – which requires a comparison between the class's plan recovery and its baseline entitlement. *Id.*

These comparisons between plan recoveries and baseline entitlements are particularly useful and appropriate in the context of this Plan, which features three separate classes of general unsecured claims receiving different treatment under the Plan.

Under the Plan, Holders of Allowed General Unsecured Trade Claims in Class 5, by virtue of the GUC Trade Gift, will receive 85% of their respective claims on the Effective Date and the remaining 15% on the one-year anniversary of the Effective Date. All Other General Unsecured Claims in Class 6 and Seller Note Claims in Class 8 <u>were</u> going to be cancelled, released, and extinguished without any distribution under the first amended Plan, however, by virtue of the UCC Settlement Agreement, the UCC Settlement Amount ($275,000) will be Distributed pro rata to Holders of Allowed Claims in Classes 6 and 8.

Neither Class 6 nor Class 8 creditors are harmed by any alleged discrimination in the Plan. Even a cursory review of the liquidation analysis attached as <u>Exhibit C</u> to the Disclosure Statement shows that under any scenario, all unsecured creditors will recover nothing in a hypothetical chapter 7 liquidation. In a chapter 7 liquidation, the Prepetition Secured Lenders will only recover approximately 13% to 16% of their allowed claims of approximately $126,700,000, plus their rights as DIP Lenders. All other creditors would receive nothing. Therefore, the baseline recovery for general unsecured creditors in these cases is $0 under the absolute priority rule. Courts in this District have found no unfair discrimination where the rejecting class's plan recovery was no worse than its baseline entitlement, even where other classes of similarly situated creditors received recoveries that were far greater relative to their baseline entitlements. *Id.* at 91.

4871-9848-6481, v. 5

Distributions to holders of General Unsecured Trade Claims in Class 5 have no impact on the distributions to holders of unsecured claims in Classes 6 or 8. The record is clear that unsecured creditors are entitled to nothing under the Bankruptcy Code's priority scheme, and a gift from the Admin Agent and DIP Agent resulting in an increased distribution to unsecured creditors holding trade claims in Class 5 does not diminish the distribution to holders of claims in Classes 6 or 8. If holders of General Unsecured Trade Claims did not receive their increased recovery, the surplus distribution would revert to the Prepetition Secured Lenders and DIP Lenders, not holders of claims in Classes 6 or 8. Because holders of claims in Classes 6 and 8 are not entitled to a distribution in the first place, providing a greater distribution to a different class of unsecured creditors does not alter the distribution to which they are entitled. *Id.*

The GUC Trade Gift is a gift from the Prepetition Secured Lenders and DIP Lenders to the Holders of allowed General Unsecured Trade Claims that will have a future relationship with the Reorganized Debtors, providing goods and services necessary for the Reorganized Debtors' continued business operations upon emergence from bankruptcy. The classification of Classes 6 and 8 separately from trade creditors in Class 5 distinguishes trade claimants under a valid good faith business basis – those with whom Debtors will have a go-forward business relationship and provide goods and services necessary for Debtors' continued operations – from other general unsecured claimants. This separate classification is consistent with and ordinary in cases before courts in this District. *See, e.g.*, *In re Mallinckrodt PLC*, 639 B.R. 837, 857 (Bankr. D. Del. 2022) (finding debtors had legitimate business reason to classify creditor's claims separately from claims of trade creditors, as trade creditors would have a future relationship with debtors, providing goods and services necessary for debtors' continued operations).

Applying the foregoing principles to the treatment of creditors under the Plan, it is clear that the Plan does not unfairly discriminate against the dissenting classes (within which only a few creditors are dissenting) within the meaning of section 1129(b)(1).

## IV.    PLAN OBJECTIONS

### A.    Objection of Dr. Rinku Patel

Dr. Patel is a disgruntled former employee of the Debtors.  Dr. Patel has already thumbed her nose at the Debtors' bankruptcy proceedings and intentionally ignored and violated the automatic stay by suing Debtor Optio Rx post-petition in state court in an effort to liquidate and collect upon a pre-petition claim.  Dr. Patel initiated her post-petition lawsuit without seeking stay relief and knowing full well of the Debtors' bankruptcy proceedings.  The Debtors have filed a motion to enforce the automatic stay against Dr. Patel and are seeking sanctions in connection with Dr. Patel's intentional actions.

