**Exhibit B**

**Baybridge Seller Note**

**AMENDED AND RESTATED PROMISSORY NOTE**

$18,800,000                                                                                                  June 8, 2020

                                                                            Reissued as of September  25 , 2020

THIS AMENDED AND RESTATED PROMISSORY NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE. NEITHER THIS NOTE NOR ANY INTEREST HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED, OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR THERE EXISTS A VALID EXEMPTION FROM ALL SUCH REGISTRATION REQUIREMENTS. THIS NOTE IS SUBJECT TO FURTHER RESTRICTIONS ON TRANSFERABILITY IN THE MANNER DESCRIBED HEREIN.

THE PAYMENT OF THIS NOTE AND THE RIGHTS OF SELLERS HEREUNDER ARE SUBJECT TO COMPLIANCE WITH BUYER PARTIES' (AND THEIR AFFILIATES') SENIOR DEBT COVENANTS AND SUBJECT TO THE SUBORDINATION PROVISIONS CONTAINED IN SECTION 8 OF THIS NOTE.

       FOR VALUE RECEIVED, the undersigned, (i) Baybridge Pharmacy, LLC, a Delaware limited liability company ("Baybridge Buyer"), (ii) Central Pharmacy, LLC, a Delaware limited liability company ("Central Buyer"), and (iii) Pro Pharmacy, LLC, a Delaware limited liability company ("Pro Buyer" and, together with Baybridge Buyer and Central Buyer, each, a "Buyer Party" and, collectively "Buyer Parties"), promises to pay to (w) Baybridge Pharmacy Corp, a New York corporation ("Baybridge Seller"), (x) 121 Central Pharmacy Corp, a New York corporation ("Central Seller"), and (y) Delco Pharmacy Corp., a New York corporation ("Pro Seller" and, together with Baybridge Seller and Central Seller, "Sellers"), at their principal office at 1642 Gardenia Avenue, Merrick, New York 11566 (or any other office designated by Sellers), or to an account or accounts specified in writing by Sellers to Buyer Parties, the principal sum of Eighteen Million, Eight Hundred Thousand Dollars ($18,800,000) or such greater or lesser amount as may from time to time be owing by Buyer Parties to Sellers under this Note, together with interest thereon as provided below, in lawful money of the United States.

       WHEREAS, Sellers, Buyer Parties, and the other parties thereto entered into that certain Asset Purchase Agreement, dated as of December 28, 2019 (as amended, the "Purchase Agreement"), whereby *inter alia,* (i) Baybridge Buyer is purchasing from Baybridge Seller all of the Baybridge Purchased Assets, together with the Baybridge Assumed Liabilities, (ii) Central Buyer is purchasing from Central Seller all of the Central Purchased Assets, together with the Central Assumed Liabilities, and (iii) Pro Buyer is purchasing from Pro Seller all of the Pro Purchased Assets, together with the Pro Assumed Liabilities, and this Note is the "Note" referred to in the Purchase Agreement; and

       WHEREAS, in accordance with, Section 2.3(a) of the Purchase Agreement, this Note is being issued and delivered to Sellers as a portion of the consideration to be paid by Buyer Parties pursuant to the Purchase Agreement.

       1.      Maturity; Repayment. Subject to any prepayments and adjustments made pursuant to the terms of this Note, beginning on the last date of the fiscal quarter that includes July 1, 2021 (the "Initial Payment Date"), and continuing quarterly thereafter for fifteen additional quarters (the "Maturity Date"), Buyer Parties shall pay to Sellers in accordance with their Seller Percentages equal quarterly principal and interest payments computed based a straight line amortization of the outstanding principal amount (as may be adjusted from time to time in accordance with the terms of this Note) of this Note as of the Initial Payment Date (the "Principal Amount") over the period beginning on the Initial Payment Date and ending

