## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OPTIO RX, LLC, *et al.*,<br><br>       *Debtors.*[1] | Chapter 11<br><br>Case No. 24-11188-TMH<br><br>(Jointly Administered) |

## SKIN MEDICINALS LLC'S RESPONSE TO OPTIO RX'S MOTION FOR SUMMARY JUDGMENT ON ITS OBJECTION TO SKIN MEDICINALS' MOTION FOR AN ALLOWED ADMINISTRATIVE EXPENSE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60061

**TABLE OF CONTENTS**

<strong>Page</strong>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 3

I.     Skin Medicinals' proprietary Web Portal................................................... 3

II.    OptioRx unlawfully accesses the Web Portal to create a copy-cat platform. .......... 4

III.   Procedural history...................................................................................... 6

LEGAL STANDARD .............................................................................................. 9

ARGUMENT........................................................................................................... 9

I.     There are genuine disputes over OptioRx's postpetition misconduct..................... 9

II.    Skin Medicinals is entitled to allowed administrative expense for postpetition misconduct........................................................................................ 12

CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Attia v. Google LLC*,
    983 F.3d 420 (9th Cir. 2020) ....................................................... 21

*Carter-Wallace Inc. v. Davis-Edwards Pharmacal Corp.*,
    443 F.2d 867 (2d Cir. 1971) ......................................................... 20

*Costlow v. United States*,
    552 F.2d 560 (3d Cir. 1977) ......................................................... 12

*In re Auto. Parts Antitrust Litig.*,
    2013 WL 2456010 (E.D. Mich. June 6, 2013) ............................ 17

*In re Avaya Inc.*,
    2018 WL 1940381 (Bankr. S.D.N.Y. Apr. 23, 2018) .................. 19

*In re Beverage Canners Int'l Corp.*,
    255 B.R. 89 (Bankr. S.D. Fla. 2000) ........................................... 19

*In re Bill's Coal Co., Inc.*,
    124 B.R. 827 (D. Kan. 1991) ....................................................... 18

*In re B–K of Kansas, Inc.*,
    82 B.R. 135 (Bankr. D. Kan. 1988) ............................................ 19

*In re Cambridge Biotech Corp.*,
    186 B.R. 9 (Bankr. D. Mass. 1995) ............................................ 19

*In re Charlesbank Laundry, Inc.*,
    755 F.2d 200 (1st Cir. 1985) ....................................................... 14

*In re Cont'l Airlines, Inc.*,
    148 B.R. 207 (D. Del. 1992) ....................................................... 18

*In re Diomed, Inc.*,
    394 B.R. 260 (Bankr. D. Mass. 2008) ........................................ 20

*In re Eagle-Picher Industries*,
    447 F.3d 461 (6th Cir. 2006) ................................................ 17, 20

*In re Energy Future Holdings Corp.*,
  990 F.3d 728 (3d. Cir. 2021)..................................................................... 14

*In re Grossman's Inc.*,
  607 F.3d 114 (3d Cir. 2010)...................................................................... 21

*In re Hayes Lemmerz Int'l, Inc.*,
  340 B.R. 461 (Bankr. D. Del. 2006) ......................................................... 14

*In re Healthco Intern., Inc.*,
  272 B.R. 510 (B.A.P. 1st Cir. 2002) ......................................................... 14

*In re Lazar*,
  207 B.R. 668 (Bankr. C.D. Cal. 1997)...................................................... 18

*In re Mallinckrodt plc*,
  2021 WL 4876908 (Bankr. D. Del. Oct. 19, 2021) ..................... 3, 16, 17, 20

*In re Mallinckrodt plc*,
  646 F. Supp. 3d 565 (D. Del. 2022)........................................................... 16

*In re Supermedia, Inc.*,
  2014 WL 7403448  (Bankr. D. Del. Dec. 29, 2014).................................... 18

*Munce's Superior Petroleum Products, Inc. v. NH Dept. of Env. Servs.*,
  490 B.R. 5 (D.N.H. 2013)......................................................................... 17

*O'Loghlin v. County of Orange*,
  229 F.3d 871 (9th Cir. 2000) .................................................................... 20

*Oakwood Labs. LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021)...................................................................... 15

*Reading Co. v. Brown*,
  391 U.S. 471 (1968)............................................................................. 13, 15

*Ruehl v. Viacom, Inc.*, 500 F.3d 375 (3d Cir. 2007).......................................... 9

*Sames v. Gable*,
  732 F.2d 49 (3d Cir. 1984)........................................................................ 11

