# <u>EXHIBIT A</u>

## (TPA APA)

CONFIDENTIAL

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of November 12, 2024 (the "**Effective Date**"), by and among Mixlab, Inc., a Delaware corporation ("**Mixlab**"), Mixlab WI, LLC, a Delaware limited liability company ("**Buyer**"), The Pet Apothecary, LLC, a Wisconsin limited liability company ("**Seller**"), and Optio Rx, LLC, a Delaware limited liability company ("**Parent**"). Mixlab, Buyer, Seller, and Parent may at times hereinafter be referred to, individually, as "**Party**" and, collectively, as "**Parties**".

### RECITALS

**WHEREAS**, Seller is an indirect wholly owned subsidiary of Parent;

**WHEREAS**, Seller owns certain Assets (as defined below) in connection with its ownership and operation of the Pharmacy (as defined below) and the provision of the Pharmacy Activities (as defined below) at the real property located at 407 W. Silver Spring Drive, Milwaukee, Wisconsin, 53217 (the "**Premises**");

**WHEREAS**, on June 7, 2024, Parent, Seller and various Affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 the United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware ("**Bankruptcy Court**"), and these Chapter 11 cases (collectively, the "**Bankruptcy Cases**") are pending in the Bankruptcy Court and are jointly administered under Case No. 24-11188 (TMH) (the Bankruptcy Cases of Seller, Parent and their various Affiliates are referred to herein collectively as the "**Seller Bankruptcy Case**");

**WHEREAS**, Seller is the debtor and debtor in possession in the Seller Bankruptcy Case;

**WHEREAS**, Buyer desires to purchase, and Seller desires to sell, the Assets, on the terms and conditions set forth in this Agreement, through a sale free and clear of liens and encumbrances pursuant to Section 363 and other provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, concurrently with the execution hereof, Mixlab, Buyer, Parent, and SBH Medical, Ltd., an Ohio limited liability company ("**SBH**") are entering into that certain Asset Purchase Agreement, which provides for the sale to Buyer from SBH those certain assets associated with SBH as more fully described therein (the "**SBH Purchase Agreement**"); and

**WHEREAS**, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court in the Seller Bankruptcy Case and the Bankruptcy Case of Parent and will be consummated only pursuant to a Sale Order to be entered in those Bankruptcy Cases.

### AGREEMENT

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree as follows:

126815117.9 0082862-00007

# ARTICLE 1
## DEFINITIONS

The terms defined in this <u>Article 1</u>, whenever used in this Agreement, shall have the respective meanings indicated below:

1.1    "**Accounting Firm**" shall have the meaning set forth in <u>Section 2.3(f)</u>.

1.2    "**Accounting Principles**" means the historic methodologies, practices, policies, procedures, categorizations, definitions, methods, judgments, classifications, techniques, and principles consistently used by Seller.

1.3    "**Affiliate**" of a party means (a) any company, individual, corporation, partnership, association, or business that now or hereafter, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such party, and (b) the companies, individuals, corporations, partnerships, associations, or businesses which control, are controlled by, or are under common control with any entity described in the foregoing clause (a). The terms "control", "controlled by" and "under common control with" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract or otherwise. Except for purposes of <u>Section 6.10</u>, in no event shall an equity owner of Parent or its respective affiliates be deemed to be an Affiliate of Seller or Parent.

1.4    "**Allocation**" shall have the meaning set forth in <u>Section 2.4</u>.

1.5    "**Assets**" means all of the assets of Seller, including those located at the Premises or used or held for use in connection with the operation of the Pharmacy or Pharmacy Activities, and all of the Accounts Receivable, Veterinary Files, Inventory, Equipment, licenses or permits, Personal Property, Intellectual Property, General Intangibles, Devices and Goodwill (but in all events excluding the Excluded Assets (as defined below)).

1.6    "**Balance Sheet**" shall have the meaning set forth in <u>Section 4.1(f)</u>.

1.7    "**Balance Sheet Date**" shall have the meaning set forth in <u>Section 4.1(f)</u>.

1.8    "**Bill of Sale**" shall have the meaning set forth in <u>Section 5.1(b)</u>.

1.9    "**Books and Records**" means the books and records of Seller relating to the Assets and/or to the Pharmacy Activities, including all accounting records, files, invoices, customer lists, and supply lists.

1.10    "**Buyer Deliverables**" shall have the meaning set forth in <u>Section 5.2</u>.

1.11    "**Buyer Terminating Breach**" shall have the meaning set forth in <u>Section 9.1(c)</u>.

1.12    "**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as signed into law by the President of the United States on March 27, 2020, together with all rules and regulations and guidance issued by any Governmental Entity with respect thereto.

1.13    "**Chosen Court**" shall have the meaning set forth in Section 10.4.

1.14    "**Claim**" means a claim pursuant to Article 7 that a party is entitled, or may become entitled, to indemnification under this Agreement.

1.15    "**Closing**" shall have the meaning set forth in Section 3.1.

1.16    "**Closing Date**" shall have the meaning set forth in Section 3.1.

1.17    "**Closing Dispensing Report**" shall have the meaning set forth in Section 4.1(g).

1.18    "**Closing Payment**" shall have the meaning set forth in Section 2.3(b)(i).

1.19    "**Closing Sales Statement**" shall have the meaning set forth in Section 2.3(b).

1.20    "**Closing Sales Volume**" shall have the meaning set forth in Section 2.3(b).

1.21    "**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and regulations promulgated thereunder, or applicable state law.

1.22    "**Code**" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

1.23    "**Confidential Information**" shall have the meaning set forth in Section 6.10(f).

1.24    "**Contract**" means any contract, commitment, lease, or other agreement or instrument (whether written or oral).

1.25    "**COVID-19**" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2) (or any mutation or variation thereof or related health condition, or any related or associated epidemics, pandemics or disease outbreaks).

1.26    "**COVID-19 Funds**" means any loan, exclusion, forgiveness, advance, grant, subsidy, or other payment or application for assistance or stimulus, received or made by Seller under or pursuant to any COVID-19 Relief Program, including any PPP Loan, Economic Stabilization Fund loan or other U.S. Small Business Administration loan, as well as any funds received in connection with any Accelerated Payment Program or Advance Payment Program administered by the Centers for Medicare & Medicaid Services (CMS) or from the Public Health and Social Services Emergency Fund established under the CARES Act.

1.27    "**COVID-19 Relief Program**" means any program authorized or promulgated by a Governmental Entity in response to or in connection with COVID-19, including the CARES Act and subsequent or related legislation or amendments, any current or future regulations or official interpretations thereof and any current or future guidance and rules published by the U.S. Small Business Administration or any other Governmental Entity administering the same.

1.28    "**Current Customers**" shall have the meaning set forth in Section 2.3(b).

1.29    "**Devices**" means cellphones, tablets, iPads, laptop computers, desktop computers, printers, fax machines, copy machines, and any other electronic devices owned by Seller or used in connection with the Pharmacy Activities.

1.30    "**Dispensing Reports**" shall have the meaning set forth in Section 4.1(g).

1.31    "**Earn-out Payment**" shall have the meaning set forth in Section 2.3(a).

1.32    "**Earn-out Sales Volume**" shall have the meaning set forth in Section 2.3(c).

1.33    "**Earn-out Statement**" shall have the meaning set forth in Section 2.3(c).

1.34    "**Employee Benefit Liability**" means any liability or obligation of Seller (a) that is an accrued but unpaid monetary obligation to make a contribution under any Employee Benefit Plan; (b) that relates in any way to or arises under any Employee Benefit Plan; (c) for accrued vacation pay, accrued sick pay, and/or other accrued paid time off of any kind; (d) for accrued employee wages and other compensation of any kind payable in the ordinary course of business and payroll taxes with respect thereto; (e) that is due and owing to independent contractors; or (f) for other employee fringe benefits of any kind, including insurance programs (which include COBRA obligations), expense reimbursement obligations, continuing education stipends, and automobile allowances.

1.35    "**Employee Benefit Plans**" means (a) all "employee benefit plans" as defined in Section 3(3) of ERISA and (b) any other agreement, arrangement, plan, or policy, qualified or non-qualified, written or oral, funded or unfunded, that involves any (i) pension, retirement, profit sharing, savings, deferred compensation, bonus, stock option, simple retirement account (as described in Code Section 408(p)), stock purchase, phantom stock, incentive plan, or change in control benefits; (ii) welfare or "fringe" benefits, including vacation, holiday, severance, redundancy, disability, medical, hospitalization, dental, life and other insurance, tuition, company car, club dues, sick leave, maternity, paternity or family leave, health care reimbursement, dependent care assistance, cafeteria plan, regular in-kind gifts, or other benefits; or (iii) employment, consulting, engagement, retainer or golden parachute agreement or arrangement, in each case, which is or was sponsored, maintained or contributed to by Seller or any ERISA Affiliate and with respect to which Seller or Buyer has or may have any current or future liability.

1.36    "**Encumbrance**" means (i) any lien, mortgage, pledge, claim, security interest, title defect, charge, condition, right of another, restriction, levy, or other restriction or encumbrance, legal or equitable or of any other kind whatsoever, or (ii) any agreement to create any of the foregoing.

1.37    "**Environmental Laws**" means the federal, state, regional, county, or local regulations, ordinances, rules, and policies and common law in effect on the Effective Date relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emission, discharge, release, or threatened release of Hazardous Substances, or otherwise relating to pollution or protection of human health (including occupational health and safety) or the environment (including ambient air, surface water, ground water, land surface, or subsurface strata), as the same may be amended or modified to the Effective Date.

1.38    "**Environmental Permits**" shall have the meaning set forth in Section 4.1(r)(ii).

1.39    "**Equipment**" means machinery, office equipment, third party computer equipment, pharmacy or other medical equipment, equipment used when conducting the Pharmacy Activities, and other equipment, tools, spare parts, furniture, and other items of tangible personal property of any kind, and including any of the foregoing of Seller located at any facility of any of Seller, Parent, or their respective Affiliates.

1.40    "**Equity Interests**" means (a) any partnership interests, (b) any membership or limited liability company interests or units, (c) any shares of capital stock, (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing entity, (e) any subscriptions, calls, warrants, options, or commitments of any kind or character relating to, or entitling any Person to purchase or otherwise acquire membership or limited liability company interests or units, capital stock, or any other equity securities, (f) any securities convertible into or exercisable or exchangeable for partnership interests, membership or limited liability company interests or units, capital stock, or any other equity securities and (g) any other interest classified as an equity security of a Person.

1.41    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

1.42    "**ERISA Affiliate**" means, with respect to any corporation or trade or business, any other corporation or trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included Seller, or that is, or was at the relevant time, a member of the same "controlled group" as Seller pursuant to Section 4001(a)(14) of ERISA.

1.43    "**Escrow Agent**" shall have the meaning set forth in Section 2.2(b)(ii).

1.44    "**Excluded Activities**" means the provision of non-veterinary pharmacy services, including the compounding, sterile compounding, ordering, storing, preparing, and dispensing of non-veterinary prescription pharmaceuticals and over-the-counter products, and the furnishing of services and supplies related thereto and all other services incidental to the operation of a non-veterinary pharmacy.

1.45    "**Excluded Assets**" means all assets of Seller that are not included in the Assets set forth on Schedule 1.45.

1.46    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.6.

1.47    "**Federal Health Care Program**" means any "federal health care program" as defined in 42 U.S.C. §1320a-7b(f), including Medicare, Medicare Advantage, state Medicaid programs, state Medicaid waiver programs, state CHIP programs, managed Medicaid, TRICARE and state and local social services programs or other similar or corresponding foreign programs.

1.48    "**Final Earn-out Payment**" shall have the meaning set forth in Section 2.3(c).

1.49    "**Final Order**" means an Order of the Bankruptcy Court or a court of competent jurisdiction as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order,

or protest of any kind, is pending before the Bankruptcy Court or court of competent jurisdiction and the time for filing any such petition or protest is passed; (iii) the Bankruptcy Court or court of competent jurisdiction does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; (iv) other than with respect to the Sale Order, the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; and (v) with respect to the Sale Order, the action or order is not then under judicial review for a challenge regarding Buyer's status as a purchaser in good faith pursuant to Section 363(m) of the Bankruptcy Code, there is no notice of appeal or other application for judicial review pending regarding Buyer's status as a purchaser in good faith pursuant to Section 363(m) of the Bankruptcy Code, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

1.50    "**Financial Statements**" shall have the meaning set forth in Section 4.1(f).

1.51    "**Fraud**" means actual fraud under the laws of the state of Delaware. For the avoidance of doubt, Fraud shall not include any claim for equitable fraud, constructive fraud, promissory fraud, unfair dealings fraud, or fraud by negligent misrepresentations.

1.52    "**Fundamental Representations**" means any representation or warranty in Sections 4.1(a) (Organization, Standing, etc.), 4.1(b) (Due Authorization), 4.1(c)(i) (Compliance with Organizational Documents) 4.1(e) (Assets of Seller), 4.1(e) (Tax Returns and Audits), and 4.1(v) (No Brokers or Finders).

1.53    "**Funds Flow**" shall have the meaning set forth in Section 2.2(b).

1.54    "**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

1.55    "**General Intangibles**" means (except to the extent specifically included in the Excluded Assets) all of Seller's right, title, and interest in and to any and all general intangibles and other intangible assets, including prepaid expenses and deposits and other prepaids.

1.56    "**Goodwill**" means the value of the Pharmacy or Pharmacy Activities attributable to the Names or reputation of the Pharmacy or any other factor leading to continued customer or patient use of Pharmacy Activities.

1.57    "**Governmental Entity**" means any federal, state, provincial, local, municipal, non-U.S. or other government or quasi-governmental authority or any department, agency, commission, board, subdivision, bureau, agency, instrumentality, court or other tribunal of any of the foregoing.

1.58    "**Hazardous Substances**" means any pollutants, contaminants, hazardous substances, hazardous wastes, hazardous materials, toxic substances, pharmaceutical, medical, biological or infectious wastes, radioactive substances or materials, or any terms of similar import or effect under any Environmental Law, or substances or materials for which standards of care are imposed by any Environmental Law, including lead-based paint or asbestos containing materials or substances, per- and polyfluoroalkyl substances, urea formaldehyde, or petroleum or petroleum-based or petroleum-derived substances.

1.59    "**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 and the currently effective regulations promulgated thereunder.

1.60    "**Human Patient Records**" means all historical health records related to human patients that includes "protected health information" as defined under 45 C.F.R. §160.103 (such as medical records, patient billing records, prescriptions, prescription files and records, signature logs and patient profiles, including refill status reports and insurance coverages and any other human patient-related documentation as required under any applicable Laws) relating to the Pharmacy.

1.61    "**Indebtedness**" means any of the following: (a) any obligation for borrowed money and any accrued interest, fees, penalties, prepayment premiums or other payment obligations related thereto; (b) any obligation evidenced by a note, bond, debenture, mortgage, indenture, deed of trust or similar instrument or with respect to which there are any Encumbrances on any assets; (c) any obligation as an account party with respect to letters of credit to the extent drawn upon; (d) the deferred purchase price of property, assets, or services or for earnouts, holdbacks of purchase price, non-compete payments, obligations to pay purchase price adjustments or other similar obligations (calculated assuming the achievement and/or satisfaction of all applicable targets, thresholds, and other terms and conditions of the same) (other than accounts payable in the ordinary course of business which are not past due); (e) deferred rent; (f) any capital lease (determined in accordance with GAAP); (g) all obligations under any interest rate or currency protection agreement or similar hedging agreement, assuming such agreements were terminated *minus* any amounts payable in connection with such termination (which may be a positive or negative number); (h) any obligation in the nature of a guarantee, indemnity, or grant of an Encumbrance with respect to any of the foregoing; (k) any loan or advance under, guaranteed, amended or made available in connection with any COVID-19 Relief Program, including the total outstanding amount of any accelerated or advance payments under any Accelerated Payment Program or Advance Payment Program administered by the Centers for Medicare & Medicaid Services (CMS) or from the Public Health and Social Services Emergency Fund established under the CARES Act; (i) with respect to any Person, all Indebtedness of others secured by an Encumbrance on property or assets owned or acquired by such Person; and (j) any interest, fee, expense, prepayment premium, termination fee, penalty, cost or other amount payable in connection with any of the foregoing.

1.62    "**Indemnity Cap**" shall have the meaning set forth in Section 7.7(b).

1.63    "**Indemnity Escrow Agreement**" shall have the meaning set forth in Section 2.2(b)(ii).

1.64    "**Indemnity Escrow Amount**" shall have the meaning set forth in Section 2.2(b)(ii).

1.65    "**Indemnity Escrow Period**" means such period commencing on the Closing Date and fifteen (15) months following the Closing Date.

1.66    "**Indemnified Party**" shall have the meaning set forth in Section 7.3.

1.67    "**Indemnifying Party**" shall have the meaning set forth in Section 7.3.

1.68    "**Information Requirements**" shall have the meaning set forth in Section 4.1(x)(i).

1.69    "**Inventory**" means all inventories and supplies of any kind, including opened and unopened and partially filled prescription and non-prescription pharmaceuticals and prescription non-prescription products, together with their related service parts, containers, storage materials, packaging, packing materials and supplies, and including any of the foregoing of Seller located at any facility of any of Seller, Parent, or their respective Affiliates.

1.70    "**Insurance Policies**" shall have the meaning set forth in Section 4.1(u).

1.71    "**Intellectual Property**" means all intellectual property, and all rights therein and thereto, recognized under any Law, by any Governmental Entity, or in any jurisdiction anywhere in the world, including any and all of the following: (i) trademarks, service marks, collective marks, certification marks, trade dress, trade names (including the Names), logos, slogans and corporate names, including all registrations and applications for registration thereof, and the goodwill connected with the use of and symbolized by the foregoing (collectively, "**Trademarks**"); (ii) copyrights, including all registrations and applications for registration thereof, and works of authorship, whether or not copyrightable, and moral rights (collectively, "**Copyrights**"); (iii) computer software and software licenses, data, databases, compilations of data, and documentation thereof; (iv) trade secrets, confidential know-how and other confidential information (including formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), data, databases, processes and techniques, drawings, specifications, designs, plans, proposals, financial and marketing plans and customer and supplier lists and information) (collectively, "**Trade Secrets**"); (v) patents, patent applications, patent disclosures and inventions, including any continuations, divisionals, continuations-in-part, renewals and reissues for any of the foregoing (collectively, "**Patents**"); (vi) websites, internet domain name registrations, URLs, and social media accounts; (vii) all other intellectual property rights similar to the foregoing; and (viii) all copies and tangible embodiments thereof (in whatever form or medium).

1.72    "**IRS**" means the Internal Revenue Service.

1.73    "**IT Assets**" shall have the meaning set forth in Section 4.1(f).

