# **EXHIBIT B**

## **(SBH APA)**

CONFIDENTIAL

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of November 12, 2024 (the "**Effective Date**"), by and among Mixlab, Inc., a Delaware corporation ("**Buyer**"), SBH Medical, Ltd., an Ohio limited liability company ("**Seller**"), and Optio Rx, LLC, a Delaware limited liability company ("**Parent**"). Buyer, Seller, and Parent may at times hereinafter be referred to, individually, as "**Party**" and, collectively, as "**Parties**".

## RECITALS

**WHEREAS**, Seller is an indirect wholly owned subsidiary of Parent;

**WHEREAS**, Seller owns certain Assets (as defined below) in connection with the provision of the Pharmacy Activities (as defined below);

**WHEREAS**, on June 7, 2024, Parent, Seller and various Affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 the United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware ("**Bankruptcy Court**"), and these Chapter 11 cases (collectively, the "**Bankruptcy Cases**") are pending in the Bankruptcy Court and are jointly administered under Case No. 24-11188 (TMH) (the Bankruptcy Cases of Seller, Parent and their various Affiliates are referred to herein collectively as the "**Seller Bankruptcy Case**");

**WHEREAS**, Seller is the debtor and debtor in possession in the Seller Bankruptcy Case;

**WHEREAS**, Buyer desires to purchase, and Seller desires to sell, the Assets, on the terms and conditions set forth in this Agreement, through a sale free and clear of liens and encumbrances pursuant to Section 363 and other provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, concurrently with the execution hereof, Buyer, Parent, and The Pet Apothecary, LLC, a Wisconsin limited liability company ("**TPA**") are entering into that certain Asset Purchase Agreement, which provides for the sale to Buyer from TPA those certain assets associated with TPA as more fully described therein (the "**TPA Purchase Agreement**"); and

**WHEREAS**, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court in the Seller Bankruptcy Case and the Bankruptcy Case of Parent and will be consummated only pursuant to a Sale Order to be entered in those Bankruptcy Cases.

## AGREEMENT

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

The terms defined in this <u>Article 1</u>, whenever used in this Agreement, shall have the respective meanings indicated below:

1.1  "**Accounting Firm**" shall have the meaning set forth in <u>Section 2.3(f)</u>.

1.2  "**Accounting Principles**" means the historic methodologies, practices, policies, procedures, categorizations, definitions, methods, judgments, classifications, techniques, and principles consistently used by Seller.

1.3  "**Affiliate**" of a party means (a) any company, individual, corporation, partnership, association, or business that now or hereafter, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such party, and (b) the companies, individuals, corporations, partnerships, associations, or businesses which control, are controlled by, or are under common control with any entity described in the foregoing clause (a). The terms "control", "controlled by" and "under common control with" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract or otherwise. Except for purposes of <u>Section 6.9</u>, in no event shall an equity owner of Parent or its respective affiliates be deemed to be an Affiliate of Seller or Parent.

1.4  "**Allocation**" shall have the meaning set forth in <u>Section 2.4</u>.

1.5  "**Assets**" means all of Seller's Veterinary Files (but in all events excluding the Excluded Assets (as defined below)).

1.6  "**Bill of Sale**" shall have the meaning set forth in <u>Section 5.1(b)</u>.

1.7  "**Books and Records**" means the books and records of Seller relating to the Assets, including all accounting records, files, invoices, customer lists, and supply lists.

1.8  "**Buyer Deliverables**" shall have the meaning set forth in <u>Section 5.2</u>.

1.9  "**Buyer Terminating Breach**" shall have the meaning set forth in <u>Section 9.1(c)</u>.

1.10  "**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as signed into law by the President of the United States on March 27, 2020, together with all rules and regulations and guidance issued by any Governmental Entity with respect thereto.

1.11  "**Chosen Court**" shall have the meaning set forth in <u>Section 10.4</u>.

1.12  "**Claim**" means a claim pursuant to <u>Article 7</u> that a party is entitled, or may become entitled, to indemnification under this Agreement.

1.13  "**Closing**" shall have the meaning set forth in <u>Section 3.1</u>.

1.14  "**Closing Date**" shall have the meaning set forth in <u>Section 3.1</u>.

1.15    "**Closing Dispensing Report**" shall have the meaning set forth in <u>Section 4.1(f)</u>.

1.16    "**Closing Sales Statement**" shall have the meaning set forth in <u>Section 2.3(b)</u>.

1.17    "**Closing Sales Volume**" shall have the meaning set forth in <u>Section 2.3(b)</u>.

1.18    "**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and regulations promulgated thereunder, or applicable state law.

1.19    "**Code**" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

1.20    "**Confidential Information**" shall have the meaning set forth in <u>Section 6.9(f)</u>.

1.21    "**Continuity of Care Arrangement**" shall have the meaning set forth in <u>Section 6.5</u>.

1.22    "**Contract**" means any contract, commitment, lease, or other agreement or instrument (whether written or oral).

1.23    "**COVID-19**" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2) (or any mutation or variation thereof or related health condition, or any related or associated epidemics, pandemics or disease outbreaks).

1.24    "**COVID-19 Funds**" means any loan, exclusion, forgiveness, advance, grant, subsidy, or other payment or application for assistance or stimulus, received or made by Seller under or pursuant to any COVID-19 Relief Program, including any PPP Loan, Economic Stabilization Fund loan or other U.S. Small Business Administration loan, as well as any funds received in connection with any Accelerated Payment Program or Advance Payment Program administered by the Centers for Medicare & Medicaid Services (CMS) or from the Public Health and Social Services Emergency Fund established under the CARES Act.

1.25    "**COVID-19 Relief Program**" means any program authorized or promulgated by a Governmental Entity in response to or in connection with COVID-19, including the CARES Act and subsequent or related legislation or amendments, any current or future regulations or official interpretations thereof and any current or future guidance and rules published by the U.S. Small Business Administration or any other Governmental Entity administering the same.

1.26    "**Current Customers**" shall have the meaning set forth in <u>Section 2.3(b)</u>.

1.27    "**Earn-out Payment**" shall have the meaning set forth in <u>Section 2.3(a)</u>.

1.28    "**Earn-out Sales Volume**" shall have the meaning set forth in <u>Section 2.3(c)</u>.

1.29    "**Earn-out Statement**" shall have the meaning set forth in <u>Section 2.3(c)</u>.

1.30    "**Employee Benefit Liability**" means any liability or obligation of Seller (a) that is an accrued but unpaid monetary obligation to make a contribution under any Employee Benefit Plan; (b) that relates in any way to or arises under any Employee Benefit Plan; (c) for accrued vacation pay, accrued sick pay, and/or other accrued paid time off of any kind; (d) for accrued employee wages and

other compensation of any kind payable in the ordinary course of business and payroll taxes with respect thereto; (e) that is due and owing to independent contractors; or (f) for other employee fringe benefits of any kind, including insurance programs (which include COBRA obligations), expense reimbursement obligations, continuing education stipends, and automobile allowances.

1.31    "**Employee Benefit Plans**" means (a) all "employee benefit plans" as defined in Section 3(3) of ERISA and (b) any other agreement, arrangement, plan, or policy, qualified or non-qualified, written or oral, funded or unfunded, that involves any (i) pension, retirement, profit sharing, savings, deferred compensation, bonus, stock option, simple retirement account (as described in Code Section 408(p)), stock purchase, phantom stock, incentive plan, or change in control benefits; (ii) welfare or "fringe" benefits, including vacation, holiday, severance, redundancy, disability, medical, hospitalization, dental, life and other insurance, tuition, company car, club dues, sick leave, maternity, paternity or family leave, health care reimbursement, dependent care assistance, cafeteria plan, regular in-kind gifts, or other benefits; or (iii) employment, consulting, engagement, retainer or golden parachute agreement or arrangement, in each case, which is or was sponsored, maintained or contributed to by Seller or any ERISA Affiliate and with respect to which Seller or Buyer has or may have any current or future liability.

1.32    "**Encumbrance**" means (i) any lien, mortgage, pledge, claim, security interest, title defect, charge, condition, right of another, restriction, levy, or other restriction or encumbrance, legal or equitable or of any other kind whatsoever, or (ii) any agreement to create any of the foregoing.

1.33    "**Equity Interests**" means (a) any partnership interests, (b) any membership or limited liability company interests or units, (c) any shares of capital stock, (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing entity, (e) any subscriptions, calls, warrants, options, or commitments of any kind or character relating to, or entitling any Person to purchase or otherwise acquire membership or limited liability company interests or units, capital stock, or any other equity securities, (f) any securities convertible into or exercisable or exchangeable for partnership interests, membership or limited liability company interests or units, capital stock, or any other equity securities and (g) any other interest classified as an equity security of a Person.

1.34    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

1.35    "**ERISA Affiliate**" means, with respect to any corporation or trade or business, any other corporation or trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included Seller, or that is, or was at the relevant time, a member of the same "controlled group" as Seller pursuant to Section 4001(a)(14) of ERISA.

1.36    "**Excluded Activities**" means the provision of non-veterinary pharmacy services, including the compounding, sterile compounding, ordering, storing, preparing, and dispensing of non-veterinary prescription pharmaceuticals and over-the-counter products, and the furnishing of services and supplies related thereto and all other services incidental to the operation of a non-veterinary pharmacy.

1.37    "**Excluded Assets**" means all assets of Seller that are not included in the Assets, including any Contracts of Seller and Patient Records.

1.38    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.6.

1.39    "**Federal Health Care Program**" means any "federal health care program" as defined in 42 U.S.C. §1320a-7b(f), including Medicare, Medicare Advantage, state Medicaid programs, state Medicaid waiver programs, state CHIP programs, managed Medicaid, TRICARE and state and local social services programs or other similar or corresponding foreign programs.

1.40    "**Final Earn-out Payment**" shall have the meaning set forth in Section 2.3(c).

1.41    "**Final Order**" means an Order of the Bankruptcy Court or a court of competent jurisdiction as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Bankruptcy Court or court of competent jurisdiction and the time for filing any such petition or protest is passed; (iii) the Bankruptcy Court or court of competent jurisdiction does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; (iv) other than with respect to the Sale Order, the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; and (v) with respect to the Sale Order, the action or order is not then under judicial review for a challenge regarding Buyer's status as a purchaser in good faith pursuant to Section 363(m) of the Bankruptcy Code, there is no notice of appeal or other application for judicial review pending regarding Buyer's status as a purchaser in good faith pursuant to Section 363(m) of the Bankruptcy Code, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

1.42    "**Fraud**" means actual fraud under the laws of the state of Delaware. For the avoidance of doubt, Fraud shall not include any claim for equitable fraud, constructive fraud, promissory fraud, unfair dealings fraud, or fraud by negligent misrepresentations.

1.43    "**Fundamental Representations**" means any representation or warranty in Sections 4.1(a) (Organization, Standing, etc.), 4.1(b) (Due Authorization), 4.1(c)(i) (Compliance with Organizational Documents), 4.1(e) (Assets of Seller), 4.1(i) (Tax Returns and Audits), and 4.1(o) (No Brokers or Finders).

1.44    "**Funds Flow**" shall have the meaning set forth in Section 2.2(b).

1.45    "**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

1.46    "**Governmental Entity**" means any federal, state, provincial, local, municipal, non-U.S. or other government or quasi-governmental authority or any department, agency, commission, board, subdivision, bureau, agency, instrumentality, court or other tribunal of any of the foregoing.

1.47    "**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 and the currently effective regulations promulgated thereunder.

1.48    "**Indebtedness**" means any of the following: (a) any obligation for borrowed money and any accrued interest, fees, penalties, prepayment premiums or other payment obligations related

thereto; (b) any obligation evidenced by a note, bond, debenture, mortgage, indenture, deed of trust or similar instrument or with respect to which there are any Encumbrances on any assets; (c) any obligation as an account party with respect to letters of credit to the extent drawn upon; (d) the deferred purchase price of property, assets, or services or for earnouts, holdbacks of purchase price, non-compete payments, obligations to pay purchase price adjustments or other similar obligations (calculated assuming the achievement and/or satisfaction of all applicable targets, thresholds, and other terms and conditions of the same) (other than accounts payable in the ordinary course of business which are not past due); (e) deferred rent; (f) any capital lease (determined in accordance with GAAP); (g) all obligations under any interest rate or currency protection agreement or similar hedging agreement, assuming such agreements were terminated *minus* any amounts payable in connection with such termination (which may be a positive or negative number); (h) any obligation in the nature of a guarantee, indemnity, or grant of an Encumbrance with respect to any of the foregoing; (k) any loan or advance under, guaranteed, amended or made available in connection with any COVID-19 Relief Program, including the total outstanding amount of any accelerated or advance payments under any Accelerated Payment Program or Advance Payment Program administered by the Centers for Medicare & Medicaid Services (CMS) or from the Public Health and Social Services Emergency Fund established under the CARES Act; (i) with respect to any Person, all Indebtedness of others secured by an Encumbrance on property or assets owned or acquired by such Person; and (j) any interest, fee, expense, prepayment premium, termination fee, penalty, cost or other amount payable in connection with any of the foregoing.

1.49    "**Indemnified Party**" shall have the meaning set forth in Section 7.3.

1.50    "**Indemnifying Party**" shall have the meaning set forth in Section 7.3.

1.51    "**Indemnity Cap**" shall have the meaning set forth in Section 7.7(b).

1.52    "**Information Requirements**" shall have the meaning set forth in Section 4.1(p)(i).

1.53    "**Insurance Policies**" shall have the meaning set forth in Section 4.1(n).

1.54    "**IRS**" means the Internal Revenue Service.

1.55    "**Joint Communications Plan**" shall have the meaning set forth in Section 6.2

1.56    "**Law**" means any law, statute, ordinance, code, rule, order, or regulation of any governmental unit, court, or administrative or regulatory agency, including, without limitation, the Code.

1.57    "**Licenses**" shall have the meaning set forth in Section 4.1(l).

1.58    "**Loss**" means any claim, liability, loss, Tax, judgment, fine, penalty, damage, cost, or expense (including lost profits, attorneys' fees, and costs of investigation and litigation).

