IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Optio Rx, LLC, *et al.*, | Case No. 24-11188 (TMH) |
| Debtors.[1] | (Jointly Administered) |

**CERTAIN SELLER NOTEHOLDERS RESPONSE TO AD HOC GROUP OF MEZZ LENDERS' NOTICE OF STATEMENT OF CLAIM**

Baybridge Pharmacy Corp., 121 Central Pharmacy Corp., and Delco Pharmacy Corp. and PIA Holdings, Inc. (the "Respondents") by and through their undersigned counsel, respond to the Ad Hoc Group of Mezz Lenders' Notice of Statement of Claim filed by the Ad Hoc Group of Mezz Lenders ("Aves") and respectfully state as follows:

*Introduction*

1. Aves is attempting to enforce its perceived subordination rights against the Respondents to redirect their portion of a $275,000 pot of money negotiated by the Unsecured Creditors Committee to provide some recovery to a series of "seller noteholders" that originally sold their business to the Debtors and are still owed millions of dollars in notes that will never be repaid. Without the Committee's settlement, the Respondents would have received nothing on

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: (1) Optio Rx, LLC (8436); (2) Braun Pharma, LLC (6643); (3) Dr. Ike's PharmaCare LLC (2237); (4) Rose Pharmacy SA LLC (5738); (5) Rose Pharmacy SF LLC (1438); (6) Rose Pharmacy RM LLC (4205); (7) Pet Apothecary LLC (4315); (8) Crestview Holdings, LLC (1907); (9) SBH Medical LLC (3260); (10) H&H Pharmacy LLC (6793); (11) Enovex Pharmacy LLC (0693); (12) SMC Pharmacy LLC (5428); (13) SMC Lyons Holdings LLC (5441); (14) Baybridge Pharmacy, LLC (5518); (15) Central Pharmacy, LLC (6195); (16) Pro Pharmacy, LLC (6299); (17) Healthy Choice Compounding LLC (8770); (18) Healthy Choice Compounding LLC (1745); (19) Oakdell Compounding Pharmacy LLC (7537); (20) The Pet Apothecary LLC (6074); (21) Crestview Pharmacy, LLC (8091); (22) SBH Medical, Ltd. (3230); (23) Concierge Pharmacy LLC (5410); (24) Firstcare Pharmacy LLC (1203); (25) Easycare Pharmacy LLC (9408); (26) Primecare Pharmacy LLC (7645); and (27) HCP Pharmacy LLC (5216). The address of the Debtors' corporate headquarters is 3701 Commercial Avenue, Suite 14, Northbrook, Illinois 60062.

1

account of more than $20 million in claims. Based upon a review of the disclosure statement and confirmed plan, seller noteholders, like each of the Respondents, will now receive approximately 0.9% of the millions they are owed by the Debtors. Now, to add insult to injury, Aves wants to redirect that tiny recovery.

2. The Respondents, however, are not subordinate to the Aves' claim because any recovery the Respondents receive from this bankruptcy will come from secured creditors and the committee's professionals through a gift. Since the Debtors' assets are not being paid to the Respondents, Aves has no right to intercept that recovery. Furthermore, the subordination rights require an active default by the Debtors. The confirmed and effective plan cured each of the default, released the Debtors from liability, and canceled the debt instruments.

3. Finally, Aves removed itself from the Unsecured Creditors Committee and struck its own deal with the Debtors, voluntarily, and then supported the Debtors' plan. Principles of equity dictate that Aves should not be allowed to then attack the Respondents after waiving their rights to pursue the Debtors or hold out for a better deal.

4. This Court should rule that Aves alleged subordination rights are not applicable and find that the Respondents are entitled to the relief set forth in the Plan.

## *Factual Background*

5. The Respondents are each former owners of pharmacies that sold their business to the Debtors in exchange for notes issued from the Debtors back to the sellers. When the Respondents sold their businesses, they took back two notes memorialized by Amended and Restated Promissory Notes. The first note involved sales from Baybridge Pharmacy Corp., 121 Central Pharmacy Corp., and Delco Pharmacy Corp. that sold their businesses to Baybridge Pharmacy, LLC, Central Pharmacy, LLC and Pro Pharmacy, LLC. Similarly, the seller note to

PIA Holdings, Inc. was issued when PIA Holdings, Inc. sold its business to Healthy Choice Compounding, LLC.