Dr. Patel has filed an objection to provisions of the Plan which, ironically, are designed to protect the Debtors and Reorganized Debtors from facing impermissible continued post-confirmation litigation from creditors, like Dr. Patel, who hold pre-petition claims against the Debtors.   This objection appears to just be another litigation tactic by Dr. Patel and her contingency fee attorney.

Dr. Patel's principal objection appears to be that the release provisions in section 7.03 of the Plan could be construed to be non-consensual third-party releases.  This is not the case. While certain non-debtors are "Released Parties" under the Plan, the releases of the non-debtor "Released Parties" are intended to be consensual.  In fact, section 1.01 (wwwww) of the Plan, which defines the "Releasing Parties" who are giving releases to the "Released Parties" under section 7.03 of the Plan, attempts to make this clear and specifies that Holders of Claims and

Interests are only "Releasing Parties" if they affirmatively opt-in to the releases provided in the

Plan.  In particular, Releasing Parties are defined as follows:

> "Releasing Party" means, collectively, and in each case in their
> capacity as such: (i) each of the Released Parties; (ii) **all Holders
> of Claims or Interests that vote to accept or reject the Plan and
> opt-into the releases provided by the Plan by checking the box
> on the applicable form indicating that they opt to grant the
> releases provided in the Plan; (iii) all Holders of Claims or
> Interests that abstain from voting on the Plan and who
> affirmatively opt-into the releases provided by the Plan by
> checking the box on the applicable form indicating that they
> opt to grant the releases provided in the Plan**; (iv) each current
> and former Affiliate of each Entity in clause (i) through the
> following clause (v); and (v) each Related Party with respect to
> each of the foregoing in clauses (i) through (v).

(Plan, Section 1.01 (wwwww)) (emphasis added).

Nothing in the Supreme Court's recent decision in H*arrington v. Purdue Pharma L.P.*,

603 U.S. ___, 144 S. Ct. 2071, 2086 (2024) prohibits consensual third-party opt-in releases like

those proposed by the Plan.   However, out of an abundance of caution, the Debtors have revised

Section 7.03 of the Plan by adding the following language **"For the avoidance of doubt, no

direct third-party claims are non-consensually released herein"** to avoid any possible

ambiguity as to whether the third-party releases are non-consensual.  The Debtors respectfully

submit that the foregoing change to the Plan resolves and moots Dr. Patel's principal objection to

confirmation.

In an apparent effort to get a leg up in her pending state court litigation, Dr. Patel raises

several other objections to confirmation, all of which are misplaced.  Dr. Patel's other objections

generally are an attempt to construe the Injunction provisions in section 7.06 of the Plan as

impermissibly broad.  Dr. Patel tries to cast the Injunction as some sort of attempt to completely

cut-off Dr. Patel's ongoing litigation in state court.  That, however, is a strained reading of

section 7.06 of the Plan.  Instead, the Injunction provisions of section 7.06 of the Plan are designed and tailored to prevent holders of <u>Claims</u> from continuing to pursue or enforce such <u>Claims</u> post-Effective Date outside the jurisdiction of the Bankruptcy Court and contradiction of the terms of the Plan that address the treatment of such Claims.[8]  This is standard and necessary to ensure that the Plan can be properly carried out without improper continued litigation by holders of pre-petition Claims dealt with and discharged under the Plan.  Further, as discussed above, the Plan does not unfairly discriminate by separately classifying Class 6 claims from Class 5 claims.

At bottom, it appears that Dr. Patel, who has already knowingly violated the automatic stay, is trying to create ambiguity in a way that would allow her to continue to pursue pre-petition Claims against the Debtors post-Effective Date outside of the purview of this Court and in contradiction to the Plan and section 1141 of the Bankruptcy Code.

### B.    Objection of the Office of the United States Trustee

The Debtors believe that changes made to the Plan have resolved all/most of the issues raised by the U.S. Trustee.  Specifically, and among other things, the Debtors have (i) modified the definition of "Exculpated Parties" to limit such parties to fiduciaries of the Debtors' Estates and added further clarifying, temporal language to the Exculpation provisions of the Plan; (ii) have clarified the Third-Party Release language to confirm that the Plan does not contemplate nonconsensual releases; and (iii) clarifying the settlement language interspersed throughout the Plan to only put forth specific settlements for approval, as opposed to asking for approval of the Plan itself under Bankruptcy Rule 9019.