on the Maturity Date; provided, however, the payment due on the Initial Payment Date shall be increased by the amount of any unpaid and outstanding interest accrued on the Principal Amount from the date hereof through the Initial Payment Date. Payment of the Note will be subject to compliance with Buyer Parties' (and their Affiliates') covenants set forth in the Debt Documents (as defined below) and subject to the subordination provisions contained in Section 8 below. This Note may be prepaid, in whole or in part, at any time without penalty, provided, however, Buyer Parties shall immediately prepay this Note in full to Sellers in accordance with their Seller Percentages, including all of the Principal Amount then outstanding (following the adjustment in Section 4), plus interest accrued thereon, upon the occurrence of a Change of Control. Following any adjustments to the Principal Amount of the Note hereunder or pursuant to the Purchase Agreement, the amortization of the Note will be recalculated on a straight-line basis based upon the adjusted outstanding Principal Amount and the period of time between such recalculation date and the Maturity Date. For the avoidance of doubt, this Note may be prepaid anytime in accordance with Section 3(b) or Section 4, as applicable.

2. Right of Setoff. Subject to Section 8, Buyer Parties may, in their sole discretion, set off any amount to which it in good faith believes it may be entitled under Section 9.2(f) of the Purchase Agreement against amounts otherwise payable to Sellers under this Note by promptly providing written notice of, together with reasonable detail regarding, the same to Sellers. The exercise of such right of setoff by Buyer Parties in good faith, whether or not ultimately determined to be justified, shall not be a breach of this Note. Neither the exercise nor the failure to exercise such right of setoff will constitute an election of remedies or limit Buyer Parties in any manner in the enforcement of any other remedies that may be available to it. In the event any of Sellers disagree with such set off by providing written notice of, together with reasonable detail as to the basis of such disagreement, the parties shall resolve such dispute in accordance with the terms of the Purchase Agreement and such resolution process shall not be a breach of the terms of this Note.

3. Purchase Price Adjustment; Performance Adjustment; Revaluation.

(a) Purchase Price Adjustment. Without any action by Buyer Parties or Sellers, in accordance with Section 2.3(e) of the Purchase Agreement, (i) the outstanding Principal Amount due hereunder shall be increased dollar-for-dollar in an aggregate amount equal to the amount by which the Final Purchase Price exceeds the Estimated Purchase Price (and interest on such excess amount calculated as though such excess had been added to the Note Amount on the Closing Date) and (ii) the outstanding Principal Amount due hereunder shall be decreased dollar-for-dollar in an aggregate amount equal to such the amount by which the Estimated Purchase Price exceeds the Final Purchase Price (and all interest on such excess amount forfeited).

(b) Revaluation; Prepayment. Buyer Parties and Sellers hereby agree as follows, subject to Section 8:

(i) Revaluation. Immediately prior to the prepayment described in Section 3(b)(ii), and without any action by Buyer Parties or Sellers, the Principal Amount will be adjusted dollar-for-dollar to equal the Revalued Note Balance (and all interest outstanding increased or forfeited, as applicable, as if the Revalued Note Balance was the original principal amount outstanding hereunder).

(ii) Potential Prepayment.

(1) If the Adjustment Amount is an amount greater than zero, then, subject to Section 3(b)(ii)(2), 60% of such Adjustment Amount (plus accrued interest on such portion) shall be prepaid to Sellers in accordance with their Seller Percentages (which amount shall, for the avoidance of doubt, reduce the Principal Amount accordingly) 90 days following the final determination of the Adjustment Amount.

11177229

(2) Notwithstanding anything to the contrary herein, in no event shall the amounts prepaid pursuant to this Section 3(b)(ii) exceed $14,400,000 in the aggregate (exclusive of interest).

(iii) For illustrative purposes only, the attached Exhibit A sets forth sample calculations for the items described in this Section 3(b) based on certain assumed facts and timing.

(c) In the event of any dispute as to any matters described in Section 3(b) or Section 4, such dispute shall be resolved by the parties hereto in accordance with the general procedures of Section 2.3(d) of the Purchase Agreement applied *mutatis mutandis*. The Arbiter shall be instructed to deliver within 30 calendar days a written statement setting forth its determination of such disputed amounts, which shall be final, conclusive and binding on the parties hereto.