**Statutes**

11 U.S.C. § 1129 ............................................................................................ 13

11 U.S.C. § 503 .............................................................................................. 13

11 U.S.C. § 507 ........................................................................................................ 13

18 U.S.C. § 1836 ...................................................................................................... 19

**Rules**

Fed. R. Bankr. P. 5011................................................................................................ 12

Fed. R. Civ. P. 56...................................................................................................... 9, 11

Skin Medicinals LLC ("Skin Medicinals"), plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding") and administrative expense and prepetition claimant in the above-captioned bankruptcy cases (the "Bankruptcy Cases"), hereby responds in opposition to the above-captioned debtors' (the "Debtors") motion for summary judgment on the Debtors' objection to the motion of Skin Medicinals for entry of an order granting an allowed administrative expense pursuant to Section 503(b) of the Bankruptcy Code, and respectfully states as follows:

## PRELIMINARY STATEMENT

Earlier this year, Skin Medicinals discovered that defendant OptioRx LLC ("OptioRx") and its CEO, defendant Ben David, had surreptitiously gained unauthorized access to Skin Medicinals' password-protected, medical-providers-only web portal for the express purpose of stealing Skin Medicinals' proprietary information and using it to build a competing website. Since then, Skin Medicinals has worked tirelessly to remedy the harm caused by the Debtors' scheme. At every turn, the Debtors have thrown up obstacles to relief. The Debtors opposed Skin Medicinals' motion for a preliminary injunction, insisting that the continued development and launch of OptioRx's copycat web portal was integral to their restructuring. Without a preliminary injunction, Skin Medicinals proposed an expedited litigation schedule, but the Debtors insisted on extending that schedule by several months. Skin Medicinals served discovery requests on August 3, 2024, but OptioRx and its CEO have yet to produce a single document in discovery in response to those requests. They have not even responded to Skin Medicinals' draft protective order.

In parallel with its discovery efforts in the Adversary Proceeding, Skin Medicinals filed protective proofs of claim (the "Proofs of Claim") (Nos. 83, 87, 89, 102, 103, 105–15, 117-21, 123-26, 128-29) and a motion to allow as administrative expenses any postpetition damages awarded in the Adversary Proceeding. D.I. 362 (the "Administrative Expense Motion"). The Debtors objected to the Administrative Expense Motion. D.I. 384. They now move for summary judgment, arguing that Skin Medicinals' claims "arose" prepetition and therefore that Skin Medicinals cannot show a "postpetition transaction between the claimant and the estate" as a matter of law." D.I. 469. The motion fails.

As an initial matter, the Debtors' motion for summary judgment is plainly premature. The question at the heart of the Debtors' motion is one of fact: *when* did the tortious misconduct at issue occur? Relying on an obvious misreading of Skin Medicinals' complaint, the Debtors claim that it is undisputed that all the challenged conduct stopped prepetition. Not so. In fact, that question of timing is sharply disputed—and certainly cannot be resolved before OptioRx has cooperated in the discovery process.

In any event, the Debtors' motion fails on legal grounds as well. The Debtors may not use these proceedings to absolve themselves of ongoing wrongdoing and insulate themselves from liability for the misconduct moving forward. The gravamen of the Debtors' position is that even if OptioRx and its CEO accessed Skin Medicinals' system without authorization and obtained something of value prepetition—as they did—OptioRx can ***continue*** to use that misappropriated information in perpetuity without having to pay Skin Medicinals damages for the ***new and greater*** harm Skin Medicinals would suffer as a result of OptioRx's postpetition conduct. It would be entirely incongruous, and entirely

unfair, if a company could steal trade secrets or proprietary information, declare bankruptcy soon after being caught, and then use the same stolen secrets or information to compete with the victim without affording any meaningful damages remedy. "The 'fresh start' provided by the Bankruptcy Code cannot be both a sword and a shield." *In re Mallinckrodt plc*, 2021 WL 4876908, at *11 (Bankr. D. Del. Oct. 19, 2021).

For either of these reasons, it would be entirely inappropriate to hold at this stage that Skin Medicinals is not entitled to an administrative expense. Accordingly, the Debtors' motion should be denied in full.

## BACKGROUND

### I.   Skin Medicinals' proprietary Web Portal.

Skin Medicinals, launched in 2018 by two dermatologists, is dedicated to making dermatology medications and healthy skin more accessible. In pursuit of that goal, the company created its web portal (the "Web Portal"), an online platform that allows medical providers to prescribe, and customers to purchase, prescription oral medications and compounded topical medications online through partner pharmacies. Skin Medicinals remains the only platform of its kind in the market today.