1.74    [Reserved].

1.75    "**Law**" means any law, statute, ordinance, code, rule, order, or regulation of any governmental unit, court, or administrative or regulatory agency, including, without limitation, the Code.

1.76    "**Leased Real Property**" shall have the meaning set forth in Section 4.1(q).

1.77    "**Licenses**" shall have the meaning set forth in Section 4.1(o).

1.78    "**Loss**" means any claim, liability, loss, Tax, judgment, fine, penalty, damage, cost, or expense (including lost profits, attorneys' fees, and costs of investigation and litigation).

1.79    "**Material Adverse Effect**" means any event, change or effect that, individually or in the aggregate, has had a material adverse effect on the business, financial condition or results of operations of the Pharmacy; *provided*, *however*, that no such event, change or effect resulting or arising from or in connection with any of the following matters shall be deemed, either alone or in combination, to constitute or contribute to a Material Adverse Effect: (a) the conditions generally

affecting the industries in which the Pharmacy operates; (b) the general political, economic, business, monetary, financial or capital or credit market conditions or trends (including interest rates, currency exchange rates, tax rates and price levels or trading volumes in the United States or foreign securities markets); (c) changes in global, national or regional political conditions or trends; (d) any act of civil unrest, war or terrorism (including by cyberattack or otherwise), including an outbreak or escalation of hostilities involving the United States or any other country or the declaration by the United States or any other country or jurisdiction of a national emergency or war; (e) natural disasters or weather developments, including earthquakes, hurricanes, tsunamis, typhoons, lightning, hail storms, blizzards, tornadoes, droughts, floods, cyclones, arctic frosts, mudslides and wildfires, manmade disasters or acts of God or any outbreak of any disease or other public health event; (f) failure of the financial or operating performance of the Pharmacy to meet internal, Buyer or analyst projections, forecasts or budgets for any period (provided that this clause (f) shall not be construed as implying that Seller is making any representation or warranty herein with respect to any internal, Buyer or analyst projections, forecasts or budgets and no such representations or warranties are being made); (g) any action taken or omitted to be taken by or at the request or with the consent of Buyer or as expressly required pursuant to this Agreement, including without limitation, disclosure of the identity of Buyer to customer suppliers; (h) the execution, announcement, pendency, performance or consummation of this Agreement, the transactions contemplated hereby, or the identity of Buyer (including the impact on or any loss of employees, customers, suppliers, Government Entities or any relationships with any of the foregoing or other business relationships resulting from any of the foregoing) or (i) changes in any Law (including any proposed Law) or applicable accounting principles or standard or any interpretations of any of the foregoing, or (j) the Seller Bankruptcy Case; *provided* that any adverse events, changes or effects resulting from the matters described in clauses (a), (b), (c), (d), (e) and (i) may be taken into account in determining whether there has been a Material Adverse Effect only to the extent they have a disproportionate effect on the Pharmacy relative to similarly situated businesses in the industries in which the Pharmacy operates.

1.80     "**Names**" means all of Seller's right, title, and interest in and to the Pharmacy's names set forth in Schedule 1.80.

1.81     "**Net Sales Volume**" means the trailing twelve-month net sales of the Pharmacy, calculated as gross sales, less all discounts, refunds, returns and chargebacks, and recognized as of the date the associated prescription(s) is filled and prepared for shipment to the end customer or prescriber.

1.82     [Reserved].

1.83     "**Objection Statement**" shall have the meaning set forth in Section 2.3(d).

1.84     "**Organizational Documents**" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity and any operating agreement, partnership agreement or similar governing agreement; and (c) any amendment to any of the foregoing.

1.85     "**Outside Date**" shall have the meaning set forth in Section 9.1(a).

1.86     "**Patient Records**" means all records including "protected health information" as defined under 45 C.F.R. §160.103 (such as medical records, patient billing records, prescriptions, prescription files and records, signature logs and patient profiles, including refill status reports and

insurance coverages and other patient-related documentation as required under any applicable Laws and Veterinary and Pharmacy Laws) relating to the Pharmacy.

1.87 "**Performance Period**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

1.88 "**Permits**" means all permits, licenses, authorizations, registrations, franchises, approvals, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Entities.

1.89 "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Entity, unincorporated organization, trust, association or other entity.

1.90 "**Personal Property**" means tangible personal property, including all office furniture, fixtures, computer software and licenses, leasehold improvements, supplies, Inventory, Equipment, Books and Records, pharmacy and other medical instruments, materials, and consumables, together with any and all warranties thereon, including those described on <u>Schedule 1.90</u> attached hereto.

1.91 "**Pharmacy**" means the business of Seller engaged in the Pharmacy Activities.

1.92 "**Pharmacy Activities**" means the provision of veterinary pharmacy services including the compounding, sterile compounding, ordering, storing, preparing, and dispensing of prescription veterinarian pharmaceuticals and over-the-counter products, and the furnishing of services and supplies related thereto and all other services incidental to the operation of a veterinary pharmacy, in all cases in connection with the Pharmacy's veterinary customers and participating veterinary clinics. "**Pharmacy Activities**" does not include the Excluded Activities.

1.93 "**Pharmacy Employees**" shall have the meaning set forth in <u>Section 4.1(k)</u>.

1.94 "**Pre-Closing Dispensing Report**" shall have the meaning set forth in <u>Section 4.1(g)</u>.

1.95 "**Premises**" shall have the meaning set forth in the recitals.

1.96 "**Post-Closing Tax Period**" means any taxable period commencing after the Closing Date.

1.97 "**Powers of Attorney**" shall have the meaning set forth in <u>Section 6.13(f)</u>.

1.98 "**PPP Loan**" means any loan under the Paycheck Protection Program of the U.S. Small Business Administration.

1.99 "**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such taxable period ending on and including the Closing Date.

1.100 "**Proceeding**" shall have the meaning set forth in <u>Section 4.1(j)</u>.

1.101 "**Purchase Price**" shall have the meaning set forth in <u>Section 2.2(a)</u>.

1.102 "**Referral Plan**" shall have the meaning set forth in <u>Section 6.10(b)</u>.

1.103  "**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

1.104  "**Resolution Period**" shall have the meaning set forth in Section 7.3.

1.105  "**Restricted Area**" means the United States of America.

1.106  "**Restricted Time Period**" means the period beginning on the Closing Date and ending two (2) years thereafter.

1.107  "**Sale Hearing**" means the hearing conducted by the Bankruptcy Court for purposes of approving and confirming the sale of the Assets in accordance with this Agreement.

1.108  "**Sale Order**" means an order of the Bankruptcy Court, in form, content, and detail acceptable to Seller, approving this Agreement and the consummation of the transactions contemplated hereby.

1.109  "**SBH**" shall have the meaning set forth in Section 2.1(a).

1.110  "**SBH Purchase Agreement**" shall have the meaning set forth in the recitals.

1.111  "**Schedules**" means the Disclosure Schedules delivered by Seller with the execution and delivery of this Agreement.

1.112  "**Seller Deliverables**" shall have the meaning set forth in Section 5.1.

1.113  "**Seller Taxes**" means any liability, obligation or other Loss for (i) Taxes of Seller and Parent (or any member, partner, stockholder or Affiliate of Seller or Parent) or relating to the Pharmacy Activities or the Assets for any Pre-Closing Tax Period (if any); (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to Section 6.10(a) and Section 6.10(b); or (iii) other Taxes of Seller or Parent (or any member, partner, stockholder or Affiliate of Seller or Parent) of any kind or description (including any liability, obligation or other Loss for Taxes of Seller (or any member, partner, stockholder or Affiliate of Seller or Parent) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law).

1.114  "**Security Event**" shall have the meaning set forth in Section 4.1(x)(iii).

1.115  "**Seller Information**" shall have the meaning set forth in Section 4.1(x)(ii).

1.116  "**Seller Intellectual Property**" shall have the meaning set forth in Section 4.1(w)(i).

1.117  "**Seller Terminating Breach**" shall have the meaning set forth in Section 9.1(b).

1.118  "**Straddle Period**" means any taxable period that includes (but does not end on) the Closing Date.

1.119  "**Straddle Period Property Taxes**" shall have the meaning set forth in Section 6.11(b).

1.120  "**Tax**" means (i) all federal, state, local, or foreign income, profits, employment (including social security, unemployment insurance, employer health and employee income tax withholding), payroll, corporate, franchise, net worth, gross receipts, sales, use, transfer, stamp, license, withholding, occupation, premium, real and personal property, unclaimed or abandoned property, escheat, capital, windfall profits, environmental, customs, duties, ad valorem, recapture, alternative or add on minimum, value added, goods and services, excise, severance, PBGC premiums, and any other federal, state, local, or foreign taxes, charges, fees, levies, or other assessments of any kind, however denominated; (ii) all interest, assessments, penalties, fines, additions to, or additional amounts imposed in connection with any item described in clause (i), whether disputed or not; and (iii) any transferee liability in respect of any items described in clauses (i) or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof and any analogous or similar provision under Law) or otherwise.

1.121  "**Tax Return**" means any return, report, or statement required to be filed in connection with any Tax (including related or supporting information with respect to any of the foregoing and any schedules or attachments thereto, and any amendment thereof) including any election, declaration, statement of foreign bank and financial accounts, information return, claim for refund, or declaration of estimated Tax, and including, where permitted or required, combined, consolidated, or unitary returns for any group of entities that includes Seller or any of its Affiliates.

1.122  "**Taxing Authority**" means any Governmental Entity responsible for the administration, imposition, or collection of any Tax, including, without limitation, the Internal Revenue Service and each applicable state department of revenue or similar Governmental Entity.

1.123  "**Third Party Suit**" means a suit or proceeding by a third party with respect to which a Claim is made.

1.124  "**Transaction Expenses**" means the all costs, fees and expenses payable by Seller that are incurred in connection with or as a result of the preparation, negotiation or execution of this Agreement or any of the agreements, documents or instructions contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, including all fees and expenses of (including under any engagement letter) brokers, investment bankers, financial advisors, commercial lenders, accountants and legal advisors.

1.125  "**Transaction Documents**" means this Agreement, the Disclosure Schedules, any Exhibits, or any other agreement, instrument, certificate, and document executed and delivered by or on behalf of the Parties in connection with this Agreement, and the consummation of the transactions contemplated hereby.

1.126  "**Transfer Taxes**" shall have the meaning set forth in Section 6.11(a).

1.127  "**Veterinary and Pharmacy Laws**" means (i) any and all Laws relating to the regulation of the veterinary industry (including any services rendered by any professional operating in the industry) institutional and professional licensure, documentation and prescription orders, informed consent, quality assurance, risk management, mandated reporting of incidents, occurrences, diseases and events, advertising or marketing; (ii) all Laws administered by the Drug Enforcement Administration including 21 U.S.C. § 801 et. seq., commonly referred to as the "Controlled Substances Act" and any similar state Laws governing the prescribing, storing, and dispensing of controlled

substances, including all required licensure and registrations related to controlled substances; (iii) all Laws administered by the U.S. Food & Drug Administration, including 21 U.S.C. Chapter § 301 et. seq., commonly referred to as the "Federal Food, Drug, and Cosmetic Act" and any similar state Laws; and (iv) Laws relating to the practice of pharmacy, the operation of pharmacies, the wholesale distribution, dispensing, labeling, packaging, repackaging, advertising, adulteration or compounding of drug products or controlled substances.

1.128   "**Veterinary Files**" means all forms, documents, and logs prepared in connection with the Pharmacy Activities setting forth the compounded prescriptions (including both non-sterile and sterile compounded prescriptions), commercial prescriptions, compound formulations (including both non-sterile and sterile), processes, studies and other relevant compounding records, including all related patient, owner and prescriber information and profiles (including but not limited to contact information, weight, breed, sex, allergies, and any other applicable information).

1.129   "**Wisconsin Regulatory Approval**" shall have the meaning set forth in <u>Section 8.1(e)</u>.

## ARTICLE 2
## PURCHASE OF ASSETS

2.1   <u>Purchase</u>. Subject to Bankruptcy Court approval of this Agreement through the entry of the Sale Order, and on the terms and subject to the satisfaction or, if permissible, waiver of the conditions set forth in this Agreement, Seller agrees to sell, assign, convey, transfer, and deliver all right, title and interest in and to the Assets to Buyer, as applicable, free and clear of all Encumbrances, and Buyer agrees to purchase, acquire and accept the Assets, as applicable, in each case at the Closing and effective as of the Closing Date.

2.2   <u>Purchase Price; Payment</u>.

(a)   As consideration for the sale, assignment, conveyance, transfer, and delivery to Buyer of the Assets (free and clear of all Encumbrances) and the obligations of Seller and Parent under <u>Section 6.10</u>, and subject to adjustment as set forth herein, Buyer shall pay to Seller by wire transfer of immediately available funds an amount equal to $2,698,000 (the "**Purchase Price**").

(b)   The Purchase Price shall be paid in accordance with this <u>Section 2.2(b)</u> as more fully set forth in a funds flow memorandum prepared by Buyer and delivered to Seller promptly prior to the Closing (the "**Funds Flow**"):

(i)   On the Closing Date, Buyer shall pay to Seller by wire transfer of immediately available funds to the account designated in writing by Seller at least three (3) business days prior to the Closing Date and as set forth in the Funds Flow, an amount equal to: (a) the Cash Payment, less (b) the Escrow Amount (collectively, the "**Closing Payment**");

(ii)   On the Closing Date, Buyer shall deliver by wire transfer of immediately available funds to the accounts designated by an escrow agent that is mutually agreed upon by the Parties (the "**Escrow Agent**") an amount equal to $134,900 (the "**Indemnity Escrow Amount**") to be held and released subject to the terms and conditions of an escrow agreement in a form mutually agreed to by the Parties (the "**Indemnity Escrow Agreement**"). The Parties shall include escrow terms consistent in all material respects with

the terms set forth on Exhibit E attached heretoin the Indemnity Escrow Agreement, and shall reasonably negotiate in good faith with the Escrow Agent any remaining escrow terms.

(c)     Within three (3) business days following the conclusion of the Indemnity Escrow Period, Buyer and Seller shall cause the Escrow Agent to make payment to Seller in accordance with the Indemnity Escrow Agreement of an amount equal to (i) the Indemnity Escrow Amount less (ii) the aggregate amount which is subject to Claims for indemnification made by Buyer in accordance with the provisions of Section 7.2 which have not been resolved or satisfied. In the event that the Indemnity Escrow Amount shall be reduced with respect to a Claim for indemnification made by Buyer, promptly (and in any event within three (3) business days) following the final resolution of such Claim, Buyer and Seller shall cause the Escrow Agent (in accordance with the Indemnity Escrow Agreement) to make payment to Buyer or Seller, as applicable, of such amount in accordance with the Indemnity Escrow Agreement.

2.3     Earn-out.

(a)     As additional consideration for the Assets, Buyer shall pay to Seller, if earned during the period between the Closing Date and the date that is twelve (12) months following the Closing Date (the "**Performance Period**") a retention earn-out payment in an amount not to exceed $300,000 (the "**Earn-out Payment**"). The Final Earn-out Payment (as defined below), if any, shall be due and payable to Seller on or before the fifth (5th) business day after the final determination thereof in accordance with this Section 2.3, and shall be paid to Seller by wire transfer of immediately available funds.

(b)     No later than five (5) days following the Closing, Seller shall deliver to Buyer a statement in form reasonably acceptable to Buyer (the "**Closing Sales Statement**") setting forth (i) the Net Sales Volume of those certain customers of Seller set forth on Schedule 2.3(b) (the "**Current Customers**") measured as of the Closing Date and calculated using the Accounting Principles (the "**Closing Sales Volume**"), and (ii) the estimated Earn-out Payment, calculated by Seller in accordance with the methodology set forth on Exhibit A attached hereto.

(c)     No later than thirty (30) days after the conclusion of the Performance Period, Buyer shall deliver to Seller a statement in form reasonably acceptable to Seller (the "**Earn-out Statement**") setting forth (i) the Net Sales Volume of the Current Customers measured as of the conclusion of the Performance Period and calculated using the Accounting Principles (the "**Earn-out Sales Volume**"), and (ii) the final Earn-out Payment, calculated by Buyer in accordance with the methodology set forth on Exhibit A attached hereto (the "**Final Earn-out Payment**").

(d)     The Earn-out Statement shall be final and binding upon all Parties unless Seller objects within thirty (30) days after receipt thereof (a) by notifying Buyer in writing of each objection; and (b) delivering to Buyer a statement describing in detail the basis for each objection and a new Earn-out Statement, along with any details or documentation supporting Seller's objections (collectively, the "**Objection Statement**"). Any component of the Earn-out Statement that is not the subject of an objection by Seller shall be final and binding upon all Parties.

(e)     If Buyer agrees with the Objection Statement or does not provide a written objection within fifteen (15) days after receipt thereof, then the Objection Statement will be final and binding upon all Parties and shall be the basis for determining the Earn-out Payment. If Buyer does not

agree with the Objection Statement, then Buyer shall, within fifteen (15) days after receipt thereof, notify Seller in writing of its disagreement and the basis for its disagreement.

(f)    The Parties shall use reasonable efforts to resolve any dispute described in this Section 2.3; *provided*, that if they are unable to do so within thirty (30) days following Buyer's notice to Seller that it disagrees with the Objection Statement, then by notice from Seller or Buyer to the other, the disagreement shall be submitted for resolution to an independent accounting firm as mutually agreed upon by Buyer and Seller in writing  (the "**Accounting Firm**"). Within ten (10) business days after the Accounting Firm has been retained, Seller and Buyer shall furnish, at their own expense, to the Accounting Firm and the other Party a written statement of their position with respect to each matter in dispute. Within five (5) business days after the expiration of such ten (10)-day period, Seller and Buyer may deliver to the Accounting Firm and to the other Party their response to the other's position on each matter in dispute. With each submission, Seller and Buyer may also furnish to the Accounting Firm such other information and documents as they deem relevant or such information and documents as may be requested by the Accounting Firm with appropriate copies or notification being given to the other Party. In connection with such process, there shall be no hearings, oral examinations, testimony, depositions, discovery or other similar proceedings conducted by any Party or by the Accounting Firm, except that the Accounting Firm may, in its discretion, require a conference with Seller and Buyer, at which conference each Party shall have the right to present additional documents, materials and other information and to have present its advisors, counsel and accountants. The Accounting Firm shall be directed to promptly, and in any event within thirty (30) days after their appointment pursuant to this Section 2.3, render its decision on the disputed item(s), unless an alternate date is otherwise agreed upon by Buyer, Seller, and the Accounting Firm. The decision of the Accounting Firm on each item in dispute may not be greater than the higher position of Buyer or Seller nor lower than the lower position of Buyer or Seller with respect to such item. The Accounting Firm's determination as to each item in dispute shall be set forth in a written statement delivered to Seller and Buyer, which shall include the Accounting Firm's determination of the Earn-out Payment. The Accounting Firm shall also determine the proportion of its fees and expenses to be paid by each of Seller and Buyer based primarily on the degree to which the Accounting Firm has accepted the positions of the respective parties and the respective parties shall pay such amount within thirty (30) days after receipt of an invoice therefor from the Accounting Firm.