1.59    "**Material Adverse Effect**" means any event, change or effect that, individually or in the aggregate, has had a material adverse effect on the business, financial condition or results of operations of the Pharmacy; *provided*, *however*, that no such event, change or effect resulting or arising from or in connection with any of the following matters shall be deemed, either alone or in combination, to constitute or contribute to a Material Adverse Effect: (a) the conditions generally

affecting the industries in which the Pharmacy operates; (b) the general political, economic, business, monetary, financial or capital or credit market conditions or trends (including interest rates, currency exchange rates, tax rates and price levels or trading volumes in the United States or foreign securities markets); (c) changes in global, national or regional political conditions or trends; (d) any act of civil unrest, war or terrorism (including by cyberattack or otherwise), including an outbreak or escalation of hostilities involving the United States or any other country or the declaration by the United States or any other country or jurisdiction of a national emergency or war; (e) natural disasters or weather developments, including earthquakes, hurricanes, tsunamis, typhoons, lightning, hail storms, blizzards, tornadoes, droughts, floods, cyclones, arctic frosts, mudslides and wildfires, manmade disasters or acts of God or any outbreak of any disease or other public health event; (f) failure of the financial or operating performance of the Pharmacy to meet internal, Buyer or analyst projections, forecasts or budgets for any period (provided that this clause (f) shall not be construed as implying that Seller is making any representation or warranty herein with respect to any internal, Buyer or analyst projections, forecasts or budgets and no such representations or warranties are being made); (g) any action taken or omitted to be taken by or at the request or with the consent of Buyer or as expressly required pursuant to this Agreement, including without limitation, disclosure of the identity of Buyer to customer suppliers; (h) the execution, announcement, pendency, performance or consummation of this Agreement, the transactions contemplated hereby, or the identity of Buyer (including the impact on or any loss of employees, customers, suppliers, Government Entities or any relationships with any of the foregoing or other business relationships resulting from any of the foregoing), (i) changes in any Law (including any proposed Law) or applicable accounting principles or standard or any interpretations of any of the foregoing, or (j) the Seller Bankruptcy Case; *provided* that any adverse events, changes or effects resulting from the matters described in clauses (a), (b), (c), (d), (e) and (i)  may be taken into account in determining whether there has been a Material Adverse Effect only to the extent they have a disproportionate effect on the Pharmacy relative to similarly situated businesses in the industries in which the Pharmacy operates.

1.60    "**Net Sales Volume**" means the trailing twelve-month net sales of the Pharmacy, calculated as gross sales, less all discounts, refunds, returns and chargebacks, and recognized as of the date the associated prescription(s) is filled and prepared for shipment to the end customer or prescriber.

1.61    "**Objection Statement**" shall have the meaning set forth in Section 2.3(d).

1.62    "**Organizational Documents**" means (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity and any operating agreement, partnership agreement or similar governing agreement; and (c) any amendment to any of the foregoing.

1.63    "**Outside Date**" shall have the meaning set forth in Section 9.1(a).

1.64    "**Patient Records**" means all records including "protected health information" as defined under 45 C.F.R. §160.103 (such as medical records, patient billing records, prescriptions, prescription files and records, signature logs and patient profiles, including refill status reports and insurance coverages and other patient-related documentation as required under any applicable Laws and Veterinary and Pharmacy Laws) relating to the Pharmacy.

1.65    "**Performance Period**" shall have the meaning set forth in Section 2.3(a).

1.66    "**Permits**" means all permits, licenses, authorizations, registrations, franchises, approvals, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Entities.

1.67    "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Entity, unincorporated organization, trust, association or other entity.

1.68    "**Pharmacy**" means the business of Seller engaged in the Pharmacy Activities.

1.69    "**Pharmacy Activities**" means the provision of veterinary pharmacy services including the compounding, sterile compounding, ordering, storing, preparing, and dispensing of prescription veterinarian pharmaceuticals and over-the-counter products, and the furnishing of services and supplies related thereto and all other services incidental to the operation of a veterinary pharmacy, in all cases in connection with the Pharmacy's veterinary customers and participating veterinary clinics. "**Pharmacy Activities**" does not include the Excluded Activities.

1.70    "**Post-Closing Tax Period**" means any taxable period commencing after the Closing Date.

1.71    "**PPP Loan**" means any loan under the Paycheck Protection Program of the U.S. Small Business Administration.

1.72    "**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such taxable period ending on and including the Closing Date.

1.73    "**Proceeding**" shall have the meaning set forth in Section 4.1(j).

1.74    "**Purchase Price**" shall have the meaning set forth in Section 2.2.

1.75    "**Referral Plan**" shall have the meaning set forth in Section 6.9.

1.76    "**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

1.77    "**Resolution Period**" shall have the meaning set forth in Section 7.3.

1.78    "**Restricted Area**" means the United States of America.

1.79    "**Restricted Time Period**" means the period beginning on the Closing Date and ending three (3) years thereafter.

1.80    "**Sale Hearing**" means the hearing conducted by the Bankruptcy Court for purposes of approving and confirming the sale of the Assets in accordance with this Agreement.

1.81    "**Sale Order**" means an order of the Bankruptcy Court, in form, content, and detail acceptable to Seller, approving this Agreement and the consummation of the transactions contemplated hereby.

1.82   "**Schedules**" means the Disclosure Schedules delivered by Seller with the execution and delivery of this Agreement.

1.83   "**Seller Deliverables**" shall have the meaning set forth in Section 5.1.

1.84   "**Seller Taxes**" means any liability, obligation or other Loss for (i) Taxes of Seller and Parent (or any member, partner, stockholder or Affiliate of Seller or Parent) or relating to the Pharmacy Activities or the Assets for any Pre-Closing Tax Period (if any); (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to Section 6.10(a) and Section 6.10(b); or (iii) other Taxes of Seller or Parent (or any member, partner, stockholder or Affiliate of Seller or Parent) of any kind or description (including any liability, obligation or other Loss for Taxes of Seller (or any member, partner, stockholder or Affiliate of Seller or Parent) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law).

1.85   "**Security Event**" shall have the meaning set forth in Section 4.1(p)(iii).

1.86   "**Seller Information**" shall have the meaning set forth in Section 4.1(p)(ii).

1.87   "**Seller Terminating Breach**" shall have the meaning set forth in Section 9.1(b).

1.88   "**Straddle Period**" means any taxable period that includes (but does not end on) the Closing Date.

1.89   "**Tax**" means (i) all federal, state, local, or foreign income, profits, employment (including social security, unemployment insurance, employer health and employee income tax withholding), payroll, corporate, franchise, net worth, gross receipts, sales, use, transfer, stamp, license, withholding, occupation, premium, real and personal property, unclaimed or abandoned property, escheat, capital, windfall profits, environmental, customs, duties, ad valorem, recapture, alternative or add on minimum, value added, goods and services, excise, severance, PBGC premiums, and any other federal, state, local, or foreign taxes, charges, fees, levies, or other assessments of any kind, however denominated; (ii) all interest, assessments, penalties, fines, additions to, or additional amounts imposed in connection with any item described in clause (i), whether disputed or not; and (iii) any transferee liability in respect of any items described in clauses (i) or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof and any analogous or similar provision under Law) or otherwise.

1.90   "**Tax Return**" means any return, report, or statement required to be filed in connection with any Tax (including related or supporting information with respect to any of the foregoing and any schedules or attachments thereto, and any amendment thereof) including any election, declaration, statement of foreign bank and financial accounts, information return, claim for refund, or declaration of estimated Tax, and including, where permitted or required, combined, consolidated, or unitary returns for any group of entities that includes Seller or any of its Affiliates.

1.91   "**Taxing Authority**" means any Governmental Entity responsible for the administration, imposition, or collection of any Tax, including, without limitation, the Internal Revenue Service and each applicable state department of revenue or similar Governmental Entity.

1.92    "**Third Party Suit**" means a suit or proceeding by a third party with respect to which a Claim is made.

1.93    "**TPA**" shall have the meaning set forth in Section 2.1(a).

1.94    "**TPA Purchase Agreement**" shall have the meaning set forth in Section 2.1(a).

1.95    "**Transaction Expenses**" means the all costs, fees and expenses payable by Seller that are incurred in connection with or as a result of the preparation, negotiation or execution of this Agreement or any of the agreements, documents or instructions contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, including all fees and expenses of (including under any engagement letter) brokers, investment bankers, financial advisors, commercial lenders, accountants and legal advisors.

1.96    "**Transaction Documents**" means this Agreement, the Disclosure Schedules, any Exhibits, or any other agreement, instrument, certificate, and document executed and delivered by or on behalf of the Parties in connection with this Agreement, and the consummation of the transactions contemplated hereby.

1.97    "**Transfer Taxes**" shall have the meaning set forth in Section 6.10.

1.98    "**Veterinary and Pharmacy Laws**" means (i) any and all Laws relating to the regulation of the veterinary industry (including any services rendered by any professional operating in the industry) institutional and professional licensure, documentation and prescription orders, informed consent, quality assurance, risk management, mandated reporting of incidents, occurrences, diseases and events, advertising or marketing; (ii) all Laws administered by the Drug Enforcement Administration including 21 U.S.C. § 801 et. seq., commonly referred to as the "Controlled Substances Act" and any similar state Laws governing the prescribing, storing, and dispensing of controlled substances, including all required licensure and registrations related to controlled substances; (iii) all Laws administered by the U.S. Food & Drug Administration, including 21 U.S.C. Chapter § 301 et. seq., commonly referred to as the "Federal Food, Drug, and Cosmetic Act" and any similar state Laws; and (iv) Laws relating to the practice of pharmacy, the operation of pharmacies, the wholesale distribution, dispensing, labeling, packaging, repackaging, advertising, adulteration or compounding of drug products or controlled substances.

1.99    "**Veterinary Files**" means all forms, documents, and logs prepared in connection with the Pharmacy Activities setting forth the compounded prescriptions (including both non-sterile and sterile compounded prescriptions), commercial prescriptions, compound formulations (including both non-sterile and sterile), processes, studies and other relevant compounding records, including all related patient, owner and prescriber information and profiles (including but not limited to contact information, weight, breed, sex, allergies, and any other applicable information).

## ARTICLE 2
## PURCHASE OF ASSETS

2.1    Purchase. Subject to Bankruptcy Court approval of this Agreement through the entry of the Sale Order, and on the terms and subject to the satisfaction or, if permissible, waiver of the conditions set forth in this Agreement, Seller agrees to sell, assign, convey, transfer, and deliver all right, title and interest in and to the Assets to Buyer, as applicable, free and clear of all Encumbrances, and Buyer agrees to purchase, acquire and accept the Assets, as applicable, in each case at the Closing and effective as of the Closing Date.

2.2    Purchase Price; Payment. As consideration for the sale, assignment, conveyance, transfer, and delivery to Buyer of the Assets (free and clear of all Encumbrances) and the obligations of Seller and Parent under Section 6.9, and subject to adjustment as set forth herein, Buyer shall pay to Seller by wire transfer of immediately available funds an amount equal to $1,106,000 (the "**Purchase Price**") to an account designated in writing by Seller.

2.3    Earn-out.

(a)    As additional consideration for the Assets, Buyer shall pay to Seller, if earned during the period between the Closing Date and the date that is twelve (12) months following the Closing Date (the "**Performance Period**") a retention earn-out payment in an amount not to exceed $277,000 (the "**Earn-out Payment**"). The Final Earn-out Payment (as defined below), if any, shall be due and payable to Seller on or before the fifth (5th) business day after the final determination thereof in accordance with this Section 2.3, and shall be paid to Seller by wire transfer of immediately available funds.

(b)    No later than five (5) days following the Closing, Seller shall deliver to Buyer a statement in form reasonably acceptable to Buyer (the "**Closing Sales Statement**") setting forth (i) the Net Sales Volume of those certain customers of Seller set forth on Schedule 2.3(b) (the "**Current Customers**") measured as of the Closing Date and calculated using the Accounting Principles (the "**Closing Sales Volume**"), and (ii) the estimated Earn-out Payment, calculated by Seller in accordance with the methodology set forth on Exhibit A attached hereto.

(c)    No later than thirty (30) days after the conclusion of the Performance Period, Buyer shall deliver to Seller a statement in form reasonably acceptable to Seller (the "**Earn-out Statement**") setting forth (i) the Net Sales Volume of the Current Customers measured as of the conclusion of the Performance Period and calculated using the Accounting Principles (the "**Earn-out Sales Volume**"), and (ii) the final Earn-out Payment, calculated by Buyer in accordance with the methodology set forth on Exhibit A attached hereto (the "**Final Earn-out Payment**").

(d)    The Earn-out Statement shall be final and binding upon all Parties unless Seller objects within thirty (30) days after receipt thereof (a) by notifying Buyer in writing of each objection; and (b) delivering to Buyer a statement describing in detail the basis for each objection and a new Earn-out Statement, along with any details or documentation supporting Seller's objections (collectively, the "**Objection Statement**"). Any component of the Earn-out Statement that is not the subject of an objection by Seller shall be final and binding upon all Parties.

(e)    If Buyer agrees with the Objection Statement or does not provide a written objection within fifteen (15) days after receipt thereof, then the Objection Statement will be final and

binding upon all Parties and shall be the basis for determining the Earn-out Payment. If Buyer does not agree with the Objection Statement, then Buyer shall, within fifteen (15) days after receipt thereof, notify Seller in writing of its disagreement and the basis for its disagreement.