6. The Respondents filed proofs of claim as follows: Baybridge Pharmacy Corp. -- $16,318,400.00,[2] 121 Central Pharmacy Corp. -- $2,331,220.00,[3] Delco Pharmacy Corp. -- $4,662,400.[4] PIA Holdings, Inc.'s claim was scheduled by the Debtors at $2,691,387.21.[5]

7. The Second Amended Joint Chapter 11 Plan of Reorganization of Optio Rx, LLC *et al* (the "Plan") was confirmed on October 17, 2024 [D.I. 484] and went effective on March 21, 2025 [D.I. 797].

8. Between the First Amended Joint Chapter 11 Plan of Reorganization and the operative Plan, the Unsecured Creditors' Committee negotiated what became known as the UCC Settlement Agreement that was incorporated into the Plan. The UCC Settlement Agreement stated that the Prepetition Admin Agent, the DIP Agent, and the Committee Professionals (the "Gifting Parties") would contribute funds as a gift to Class 6 and Class 8 creditors under the Plan the "Settlement Amount" as described below.

9. On June 29, 2024, Aves and the Debtors entered into a Settlement Term Sheet that was later referred to in the Plan as the "Aves Settlement Agreement." That agreement stated that Aves was to receive the following benefit from the Debtors in exchange for its support in confirmation of a plan of reorganization and opting into third party releases; (i) $350,000 (subject to the DIP Lender Clawback described in the Aves Settlement Agreement and the Plan); (ii) 1.5% of the common equity in New Parent at Emergence; and (iii) $3,000,000 (subject to the

---

[2] Proof of Claims numbered 84 and 91.
[3] Proof of Claims numbered 104 and 122.
[4] Proof of Claims numbered 95 and 99.
[5] Proof of Claim scheduled number 2649403.

3

DIP Lender Clawback) in aggregate liquidation preference of junior preferred equity of New Parent. [DI 258 at Ex. E].

10. Pursuant to Section 4.10 of the Plan, Aves was permitted to file a statement of claim within 14 days of the Effective Date, which it did timely on March 25, 2025 (the "Statement'). Aves seeks to intercept the paltry distribution afforded to the Respondents after Aves agreed to its own distribution in a negotiated deal with the Debtors.

## *Argument*

11. The Amended and Restated Promissory Note between Baybridge Pharmacy Corp., Central Pharmacy Corp. and Delco Pharmacy Corp.[6] allegedly subordinates certain payments to be received by the Respondents below the rights of Aves and other senior debtholders pursuant to Section 8(d) and 8(c) of the Seller Note. Aves moves primarily under Section 8(d) of the Seller Note.

12. Section 8(d) of the Seller Note is triggered **"[u]pon any distribution by Buyer Parties** of assets of any kind or character, whether in cash, property or securities to creditors upon any dissolution, winding up, liquidation, or reorganization of the Buyer Parties, whether in a voluntary or involuntary bankruptcy, insolvency or receivership proceeding or upon any assignment for the benefit of creditors or otherwise or any marshalling of assets and liabilities of the Buyer Parties"[7] Seller Note at § 8(d)(emphasis added). Section 8(d) is not triggered because there is no payment to Class 8, the class holding the Respondents' claims, by any of the Buyer Parties or any other Debtors. Class 8 creditors such as the Respondents are not receiving any

---

[6] As was the case in the Statement, this response will focus on the Baybridge Seller Note as a specimen. The Seller Note related to PIA Holdings, LLC is substantially similar for all purposes.

[7] The Buyer Parties in the Baybridge Seller Note are Baybridge Pharmacy, LLC, Central Pharmacy, LLC and Pro Pharmacy LLC each a debtor in these cases.

4

payment from the Debtors but rather receiving a gift from the Gifting Parties. The Plan states as follows when describing the treatment to Class 8:

> On the Effective Date, all Seller Notes Claims shall receive, by virtue of the **gift funding** the UCC Settlement Amount under the UCC Settlement Agreement, their respective pro rata share of the UCC Settlement Amount among the Holders of the of Allowed Claims treated under Classes 6 and 8 of the Plan.