---

[8]    Indeed, all subsections of section 7.06 are clear that such sections are only designed to enjoin parties from pursuing or enforcing "Claims" or "Interests" on a post-effective date basis.  All such Claims and Interests receive treatment under the Plan and are discharged under section 7.04 of the Plan.  There is nothing unusual or impermissible about prohibiting creditors from pursuing or enforcing discharged Claims on a post-effective date basis.

4871-9848-6481, v. 5

C.  **Objection of Skin Medicinals**

Skin Medicinals LLC (**"Skin Medicinals"**) filed a limited objection and reservation of rights to confirmation of the Plan (the **"Limited Objection"**) [Docket No. 367]. The Limited Objection requests language be added to the confirmation order that would negate the Plan's release, exculpation, injunction, and discharge provisions (the "**Release Provisions**"), as they relate to Skin Medicinals, so they can continue to pursue wholly prepetition general unsecured claims against the Debtors that are being discharged by the Plan under section 1141(d) of the Bankruptcy Code.

On September 3, 2024, Skin Medicinals also filed its *Motion of Skin Medicinals LLC for Entry of an Order Granting an Allowed Administrative Expense Pursuant to Section 503(b) of the Bankruptcy Code* [Docket No. 362] (the **"Motion"**) seeking entry of an order allowing Skin Medicinals an administrative expense claim.

On September 10, 2024, the Debtors filed *Debtors' Objection to Motion of Skin Medicinals LLC for Entry of an Order Granting an Allowed Administrative Expense Pursuant to Section 503(b) of the Bankruptcy Code* (the **"Debtors' Objection"**) [Docket No. 384].

For the reasons set forth in the Debtors' Objection, attached hereto a **Exhibit B** and incorporated herein by reference, Skin Medicinals is not entitled to an administrative expense claim in these cases for alleged misappropriation of its alleged trade secrets (the **"Trade Secrets Claims"**) or for any of its other claims, including violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (**"CFAA Claims"**) and the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.801 *et seq.* (**"CADRA Claims"** and together with the CFAA Claims, the "**Unauthorized Access Claims**").

As more fully set forth in the Debtors' Objection, all of the alleged conduct giving rise to the alleged Trade Secret Claims, the Unauthorized Access Claims, or Skin Medicinals' other claims (collectively, the **"Asserted Administrative Claims"**) occurred well prior to the Petition Date and are prepetition unsecured claims under section 101(5) of the Bankruptcy Code that are being discharged under section 1141(d) of the Bankruptcy Code. For the reason set for in the

45

Debtors' Objection, the Debtors should not be required to add any language to the proposed form of confirmation order and the Limited Objection should be denied.

Skin Medicinals' concerns with respect to their claims against non-debtor third parties are also unfounded.  As set forth above, the Debtors have revised Section 7.03 of the Plan by adding the following language **"For the avoidance of doubt, no direct third-party claims are non-consensually released herein"** to avoid any possible ambiguity as to whether the third-party releases are non-consensual.  The Debtors respectfully submit that the foregoing change to the Plan resolves and moots this portion of the Limited Objection.

Finally, the Debtors agree that claims that may arise after the confirmation date of the Plan are not impacted by the Plan as a matter of law. The Debtors do not believe any language needs to be added to the Confirmation Order to clarify this basic bankruptcy principle.  For the foregoing reasons, the Limited Objection should be denied.

## VI.  <u>RESERVATION OF RIGHTS</u>

The Debtors expressly reserve their rights to amend or supplement this Confirmation Memorandum.  Nothing contained herein shall constitute a waiver of any of the rights or remedies of the Debtors and all such rights are hereby expressly reserved.

## VII. <u>CONCLUSION</u>

**WHEREFORE**, based on the foregoing, the Debtors respectfully request that the Court enter the Confirmation Order confirming the Plan, and grant such other and further relief as is just and proper under the circumstances.

4871-9848-6481, v. 5

Dated: September 10, 2024
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*

William E. Chipman, Jr. (No. 3818)
David Carickhoff (No. 3715)
Mark D. Olivere (No. 4291)
Alan M. Root (No. 5427)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    chipman@chipmanbrown.com
        Carickhoff@chipmanbrown.com
        Olivere@chipmanbrown.com
        Root@chipmanbrown.com

*Counsel to the Debtors and Debtors-In-Possession*

4871-9848-6481, v. 5