4. Change of Control Revaluation. Notwithstanding anything to the contrary in this Note, in the event that a Change of Control occurs prior to December 31, 2020, Section 3(b)(ii) shall not apply and instead, immediately prior to the prepayment of this Note upon occurrence of a Change of Control, the Principal Amount will be increased or decreased dollar-for-dollar in an amount equal to (a) six, multiplied by (b) (i) the Revaluation EBITDA calculated based on the trailing three month period ending on the last day of the month immediately prior to the month in which the Change of Control occurs, multiplied by four, minus (ii) $8,000,000.

5. Interest. The Principal Amount under this Note shall accrue interest at six percent (6%) per annum, payable in arrears with each payment of the Principal Amount. Interest shall be calculated on the basis of a 365-day year for the actual days elapsed.

6. Payments. All payments on this Note shall be paid to Sellers in accordance with their Seller Percentages at their principal office at 1642 Gardenia Avenue, Merrick, New York 11566 (or any other office designated by Sellers), or to an account specified in writing by Sellers to Buyer Parties. Notwithstanding any other provision of this Note, if any day upon which payment under this Note is due is not a Business Day, such payment shall be made on the next succeeding Business Day.

7. Events of Default. Any of the following events is an "Event of Default" under this Note:

(a) non-payment by Buyer Parties of (i) the principal of this Note when due or (ii) any interest payable under this Note within five (5) days of the due date thereof;

(b) the default by Buyer Parties in the observance or performance of any of the other conditions, covenants or agreements set forth in this Note and such default has continued for thirty (30) consecutive days after written notice by Sellers to Buyer Parties; or

(c) (i) Buyer Parties commence any case, proceeding or other action (A) under any law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Buyer Parties shall make a general assignment for the benefit of its creditors; (ii) there shall be commenced against Buyer Parties any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; (iii) there shall be commenced against Buyer Parties any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) Buyer Parties shall take

any action indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above.

    8.    <u>Subordination</u>.

    (a)    Definitions. The following terms when used in this <u>Section 8</u> shall have the meaning as assigned to them below:

"<u>Administrative Agent</u>" means the Administrative Agent, Agent or other analogous term, as defined in, and pursuant to, the applicable Senior Loan Agreement, and its successors and assigns.

"<u>Senior Loan Agreements</u>" means (a) the Senior Secured Debt Agreement and (b) the Mezzanine Debt Agreement.

"<u>Debt Documents</u>" means the Senior Loan Agreements and the Credit Documents and Note Documents (or any similar term as defined in applicable Senior Loan Agreement).

"<u>Lenders</u>" means the Lenders (as defined in the Senior Secured Debt Agreement) and Buyer Parties (as defined in the Mezzanine Debt Agreement) from time to time party to the Senior Loan Agreements.

"<u>Mezzanine Debt Agreement</u>" means that certain Note Purchase Agreement, dated as of September [25], 2020, by and among CBC Pharma HoldCo, LLC, a Delaware limited liability company ("<u>Holdings</u>"), Optio Rx, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), the Note Parties (as defined therein) from time to time party thereto, Aves Management, LLC, as Administrative Agent (as defined therein) and the Buyer Parties (as defined therein) from time to time party thereto, as amended, restated, modified or supplemented through the date hereof and hereafter and in effect from time to time and as the same may be refinanced, extended or replaced.

"<u>Preferred Equity</u>" means the 26,818,514 Class A-1 Units issued by Holdings and held by Sellers as follows: 18,772,960 Class A-1 Units held by Baybridge Seller; 2,681,851 Class A-1 Units held by Central Seller; and 5,363,703 Class A-1 Units held by Pro Seller.