Skin Medicinals' Web Portal has two main components: one for patients and one for physicians and other licensed medical providers. Once the user has credentials to access the physician and medical provider portion of the Skin Medicinals Web Portal, the user can review Skin Medicinals' compounded formulations, which are designed to allow customized care for a wide variety of dermatologic needs (the "Compound List"). The Compound List includes the price of each compounded medication and information about

primary ingredients. Provider credentials also permit access to portions of the underlying software, code, and content used to operate the physician portion of the Web Portal.

## II.   OptioRx unlawfully accesses the Web Portal to create a copy-cat platform.

OptioRx is a brick-and-mortar compounding pharmacy chain with eighteen locations nationwide. OptioRx does not currently have a platform allowing physicians to prescribe medications online.

In early 2024, Ben David was named OptioRx's Chief Executive Officer. Around this time, OptioRx tasked its software developers with designing a web platform to offer compounded dermatological medications. The mandate was explicit: build a website that looks, feels, and functions like the Skin Medicinals' Web Portal.

Mr. David and OptioRx's Director of Engineering, Arun Suresh Kumar met on January 30, 2024. On information and belief, Mr. David and Mr. Kumar discussed their desire to build a platform that would compete with Skin Medicinals at that meeting. On information and belief, Mr. David and Mr. Kumar also discussed this plan on other, undisclosed occasions.

On February 19, 2024, Mr. David texted Lisa Bassett Ippolito, a nurse practitioner and chiropractor licensed in Florida, asking for a "favor." Mr. David wanted access to the password-protected, prescribers-only portion of the Skin Medicinals' Web Portal. Mr. David was not shy about the purpose of his request. As he told Ms. Ippolito, his reasons for needing prescriber credentials were simple: "I want to get in and see how it works." Ms. Ippolito then created credentials and provided them to Mr. David, who proceeded to

access the Skin Medicinals' Web Portal on more than half a dozen occasions over the course of February and March 2024.

On March 12, someone at OptioRx used Ms. Ippolito's credentials to login to the Web Portal from an Illinois IP address and downloaded at least four documents from the physicians-only portion of the Web Portal. All the while, OptioRx was sprinting to develop a beta version of its copy-cat website, which was attracting substantial attention from the company's investors.

On March 14, just days after OptioRx gained illegal access to the Web Portal and downloaded Skin Medicinals' proprietary documents from the physicians-only portion of the site, Mr. David and Mr. Kumar scheduled a meeting to discuss a "Derma Website Feature matrix." Other members of the OptioRx development team were also invited. The Feature matrix in question laid out a number of "must have" and "good to have" features for OptioRx's proposed website. On information and belief, many, if not all, of the features on the matrix were drawn from the Skin Medicinals' Web Portal.

In addition to the matrix, Mr. David and Mr. Kumar discussed the Skin Medicinals Compound List toward the end of March. On March 28, following that discussion, Mr. Kumar redacted the Compound List to remove Skin Medicinals' name and logo, thus concealing the fact that the document was stolen from Skin Medicinals. Mr. David then emailed the Compound List to OptioRx Operations Manager Ben Gabaie and pharmacist Payam Tizabgar for review in connection with the launch of the website. Mr. Gabaie later, on separate occasions, circulated the Compound List internally among OptioRx employees, describing the document as OptioRx's "preliminary formula."

5

In late March 2024—as OptioRx was about to launch its internal beta—Skin Medicinals learned from a whistleblower that someone at OptioRx was using physician credentials to log into the Skin Medicinals' Web Portal without authorization and planning to build a competing platform and undercut Skin Medicinals' costs.

Skin Medicinals expended significant resources and time to investigate the allegations and attempt to determine what accounts were being used and by whom. After concluding with confidence that Ms. Ippolito's account was the source of the incursion, and that Mr. David was the person using the login credentials, Skin Medicinals directed its counsel to send cease and desist letters to Ms. Ippolito, Mr. David, and OptioRx.

Based on Skin Medicinals' investigation, it is clear that OptioRx was engaged in widespread copying and distribution of Skin Medicinals' proprietary information and paused its rapid development of a competing platform only because its CEO was caught red-handed. The full extent of OptioRx's unlawful access to and copying of the Skin Medicinals' Web Portal remains under investigation.

## III. Procedural history.

On June 7, 2024, the Debtors filed voluntary petitions in the Bankruptcy Court commencing cases for relief under the Bankruptcy Code. To avoid the harm Skin Medicinals faces as a result of OptioRx's conduct, on June 17, 2024, Skin Medicinals commenced the Adversary Proceeding against OptioRx, Mr. David, Mr. Kuresh and Ms. Ippolito in the Bankruptcy Court, alleging misappropriation of Skin Medicinals' trade secrets and violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Florida Computer Abuse and Data Recovery Act, Fla. Stat. § 668.801 et seq.