(g)    The Parties understand and agree that (i) the contingent rights to receive the Earn-out Payment shall not be represented by any form of certificate or other instrument, are not transferable, except by operation of Law relating to descent and distribution, divorce and community property, and do not constitute an equity or ownership interest in Buyer, (ii) Seller shall not have any rights as a securityholder of Buyer as a result of Seller's contingent right to receive the Earn-out Payment, and (iii) no interest is payable with respect to the Earn-out Payment. Seller further hereby acknowledges that the achievement of financial results sufficient to result in the Earn-out Payment being payable to Seller hereunder is uncertain and that the operation of the business following the Closing may not achieve such financial results. As such, Seller acknowledges that there are no assurances that Seller will receive the Earn-out Payment hereunder. Notwithstanding the foregoing, Buyer covenants and agrees that it shall not act in bad faith for the purpose of avoiding or reducing the Earn-out Payment; *provided, however*, that Buyer shall have sole discretion with regard to all matters relating to the operation of the Assets following the Closing.

2.4    Allocation. Buyer, Seller and Parent agree to allocate the Purchase Price, the Earn-out Payment (to the extent paid hereunder) and all other amounts properly treated as consideration for Tax purposes among the Assets in a manner complying with Section 1060 of the Code and the Treasury

Regulations promulgated thereunder (the "**Allocation**"). Buyer shall deliver a proposed Allocation to Seller within 60 days after the Closing Date. If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided* that if Seller and Buyer cannot or do not resolve such dispute, then such dispute shall be resolved using the procedures set forth in Section 2.3(f), mutatis mutandis. Buyer, Seller, Parent and their respective Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. In the event an adjustment to the Purchase Price (or any items constituting consideration for Tax purposes and including any adjustment thereto) is made pursuant to this Agreement or upon the payment of the Earn-out Payment hereunder, Buyer shall make appropriate adjustments to the Allocation to reflect such adjustments and shall promptly provide a written copy of such adjustments to Seller. Neither Buyer, Seller nor Parent shall take any position (whether in audits or other Proceedings, Tax Returns or otherwise) that is inconsistent with such Allocation unless required to do so by applicable Law.  The Parties shall promptly advise one another in writing of the existence of any Tax audit, controversy or litigation related to the foregoing Allocation.

2.5    No Assumed Liabilities. Buyer does not assume, and will not in any way be responsible for, any liabilities or obligations of Seller, Parent, or any of their respective Affiliates, or any of the bankruptcy estates in the Bankruptcy Cases.

2.6    Excluded Liabilities. Buyer does not assume or agree to assume, will not assume or become liable for and shall not be obligated to pay, perform, discharge, or satisfy any obligation, debt, or liability whatsoever, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created, whether or not disclosed on the Schedules attached hereto, and regardless of when or by whom asserted, of the Pharmacy, Parent, Seller, or any their respective Affiliates, or any of the bankruptcy estates in the Bankruptcy Cases, including, without limitation, any liability arising out of the business, or operation, of the Pharmacy, the Pharmacy Activities or custody of the Assets prior to the Closing Date, and the Excluded Activities prior to or following the Closing Date (collectively, the "**Excluded Liabilities**"). The Excluded Liabilities shall remain the responsibility and obligation of Parent, Seller and their respective Affiliates, and Parent and Seller shall, and shall cause their respective Affiliates to, pay, perform, and discharge all Excluded Liabilities as and when due. For the avoidance of doubt, Excluded Liabilities include, without limitation, any liabilities or obligations of Seller arising from or relating to the following: (i) all employment-related claims arising from any event or occurrence prior to Closing, including under any employment, bonus, severance, retention, paid-time off, retirement or termination payment or agreement with an employee of Seller (including any claim arising under ERISA and the WARN Act); (ii) any Employee Benefit Liability or other liability relating to Seller's payroll, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock options or profit-sharing plans or benefits of any other kind, including the Employee Benefits Plans, for Seller's employees or former employees or both (including any obligations arising under any 280G agreements or payments); (iii) the Excluded Assets; (iv) all Indebtedness obligations of Seller; (v) Seller Taxes; (vi) the provision of the Pharmacy Activities prior to the Closing; (vii) any liabilities arising out of or relating to any Proceeding, including any costs, fees, fines, penalties, or damages associated therewith; (viii) any liability arising from or related to participation in or receipt of any COVID-19 Relief Program or COVID-19 Funds; (ix) any Pharmacy Activities, including dispensing or shipping, that are not in compliance with Veterinary and Pharmacy Laws, and (x) any claim asserted against Parent or Seller or any of their respective Affiliates (or any of their respective bankruptcy estates) in any of the Bankruptcy Cases, or any other claim or liability arising out of or relating to any of the Bankruptcy Cases.

2.7    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, at the Closing, Buyer shall not purchase, and Seller and Parent and their respective Affiliates will retain, all Excluded Assets. Buyer acknowledges and agrees that neither Buyer nor any of its Affiliates will acquire or be permitted to retain any direct or indirect right, title and interest in any Excluded Asset.

2.8    [<u>Reserved</u>].

2.9    <u>Withholding</u>. Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any payment made pursuant to this Agreement such amounts as it reasonably determines that it is required to deduct and withhold under Tax or other applicable Law. Buyer shall provide Seller with written notice of its intent to withhold at least ten days prior to the Closing Date with a written explanation substantiating the requirement to withhold, and the Parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the extent permitted by Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

## ARTICLE 3
## THE CLOSING

3.1    <u>The Closing</u>. Subject to the terms and conditions set forth herein, the sale and transfer of the Assets by Seller to Buyer (the "**Closing**") shall take place electronically three (3) business days after all conditions to closing of Buyer and Seller set forth in this Agreement are either satisfied or waived by the party to which the closing condition applies, or such other date as mutually agreed to by the Parties in writing  (the "**Closing Date**"). Seller shall deliver to Buyer custody of the Assets on the Closing Date as reasonably directed by Buyer.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

4.1    <u>Representations and Warranties by Seller</u>. Except as otherwise set forth on the Schedules, as a material inducement for Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby makes the following representations and warranties as of the Effective Date and as of the Closing, each of which is relied upon by Buyer:

(a)    <u>Organization, Standing, etc</u>.

(i)    Seller is a Wisconsin limited liability company, with full power and authority to carry on its business as presently conducted. Seller is duly formed, validly existing and in good standing under the laws of the State of Wisconsin. Parent is a Delaware limited liability company, with full power and authority to carry on its business as presently conducted. Parent is duly formed, validly existing and in good standing under the laws of the State of Delaware.

(ii)    Seller has made available to Buyer true, complete and correct copies of the Organizational Documents. Except as set forth in <u>Schedule 4.1(a)(ii)</u>, Seller is not and has not been in breach or violation of or default under any provision of its Organizational Documents.

(iii)     Pet Apothecary, LLC, a Delaware limited liability company, is the sole beneficial, legal and record owner of Seller, and Parent is the sole beneficial, legal and record owner of, the Equity Interests of Pet Apothecary, LLC, a Delaware limited liability company, and such Persons are the only Persons entitled to vote with respect to all outstanding Equity Interests of Seller, and there are no outstanding rights, options, warrants, convertible securities, subscription rights, conversion rights, exchange rights, or other agreements that require Seller to directly or indirectly issue or sell any of its Equity Interests or to redeem or otherwise acquire any of its outstanding Equity Interests.

(iv)     Subject to Bankruptcy Court approval, Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and any other agreements, instruments, certificates, and documents to which Seller is a party in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

(b)     Due Authorization. The execution, delivery, and performance of this Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Seller and Parent in connection with this Agreement and the consummation of the transactions contemplated hereby and thereby by Seller and Parent have been duly authorized, and no other approvals or authorizations are necessary in connection therewith except only for approval by the Bankruptcy Court. This Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Seller and Parent in connection herewith, assuming the due authorization, execution and delivery of this Agreement by Buyer and approval by the Bankruptcy Court, are the valid and binding obligations of Seller and Parent, enforceable against Seller and Parent in accordance with their respective terms, subject as to enforcement only to applicable bankruptcy, insolvency, reorganization, or other laws affecting the rights of creditors generally, or to equitable principles.

(c)     Compliance with Instruments and Agreements. Schedule 4.1(c) contains a list of the required consents, notices, filings, or authorizations to be obtained at or prior to Closing for the execution, delivery, and performance of this Agreement, including any consents of any Governmental Entity. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby will not (i) result in any breach or violation of any of the terms or provisions of, or constitute a breach or default under, the Organizational Documents of Seller or any applicable Law; (ii) [reserved]; (iii) assuming that each consent referred to in Schedule 4.1(c) is obtained at or prior to the Closing, violate any legally protected right of any individual or entity or give to any individual or entity a right or claim against Buyer or the Assets; (iv) assuming that each consent referred to in Schedule 4.1(c) is obtained at or prior to the Closing, result in the imposition or creation of any Encumbrance on any of the Assets or accelerate any Indebtedness of Seller or to which the Assets may be bound; (v) assuming that each consent referred to in Schedule 4.1(c) is obtained at or prior to the Closing and Buyer obtains any Drug Enforcement Agency licenses, permits or authorizations required to operate the Pharmacy, breach, impair, or in any way limit any governmental or official license, approval, permit, or authorization of Seller or the Pharmacy; or (vi) other than in connection with the Seller Bankruptcy Case, require any permit, notice, consent, review, approval, filing, registration, or other process by, with, to or of any Governmental Entity.

(d)     [Reserved].

(e)     <u>Assets of Seller</u>.

(i)     Seller has good, valid and marketable title to all of the Assets. Seller has maintained the Assets in all material respects in accordance with applicable Law. Except as required by applicable Law, Seller has not intentionally destroyed or misplaced any Assets.

(ii)     The Personal Property is materially sufficient to operate the Pharmacy at its present level of operation, and each item of Personal Property (including all Equipment) is in good operating condition, normal wear and tear excepted.

(iii)     All of the Inventory is of a quality, mix and quantity usable in the ordinary course of business of the Pharmacy. Inventory is fairly and accurately reflected in all material respects on the Balance Sheet as of the Balance Sheet Date, and, since the Balance Sheet Date, there have been only normal fluctuations of Inventory in the ordinary course of business.

(f)     <u>Financial Statements</u>. Attached hereto as <u>Schedule 4.1(f)</u> are true, correct, and complete copies of the following financial statements of Seller with respect to the Pharmacy Activities (collectively, the "**Financial Statements**"): (i) an unaudited balance sheet as of December 31, 2023 (such date, the "**Balance Sheet Date**" such balance sheet, the "**Balance Sheet**"); (ii) unaudited balance sheets of Seller and the unaudited statements of income for the fiscal years ended December 31, 2023, December 31, 2022 and December 31, 2021, subject to the absence of footnotes thereto; and (iii) an unaudited profit and loss statement and balance sheet for the fiscal year beginning on January 1, 2024 through the Effective Date. The Financial Statements (i) are true, correct, and complete in all material respects, (ii) are in accordance with and derived from the Books and Records, (iii) fairly present in all material respects the financial condition and results of operations of the Pharmacy at the respective dates and for the periods therein specified, and (iv) have been prepared in accordance with the Accounting Principles, including for clarity's sake, the absence of footnotes thereto, as applicable.

(g)     <u>Dispensing Report</u>. Attached hereto as <u>Schedule 4.1(g)</u> is a true, correct, and complete copy of the dispensing report prepared in connection with the Pharmacy Activities for the twelve (12) months prior to the Effective Date (the "**Pre-Closing Dispensing Report**"). As of the Closing Date, Seller has provided Buyer with a true, correct, and complete copy of the dispensing report prepared in connection with the Pharmacy Activities that reflects the twelve (12) months prior to the Closing Date (the "**Closing Dispensing Report**", and together with the Pre-Closing Dispensing Report, the "**Dispensing Reports**"). The Dispensing Reports (i) are true, correct, and complete in all material respects, (ii) were prepared in accordance with historical business practices of Seller and applicable Law, and (iii) fairly present in all material respects the quantity of all prescriptions dispensed by the Pharmacy by any means.

(h)     <u>Non-Competition Covenants</u>. Seller is not subject to any non-competition covenant or other similar agreement restricting Seller's ability to engage in the Pharmacy Activities (except as set forth in <u>Section 6.10</u> hereto), and following the Closing, Buyer and its Affiliates will not be subject to any such non-competition covenant or restrictive agreement by virtue of Buyer's purchase of the Assets.

(i)     <u>[Reserved]</u>.

(j)     Tax Returns and Audits.

(i)     Seller and Parent each have timely filed (or will timely file) all Tax Returns that each was required to file for any Pre-Closing Tax Period. All such Tax Returns are, or will be, true, complete and correct in all respects and were completed in substantial compliance with all applicable laws. Seller and Parent each have timely paid (or will timely pay) all Taxes, due and payable.

(ii)     There are no Encumbrances for Taxes on any of the Assets or any other assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax and to Seller's knowledge, no Taxing Authority is in the process of imposing any Encumbrance for Taxes on any of the Assets or any other assets of Seller (other than for Taxes not yet due and payable).

(iii)     Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and Seller has complied with all information reporting withholding provisions of applicable Law including, without limitation, properly completing and timely filing all Forms W-2 and 1099.

(iv)     Neither Seller nor Parent is the beneficiary of any extensions of time to file Tax Returns or waivers of statutes of limitations. No claim has ever been made by a Taxing Authority in a jurisdiction where Seller or Parent does not file Tax Returns that Seller or Parent is or may be subject to taxation by that jurisdiction. Neither Seller nor Parent is a party to any audit or other Proceeding by or involving any Taxing Authority related to Taxes or a Tax Return.

(v)     Neither Seller nor Parent (i) is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2, (ii) is a party to any Tax allocation or sharing agreement (excluding commercial agreements entered into in the ordinary course of business the primary purpose of which does not relate to Taxes), (iii) has any liability for Taxes of any Person as a transferee, successor, by contract or otherwise or (iv) is, or has been, a party to, or a promoter of, a "listed transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

(k)     Employees and Independent Contractors. Seller has provided Buyer with a complete and accurate list setting forth the following information regarding each of the employees, independent contractors, and consultants of Seller who provide services at or for the Pharmacy ("**Pharmacy Employees**") as of the Effective Date: job title, date of hire, rate of compensation, bonus/incentive compensation programs, vacation time and pay, severance pay, malpractice insurance programs, sick time and pay, and group insurance and other benefit plans, policies, and arrangements (whether such benefits are provided pursuant to contract, policy, custom, or informal understanding). Seller has delivered to Buyer true and complete copies of Seller's written employee policies and practices (including any employee handbook) with respect to the Pharmacy. Except as set forth on Schedule 4.1(k), Seller does not have and has never had any collective bargaining agreement or other Contract, or any duty to bargain, with any labor union, and is not currently negotiating with a labor union. No Pharmacy Employee has during the three (3) years prior to Closing petitioned for a representation election, and there has never been any strike, slowdown, lockout, picketing, or other labor unrest by any Pharmacy Employee. Except as set forth on Schedule 4.1(k), during the three (3)

years prior to Closing, no Pharmacy Employee has filed with any court or other Governmental Entity any claim asserting wrongful termination, employment discrimination, harassment or retaliation, violation of OSHA, or other violation of any Law respecting labor or employment matters, by Seller or any officer, manager, director, employee, or agent of Seller.

        (l)      <u>Employee Benefit Plans</u>.

        (i)      Except as described in <u>Schedule 4.1(l)(i)</u>, Seller does not maintain, contribute to, or participate in any Employee Benefit Plan. To Seller's knowledge, each Employee Benefit Plan has been established, operated, funded, maintained, and administered in compliance with its terms and all applicable Laws, including, ERISA, COBRA, the ACA and the Code.

        (ii)      For each Employee Benefit Plan which is a "group health plan" within the meaning of Section 5000(b)(1) of the Code, Seller has complied in all material respects with all notice and continuation coverage requirements under COBRA. Other than the "group health plan" covering employees of Seller as of the Closing Date, there are no other "group health plans" within the "seller group" (as such term is defined in Treasury Regulation Section 54.4980B-9).

        (iii)      For each Employee Benefit Plan that is intended to satisfy the provisions of Section 401(a) of the Code, (A) Seller has obtained a favorable determination letter from the IRS to such effect, or if such Employee Benefit Plan is a pre-approved plan, and Seller is relying on a valid opinion or advisory letter from the IRS issued to the plan sponsor, such Employee Benefit Plan has been timely amended for all applicable Laws, and no modifications to the Employee Benefit Plan have been made to cause Seller not to be entitled to rely on such opinion or advisory letter; (B) Seller has provided a copy of such determination, opinion or advisory letter to Buyer; (C) none of the determination, opinion, or advisory letters has been revoked by the IRS, nor has the IRS given any indication to Seller that it intends to revoke any such determination, opinion, or advisory letter; and (D) no action or failure to act has occurred that would reasonably be expected to cause revocation of such favorable determination, opinion, or advisory letter. Neither Seller nor any ERISA Affiliate has ever maintained, contributed to, sponsored or otherwise had any liability with respect to (i) a plan that is subject to Title IV of ERISA, or to the minimum funding standards of Section 302 of ERISA and Section 412 of the Code, (ii) a "multi-employer plan" (as defined in Section 3(37) of ERISA), or (iii) a plan, program, agreement or arrangement that provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment (other than death benefits when termination occurs upon death). With respect to any Employee Benefit Plan, no event has occurred or is reasonably expected to occur that has resulted in or would subject Seller to a Tax under Section 4971 of the Code or the Assets to a lien under Section 430(k) of the Code.

        (iv)      Neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will (whether alone or together with any other event or events, including termination of employment) (i) entitle any current or former service provider of Seller to any increase in any compensation or benefits due under any Employee Benefit Plan, (ii) accelerate the time at which any compensation, benefits or award may become payable, vested or required to be funded in respect of any current or former service provider of Seller, (iii) entitle any current or former service provider of Seller to any compensation or

benefits, (iv) require any contributions or payments to fund any obligations under any Employee Benefit Plan or (v) result in the payment of an "excess parachute payment" within the meaning of Section 280G of the Code.