(f)       The Parties shall use reasonable efforts to resolve any dispute described in this Section 2.3; *provided*, that if they are unable to do so within thirty (30) days following Buyer's notice to Seller that it disagrees with the Objection Statement, then by notice from Seller or Buyer to the other, the disagreement shall be submitted for resolution to an independent accounting firm as mutually agreed upon by Buyer and Seller in writing (the "**Accounting Firm**"). Within ten (10) business days after the Accounting Firm has been retained, Seller and Buyer shall furnish, at their own expense, to the Accounting Firm and the other Party a written statement of their position with respect to each matter in dispute. Within five (5) business days after the expiration of such ten (10)-day period, Seller and Buyer may deliver to the Accounting Firm and to the other Party their response to the other's position on each matter in dispute. With each submission, Seller and Buyer may also furnish to the Accounting Firm such other information and documents as they deem relevant or such information and documents as may be requested by the Accounting Firm with appropriate copies or notification being given to the other Party. In connection with such process, there shall be no hearings, oral examinations, testimony, depositions, discovery or other similar proceedings conducted by any Party or by the Accounting Firm, except that the Accounting Firm may, in its discretion, require a conference with Seller and Buyer, at which conference each Party shall have the right to present additional documents, materials and other information and to have present its advisors, counsel and accountants. The Accounting Firm shall be directed to promptly, and in any event within thirty (30) days after their appointment pursuant to this Section 2.3, render its decision on the disputed item(s), unless an alternate date is otherwise agreed upon by Buyer, Seller, and the Accounting Firm. The decision of the Accounting Firm on each item in dispute may not be greater than the higher position of Buyer or Seller nor lower than the lower position of Buyer or Seller with respect to such item. The Accounting Firm's determination as to each item in dispute shall be set forth in a written statement delivered to Seller and Buyer, which shall include the Accounting Firm's determination of the Earn-out Payment. The Accounting Firm shall also determine the proportion of its fees and expenses to be paid by each of Seller and Buyer based primarily on the degree to which the Accounting Firm has accepted the positions of the respective parties and the respective parties shall pay such amount within thirty (30) days after receipt of an invoice therefor from the Accounting Firm.

(g)       The Parties understand and agree that (i) the contingent rights to receive the Earn-out Payment shall not be represented by any form of certificate or other instrument, are not transferable, except by operation of Law relating to descent and distribution, divorce and community property, and do not constitute an equity or ownership interest in Buyer, (ii) Seller shall not have any rights as a securityholder of Buyer as a result of Seller's contingent right to receive the Earn-out Payment, and (iii) no interest is payable with respect to the Earn-out Payment. Seller further hereby acknowledges that the achievement of financial results sufficient to result in the Earn-out Payment being payable to Seller hereunder is uncertain and that the operation of the business following the Closing may not achieve such financial results. As such, Seller acknowledges that there are no assurances that Seller will receive the Earn-out Payment hereunder. Notwithstanding the foregoing, Buyer covenants and agrees that it shall not act in bad faith for the purpose of avoiding or reducing the Earn-out Payment; *provided, however*, that Buyer shall have sole discretion with regard to all matters relating to the operation of the Assets following the Closing.

2.4    Allocation. Buyer, Seller and Parent agree to allocate the Purchase Price, the Earn-out Payment (to the extent paid hereunder) and all other amounts properly treated as consideration for Tax

purposes among the Assets in a manner complying with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "**Allocation**"). Buyer shall deliver a proposed Allocation to Seller within 60 days after the Closing Date. If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided* that if Seller and Buyer cannot or do not resolve such dispute, then such dispute shall be resolved using the procedures set forth in <u>Section 2.3(f)</u>, mutatis mutandis. Buyer, Seller, Parent and their respective Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation. In the event an adjustment to the Purchase Price (or any items constituting consideration for Tax purposes and including any adjustment thereto) is made pursuant to this Agreement or upon the payment of the Earn-out Payment hereunder, Buyer shall make appropriate adjustments to the Allocation to reflect such adjustments and shall promptly provide a written copy of such adjustments to Seller. Neither Buyer, Seller nor Parent shall take any position (whether in audits or other Proceedings, Tax Returns or otherwise) that is inconsistent with such Allocation unless required to do so by applicable Law.  The Parties shall promptly advise one another in writing of the existence of any Tax audit, controversy or litigation related to the foregoing Allocation.

2.5    <u>No Assumed Liabilities</u>. Buyer does not assume, and will not in any way be responsible for, any liabilities or obligations of Seller, Parent, or any of their respective Affiliates, or any of the bankruptcy estates in the Bankruptcy Cases.

2.6    <u>Excluded Liabilities</u>. Buyer does not assume or agree to assume, will not assume or become liable for and shall not be obligated to pay, perform, discharge, or satisfy any obligation, debt, or liability whatsoever, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created, whether or not disclosed on the Schedules attached hereto, and regardless of when or by whom asserted, of the Pharmacy, Parent, Seller, or any their respective Affiliates, or any of the bankruptcy estates in the Bankruptcy Cases, including, without limitation, any liability arising out of the business, or operation, of the Pharmacy, the Pharmacy Activities or custody of the Assets prior to the Closing Date, services provided by Seller pursuant to the Continuity of Care Arrangement (as defined below), and the Excluded Activities prior to or following the Closing Date (collectively, the "**Excluded Liabilities**"). The Excluded Liabilities shall remain the responsibility and obligation of Parent, Seller and their respective Affiliates, and Parent and Seller shall, and shall cause their respective Affiliates to, pay, perform, and discharge all Excluded Liabilities as and when due. For the avoidance of doubt, Excluded Liabilities include, without limitation, any liabilities or obligations of Seller arising from or relating to the following: (i) all employment-related claims arising from any event or occurrence prior to Closing, including under any employment, bonus, severance, retention, paid-time off, retirement or termination payment or agreement with an employee of Seller (including any claim arising under ERISA and the WARN Act); (ii) any Employee Benefit Liability or other liability relating to Seller's payroll, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock options or profit-sharing plans or benefits of any other kind, including the Employee Benefits Plans, for Seller's employees or former employees or both (including any obligations arising under any 280G agreements or payments); (iii) the Excluded Assets; (iv) all Indebtedness obligations of Seller; (v) Seller Taxes; (vi) the provision of the Pharmacy Activities prior to the Closing; (vii) any liabilities arising out of or relating to any Proceeding, including any costs, fees, fines, penalties, or damages associated therewith; (viii) any liability arising from or related to participation in or receipt of any COVID-19 Relief Program or COVID-19 Funds; and (ix) any claim asserted against Parent or Seller or any of their respective Affiliates (or any of their respective bankruptcy estates) in any of the Bankruptcy Cases, or any other claim or liability arising out of or relating to any of the Bankruptcy Cases.

2.7     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, at the Closing, Buyer shall not purchase, and Seller and Parent and their respective Affiliates will retain, all Excluded Assets. Buyer acknowledges and agrees that neither Buyer nor any of its Affiliates will acquire or be permitted to retain any direct or indirect right, title and interest in any Excluded Asset.

2.8     Withholding. Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any payment made pursuant to this Agreement such amounts as it reasonably determines that it is required to deduct and withhold under Tax or other applicable Law. Buyer shall provide Seller with written notice of its intent to withhold at least ten days prior to the Closing Date with a written explanation substantiating the requirement to withhold, and the Parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the extent permitted by Law.  All such withheld amounts shall be treated as delivered to Seller hereunder.

**ARTICLE 3**
**THE CLOSING**

3.1     The Closing. Subject to the terms and conditions set forth herein, the sale and transfer of the Assets by Seller to Buyer (the "**Closing**") shall take place electronically one (1) business day after all conditions to closing of Buyer and Seller set forth in this Agreement are either satisfied or waived by the party to which the closing condition applies, and in any event, no earlier than November 18, 2024 (the "**Closing Date**"). Seller shall deliver to Buyer custody of the Assets on the Closing Date as reasonably directed by Buyer.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES**

4.1     Representations and Warranties by Seller. Except as otherwise set forth on the Schedules, as a material inducement for Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby makes the following representations and warranties as of the Effective Date and as of the Closing, each of which is relied upon by Buyer:

(a)     Organization, Standing, etc.

(i)     Seller is an Ohio limited liability company, with full power and authority to carry on its business as presently conducted. Seller is duly formed, validly existing and in good standing under the laws of the State of Ohio. Parent is a Delaware limited liability company, with full power and authority to carry on its business as presently conducted. Parent is duly formed, validly existing and in good standing under the laws of the State of Delaware.

(ii)     Seller has made available to Buyer true, complete and correct copies of the Organizational Documents. Except as set forth in Schedule 4.1(a)(ii), Seller is not and has not been in breach or violation of or default under any provision of its Organizational Documents.

(iii)     SBH Medical, LLC, a Delaware limited liability company, is the sole beneficial, legal and record owner of the Equity Interests of Seller, and Parent is the sole beneficial, legal and record owner of Equity Interests of SBH Medical, LLC, a Delaware

limited liability company, and such Persons are the only Persons entitled to vote with respect to all outstanding Equity Interests of Seller, and there are no outstanding rights, options, warrants, convertible securities, subscription rights, conversion rights, exchange rights, or other agreements that require Seller to directly or indirectly issue or sell any of its Equity Interests or to redeem or otherwise acquire any of its outstanding Equity Interests.

(iv)    Subject to Bankruptcy Court approval, Seller has all requisite limited liability company power and authority to execute and deliver this Agreement and any other agreements, instruments, certificates, and documents to which Seller is a party in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

(b)    <u>Due Authorization</u>. The execution, delivery, and performance of this Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Seller and Parent in connection with this Agreement and the consummation of the transactions contemplated hereby and thereby by Seller and Parent have been duly authorized, and no other approvals or authorizations are necessary in connection therewith except only for approval by the Bankruptcy Court. This Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Seller and Parent in connection herewith, assuming the due authorization, execution and delivery of this Agreement by Buyer and approval by the Bankruptcy Court, are the valid and binding obligations of Seller and Parent, enforceable against Seller and Parent in accordance with their respective terms, subject as to enforcement only to applicable bankruptcy, insolvency, reorganization, or other laws affecting the rights of creditors generally, or to equitable principles.

(c)    <u>Compliance with Instruments and Agreements</u>. Schedule 4.1(c) contains a list of the required consents to be obtained at or prior to Closing. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby will not (i) result in any breach or violation of any of the terms or provisions of, or constitute a breach or default under, the Organizational Documents of Seller or any applicable Law; (ii) [reserved]; (iii) assuming that the required consents referred to in <u>Schedule 4.1(c)</u> are obtained at or prior to the Closing, violate any legally protected right of any individual or entity or give to any individual or entity a right or claim against Buyer or the Assets; (iv) assuming that the required consents referred to in <u>Schedule 4.1(c)</u> are obtained at or prior to the Closing, result in the imposition or creation of any Encumbrance on any of the Assets or accelerate any Indebtedness of Seller or to which the Assets may be bound; (v) breach, impair, or in any way limit any governmental or official license, approval, permit, or authorization of Seller; or (vi) other than in connection with the Seller Bankruptcy Case, require any permit, notice, consent, review, approval, filing, registration, or other process by, with, to or of any Governmental Entity.

(d)    [Reserved].

(e)    <u>Assets of Seller</u>. Seller has good, valid and marketable title to all of the Assets. Seller has maintained the Assets in all material respects in accordance with applicable Law. Except as required by applicable Law, Seller has not intentionally destroyed or misplaced any Assets.

(f)    <u>Dispensing Report</u>. Attached hereto as <u>Schedule 4.1(f)</u> is a true, correct, and complete copy of the dispensing report prepared in connection with the Pharmacy Activities for the twelve (12) months prior to the Effective Date (the "**Pre-Closing Dispensing Report**"). As of the

Closing Date, Seller has provided Buyer with a true, correct, and complete copy of the dispensing report prepared in connection with the Pharmacy Activities that reflects the twelve (12) months prior to the Closing Date (the "**Closing Dispensing Report**", and together with the Pre-Closing Dispensing Report, the "**Dispensing Reports**"). The Dispensing Reports (i) are true, correct, and complete in all material respects, (ii) were prepared in accordance with historical business practices of Seller and applicable Law, and (iii) fairly present in all material respects the quantity of all prescriptions dispensed by the Pharmacy by any means.

(g)     <u>Non-Competition Covenants</u>. Seller is not subject to any non-competition covenant or other similar agreement restricting Seller's ability to sell the Assets (except as set forth in <u>Section 6.9</u> hereto), and following the Closing, Buyer and its Affiliates will not be subject to any such non-competition covenant or restrictive agreement by virtue of Buyer's purchase of the Assets.

(h)     [<u>Reserved</u>].

(i)     <u>Tax Returns and Audits</u>.

(i)     Seller and Parent each have timely filed (or will timely file) all Tax Returns that each was required to file for any Pre-Closing Tax Period. All such Tax Returns are, or will be, true, complete and correct in all respects and were completed in substantial compliance with all applicable laws. Seller and Parent each have timely paid (or will timely pay) all Taxes due and payable.

(ii)     There are no Encumbrances for Taxes on any of the Assets or any other assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax and to Seller's knowledge, no Taxing Authority is in the process of imposing any Encumbrance for Taxes on any of the Assets or any other assets of Seller (other than for Taxes not yet due and payable).

(iii)     Neither Seller nor Parent is the beneficiary of any extensions of time to file Tax Returns or waivers of statutes of limitations. No claim has ever been made by a Taxing Authority in a jurisdiction where Seller or Parent does not file Tax Returns that Seller or Parent is or may be subject to taxation by that jurisdiction. Neither Seller nor Parent is a party to any audit or other Proceeding by or involving any Taxing Authority related to Taxes or a Tax Return.

(iv)     Neither Seller nor Parent (i) is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2, (ii) is a party to any Tax allocation or sharing agreement (excluding commercial agreements entered into in the ordinary course of business the primary purpose of which does not relate to Taxes), (iii) has any liability for Taxes of any Person as a transferee, successor, by contract or otherwise or (iv) is, or has been, a party to, or a promoter of, a "listed transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

(j)     <u>Litigation and Proceedings</u>. Except as set forth on <u>Schedule 4.1(j)</u> attached hereto, and other than the Seller Bankruptcy Case, there are no, and in the previous three (3) years there have not been any, outstanding legal claims, demands, actions, suits, arbitrations, investigations, or other legal, administrative, or governmental audits or proceedings (each, a "**Proceeding**") pending or threatened against Seller or the Assets, or any person at any time employed or engaged by Seller in

the business or operation of the Pharmacy with respect to the Pharmacy Services or period of such employment or engagement, and no facts exist which have been, should have been, or should be reported under any professional liability insurance policy covering Seller or any person at any time employed or engaged by Seller in the operation of the Pharmacy. The Assets are not subject to any judgment, order, decree, settlement, corporate integrity agreement or deferred prosecution agreement of any court, Governmental Entity, or instrumentality.

(k)     Compliance with Law and Instruments.