Plan ¶ 3.04(h)(emphasis added). The UCC Settlement Agreement is defined in the Plan as follows:

> "UCC Settlement Agreement" means the settlement amount the Debtors, the Committee, the Prepetition Admin Agent and the DIP Agent resolving all Challenges, whether or not alleged by the Committee or any other party, to the Prepetition Lien Claims and Prepetition Liens and the DIP Lien Claim and DIP Liens, against the Prepetition Admin Agent and the Prepetition Secured Lenders, and against the DIP Agent and the DIP Lenders, and each of the respective Related Parties, in consideration **for funding a gift by the Prepetition Admin Agent, the DIP Agent, and the Committee Professionals from their collateral or Professional Fee Claim,** as applicable, on the Effective Date of the UCC Settlement Amount, comprising the sum of (x) 10% of the Committee's Professional Fee Claims shall be paid or otherwise contributed by or on behalf of the Committee Professionals into the UCC Settlement Amount plus (y) up to $125,000 for the ratable benefit of Holders of Allowed Claims in Classes 6 and 8 to be distributed on a pro rata basis, and pursuant to which the Committee shall not object to but shall support confirmation of the Plan. Further, the UCC Settlement Agreement on and following the Effective Date permits the Committee, at its election and sole expense, to seek to establish a trust to reconcile Unsecured Claims and make Distributions to Holders of Allowed Claims in Classes 6 and 8 under the Plan, but not to pursue any Retained Causes of Action or any Causes of Action or Claims released under the Plan.

*Id*. at pp 15-16 (unnumbered paragraph)(emphasis added).

13.     Since the payments to be made to Class 8 Claimants, such as the Respondents, will come from the Gifting Parties and not the Debtors, Section 8(d) of the Seller Note is never triggered as it requires "distribution by Buyer Parties of assets of any kind or character.

14.     The Committee, through the UCC Settlement Agreement, agreed to give up a portion of its professional fee claim and its ability to challenge the secured creditors prepetition

liens in order for Classes 6 and 8 to receive a distribution under the Plan. Aves resigned its position on the Committee and entered into its own agreement with the Debtors, as memorialized by Class 7 of the Plan. Aves should not be permitted to stand in the shoes of the Class 8 Creditors when it voted in favor of the Plan and agreed to its terms.

15. Paragraph 8(d) of the Seller Note has three distinct clauses that each lead to the conclusion that Aves has no subordination rights under the Seller Notes. Each is discussed below.

16. Paragraph 8(d)(i) states:

> The Administrative Agents and the Lenders shall first receive payment in full in cash of all Senior Debtor (or have such payments duly provided for in a manner satisfactory to the Administrative Agents and the Lenders) **before the Seller is entitled to receive any Subordinated Payment** on account of or accrued in connection with any Subordinated Debt.

*Id*. at ¶ 8(d)(i) (emphasis added). This paragraph therefore creates a prohibition against the receipt of a "Subordinated Payment." The term "Subordinated Payment" is defined in the Seller Notes by reference to Paragraph 8(c)(2) through Paragraph 8(a) as:

> (ii) If any default or event of default exists with respect to any of the Senior Debtor or would be caused by any payment on or with respect to the Subordinated Debt, the Seller **shall not be entitled to receive any payment, either directly or indirectly, by or on behalf of the Buyer Parties**, in cash, property, or securities (1) on account of the principal of, and interest (including post-petition interest) on, the Subordinated Debt at any time outstanding, or other fee, costs, expenses and other amounts accrued, incurred, or otherwise due in respect of the Subordinated Debt or (2) to prepay, purchase, redeem, retire, exchange, defease or otherwise acquire the Subordinated Debt or this Note for cash or property (collectively the "Subordinated Payments") **until such default or event of default is cured or waived to the satisfaction of the applicable Lenders** in accordance with the terms of the applicable Debt Documents or the Lenders have received satisfactory evidence that such payment shall not cause a default or event of default with respect to any of the Senior Debt.

*Id*. at ¶ 8(c)(2) (emphasis added).

17. Aves has no entitlement to intercept the Respondents' distributions pursuant to paragraph 8(d)(i) because Respondents are not receiving any Subordinated Payment, as that term

is defined under the Seller Note. To be a "Subordinated Payment" as defined in above, two elements must be met. First, the payment must come by, or on behalf of the "Buyer Parties" (Debtors), and second, the default or event of default must have been cured or waived to the satisfaction of the applicable Lenders (Aves).