"<u>Senior Debt</u>" means as all loans, advances, debts, liabilities, debit balances, covenants and duties at any time or times owed by the Buyer Parties to Administrative Agents or any Lender, whether direct or indirect, absolute or contingent, secured or unsecured, primary or secondary, joint or several, liquidated or unliquidated, due or to become due, now existing or hereafter arising, including (a) all debts, liabilities and obligations now or hereafter owing by the Buyer Parties to any Administrative Agent or any Lender under any of the Debt Documents, (b) all debts, liabilities or obligations owing by the Buyer Parties to others which any Administrative Agent or any Lender may have obtained by assignment, pledge, purchase or otherwise, (c) all loans made or credit extended by any Administrative Agent or any Lender to the Buyer Parties during the pendency of any bankruptcy or other insolvency proceeding the Buyer Parties, (d) all interest, fees, charges, expenses and attorneys' fees for which the Buyer Parties is now or hereafter becomes liable to pay to any Administrative Agent or any Lender under any agreement or by law (including, all interest, legal fees and other charges that accrue or are incurred in connection with any of the Senior Debt during the pendency of any bankruptcy case or other insolvency proceeding of the Buyer Parties, whether or not such Administrative Agent or such Lender is authorized by 11 U.S.C. § 506 or otherwise to claim or collect any such interest, legal fees or other charges from the Buyer Parties), and (e) any renewals, extensions or refinancings of any of the foregoing.

"<u>Senior Secured Debt</u>" shall mean that certain Credit Agreement, dated as of June 28, 2019, by and among Holdings, the Borrower, the Credit Parties (as defined therein) from time to time party thereto, the Lenders from time to time party thereto, and Loan Admin Co LLC as Administrative

Agent and Lead Arranger, as amended, restated, modified or supplemented through the date hereof and hereafter and in effect from time to time and as the same may be refinanced, extended or replaced.

"Subordinated Debt" shall be defined as all amounts payable to the Seller pursuant to this Note.

"Subordinated Payments" shall have the meaning assigned thereto in Section 8(c).

(b) Subordination to Senior Debt. Notwithstanding anything in this Note or the Purchase Agreement to the contrary, the Seller hereby agrees and covenants that, to the extent set forth herein and on the terms and conditions set forth herein, the Subordinated Debt is and shall be subordinate in right of order and payment to the principal in full of the Senior Debt. Each holder of Senior Debt, either now existing or hereafter arising, shall be deemed to have acquired such Senior Debt in reliance upon the provisions contained in this Section 8.

(c) No Payment or Remedies with respect to the Subordinated Debt. Sellers hereby agree as follows:

(i) Sellers shall not accelerate, demand, sue for, commence any collection or enforcement action or exercise any remedy with respect to the Subordinated Debt until the prior payment in full, in cash, of the Senior Debt;

(ii) If any default or event of default exists with respect to any of the Senior Debt or would be caused by any payment on or with respect to the Subordinated Debt, the Seller shall not be entitled to receive any payment, either directly or indirectly, by or on behalf of the Buyer Parties, in cash, property or securities (1) on account of the principal of, and interest (including post-petition interest) on, the Subordinated Debt at any time outstanding, or other fees, costs, expenses and any other amounts accrued, incurred or otherwise due in respect of the Subordinated Debt, or (2) to prepay, purchase, redeem, retire, exchange, defease or otherwise acquire the Subordinated Debt or this Note for cash or property (collectively, "Subordinated Payments"), until such default or event of default is cured or waived to the satisfaction of the applicable Lenders in accordance with the terms of the applicable Debt Documents or the Lenders have received satisfactory evidence that such payment shall not cause a default or event of default with respect to any of the Senior Debt; and