On June 20, 2024, the parties agreed to a status quo order (A.D.I. 12) (the "Status Quo Order") pending determination on the request for a preliminary injunction. The Status Quo Order temporarily restrained OptioRx from accessing Skin Medicinals' Web Portal, launching a competing physician-based web portal, or selling compounded dermatologic medications derived from Skin Medicinals' proprietary compound list.

On July 12, 2024, the Bankruptcy Court denied Skin Medicinals' request for a preliminary injunction in a bench ruling (A.D.I. 56) and entered an order to that effect on July 15, 2024 (A.D.I. 58). The Bankruptcy Court's order was subsequently vacated on appeal on August 5, 2024. *Skin Medicinals LLC v. Optio Rx, LLC*, C.A. No. 24-828 (MN) (D. Del. Aug. 8, 2024). On August 13, 2024, the Bankruptcy Court issued a supplemental ruling (the "Supplemental Ruling") again denying Skin Medicinals' request for a preliminary injunction (A.D.I. 80). On August 16, 2024, Skin Medicinals filed a motion to reconsider the Bankruptcy Court's Supplemental Ruling (A.D.I. 92), which was denied by the Bankruptcy Court at a hearing on August 29, 2024. As a result of the Bankruptcy Court's Supplemental Ruling and denial of the motion for reconsideration, OptioRx is currently free to continue developing and to launch its new copy-cat platform and, on information and belief, is actively engaged in doing so.

On August 16, 2024, each of the defendants in the Adversary Proceeding moved to dismiss the Complaint. *See* Def. OptioRx, LLC's Partial Mot. to Dismiss (A.D.I. 86); Defs. Ben David and Arun Suresh Kumar's Partial Mot. to Dismiss Pl.'s Compl. (A.D.I. 88); Def. Lisa Bassett Ippolito's Mot. to Dismiss Compl. on Jurisdictional Grounds (A.D.I. 90).

The parties have exchanged some initial discovery requests but OptioRx has not produced documents or engaged in motions practice. *See* Glickstein Decl. ¶¶ 2-8 (Ex. A hereto).

On July 29, 2024, the Debtors filed their Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC (D.I. 259) and Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC (D.I. 260).

On August 6, 2024, under compulsion of the claims bar date order (D.I. 104), Skin Medicinals filed its Proofs of Claim against each of the Debtors for all claims related to and arising out of OptioRx's illegal scheme. In each of its Proofs of Claim, Skin Medicinals expressly stated that the proof of claim was "conditional only and is not intended, nor should it be construed, as Skin Medicinals' consent to jurisdiction in the United States Bankruptcy Court, or as a waiver of Skin Medicinals' right to a trial by jury in any action or proceeding." Proof of Claim No. 83 Ex. A, at 2.

On September 3, 2024, Skin Medicinals filed its Administrative Expense Motion seeking entry of an order allowing Skin Medicinals an administrative expense for damages arising from OptioRx's unlawful, postpetition acts. Skin Medicinals expressly reserved its rights, stating that the motion "is not intended, nor should it be construed, as Skin Medicinals' consent to jurisdiction in the United States Bankruptcy Court, or as a waiver of Skin Medicinals' right to a trial by jury in any action or proceeding." D.I. 362 at 15. Skin Medicinals also filed a Motion to Withdraw the Reference (D.I. 371) on the grounds both mandatory and permissive withdrawal were appropriate.

The Debtors filed an objection to the Administrative Expense Motion on September 10 (D.I. 384). They also filed a second amended plan on that date. D.I. 382. The Court confirmed the second amended plan on October 17, 2024. D.I. 484.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding through Federal Rule of Bankruptcy Procedure 7056 and 9014, provides that summary judgment shall be granted "only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n. 6 (3d Cir. 2007). In determining whether summary judgment is appropriate, courts may consider pleadings, depositions, documents, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials that would be admissible or usable at trial. Fed. R. Civ. P. 56. In addition, where a nonmovant shows that it cannot present facts essential to justify its opposition, a court can defer or deny without prejudice a motion for summary judgment or allow sufficient time to take discovery. Fed. R. Civ. P. 56(d).

## ARGUMENT

**I.      There are genuine disputes over OptioRx's postpetition misconduct.**

The summary judgment device is supposed to be used where the record shows that there are no genuine issues of fact requiring trial. But rather than offer any record evidence in support of the motion, the Debtors argue that allegations in Skin Medicinals' Administrative Claim and Adversary Complaint compel summary judgment. In other words, despite labeling their motion one for summary judgment under Rule 56, the Debtors

appear to be seeking relief under Rule 12(b)(6) or Rule 12(c). Regardless, the Debtors'
memorandum is filled with mischaracterizations of the facts alleged.