(m)     <u>Litigation and Proceedings</u>. Except as set forth on <u>Schedule 4.1(m)</u> attached hereto and other than the Seller Bankruptcy Case, there are no, and in the previous three (3) years there have not been any, outstanding legal claims, demands, actions, suits, arbitrations, investigations, or other legal, administrative, or governmental audits or proceedings (each, a "**Proceeding**") pending or threatened against Seller, the Assets, or any person at any time employed, engaged, or otherwise associated by or with Seller in the business or operation of the Pharmacy with respect to the Pharmacy Services or period of such employment, engagement, or association, and no facts exist which have been, should have been, or should be reported under any professional liability insurance policy covering Seller or any person at any time employed, engaged, or otherwise associated by or with Seller in the operation of the Pharmacy. The Assets are not subject to any judgment, order, decree, settlement, corporate integrity agreement or deferred prosecution agreement of any court, Governmental Entity, or instrumentality, and Seller is not engaged in any legal action to recover money due to damages sustained or alleged by Seller which relate to the Pharmacy Activities.

(n)     <u>Compliance with Law and Instruments</u>.

(i)     Except as set forth on <u>Schedule 4.1(n)(i)</u>, Seller is and has been during the three (3) years prior to Closing, conducting the business and operation of the Pharmacy in compliance in all material respects with all applicable Laws and Veterinary and Pharmacy Laws, and Seller has not during the three (3) years prior to Closing received any written notification claiming or asserting any violation of or liability pursuant to any Law with respect to the business and operation of the Pharmacy. Any certificates of need or other Permits or approvals required for the construction or operation of the Pharmacy have been and were duly obtained, and such certificates of need, Permits, and approvals, if any, will remain in full force and effect immediately after the consummation of the transactions provided for herein. No Governmental Entity has during the three (3) years prior to Closing conducted or has given Seller any notice that it intends to conduct any audit or other review or investigation of the Pharmacy, except an audit, review or investigation conducted in the ordinary course of business.

(ii)     Seller has not arranged or contracted with (by employment or otherwise) any Pharmacy Employee, individual or entity that Seller knows or should know has been convicted of or pled guilty or nolo contendere to any federal or state criminal offense or been subject to any disciplinary action under any Laws. Seller is not, nor is any Pharmacy Employee, currently debarred, suspended, or excluded from participation in any Federal Health Care Program.

(o)     <u>Permits and Licenses</u>. Seller, its Affiliates, and all employees or contractors of the Pharmacy hold all permits, licenses, approvals, and authorizations that Seller or any of its Affiliates or employees or contractors of the Pharmacy are required by applicable Law to hold for the lawful conduct of Seller's business and the operation of the Pharmacy Activities (the "**Licenses**"). The Licenses are set forth on <u>Schedule 4.1(o)</u>, and except as otherwise set forth on <u>Schedule 4.1(o)</u>, no other Permit, license, approval, or authorization of any Governmental Entity or administrative or regulatory agency is necessary under any Laws, including all Veterinary and Pharmacy Laws, for the lawful conduct of Seller's business and the operation of the Pharmacy.  Seller has delivered to Buyer

copies of all Licenses, as well as copies of all Licenses held by all Pharmacy Employees. Each License is valid and in good standing, and none of the Licenses have expired or failed to renew. Neither Seller, its Affiliates, or any Pharmacy Employee (i) is in material violation of any Licenses, and, to Seller's knowledge, there is no pending or threatened proceeding by any Governmental Entity or third party in connection with any actual or alleged material violation of such Permits, or (ii) has received written notice that any Governmental Entity has taken or is taking action to limit, suspend, adversely modify, or revoke any Licenses or Permits of Seller.

(p)      Accounts Receivable. The Accounts Receivable of Seller are valid, existing, and represent monies arising from bona fide and arm's length transactions in the ordinary course of the lawful conduct of Seller's operation of the Pharmacy. The Accounts Receivable, to Seller's knowledge, are not disputed or otherwise subject to any refund, discount, counterclaim or right of setoff, except as reflected on the Financial Statements.

(q)      Leased Real Property. Schedule 4.1(q) sets forth all real property leased by Seller and/or otherwise used in connection with the Pharmacy, including the Premises (collectively, the "**Leased Real Property**"). The Leased Real Property comprises all the real property utilized by Seller in connection with the operation of the Pharmacy. To the Seller's knowledge:

(i)      neither the whole nor any portion of any Leased Real Property has been damaged or destroyed by fire or other casualty;

(ii)      the Leased Real Property is adequately served with all necessary utilities for the proper operation thereof, including sewer, water, gas, electricity and telephone, and no fact or condition exists which would reasonably be expected to result in the termination of such utility service;

(iii)      there are no service, supply, maintenance, leasing, or management agreements to which Seller is a party affecting the Leased Real Property or the operation of any part thereof that will not be terminated on or prior to Closing;

(iv)      Seller is in actual possession and occupation of the Leased Real Property, and except as set forth on Schedule 4.1(q)(iv), Seller does not lease, sublease, license or share occupation of the Leased Real Property with any third party;

(v)      Seller's use and occupation of the Leased Real Property is and during the three (3) years prior to Closing has been in compliance in all material respects with all applicable Laws, and no current use of the Leased Real Property is dependent on a nonconforming use or other governmental approval or concession; and

(vi)      Seller has not received any written notice that any of the Leased Real Property is subject to any governmental decree or order to be sold or is being condemned, expropriated or otherwise taken by any public authority with or without payment of compensation therefor.

(r)      Environmental Matters. Except as set forth on Schedule 4.1(r), to Seller's knowledge:

(i)        Seller's occupation and use of the Leased Real Property has been in compliance with all applicable Environmental Laws and those relating to Hazardous Substances, and Seller has not received any written notice of existing, pending or threatened: (i) condemnation proceedings affecting the Leased Real Property, or (ii) zoning, building code or other moratorium proceedings, or similar matters which would reasonably be expected to adversely affect the ability to operate the Leased Real Property as currently operated;

(ii)       Seller, in connection with the operation of the Pharmacy, and the Pharmacy are and during the three (3) years prior to Closing have been in compliance in all material respects with all Environmental Laws, which compliance includes the possession by Seller of all material Permits and other governmental authorizations required under applicable Environmental Laws to operate the Pharmacy ("**Environmental Permits**"). All such Environmental Permits are valid and in good standing, and Seller and the Pharmacy are and during the three (3) years prior to Closing have been in compliance in all material respects with the terms and conditions thereof;

(iii)      during the three (3) years prior to Closing, no Hazardous Substances have been generated, disposed of or stored on, by Seller at or adjacent to the Real Property, except in compliance with applicable Environmental Laws.

(iv)      during the three (3) years prior to Closing, neither Seller nor the Pharmacy have released any Hazardous Substances to, at or from the Real Property or the Pharmacy, and there is no Hazardous Substance at, on, in or beneath the Real Property;

(v)       during the three (3) years prior to Closing, Seller has not received any notice or communication, whether from a Governmental Entity, citizen's group, employee, consultant, or otherwise, that alleges noncompliance with or liability pursuant to any Environmental Law in connection with the operation of the Pharmacy or the ownership of the Assets, and there is no Environmental Claim pending or threatened against Seller or any Affiliate of Seller; and

(vi)      Seller has provided to Buyer true, accurate and complete copies of all Environmental Permits and all reports, studies, assessments or other material documents in its possession, custody or control relating to the compliance by Seller or the Pharmacy with applicable Environmental Laws.

(s)        <u>Transactions with Related Persons</u>. Except as set forth on <u>Schedule 4.1(s)</u> or otherwise reflected in the Balance Sheet, no Affiliate, officer, employee, member, manager or director of Seller, including Parent or any Pharmacy Employee, or any family member of any member (a) owns any interest in any of the Assets or (b) is a party to any Contract with Seller used or held for use in connection with the business, or the operation, of the Pharmacy.

(t)        <u>Absence of Material Adverse Effect</u>. To Seller's and Parent's knowledge, since January 1, 2024, Seller has operated the Pharmacy only in the ordinary course of business consistent with past practices and there has not been a Material Adverse Effect.

(u)        <u>Insurance Policies</u>. The Assets are covered by insurance policies held by Seller of a type customarily insured and covering property damage and loss of income by customary risks, including without limitation fire or other casualty, and adequate insurance protection against liabilities,

claims, and risks it is customary to insure, including professional liability insurance and worker's compensation, and are sufficient for compliance with all applicable Laws (the "**Insurance Policies**"). Schedule 4.1(u) sets forth a true and complete list of the Insurance Policies. No claims are pending under any Insurance Policy. Seller has not received any written notification from any insurance carrier denying or disputing any claim made by Seller, denying or disputing the coverage for any claim, denying or disputing the amount of any claim, or regarding the possible cancellation of any policies.

(v)    No Brokers or Finders. No Person has, as a result of any act or failure to act by Seller or any Affiliate of Seller, nor as a result of the transactions contemplated hereby will any Person have as a result of any act or failure to act by Seller or any Affiliate of Seller any right, interest, or claim for any commission, fee, or other compensation as a broker, finder, or in any similar capacity in connection with the transactions contemplated by this Agreement.

(w)    Intellectual Property.

(i)    Schedule 4.1(w)(i) contains a list of all of the material Intellectual Property that is owned by Seller and used or held for use in connection with and material to the business, or the operation of, the Pharmacy (the "**Seller Intellectual Property**"). Each such item of Seller Intellectual Property required to be listed on Schedule 4.1(w)(i) is valid, subsisting, and enforceable. Schedule 4.1(w)(i) also contains a list of all options, licenses, agreements, or other Contracts involving any right (1) granted by or on behalf of Seller to use any Seller Intellectual Property or (2) received or relied upon by Seller to use any Intellectual Property owned by any other Person in connection with the operation of the Pharmacy. Seller is not bound by or a party to any options, licenses, agreements, or Contracts of any kind with respect to any Intellectual Property of any other Person other than as listed in Schedule 4.1(w)(i).

(ii)    Seller owns and possesses all necessary right, title, and interest in and to all Intellectual Property used in or necessary for the operation of the Pharmacy.

(iii)    Seller has taken commercially reasonable precautions to maintain and protect each item of Intellectual Property, including taking commercially reasonable security measures to protect the secrecy, confidentiality and value of all material Trade Secrets of Seller.

(iv)    Each item of Seller Intellectual Property will be owned by Buyer on identical terms following the consummation of the transactions contemplated hereby as such items were owned by Seller prior to the consummation of such transactions. The consummation of any transactions contemplated hereby shall not result in the loss, impairment, or termination of, or give rise to any right to terminate, any rights of Seller in any Intellectual Property, other than with respect to Contracts that are Excluded Assets.

(v)    Except as otherwise set forth on Schedule 4.1(v)(v), to Seller's knowledge, Seller and the operation of the Pharmacy do not infringe, misappropriate or violate, and have not, to Seller's knowledge, during the three (3) years prior to Closing infringed, misappropriated or violated, any other Person's or entity's Intellectual Property. Except as otherwise set forth on Schedule 4.1(v)(v), during the three (3) years prior to the Closing, except as what would constitute a frivolous claim, Seller has not received any written communications alleging that it violates or has violated, or by operating the Pharmacy violates or has violated, any other person's or entity's Intellectual Property.

(vi)    The computers, devices, equipment, networks, systems, and other information technology infrastructure computers, as well as all software operating thereon or in connection therewith, used in the business or operation of the Pharmacy, including all Devices (collectively, the "**IT Assets**") are sufficient in all material respects for current needs of Seller with respect to the Pharmacy and the business and operation thereof as currently conducted. To Seller's knowledge, during the three (3) years prior to Closing, there have been no material failures, crashes, security breaches or other adverse events affecting in any material respect the IT Assets. Schedule 4.1(v)(vi) also contains an accurate and complete list of all options, licenses, agreements, or other Contracts involving any software or any IT Assets.

(x)    Privacy and Security Compliance.

(i)    Seller is and in the three (3) years prior to Closing has been in compliance in all material respects with the applicable requirements of all Laws, all policies of Seller, and all obligations under any Contract, in each case applicable to the privacy and security of data or information or the processing or other use thereof by or on behalf of Seller in the business, or operation, of the Pharmacy ("**Information Requirements**"). There has been no notice or complaint made or received by Seller in the three (3) years prior to Closing regarding the processing or other use of Seller Information (as defined below) by or on behalf of Seller. Seller has not received any written notice or communication with respect to any allegation that Seller is or was not in material compliance with any Information Requirement in the three (3) years prior to Closing.

(ii)    Seller maintains and in the three (3) years prior to Closing has maintained such policies regarding the processing or other use of all data or information, processed or otherwise used by or on behalf of Seller in the business, or operation of the Pharmacy ("**Seller Information**") as are required by Information Requirements. Without limiting the foregoing, Seller maintains and during the three (3) years prior to Closing has maintained a security program including reasonable and appropriate technical, administrative, and physical safeguards and measures covering all IT Assets and all Seller Information that are designed to protect the security, confidentiality, integrity, and availability of the Seller Information and IT Assets in accordance with all Information Requirements.

(iii)    Seller has taken commercially reasonable measures to protect against the occurrence of any suspected or actual breach of security, violation of any security policy, or unauthorized access, acquisition, use, loss, denial or loss of use, destruction, compromise, or disclosure of any Seller Information or IT Assets, including any security incident ("**Security Event**"). Seller has not experienced any such Security Event during the three (3) years prior to Closing.

(iv)    Seller has obtained all consents, permissions, and authorizations required with respect to the processing and other use of all Seller Information by or on behalf of Seller and in the operation of the Pharmacy.

(y)    Scope of Pharmacy Activities. Solely with respect to the Pharmacy Activities, for the last three (3) years, Seller does not bill, and has not billed, any Federal Health Care Program. Solely with respect to the Pharmacy Activities, Seller is not, and has not previously been, subject to HIPAA.

(z)    <u>Full Disclosure</u>. No representation or warranty by Seller or Parent in this Agreement and no statement contained in the Schedules or any other document furnished or to be furnished to Buyer pursuant to this Agreement, including the Transaction Documents, when taken as a whole, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

(aa)    <u>No Other Representations and Warranties</u>. Except for the representations and warranties contained in this <u>Section 4.1</u> (including the related portions of the Schedules), Seller has not made or makes any other express or implied representation or warranty, either written or oral, including any representation or warranty as to the accuracy or completeness of any information, documents or material regarding the business of Seller, Pharmacy, Pharmacy Activities, and the Assets furnished or made available to Buyer and its Representatives in any form (including any information, documents, or material made available to Buyer in Seller's virtual data room or any management presentations made in expectation of the transactions contemplated hereby), or as to the future revenue, profitability, or success of the Pharmacy, or any representation or warranty arising from statute or otherwise in Law.

4.2    <u>Representations and Warranties by Buyer</u>. As a material inducement for Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date, each of which is relied upon by Seller:

(a)    <u>Organization and Good Standing</u>. Buyer is a limited liability company validly existing in good standing under the laws of the State of Delaware, with all requisite power and authority to carry on its business as presently conducted. Mixlab is a corporation validly existing in good standing under the laws of the State of Delaware, with all requisite power and authority to carry on its business as presently conducted.

(b)    <u>Due Authorization</u>. The execution, delivery, and performance of this Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Buyer or Mixlab in connection with the Agreement and the consummation of the transactions contemplated hereby by Buyer or Mixlab, as applicable, have been duly authorized, and no other approvals or authorizations are necessary in connection therewith. This Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Buyer or Mixlab, as applicable, in connection herewith are the valid and binding obligations of Buyer and Mixlab, enforceable against Buyer and Mixlab in accordance with their respective terms, subject as to enforcement only to applicable bankruptcy, insolvency, reorganization, or other laws affecting the rights of creditors generally, or to equitable principles.

(c)    <u>Compliance with Instruments and Agreements</u>. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby will not result in any material breach or material violation of any of the terms or provisions of, or constitute a breach of or default under, the organizational documents of Buyer or Mixlab, as applicable, any applicable Law, or any agreement, instrument, or commitment to which Buyer is a party or by which it is bound, except in the cases of the foregoing where the breach, violation or default would not have a material adverse effect on Buyer's or Mixlab's ability to consummate the transactions contemplated herein.

(d)      No Finders or Brokers. No Person has, as a result of any act or failure to act by Buyer. Mixlab, or any of their respective Affiliates, nor as a result of the transactions contemplated hereby will any Person have, as a result of any act or failure to act by Buyer, Mixlab, or any of their respective Affiliates, any right, interest, or claim upon Seller for any commission, fee, or other compensation as a finder, broker, or in any similar capacity in connection with the transactions contemplated by this Agreement.

(e)      Legal Proceedings. There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's or Mixlab's knowledge, threatened against or by Buyer, Mixlab, or any of their respective Affiliates that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

(f)      Sufficient Funds. Buyer has, or will have as of the Closing, sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

(g)      Independent Investigation. Each of Buyer and Mixlab has conducted its own independent investigation, review and analysis of the Pharmacy and the Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, Books and Records and other documents and data of Seller for such purpose. Each of Buyer and Mixlab acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Each of Buyer and Mixlab has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Section 4.1 of this Agreement (including related portions of the Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Pharmacy, Pharmacy Activities, the Assets or this Agreement, except as expressly set forth in Section 4.1 of this Agreement (including the related portions of the Schedules).

## ARTICLE 5
## CLOSING DELIVERABLES

5.1      Seller's Closing Deliverables. At the Closing, Seller shall deliver to Buyer the following (the "**Seller Deliverables**"):

(a)      The Closing Sales Statement;

(b)      A Bill of Sale, dated as of the Closing Date, substantially in the form attached hereto as Exhibit B, duly executed by Seller (the "**Bill of Sale**");

(c)      An executed certificate of Seller and Parent dated as of the Closing Date in form and substance reasonably satisfactory to Buyer certifying (i) as to the satisfaction of the conditions specified in Section 8.1(a) and Section 8.1(b) and (ii) the representative of Seller and Parent executing this Agreement and the other Transaction Documents or making certifications pursuant hereto has the requisite power and authority to so execute the foregoing on behalf of Seller and Parent, as the case may be, together with copies of any of resolutions duly adopted by Seller's and Parent's governing authority, authorizing and approving Seller's and Parent's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and any other agreement, instrument, certificate, and/or document to be executed and delivered by Seller and Parent, as applicable;

(d)      The Closing Dispensing Report;

(e)      A certificate of good standing of Seller from the State of Wisconsin dated within ten (10) days prior to the Closing Date;

(f)      Copies of all consents, approvals, and authorizations and all notices identified in Schedule 4.1(c);

(g)      A properly executed and completed IRS Form W-9 from Seller and Parent;

(h)      The Powers of Attorney, duly executed by Seller and Parent;

(i)      The Escrow Agreement, duly executed by Seller; and

(j)      Custody of the Assets.