(i)     Except as set forth on Schedule 4.1(k)(i), Seller is and has been during the three (3) years prior to Closing, maintaining the Assets in compliance in all material respects with all applicable Laws and Veterinary and Pharmacy Laws, and Seller has not during the three (3) years prior to Closing received any written notification claiming or asserting any violation of or liability pursuant to any Law with respect to the Assets. With respect to the Assets, any certificates of need or other Permits or approvals required for the construction or operation of the Pharmacy have been and were duly obtained, and such certificates of need, Permits, and approvals, if any, will remain in full force and effect immediately after the consummation of the transactions provided for herein. No Governmental Entity has during the three (3) years prior to Closing conducted or has given Seller any notice that it intends to conduct any audit or other review or investigation of the Pharmacy with respect to the Assets, except an audit, review or investigation conducted in the ordinary course of business.

(ii)     Seller has not arranged or contracted with (by employment or otherwise) any employee, individual or entity that Seller knows or should know has been convicted of or pled guilty or nolo contendere to any federal or state criminal offense or been subject to any disciplinary action under any Laws. Seller is not, nor is any employee of the Pharmacy, currently debarred, suspended, or excluded from participation in any Federal Health Care Program.

(l)     Permits and Licenses. Seller, its Affiliates, and all employees or contractors of the Pharmacy hold all permits, licenses, approvals, and authorizations that Seller or any of its Affiliates or employees or contractors of the Pharmacy are required by applicable Law to hold for the lawful conduct of Seller's business and the operation of the Pharmacy Activities (the "**Licenses**"). Each License is valid and in good standing, and none of the Licenses have expired or failed to renew. Neither Seller, its Affiliates, or any employee or contractor of the Pharmacy (i) is in material violation of any Licenses, and to Seller's knowledge, there is no pending or threatened proceeding by any Governmental Entity or third party in connection with any actual or alleged material violation of such Permits, or (ii) has received written notice that any Governmental Entity has taken or is taking action to limit, suspend, adversely modify, or revoke any Licenses or Permits of Seller.

(m)     Absence of Material Adverse Effect. To Seller's and Parent's knowledge, since January 1, 2024, Seller has operated the Pharmacy only in the ordinary course of business consistent with past practices and there has not been a Material Adverse Effect.

(n)     Insurance Policies. The Assets are covered by insurance policies held by Seller of a type customarily insured and covering property damage and loss of income by customary risks, including without limitation fire or other casualty, and adequate insurance protection against liabilities, claims, and risks it is customary to insure (the "**Insurance Policies**"). Schedule 4.1(n) sets forth a true and complete list of the Insurance Policies. No claims are pending under any Insurance Policy. Seller

has not received any written notification from any insurance carrier denying or disputing any claim made by Seller with respect to the Assets, denying or disputing the coverage for any claim, denying or disputing the amount of any claim, or regarding the possible cancellation of any policies.

(o)    No Brokers or Finders. No Person has, as a result of any act or failure to act by Seller or any Affiliate of Seller, nor as a result of the transactions contemplated hereby will any Person have as a result of any act or failure to act by Seller or any Affiliate of Seller any right, interest, or claim for any commission, fee, or other compensation as a broker, finder, or in any similar capacity in connection with the transactions contemplated by this Agreement.

(p)    Privacy and Security Compliance.

(i)    Seller is and in the three (3) years prior to Closing has been in compliance in all material respects with the applicable requirements of all Laws, all policies of Seller, and all obligations under any Contract related to the Assets, in each case applicable to the privacy and security of data or information or the processing or other use thereof by or on behalf of Seller in its ownership and use of the Assets ("**Information Requirements**"). There has been no notice or complaint made and received by Seller in the three (3) years prior to Closing regarding the processing or other use of Seller Information (as defined below) by or on behalf of Seller. Seller has not received any written notice or communication with respect to any allegation that Seller is or was not in material compliance with any Information Requirement in the three (3) years prior to Closing.

(ii)    Seller maintains and in the three (3) years prior to Closing has maintained such policies regarding the processing or other use of all data or information, processed or otherwise used by or on behalf of Seller in the ownership and use of the Assets ("**Seller Information**") as are required by Information Requirements. Without limiting the foregoing, Seller maintains and during the three (3) years prior to Closing has maintained a security program including reasonable and appropriate technical, administrative, and physical safeguards and measures covering all Seller Information that are designed to protect the security, confidentiality, integrity, and availability of the Seller Information in accordance with all Information Requirements.

(iii)    Seller has taken commercially reasonable measures to protect against the occurrence of any suspected or actual breach of security, violation of any security policy, or unauthorized access, acquisition, use, loss, denial or loss of use, destruction, compromise, or disclosure of any Seller Information, including any security incident ("**Security Event**"). Seller has not experienced any such Security Event during the three (3) years prior to Closing.

(iv)    Seller has obtained all consents, permissions, and authorizations required with respect to the processing and other use of all Seller Information by or on behalf of Seller.

(q)    Scope of Pharmacy Activities. Solely with respect to the Assets, for the last three (3) years, Seller does not bill, and has not billed, any Federal Health Care Program. Solely with respect to the Assets, Seller is not, and has not previously been, subject to HIPAA.

(r)    Full Disclosure. No representation or warranty by Seller or Parent in this Agreement and no statement contained in the Schedules or any other document furnished or to be

furnished to Buyer pursuant to this Agreement, including the Transaction Documents, when taken as a whole, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

        (s)      No Other Representations and Warranties. Except for the representations and warranties contained in this <u>Section 4.1</u> (including the related portions of the Schedules), Seller has not made or makes any other express or implied representation or warranty, either written or oral, including any representation or warranty as to the accuracy or completeness of any information, documents or material regarding the business of Seller, Pharmacy, Pharmacy Activities, and the Assets furnished or made available to Buyer and its Representatives in any form (including any information, documents, or material made available to Buyer in Seller's virtual data room or any management presentations made in expectation of the transactions contemplated hereby), or as to the future revenue, profitability, or success of the Pharmacy, or any representation or warranty arising from statute or otherwise in Law.

        4.2      <u>Representations and Warranties by Buyer</u>. As a material inducement for Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date, each of which is relied upon by Seller:

        (a)      <u>Organization and Good Standing</u>. Buyer is a corporation validly existing in good standing under the laws of the State of Delaware, with all requisite power and authority to carry on its business as presently conducted.

        (b)      <u>Due Authorization</u>. The execution, delivery, and performance of this Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Buyer in connection with the Agreement and the consummation of the transactions contemplated hereby by Buyer has been duly authorized, and no other approvals or authorizations are necessary in connection therewith. This Agreement and all other agreements, instruments, certificates, and documents executed and delivered by or on behalf of Buyer in connection herewith are the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, subject as to enforcement only to applicable bankruptcy, insolvency, reorganization, or other laws affecting the rights of creditors generally, or to equitable principles.

        (c)      <u>Compliance with Instruments and Agreements</u>. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby will not result in any material breach or material violation of any of the terms or provisions of, or constitute a breach of or default under, the organizational documents of Buyer any applicable Law, or any agreement, instrument, or commitment to which Buyer is a party or by which it is bound, except in the cases of the foregoing where the breach, violation or default would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated herein.

        (d)      <u>No Finders or Brokers</u>. No Person has, as a result of any act or failure to act by Buyer or any of its Affiliates, nor as a result of the transactions contemplated hereby will any Person have, as a result of any act or failure to act by Buyer or any of its Affiliates, any right, interest, or claim upon Seller for any commission, fee, or other compensation as a finder, broker, or in any similar capacity in connection with the transactions contemplated by this Agreement.

(e)     Legal Proceedings. There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any of its Affiliates that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

(f)     Sufficient Funds. Buyer has, or will have as of the Closing, sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

(g)     Independent Investigation. Buyer has conducted its own independent investigation, review and analysis of the Pharmacy and the Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, Books and Records and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Each of Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Section 4.1 of this Agreement (including related portions of the Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Pharmacy, Pharmacy Activities, the Assets or this Agreement, except as expressly set forth in Section 4.1 of this Agreement (including the related portions of the Schedules).

## ARTICLE 5
## CLOSING DELIVERABLES

5.1     Seller's Closing Deliverables. At the Closing, Seller shall deliver to Buyer the following (the "**Seller Deliverables**"):

(a)     The Closing Sales Statement;

(b)     A Bill of Sale, dated as of the Closing Date, substantially in the form attached hereto as Exhibit B, duly executed by Seller (the "**Bill of Sale**");

(c)     An executed certificate of Seller and Parent dated as of the Closing Date in form and substance reasonably satisfactory to Buyer certifying (i) as to the satisfaction of the conditions specified in Section 8.1(a) and Section 8.1(b) and (ii) the representative of Seller and Parent executing this Agreement and the other Transaction Documents or making certifications pursuant hereto has the requisite power and authority to so execute the foregoing on behalf of Seller and Parent, as the case may be, together with copies of any of resolutions duly adopted by Seller's and Parent's governing authority, authorizing and approving Seller's and Parent's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and any other agreement, instrument, certificate, and/or document to be executed and delivered by Seller and Parent, as applicable;

(d)     The Closing Dispensing Report;

(e)     Copies of all consents, approvals, and authorizations and all notices identified in Schedule 4.1(c);

(f)     A properly executed and completed IRS Form W-9 from Seller and Parent; and

(g)    Custody of the Assets.

5.2    <u>Buyer's Closing Deliverables</u>. At the Closing, Buyer shall deliver (or cause to be delivered) to Seller the following (the "**Buyer Deliverables**"):

(a)    The Bill of Sale, duly executed by Buyer;

(b)    An executed certificate of Buyer dated as of the Closing Date in form and substance reasonably satisfactory to Seller certifying (i) as to the satisfaction of the conditions specified in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> and (ii) the representative of Buyer executing this Agreement and the other Transaction Documents or making certifications pursuant hereto has the requisite power and authority to so execute the foregoing on behalf of Buyer; and

(c)    The Purchase Price.

**ARTICLE 6**
**COVENANTS**

6.1    <u>Operating Covenants</u>. From the Effective Date to the Closing Date, except as otherwise expressly contemplated or permitted by this Agreement, and except as set forth on <u>Schedule 6.1</u>, Seller shall, and Parent shall cause Seller to, conduct the Pharmacy, in substantially the same manner as operated and conducted immediately prior to the Effective Date and, unless consented to in writing by Buyer in advance, Seller shall:

(a)    use reasonable efforts to (i) preserve the business organization intact and (ii) preserve its present relationships with employees and suppliers, vendors, lessors, and customers in accordance with past practice over the past twelve (12) months;

(b)    keep in effect the Insurance Policies;

(c)    not (i) sell, lease, license, transfer, or otherwise dispose of any of the Assets, (ii) be a party to any merger, consolidation, restructuring or similar transaction or enter into any Contract for or otherwise agree to acquire any material assets, properties, or securities of any Person; (iii) create or permit to be created any Encumbrances on any of the Assets; (iv) terminate, enter into, amend, or modify any Contract that is material to the Assets outside of the ordinary course of business; (v) commence or enter into any compromise or settlement of any legal claim, demand, action, suit, arbitration, investigation, or other legal, administrative, or governmental proceeding, in each case with respect to the Assets; or (vi) agree or commit to any of the foregoing; and

(d)    Seller shall (i) afford Buyer and its Representatives full and free access to and the right to inspect all of the Assets, Books and Records, Contracts and other documents and data related to the Assets; (ii) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Assets as Buyer or any of its Representatives may reasonably request; and (iii) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Assets.

6.2    <u>Joint Communications Plan</u>. Following the Closing, Seller and Parent shall use commercially reasonable efforts to expeditiously perform pursuant to, and promptly comply in all material respects with, the Joint Communications Plan in substantially the form attached hereto as

Exhibit C (the "**Joint Communications Plan**"), and to the extent such obligations or agreements are capable of being performed or fulfilled prior to Closing (including for purposes of clarity, providing Buyer with all material data related to and necessary for the implementation of the Joint Communications Plan), shall perform or fulfill such obligations or agreements prior to Closing.

6.3     Notice of Developments. From the Effective Date to the Closing Date, Seller shall promptly notify Buyer in writing with respect to any matter, event or circumstance (i) arising on or before the Effective Date which was known by Seller and that would otherwise constitute a breach, violation or inaccuracy of any representation or warranty of Seller set forth herein, (ii) arising on or before the Effective Date which was not known by Seller and that would otherwise constitute a breach, violation or inaccuracy of any representation or warranty of Seller set forth herein, (iii) arising after the Effective Date that, if existing at, or occurring on the Effective Date, the Closing Date or any date in between the Effective Date and the Closing Date, would constitute a breach, violation or inaccuracy of any representation or warranty of Seller set forth herein, or (iv) relating to a breach or violation of any covenant, agreement or obligation of Seller set forth herein. No notification of a matter, event or circumstance set forth in the forgoing clauses (i) through (iv) shall be deemed to cure any breach, violation or inaccuracy of any representation or warranty or a breach or violation of any covenant, agreement or obligation, nor limit or alter any of the representations, warranties, covenants, agreements or obligations of Seller set forth in this Agreement nor any rights or remedies Buyer may have with respect thereto for purposes of Section 7.2 of this Agreement, *provided, however,* that if as a result of matters disclosed in pursuant to this Section 6.3, Buyer has the right to, but does not elect to, terminate this Agreement within ten (10) business days of its receipt of such information, then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.

6.4     [Reserved].

6.5     [Reserved].

6.6     Bankruptcy Court Matters.

(a)     Submission to Bankruptcy Court. Seller may file with the Bankruptcy Court this Agreement and such motions, pleadings and notices as may be appropriate in connection therewith.

(b)     Sale Order. Seller shall obtain the entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Cases in terms and in form and substance reasonably acceptable to Buyer. Buyer shall take such actions as are reasonably requested by Seller to assist in obtaining entry of a Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under Section 363(m) or any other Section of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) or any other Section of the Bankruptcy Code. Seller shall request that the Sale Order provide that it shall be effective and enforceable immediately upon entry by the Bankruptcy Court notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure. Seller agrees that it will not submit to the Bankruptcy Court a proposed Sale Order that has not been consented to by Buyer.

6.7     Further Assurances. Following the Effective Date, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Transaction Documents.