18. As stated above, any payment to the Respondents is coming from the Gifting Parties and not the Debtors; therefore, the first prong of Paragraph 8(d)(i) fails.[8]

19. Second, Aves agreed to waive its default against the Debtors when it entered into the "Aves Settlement Agreement" referenced in page 2 of the Plan. The Aves Settlement Agreement was executed on June 29, 2024 and provided valuable consideration to Aves in exchange for its affirmative vote on the Plan, which expressly incorporates the Aves Settlement Agreement. The Aves Settlement Agreement constitutes Aves' waiver of the Debtors' default and extinguishes any entitlement to the Respondents' distribution under Paragraph 8(d)(i).

20. Even if Aves did not waive the Debtors' default, the terms of the Plan operate to release Aves' claim against the Debtors and render such claim satisfied. Section 7.01 of the Plan provides that the Plan provides a good faith resolution of Aves' claims against the Debtors. Section 7.03 states that the Debtor "is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party [which includes Aves] from any and all Causes of Action . . . based on or related to, or in any manner arising from, in whole or in part, any of the Debtors[.]" Plan ¶ 7.03. Section 7.04 states that Aves' claims against the Debtors are discharged. Even if Aves did not release the subordination rights, the Seller Note requires the claim between Aves and the Debtors to be an enforceable claim in order for the subordination rights to be enforceable. As of the Effective

---

[8] Similarly, since Paragraph 8(c) is dependent upon a "Subordinated Payment," Aves has no right to receive anything from the Respondents pursuant to Paragraph 8(c).

Date, the Debtor was no longer in default to Aves and Aves was not able to enforce any default. This renders Aves' alleged subordination rights ineffective.

21. Paragraph 8(d)(ii)'s analysis is identical to Paragraph 8(d)(i). That provision states:

> Any payment or distribution **of assets of the Buyer Parties** of any kind or character, whether in cash, property or securities to which the Seller would be entitled except for the provisions of this Section 8 shall be paid by the Buyer Parties, the liquidating trustee or other person making such a payment or distribution, directly to, **until the termination of, and the satisfaction in full of all obligations under, the Senior Secured Loan Agreement, the Administrative Agent under the Senior Secured Loan Agreement, and thereafter, to the Administrative Agent under the Mezzanine Debt Agreement**, for application to the Senior Debt in accordance with the terms of any applicable intercreditor agreements between the Administrative Agents to the extent necessary to make payment in full of all Senior Debt remaining unpaid.

Seller Note, ¶ 8(d)(ii) (emphasis added).

22. Although cast slightly differently, the same analysis applies as it did to Paragraph 8(d)(i).

23. The final section of Paragraph 8 warrants the same conclusion sections (i) and (ii). It states:

> In the event that, notwithstanding the foregoing, any payment or distribution of assets of the Buyer Parties of any kind or character, whether in cash, property, or securities, shall be received by the Seller on account of, or accrued or incurred in connection with, any Subordinated Debt before all Senior Debt is paid in full in cash, then such payment or distribution shall be received and held in trust for the benefit of and shall be promptly paid over to, until the termination of, and the satisfaction in full of all obligations under, the Senior Secured Loan agreement, the Administrative Agent under the Mezzanine Debt Agreement, for applications to the Senior Debt in accordance with the terms of any applicable intercreditor agreements between the Administrative Agents until all Senior Debt shall be paid in full. **For the avoidance of doubt, the foregoing only applies upon distribution by the Buyer Parties of assets of any kind or character, whether in cash, property, or securities, to creditors upon any dissolution, winding up, liquidation or reorganization of the Buyer Parties**, whether in a voluntary or involuntary bankruptcy, insolvency or receivership proceedings or upon

      any assignment for the benefit of creditors or otherwise or any marshalling of assets and liabilities of the Buyer Parties.

Seller Note, ¶ 8(d)(iii) (emphasis added).

24. Section (iii) has the same flaws as the previous sections and is equally unenforceable.

### *Conclusion*

Since the Respondents are not being paid by the Debtors and the Aves debt is no longer in default, this Court should rule that the Seller Notes do not require any subordination of the meager recovery the Respondents will receive in this due to the Committee's efforts to secure some recovery.

Dated: April 8, 2025                                          **FLASTER/GREENBERG, P.C.**

                                                            */s/ Damien Nicholas Tancredi*
                                                            Damien Nicholas Tancredi (DE No. 5395)
                                                            221 W. 10th Street, Fourth Floor
                                                            Wilmington, DE 19801
                                                            (215) 587-5675
                                                            damien.tancredi@flastergreenberg.com