(iii) In the event that, notwithstanding the foregoing provisions of this Section 8(c), any Subordinated Payment, either directly or indirectly, shall be made by or on behalf of the Buyer Parties, and received by the Seller at a time when such payment was prohibited by the provisions of this Section 8(c), then, unless and until such payment is no longer prohibited by this Section 8(c), such payment shall be held in trust for the benefit of and shall be promptly paid over to, until the termination of, and the satisfaction in full of all obligations under, the Senior Secured Loan Agreement, the Administrative Agent under the Senior Secured Loan Agreement, and thereafter, to the Administrative Agent under the Mezzanine Debt Agreement, for application to the Senior Debt in accordance with the terms of any applicable intercreditor agreements between the Administrative Agents. Notwithstanding the foregoing provisions of this Section 8(c)(iii), the provisions of this Section 8(c)(iii) shall not apply to any Subordinated Payment received by the Seller and held for more than eighteen (18) months after the applicable Administrative Agent has received written notice of such Subordinated Payment; provided that any claim asserted by an Administrative Agent or Lenders with respect to such Subordinated Payment during such eighteen (18) month period shall toll such period until the final adjudication of such claim.

(d) Subordination upon Dissolution, Liquidation or Reorganization of Buyer Parties. Upon any distribution by Buyer Parties of assets of any kind or character, whether in cash, property or

11177229

securities, to creditors upon any dissolution, winding up, liquidation or reorganization of Buyer Parties, whether in a voluntary or involuntary bankruptcy, insolvency or receivership proceedings or upon any assignment for the benefit of creditors or otherwise or any other marshalling of assets and liabilities of Buyer Parties:

(i) The Administrative Agents and the Lenders shall first receive payment in full in cash of all Senior Debt (or have such payments duly provided for in a manner satisfactory to the Administrative Agents and the Lenders) before the Seller is entitled to receive any Subordinated Payment on account of or accrued or incurred in connection with any Subordinated Debt;

(ii) Any payment or distribution of assets of the Buyer Parties of any kind or character, whether in cash, property or securities to which the Seller would be entitled except for the provisions of this Section 8 shall be paid by the Buyer Parties, the liquidating trustee or agent or other person making such a payment or distribution, directly to, until the termination of, and the satisfaction in full of all obligations under, the Senior Secured Loan Agreement, the Administrative Agent under the Senior Secured Loan Agreement, and thereafter, to the Administrative Agent under the Mezzanine Debt Agreement, for application to the Senior Debt in accordance with the terms of any applicable intercreditor agreements between the Administrative Agents to the extent necessary to make payment in full of all Senior Debt remaining unpaid; and

(iii) In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Buyer Parties of any kind or character, whether in cash, property or securities, shall be received by the Seller on account of, or accrued or incurred in connection with, any Subordinated Debt before all Senior Debt is paid in full in cash, then such payment or distribution shall be received and held in trust for the benefit of and shall be promptly paid over to, until the termination of, and the satisfaction in full of all obligations under, the Senior Secured Loan Agreement, the Administrative Agent under the Senior Secured Loan Agreement, and thereafter, to the Administrative Agent under the Mezzanine Debt Agreement, for application to the Senior Debt in accordance with the terms of any applicable intercreditor agreements between the Administrative Agents until all Senior Debt shall have been paid in full. For the avoidance of doubt, the foregoing only applies upon any distribution by the Buyer Parties of assets of any kind or character, whether in cash, property or securities, to creditors upon any dissolution, winding up, liquidation or reorganization of the Buyer Parties, whether in a voluntary or involuntary bankruptcy, insolvency or receivership proceedings or upon any assignment for the benefit of creditors or otherwise or any other marshalling of assets and liabilities of the Buyer Parties.

(e) Subordination Rights Not Impaired.

(i) No right of the Administrative Agents or any Lender to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Buyer Parties or by any act or failure to act, in good faith, by any Administrative Agent or any such Lender, or by any noncompliance by the Buyer Parties with the terms of any Subordinated Debt, regardless of any knowledge thereof which any such Lender may have or be otherwise charged with. The Administrative Agents and the Lenders may extend, renew, refinance, modify or amend the terms of any Senior Debt or any security therefor and release, sell or exchange such security and otherwise deal freely with the Buyer Parties, all without affecting rights of the Administrative Agents or Lenders hereunder.

(ii) All rights and interests hereunder of the Administrative Agents and the Lenders, and all agreements and obligations of the Seller under this Section 8, shall remain in full force and effect irrespective of (1) any lack of validity or enforceability of any Debt Document or any other loan or note document executed in connection therewith, or of any provision of such

agreements or (2) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Buyer Parties in respect of the Senior Debt.