In particular, the Debtors repeatedly state that Skin Medicinals has not accused them
of any postpetition "tortious conduct." *E.g.,* D.I. 469 at 5 ("Skin Medicinals admits the
conduct occurred prepetition only."); *id*. at 6 ("The *conduct* upon which Skin Medicinals'
purported Administrative Claim is based occurred prepetition"); *id*. at 9 ("Skin Medicinals
alleges and concedes it was 'exposed' to OptioRx's alleged tortious 'conduct' in *February
and March 2024*, prior to the Petition Date."). But that is patently incorrect. When Skin
Medicinals filed its complaint—just days after learning that OptioRx had petitioned for
bankruptcy, and without meaningful visibility into OptioRx's operations—it alleged that
OptioRx had engaged in extensive misappropriation and that investigation was continuing
into the full scope and effect of the misconduct. The complaint stated that "OptioRx's
counsel told Skin Medicinals that OptioRx did in fact intend to launch a competing
ecommerce dermatology website as soon as June 2024." A.D.I. 1 ¶ 68. It further stated that
"OptioRx was engaged in widespread copying and distribution of Skin Medicinals'
proprietary information and paused its rapid development of a competing platform only
because its CEO was caught red-handed." *Id*. ¶ 69. And it further alleged that the "full
extent of OptioRx's unlawful access to and copying of the Skin Medicinals Web Portal
remains under investigation, and Skin Medicinals expects that discovery will reveal
additional evidence of copying and misappropriation." *Id*.

Put simply, Skin Medicinals has never "conceded" that OptioRx is not continuing
to misuse and misappropriate its confidential information. To the contrary, Skin Medicinals

has consistently alleged that OptioRx has continued to misappropriate Skin Medicinals' trade secrets postpetition to develop its own competing compounding dermatology business. *See, e.g.,* A.D.I. 110 at 9 ("As a result of the Bankruptcy Court's Supplemental Ruling and denial of the motion for reconsideration, OptioRx is currently free to continue developing and to launch its new copy-cat platform and, on information and belief, is actively engaged in doing so.").

Skin Medicinals has not yet had a full and fair opportunity to develop evidence to support these well-founded allegations because, as discussed above, OptioRx has yet to produce *any* discovery on these matters, even though Skin Medicinals' requests have been outstanding for several months. *See* Glickstein Decl. ¶¶ 2-8 (Ex. A hereto). Skin Medicinals also needs to depose key individuals, like CEO Ben David and others at OptioRx responsible for developing the company's dermatology web vertical. The fact that no meaningful discovery has occurred to date is, on its own, a more than sufficient basis to deny the Debtors' summary judgment motion. *See* Fed. R. Civ. P. 56(d) (courts may defer considering or deny a motion for summary judgment when facts are unavailable to the nonmovant); *Sames v. Gable*, 732 F.2d 49, 51 (3d Cir. 1984) ("This court has criticized the practice of granting summary judgment motions at a time when pertinent discovery requests remain unanswered by the moving party."); *Costlow v. United States*, 552 F.2d 560, 564 (3d Cir. 1977) ("[W]e have said where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.").

Furthermore, OptioRx offers no reason why it would be helpful to decide this question now, before there has been any factual development or determinations about the extent and scope of liability. The Debtors did not argue that resolution of the Administrative Expense Motion should be a condition precedent for confirmation of their bankruptcy plan. Regardless, the plan has now been approved (D.I. 484), so there cannot be any argument that the Administrative Expense Motion is delaying the Debtors' plan. The Court should deny the Debtors' motion for summary judgment as premature or continue the motion until discovery has been completed.[2]

## II.    Skin Medicinals is entitled to an allowed administrative expense for postpetition misconduct.

In addition to mischaracterizing Skin Medicinals' factual allegations, the Debtors argue that Skin Medicinals is not entitled to an administrative expense as a matter of law. The Debtors are wrong. If the evidence shows that OptioRx has continued to misappropriate Skin Medicinals' trade secrets since filing for bankruptcy—as Skin Medicinals expects— then Skin Medicinals will be entitled to an administrative claim for damages stemming from that postpetition tortious conduct.