5.2      Buyer's Closing Deliverables. At the Closing, Buyer shall deliver (or cause to be delivered) to Seller the following (the "**Buyer Deliverables**"):

(a)      The Bill of Sale, duly executed by Buyer;

(b)      An executed certificate of Buyer and Mixlab dated as of the Closing Date in form and substance reasonably satisfactory to Seller certifying (i) as to the satisfaction of the conditions specified in Section 8.2(a) and Section 8.2(b) and (ii) the representative of Buyer and Mixlab executing this Agreement and the other Transaction Documents or making certifications pursuant hereto has the requisite power and authority to so execute the foregoing on behalf of Buyer and Mixlab;

(c)      The Powers of Attorney, duly executed by Buyer;

(d)      The Escrow Agreement, duly executed by Seller; and

(e)      The Closing Payment.

## ARTICLE 6
## COVENANTS

6.1      Operating Covenants. From the Effective Date to the Closing Date, except as otherwise expressly contemplated or permitted by this Agreement, and except as set forth on Schedule 6.1, Seller shall, and Parent shall cause Seller to, conduct the Pharmacy, in substantially the same manner as operated and conducted immediately prior to the Effective Date, including with respect to collection of receivables, disbursements on payables, employee compensation, pricing, and capital expenditures, and unless consented to in writing by Buyer in advance, Seller shall:

(a)      use reasonable efforts to (i) preserve the business organization intact and (ii) preserve its present relationships with employees and suppliers, vendors, lessors, and customers in accordance with past practice over the past twelve (12) months;

(b)      keep in effect the Insurance Policies;

(c)      maintain all physical properties and assets included in the Assets in good repair and operating condition, reasonable wear and tear excepted, in each case, consistent with past practice;

(d)      not (i) sell, lease, license, transfer, or otherwise dispose of any of the Assets, (ii) [reserved]; (iii) be a party to any merger, consolidation, restructuring or similar transaction or enter into any Contract for or otherwise agree to acquire any material assets, properties, or securities of any Person; (iv) create or permit to be created any Encumbrances on any of the Assets; (v) terminate, enter into, amend, or modify any Contract that is material to the Pharmacy other than in the ordinary course of business; (vi) enter into any employment Contract with respect to the Pharmacy or any employee or contractor of the Pharmacy, or enter into any collective bargaining agreement with any trade union or other labor organization or recognize any trade union or other labor organization as the bargaining representative of any employees of Seller; (viii) commence or enter into any compromise or settlement of any legal claim, demand, action, suit, arbitration, investigation, or other legal, administrative, or governmental proceeding, in each case with respect to the Pharmacy; (ix) terminate, suspend, fail to renew, or amend or modify in any material respect, any License, other than renewals of Permits in the ordinary course of business; (x) grant, issue, sell or otherwise dispose of, or authorize or approve the transfer, assignment, pledge or other disposition of any Equity Interests of Seller; (xi) amend any of any Organizational Documents; or (xii) agree or commit to any of the foregoing; and

(e)      Seller shall (i) afford Buyer and its Representatives full and free access during regular business hours to and the right to inspect all of the Assets, Books and Records, Contracts and other documents and data related to the Pharmacy Activities, all premises including the Leased Real Property and personnel, and all documents of Seller to the extent relating to the Pharmacy Activities, including customer reference calls, management and pharmacy operations team reference calls, regulatory history, insurance documents, and medication sales history, and; (ii) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Pharmacy Activities as Buyer or any of its Representatives may reasonably request; and (iii) instruct the Representatives of Seller to cooperate with Buyer in its investigation of Seller.

6.2      [Reserved].

6.3      <u>Notice of Developments</u>. From the Effective Date to the Closing Date, Seller shall promptly notify Buyer in writing with respect to any matter, event or circumstance (i) arising on or before the Effective Date which was known by Seller and that would otherwise constitute a breach, violation or inaccuracy of any representation or warranty of Seller set forth herein, (ii) arising on or before the Effective Date which was not known by Seller and that would otherwise constitute a breach, violation or inaccuracy of any representation or warranty of Seller set forth herein, (iii) arising after the Effective Date that, if existing at, or occurring on the Effective Date, the Closing Date or any date in between the Effective Date and the Closing Date, would constitute a breach, violation or inaccuracy of any representation or warranty of Seller set forth herein, or (iv) relating to a breach or violation of any covenant, agreement or obligation of Seller set forth herein. No notification of a matter, event or circumstance set forth in the forgoing clauses (i) through (iv) shall be deemed to cure any breach, violation or inaccuracy of any representation or warranty or a breach or violation of any covenant, agreement or obligation, nor limit or alter any of the representations, warranties, covenants, agreements or obligations of Seller set forth in this Agreement nor any rights or remedies Buyer may have with respect thereto for purposes of <u>Section 7.2</u> of this Agreement, *provided, however,* that if as a result of matters disclosed in pursuant to this <u>Section 6.3</u>, Buyer has the right to, but does not elect to, terminate this Agreement within ten (10) business days of its receipt of such information, then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.

6.4    <u>Exclusivity</u>. From the date of the Bankruptcy Court's approval of this Agreement and until the Closing or the termination of this Agreement, Seller shall not, and shall cause its Affiliates, and the respective directors, officers, employees, managers, equity holders, agents and Representatives of the foregoing, as applicable, to not, in each case, directly or indirectly: (i) initiate, solicit, encourage, discuss, negotiate, furnish information to, consider, accept or otherwise pursue any offers or proposals regarding, or enter into any agreement, understanding or arrangement with respect to, the sale of Equity Interests of Seller or the incurrence of any Indebtedness by any of the foregoing, any merger, consolidation or acquisition of or involving Seller, any sale or licensing of all or any assets of Seller or any interest therein other than in the ordinary course of business, or any other transaction the consummation of which would reasonably be expected to prevent, impede, delay or have an adverse effect on the consummation of the transactions contemplated herein, in each case, involving any Person other than Buyer and (ii) assist, participate in any discussions or negotiations regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage any effort or attempt by another Person to do or seek to do any of the foregoing.

6.5    [Reserved].

6.6    <u>Bankruptcy Court Matters</u>.

(a)    <u>Submission to Bankruptcy Court</u>. Seller may file with the Bankruptcy Court this Agreement and such motions, pleadings and notices as may be appropriate in connection therewith.

(b)    <u>Sale Order</u>. Seller shall obtain the entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Cases with terms and in form and substance reasaonably acceptable to Buyer. Buyer shall take such actions as are reasonably requested by Seller to assist in obtaining entry of a Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under Section 363(m) or any other Section of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) or any other Section of the Bankruptcy Code. Seller shall request that the Sale Order provide that it shall be effective and enforceable immediately upon entry by the Bankruptcy Court notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure. Seller agrees that it will not submit to the Bankruptcy Court a proposed Sale Order that has not been consented to by Buyer.

6.7    <u>Regulatory Filings</u>.

(a)    From the Effective Date and until such filings have been deemed completed and approved by the applicable regulatory agency, Buyer, and Seller, as outlined in <u>Schedule 6.7(a)</u>, shall give all notices to, make all filings with and use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to obtain all authorizations, consents or approvals, from any Governmental Entity or other person or entity that are required for, or in connection with, the valid and lawful (i) authorization, execution, delivery and performance by Seller, as applicable, of the agreements, documents or instructions contemplated hereby to which such person or entity is a party or (ii) the consummation of the transactions contemplated hereby by Buyer, and Seller, as applicable.

(b)    In addition to, and without limiting the terms of this <u>Section 6.7</u>, Seller shall, and shall cause its representatives to, reasonably cooperate and consult with Buyer with respect to

giving all notices to and obtaining all authorizations, consents or approvals from third parties under Contracts with respect to the agreements, documents or instructions contemplated hereby, including (i) at the request of Buyer, providing updates and information regarding the status thereof, including copies of documents related to, any such notices, authorizations, consents and approvals, (ii) providing Buyer with a reasonable opportunity in advance to review and comment upon all of the documentation relating to such notices, authorizations, consents and approvals and (iii) cooperating with Buyer with respect to such documentation so that it is in form and substance acceptable to Buyer and its counsel.

(c)    From the Effective Date and until the Closing Date, Seller and Buyer (to the extent permitted by Law) shall cooperate in all respects with one another, and consider in good faith the views of one another, in connection with the form and content of any notices or filings made or submitted to Governmental Entities. In that regard, from the Effective Date and until all regulatory filings have been deemed completed and approved by the applicable regulatory agency, to the extent permitted by Law, each party shall promptly (i) inform the other party of any substantive communication with and promptly provide copies of (or, in the case of oral communications, advise the other party orally of) all communications with any Governmental Entity regarding any such filing or notification or the transactions contemplated hereby, and (ii) cooperate in responding as promptly as reasonably practicable to any investigation, inspection, or other inquiry from any Governmental Entity.

(d)    Subject to the terms and conditions of this Agreement, each party shall use commercially reasonable efforts (unless, with respect to any action, another standard of performance is expressly provided for herein) to take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary to consummate and make effective as promptly as reasonably practicable the transactions contemplated hereby, including the satisfaction (but not waiver) of the conditions to the Closing set forth in <u>Article 8</u>.

6.8    <u>Further Assurances</u>. Following the Effective Date, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Transaction Documents.

6.9    [Reserved].

6.10    <u>Referral; Non-Disparagement, Non-Competition, Non-Solicitation and Confidentiality Covenants of Seller and Parent</u>.

(a)    Seller and Parent hereby expressly acknowledge (i) Buyer's substantial investment in the Assets (including the Goodwill) and (ii) that each of them will receive substantial benefit from the consummation of the transactions hereunder. Seller and Parent further acknowledge and agree that the covenants, restrictions and obligations contained in this <u>Section 6.10</u> are a material inducement to Buyer to enter into this Agreement, and Buyer is doing so in reliance upon Seller and Parent agreeing to be bound by such covenants, restrictions and obligations. Accordingly, Seller and Parent hereby covenant and agree to be bound and abide by the restrictions set forth in this <u>Section 6.10</u>.

(b)    Except as prohibited by applicable Law, from and after the Closing Date, Seller and Parent shall use commercially reasonable efforts to refer to Buyer all business or leads related to

the Pharmacy Activities, including any veterinary prescriptions and Current Customers or prospective customers across all pharmacy locations owned or controlled (whether directly or indirectly) by Parent, in accordance with the referral plan, in substantially the form attached hereto as <u>Exhibit C</u> (the "**Referral Plan**").

(c)     Seller and Parent shall not, and shall cause their respective officers, directors, employees, shareholders, Representatives, agents, and Affiliates not to, whether directly or indirectly and whether oral or written, make any remark or statement that is or could reasonably be construed as disparaging in connection with the Pharmacy, Pharmacy Activities, Buyer, or Buyer's officers, directors, employees, shareholders, Representatives, agents, or Affiliates.

(d)     During the Restricted Time Period, within the Restricted Area, Seller and Parent shall not (and shall cause its Affiliates not to), directly or indirectly (including via financial interests held by Seller or its Affiliates), either as an employer, consultant, agent, employee, independent contractor, principal, partner, member, stockholder (other than as a passive owner of less than five percent (5%) of the securities of a publicly held corporation), or in any other capacity, engage or participate in, consult with, or provide financial assistance to any Person engaged in or providing Pharmacy Activities. In no event shall the restrictions set forth in this <u>Section 6.10(d)</u> restrict an equity owner of Parent acting as a lender to any such Person engaged in or providing Pharmacy Activities.

(e)     During the Restricted Time Period, Seller and Parent shall not (and shall cause its Affiliates not to), either for its own account or for or in association with any other Person, either directly or indirectly, as an employer, consultant, agent, employee, independent contractor, principal, partner, member, stockholder (other than as a passive owner of less than five percent (5%) of the securities of a publicly held corporation), or in any other capacity (provided, that in no event shall the restrictions set forth in this <u>Section 6.10(e)</u> restrict an equity owner of Parent acting as a lender to any such Person engaged in or providing Pharmacy Activities): induce, or attempt to induce, any Pharmacy Employee or any employee or independent contractor of Buyer or any Affiliate of Buyer, to terminate his or her employment or engagement with Buyer or any Affiliate of Buyer. Notwithstanding anything to the contrary in this <u>Section 6.10(e)</u>, Seller and Parent shall be permitted to, directly or indirectly (i) engage in general advertising, solicitations or hiring campaigns, programs or other efforts (whether or not conducted through an independent search firm) not specifically targeted or directed at such employees and hire any employees who respond to such solicitations and (ii) solicit or hire any employee who was terminated by Buyer or its Affiliates at least thirty (30) days prior to any such solicitation and hire by Seller or its Affiliates.

(f)     Seller and Parent expressly acknowledges that they have knowledge of certain business methods, trade secrets, and other proprietary information relating to or used or, held for use in connection with the Pharmacy Activities ("**Confidential Information**"), which Confidential Information constitutes an Asset which Buyer is purchasing hereunder. Seller and Parent shall hold, and shall use their best efforts to cause their respective Representatives to hold, in confidence any and all Confidential Information. Except as required by applicable Law, Seller and Parent shall not (and shall cause their Affiliates not to) disclose, disseminate, or distribute, or induce any other Person to disclose, disseminate, or distribute, any Confidential Information, directly or indirectly, either for Seller's, Parent's, or their respective Affiliates' own benefit or for the benefit of any other Person, whether or not acquired, learned, obtained, or developed by Seller, Parent, or their respective Affiliates alone or in conjunction with others, and Seller and Parent shall not use or cause to be used (and shall cause their Affiliates not to use or cause to be used) any Confidential Information in any way. Notwithstanding the foregoing, the non-disclosure obligations set forth in this <u>Section 6.10(f)</u> shall not

apply to any information (i) that becomes publicly available through no fault of Seller (other than if such availability results from a breach by Seller or Parent of this Agreement or any other relevant agreement or obligation of confidentiality) or (ii) that becomes available to Seller, Parent, or their respective Affiliates from and after the Closing, from a third party source that is not known by Seller to be under any obligations of confidentiality in respect of such information. The obligations set forth in this <u>Section 6.10(f)</u> shall be deemed by the Parties to be in addition to those obligations of Seller and Parent set forth in that certain Mutual Non-Disclosure Agreement, by and between Mixlab, Inc. and Parent, dated June 18, 2024, and shall not be deemed to supersede such obligations.

(g)     The Confidential Information includes, without limitation: (i) lists containing the names of customers, employees, principals, vendors, and suppliers of the Pharmacy; (ii) the past, present, and prospective methods, procedures, and techniques utilized by the Pharmacy in conducting the Pharmacy Activities, and identifying prospective referral sources, customers, and suppliers and in soliciting the business thereof; (iii) the methods, procedures, and techniques used in the operation of any of the Pharmacy's business, including the methods, procedures, and techniques utilized in marketing, pricing, applying, and delivering the Pharmacy Activities; and (iv) compilations of information, records, and processes.

(h)     Each covenant in this <u>Section 6.10</u> shall be construed as an agreement that is independent of any other provision of this Agreement and, unless otherwise indicated herein, each such covenant shall survive the Closing of the transactions contemplated by this Agreement. The existence of any claim or cause of action of Seller against Buyer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Buyer of each of the covenants set forth in this <u>Section 6.10</u>.

(i)     If Seller and Parent violate any of covenants set forth in this <u>Section 6.10</u> and Buyer or any of its Affiliates brings legal action for injunctive or other relief hereunder, Buyer shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full Restricted Time Period of the protective covenants contained in this <u>Section 6.10</u>. Accordingly, the Restricted Time Period shall have a duration equal to the time period stated in <u>Section 1.106</u>, computed from the date relief is granted, but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by Seller or Parent.

(j)     Seller and Parent agree that the breach or attempted breach of Seller's or Parent's obligations under this <u>Section 6.10</u> may cause irreparable injury to Buyer and that any remedy at law may be inadequate, and therefore agree, in addition to any other relief, that Buyer and its Affiliates will be entitled to seek injunctive and other equitable relief in case of any such breach or attempted breach. Seller and Parent expressly waive any requirement that Seller or Parent could assert for the securing or posting of any bond in connection with the obtaining of such injunctive or other equitable relief.

(k)     Seller and Parent agree that the territorial, time and other restrictions set forth in this <u>Section 6.10</u> are reasonable and properly required for the adequate protection of the business and affairs of Buyer effective from and after the Closing. The Parties acknowledge and agree that if any of the restrictions set forth in this <u>Section 6.10</u> are adjudicated by a court of competent jurisdiction to be excessively broad, those restrictions determined to be excessively broad shall be reduced to the minimum extent necessary to make such restrictions enforceable, and the restrictions shall be enforced subject to such reduction. Any provision of this <u>Section 6.10</u> not so reduced shall remain in full force and effect as written.

6.11    Tax Matters.

(a)    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) ("**Transfer Taxes**") attributable to the purchase and sale of the Assets hereunder shall be borne equally by Seller and Buyer. Seller shall timely file any Tax Return or other document which Seller is obligated to file with respect to such Transfer Taxes. The Parties shall cooperate with each other to the extent necessary to qualify for any statutory or regulatory exemption that a Party reasonably determines to be applicable under the circumstances.

(b)    Property Taxes. The amount of any personal property Tax, real property Tax, ad valorem Tax, transaction privilege Tax or similar Tax with respect to the Assets for any Straddle Period ("**Straddle Period Property Taxes**") shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in accordance with this Section 6.10(b). The portion of such Straddle Period Property Taxes attributable to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the Straddle Period. The portion of any Straddle Period Property Tax attributable to a Post-Closing Tax Period shall be calculated in a corresponding manner. Seller shall be liable for the amount of such Straddle Period Property Taxes attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the amount of such Straddle Period Property Taxes attributable to the Post-Closing Tax Period.

(c)    Tax Returns. Except as otherwise provided in Section 6.10(a) above, (i) Seller and Parent shall prepare, or cause to be prepared, and timely file or cause to be timely filed, all Tax Returns, and pay all Taxes with respect to the Pharmacy and the Assets for any Pre-Closing Tax Period (if any) in accordance with past practices unless otherwise required by applicable Law, and (ii) Buyer shall file all Tax Returns with respect to the Assets for all Post-Closing Tax Periods.

(d)    Tax Payment. Straddle Period Property Taxes and Transfer Taxes shall be timely paid, and all applicable filings, reports and Tax Returns shall be filed, as provided by applicable Law and the terms of this Agreement. The paying Party shall be entitled to reimbursement from the non-paying Party to the extent provided in Section 6.10(a) or Section 6.10(b), as the case may be. Upon payment of any such Straddle Period Property Tax or Transfer Tax, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under Section 6.10(a) or Section 6.10(b), as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying Party shall make such reimbursement promptly but in no event later than 10 days after the presentation of such statement.