6.8    <u>Continuity of Care Arrangement</u>. Following the Closing and until the earlier of December 31, 2024 or Buyer's written direction to the contrary, Seller shall ensure continuity of care for all Current Customers pursuant to an arrangement entered into between Buyer and Seller that is subject to all Veterinary and Pharmacy Laws and all regulatory requirements and/or agreements, in a form to be agreed upon by the Parties (the "**Continuity of Care Arrangement**"). Subject to applicable Law, the Continuity of Care Arrangement shall provide (i) that each party to the Continuity of Care Arrangement shall bear its own costs with respect to the prescriptions filled thereunder; (ii) Seller shall retain the right to receive all reimbursement payments of any nature with respect to prescriptions filled by Seller;  and (iii) each party to the Continuity of Care Arrangement shall be liable for its acts and omissions in the performance of its obligations thereunder.

6.9    <u>Referral; Non-Disparagement, Non-Competition, Non-Solicitation and Confidentiality Covenants of Seller and Parent</u>.

(a)    Seller and Parent hereby expressly acknowledge (i) Buyer's substantial investment in the Assets and (ii) that each of them will receive substantial benefit from the consummation of the transactions hereunder. Seller and Parent further acknowledge and agree that the covenants, restrictions and obligations contained in this <u>Section 6.9</u> are a material inducement to Buyer to enter into this Agreement, and Buyer is doing so in reliance upon Seller and Parent agreeing to be bound by such covenants, restrictions and obligations. Accordingly, Seller and Parent hereby covenant and agree to be bound and abide by the restrictions set forth in this <u>Section 6.9</u>.

(b)    Except as prohibited by applicable Law, from and after the Closing Date, Seller and Parent shall use commercially reasonable efforts to refer to Buyer all business or leads related to the Pharmacy Activities, including any veterinary prescriptions and Current Customers or prospective customers across all pharmacy locations owned or controlled (whether directly or indirectly) by Parent, in accordance with the referral plan in substantially the form attached hereto as <u>Exhibit D</u> (the "**Referral Plan**").

(c)    Seller and Parent shall not, and shall cause their respective officers, directors, employees, shareholders, Representatives, agents, and Affiliates not to, whether directly or indirectly and whether oral or written, make any remark or statement that is or could reasonably be construed as disparaging in connection with the Pharmacy, Pharmacy Activities, Buyer, or Buyer's officers, directors, employees, shareholders, Representatives, agents, or Affiliates.

(d)    Except as set forth in the Continuity of Care Arrangement, during the Restricted Time Period, within the Restricted Area, Seller and Parent shall not (and shall cause its Affiliates not to), directly or indirectly (including via financial interests held by Seller or its Affiliates), either as an employer, consultant, agent, employee, independent contractor, principal, partner, member, stockholder (other than as a passive owner of less than five percent (5%) of the securities of a publicly held corporation), or in any other capacity, engage or participate in, consult with, or provide financial assistance to any Person engaged in or providing Pharmacy Activities. In no event shall the restrictions set forth in this <u>Section 6.9(d)</u> restrict an equity owner of Parent acting as a lender to any such Person engaged in or providing Pharmacy Activities.

(e)    During the Restricted Time Period, Seller and Parent shall not (and shall cause its Affiliates not to), either for its own account or for or in association with any other Person, either directly or indirectly, as an employer, consultant, agent, employee, independent contractor, principal, partner, member, stockholder (other than as a passive owner of less than five percent (5%) of the

securities of a publicly held corporation), or in any other capacity (provided, that in no event shall the restrictions set forth in this Section 6.9(e) restrict an equity owner of Parent acting as a lender to any such Person engaged in or providing Pharmacy Activities): induce, or attempt to induce, any employee or independent contractor of Buyer or any Affiliate of Buyer, to terminate his or her employment or engagement with Buyer or any Affiliate of Buyer. Notwithstanding anything to the contrary in this Section 6.9(e), Seller and Parent shall be permitted to, directly or indirectly (i) engage in general advertising, solicitations or hiring campaigns, programs or other efforts (whether or not conducted through an independent search firm) not specifically targeted or directed at such employees and hire any employees who respond to such solicitations and (ii) solicit or hire any employee who was terminated by Buyer or its Affiliates at least thirty (30) days prior to any such solicitation and hire by Seller or its Affiliates.

(f)     Seller and Parent expressly acknowledges that they have knowledge of certain business methods, trade secrets, and other proprietary information relating to or used or held for use in connection with the Assets ("**Confidential Information**"), which Confidential Information constitutes an Asset which Buyer is purchasing hereunder. Seller and Parent shall hold, and shall use their best efforts to cause their respective Representatives to hold, in confidence any and all Confidential Information. Except as required by applicable Law, Seller and Parent shall not (and shall cause their Affiliates not to) disclose, disseminate, or distribute, or induce any other Person to disclose, disseminate, or distribute, any Confidential Information, directly or indirectly, either for Seller's, Parent's, or their respective Affiliates' own benefit or for the benefit of any other Person, whether or not acquired, learned, obtained, or developed by Seller, Parent, or their respective Affiliates alone or in conjunction with others, and Seller and Parent shall not use or cause to be used (and shall cause their Affiliates not to use or cause to be used) any Confidential Information in any way. Notwithstanding the foregoing, the non-disclosure obligations set forth in this Section 6.9(f) shall not apply to any information (i) that becomes publicly available through no fault of Seller (other than if such availability results from a breach by Seller or Parent of this Agreement or any other relevant agreement or obligation of confidentiality) or (ii) that becomes available to Seller, Parent, or their respective Affiliates from and after the Closing, from a third party source that is not known by Seller to be under any obligations of confidentiality in respect of such information. The obligations set forth in this Section 6.9(f) shall be deemed by the Parties to be in addition to those obligations of Seller and Parent set forth in that certain Mutual Non-Disclosure Agreement, by and between Buyer and Parent, dated June 18, 2024, and shall not be deemed to supersede such obligations.

(g)     The Confidential Information includes, without limitation: (i) lists containing the names of customers, employees, principals, vendors, and suppliers of the Pharmacy; (ii) the past, present, and prospective methods, procedures, and techniques utilized by the Pharmacy in conducting the Pharmacy Activities, and identifying prospective referral sources, customers, and suppliers and in soliciting the business thereof; (iii) the methods, procedures, and techniques used in the operation of any of the Pharmacy's business, including the methods, procedures, and techniques utilized in marketing, pricing, applying, and delivering the Pharmacy Activities; and (iv) compilations of information, records, and processes.

(h)     Each covenant in this Section 6.9 shall be construed as an agreement that is independent of any other provision of this Agreement and, unless otherwise indicated herein, each such covenant shall survive the Closing of the transactions contemplated by this Agreement. The existence of any claim or cause of action of Seller against Buyer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Buyer of each of the covenants set forth in this Section 6.9.

(i)      If Seller and Parent violate any of covenants set forth in this <u>Section 6.9</u> and Buyer or any of its Affiliates brings legal action for injunctive or other relief hereunder, Buyer shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full Restricted Time Period of the protective covenants contained in this <u>Section 6.9</u>. Accordingly, the Restricted Time Period shall have a duration equal to the time period stated in <u>Section 1.79</u>, computed from the date relief is granted, but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by Seller or Parent.

(j)      Seller and Parent agree that the breach or attempted breach of Seller's or Parent's obligations under this <u>Section 6.9</u> may cause irreparable injury to Buyer and that any remedy at law may be inadequate, and therefore agree, in addition to any other relief, that Buyer and its Affiliates will be entitled to seek injunctive and other equitable relief in case of any such breach or attempted breach. Seller and Parent expressly waive any requirement that Seller or Parent could assert for the securing or posting of any bond in connection with the obtaining of such injunctive or other equitable relief.

(k)      Seller and Parent agree that the territorial, time and other restrictions set forth in this <u>Section 6.9</u> are reasonable and properly required for the adequate protection of the business and affairs of Buyer effective from and after the Closing. The Parties acknowledge and agree that if any of the restrictions set forth in this <u>Section 6.9</u> are adjudicated by a court of competent jurisdiction to be excessively broad, those restrictions determined to be excessively broad shall be reduced to the minimum extent necessary to make such restrictions enforceable, and the restrictions shall be enforced subject to such reduction. Any provision of this <u>Section 6.9</u> not so reduced shall remain in full force and effect as written.

6.10    <u>Tax Matters</u>.

(a)      <u>Transfer Taxes</u>. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) ("**Transfer Taxes**") attributable to the purchase and sale of the Assets hereunder shall be borne equally by Seller and Buyer. Seller shall timely file any Tax Return or other document which Seller is obligated to file with respect to such Transfer Taxes. The Parties shall cooperate with each other to the extent necessary to qualify for any statutory or regulatory exemption that a Party reasonably determines to be applicable under the circumstances.

(b)      <u>Property Taxes</u>. The amount of any personal property Tax, real property Tax, ad valorem Tax, transaction privilege Tax or similar Tax with respect to the Assets for any Straddle Period ("**Straddle Period Property Taxes**") shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in accordance with this <u>Section 6.10(b)</u>. The portion of such Straddle Period Property Taxes attributable to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the Straddle Period. The portion of any Straddle Period Property Tax attributable to a Post-Closing Tax Period shall be calculated in a corresponding manner. Seller shall be liable for the amount of such Straddle Period Property Taxes attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the amount of such Straddle Period Property Taxes attributable to the Post-Closing Tax Period.

(c)    Tax Returns. Except as otherwise provided in Section 6.10(a) above, (i) Seller and Parent shall prepare, or cause to be prepared, and timely file or cause to be timely filed, all Tax Returns, and pay all Taxes with respect to the Pharmacy and the Assets for any Pre-Closing Tax Period (if any) in accordance with past practices unless otherwise required by applicable Law, and (ii) Buyer shall file all Tax Returns with respect to the Assets for all Post-Closing Tax Periods.

(d)    Tax Payment. Straddle Period Property Taxes and Transfer Taxes shall be timely paid, and all applicable filings, reports and Tax Returns shall be filed, as provided by applicable Law and the terms of this Agreement. The paying Party shall be entitled to reimbursement from the non-paying Party to the extent provided in Section 6.10(a) or Section 6.10(b), as the case may be. Upon payment of any such Straddle Period Property Tax or Transfer Tax, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under Section 6.10(a) or Section 6.10(b), as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying Party shall make such reimbursement promptly but in no event later than 10 days after the presentation of such statement.

(e)    Cooperation. Buyer and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Pharmacy and the Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for any Tax audit, for the preparation for any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters. Any Tax audit or other Tax proceeding shall be deemed a Third Party Suit subject to the procedures set forth in this Section 6.10 and not Section 7.4.

6.11    Misallocated Assets. From and after the Closing, if Seller, Parent, or any of their respective Representatives or Affiliates receives or collects any funds relating to any Asset, then Seller, Parent or their respective Representatives or Affiliates shall remit such funds to Buyer, to an account specified by Buyer in writing, no later than five (5) business days after its receipt thereof. From and after the Closing, if Buyer receives or collects any funds relating to any Excluded Asset, Buyer shall remit any such funds to Seller, to an account specified by Seller in writing, within five (5) business days after its receipt thereof.

## ARTICLE 7
## INDEMNIFICATION

7.1    Indemnification by Buyer. Buyer covenants and agrees to indemnify and hold Seller, Parent, and each of their respective successors and assigns and its Affiliates, officers, directors, managers, members, shareholders, employees, and agents at all times harmless from and against any Loss incurred or to be incurred by any of them caused by or arising out of or in connection with (a) any misrepresentation, breach of, or inaccuracy in any representation or warranty made by Buyer in this Agreement, or any other Transaction Document; (b) any breach of, or failure to timely perform, any covenant or agreement of Buyer in this Agreement, or any other Transaction Document; or (c) the ownership, use or possession of the Assets following the Closing Date.

7.2    Indemnification by Seller and Parent. Seller and Parent, jointly and severally, covenant and agree to indemnify and hold Buyer and each of its successors and assigns and its Affiliates, officers, directors, managers, members, shareholders, employees, and agents at all times harmless from and against any Loss incurred or to be incurred by any of them caused by or arising out of or in connection with (a) any misrepresentation, breach of, or inaccuracy in any representation or warranty made by

Seller in this Agreement, or any other Transaction Document; (b) any breach of, or failure to timely perform, any covenant or agreement of Parent or Seller in this Agreement, or any other Transaction Document; (c) the ownership, use or possession of the Assets prior to the Closing Date; (d) the ownership, use or possession of the Excluded Assets, or (e) any Excluded Liabilities.

7.3     Undisputed Claims. A party (the "**Indemnified Party**") may assert a Claim that it is entitled to, or may become entitled to, indemnification under this Agreement by giving notice of its Claim to the party or parties that are, or may become, required to indemnify the Indemnified Party (the "**Indemnifying Party**," whether one or more), providing reasonable details of the facts giving rise to the Claim and a statement of the Indemnified Party's Loss in connection with the Claim, to the extent such Loss is then known to the Indemnified Party and, otherwise, an estimate of the amount of the Loss that it reasonably anticipates that it will incur or suffer. The parties shall attempt in good faith to resolve any differences during the forty-five (45) day period following the date of delivery of the Indemnifying Party's notice of claim (the "**Resolution Period**"), and (b) if the parties fail to resolve their disagreement during the Resolution Period, then the Indemnified Party may file suit with respect to any amounts in dispute, in accordance with Section 10.4 and pursuant to any other terms, conditions and limitations of this Agreement.

7.4     Third Party Suits. In the case of any Third Party Suit, the Indemnified Party shall control the defense and settlement of the Third Party Suit, and the Indemnifying Party may, at its own expense, participate in (but not control) the defense and employ counsel separate from the counsel employed by the Indemnified Party; *provided*, *however*, that the Indemnified Party may demand that the Indemnifying Party assume control of the defense of the Third Party Suit at any time during the course of the suit. If the Indemnifying Party assumes control of the defense of a Third Party Suit after such a demand, (a) the Indemnifying Party shall consult with the Indemnified Party with respect to the Third Party Suit upon the Indemnified Party's reasonable request for consultation, and (b) the Indemnified Party may, at its expense, participate in (but not control) the defense and employ counsel separate from the counsel employed by the Indemnifying Party. Regardless of whether the Indemnifying Party assumes the defense of the Third Party Suit, all parties shall cooperate in its defense.