(f) <u>Authorization to Effect Subordination</u>. The Sellers, by its acceptance hereof, solely in its capacity as obligee with respect to Subordinated Debt (i) irrevocably authorizes and empowers (but without imposing any obligation on) the Administrative Agents (through their respective authorized representatives), on behalf of themselves and the Lenders, to demand, sue for, collect and receive such obligee's ratable share of payments or distributions with respect to Subordinated Debt and take all such other action, in the name of such obligee or otherwise, as such authorized representatives may determine to be necessary or appropriate for the enforcement of the provisions of this Section 8, including without limitation, that (1) such representatives shall have the right to vote such obligee's interest in any proceeding under applicable insolvency laws as such vote relates to any Subordinated Debt or Subordinated Payment, and (2) in any such proceeding such representatives may, as attorney-in-fact for such obligee, file any claim, proof of claim or such other instrument of similar character, in each case, solely to the extent such proof of claim or such other instrument relates to any Subordinated Debt or Subordinated Payment; and (ii) agree to execute and deliver to such representatives, all such further instruments confirming the authorization hereinabove set forth, and all such powers of attorney, proofs of claim, assignments of claim and other instruments as may reasonably be requested by the Administrative Agents. For the avoidance of doubt, until the termination of, and the satisfaction in full of all obligations under, the Senior Secured Loan Agreement, all rights under this Section 8(f) shall be exercisable only by the Administrative Agent in respect of the Senior Secured Debt Agreement.

(g) <u>Amendments and Modifications to Note</u>. Under no circumstance shall the Sellers or the Buyer Parties amend or modify, or permit the amendment or modification of, any provision of this Note, including without limitation any amendment to shorten the maturity date, change the amortization schedule or increase the interest rate, in any way adverse to the interests of the Administrative Agents and Lenders. The Administrative Agents and Lenders are intended to be, and shall be, express third party beneficiaries of the terms of Section 8 of this Note.

(h) <u>Security for Subordinated Debt</u>. Except with the prior written consent of the Administrative Agents and the Lenders, in no event shall the Sellers take, accept or receive any lien or security interest on any asset of the Buyer Parties or its subsidiaries or any other collateral or security for the Subordinated Debt.

(i) <u>Further Subordination</u>. Neither Sellers nor any obligor with respect to the Subordinated Debt shall agree to any further subordination of the Subordinated Debt.

(j) <u>Preferred Equity</u>. Notwithstanding anything contained in this <u>Section 8</u> to the contrary, until such time as the Preferred Equity is redeemed by Holdings pursuant to that certain Rollover Agreement, dated June 8, 2020, by and among Holdings and the Sellers, the provisions of this <u>Section 8</u> shall not apply to any Senior Debt arising under the Mezzanine Debt Agreement.

9. <u>Remedies</u>. Subject to <u>Section 8</u> above, if an Event of Default has occurred and is continuing hereunder, Sellers may (i) declare the outstanding Principal Amount of this Note together with interest, immediately due and payable, without presentment, notice or demand, all of which are hereby expressly waived by Buyer Parties, and (ii) without notice of default or demand, pursue and enforce any of the Sellers' other rights and remedies under this Note or otherwise provided under or pursuant to any applicable law or agreement. During an Event of Default, interest on the entire unpaid principal balance of this Note plus accrued and unpaid interest thereon shall thereafter accrue at the lesser of (i) ten percent (10%) per annum, or (ii) the maximum interest permitted by applicable law, from the date of the Event of Default until the Event of Default is cured.

11177229

10. **No Usury Intended; Usury Savings Clause**. In no event shall interest contracted for, charged or received hereunder, plus any other charges in connection herewith which constitute interest, exceed the maximum interest permitted by applicable law. The amounts of such interest or other charges previously paid to Sellers in excess of the amounts permitted by applicable law shall be applied by Sellers to reduce the Principal Amount, or, at the option of Sellers, be refunded. To the extent permitted by applicable law, determination of the legal maximum amount of interest shall at all times be made by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of this Note, all interest at any time contracted for, charged or received from Buyer Parties in connection with the loan and indebtedness evidenced hereby, so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof.