Section 503(b)(1) of the Bankruptcy Code provides that "allowed administrative expenses" include "the actual, necessary costs and expenses of preserving the estate." 11

---

[2] As noted above, Skin Medicinals' Motion to Withdraw the Reference is fully briefed and pending in the district court. *See* No. 24-cv-1015 (D. Del.). In opposing withdrawal, the Debtors have raised similar issues relating to the proper allocation and treatment of prepetition and postpetition conduct and damages under the bankruptcy code. Accordingly, the pendency of the Motion to Withdraw the Reference provides another prudential reason not to rush to summary judgment before discovery has begun. *Cf.* Fed. R. Bankr. P. 5011(c) bankruptcy courts are permitted, but not required, to stay proceedings during the pendency of a motion for withdrawal).

U.S.C. § 503(b)(1)(A). These expenses are entitled to priority payment under section 507(a)(2) of the Bankruptcy Code and, once allowed, are required to be paid in full pursuant to section 1129(a)(9) of the Bankruptcy Code. *See id.* §§ 507(a)(2), 1129(a)(9). It has long been established that damages arising from a postpetition tort committed by a debtor within the course and scope of its continued operation of the estate's business may be considered "necessary costs and expenses" and are therefore entitled to administrative expense priority. *E.g., Reading Co. v. Brown*, 391 U.S. 471, 477 (1968) (deeming costs from fire damage resulting from the negligent actions of the bankruptcy receiver acting in the scope of his authority an "actual and necessary" expense of reorganization).

In *Reading*, the Supreme Court reasoned that if a party were injured by negligence in the operation of an "insolvent business thrust upon it by operation of law," it was "fairer" to compensate the injured party upon whom the arrangement had been imposed before compensating those for whose benefit the arrangement had been created. *Id.* at 478–79. Courts have since applied this so-called "fundamental fairness doctrine" in chapter 11 reorganization cases under the Bankruptcy Code. *See, e.g., In re Energy Future Holdings Corp.*, 990 F.3d 728, 737–38 (3d. Cir. 2021); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del. 2006) (allowing administrative expense claim for damages caused by debtors' postpetition parts-stripping of machinery done in the course of its business).

Courts have found *Reading*'s rationale to be even stronger in circumstances involving ongoing intentional misconduct, in which the debtor has "deliberately continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the [law] than within it." *In re Charlesbank Laundry, Inc.*, 755

F.2d 200, 203 (1st Cir. 1985); *see also In re Healthco Intern., Inc.*, 272 B.R. 510, 513

(B.A.P. 1st Cir. 2002) ("the 'fundamental fairness' exception is recognized when the

debtor's postpetition operations occasion tortious injuries to third parties (*Reading*), or

when the claim arises from postpetition actions that deliberately violate applicable law and

damage others (*Charlesbank*).").

Here, OptioRx's restructured business involves the ongoing development and

pending launch of a compounding dermatology website. Skin Medicinals alleges that

OptioRx is currently using Skin Medicinals' trade secrets to inform and develop this

competing platform and has, therefore, engaged in postpetition misappropriation. *See*

*Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (misappropriation in the

trade secret context is defined "broadly as the knowing improper acquisition, or use or

disclosure of the secret"). In other words, OptioRx is intentionally continuing its unlawful

behavior against Skin Medicinals for OptioRx's benefit and that of its creditors. This is

precisely the type of claim that warrants administrative expense status, pursuant to

*Reading*'s fundamental fairness doctrine. *Reading*, 391 U.S. at 477 (explaining that it is

"more natural and just" for those injured during the operation of a business to recover ahead

of those for whose benefit the business was allowed to continue operating).

The Debtors do not contest that, pursuant to *Reading* and its progeny, postpetition

torts are subject to administrative expense treatment. Instead, they argue that when a claim

"arises" prepetition, any damages from postpetition misconduct cannot be afforded

administrative expense status. The Debtors insist, in other words, that so long as their

tortious conduct *began* prepetition, they may now *continue* their unlawful behavior in

14

perpetuity with no fear of being held accountable. *See, e.g.,* D.I. 469 at 1 ("[T]he 'exposure' occurred upon the original alleged trade secret misappropriation that Skin Medicinals admits occurred prepetition. Any purported continuing or repeated violation thereafter constitutes a single claim that relates back to the initial 'exposure' as a matter of law, thereby precluding any purported administrative expense."). But this reasoning is untenable and has been repeatedly foreclosed.