(e)    Employment Taxes. Seller shall be responsible for and will perform all Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by Seller on or before the Closing Date to any employee of Seller, and Buyer shall be responsible for and will perform all Tax withholding, payment and reporting duties with respect to any wages and other compensation paid to any continuing employee after the Closing Date. Buyer and Seller agree to use the Standard Procedure as set forth in Rev. Proc. 2004-53, 2004-2 CB 320 with respect to furnishing IRS Form W-2s to each continuing employee of the Business.

(f)    Cooperation. Buyer and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Pharmacy and the Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for any Tax audit, for the preparation for any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters. Any Tax audit or other Tax proceeding shall be deemed a Third Party Suit subject to the procedures set forth in this Section 6.10 and not Section 7.4.

6.12    Misallocated Assets. From and after the Closing, if Seller, Parent, or any of their respective Representatives or Affiliates receives or collects any funds relating to any Asset, then Seller, Parent or their respective Representatives or Affiliates shall remit such funds to Buyer, to an account specified by Buyer in writing, no later than five (5) business days after its receipt thereof. From and after the Closing, if Buyer receives or collects any funds relating to any Excluded Asset, Buyer shall remit any such funds to Seller, to an account specified by Seller in writing, within five (5) business days after its receipt thereof.

6.13    Certain Employee Matters.

(a)    As of the Closing Date, Seller, Parent, or their respective Affiliates, as applicable, shall terminate all of the Pharmacy Employees employed or engaged as of immediately prior to the Closing Date. Buyer and/or an Affiliate of Buyer may make offers of employment to such Pharmacy Employees, and upon such terms, as Buyer or such Affiliate of Buyer may determine at its sole discretion. All such offers made to Pharmacy Employees shall be made prior to the Closing Date and be for employment that commences automatically on the Closing Date unless the Pharmacy Employee rejects such offer.

(b)    Immediately following the Closing, Seller, Parent, or its Affiliates, as applicable, shall, to the extent required consistent with their respective past practices, as applicable, pay all accrued and unpaid vacation, sick leave, and/or paid time off payable to Pharmacy Employees employed or engaged as of immediately prior to the Closing.

(c)    Effective as of the Closing, the Pharmacy Employees shall cease active participation in the Employee Benefit Plans maintained by Seller. Seller shall remain liable for all eligible claims for benefits under the Employee Benefit Plans that are incurred (as determined in accordance with the applicable Employee Benefit Plan) by the Pharmacy Employees prior to the Closing Date.

(d)    The provisions of this Section 6.13 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to (i) obligate Buyer or Buyer's Affiliate, after it has hired or engaged any employee or independent contractor, to continue to employ or engage any employee or independent contractor for any length of time, and the employment or engagement of any such person shall be terminable at will at any time, (ii) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Employee Benefit Plan or other compensation or benefit plan, agreement or arrangement, (iii) create any right in any Pharmacy Employee to any continued employment with Buyer or any of its Affiliates or compensation or benefits of any nature or kind whatsoever or (iv) confer upon or give any person, other than the Parties and their respective permitted successors and assigns, any legal or equitable third-party beneficiary or other rights or remedies with respect to the matters provided for in this Section 6.13, under or by reason of any provision of this Agreement.

6.14    Powers of Attorney. Seller, Parent, and Buyer shall (i) execute Drug Enforcement Administration ("**DEA**") Powers of Attorney authorizing Buyer to act and conduct business involving controlled substances under Seller's Manufacturer and Retail Pharmacy DEA registrations until the DEA issues Buyer a new DEA registration, and (ii) execute a Power of Attorney for continuing pharmacy operations authorizing Buyer to act and conduct the Pharmacy under Seller's Permits until the applicable Governmental Entity issues new state pharmacy Permits (each of the foregoing in substantially the forms attached hereto as Exhibit D, collectively, the "**Powers of Attorney**").

# ARTICLE 7
# INDEMNIFICATION

7.1    Indemnification by Buyer and Mixlab. Buyer and Mixlab, jointly and severally, covenant and agree to indemnify and hold Seller, Parent, and each of their respective successors and assigns and its Affiliates, officers, directors, managers, members, shareholders, employees, and agents at all times harmless from and against any Loss incurred or to be incurred by any of them caused by or arising out of or in connection with (a) any misrepresentation, breach of, or inaccuracy in any representation or warranty made by Buyer in this Agreement or any other Transaction Document; (b) any breach of, or failure to timely perform, any covenant or agreement of Buyer in this Agreement or any other Transaction Document; or (c) the ownership, use or possession of the Assets following the Closing Date.

7.2    Indemnification by Seller and Parent. Seller and Parent, jointly and severally, covenant and agree to indemnify and hold Buyer and Mixlab, and each of their respective successors and assigns and its Affiliates, officers, directors, managers, members, shareholders, employees, and agents at all times harmless from and against any Loss incurred or to be incurred by any of them caused by or arising out of or in connection with (a) any misrepresentation, breach of, or inaccuracy in any representation or warranty made by Seller in this Agreement or any other Transaction Document; (b) any breach of, or failure to timely perform, any covenant or agreement of Parent or Seller in this Agreement or any other Transaction Document; (c) the ownership, use or possession of the Assets prior to the Closing Date; (d) the ownership, use or possession of the Excluded Assets, or (e) any Excluded Liabilities.

7.3    Undisputed Claims. A party (the "**Indemnified Party**") may assert a Claim that it is entitled to, or may become entitled to, indemnification under this Agreement by giving notice of its Claim to the party or parties that are, or may become, required to indemnify the Indemnified Party (the "**Indemnifying Party**," whether one or more), providing reasonable details of the facts giving rise to the Claim and a statement of the Indemnified Party's Loss in connection with the Claim, to the extent such Loss is then known to the Indemnified Party and, otherwise, an estimate of the amount of the Loss that it reasonably anticipates that it will incur or suffer. The parties shall attempt in good faith to resolve any differences during the forty-five (45) day period following the date of delivery of the Indemnifying Party's notice of claim (the "**Resolution Period**"), and (b) if the parties fail to resolve their disagreement during the Resolution Period, then the Indemnified Party may file suit with respect to any amounts in dispute, in accordance with Section 10.4 and pursuant to any other terms, conditions and limitations of this Agreement.

7.4    Third Party Suits. In the case of any Third Party Suit, the Indemnified Party shall control the defense and settlement of the Third Party Suit, and the Indemnifying Party may, at its own expense, participate in (but not control) the defense and employ counsel separate from the counsel employed by the Indemnified Party; *provided*, *however*, that the Indemnified Party may demand that

the Indemnifying Party assume control of the defense of the Third Party Suit at any time during the course of the suit. If the Indemnifying Party assumes control of the defense of a Third Party Suit after such a demand, (a) the Indemnifying Party shall consult with the Indemnified Party with respect to the Third Party Suit upon the Indemnified Party's reasonable request for consultation, and (b) the Indemnified Party may, at its expense, participate in (but not control) the defense and employ counsel separate from the counsel employed by the Indemnifying Party. Regardless of whether the Indemnifying Party assumes the defense of the Third Party Suit, all parties shall cooperate in its defense.

7.5     <u>Source of Recovery</u>. Any indemnity obligation of Seller or Parent shall be settled as follows: (i) first, a payment from the Indemnity Escrow Amount; and (ii) following exhaustion of the Indemnity Escrow Amount, then (x) from a cash payment from Seller or Parent by wire transfer of immediately available funds within five (5) business days after the final determination thereof, or (y) a reduction to the Earn-out Payment, if any; in the case of each of (x)-(y) hereof, at Buyer's election. Notwithstanding the foregoing, if Seller has earned an Earn-out Payment such that the Earn-out Payment is owed and payable to Seller pursuant to <u>Section 2.3</u>, then Buyer shall first seek recovery from the Earn-out Payment prior to seeking recovery pursuant to (x) hereof. Any indemnity obligation of Buyer or Mixlab may be settled by a cash payment from Buyer or Mixlab by wire transfer of immediately available funds within five (5) business days after the final determination thereof.

7.6     <u>Additional Agreements.</u>

(a)     Each representation and warranty of any of the Parties set forth in this Agreement shall survive the Closing for a period of fifteen (15) months, *provided* that Fundamental Representations shall survive the Closing for the longer of (i) a period of four (4) years, or (ii) sixty (60) days after the expiration of the applicable statute of limitations. Each covenant and agreement of any of the Parties set forth in this Agreement shall survive until such covenant and agreement has been fully performed in accordance with its terms, including for purposes of clarity, the covenant set forth in <u>Section 6.5</u> hereof. Buyer, Seller, Mixlab, and Parent further acknowledge that the time periods set forth in this <u>Section 7.6</u> for the assertion of claims under this Agreement are the result of arms'-length negotiation among Buyer, Seller, Mixlab, and Parent and that they intend for the time periods to be enforced as agreed by Buyer, Seller, Mixlab, and Parent.

(b)     All amounts payable under <u>Sections 7.1</u> or <u>7.2</u> shall be treated for all Tax purposes as adjustments to the Purchase Price, except as otherwise required by Law.

7.7     <u>Limitations.</u>

(a)     The amount of any Losses claimed by an Indemnified Party under this <u>Article 7</u> shall be net of any insurance proceeds actually paid to such Indemnified Party in connection with the facts giving rise to the right of indemnification (less any out-of-pocket expenses, including from increased premiums resulting from such payment, incurred by the Indemnified Party in connection with obtaining such insurance proceeds or other recoveries).

(b)     The aggregate liability of Seller or Parent for Losses (a) pursuant to a breach of the representations and warranties contained herein (other than a Fundamental Representation), shall not exceed fifteen percent (15%) of the Purchase Price, or (b) pursuant to a breach of any Fundamental Representation, shall not exceed the Purchase Price (the foregoing, collectively, the "**Indemnity**

**Cap**"). Notwithstanding the foregoing, the Indemnity Cap shall not apply to claims arising in connection with Taxes accrued to Seller or Parent or the Indemnifying Party's Fraud.

(c)     Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any indemnifiable Loss arising under this Article 7 upon becoming aware of any such Loss.

(d)     With respect to any claim as to which the Indemnified Party may be entitled to indemnification under Section 7.1(a) or Section 7.2(a), as the case may be, the Indemnifying Party shall not be liable for any individual or series of related Losses unless and until such Losses exceed $35,000, in which case the Indemnifying Party shall be liable for the full amount of such Losses in excess of $35,000.

(e)     In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special, or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple. An Indemnified Party may not recover duplicative Losses in respect of a single set of facts or circumstances under more than one representation, warranty, covenant, or agreement in this Agreement.

7.8     Exclusive Remedy. The Parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from Fraud) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article 7. Nothing in this Section 7.8 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to this Agreement or to seek any remedy on account of any Fraud.

## ARTICLE 8
## CONDITIONS TO CLOSING

8.1     Conditions to Obligations of Buyer. The obligations of Buyer to effect the Closing are subject to the fulfillment, at or before the Closing, of the following conditions (all or any of which may be waived in writing in whole or in part by Buyer, in its discretion, to the extent permitted by Law):

(a)     Representations and Warranties. Each of the representations and warranties set forth in Section 4.1 shall be true and correct in all material respects, in each case as of the Closing Date as though made on the Closing Date (except to the extent that any such representation and warranty by its terms is limited to a specified date, in which case as of such specified date).

(b)     Covenants. Seller and Parent shall have performed or complied in all material respects with all covenants, agreements, and conditions contained in this Agreement and any other agreements, documents or instructions contemplated hereby required to be performed or complied with by Seller at or prior to the Closing.

(c)     TPA Sale Order. The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case in form and substance reasonably acceptable to Buyer, and the Sale Order shall be a Final Order and remain in full force and effect. Among other things, the Sale Order shall provide for a sale of the Assets to Buyer free and clear of all Encumbrances, with the Encumbrances attached

to the sale proceeds. Seller agrees that it will not submit to the Bankruptcy Court a proposed Sale Order that has not been consented to by Buyer.

        (d)      SBH Purchase Agreement. Buyer, SBH, and Parent shall have entered into the SBH Purchase Agreement.

        (e)      Wisconsin Regulatory Approval. Buyer shall have obtained a new state pharmacy Permit in the state of Wisconsin (the "**Wisconsin Regulatory Approval**").

        (f)      Seller Deliverables. Seller shall have delivered the Seller Deliverables to Buyer.

    8.2    Conditions to Obligations of Seller. The obligations of Seller to effect the Closing are subject to the fulfillment, at or before the Closing, of the following conditions (all or any of which may be waived in writing in whole or in part by Seller to the extent permitted by Law):

        (a)      Representations and Warranties. Each of Buyer's representations and warranties set forth in Section 4.2 shall be true and correct in all material respects, in each case as of the Closing Date as though made on the Closing Date (except to the extent that any such representation or warranty by its terms is limited to a specified date, in which case as of such specified date).

        (b)      Covenants. Each of the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement and any other agreements contemplated herein at or prior to the Closing shall have been duly performed and complied with in all material respects.

        (c)      Buyer Deliverables. Buyer shall have delivered the Buyer Deliverables to Seller.

    8.3    Conditions Precedent to Obligations of Buyer and Seller. The obligations of both of Buyer and Seller to consummate the transactions contemplated hereby at the Closing shall be subject to the Bankruptcy Court's entry of the Sale Order, and are subject to the fulfillment, at or before the Closing, of the following conditions (which may be waived in writing in whole or in part by the Parties in their discretion, to the extent permitted by Law): No Proceeding of any Governmental Entity restraining, enjoining or otherwise preventing or materially delaying the consummation of this Agreement or the transactions contemplated hereby shall be outstanding, and no Proceeding or other legal action, whether at law or in equity, or before or by any Governmental Entity, shall be pending or threatened in writing wherein an unfavorable outcome would (a) prevent or enjoin the performance of this Agreement or the consummation of the transactions contemplated hereby or declare unlawful any of the transactions contemplated hereby or (b) cause any of the transactions contemplated hereby to be rescinded following consummation.

    8.4    Frustration of Closing Conditions. No Party may rely on the failure of any condition set forth in Sections 8.1, 8.2, or 8.3, as the case may be, if such failure was primarily due to such Party's failure to comply with any provision of this Agreement.

**ARTICLE 9**
**TERMINATION**

9.1    <u>Termination Events</u>. This Agreement may be terminated prior to the Closing only as follows:

(a)    by written notice from Buyer or Seller to the other Party, if the Closing has not occurred on or before April 1, 2025 (the "**Outside Date**") or such later date as Buyer and Seller may mutually agree upon in writing, *provided*, that the right to terminate this Agreement pursuant to this <u>Section 9.1(a)</u> shall not be available to any Party whose breach of this Agreement has been the primary cause of any condition or conditions not being capable of being satisfied prior to the Outside Date.

(b)    by written notice from Buyer to Seller, in the event Seller materially breaches or fails to perform any of its covenants contained in this Agreement, or any of Seller's representations or warranties is materially inaccurate, and such breach, failure to perform, or inaccuracy could give rise to the failure of a condition set forth in <u>Section 8.1</u> (a "**Seller Terminating Breach**"), and such breach or inaccuracy has not been cured (if curable) within the earlier of (x) twenty (20) days following Seller's receipt of written notice of such breach from Buyer and (y) one (1) business day prior to the Outside Date, except that the right of Buyer to terminate in accordance with this <u>Section 9.1(b)</u> will not be available if there is an uncured Buyer Terminating Breach at the time Buyer seeks to terminate under this <u>Section 9.1(b)</u>;

(c)    by written notice from Seller to Buyer, in the event the Buyer materially breaches or fails to perform any of its covenants contained in this Agreement, or any of the Buyer's representations or warranties is materially inaccurate, and such breach, failure to perform, or inaccuracy would give rise to the failure of a condition set forth in <u>Section 8.2</u> (a "**Buyer Terminating Breach**") and such breach or inaccuracy has not been cured (if curable) within the earlier of (x) twenty (20) days following Buyer's receipt of written notice of such breach from Seller and (y) one (1) business day prior to the Outside Date, except that the right of Seller to terminate in accordance with this <u>Section 9.1(c)</u> will not be available if there is an uncured Seller Terminating Breach at the time Seller seeks to terminate under this <u>Section 9.1(c)</u>;

(d)    by either Buyer or Seller by written notice to the other, if any order or determination by the Bankruptcy Court or any Governmental Entity of competent jurisdiction permanently restraining, enjoining or otherwise preventing the consummation of the transactions contemplated hereby has been issued and becomes final and non-appealable, except that the right to terminate this Agreement under this <u>Section 9.1(d)</u> shall not be available to a Party if such order or determination was primarily due to the failure of such Party to perform any of such Party's covenants or agreements under this Agreement;

(e)    by mutual written consent of Buyer and Seller;

(f)    by Buyer, if at any time Parent or SBH materially default under and in accordance with the terms of the SBH Purchase Agreement, and such default shall be deemed by each of the Parties to be a default of Parent and SBH (as applicable) under each of the SBH Purchase Agreement and this Agreement; or

(g)    by Seller, if at any time Buyer materially defaults under and in accordance with the terms of the SBH Purchase Agreement, and such default shall be deemed by each of the Parties to be a default of Buyer under each of the SBH Purchase Agreement and this Agreement.

9.2    Effect of Termination. Each Party's right of termination under Section 9.1 is in addition to any other rights such Party may have under this Agreement. If this Agreement is terminated pursuant to Section 9.1, then this Agreement and all obligations of the Parties under this Agreement will terminate and no Party shall have any liability hereunder, except that Article 1, Section 6.10(f), this Section 9.2 and Article 10 shall survive and nothing herein shall relieve any Party hereto from liability arising out of Fraud, willful misconduct or intentional misrepresentation occurring prior to such termination.

## ARTICLE 10
## MISCELLANEOUS

10.1    Expenses. Each Party shall pay its own expenses incident to preparing and entering into this Agreement and the consummation of the transactions contemplated hereby.