7.5     Source of Recovery. Any indemnity obligation of Seller or Parent shall be settled by either of the following, at the election of Buyer: (i) a cash payment from Seller or Parent by wire transfer of immediately available funds within five (5) business days after the final determination thereof, or (ii) a reduction to the Earn-out Payment, if any. Notwithstanding the foregoing, if Seller has earned an Earn-out Payment such that the Earn-out Payment is owed and payable to Seller pursuant to Section 2.3, then Buyer shall first seek recovery from the Earn-out Payment prior to seeking recovery pursuant to (i) hereof. Any indemnity obligation of Buyer may be settled by a cash payment from Buyer by wire transfer of immediately available funds within five (5) business days after the final determination thereof.

7.6     Additional Agreements.

(a)     Each representation and warranty of any of the Parties set forth in this Agreement shall survive the Closing for a period of fifteen (15) months, *provided* that Fundamental Representations shall survive the Closing for the longer of (i) a period of four (4) years, or (ii) sixty (60) days after the expiration of the applicable statute of limitations. Each covenant and agreement of any of the Parties set forth in this Agreement shall survive until such covenant and agreement has been fully performed in accordance with its terms, including for purposes of clarity, the covenant set forth

in Section 6.5 hereof. Buyer, Seller, and Parent further acknowledge that the time periods set forth in this Section 7.6 for the assertion of claims under this Agreement are the result of arms'-length negotiation among Buyer, Seller, and Parent and that they intend for the time periods to be enforced as agreed by Buyer, Seller, and Parent.

(b)     All amounts payable under Sections 7.1 or 7.2 shall be treated for all Tax purposes as adjustments to the Purchase Price, except as otherwise required by Law.

7.7     Limitations.

(a)     The amount of any Losses claimed by an Indemnified Party under this Article 7 shall be net of any insurance proceeds actually paid to such Indemnified Party in connection with the facts giving rise to the right of indemnification (less any out-of-pocket expenses, including from increased premiums resulting from such payment, incurred by the Indemnified Party in connection with obtaining such insurance proceeds or other recoveries).

(b)     The aggregate liability of Seller or Parent for Losses (a) pursuant to a breach of the representations and warranties contained herein (other than a Fundamental Representation), shall not exceed fifteen percent (15%) of the Purchase Price, or (b) pursuant to a breach of any Fundamental Representation, shall not exceed the Purchase Price (the foregoing, collectively, the "**Indemnity Cap**"). Notwithstanding the foregoing, the Indemnity Cap shall not apply to claims arising in connection with the Indemnifying Party's Fraud or Taxes accrued to Seller or Parent.

(c)     Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any indemnifiable Loss arising under this Article 7 upon becoming aware of any such Loss.

(d)     With respect to any claim as to which the Indemnified Party may be entitled to indemnification under Section 7.1(a) or Section 7.2(a), as the case may be, the Indemnifying Party shall not be liable for any individual or series of related Losses unless and until such Losses exceed $35,000, in which case the Indemnifying Party shall be liable for the full amount of such Losses in excess of $35,000.

(e)     In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special, or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple. An Indemnified Party may not recover duplicative Losses in respect of a single set of facts or circumstances under more than one representation, warranty, covenant, or agreement in this Agreement.

7.8     Exclusive Remedy. The Parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from Fraud) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article 7. Nothing in this Section 7.8 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to this Agreement or to seek any remedy on account of any Fraud.

## ARTICLE 8
## CONDITIONS TO CLOSING

8.1     Conditions to Obligations of Buyer. The obligations of Buyer to effect the Closing are subject to the fulfillment, at or before the Closing, of the following conditions (all or any of which may be waived in writing in whole or in part by Buyer, in its discretion, to the extent permitted by Law):

(a)     Representations and Warranties. Each of the representations and warranties set forth in Section 4.1 shall be true and correct in all material respects, in each case as of the Closing Date as though made on the Closing Date (except to the extent that any such representation and warranty by its terms is limited to a specified date, in which case as of such specified date).

(b)     Covenants. Seller and Parent shall have performed or complied in all material respects with all covenants, agreements, and conditions contained in this Agreement and any other agreements, documents or instructions contemplated hereby required to be performed or complied with by Seller at or prior to the Closing.

(c)     SBH Sale Order. The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case in form and substance reasonably acceptable to Buyer, and the Sale Order shall be a Final Order and remain in full force and effect. Among other things, the Sale Order shall provide for a sale of the Assets to Buyer free and clear of all Encumbrances, with the Encumbrances attached to the sale proceeds. Seller agrees that it will not submit to the Bankruptcy Court a proposed Sale Order that has not been consented to by Buyer.

(d)     TPA Purchase Agreement. Buyer, TPA, and Parent shall have entered into the TPA Purchase Agreement.

(e)     Seller Deliverables. Seller shall have delivered the Seller Deliverables to Buyer.

8.2     Conditions to Obligations of Seller. The obligations of Seller to effect the Closing are subject to the fulfillment, at or before the Closing, of the following conditions (all or any of which may be waived in writing in whole or in part by Seller to the extent permitted by Law):

(a)     Representations and Warranties. Each of Buyer's representations and warranties set forth in Section 4.2 shall be true and correct in all material respects, in each case as of the Closing Date as though made on the Closing Date (except to the extent that any such representation or warranty by its terms is limited to a specified date, in which case as of such specified date).

(b)     Covenants. Each of the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement and any other agreements contemplated herein at or prior to the Closing shall have been duly performed and complied with in all material respects.

(c)     Buyer Deliverables. Buyer shall have delivered the Buyer Deliverables to Seller.

8.3     Conditions Precedent to Obligations of Buyer and Seller. The obligations of both of Buyer and Seller to consummate the transactions contemplated hereby at the Closing shall be subject to the Bankruptcy Court's entry of the Sale Order, and are subject to the fulfillment, at or before the

Closing, of the following conditions (which may be waived in writing in whole or in part by the Parties in their discretion, to the extent permitted by Law): No Proceeding of any Governmental Entity restraining, enjoining or otherwise preventing or materially delaying the consummation of this Agreement or the transactions contemplated hereby shall be outstanding, and no Proceeding or other legal action, whether at law or in equity, or before or by any Governmental Entity, shall be pending or threatened in writing wherein an unfavorable outcome would (a) prevent or enjoin the performance of this Agreement or the consummation of the transactions contemplated hereby or declare unlawful any of the transactions contemplated hereby or (b) cause any of the transactions contemplated hereby to be rescinded following consummation.

       8.4    <u>Frustration of Closing Conditions</u>. No Party may rely on the failure of any condition set forth in <u>Sections 8.1</u>, <u>8.2</u>, or <u>8.3</u>, as the case may be, if such failure was primarily due to such Party's failure to comply with any provision of this Agreement.

**ARTICLE 9**
**<u>TERMINATION</u>**

       9.1    <u>Termination Events</u>. This Agreement may be terminated prior to the Closing only as follows:

       (a)    by written notice from Buyer or Seller to the other Party, if the Closing has not occurred on or before April 1, 2025 (the "**Outside Date**") or such later date as Buyer and Seller may mutually agree upon in writing, *provided*, that the right to terminate this Agreement pursuant to this <u>Section 9.1(a)</u> shall not be available to any Party whose breach of this Agreement has been the primary cause of any condition or conditions not being capable of being satisfied prior to the Outside Date.

       (b)    by written notice from Buyer to Seller, in the event Seller materially breaches or fails to perform any of its covenants contained in this Agreement, or any of Seller's representations or warranties is materially inaccurate, and such breach, failure to perform, or inaccuracy could give rise to the failure of a condition set forth in <u>Section 8.1</u> (a "**Seller Terminating Breach**"), and such breach or inaccuracy has not been cured (if curable) within the earlier of (x) twenty (20) days following Seller's receipt of written notice of such breach from Buyer and (y) one (1) business day prior to the Outside Date, except that the right of Buyer to terminate in accordance with this <u>Section 9.1(b)</u> will not be available if there is an uncured Buyer Terminating Breach at the time Buyer seeks to terminate under this <u>Section 9.1(b)</u>;

       (c)    by written notice from Seller to Buyer, in the event the Buyer materially breaches or fails to perform any of its covenants contained in this Agreement, or any of the Buyer's representations or warranties is materially inaccurate, and such breach, failure to perform, or inaccuracy would give rise to the failure of a condition set forth in <u>Section 8.2</u> (a "**Buyer Terminating Breach**") and such breach or inaccuracy has not been cured (if curable) within the earlier of (x) twenty (20) days following Buyer's receipt of written notice of such breach from Seller and (y) one (1) business day prior to the Outside Date, except that the right of Seller to terminate in accordance with this <u>Section 9.1(c)</u> will not be available if there is an uncured Seller Terminating Breach at the time Seller seeks to terminate under this <u>Section 9.1(c)</u>;

       (d)    by either Buyer or Seller by written notice to the other, if any order or determination by the Bankruptcy Court or any Governmental Entity of competent jurisdiction permanently restraining, enjoining or otherwise preventing the consummation of the transactions

contemplated hereby has been issued and becomes final and non-appealable, except that the right to terminate this Agreement under this <u>Section 9.1(d)</u> shall not be available to a Party if such order or determination was primarily due to the failure of such Party to perform any of such Party's covenants or agreements under this Agreement;

(e)    by mutual written consent of Buyer and Seller;

(f)    by Buyer, if at any time Parent or TPA materially default under and in accordance with the terms of the TPA Purchase Agreement, and such default shall be deemed by each of the Parties to be a default of Parent or TPA under each of the TPA Purchase Agreement and this Agreement (as applicable); or

(g)    by Seller, if at any time Buyer materially defaults under and in accordance with the terms of the TPA Purchase Agreement, and such default shall be deemed by each of the Parties to be a default of Buyer under each of the TPA Purchase Agreement and this Agreement.

9.2    <u>Effect of Termination</u>. Each Party's right of termination under <u>Section 9.1</u> is in addition to any other rights such Party may have under this Agreement. If this Agreement is terminated pursuant to <u>Section 9.1</u>, then this Agreement and all obligations of the Parties under this Agreement will terminate and no Party shall have any liability hereunder, except that <u>Article 1</u>, <u>Section 6.9(f)</u>, this <u>Section 9.2</u> and <u>Article 10</u> shall survive and nothing herein shall relieve any Party hereto from liability arising out of Fraud, willful misconduct or intentional misrepresentation occurring prior to such termination.

## ARTICLE 10
## MISCELLANEOUS

10.1    <u>Expenses</u>. Each Party shall pay its own expenses incident to preparing and entering into this Agreement and the consummation of the transactions contemplated hereby.

10.2    <u>Notices</u>. All notices, requests, demands, and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when received if delivered personally; mailed by first class mail, postage prepaid, registered or certified mail, return receipt requested; delivered by Federal Express or other overnight courier service; or sent by e-mail or other online transmission system with written confirmation of delivery, as follows:

If to Buyer:            Fred Dijols
                        Mixlab, Inc.
                        336 West 37th Street, Suite 850
                        New York, New York 10018

with a copy (which shall not constitute notice) to:

                        Quarles & Brady LLP
                        Two North Central Avenue, Suite 600
                        Phoenix, Arizona 85004
                        Attention: Amy Cotton Peterson
                        Email: Amy.Peterson@quarles.com

If to Seller:                     SBH Medical, Ltd.
                                  c/o Optio Rx, LLC
                                  3701 Commercial Ave., Suite 14
                                  Northbrook, IL 60062
                                  Attention: Leo LaFranco
                                  Email: llafranco@optiorx.com

        with a copy (which shall not constitute notice) to:

                                  Stoel Rives LLP
                                  760 SW Ninth Ave., Suite 3000
                                  Portland, OR 97205
                                  Attention: Kevin Burnett
                                  Email: Kevin.Burnett@stoel.com

If to Parent:                     Optio Rx, LLC
                                  3701 Commercial Ave., Suite 14
                                  Northbrook, IL 60062
                                  Attention: Leo LaFranco
                                  Email: llafranco@optiorx.com

        with a copy (which shall not constitute notice) to:

                                  Stoel Rives LLP
                                  760 SW Ninth Ave., Suite 3000
                                  Portland, OR 97205
                                  Attention: Kevin Burnett
                                  Email: Kevin.Burnett@stoel.com

        10.3    <u>Governing Law</u>. This Agreement, the negotiation, terms and performance of this Agreement, the rights of the Parties under this Agreement, and any proceeding or other legal action arising in whole or in part under or in connection with this Agreement, are to be governed by and construed in accordance with the domestic substantive laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

        10.4    <u>Submission to Jurisdiction and Venue; Waiver of Jury Trial</u>. Any proceeding or other legal action relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced exclusively in the Bankruptcy Court or in the Delaware Court of Chancery, located in the City of Wilmington and County of New Castle Delaware (collectively, "**Chosen Court**"). Each party: (i) expressly and irrevocably consents and submits to the exclusive jurisdiction of the Chosen Court (and each appellate court to the Chosen Court) in connection with any such proceeding or other legal action; (ii) agrees that the Chosen Court shall be deemed to be a convenient forum; and (iii) agrees not to assert (by way of motion, as a defense or otherwise), in any such proceeding commenced in the Chosen Court, any claim that such party is not subject personally to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Agreement or the subject matter of this Agreement

may not be enforced in or by such court. EACH PARTY HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY PROCEEDING IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT.

10.5    Headings; Plurals; Gender. The headings of the articles, sections, and paragraphs herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

10.6    Entire Agreement. The recitals are incorporated herein by reference. This Agreement (including the Schedules and Exhibits referred to herein) sets forth the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby and supersedes all prior agreements, arrangements, and understandings, whether written or oral, related to the subject matter hereof, including the non-binding, confidential letter of intent, by and between Seller and Buyer dated October 21, 2024.

10.7    Survival; Limitation on Actions. The terms, provisions, covenants, representations, warranties, and conditions of this Agreement shall survive the Closing subject to the limitations set forth herein. All of the terms, provisions, covenants, representations, warranties, and conditions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

10.8    Amendment; No Waiver. This Agreement may be amended, modified, superseded, or canceled, and any of the terms, provisions, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by all Parties, or, in the case of a waiver, by the party waiving compliance. The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect the right to enforce the same. No waiver by any party of any condition, or of the breach of any term, provision, covenant, representation, or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, provision, covenant, representation, or warranty.