11. **Miscellaneous**.

(a) Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

(b) The following terms when used in this Note shall have the meaning as assigned to them below:

"Adjustment Amount" means an amount (which may be an amount less than zero) equal to (i) six, multiplied by (ii) (A) the Revaluation EBITDA calculated based on the trailing six month period ending on December 31, 2020, multiplied by two, minus (B) $8,000,000.

"Change of Control" means any transaction or series of related transactions pursuant to which any Person or group of related Persons (other than Affiliates of Cold Bore Capital Management, LLC) in the aggregate acquire(s), directly or indirectly, (i) equity securities of Optio Rx, LLC, a Delaware limited liability company ("Optio"), possessing the right to receive a majority of the distributions to holders of the equity securities of Optio (whether by merger, consolidation, reorganization, combination, sale or transfer of Optio's equity securities or voting agreement, proxy, power of attorney or otherwise) or (ii) all or substantially all of Optio's assets determined on a consolidated basis.

"Revalued Note Balance" means an amount equal to the greater of (i) zero dollars and (ii) the then outstanding Principal Amount plus the Adjustment Amount.

"Seller Percentage" means the percentage set forth opposite a Seller's name on the Schedule of Sellers attached hereto.

(c) Buyer Parties hereby waive presentment, notice of dishonor, protest and any other formality with respect to this Note.

(d) Subject to Section 8, upon any Event of Default hereunder, Sellers may pursue any legal or equitable remedies that are available to it. No delay or omission to exercise any right, power or remedy accruing to Sellers, upon any breach or Event of Default hereunder, shall impair any such right, power or remedy of Sellers nor shall it be construed to be a waiver of any such breach or Event of Default, or an acquiescence therein, or of any similar breach or Event of Default thereafter occurring. No waiver by Sellers of any breach or Event of Default shall be deemed a waiver by Sellers of any other breach or Event of Default theretofore or thereafter occurring.

(e) If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

11177229

(f) The remedies of Sellers, as provided herein, or any one or more of them, or in law or in equity, shall be cumulative and concurrent, and may be pursued singularly, successively or together.

(g) This Note shall be binding on Buyer Parties and their successors and permitted assigns and shall inure to the benefit of Sellers and their respective successors and permitted assigns. Neither Buyer Parties nor Sellers may assign or transfer this Note or any interest, rights or obligations hereunder without the prior written consent of the other party and the Administrative Agents, on behalf of the Lenders.

(h) This Note shall be governed by and construed in accordance with the internal laws of the State of Delaware without regard to choice of law provisions. The exclusive venue and jurisdiction for any disputes, actions or conflicts with respect to this Note shall be the state or federal courts of the State of Delaware.

(i) EACH BUYER PARTY AND, BY ACCEPTANCE OF THIS NOTE, EACH SELLER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS NOTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE, IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE AND ANY OF THE DOCUMENTS OR TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH BUYER PARTIES AND, BY ACCEPTANCE OF THIS NOTE, SELLERS CERTIFY AND ACKNOWLEDGE THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO EXECUTE, DELIVER AND ACCEPT, AS APPLICABLE, THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11(i).

(j) In the event any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

(k) Neither this Note nor any provision hereof may be waived, modified or discharged orally, but may be waived, modified or discharged only by an agreement in writing signed by the party against whom enforcement of any waiver, modification or discharge is sought.

(l) This Note amends and restates and is issued as a replacement for that certain Promissory Note, issued as of June 8, 2020 (the "**Original Note**"). The execution and delivery of this Amended and Restated Promissory Note shall not act as a discharge or novation of any of the obligations under the Original Note, all of which shall remain in effect as amended hereby

**[SIGNATURE PAGE FOLLOWS]**

11177229