When a debtor's tortious overt acts begin prepetition and continue postpetition, damages arising from the postpetition acts are entitled to administrative status. In *Mallinckrodt*, for example, a group of health insurers asserted an administrative expense for alleged antitrust violations committed by the debtor, culminating in the debtor charging a supracompetitive price for a drug called Acthar. 2021 WL 4876908, at *1. The insurers argued that their damages—representing the difference between the price they paid for Acthar postpetition and what an actual but for market price would be absent the debtor's conduct—constituted administrative expenses. *Id.* at *3.[3] As here, the debtor moved for summary judgment, arguing that the insurers could not have an administrative expense because the debtor ceased any alleged anticompetitive conduct prepetition. *Id.* at *5. But

---

[3] The debtors note that a later order in *Mallinckrodt* held that a different claimant's contract claims were dischargeable contingent claims. But that order is entirely inapposite. There, Judge Dorsey analyzed a claim for postpetition royalties payable under a prepetition contract and found them fully dischargeable in bankruptcy because the claimant (Sanofi) and the debtor (Mallinckrodt) had "fixed their rights against each other" through their prepetition contract, by which Sanofi "sold full title to the intellectual property" to Mallinckrodt and "assumed the risk of Mallinckrodt's creditworthiness" by agreeing to an ongoing royalty. *In re Mallinckrodt plc*, 646 F. Supp. 3d 565, 570 (D. Del. 2022). Skin Medicinals is not bringing a contract claim based on rights that were "fixed" prepetition. Nor did Skin Medicinals—an innocent bystander—"assume[] the risk" that OptioRx would break into its website and steal its proprietary information.

Judge Dorsey denied the debtor's request for summary judgment, ruling that claims based on the debtor's postpetition sale of the prescription drug "arose after the petition date and are thus postpetition claims" and could therefore be entitled to administrative expense priority under *Reading*, even if the alleged unlawful conduct enabling the supracompetitive pricing ceased prepetition. *Id*. at *8.

Many other cases hold similarly. *See also, e.g., In re Eagle-Picher Industries*, 447 F.3d 461, 462 (6th Cir. 2006) (allowing administrative expense claim for patent infringement damages arising out of prepetition and postpetition purchases); *Munce's Superior Petroleum Products, Inc. v. NH Dept. of Env. Servs*., 490 B.R. 5, 12 (D.N.H. 2013) (where defendants affirmatively operated their facilities in violation of state environmental law, "[i]t was their deliberate continuation of their violation after filing for bankruptcy that the Superior Court penalized, and those penalties are entitled to priority under § 503(b)(1)(A)"); *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456010, at *5 (E.D. Mich. June 6, 2013) (contrasting "rippling effects" stemming from an initial violation with cases where defendants continue "overt acts" after emerging from bankruptcy); *In re Bill's Coal Co., Inc.*, 124 B.R. 827, 829 (D. Kan. 1991) (if penalties are "assessed for postpetition misconduct *or misconduct which continued into the postpetition period*, then the assessments should be treated as an administrative expense") (emphasis added). Under

16

these cases, a claimant is entitled administrative expense priority for continuing postpetition misconduct, even if a claim originates prepetition.[4]

Applying this reasoning to trade secrets claims, where misappropriation—which includes use—occurs postpetition, claimants are entitled to administrative expense status for damages arising from that postpetition conduct. In *In re Avaya Inc.*, for example, the debtor misappropriated traded secrets from the claimant (SAE) prepetition and then filed bankruptcy. The bankruptcy court determined that the claimant was entitled to royalty damages for prepetition sales and as well as "the same royalty" on "postpetition sales, . . . whatever that number may be." *In re Avaya Inc.*, 2018 WL 1940381, at *10 (Bankr. S.D.N.Y. Apr. 23, 2018). As the court explained, "Avaya continues to benefit from the hypothetical license to use SAE's trade secrets, and SAE remains entitled to a royalty based on that use *except to the extent that SAE may have waived a right to an administrative expense by failing to make a timely request*." *Id*. (emphasis added). Exactly the same is true here—except, of course, there is no question of waiver given Skin Medicinals' timely request to allow an administrative expense.

---

[4] The cases cited by the Debtors are distinguishable because there the postpetition damages flowed exclusively from prepetition misconduct. *See In re Cont'l Airlines, Inc.*, 148 B.R. 207, 214 (D. Del. 1992) (denying administrative expense claim arising from prepetition wrongful termination where "the only violation was a prepetition event, and therefore there is no question that *Reading* and its progeny are inapplicable."); *In re Lazar*, 207 B.R. 668, 675 (Bankr. C.D. Cal. 1997) (rejecting administrative expense claim where "[a]ll of the acts by the debtors that caused [the damages alleged] took place prepetition" and claimant "has shown no active postpetition conduct by the debtors to justify an award of administrative expense priority"); *In re Supermedia, Inc.*, 2014 WL 7403448, at *19-20 (Bankr. D. Del. Dec. 29, 2014) (rejecting administrative expense claim where infringing acts all occurred prepetition). As explained above, there is a sharp and material dispute over whether and to what extent continuing postpetition misconduct has occurred. That is precisely why discovery is needed before deciding the Debtors' motion.