10.2    Notices. All notices, requests, demands, and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when received if delivered personally; mailed by first class mail, postage prepaid, registered or certified mail, return receipt requested; delivered by Federal Express or other overnight courier service; or sent by e-mail or other online transmission system with written confirmation of delivery, as follows:

If to Buyer / Mixlab:        Fred Dijols
                             Mixlab WI, LLC
                             336 West 37th Street, Suite 850
                             New York, New York 10018

with a copy (which shall not constitute notice) to:

                             Quarles & Brady LLP
                             Two North Central Avenue, Suite 600
                             Phoenix, Arizona 85004
                             Attention: Amy Cotton Peterson
                             Email: Amy.Peterson@quarles.com


If to Seller:                The Pet Apothecary, LLC

c/o Optio Rx, LLC

                             3701 Commercial Ave., Suite 14
                             Northbrook, IL 60062
                             Attention: Leo LaFranco
                             Email: llafranco@optiorx.com
with a copy (which shall not constitute notice) to:

                             Stoel Rives LLP
                             760 SW Ninth Ave., Suite 3000

Portland, OR 97205
Attention: Kevin Burnett
Email: Kevin.Burnett@stoel.com

If to Parent:    Optio Rx, LLC
3701 Commercial Ave., Suite 14
Northbrook, IL 60062
Attention: Leo LaFranco
Email: llafranco@optiorx.com

with a copy (which shall not constitute notice) to:

Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Attention: Kevin Burnett
Email: Kevin.Burnett@stoel.com

10.3    Governing Law. This Agreement, the negotiation, terms and performance of this Agreement, the rights of the Parties under this Agreement, and any proceeding or other legal action arising in whole or in part under or in connection with this Agreement, are to be governed by and construed in accordance with the domestic substantive laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

10.4    Submission to Jurisdiction and Venue; Waiver of Jury Trial. Any proceeding or other legal action relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced exclusively in the Bankruptcy Court or in the Delaware Court of Chancery, located in the City of Wilmington and County of New Castle Delaware (collectively, "**Chosen Court**"). Each party: (i) expressly and irrevocably consents and submits to the exclusive jurisdiction of the Chosen Court (and each appellate court to the Chosen Court) in connection with any such proceeding or other legal action; (ii) agrees that the Chosen Court shall be deemed to be a convenient forum; and (iii) agrees not to assert (by way of motion, as a defense or otherwise), in any such proceeding commenced in the Chosen Court, any claim that such party is not subject personally to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court. EACH PARTY HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY PROCEEDING IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT.

10.5    Headings; Plurals; Gender. The headings of the articles, sections, and paragraphs herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

10.6    Entire Agreement. The recitals are incorporated herein by reference. This Agreement (including the Schedules and Exhibits referred to herein) sets forth the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements, arrangements, and understandings, whether written or oral, related to the subject matter hereof, including the non-binding, confidential letter of intent, by and between Seller and Buyer dated October 21, 2024.

10.7    Survival; Limitation on Actions. The terms, provisions, covenants, representations, warranties, and conditions of this Agreement shall survive the Closing subject to the limitations set forth herein. All of the terms, provisions, covenants, representations, warranties, and conditions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

10.8    Amendment; No Waiver. This Agreement may be amended, modified, superseded, or canceled, and any of the terms, provisions, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by all Parties, or, in the case of a waiver, by the party waiving compliance. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect the right to enforce the same. No waiver by any party of any condition, or of the breach of any term, provision, covenant, representation, or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, provision, covenant, representation, or warranty.

10.9    Severability. In the event that any one or more of the provisions of this Agreement shall be held or otherwise found to be invalid, illegal, or unenforceable, all other provisions hereof shall be given effect separately therefrom and shall not be affected thereby. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

10.10    Assignment; No Third Party Beneficiary. None of the Parties shall assign any of its rights or obligations hereunder without the prior written consent of the other Parties; *provided*, *however*, and notwithstanding the foregoing, that Buyer may (a) prior to or at the Closing assign all or any portion of Buyer's rights and obligations pursuant to this Agreement to any other wholly owned subsidiary or Affiliate of Buyer (provided that such assignment shall not relieve Buyer from any obligations under this Agreement) and (b) concurrently with or after the Closing, assign any or all of its rights hereunder without any consent or approval of any other party to this Agreement. For the avoidance of doubt, a change of control of Buyer shall be deemed to be an assignment or transfer and shall be subject to this Section 10.10. Except for any such valid assignment and except as set forth in Section 7.1, Section 7.2 or Section 10.7 of this Agreement, this Agreement is for the sole benefit of the undersigned Parties and is not for the benefit of any third party.

10.11    Counterparts; Electronic Delivery. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. If this Agreement is originally executed and a copy or counterpart thereof is transmitted by electronic mail (including DocuSign), such transmitted document shall be deemed to be an original.

10.12    Construction. The Parties acknowledge and agree that this Agreement has been negotiated at arm's length and between Parties equally sophisticated and knowledgeable in the matters

dealt with in this Agreement and were represented by counsel in connection with this Agreement and that each of them and its counsel has reviewed and revised this Agreement, or has had an opportunity to do so. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties as set forth in this Agreement.

*[Remainder of page intentionally left blank; signature page follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the Effective Date.

**BUYER**:

Mixlab WI, LLC

By: _____
Name: Frederic Dijols
Title: President

**MIXLAB**:

Mixlab, Inc.

By: _____
Name: Frederic Dijols
Title: President

**SELLER**:

The Pet Apothecary, LLC

By: _____
Name: _____
Title: _____

**PARENT**:

Optio Rx, LLC

By: _____
Name: _____
Title: _____

*[Signature Page to TPA Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the Effective Date.

**BUYER**:

Mixlab WI, LLC

By: _____
Name: _____
Title: _____

**MIXLAB**:

Mixlab, Inc.

By: _____
Name: _____
Title: _____

**SELLER**:

The Pet Apothecary, LLC

By: _____
Name: _____Ben David_____
Title: _____CEO_____

**PARENT**:

Optio Rx, LLC

By: _____
Name: _____Ben David_____
Title: _____CEO_____

# EXHIBIT A

# EARN-OUT METHODOLOGY

**TPA Earnout Calculation**

| | |
|---|---:|
| TTM Sales at Closing | $2,710,000 |
| TTM Sales at Measurement Date | $2,710,000 |
| **Delta** | **$0** |
| EBITDA Margins | 25% |
| **EBITDA Lost** | **$0** |
| xEBITDA | 4.5x |
| **Reduction in Earnout** | **$0** |
| | |
| Earnout Maximum | $300,000 |
| Reduction in Earnout | $0 |
| **Earnout Paid** | **$300,000** |
| % of Earnout | 100.00% |

## **EXHIBIT B**

**BILL OF SALE**

*[Exhibit B]*

## BILL OF SALE

This Bill of Sale (this "**Bill of Sale**") is entered into as of [●] (the "**Closing Date**") by and between [Mixlab WI, LLC, a Delaware limited liability company] ("**Buyer**"), and [SBH Medical, Ltd., an Ohio limited liability company / The Pet Apothecary, LLC, a Wisconsin limited liability company] ("**Seller**").

Capitalized terms not otherwise defined herein have the meanings assigned to them in that certain Asset Purchase Agreement dated as of [●] by and among Buyer, Seller and Optio Rx, LLC, a Delaware limited liability company (the "**Purchase Agreement**").

## <u>RECITALS:</u>

**WHEREAS**, pursuant to the Purchase Agreement, Buyer and Seller are entering into this Bill of Sale;

**WHEREAS**, simultaneously with the execution and delivery of this Bill of Sale, Seller desires to sell to Buyer all of the Assets, free and clear of all Encumbrances, but in all cases excluding the Excluded Assets, as of the Closing Date in accordance with the terms and conditions of the Purchase Agreement; and

**WHEREAS**, Seller desires to deliver to Buyer such instruments of sale, transfer, conveyance, and delivery as are required to sell, convey, transfer, and deliver to Buyer all of the Assets.

**NOW, THEREFORE**, in consideration of the recitals, which are hereby incorporated by reference, and of the consummation of the transactions contemplated by the Purchase Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties intending to be legally bound agree as follows:

1.    **Sale and Purchase**. Upon all of the terms and subject to all of the conditions of this Bill of Sale, except as set forth in <u>Section 2</u> below, Seller hereby sells, transfers, conveys and delivers to Buyer, and Buyer hereby purchases, all of Seller's right, title, and interest in, to and under the Assets.

2.    **<u>Excluded Assets and Excluded Liabilities</u>**. Notwithstanding the foregoing or anything else to the contrary, no Excluded Assets are transferred, conveyed, or delivered to Buyer pursuant to this Bill of Sale, and Buyer assumes no liabilities of Seller of any kind, including any Excluded Liabilities  and the parties agree that all liabilities of Seller, including the Excluded Liabilities, shall remain the sole responsibility of Seller.

3.    **<u>Agreement</u>**. Nothing contained in this Bill of Sale shall be deemed to supersede or otherwise affect any of the obligations, agreements, covenants, representations or warranties of Buyer and Seller contained in the Purchase Agreement. This Bill of Sale is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including, without limitation, the representations, warranties and covenants set forth in the Purchase Agreement).

4.     **Third Parties**.   Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Bill of Sale.

5.     **Further Assurances**. Each party, for itself and its successors and assigns, hereby covenants that at any time and from time to time after the delivery of this instrument, at such other party's request and expense, such party will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, such further acts, conveyances, transfers, assignments, powers of attorney and assurances as may be reasonably requested and as may be necessary to more effectively convey, transfer and vest in Buyer any of the Assets or to better effectuate the intent and purposes hereof.

6.     **Binding Effect**. This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives, and assigns.

7.     **Governing Law; Dispute Resolution**. This Bill of Sale shall be construed and enforced in accordance with the laws of the State of Delaware. All claims and disputes arising under this Bill of Sale shall be governed by the dispute resolution provisions contained in the Purchase Agreement.

8.     **Successors and Assigns**.  This Bill of Sale shall be binding upon and inure solely to the benefit of each party hereto and its respective successors and permitted assigns, and nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any other person any rights, interests, benefits or remedies of any nature whatsoever under or by reason of this Bill of Sale.

9.     **Severability**.  Should any term, provision or paragraph of this Bill of Sale be determined to be illegal or void or of no force and effect, the balance of the Bill of Sale shall survive.

10.     **Electronic Signatures**. This Bill of Sale may be executed and delivered by electronic transmission, including email. Any electronic signatures shall have the same legal effect as manual signatures. This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties hereto had signed the same signature page.

*[Remainder of this page intentionally left blank. Signature page follows.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed by their respective duly authorized representatives as of the day and year first above written.

<u>**BUYER**</u>:
[MIXLAB WI, LLC]


By:_____
Name:
Title:


<u>**SELLER**</u>:
[SBH MEDICAL, LTD. / THE PET
APOTHECARY, LLC]


By:_____
Name:
Title:

**<u>EXHIBIT C</u>**

**REFERRAL PLAN**

*[Exhibit C]*

**Exhibit C (the "Referral Plan")**

# OptioRx & SBH Medical Pharmacy Referral Plan

## Overview

The purpose of this document is to outline the referral process for veterinary prescriptions transitioning from OptioRx/SBH Medical Pharmacy to Mixlab. This plan includes internal communications, referral channels, customer notification processes, and audit and enforcement measures to ensure a seamless transition and accountability.

## Internal Communications

- **OptioRx Internal Communications:** Notify all relevant OptioRx staff, especially those handling customer interactions, of the transition and referral process to Mixlab.

- **General Manager Communication:**
  - An email will be sent at closing to General Managers at all OptioRx locations, detailing Mixlab's role as the veterinary pharmacy partner.

    - **Email 0: Closing Announcement:**

      *"Subject: Important Update: Transition of Veterinary Prescription Services to Mixlab*

      *Dear [General Manager's Name],*

      *We are writing to inform you of an important change in our veterinary prescription services. SBH Medical and OptioRx have made the strategic decision to focus exclusively on human health and will no longer fulfill veterinary prescriptions. To ensure continued high-quality service for our veterinary clients, we have selected Mixlab, a trusted veterinary pharmacy, to fulfill all veterinary prescriptions moving forward. This transition allows SBH and OptioRx to focus fully on human health and wellness, while ensuring that our veterinary clients continue to receive high-quality medication and care.*

      *Here's what this means for you and your team:*

      - *Veterinary Prescriptions: Effective immediately, all veterinary prescriptions and inquiries should be directed to Mixlab. Mixlab specializes in compounded, commercial, and over-the-counter medications for animals and provides exceptional service, including free next-day delivery.*

      - *Referral Process:*
        *For detailed instructions on directing veterinary prescription inquiries and forwarding prescriptions to Mixlab, please refer to the referral plan document.*

*This document outlines the full process for handling phone, email, fax, and physical prescription referrals.*

*Mixlab is committed to providing seamless, high-quality service to our veterinary clients, and we are confident that they will maintain the standards our customers expect.*

*Please ensure that all relevant team members are familiar with these referral procedures. We will be in touch with periodic updates and reminders to support this transition.*

*If you have any questions or need further clarification, please don't hesitate to reach out.*

*Thank you for your support in making this transition as smooth as possible.*

*Best,*
*[Your Name]"*

○ Follow-up emails will be sent 3, 6, and 12 months post-close to ensure continued awareness.

■ **Email 1: 3-Month Follow-Up:**

*"**Subject:** 3-Month Update on Veterinary Referrals to Mixlab*

*Dear [General Manager's Name],*

*It's been three months since SBH selected Mixlab to support our veterinary customers, allowing SBH to focus exclusively on human health and wellness. As a modern, full-service veterinary pharmacy, Mixlab is dedicated to providing exceptional care and reliable service to meet our veterinary customers' needs.*

*As a reminder, please continue to follow these steps for handling veterinary prescription referrals:*

- ***Phone Referrals**: Direct all veterinary prescription inquiries to the designated Mixlab referral phone number 1 (347) 308-5760. Calls will be received by Mixlab's Care team after a welcome message plays for SBH customers.*

- ***Email & Fax Referrals**: Forward all relevant prescriptions to optiorxvet@mixlab.com for Mixlab processing.*

- ***Website Referrals**: Veterinary customers visiting our veterinary compounding page will be redirected to a Mixlab-hosted landing page.*

- ***Physical Prescriptions**: Follow the protocol for scanning and emailing non-controlled prescriptions and handling controlled substance prescriptions as outlined.*

*These processes are key to ensuring a smooth transition and continued high-quality service for our veterinary customers. We'll reach out again in three months to check in on this process.*

*Thank you for your attention to this important plan!*

*Best,*
*[Your Name]*
*[Your Position]"*

■ **Email 2: 6-Month Follow-Up:**

*"Subject: 6-Month Update on Veterinary Referrals Transitioning to Mixlab*

*Hello [General Manager's Name],*

*We're now at the 6-month mark since SBH transitioned its veterinary prescriptions to Mixlab. Thanks for your support in facilitating this shift.*

*Here's a reminder of the established procedures:*

- *Consistent Referral Processes: Continue directing all veterinary calls, emails, faxes, and physical prescriptions to Mixlab using the approved referral methods. This consistency helps maintain high standards of care for our veterinary customers.*

- *Data Tracking: All interactions forwarded to Mixlab are tagged for tracking to ensure we maintain visibility into referral volumes and success metrics.*

*Mixlab is generating quarterly reports to track all referral activity, which we'll review together. These reports allow us to gauge how well the transition is meeting our customer service goals.*

*Thank you for your continued efforts to support this transition.*

*Best,*
*[Your Name]*
*[Your Position]"*

■ **Email 3: 9-Month Follow-Up:**

*"Subject: 9-Month Update: Mixlab Support for Veterinary Prescriptions*

*Dear [General Manager's Name],*

*As we approach the 9-month mark, we wanted to check in regarding the transition of veterinary prescriptions to Mixlab. Our priority remains ensuring seamless support and excellent service for veterinary clients.*

*Please review the following reminders:*

- *Referral Tracking: Continue to forward all veterinary calls, emails, faxes, and physical prescriptions to the appropriate Mixlab contacts. Using the correct contacts helps Mixlab provide efficient and reliable service.*

3

- ● ***Quarterly Reports:*** *Mixlab's quarterly reports provide insight into the volume and effectiveness of our veterinary referrals, helping us confirm our goals are being met.*

*Thank you for your continued dedication to supporting this process for our veterinary customers. We're on track to complete the first year of this transition, and we'll reach out again at the 12-month mark.*

*Best,*
*[Your Name]*
*[Your Position]"*

- ■ **Email 4: 12-Month Follow-Up:**

*"**Subject:** 12-Month Review: Veterinary Referrals Transition to Mixlab*

***Hello [General Manager's Name],***

*It's been a full year since SBH made the strategic decision to focus exclusively on human wellness, selecting Mixlab to support our veterinary customers. Thanks to your efforts, this transition has been successful, ensuring pets and their families continue receiving the quality care they depend on.*

*As a final reminder:*

- ● ***Referral Compliance****: Please continue to refer veterinary calls, emails, faxes, and physical prescriptions to Mixlab according to the established guidelines.*

- ● ***Final Quarterly Report****: Mixlab's upcoming report will summarize a full year of referral data, offering valuable insights into the impact of this transition and any improvements for the future.*

*Thank you again for playing an essential role in the success of this plan. We appreciate your commitment to ensuring our veterinary customers receive the best possible service.*

*Best,*
*[Your Name]*
*[Your Position]"*

- ● **Staff Presentation:**
  - ○ Vinnie will conduct an in-person presentation for the SBH team, detailing the referral plan and the steps for referring customers to Mixlab. Mixlab will provide lunch for the SBH team during this presentation.

    - ■ This presentation will be prepared by Mixlab and approved by OptioRx.

# Inbound Requests from Veterinary Clients

## Phone Referrals

- **Centralized Mixlab Referral Phone Number:**
  - All veterinary-related calls from OptioRx locations will be forwarded to a dedicated Mixlab referral phone number. This centralized approach enables tracking and consistent handling of referrals across all OptioRx locations.

- **SBH IVR Pre-Message Flow:**
  - **At SBH:**
    - The SBH/OptioRx team will direct veterinary prescription inquiries through a dedicated option in their phone tree.

    - When a caller selects the veterinary option, the call will be forwarded to Mixlab's dedicated referral phone number 1 (347) 308-5760.

    - Upon reaching Mixlab's IVR system, the call will route into a segregated queue specifically for SBH veterinary referrals, and the following message will play:

      *"Thank you for calling SBH Medical Pharmacy. SBH no longer fulfills veterinary prescriptions and has selected Mixlab, a full-service veterinary pharmacy, to ensure you continue to receive high-quality medication and service. Mixlab specializes in compounded, commercial, and over-the-counter medications for animals of all sizes and offers free next-day delivery to your doorstep. You are now being connected to Mixlab's Care team for assistance with placing your order."*

    - After this message plays, the call will be automatically forwarded to the main Mixlab IVR, where it will be handled by a Mixlab Care Team member.

  - **Other OptioRx Locations:**
    - Veterinary-related calls from all other OptioRx locations will be forwarded directly to the Mixlab main phone number 1 (888) 901-4480.

    - Once routed into Mixlab's main queue, the call will be directed to Mixlab's Care team for support.

- **Call Tagging in Kustomer:**
  - Every incoming veterinary referral call received through the Mixlab referral phone number will be tagged as "#optiorxvetph" in Kustomer. This tagging will enable effective tracking, reporting, and auditing for OptioRx veterinary referrals, providing data on referral call volume and quality.

# Email Referrals

- **Forwarded Emails:**
  - All emails related to veterinary prescriptions should be forwarded to the designated Mixlab referral inbox at optiorxvet@mixlab.com.