10.9    Severability. In the event that any one or more of the provisions of this Agreement shall be held or otherwise found to be invalid, illegal, or unenforceable, all other provisions hereof shall be given effect separately therefrom and shall not be affected thereby. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

10.10    Assignment; No Third Party Beneficiary. None of the Parties shall assign any of its rights or obligations hereunder without the prior written consent of the other Parties; *provided*, *however*, and notwithstanding the foregoing, that Buyer may (a) prior to or at the Closing assign all or any portion of Buyer's rights and obligations pursuant to this Agreement to any other wholly owned subsidiary or Affiliate of Buyer (provided that such assignment shall not relieve Buyer from any obligations under this Agreement) and (b) concurrently with or after the Closing, assign any or all of its rights hereunder without any consent or approval of any other party to this Agreement. For the avoidance of doubt, a change of control of Buyer shall be deemed to be an assignment or transfer and

shall be subject to this <u>Section 10.10</u>. Except for any such valid assignment and except as set forth in <u>Section 7.1</u>, <u>Section 7.2</u> or <u>Section 10.7</u> of this Agreement, this Agreement is for the sole benefit of the undersigned Parties and is not for the benefit of any third party.

10.11    <u>Counterparts; Electronic Delivery</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. If this Agreement is originally executed and a copy or counterpart thereof is transmitted by electronic mail (including DocuSign), such transmitted document shall be deemed to be an original.

10.12    <u>Construction</u>. The Parties acknowledge and agree that this Agreement has been negotiated at arm's length and between Parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement and were represented by counsel in connection with this Agreement and that each of them and its counsel has reviewed and revised this Agreement, or has had an opportunity to do so. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties as set forth in this Agreement.

[*Remainder of page intentionally left blank; signature page follows*]

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the Effective Date.

<u>**BUYER**</u>:

Mixlab, Inc.

By: _____
Name: Frederic Dijols
Title: President

<u>**SELLER**</u>:

SBH Medical, Ltd.

By: _____
Name: _____
Title: _____

<u>**PARENT**</u>:

Optio Rx, LLC

By: _____
Name: _____
Title: _____

*[Signature Page to SBH Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the Effective Date.

<u>**BUYER**</u>:

Mixlab, Inc.

By: _____
Name: _____
Title: _____

<u>**SELLER**</u>:

SBH Medical, Ltd.

By: _____
Name: ___Ben David_____
Title: ___CEO_____

<u>**PARENT**</u>:

Optio Rx, LLC

By: _____
Name: ___Ben David_____
Title: ___CEO_____

# **EXHIBIT A**

# **EARN-OUT METHODOLOGY**

**SBH Earnout Calculation**

| | |
|---|---:|
| TTM Sales at Closing | $1,077,000 |
| TTM Sales at Measurement Date | $1,077,000 |
| **Delta** | **$0** |
| EBITDA Margins | 29% |
| **EBITDA Lost** | **$0** |
| xEBITDA | 4.5x |
| **Reduction in Earnout** | **$0** |
| | |
| Earnout Maximum | $277,000 |
| Reduction in Earnout | $0 |
| **Earnout Paid** | **$277,000** |
| % of Earnout | 100.00% |

# EXHIBIT B

## BILL OF SALE

## BILL OF SALE

This Bill of Sale (this "**Bill of Sale**") is entered into as of [●] (the "**Closing Date**") by and between [Mixlab WI, LLC, a Delaware limited liability company] ("**Buyer**"), and [SBH Medical, Ltd., an Ohio limited liability company / The Pet Apothecary, LLC, a Wisconsin limited liability company] ("**Seller**").

Capitalized terms not otherwise defined herein have the meanings assigned to them in that certain Asset Purchase Agreement dated as of [●] by and among Buyer, Seller and Optio Rx, LLC, a Delaware limited liability company (the "**Purchase Agreement**").

## <u>RECITALS:</u>

**WHEREAS**, pursuant to the Purchase Agreement, Buyer and Seller are entering into this Bill of Sale;

**WHEREAS**, simultaneously with the execution and delivery of this Bill of Sale, Seller desires to sell to Buyer all of the Assets, free and clear of all Encumbrances, but in all cases excluding the Excluded Assets, as of the Closing Date in accordance with the terms and conditions of the Purchase Agreement; and

**WHEREAS**, Seller desires to deliver to Buyer such instruments of sale, transfer, conveyance, and delivery as are required to sell, convey, transfer, and deliver to Buyer all of the Assets.

**NOW, THEREFORE**, in consideration of the recitals, which are hereby incorporated by reference, and of the consummation of the transactions contemplated by the Purchase Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties intending to be legally bound agree as follows:

1.    **Sale and Purchase**. Upon all of the terms and subject to all of the conditions of this Bill of Sale, except as set forth in <u>Section 2</u> below, Seller hereby sells, transfers, conveys and delivers to Buyer, and Buyer hereby purchases, all of Seller's right, title, and interest in, to and under the Assets.

2.    **<u>Excluded Assets and Excluded Liabilities</u>**. Notwithstanding the foregoing or anything else to the contrary, no Excluded Assets are transferred, conveyed, or delivered to Buyer pursuant to this Bill of Sale, and Buyer assumes no liabilities of Seller of any kind, including any Excluded Liabilities  and the parties agree that all liabilities of Seller, including the Excluded Liabilities, shall remain the sole responsibility of Seller.

3.    **Agreement**. Nothing contained in this Bill of Sale shall be deemed to supersede or otherwise affect any of the obligations, agreements, covenants, representations or warranties of Buyer and Seller contained in the Purchase Agreement. This Bill of Sale is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including, without limitation, the representations, warranties and covenants set forth in the Purchase Agreement).

4. **Third Parties**.   Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Bill of Sale.

5. **Further Assurances**. Each party, for itself and its successors and assigns, hereby covenants that at any time and from time to time after the delivery of this instrument, at such other party's request and expense, such party will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, such further acts, conveyances, transfers, assignments, powers of attorney and assurances as may be reasonably requested and as may be necessary to more effectively convey, transfer and vest in Buyer any of the Assets or to better effectuate the intent and purposes hereof.

6. **Binding Effect**. This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives, and assigns.

7. **Governing Law; Dispute Resolution**. This Bill of Sale shall be construed and enforced in accordance with the laws of the State of Delaware. All claims and disputes arising under this Bill of Sale shall be governed by the dispute resolution provisions contained in the Purchase Agreement.

8. **Successors and Assigns**.  This Bill of Sale shall be binding upon and inure solely to the benefit of each party hereto and its respective successors and permitted assigns, and nothing in this Bill of Sale, express or implied, is intended to or shall confer upon any other person any rights, interests, benefits or remedies of any nature whatsoever under or by reason of this Bill of Sale.

9. **Severability**.  Should any term, provision or paragraph of this Bill of Sale be determined to be illegal or void or of no force and effect, the balance of the Bill of Sale shall survive.

10. **Electronic Signatures**. This Bill of Sale may be executed and delivered by electronic transmission, including email. Any electronic signatures shall have the same legal effect as manual signatures. This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties hereto had signed the same signature page.

*[Remainder of this page intentionally left blank. Signature page follows.]*

       **IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed by their respective duly authorized representatives as of the day and year first above written.

**<u>BUYER</u>**:
[MIXLAB WI, LLC]


By:_____
Name:
Title:


**<u>SELLER</u>**:
[SBH MEDICAL, LTD. / THE PET
APOTHECARY, LLC]


By:_____
Name:
Title:

**<u>EXHIBIT C</u>**

**JOINT COMMUNICATIONS PLAN**

*[Exhibit C]*

## SBH to Mixlab Transition Marketing Plan

**Branding Strategy and Communication Rollout**

**Objective**: Communicate that SBH is transitioning away from fulfilling veterinary prescriptions to focus exclusively on human anti-aging and wellness. Position Mixlab as the new, trusted veterinary provider chosen by SBH for their shared commitment to high-quality, personalized care.

**Transition Messaging:**

*SBH has made the strategic decision to focus exclusively on human anti-aging and wellness and will no longer fulfill veterinary prescriptions. To ensure continued high-quality service for their veterinary customers, SBH selected Mixlab, a modern, full-service veterinary pharmacy specializing in compounded, commercial, and over-the-counter medications for animals of all sizes across all 50 states. SBH recognized Mixlab's dedication to delivering quality, personalized care with unmatched speed and reliability. This alignment in values and commitment to exceptional service made Mixlab the ideal choice to support SBH's veterinary customers in this new chapter.*

**Pre-Close and At-Close Communications**

- **Website Update for SBH**:
  Instead of updating the veterinary compounding page on SBH's website, SBH will now redirect the URL for this page to a dedicated landing page hosted by Mixlab. This Mixlab landing page will inform visitors about SBH's shift to human wellness, highlight Mixlab as the chosen veterinary provider, and provide options for signing up with Mixlab's services. This redirect will go live post-APA and pre-close, ensuring continuity for all veterinary customers.

- **Social Media Announcements**:
  Mixlab's social media channels will post coordinated messages explaining the transition and the decision by SBH to choose Mixlab for ongoing veterinary needs. These updates will occur pre-close, at close, and periodically post-close. Mixlab's marketing team will prepare the messaging and graphics for SBH to approve before posting.

- **IVR Update**:
  SBH's IVR system will be updated to include a dedicated veterinary option. Calls directed to this option will be forwarded to Mixlab's IVR, ensuring seamless service for veterinary customers. Mixlab will provide a pre-recorded message for continuity and customer ease.

- **Point of Sale:**
  To ensure clear communication at the point of sale, visible signage will be placed for customers picking up orders, explaining the transition. Additionally, postcards will be

included in all shipping and pick-up packages, reiterating SBH's transition to human wellness and Mixlab's role as the veterinary provider.

- **Practice Data:**
  Complete practice and prescriber data will be provided, including practice names, addresses, phone numbers, emails, and points of contact for all past practices and prescribers. This will enable Mixlab to maintain continuity in customer communication and service.

## Targeted Outreach and Personal Touchpoints

- **Direct Communications**:
  - **Letter**: A letter from SBH will detail the transition, inform prescribers and top customers of SBH's new focus on human wellness, and introduce Mixlab as the trusted veterinary provider. The letter will include a Mixlab Product Guide covering Mixlab's product offerings, service capabilities, and tech solutions, providing recipients with a comprehensive introduction to Mixlab. This letter will be distributed 2-3 weeks pre-close, with Mixlab covering production and mailing costs.

  - **Email Campaign**: An email reflecting the transition message will be sent to all SBH prescribers and customers with emails on file, approximately 1-2 weeks pre-close. The email will mirror the letter's content to maintain a consistent communication approach.

  - **Postcard Reminder**: A postcard reminder will be sent one week before closing to reinforce the transition message. The postcard will include a QR code directing recipients to a detailed landing page where they can learn more about Mixlab's services and sign up directly.

  - **Personalized Calls**: Jason and/or key SBH contacts will personally reach out to the top 74 prescribers (representing approximately 80% of sales) to inform them of the changes and introduce Ben Mathis, the designated Mixlab sales representative. Calls will ideally start one week post-APA signing.

- **In-Person Meetings with Key Clinics**:

  - **On-Site Meetings**: Vinnie, Ben, and Jason (or key SBH contact) will visit the top 20-30 clinics, coordinating lunch meetings to introduce the benefits of working with Mixlab. Each clinic will receive a swag bag with Mixlab-branded items, reinforcing Mixlab's commitment to high-quality service and customer support.

## Mass Notifications

- **Bulk SMS**: Pending approval, a bulk SMS will notify all SBH prescribers and customers with available phone numbers about the transition. Mixlab will prepare the message and workflow, in collaboration with SBH and OptioRx, ideally 1-2 weeks pre-close.

**Timeline Overview (Key Dates)**

| Task | Owner | Timing |
|---|---|---|
| Draft initial website update | Mixlab | Post-APA |
| Send co-branded letter | Mixlab | 2-3 weeks pre-close |
| Send co-branded email | Mixlab | 1-2 weeks pre-close |
| Start personalized calls to prescribers | Jason/key SBH contact | 1 week post-APA |
| Conduct in-person meetings with clinics | Vinnie/Ben/Jason (or key SBH contact) | Weeks leading to close |

**EXHIBIT D**

**REFERRAL PLAN**

**Exhibit D (the "Referral Plan")**

# OptioRx & SBH Medical Pharmacy Referral Plan

## Overview

The purpose of this document is to outline the referral process for veterinary prescriptions transitioning from OptioRx/SBH Medical Pharmacy to Mixlab. This plan includes internal communications, referral channels, customer notification processes, and audit and enforcement measures to ensure a seamless transition and accountability.

## Internal Communications

- **OptioRx Internal Communications:** Notify all relevant OptioRx staff, especially those handling customer interactions, of the transition and referral process to Mixlab.

- **General Manager Communication:**
  - An email will be sent at closing to General Managers at all OptioRx locations, detailing Mixlab's role as the veterinary pharmacy partner.

    - **Email 0: Closing Announcement:**

      *"Subject: Important Update: Transition of Veterinary Prescription Services to Mixlab*

      *Dear [General Manager's Name],*

      *We are writing to inform you of an important change in our veterinary prescription services. SBH Medical and OptioRx have made the strategic decision to focus exclusively on human health and will no longer fulfill veterinary prescriptions. To ensure continued high-quality service for our veterinary clients, we have selected Mixlab, a trusted veterinary pharmacy, to fulfill all veterinary prescriptions moving forward. This transition allows SBH and OptioRx to focus fully on human health and wellness, while ensuring that our veterinary clients continue to receive high-quality medication and care.*

      *Here's what this means for you and your team:*

      - *Veterinary Prescriptions: Effective immediately, all veterinary prescriptions and inquiries should be directed to Mixlab. Mixlab specializes in compounded, commercial, and over-the-counter medications for animals and provides exceptional service, including free next-day delivery.*

      - *Referral Process:*
        *For detailed instructions on directing veterinary prescription inquiries and forwarding prescriptions to Mixlab, please refer to the referral plan document.*

*This document outlines the full process for handling phone, email, fax, and physical prescription referrals.*

*Mixlab is committed to providing seamless, high-quality service to our veterinary clients, and we are confident that they will maintain the standards our customers expect.*

*Please ensure that all relevant team members are familiar with these referral procedures. We will be in touch with periodic updates and reminders to support this transition.*

*If you have any questions or need further clarification, please don't hesitate to reach out.*

*Thank you for your support in making this transition as smooth as possible.*

*Best,*
*[Your Name]"*

- Follow-up emails will be sent 3, 6, and 12 months post-close to ensure continued awareness.