Relatedly, courts routinely conclude that administrative expense priority treatment is appropriate in the analogous contexts of ongoing postpetition trademark[5] and patent infringement.[6] Courts have also held that claimants may state new claims for postpetition misconduct even when the post-bankruptcy violation is a continuation of the debtor's allegedly illegal pre-bankruptcy behavior. "A 'fresh start' means only that; it does not mean a continuing license to violate the law." *O'Loghlin v. County of Orange*, 229 F.3d 871, 874–75 (9th Cir. 2000) (explaining that prohibiting plaintiffs from bringing new claims for ongoing discrimination would allow a debtor "to use pre-discharge violations of the ADA to insulate itself from liability for post-discharge violations, so long as the pre- and post-discharge violations were part of the same course of conduct," which would "doubly disadvantage" the creditor).

The Debtors' argument that Skin Medicinals' claims *accrued* prepetition (D.I. 469 at 11–12) also misses the mark. The question of when claims accrue (for purposes of nonbankruptcy law) and when claims arise (for purposes of bankruptcy law) are distinct. *Mallinckrodt*, 2021 WL 4876908, at *8. Indeed, the Third Circuit squarely held that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct

---

[5] *See, e.g., In re Beverage Canners Int'l Corp.*, 255 B.R. 89 (Bankr. S.D. Fla. 2000) (granting administrative status to a trademark licensor whose mark was used postpetition despite the fact the license agreement was entered into prepetition); *In re Cambridge Biotech Corp.*, 186 B.R. 9, 14 (Bankr. D. Mass. 1995) (same); *In re B–K of Kansas, Inc.*, 82 B.R. 135, 137 (Bankr. D. Kan. 1988), *aff'd*, 99 B.R. 446 (D. Kan. 1989) (same).

[6] *See, e.g., In re Diomed, Inc.*, 394 B.R. 260, 267 (Bankr. D. Mass. 2008) (describing royalties accrued postpetition as "a 'classic' administrative claim"); *Eagle-Picher Industries*, 447 F.3d at 462 (allowing administrative expense claim for patent infringement damages arising out of prepetition and postpetition purchases); *Carter-Wallace Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 874 (2d Cir. 1971) (same).

giving rise to an injury"—not when the cause of action happens to accrue. *In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010); *see also* D.I. 469 at 8 (agreeing with this principle). To the extent the "conduct giving rise to an injury" continues postpetition, therefore, it is fully consistent with *Grossman*'s to allow an administrative expense for that portion of the injury suffered, regardless of when the claims may originally have accrued.

The sources of substantive law the Debtors rely on further demonstrate that the nonbankruptcy-law accrual question and the bankruptcy-law allocation question are separate and distinct. For instance, the rule that "a continuing misappropriation constitutes a single claim of misappropriation" under the DTSA expressly applies only "[f]or purposes of this subsection"—*i.e.*, for purposes of deciding when a claim is timely. *See* 18 U.S.C. § 1836(d) (titled "Period of Limitations"). As the *Attia* case cited by the Debtors explains, "[w]hile the DTSA states that 'a continuing misappropriation constitutes a single claim of misappropriation,' it does so *only in the context of the limitations period* for claims pursuant to the DTSA." *Attia v. Google LLC*, 983 F.3d 420, 425 (9th Cir. 2020) (emphasis added). The administrative expense question turns on when the conduct giving rise to an injury occurs, not the date of accrual (relevant to the statute of limitations). In short, because Section 1836(d)'s rule regarding claims of continuing misappropriation applies only in the accrual context, it is not relevant to the administrative expense inquiry.

## CONCLUSION

WHEREFORE, Skin Medicinals respectfully requests that the Court deny the Debtors' Motion for Summary Judgment on Debtors' Objection to Motion of Skin Medicinals for Entry of an Order Granting an Allowed Administrative Expense.

Dated: October 23, 2024
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: mharvey@morrisnichols.com
      mtalmo@morrisnichols.com

- and -

**KAPLAN & GRADY LLC**

Howard Kaplan, Esq. (admitted *pro hac vice*)
Jed W. Glickstein, Esq. (admitted *pro hac vice*)
Annie Garau Kelly, Esq.
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: howard@kaplangrady.com
      jglickstein@kaplangrady.com
      annie@kaplangrady.com

*Counsel for Skin Medicinals LLC*