    - optiorxvet@mixlab.com will be configured as a group inbox. The recipients will be [hello@mixlab.com](mailto:hello@mixlab.com) and [ben@mixlab.com](mailto:ben@mixlab.com).

  - **Auto-Responder:** Mixlab will set up an auto-responder to inform customers that OptioRx and its affiliates are no longer fulfilling veterinary prescriptions and that Mixlab is the chosen veterinary pharmacy partner. The auto-responder will read as follows -

    *"Subject: Important Update on Your Veterinary Prescriptions*

    *Dear [Valued Customer],*

    *SBH Medical Pharmacy no longer fulfills veterinary prescriptions. To ensure you continue to receive high-quality medication and service, we have selected **Mixlab**, a trusted veterinary pharmacy, to support your needs with free next-day delivery to your doorstep.*

    *A member of Mixlab's Care team will respond to your email shortly. In the meantime, if you have any questions or to place an order, please feel free to text or call us directly at (888) 901-4480.*

    *Thank you for trusting us with your pet's health. We look forward to supporting your veterinary care needs.*

    *Warm regards,*

    *The Mixlab Team"*

- **Email Tagging in Kustomer:**
  - Every incoming veterinary referral call received through the Mixlab referral email optiorxvet@mixlab.com will be tagged as "#optiorxvetemail" in Kustomer. This tagging will enable effective tracking, reporting, and auditing for OptioRx veterinary referrals, providing data on referral emails.

# Fax Referrals

- **Forwarding Faxes:**
  - Veterinary prescription faxes will be transferred/forwarded to Mixlab's fax number 1 (614) 633-3338 or sent to optiorxvet@mixlab.com, where Mixlab will handle order processing. These faxes will be tagged with "#optiorxvetfax" in Kustomer.

# Website Referrals

- **SBH Veterinary Compounding Page Redirect:**
  - SBH will keep "Veterinary Compounding" under the "Services" navigation on their website and implement a 301 redirect for their veterinary compounding page at https://sbhmed.com/veterinary-compounding/ for a period of 12 months to a Mixlab-hosted landing page [HubSpot URL]. The redirected URL will include a HubSpot tracking link to monitor traffic and engagement from former SBH customers.

- **Mixlab Landing Page Content:**
  - The Mixlab landing page will provide a detailed explanation of the transition from SBH to Mixlab for veterinary prescriptions, consistent with the messaging used in the IVR and email templates.

  - **Content Overview:**

    - **Transition Explanation:** Outline SBH's decision to focus on human health and wellness, leading to the transition of veterinary prescription services to Mixlab.

    - **Rationale for Selection:** Explain that SBH chose Mixlab due to shared values of quality, speed, and reliability in veterinary care.

    - **Setup Process:** Provide instructions for setting up a new account with Mixlab, including contact details and a link to register online.

  - **Copy and Design:**
    https://info.mixlab.com/sbh?hs_preview=PVXbMxer-182408085381

- **HubSpot Tracking and Metrics:**
  - Each CTA on the Mixlab landing page will be linked to a specific HubSpot tracking URL. These URLs will allow Mixlab to track each SBH referral's journey from referral to customer, providing metrics on conversion rates sourced from the SBH redirect.

# Physical Prescriptions

- **Non-Controlled Substances:**

  - **Scanning and Emailing:**

    - All physical (non-controlled) veterinary prescriptions received by OptioRx/SBH will be scanned and emailed to the Mixlab referral email address, optiorxvet@mixlab.com, for processing.

7

- Digital prescriptions (non-controlled) will also be forwarded directly to optiorxvet@mixlab.com.

- **Tracking:** Each forwarded prescription will be tagged in Mixlab's system (e.g., "#optiorxvetscript") for tracking, reporting, and auditing. This tagging enables Mixlab to monitor the volume and details of prescriptions forwarded by OptioRx/SBH, ensuring clear reporting metrics for referrals.

- **New Prescriptions for Controlled Substances (Schedules II-V):**

  - **CIII - IV Prescriptions:**

    - A patient may request that a prescription for a controlled substance (Schedules III-V) be forwarded to Mixlab via fax 1 (614) 633-3338 or verbal/phone 1 (347) 308-5760

    - **Tracking:** For transferred controlled substances, each transfer will be logged in Mixlab's system with the same "#optiorxvetscript" tag and include tracking details for compliance and auditing purposes.

  - **CII Paper Prescriptions for Controlled Substances:**

    - **Direct Patient Handling:** If a CII paper prescription is initially received by SBH Medical pharmacy, but will be filled by Mixlab, SBH team will fax to 1 (614) 633-3338 or email scanned hard copy to Mixlab at optiorxvet@mixlab.com. The Mixlab team will review the hardcopy prescription to ensure it meets compliance standards, then provide the SBH team with approval to use the provided prepaid envelopes to mail the prescription.

    - **Tracking:** Paper prescriptions for Schedule II medications brought in by patients and received from SBH Medical will be manually entered into Mixlab's dispensing system. They will be tagged with "#optiorxvetscript" and linked to the customer's record for tracking.

  - **Refills:**

    - **Authorized Refills:** Any refills authorized by the prescriber on a Schedule III, IV, or V prescription will be transferred along with the original prescription details as part of the initial file transition to Mixlab.

    - **Tracking:** Each refill transfer will be recorded in Mixlab's system under "#optiorxvetscript" to ensure transparency and accurate metrics on referral-based refills.

# Tracking and Reporting

## Tracking Referrals

- **Data Aggregation and Tracking:**
  - Mixlab will track each referral through specific tagging and logging protocols within its systems:

    - **Phone Referrals:** Calls received via the centralized Mixlab referral phone number 1 (347) 308-5760 will be tagged with "#optiorxvetph" in Kustomer.

    - **Email Referrals:** Non-controlled and controlled prescriptions forwarded to optiorxvet@mixlab.com will be tagged in Kustomer with "#optiorxvetemail" for easy identification and tracking.

    - **Fax Referrals:** All veterinary-related faxes should be sent to 1 (614) 633-3338 or forwarded to optiorxvet@mixlab.com if in digital format. These faxes will be tagged with "#optiorxvetfax" in Kustomer, allowing for comprehensive tracking, reporting, and auditing of fax referrals, and providing visibility into fax-based referrals.

    - **Website Referrals:** All web-based inquiries from the Mixlab landing page (redirected from SBH) will be tracked through HubSpot Tracking URLs HubSpot URL and tagged within the account's profile in Mixlab's HubSpot instance.  This data will also be included in the Metabase report for review and auditing purposes

    - **Physical Prescriptions:** Non-controlled physical prescriptions and controlled prescription transfers will be similarly tagged  using "#optiorxvetscript" and logged to ensure all records are accounted for.

## Reporting

- **Custom Reporting in Metabase:**
  - Mixlab will aggregate all referral data into a custom report built in Metabase. This report will serve as a centralized dashboard to monitor compliance with the referral plan requirements, including referral volumes, types, sources, and outcomes.

- **Regular Reporting:**
  - **Quarterly Reports:** For the first 12 months post-close, Mixlab will generate quarterly reports based on this aggregated data to provide to OptioRx/SBH. These reports will include referral counts, conversion metrics, and compliance insights, offering OptioRx/SBH a detailed view for verification against their own data.

# Auditing and Compliance

## Audit Process

- **Audit Frequency:**
  - OptioRx/SBH Medical Pharmacy will conduct quarterly audits during the first year post-transition to ensure adherence to referral protocols and accuracy in reporting.

- **Audit Capabilities:**
  - Dispensing reports will be reviewed quarterly. The Net Sales Volume of any veterinary prescriptions filled by OptioRx post-close will be deducted dollar-for-dollar from the Earn Out Sales Volume.

  - Dispensing reports will be provided in the same form as the Closing Sales Statement.

# **EXHIBIT D**

## **POWERS OF ATTORNEY**

*[Exhibit D]*

## POWER OF ATTORNEY FOR
## CONTINUING PHARMACY OPERATIONS

**WHEREAS**, The Pet Apothecary, LLC, ("Company") and Mixlab WI, LLC ("Buyer") are undergoing a transaction to occur on or about [●], pursuant to an Asset Purchase Agreement (the "Agreement").

**WHEREAS,** for purposes of this Power of Attorney for Continuing Pharmacy Operations ("POA"), Company, as it exists prior to the transaction under the ownership and associated permit numbers is referred to as "Registrant".

**WHERAS**, for purposes of this POA, Mixlab WI, LLC, as it exists after the transaction under the new ownership shall be referred to herein as "Agent".

**WHEREAS**, as a result of the transaction and change of ownership, Agent will obtain pharmacy permit numbers distinct from Registrant's.

**NOW, THEREFORE**, in consideration of the covenants and agreements set forth in the Agreement, Registrant and Agent hereby covenant and agree that Agent shall have the full power and authority under, and the full use and benefit of, any pharmacy license or permit number, or any other required license, permit, registration, or document, issued to Company for Registrant at each of the pharmacy locations listed on the attached Exhibit A (together the "Registrations"), for purposes of continuing and maintaining uninterrupted pharmacy operations in compliance with state and federal law. This POA shall apply to such Registrations set forth in Exhibit A only as allowed by law and/or the applicable governing agency. This POA shall automatically terminate as to each individual Registration when the applicable agency processes the change of ownership on such Registration and/or the Agent secures an individual Registration to effectively replace such individual Registration.

The parties shall execute a separate Power of Attorney that relates to the DEA registration numbers and required DEA purchase order forms (222 forms) for the Registrant. Accordingly, the DEA registration numbers and DEA purchase order forms are not included in the term "Registrations" for purposes of this POA.

Effective as of the Closing Date defined by the Agreement (the "Effective Date"), Company hereby nominates, constitutes, and appoints Agent as its true and lawful Attorney-in-Fact for Company in its name, place, and stead and hereby gives and grants unto Agent full power and authority to operate and otherwise conduct business with full use and enjoyment of the aforesaid licenses, permits, registration numbers, or documents issued to Company for the Registrant and does hereby give and grant unto Agent full power and authority to represent to third parties said authority and to execute all necessary forms and other instruments which require the use of said credentials and documents to perform any act which shall be required by, or be incidental to, the full use and enjoyment of the same.

Company recognizes that, to the extent required by law, it is legally responsible for its Registrations (for Illinois purposes, including but not limited to, as required under 68 Ill. Admin. Code 1330.400(e)) and all activities undertaken with its Registrations until such time as Agent obtains new Registrations. Company grants the power of attorney based upon the following covenants and warranties of the Agent: (a) at all times that this power of attorney is in effect, the Agent shall operate the Registrant and utilize the Registrations in material compliance with all applicable federal, state, and local laws,

rules, statutes, regulations, and ordinances, including, but not limited to, all federal, state and local laws governing the regulation of controlled substances and pharmacy practice,  and (b) Agent shall make timely application for, diligently pursue, and use its best efforts to obtain new Registrations as soon as practicable.

This POA shall be provided to any applicable governmental agency upon request.

[Signature page to follow]

**IN WITNESS WHEREOF**, Agent and Company have executed this POA for use of the Registrations.

Company:

The Pet Apothecary, LLC:

By: _____

_____     Name:

WITNESS                                          Title:

Agent:

Mixlab WI, LLC

By: _____

_____     Name:

WITNESS                                          Title:

## <u>Exhibit A</u>

Registrations

| State | Name As It Appears on the License | License Type | State License # |
|---|---|---|---|
| Georgia | The Pet Apothecary | Non-Resident Pharmacy License | PHNR001938 |
| Illinois | The Pet Apothecary LLC | Licensed Pharmacy – Nonresident | 054.016453 |
| Pennsylvania | The Pet Apothecary | Nonresident Pharmacy | NP001556 |
| Wisconsin | The Pet Apothecary | License to Operate a Pharmacy | 9293-42 |
| Wisconsin | The Pet Apothecary LLC | Sellers Permit | 456-1027322357-02 |
| Wisconsin | The Pet Apothecary LLC | Tax Registration | 456-1027322357-02 |

## LIMITED POWER OF ATTORNEY
## FOR USE OF DEA REGISTRATION NUMBER
## AND DEA ORDER FORMS

### Pharmacy

The Pet Apothecary, LLC, a Wisconsin limited liability company, located at 407 W. Silver Spring Drive, Milwaukee, Wisconsin, 53217 ("Registrant"), is licensed to operate a compounding pharmacy in the State of Wisconsin and is an active DEA registrant. As the registrant under the Controlled Substances Act of the United States, Registrant is authorized to sign the current applications for registration and licensure under DEA registration number FT1637579 (prior to transaction).

As a result of a transaction to be effective on or about [●] ("Transaction"), Registrant will transfer assets to Mixlab WI, LLC. For the purposes of this Limited Power of Attorney for Use of DEA Registration Number and DEA Order Forms, Mixlab WI, LLC, as it exists and operates after the Transaction shall be deemed the "Agent".

Registrant hereby has made, constituted, and appointed, and hereby makes, constitutes and appoints Agent as Registrant's agent and true and lawful attorney-in-fact for the purposes of utilizing Registrant's controlled substances registrations, DEA registration, and any other registrations required under the laws of the United States or the state pharmacy boards to continue pharmacy operations for Registrant. Agent may act in this capacity until such time as Agent or its designee obtains new controlled substances registration(s), DEA registration(s) and such other registrations for Agent, but in no event shall this Limited Power of Attorney continue more than ninety (90) calendar days after the effective date of the transaction, unless, despite Agent's good faith efforts, the issuance of new controlled substances registrations, DEA registrations and such other registrations for Agent is delayed by the applicable governmental agency. Registrant further grants this Limited Power of Attorney to Agent to act as the true and lawful agent and attorney-in-fact of Registrant, and to act in the name, place, and stead of Registrant, to execute renewal applications, to execute applications for books of official order forms, to sign such order forms in requisition for controlled substances whether on official order forms or electronic, and to appoint an appropriate designee to execute applications for books of official order forms and sign such order forms in requisition for controlled substances whether these orders be on official order forms or electronic, in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. § 828) and Part 1305 of Title 21 of the Code of Federal Regulations.

Registrant recognizes it remains legally responsible for its controlled substances registration(s), DEA registration and other registrations during the period in which this Limited Power of Attorney is in effect. Therefore, Registrant grants this Limited Power of Attorney based upon the following covenants and warranties of Agent: (a) Agent shall follow and abide by and comply with all federal and state laws governing the regulation of controlled substances and pharmacy practice at all times while utilizing this Limited Power of Attorney; and (b) Agent, or its designee, shall make application for and pursue its own DEA registration and other registrations required for the distribution of pharmaceuticals, including, but not limited to, controlled substances at the Registrant's location as soon as practicable.

The undersigned is authorized to sign the current application for registration of Registrant under the Controlled Substances Act.

[Signatures to follow]

IN WITNESS WHEREOF, Registrant and Agent have executed this Limited Power of Attorney as of [●].

The Pet Apothecary, LLC
REGISTRANT

_____    By:_____
WITNESS                                                    Name:
                                                          Title:

Mixlab WI, LLC
AGENT

_____    By: _____
WITNESS                                                    Name:
                                                          Title:

## EXHIBIT E

## ESCROW TERMS

**I. Indemnification Related Claims**.

(i) At any time and from time to time on or prior to [DATE] (the "Escrow Release Date"), if any [Buyer Indemnitee] makes a claim for indemnity pursuant to and in accordance with Section [NUMBER] of the Purchase Agreement (a "Claim"), the [Buyer Indemnitee] (or Buyer on its behalf) shall deliver to the Escrow Agent and Seller a written notice (an "Escrow Notice") setting forth in reasonable detail the amount, nature, and basis of the Claim by the [Buyer Indemnitee]. If the Escrow Agent has not received a written objection to such Claim or portion thereof or the amount of such Claim from Seller within 30 days following the Escrow Agent's and Seller's receipt of such Escrow Notice, then on the 31st day following such receipt, the Escrow Agent shall release, by wire transfer to an account or accounts designated by Buyer, an amount of Escrow Funds from the Escrow Account equal to the amount of such Claim.

(ii) If Seller in good faith delivers to the Escrow Agent and Buyer a written objection (a "Dispute Notice") to any Claim or portion thereof or the amount of such Claim within 30 days following both the Escrow Agent's and Seller's receipt of such Escrow Notice, then the Escrow Agent shall not distribute to Buyer any portion of the Escrow Funds in the Escrow Account that is the subject of the Dispute Notice until the Escrow Agent receives either (A) joint written instructions signed by Seller and Buyer authorizing the release to Buyer of the portion of the Escrow Funds in the Escrow Account that is agreed upon as the amount recoverable in respect of the Dispute Notice or (B) a final and non-appealable order of any court of competent jurisdiction directing the release to Buyer of the portion of the Escrow Funds in the Escrow Account that is determined to be the amount recoverable in respect of the Dispute Notice; provided, that notwithstanding the foregoing, if Seller objects in part to the amount of the Claim, the Escrow Agent shall, after the lapse of the aforementioned 30 day period, deliver to Buyer an amount from the Escrow Fund equal to the portion of the Claim not objected to by Seller. Upon receipt of such joint written instructions or such final and non-appealable order, as the case may be, the Escrow Agent shall release to Buyer such amount of the Escrow Funds in the Escrow Account in accordance with such written instructions or final and non-appealable order.

**II. Release of Remaining Escrow Funds**.

(i) Within three Business Days of the Escrow Release Date (the "Distribution Date"), the Escrow Agent shall release to Seller, by wire transfer to an account or accounts designated by Seller, the remaining balance of the Escrow Funds in the Escrow Account, less the amount of all Unresolved Claims. For purposes of this Agreement, the term "Unresolved Claims" shall mean, as of the Escrow Release Date, the aggregate amount of all Claims that are the subject of a Dispute Notice that have not previously been resolved or satisfied in accordance herewith or that were otherwise properly and timely asserted under this Agreement but otherwise unsatisfied as of the Escrow Release Date, including any Claims for which an Escrow Notice has been delivered but for which the 30 day objection period has not expired as of the Escrow Release Date.

*[Exhibit E]*

(ii) Unresolved Claims for which Seller has objected in accordance with subclauses (i) and (ii) of [Section X] shall be administered in accordance with subclause (ii) of [Section X]. Upon the expiration of the 30-day objection period for any Unresolved Claims for which no Dispute Notice has been delivered, the Escrow Agent shall release by wire transfer to an account or accounts designated by Buyer an amount of funds in the Escrow Account equal to the amount of such Unresolved Claim for which no Dispute Notice has been delivered. After the resolution of each Unresolved Claim, any remaining portion of the Escrow Funds in the Escrow Account not distributed to Buyer pursuant to the immediately preceding sentences and not subject to other Unresolved Claims shall be released by wire transfer promptly thereafter by the Escrow Agent to an account or accounts designated by Seller.