  - **Email 1: 3-Month Follow-Up:**

    *"**Subject:** 3-Month Update on Veterinary Referrals to Mixlab*

    ***Dear [General Manager's Name],***

    *It's been three months since SBH selected Mixlab to support our veterinary customers, allowing SBH to focus exclusively on human health and wellness. As a modern, full-service veterinary pharmacy, Mixlab is dedicated to providing exceptional care and reliable service to meet our veterinary customers' needs.*

    *As a reminder, please continue to follow these steps for handling veterinary prescription referrals:*

    - ***Phone Referrals**: Direct all veterinary prescription inquiries to the designated Mixlab referral phone number 1 (347) 308-5760. Calls will be received by Mixlab's Care team after a welcome message plays for SBH customers.*

    - ***Email & Fax Referrals**: Forward all relevant prescriptions to optiorxvet@mixlab.com for Mixlab processing.*

    - ***Website Referrals**: Veterinary customers visiting our veterinary compounding page will be redirected to a Mixlab-hosted landing page.*

    - ***Physical Prescriptions**: Follow the protocol for scanning and emailing non-controlled prescriptions and handling controlled substance prescriptions as outlined.*

    *These processes are key to ensuring a smooth transition and continued high-quality service for our veterinary customers. We'll reach out again in three months to check in on this process.*

2

*Thank you for your attention to this important plan!*

*Best,*
*[Your Name]*
*[Your Position]"*

■ **Email 2: 6-Month Follow-Up:**

*"**Subject:** 6-Month Update on Veterinary Referrals Transitioning to Mixlab*

***Hello [General Manager's Name],***

*We're now at the 6-month mark since SBH transitioned its veterinary prescriptions to Mixlab. Thanks for your support in facilitating this shift.*

*Here's a reminder of the established procedures:*

- ● ***Consistent Referral Processes:*** *Continue directing all veterinary calls, emails, faxes, and physical prescriptions to Mixlab using the approved referral methods. This consistency helps maintain high standards of care for our veterinary customers.*

- ● ***Data Tracking:*** *All interactions forwarded to Mixlab are tagged for tracking to ensure we maintain visibility into referral volumes and success metrics.*

*Mixlab is generating quarterly reports to track all referral activity, which we'll review together. These reports allow us to gauge how well the transition is meeting our customer service goals.*

*Thank you for your continued efforts to support this transition.*

*Best,*
*[Your Name]*
*[Your Position]"*

■ **Email 3: 9-Month Follow-Up:**

*"**Subject:** 9-Month Update: Mixlab Support for Veterinary Prescriptions*

***Dear [General Manager's Name],***

*As we approach the 9-month mark, we wanted to check in regarding the transition of veterinary prescriptions to Mixlab. Our priority remains ensuring seamless support and excellent service for veterinary clients.*

*Please review the following reminders:*

- ● ***Referral Tracking:*** *Continue to forward all veterinary calls, emails, faxes, and physical prescriptions to the appropriate Mixlab contacts. Using the correct contacts helps Mixlab provide efficient and reliable service.*

3

- *Quarterly Reports: Mixlab's quarterly reports provide insight into the volume and effectiveness of our veterinary referrals, helping us confirm our goals are being met.*

*Thank you for your continued dedication to supporting this process for our veterinary customers. We're on track to complete the first year of this transition, and we'll reach out again at the 12-month mark.*

*Best,*
*[Your Name]*
*[Your Position]"*

- **Email 4: 12-Month Follow-Up:**

*"Subject: 12-Month Review: Veterinary Referrals Transition to Mixlab*

*Hello [General Manager's Name],*

*It's been a full year since SBH made the strategic decision to focus exclusively on human wellness, selecting Mixlab to support our veterinary customers. Thanks to your efforts, this transition has been successful, ensuring pets and their families continue receiving the quality care they depend on.*

*As a final reminder:*

- *Referral Compliance: Please continue to refer veterinary calls, emails, faxes, and physical prescriptions to Mixlab according to the established guidelines.*

- *Final Quarterly Report: Mixlab's upcoming report will summarize a full year of referral data, offering valuable insights into the impact of this transition and any improvements for the future.*

*Thank you again for playing an essential role in the success of this plan. We appreciate your commitment to ensuring our veterinary customers receive the best possible service.*

*Best,*
*[Your Name]*
*[Your Position]"*

- **Staff Presentation:**
  - Vinnie will conduct an in-person presentation for the SBH team, detailing the referral plan and the steps for referring customers to Mixlab. Mixlab will provide lunch for the SBH team during this presentation.

    - This presentation will be prepared by Mixlab and approved by OptioRx.

# Inbound Requests from Veterinary Clients

## Phone Referrals

- **Centralized Mixlab Referral Phone Number:**
  - All veterinary-related calls from OptioRx locations will be forwarded to a dedicated Mixlab referral phone number. This centralized approach enables tracking and consistent handling of referrals across all OptioRx locations.

- **SBH IVR Pre-Message Flow:**
  - **At SBH:**
    - The SBH/OptioRx team will direct veterinary prescription inquiries through a dedicated option in their phone tree.

    - When a caller selects the veterinary option, the call will be forwarded to Mixlab's dedicated referral phone number 1 (347) 308-5760.

    - Upon reaching Mixlab's IVR system, the call will route into a segregated queue specifically for SBH veterinary referrals, and the following message will play:

      *"Thank you for calling SBH Medical Pharmacy. SBH no longer fulfills veterinary prescriptions and has selected Mixlab, a full-service veterinary pharmacy, to ensure you continue to receive high-quality medication and service. Mixlab specializes in compounded, commercial, and over-the-counter medications for animals of all sizes and offers free next-day delivery to your doorstep. You are now being connected to Mixlab's Care team for assistance with placing your order."*

    - After this message plays, the call will be automatically forwarded to the main Mixlab IVR, where it will be handled by a Mixlab Care Team member.

  - **Other OptioRx Locations:**
    - Veterinary-related calls from all other OptioRx locations will be forwarded directly to the Mixlab main phone number 1 (888) 901-4480.

    - Once routed into Mixlab's main queue, the call will be directed to Mixlab's Care team for support.

- **Call Tagging in Kustomer:**
  - Every incoming veterinary referral call received through the Mixlab referral phone number will be tagged as "#optiorxvetph" in Kustomer. This tagging will enable effective tracking, reporting, and auditing for OptioRx veterinary referrals, providing data on referral call volume and quality.

5

## Email Referrals

- **Forwarded Emails:**
  - All emails related to veterinary prescriptions should be forwarded to the designated Mixlab referral inbox at optiorxvet@mixlab.com.

    - optiorxvet@mixlab.com will be configured as a group inbox. The recipients will be [hello@mixlab.com](hello@mixlab.com) and [ben@mixlab.com](ben@mixlab.com).

  - **Auto-Responder:** Mixlab will set up an auto-responder to inform customers that OptioRx and its affiliates are no longer fulfilling veterinary prescriptions and that Mixlab is the chosen veterinary pharmacy partner. The auto-responder will read as follows -

    *"Subject: Important Update on Your Veterinary Prescriptions*

    *Dear [Valued Customer],*

    *SBH Medical Pharmacy no longer fulfills veterinary prescriptions. To ensure you continue to receive high-quality medication and service, we have selected **Mixlab**, a trusted veterinary pharmacy, to support your needs with free next-day delivery to your doorstep.*

    *A member of Mixlab's Care team will respond to your email shortly. In the meantime, if you have any questions or to place an order, please feel free to text or call us directly at (888) 901-4480.*

    *Thank you for trusting us with your pet's health. We look forward to supporting your veterinary care needs.*

    *Warm regards,*

    *The Mixlab Team"*

- **Email Tagging in Kustomer:**
  - Every incoming veterinary referral call received through the Mixlab referral email optiorxvet@mixlab.com will be tagged as "#optiorxvetemail" in Kustomer. This tagging will enable effective tracking, reporting, and auditing for OptioRx veterinary referrals, providing data on referral emails.

## Fax Referrals

- **Forwarding Faxes:**
  - Veterinary prescription faxes will be transferred/forwarded to Mixlab's fax number 1 (614) 633-3338 or sent to optiorxvet@mixlab.com, where Mixlab will handle order processing. These faxes will be tagged with "#optiorxvetfax" in Kustomer.

## Website Referrals

- **SBH Veterinary Compounding Page Redirect:**
  - SBH will keep "Veterinary Compounding" under the "Services" navigation on their website and implement a 301 redirect for their veterinary compounding page at https://sbhmed.com/veterinary-compounding/ for a period of 12 months to a Mixlab-hosted landing page [HubSpot URL]. The redirected URL will include a HubSpot tracking link to monitor traffic and engagement from former SBH customers.

- **Mixlab Landing Page Content:**
  - The Mixlab landing page will provide a detailed explanation of the transition from SBH to Mixlab for veterinary prescriptions, consistent with the messaging used in the IVR and email templates.

  - **Content Overview:**

    - **Transition Explanation:** Outline SBH's decision to focus on human health and wellness, leading to the transition of veterinary prescription services to Mixlab.

    - **Rationale for Selection:** Explain that SBH chose Mixlab due to shared values of quality, speed, and reliability in veterinary care.

    - **Setup Process:** Provide instructions for setting up a new account with Mixlab, including contact details and a link to register online.

  - **Copy and Design:**
    https://info.mixlab.com/sbh?hs_preview=PVXbMxer-182408085381

- **HubSpot Tracking and Metrics:**
  - Each CTA on the Mixlab landing page will be linked to a specific HubSpot tracking URL. These URLs will allow Mixlab to track each SBH referral's journey from referral to customer, providing metrics on conversion rates sourced from the SBH redirect.

## Physical Prescriptions

- **Non-Controlled Substances:**

  - **Scanning and Emailing:**

    - All physical (non-controlled) veterinary prescriptions received by OptioRx/SBH will be scanned and emailed to the Mixlab referral email address, optiorxvet@mixlab.com, for processing.

7

- Digital prescriptions (non-controlled) will also be forwarded directly to optiorxvet@mixlab.com.

- **Tracking:** Each forwarded prescription will be tagged in Mixlab's system (e.g., "#optiorxvetscript") for tracking, reporting, and auditing. This tagging enables Mixlab to monitor the volume and details of prescriptions forwarded by OptioRx/SBH, ensuring clear reporting metrics for referrals.

- **New Prescriptions for Controlled Substances (Schedules II-V):**

  - **CIII - IV Prescriptions:**

    - A patient may request that a prescription for a controlled substance (Schedules III-V) be forwarded to Mixlab via fax 1 (614) 633-3338 or verbal/phone 1 (347) 308-5760

    - **Tracking:** For transferred controlled substances, each transfer will be logged in Mixlab's system with the same "#optiorxvetscript" tag and include tracking details for compliance and auditing purposes.

  - **CII Paper Prescriptions for Controlled Substances:**

    - **Direct Patient Handling:** If a CII paper prescription is initially received by SBH Medical pharmacy, but will be filled by Mixlab, SBH team will fax to 1 (614) 633-3338 or email scanned hard copy to Mixlab at optiorxvet@mixlab.com. The Mixlab team will review the hardcopy prescription to ensure it meets compliance standards, then provide the SBH team with approval to use the provided prepaid envelopes to mail the prescription.

    - **Tracking:** Paper prescriptions for Schedule II medications brought in by patients and received from SBH Medical will be manually entered into Mixlab's dispensing system. They will be tagged with "#optiorxvetscript" and linked to the customer's record for tracking.

  - **Refills:**

    - **Authorized Refills:** Any refills authorized by the prescriber on a Schedule III, IV, or V prescription will be transferred along with the original prescription details as part of the initial file transition to Mixlab.

    - **Tracking:** Each refill transfer will be recorded in Mixlab's system under "#optiorxvetscript" to ensure transparency and accurate metrics on referral-based refills.

8

# Tracking and Reporting

## Tracking Referrals

- **Data Aggregation and Tracking:**
  - Mixlab will track each referral through specific tagging and logging protocols within its systems:

    - **Phone Referrals:** Calls received via the centralized Mixlab referral phone number 1 (347) 308-5760 will be tagged with "#optiorxvetph" in Kustomer.

    - **Email Referrals:** Non-controlled and controlled prescriptions forwarded to optiorxvet@mixlab.com will be tagged in Kustomer with "#optiorxvetemail" for easy identification and tracking.

    - **Fax Referrals:** All veterinary-related faxes should be sent to 1 (614) 633-3338 or forwarded to optiorxvet@mixlab.com if in digital format. These faxes will be tagged with "#optiorxvetfax" in Kustomer, allowing for comprehensive tracking, reporting, and auditing of fax referrals, and providing visibility into fax-based referrals.

    - **Website Referrals:** All web-based inquiries from the Mixlab landing page (redirected from SBH) will be tracked through HubSpot Tracking URLs HubSpot URL and tagged within the account's profile in Mixlab's HubSpot instance.  This data will also be included in the Metabase report for review and auditing purposes

    - **Physical Prescriptions:** Non-controlled physical prescriptions and controlled prescription transfers will be similarly tagged  using "#optiorxvetscript" and logged to ensure all records are accounted for.

## Reporting

- **Custom Reporting in Metabase:**
  - Mixlab will aggregate all referral data into a custom report built in Metabase. This report will serve as a centralized dashboard to monitor compliance with the referral plan requirements, including referral volumes, types, sources, and outcomes.

- **Regular Reporting:**
  - **Quarterly Reports:** For the first 12 months post-close, Mixlab will generate quarterly reports based on this aggregated data to provide to OptioRx/SBH. These reports will include referral counts, conversion metrics, and compliance insights, offering OptioRx/SBH a detailed view for verification against their own data.

# Auditing and Compliance

## Audit Process

- **Audit Frequency:**
  - OptioRx/SBH Medical Pharmacy will conduct quarterly audits during the first year post-transition to ensure adherence to referral protocols and accuracy in reporting.

- **Audit Capabilities:**
  - Dispensing reports will be reviewed quarterly. The Net Sales Volume of any veterinary prescriptions filled by OptioRx post-close will be deducted dollar-for-dollar from the Earn Out Sales Volume.

  - Dispensing reports will be provided in the same form as the Closing Sales Statement.